UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| The Eshe Fund, Individually and on behalf of All Those Similarly Situated,<br><br>                                    Plaintiff,<br><br>        -against-<br><br>Fifth Third Bancorp; Kevin T. Kabat; Citigroup Global Markets Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co. Incorporated; UBS Securities LLC.; Banc of America Securities LLC; and Credit Suisse Securities (USA) LLC,<br><br>                                    Defendants. | Case No. 1:08-cv-421<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, individually and on behalf of all other persons similarly situated by its undersigned attorneys, makes the following allegations on information and belief based upon the investigation of counsel, except as to the allegations pertaining specifically to plaintiff and plaintiff's counsel which are based on personal knowledge.  The investigation conducted by plaintiff's counsel included, *inter alia*, a review and analysis of: (i) publicly-available news articles and reports; (ii) public filings including, but not limited to, Fifth Third Bancorp's (hereinafter "FITB" or the "Company") Securities and Exchange Commission ("SEC") filings and prospectuses; (iii) securities analysts' reports and advisories about the Company; and (iv) press releases issued by Defendants.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.     This is a class action on behalf of a class of all persons and entities who purchased in the open market FITB securities, including but not limited to, purchasers of the Company's common stock, preferred stock including all Trust Preferred Securities (defined below), purchasers of call options and sellers of put options, during the period from October 19, 2007 through June 17, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5 (the "Class").

2.     This action is also brought on behalf of a sub-class (the "Sub-Class") of Class members who purchased $750,000,000 (in aggregate liquidation amount) of 7.25% Trust Preferred Securities, liquidation amount $25 per security, which were registered pursuant to an automatic shelf registration statement on Form S-3 (SEC File Nos. 333-141560 and 333-141560-03) filed with the Securities and Exchange Commission on March 26, 2007, (the "Trust Preferred Securities"), the sale of which to investors was in an initial public offering, which became effective on or about October 25, 2007, Fifth Third Capital Trust VI (the "Offering"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77l. The Securities Act imposes liability on a company's directors, officers and underwriters, among others, for failure to issue a registration statement and prospectus that fully and accurately informs investors of all material facts, including but not limited to material facts concerning industry trends affecting the issuer company. The issuer itself is held strictly liable for any material misstatements or omissions found in its prospectus.

3.     This Complaint asserts that during the Class Period, FITB issued materially false and misleading statements concerning the quality of the Company's Tier 1 capital, the relevant ratios and sufficiency of its Tier 1 capital, the necessity to take net charge-offs stemming from

increasing credit losses, and the need to shore up capital due to the Company's exposure to poorly performing real estate markets in the Mid-West region.

4.     This Complaint further alleges that Trust Preferred Securities were sold to the investing public in the Offering pursuant to a Prospectus (defined below) that, negligently, omitted material information.  The statements made in the Company's Prospectus contained material omissions because, at the time of the Offering, FITB was already suffering from several adverse factors that were not revealed and/or adequately addressed in the document.  These factors include, but are not limited to, failure to disclose the Company's exposure to the down market in light of the growing credit crisis, the increase in its non-performing loans and deterioration in its Tier I assets, as well as negligently failing to fully detail negative downward trends observed by the Company, that were not temporary, but were to be long-lived.

5.     Defendant Kevin T. Kabat, the Company's president and chief executive officer, and FITB's underwriters could have – and should have – discovered the material misstatements and omissions in the Company's Prospectus prior to its filing with the SEC and distribution to the investing public.  They, instead, failed to do so as a result of a negligent and grossly inadequate due diligence investigation.

6.     Certain of the adverse factors affecting FITB's business were first revealed on June 18, 2008, before the market opened.  At that time, the Company issued a press release stating that it was forced to cut its quarterly dividend by 66.0%, to 15 cents from 44 cents a share, and had to sell non-core businesses for at least $1.0 billion in extra capital. The Company also stated it planned to raise $1.0 billion through an offering of convertible preferred shares, which would prove dilutive to common shareholders.

7.     The Company further stated that earnings would be reduced by a provision

expense expected to be between $350.0 million and $375.0 million greater than net charge-offs for the second quarter. "Our bottom line results won't meet our expectations. We are not satisfied with these results and know that they are as disappointing to investors as well," the Company said.

8.      The Company also revised its capital targets to an 8.0% to 9.0% range for its Tier 1 capital ratio and projected a second-quarter Tier 1 capital ratio of 8.5%, which includes the impact of its First Charter acquisition and related accounting adjustments. The projection did not, however, include a possible reduction of 20 basis points from charges on earnings related to leveraged leases in the second quarter.

9.      The Company now expects 2008's ratio of reserves to loans and leases to exceed 2.0% and anticipates an even higher ratio in 2009.

10.     "We currently expect 2009 net charge-offs to be higher than 2008 levels and provision expense to continue to exceed charge-offs, resulting in continued growth in our loan loss reserves," the Company said.

11.     These disclosures caused the Company's common stock to decline 27%, to close on June 18, 2008 at $9.26 per share on very heavy volume.  The Company's stock had traded as high as $28 per share in February, 2008.

12.     The Trust Preferred Securities also traded sharply lower and closed at $16.35 per share, 34% below their October 2007 offering price.

13.     Plaintiff, the Class, and the Sub-Class have suffered serious financial damage as a result of Defendants' material misstatements and omissions in the Company's Prospectus and in other statements.  Accordingly, they bring this action to recover damages incurred thereby as well as the costs and expenses of this litigation and any further relief as may be just and proper.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act.

15.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16.     Venue is proper in this district pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), because the Company maintained its executive offices in this district during the relevant time period, and many of the alleged acts, transactions, and conduct constituting violations of law, including the preparation, issuance, and dissemination to the investing public of materially false and misleading information, occurred, at least in part, in this district.

17.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### Plaintiff

18.     Plaintiff, The Eshe Fund, purchased shares of FITB Trust Preferred Securities pursuant to the Prospectus on the Offering, as shown on the attached Certification, and was damaged economically thereby.

**Defendants**

19.     Defendant Fifth Third Bancorp operates as a diversified financial services holding company. The Company's Commercial Banking segment offers banking, cash management, and financial services; traditional lending and depository products and services; other services, including foreign exchange and international trade finance, derivatives and capital markets services, asset-based lending, real estate finance, public finance, commercial leasing, and syndicated finance for business, government, and professional customers. Its Branch Banking segment provides a range of deposit and loan, and lease products to individuals and corporations. Its products include checking and savings accounts, home equity loans and lines of credit, and credit cards and loans for automobile and personal financing needs. The Company's Consumer Lending segment is involved in mortgage and home equity lending activities, such as origination, retention, and servicing of mortgage and home equity loans; other indirect lending activities, which include loans to consumers through mortgage brokers, automobile dealers, and federal and private student education loans. Its Investment Advisors segment offers a range of investment alternatives for individuals, companies, and not-for-profit organizations. This segment also offers investment, trust, asset management, retirement planning, and custody services, as well as retail brokerage services to individual clients and broker dealer services to the institutional marketplace. The Fifth Third Processing Solutions segment offers electronic funds transfer, debit, credit, and merchant transaction processing services; and data processing services.

20.     As of March 18, 2008, Fifth Third Bancorp. operated 1,227 full-service banking centers, including 102 Bank Mart locations and 2,211 ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Pennsylvania, Missouri, and Georgia. The company was founded in 1862 and is headquartered in Cincinnati, Ohio.

**The Underwriter Defendants**

21.    Defendant Citigroup Global Markets Inc. ("CGMI") is a subsidiary of Citigroup Inc., a Delaware corporation that is headquartered at 399 Park Avenue, New York, New York 10043.  CGMI was an underwriter of the Offering.

22.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a subsidiary of Merrill Lynch & Co., a Delaware corporation that is headquartered at 4 World Financial Center, New York, New York 10080.   Merrill Lynch was an underwriter of the Offering.

23.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a subsidiary of Morgan Stanley, a Delaware corporation that is headquartered at 1585 Broadway, New York, New York 10036.  Morgan Stanley was an underwriter of the Offering.

24.    Defendant UBS Securities LLC. ("UBS") is a subsidiary of UBS AG, a Swiss corporation headquartered at Bahnhofstrasse 45, Zurich, Switzerland, and Aeschenvorstadt 1, Basel, Switzerland.  UBS is headquartered in Stamford, Connecticut.  UBS was an underwriter of the Offering.

25.    Defendant Banc of America Securities LLC ("BAS") is a subsidiary of Banc of America Corp, a Delaware Corporation that is headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255.  BAS was an underwriter of the Offering.

26.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a wholly-owned indirect subsidiary of Credit Suisse AG.  Credit Suisse is headquartered at 11 Madison Avenue, New York, New York  10010.

27.    Defendants CGMI, Merrill Lynch, Morgan Stanley, UBS, Wachovia, BAS and Credit Suisse are collectively referred to hereinafter as the "Underwriter Defendants."

**The Individual Defendant**

28.    Defendant Kevin T. Kabat is, and was at all times relevant hereto, the Company's Chief Executive Officer ("CEO") and/or President.

29.    All defendants are collectively referred to hereinafter as "Defendants."

## CLASS ACTION ALLEGATIONS

30.    Plaintiff brings this action as a class action pursuant to Rule 23 of Federal Rule of Civil Procedure on behalf of a Class of all persons and entities who purchased in the open market FITB securities (including but not limited to common stock, preferred stock including all Trust Preferred Securities, purchasers of call options and sellers of put options) during the Class Period.

31.    This action also is brought on behalf of the Sub-Class of Class members who purchased Trust Preferred Securities pursuant or traceable to the Company's March 26, 2007 prospectus, as supplemented on or about October 25, 2007 (together, the "Prospectus") for the Offering.

32.    The Prospectus is a part of a registration statement filed with the SEC pursuant to a "shelf" registration process. Under this shelf registration statement, the Company secured the right to sell, either separately or together, junior subordinated debt securities, subordinated debt securities, senior debt securities, warrants, preferred stock, depositary shares representing interests in preferred stock, and common stock in one or more offerings from time to time.

33.    Excluded from the Class and Sub-Class are defendants, the officers and directors of FITB, members of their immediate families and their legal representatives, heirs, successors and assigns and any entity in which defendants have or had a controlling interest.

34.    The members of the Class and Sub-Class are so numerous that joinder of all members is impracticable. Approximately 30 million shares of the Company's Trust Preferred

Securities were sold in the Offering.  There are approximately 523 million shares of common stock and 34 million shares of other trust preferred securities outstanding.

35.     The precise number of Class and Sub-Class members is unknown to plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class and Sub-Class members can be ascertained from the books and records of the Company or its transfer agent or the underwriters for the Offering.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions.

36.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and Sub-Class.  Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and to prosecute this action vigorously.

37.     Plaintiff's claims are typical of the claims of the other members of the Class and Sub-Class because plaintiff and all of the Class members' damages arise from and were caused by the same false and misleading representations/material omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class and Sub-Class.

38.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class and Sub-Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class and Sub-Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

39.     Common questions of law and fact exist as to all members of the Class and Sub-

Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class and/or Sub-Class are:

> (a)    Whether the Securities Act and Exchange Act were violated by Defendants' acts as alleged herein;
>
> (b)    Whether the Prospectus issued by Defendants to the investing public contained material misstatements and/or omitted material facts about the Company and its business;
>
> (c)    Whether documents, releases, reports, and statements disseminated by Defendants to the investing public during the Class Period contained materially false and misleading statements and misrepresented material facts about the Company's financial condition and operations;
>
> (d)    Whether each Defendant participated in the course of conduct complained of herein, and
>
> (e)    Whether plaintiff and other members of the Class and Sub-Class have sustained injury and damages and the appropriate measure of damages.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**<u>FRAUD-ON-THE-MARKET DOCTRINE</u>**

40.    With respect to the Exchange Act claims, at all relevant times, the market for FITB securities was an efficient market for the following reasons, among others:

> (a)    FITB's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;
>
> (b)    As a regulated issuer, FITB filed periodic public reports with the SEC; and

(c)     FITB regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

(d)     At the time of the commencement of this action, at least fifteen securities analysts followed FITB.

41.     As a result of the foregoing, the market for FITB's securities promptly digested current information regarding FITB from all publicly available sources and reflected such information in the price of FITB's securities.  Under these circumstances, all purchasers of FITB securities during the Class Period suffered similar injury through their purchase of FITB securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint, because the specific statements pleaded herein were neither identified as "forward-looking statements" when made, nor accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.  To the extent that the statutory safe harbor applies to any of the statements pleaded herein, Defendants are liable for those statements because at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of the Company who knew that the statement was false or misleading when made.

## SUBSTANTIVE ALLEGATIONS

43.     The Class Period begins on October 19, 2007, when the Company issued a press release and its quarterly financial supplement announcing its earnings for the third quarter of 2007.

44.     The Company reported third quarter 2007 earnings of $376 million, or $0.71 per diluted share, compared with $376 million, or $0.69 per diluted share, in the second quarter of 2007 and $377 million, or $0.68 per diluted share, for the same period in 2006.

45.     Defendant Kabat stated that "[t]hird quarter results were solid in a quarter that saw significant market disruption. While we weren't completely immune from that disruption, we were spared most of its effects." He also reported that "[r]evenue growth of two percent sequentially and seven percent from a year ago was impressive, given the market, with strength in both net interest income and fee income."

46.     He stated that "[e]xpenses were also well controlled during the quarter. Credit continues to be a challenge and we are actively managing our risks as the cycle progresses. We continue to expect further deterioration in credit trends for the near future but the deterioration to remain manageable. Overall, we were pleased with our results given the macro environment in this kind of quarter and continue to execute our strategic plans."

47.     The statements contained in the press release were false and misleading. Mr. Kabat failed to disclose that the Company's operating expenses were actually increasing at a dangerously swift pace and the Company was suffering under the weight of higher loan loss provisions stemming from deterioration in credit quality.

48.     The Company was also experiencing greater net charge-offs and had failed to sufficiently raise loan loss provisions to an adequate level.

49.     On or about October 25, 2007, the Company's Prospectus for the $750 million Offering of Fifth Third Capital Trust VI became effective.

50.     Each Trust Preferred Security represented an undivided beneficial interest in an underlying trust and the only assets of the trust will be the $750,000,000 in aggregate principal amount of the 7.25% Junior Subordinated Notes due 2067. The Company owns all of the common securities of the trust.

51.     The Prospectus, however, negligently omitted material information concerning: (a) the Company's exposure to certain poorly performing real estate markets, including Florida, Ohio, and Michigan, and the extent to which this exposure was materially increasing; (b) the Company's growing exposure to late payments and defaults on mortgages and other non-performing loans, and the extent to which this exposure was materially increasing; (c) the extent of the decline in the quality of the Company's Tier 1 capital base; (d) the deteriorating credit trends and increasing expenses, including negative trends, in the Company's consumer loan portfolio, including the extent of the increase in late payments and defaults; (e) the negative trends in the Company's home equity and commercial construction loans, and the extent to which there was a decrease in the value of the underlying assets and an increase in late payments and defaults, and (f) the deterioration in the credit quality of its loans.

52.     On January 22, 2008, the Company issued its fourth quarter and year-end earnings for 2007.  The press release detailed the results as follows:

> 2007 earnings of $1.1 billion, or $2.03 per diluted share, compared with $1.2 billion, or $2.13 per diluted share in 2006. Reported fourth quarter 2007 earnings were $38 million, or $0.07 per diluted share, compared with $325 million, or $0.61 per diluted share in the third quarter of 2007 and $66 million, or $0.12 per diluted share, for the same period in 2006. Reported results included a non-cash estimated charge of $155 million, both pre-tax and after-tax, or $0.29 per share, to lower the current cash surrender value of

one of our Bank-Owned Life Insurance ("BOLI") policies. Additionally, quarterly results included a non- cash charge of $94 million pre-tax, or $0.12 per share after-tax, related to Visa members' indemnification of estimated future litigation settlements, as well as $8 million pre-tax, or $0.01 per share after-tax, in acquisition- related costs primarily associated with the acquisition of R-G Crown, which closed in early November.

53.     Defendant Kabat commented on the results and, though stating that the credit markets were under stress, the Company was performing well overall:

> Obviously, this has been a difficult quarter for the banking industry.  Like others, we saw a fairly marked turn in credit performance during the quarter. And, while we have not had any significant market-related losses on structured securities, loans, or funds we manage for others, one of our BOLI insurance policies was invested in assets that experienced significant market declines due to widening credit spreads, which negatively impacted our reported results. Operating results continue to be relatively strong, in terms of loan and core deposit growth, net interest income growth, and noninterest income growth. However, the credit environment remains challenging, and we expect credit conditions and the performance of our loan portfolio to continue to deteriorate in the near term. This led to an increase in our loan loss reserves in the fourth quarter and, given current trends, we would expect that to continue in the near-term. We have been actively working over the past year to take steps to address areas of concern. These areas include home equity loans and, more generally, real estate loans, particularly in the upper Midwest and Florida.
>
> As a lending institution, we know we will experience credit cycles and we expect them. It is our responsibility to ensure that we are prepared for them and that we have the balance sheet strength and earnings power to manage through them. Fortunately, Fifth Third is well-positioned on both counts, and we intend to continue to focus on executing on our strategic plans and capitalizing on opportunities presented by this environment.

54.     The statements detailed above were false and misleading for several reasons.  The Company and Mr. Kabat failed to disclose that Non-Performing Assets (those no longer paying interest) were increasing at a dangerous rate.  And while Mr. Kabat stated the loan portfolio was under pressure, it was actually in need of a major capital infusion.  Moreover, while positive

14

revenue momentum continued, the Company failed to disclose increasing negative trends in loan-loss provisions.  Further, there was a steady acceleration in non-performing assets that defendants knew would continue into the immediate future.

55.     On April 22, 2008, the Company issued first quarter 2008 earnings of $292 million, or $0.55 per diluted share, compared with $16 million, or $0.03 per diluted share in the fourth quarter of 2007 and $359 million, or $0.65 per diluted share, for the same period in 2007.

56.     Commenting on the results, Defendant Kabat stated as follows:

> This quarter we produced excellent loan and deposit growth that drove impressive performance in net interest income and continued strong fee growth from our businesses," said Kevin T. Kabat, President and CEO of Fifth Third Bancorp. "However, strong operating performance continues to be offset by higher credit costs, primarily reflecting further deterioration of residential real estate, homebuilder and residential development loans. Nonperforming asset growth and higher loan losses reflect a weaker economic environment and continue to be disproportionately experienced in Florida and Michigan. Based on these developments, we significantly increased our allowance for loan and lease losses during the quarter.
>
> We remain very active in taking steps to address the issues we and the industry are facing, and to work with borrowers to address difficulties they are experiencing. We expect credit conditions to continue to deteriorate in the near term, and to experience higher nonperforming assets and credit losses during this period.
>
> Although every credit cycle differs, we expect them to occur. We take seriously our responsibility to provide credit to our customers, to lend prudently, and to maintain the capital necessary to manage through these cycles. This is an unusually difficult cycle, but we believe Fifth Third is well-positioned relative to many of its peers. We expect to continue to post strong operating results, to execute on our strategic plans, and to capitalize on the opportunities that are created by an environment such as this.

57.     The Company's statements and Mr. Kabat's comments were false and misleading. While the results were better than analysts expected – sending the stock up eight percent – they failed to detail that the ever-increasing provisions for loan and lease losses was placing the

Company's capital structure in jeopardy, necessitating a major infusion.

58.     The Company's and Mr. Kabat's Class Period Statements were false and misleading for the reasons detailed above and as follows.

59.     The Company's Tier 1 capital ratio was in need of support because it had continued to deteriorate.  The deterioration necessitated a major infusion of capital since at least the beginning of the Class Period.

60.     Credit losses were suffering from an unabated trend as the housing market continued to stumble in the Mid-West region and net charge-offs had not peaked in 2008 but would continue to climb well into 2009.  Indeed, net charge-offs would amount to a substantial percentage of total loans and leases.

61.     The Company's deteriorating capital base necessitated a sale of non-core businesses to supplement common equity capital.

62.     As a result of Defendants' false statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period.

63.     Moreover, as a result of Defendants' negligent material misstatements and omissions contained in the Prospectus, Defendants were able to effectuate a $750 million initial offering of preferred stock to members of the Sub-Class, including plaintiff.

## THE TRUTH EMERGES

64.     On June 18, 2008, the Company stated it would slash its quarterly dividend and earnings would be as little as 1 cent to 5 cents a share for the second quarter.  Analysts had predicted earnings of more than 40 cents per share.

65.     Additionally, in a desperate move to shore up capital, the Company said it would sell subsidiaries and issue preferred stock to raise $2 billion.  The Company also announced the cost of uncollectible loans in 2009 will rise well above 2008 levels – thereby substantiating the

ever increasing (though undisclosed) negative trends pressuring the Company.  Mr. Kabat also stated he would assume the role of Chairman of the Board.

66.     Moreover, these disclosures demonstrated that the Company's Tier 1 capital was under pressure, requiring immediate support.

67.     Fitch Ratings downgraded the Company one level due to deteriorating trends in asset quality.

68.     These disclosures, which were in sharp contrast to the Defendants' Class Period statements, caused the Company common stock to decline 27% and close at $9.26 per share on very heavy volume.  The Company's stock had traded as high as $28 per share in February, 2008.

69.     The Trust Preferred Securities also traded sharply lower and closed at $16.35 per share, 34% below their October 2007 offering price.

## CAUSES OF ACTION

### COUNT I
### For Violations Of Section 11 Of The Securities Act
### Against All Defendants

70.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

71.     Plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally, knowingly, recklessly or fraudulently by Defendants.  Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

72.     Plaintiffs do not incorporate in this Count any allegation above to the extent it contains facts which are unnecessary or irrelevant for purposes of stating a claim under Section 11, including that they do not incorporate any allegations that might be interpreted to sound in fraud or that relate to any state of mind on the part of the Section 11 defendants.

73.     This claim is brought by Plaintiff on its own behalf and on behalf of other members of the Sub-Class who acquired Trust Preferred Securities pursuant to the Prospectus on the Offering.  Each Sub-Class member acquired his shares pursuant to the Prospectus.

74.     Defendant FITB is the issuer of the shares in the Offering sold pursuant to the Prospectus.

75.     Defendant Kabat was a director of FITB and its CEO at the times the Prospectus Supplement was filed with the SEC and thereafter became effective on or about October 25, 2007.

76.     The Underwriter Defendants each are underwriters of the securities sold in the Offering pursuant to the Prospectus.

77.     The Company, as issuer of the securities sold in the Offering through the Prospectus, is strictly liable to plaintiff and the Sub-Class for the material misstatements and omissions discussed above.

78.     Defendant Kabat, participated in the preparation, issuance and dissemination of; issued and disseminated, and caused to be issued and disseminated, to the investing public the material misstatements and omissions contained in the Prospectus.

79.     Each of the Underwriter Defendants participated in the preparation, issuance and dissemination of, and issued and disseminated, to the investing public the material misstatements and omissions contained in the Prospectus.

80.     Defendant Kabat and each Underwriter Defendant owed to plaintiff and the Sub-Class the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements

contained therein fair and accurate.

81.     None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

82.     Although not required to be alleged with respect to this claim because it is an affirmative defense to be alleged and proven by defendants, nevertheless, plaintiff alleges that it and the other members of the Sub-Class purchased their Trust Preferred Securities as a direct and proximate result of, and without knowledge of, the material misstatements and omissions in the Prospectus.  Had plaintiff and the other members of the Sub-Class known of the omitted material facts, plaintiff and the other members of the Sub-Class would not have purchased or otherwise acquired the Trust Preferred Securities.

83.     As a direct and proximate result of each Defendant's unlawful conduct as alleged herein, plaintiff and the other members of the Sub-Class suffered substantial damages in connection with their purchases of Trust Preferred Securities pursuant to the Offering, in an amount in excess of $200 million.

84.     At the time plaintiff and the Sub-Class obtained their shares of Trust Preferred Securities on the Offering, plaintiff and the Sub-Class had no knowledge of the facts concerning the misstatements or omissions alleged herein.

85.     This action is brought within one year after discovery of the material misstatements and material omissions in the Prospectus, and within three years of the effective date of the Prospectus, which was October 23, 2007.

86.     By reason of the conduct alleged herein, each defendant violated Section 11 of the

Securities Act.

87.     By virtue of the foregoing, Plaintiff and the Sub-Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally, in an amount to be proven at trial.

**COUNT II**
**For Violations Of Section 15 Of The Securities Act**
**Against Individual Defendant Kabat**

88.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

89.     Plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally, knowingly, recklessly or fraudulently by Defendants.  Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

90.     Plaintiffs do not incorporate in this Count any allegation above to the extent it contains facts which are unnecessary or irrelevant for purposes of stating a claim under Section 11, including that they do not incorporate any allegations that might be interpreted to sound in fraud or that relate to any state of mind on the part of the Section 11 defendants.

91.     The Individual Defendant by reason of his management positions, is a controlling person of the Company within the meaning of Section 15 of the Securities Act and is liable for the Company's violation of Section 11 of the Securities Act as set forth herein.

92.     As set forth herein, Mr. Kabat was the Company's CEO and President.  He thus was capable of causing and did in fact cause the Company to sell the shares pursuant to the Prospectus.

93.     By virtue of his high-level position of control, Defendant Kabat had the power to influence and control and did influence and control the decision-making of the Company.

94.     By virtue of his position as a controlling person, the Individual Defendant is

20

liable, pursuant to Section 15 of the Securities Act, for the Company's material misstatements and material omissions in the Prospectus, and its violations of Section 11 of the Securities Act.

95.     The Individual Defendant also was a culpable participant in the violations of Section 11 of the Securities Act alleged above, based on his direct participation in the process which allowed the Offering to be successfully completed.  As a result of the foregoing, Plaintiff and the other members of the Sub-Class suffered damages, in an amount to be proven at trial.

**COUNT III**
**For Violations Of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Defendants FITB and Kabat**

96.     Plaintiff realleges and incorporates by reference each and every allegation contained above.

97.     This Count is asserted against defendants FITB and Kabat for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98.     Defendants FITB and Kabat, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make materially false and misleading statements about the Company's financial condition and operations and to conceal adverse material information about the Company.  They employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and courses of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company not misleading, as set forth more particularly in the paragraphs herein, and engaged in transactions, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

99.     Defendants FITB and Kabat had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such misrepresentations and/or omissions were done knowingly or recklessly with for the purpose and effect of concealing the true information about the Company's financial condition and operations from the investing public and artificially inflating the price of its securities.

100.     Defendants FITB and Kabat each acted with scienter in that each knew that the Company's public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in the issuance or dissemination of such statements or documents as primary violators of the Exchange Act.

101.     These defendants, by virtue of their receipt of information reflecting the true facts regarding the Company and its business practices, their control over and/or receipt of FITB's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning FITB, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company,

including the Individual Defendant.

102.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of FITB's securities were artificially inflated during the Class Period.

103.    In ignorance of the materially false and misleading nature of the reports and statements described above, plaintiffs and the other members of the Class relied, to their detriment, on the integrity of the market for the Company's securities and the completeness and accuracy of the information disseminated to the Company's investors in connection with their purchase of the Company's securities.

104.    By virtue of the foregoing, defendants FITB and Kabat each have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and plaintiffs and the Class have been damaged thereby, in an amount to be proven at trial.

**COUNT IV**
**For Violations of Section 20(a) of the Exchange Act**
<u>**Against Defendant Kabat**</u>

105.    Plaintiff realleges and incorporates by reference each and every allegation contained above.

106.    At the time of the wrongs alleged herein, Mr. Kabat was a controlling person of FITB within the meaning of Section 20(a) of the Exchange Act. Mr. Kabat exercised his control to cause FITB to violate Section 10(b) and Rule 10b-5, by issuing the materially false and misleading statements described herein and culpably participating in the wrongful conduct alleged herein.

107.    By virtue of the foregoing, plaintiff and the Class have been damaged by Mr. Kabat's conduct, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself, the Sub-Class, and the Class, prays for judgment as follows:

A.      declaring this action to be a plaintiff class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class and Sub-Class, and certifying counsel as Class and Sub-Class Counsel;

B.      awarding plaintiff, the Sub-Class, and the Class damages against Defendants, jointly and severally, together with interest thereon;

C.      awarding plaintiff, the Class, and the Sub-Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements;

D.      awarding plaintiff, the Class, and the Sub-Class such other and further relief as may be just and proper under the circumstances; and,

E.      awarding plaintiff, the Class, and the Sub-Class such other and further relief as this Court may deem just.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 19, 2008    Respectfully submitted,

          STRAUSS & TROY

          /s/Richard S. Wayne
          Richard S. Wayne Ohio Attorney No. 0022390
          /s/Thomas P. Glass
          Thomas P. Glass Ohio Attorney No. 0062382
          /s/Matthew R. Chasar
          Matthew R. Chaser Ohio Attorney No. 0075191
          150 E. Fourth Street
          Cincinnati, OH 45202-4018
          (513) 621-2120 - telephone
          (513) 629-9426 - facsimile
          E-mail: rswayne@strausstroy.com
          E-mail: tpglass@strausstroy.com
          E-mail: mrchaser@strausstroy.com

          WOLF HALDENSTEIN ADLER FREEMAN
           & HERZ LLP
          Gregory M. Nespole
          Daniel W. Krasner
          Robert B. Weintraub
          270 Madison Avenue
          New York, New York 10016
          Telephone: (212) 545-4600
          Facsimile: (212) 545-4653

          *Attorneys for Plaintiff*

1628061_1.DOC