# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| LOCAL 295/LOCAL 851 IBT EMPLOYER GROUP PENSION TRUST AND WELFARE FUNDS AND DISTRICT NO. 9, I.A. OF M. & A.W. PENSION TRUST, EDWIN B. SHELTON, JACQUELINE DINWOODIE, JEFFREY J. WACKSMAN, and LEON H. LOEWENSTINE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| FIFTH THIRD BANCORP, FIFTH THIRD SECURITIES, FIFTH THIRD CAPITAL TRUST VI, FIFTH THIRD CAPITAL TRUST VII, KEVIN T. KABAT, CHRISTOPHER G. MARSHALL, DANIEL T. POSTON, DARRYL F. ALLEN, JOHN F. BARRETT, ULYSSES L. BRIDGEMAN, JR., JAMES P. HACKETT, GARY R. HEMINGER, JOAN R. HERSCHEDE, ALLEN M. HILL, ROBERT L. KOCH II, MITCHEL D. LIVINGSTON, PH.D., HENDRIK G. MEIJER, JAMES E. ROGERS, GEORGE A. SCHAEFER, JR., JOHN J. SCHIFF, JR., DUDLEY S. TAFT, BANC OF AMERICA SECURITIES LLC, BARCLAYS CAPITAL INC., CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY & CO. INCORPORATED, UBS SECURITIES LLC, and WACHOVIA CAPITAL MARKETS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**CASE NO. 1:08-cv-421**

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................... 1

II.     ORGANIZATION OF THIS COMPLAINT .............................................. 1

III.    NATURE OF THE ACTION ...................................................................... 2

       A.      DEFENDANTS FALSELY STATED THAT FIFTH THIRD DID NOT
              PARTICIPATE IN SUBPRIME LENDING AND USED CONSERVATIVE
              UNDERWRITING AND DOCUMENTATION STANDARDS........................... 5

       B.      DEFENDANTS' DENIAL OF SUBPRIME LENDING WAS HIGHLY
              MATERIAL TO INVESTORS CONCERNED ABOUT THE
              DETERIORATION OF THE SUBPRIME MARKETS .................................... 7

       C.      DEFENDANTS FALSELY ASSURED INVESTORS THAT FIFTH
              THIRD'S LOAN LOSS RESERVES WERE SUFFICIENT .......................... 10

       D.      THE POOR CREDIT QUALITY OF FIFTH THIRD'S LOAN
              PORTFOLIO IMPERILED THE BANK'S CAPITALIZATION ..................... 12

       E.      THE TRUTH BEGINS TO EMERGE ..................................................... 13

IV.     JURISDICTION AND VENUE FOR ALL CLAIMS.................................... 14

V.      THE PARTIES FOR ALL CLAIMS ......................................................... 15

       A.      THE PLAINTIFFS.................................................................................. 15
       B.      THE CORPORATE DEFENDANTS....................................................... 15
       C.      THE INDIVIDUAL DEFENDANTS....................................................... 17
       D.      THE DIRECTOR DEFENDANTS ON THE PREFERRED B AND
              PREFERRED C OFFERINGS ............................................................... 18
       E.      ADDITIONAL DIRECTOR DEFENDANTS ON THE FIRST CHARTER
              REGISTRATION/PROXY STATEMENT .............................................. 20
       F.      THE UNDERWRITER DEFENDANTS ................................................. 20
            1.      The Preferred B Underwriters.................................................. 20
            2.      The Preferred C Underwriters.................................................. 22

VI.     LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR ALL CLAIMS ........... 23

VII.    BASIS OF ALLEGATIONS .................................................................... 26

VIII.   SECURITIES ACT CLAIMS ................................................................... 26

       A.      SUBSTANTIVE ALLEGATIONS OF THE SECURITIES ACT CLAIMS....... 26

            1.      The First Charter Acquisition .................................................. 26

a)     Defendants' False and Misleading Statements in the Registration/Proxy Statement ...................................................... 28

b)     The Truth Begins to Emerge....................................................... 35

c)     COUNT I – Against Defendant Fifth Third, the Individual Defendants, Director Defendants and Defendants Rogers and Bridgeman for Violations of §11 of the Securities Act in Connection with the First Charter Registration/Proxy Statement.................................................................................. 36

d)     COUNT II – Against Defendant Fifth Third for Violations of §12(a)(2) of the Securities Act in Connection with the First Charter Registration/Proxy Statement .......................................... 38

e)     COUNT III – Against the Individual Defendants for Violations of §15 of the Securities Act in Connection with the First Charter Registration/Proxy Statement .......................................... 40

f)     COUNT IV – Brought on Behalf of All First Charter Shareholders of Record as of November 26, 2007, Against Defendant Fifth Third and the Individual Defendants for Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder by the SEC ........................................ 41

g)     COUNT V – Brought on Behalf of All First Charter Shareholders of Record As of November 26, 2007 Against the Individual Defendants for Violations of §20(a) of the Exchange Act .............................................................................. 44

2.     The Preferred B Offering – Securities Act Claims ................................. 45

a)     COUNT VI – Against Defendants Fifth Third Capital Trust VI, Fifth Third, Individual Defendants, and Director Defendants for Violations of §11 of the Securities Act in Connection with the Preferred B Offering ........................................................ 49

b)     COUNT VII – Against Defendants Fifth Third, Fifth Third Capital Trust VI, and the Preferred B Underwriter Defendants for Violations of §12(a)(2) of the Securities Act in Connection with the Preferred B Offering ........................................................ 51

c)     COUNT VIII – Against Defendant Fifth Third and the Individual Defendants for Violations of §15 of the Securities Act in Connection with the Preferred B Offering ........ 52

3.     The Preferred C Offering – Securities Act Claims ................................. 54

a) COUNT IX – Against Defendants Fifth Third Capital Trust VII, Fifth Third, Defendant Marshall and the Director Defendants for Violations of §11 of the Securities Act in Connection with the Preferred C Offering ................................... 57

b) COUNT X – Against Defendants Fifth Third, Fifth Third Capital Trust VII, and the Preferred C Underwriter Defendants for Violations of §12(a)(2) of the Securities Act in Connection with the Preferred C Offering ............................................. 60

c) COUNT XI – Against Defendant Fifth Third and the Individual Defendants for Violations of §15 of the Securities Act in Connection with the Preferred C Offering ........................ 61

IX. EXCHANGE ACT CLAIMS .......................................... 63

A. SUBSTANTIVE ALLEGATIONS ............................... 63

1. Defendants Falsely Stated that Fifth Third was not a Subprime Lender and that it Used Conservative Underwriting and Documentation Standards ............................................. 63

2. The Poor Credit Quality of Fifth Third's Loans Prevented Their Sale in the Secondary Market and Required Many Such Sales to be with Recourse ........................................................................ 70

3. The Individual Defendants Had Actual Knowledge of Fifth Third's Subprime Lending and Underwriting Deficiencies ................................. 72

4. Defendants Falsely Represented that Fifth Third's Loan Loss Reserves were Sufficient to Cover Probable Losses ................................. 78

5. Defendants Falsely Represented that Fifth Third's Methodology for Setting Loan Loss Reserves, which Relied Predominantly on Historic Loss Rates, was Adequate ........................................................ 81

6. Defendants Falsely Represented that Fifth Third was Well Capitalized and its Tier 1 Capital was Not at Risk ................................... 89

7. Confidential Sources Describe How Defendants Abandoned Conservative Lending Standards in Order to Boost Revenue from Originations and Subjected Fifth Third to the Prospect of Catastrophic Loan Losses ........................................................ 91

a) Confidential Witness-1 ....................... 92
b) Confidential Witness-2 ....................... 93
c) Confidential Witness-3 ....................... 95
d) Confidential Witness-4 ...................... 101
e) Confidential Witness-5 ...................... 102
f) Confidential Witness-6 ...................... 104
g) Confidential Witness-7 ...................... 105
h) Confidential Witness-8 ...................... 105
i) Confidential Witness-9 ...................... 106

iii

|  | j) | Confidential Witness-10 ................................................ 108 |
|  | k) | Confidential Witness-11 ................................................ 110 |
|  | l) | Confidential Witness-12 ................................................ 112 |

8.     Defendants Violated Accounting Rules and SEC Regulations .............. 113

     a)     Defendants Violated Generally Accepted Accounting Principles ....................................................................... 114

     b)     Defendants Violated Other Relevant Accounting Principles ....................................................................... 115

**B.**     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................... 119

1.     The Third Quarter 2007 Earnings Release and Form 8-K .................... 119
2.     The Third Quarter 2007 Analyst Conference Call ................................ 122
3.     The Third Quarter 2007 Form 10-Q ................................................. 129
4.     The November 14, 2007 Form 8-K .................................................... 137
5.     The November 29, 2007 Form 8-K .................................................... 139
6.     The December 18, 2007 Form 8-K ..................................................... 141
7.     The January 22, 2008 Earnings Release and Form 8-K ........................ 142
8.     The January 22, 2008 Analyst Conference Call ................................... 144
9.     The January 30, 2008 Report on Form 8-K ........................................ 149
10.    The 2007 Annual Report on Form 10-K ............................................ 149
11.    The April 15, 2008 Annual Meeting and Investor Presentation ............ 154
12.    The First Quarter 2008 Earnings Release and Form 8-K ...................... 156
13.    The April 22, 2008 Analyst Conference Call ...................................... 160
14.    The May 2, 2008 Press Release and Form 8-K ................................... 165
15.    The First Quarter 2008 Form 10-Q ................................................... 166
16.    The May 12, 2008 Presentation and Form 8-K.................................... 172

**C.**     THE TRUTH BEGINS TO EMERGE ............................................... 174

1.     The June 18, 2008 Press Release and Form 8-K .................................. 174

**D.**     THE AFTERMATH ....................................................................... 177

1.     The Third Quarter 2008 Earnings Release and Form 8-K..................... 178
2.     The October 27, 2008 Press Release and Form 8-K ............................ 178
3.     The Third Quarter 2008 Form 10-Q ................................................. 179
4.     The November 28, 2008 Report on Form 8-K..................................... 179
5.     The December 31, 2008 Form 8-K .................................................... 180
6.     The January 22, 2009 Earnings Release, Form 8-K and Conference Call ......................................................................... 180
7.     The March 30, 2009 Press Release .................................................... 183

iv

E.   FACTS WHICH GIVE RISE TO A COGENT INFERENCE OF
     SCIENTER ............................................................................................ 184

     1.   The Cogent Inference of Scienter is Further Supported by the
          Individual Defendants' Motive to Secure Highly Lucrative Bonuses,
          Stock, and Stock Option Awards............................................................ 191
     2.   The Cogent Inference of Scienter is Further Supported by the
          Company's Detailed Credit Risk Management System......................... 193
     3.   Group Pleading ..................................................................................... 195

X.    PLAINTIFFS' LOSS WAS PROXIMATELY CAUSED BY THE DISCLOSURE
      OF PREVIOUSLY MISREPRESENTED AND OMITTED MATERIAL FACTS
      AND THE MATERIALIZATION OF THE RISK CREATED BY
      DEFENDANTS' CONDUCT ............................................................................ 197

XI.   INAPPLICABILITY OF THE SAFE HARBOR .......................................... 199

XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
      MARKET DOCTRINE .................................................................................. 200

XIII. PLAINTIFFS' EXCHANGE ACT CLAIMS ................................................ 202

      A.   COUNT XII – For Violations of §10(b) of the Exchange Act and Rule 10b-5
           against Defendant Fifth Third and the Individual Defendants............................ 202
      B.   COUNT XIII – Against the Individual Defendants for Violations of §20(a)
           of the Exchange Act ............................................................................ 205

XIV.  JURY TRIAL DEMANDED .......................................................................... 207

## I.    INTRODUCTION

1.      Co-Lead Plaintiffs Local 295/Local 851 IBT Employer Group Pension Trust and Welfare Funds and District No. 9, I.A. of M. & A.W. Pension Trust ("The Pension Trust Funds") and Edwin B. Shelton ("Shelton") (collectively, "Lead Plaintiffs") bring this federal class action individually and on behalf of all persons or entities that purchased and/or acquired the common stock, Preferred B Shares (defined below) and Preferred C Shares (defined below) of Fifth Third Bancorp ("Fifth Third" or the "Company") from October 19, 2007 through June 17, 2008, inclusive (the "Class Period") seeking to pursue remedies under §§10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), n(a), and t(a), and Rules 10b-5 and Rule 14a-9 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §§240.10b-5 and 240.14a-9, and §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o.

## II.    ORGANIZATION OF THIS COMPLAINT

2.      This Consolidated Class Action Complaint ("Complaint") is divided into three parts.  The first part of this Complaint contains allegations common to all claims, including Nature of the Action (Section III), Jurisdiction and Venue (Section IV), Parties (Section V), Class Allegations (Section VI), and Basis of Allegations (Section VII).  The second part (Section VIII) sets forth Lead Plaintiffs' strict liability and non-fraud claims against Defendants under §§11, 12(a)(2) and 15 of the Securities Act and non-fraud claims under §§14(a) and 20(a) of the Exchange Act, on behalf of three sub-classes consisting of: (i) former First Charter Corp. ("First Charter") shareholders who tendered their First Charter shares in exchange for shares of Fifth Third common stock, in connection with Fifth Third's acquisition of First Charter; (ii) all investors who purchased or acquired Fifth Third Preferred B Shares, pursuant or traceable to, the

Preferred B Offering (defined below); and (iii) all investors who purchased or acquired Fifth Third Preferred C Shares, pursuant or traceable to, the Preferred C Offering (defined below). The third part of the Complaint (Sections IX-XIV) sets forth Lead Plaintiffs' fraud-based claims on behalf of all purchasers of Fifth Third securities during the Class Period under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Lead Plaintiffs' Securities Act claims and non-fraud claims under §§14(a) and 20(a) of the Exchange Act in the first part of this Complaint, are pled separate and apart from the fraud-based Exchange Act claims.  With the exception of Section IX., A., 8., a) and b) (regarding Defendants' violations of Generally Accepted Accounting Principles ("GAAP")), the Securities Act claims and non-fraud claims under §§14(a) and 20(a) of the Exchange Act do not incorporate by reference, or otherwise rely upon, any allegations, particularly the scienter allegations, pled in support of the Exchange Act claims set forth in Sections IX-XIV of this Complaint, and therefore, Lead Plaintiffs' strict liability allegations in support of the Securities Act claims and non-fraud claims under §§14(a) and 20(a) of the Exchange Act are pled under notice pleading standards of Fed. R. Civ. P. 8(a).

## III.   NATURE OF THE ACTION

3.      Lead Plaintiffs purchased Fifth Third common stock during the Class Period as set forth in their respective certifications.  The defendants with respect to the class of open-market purchasers of Fifth Third common stock are Fifth Third, the Company's President and Chief Executive Officer Kevin T. Kabat ("Kabat"), former Executive Vice President and Chief Financial Officer Christopher G. Marshall ("Marshall"), and Executive Vice President, Controller and former Interim Chief Financial Officer Daniel T. Poston ("Poston").  Defendants Kabat, Marshall and Poston are referred to collectively as the "Individual Defendants" (the Individual Defendants, together with Fifth Third, are referred to collectively as "Defendants").

4.     In addition to bringing claims on behalf of open market purchasers of Fifth Third common stock, this action is also brought on behalf of a sub-class (the "First Charter Class") consisting of all former shareholders of First Charter that acquired the common stock of Fifth Third pursuant or traceable to the Registration Statement and Prospectus, which included the Proxy Statement for First Charter Special Meeting, on Form S-4 filed with the SEC by Fifth Third on November 7, 2007, as amended on November 29, 2007 (Registration No. 333-147192), which became effective on or about November 30, 2007 (the "Registration/Proxy Statement"), concerning Fifth Third's acquisition of First Charter, which transaction was completed on June 6, 2008, seeking to pursue remedies under §§11, 12(a)(2), and 15 the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, and §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC, and §20(a) of the Exchange Act.  For purposes of Plaintiffs' claims under §§14(a) and 20(a) of the Exchange Act, the sub-class also includes all First Charter shareholders of record as of the close of business of November 26, 2007, who were solicited to vote on the proposed acquisition of First Charter by Fifth Third pursuant to the Registration/Proxy Statement for the January 18, 2008 Special Meeting.  Lead Plaintiff Shelton was a former First Charter shareholder who acquired Fifth Third common stock pursuant to the Registration/Proxy Statement.  The defendants with respect to the sub-class of former First Charter shareholders are Defendants, as defined above.

5.     This action is also brought on behalf of a sub-class (the "Preferred B Class") who purchased $750,000,000 (in aggregate liquidation amount) Fifth Third Capital Trust VI, 7.25% Trust Preferred Securities (the "Preferred B Shares"), issued with a par or face value of $25.00 per share, that was registered pursuant to an automatic shelf registration statement on Form S-3 (SEC File Nos. 333-141560 and 333-141560-03) filed with the SEC on March 26, 2007, and was

initially offered for sale to the public on or about October 25, 2007, (the "Preferred B Offering"), seeking to pursue remedies under §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o. The Underwriting Agreement granted the underwriters an overallotment option to purchase an additional $112,500,000 of the Preferred B Shares, which option was exercised in full on October 26, 2007, bringing the total offering to $862,510,000. Plaintiffs Jacqueline Dinwoodie ("Dinwoodie") and Jeffrey J. Wacksman ("Wacksman") (collectively, the "Preferred B Plaintiffs") purchased the Preferred B Shares in the Preferred B Offering. The defendants in this sub-class are Defendants, the Director Defendants (defined below under the heading "Parties"), and the Preferred B Underwriter Defendants (defined below under the heading "Parties").

6.      This action is also brought on behalf of a sub-class (the "Preferred C Class") who purchased $350,000,000 (in aggregate liquidation amount) Fifth Third Capital Trust VII, 8.875% Trust Preferred Securities (the "Preferred C Shares"), issued with a par or face value of $25.00 per share, that was registered pursuant to an automatic shelf registration statement on Form S-3 (SEC File Nos. 333-141560 and 333-141560-09) filed with the SEC on March 26, 2007, and was initially offered for sale to the public on or about April 29, 2008 (the "Preferred C Offering"), seeking to pursue remedies under §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o. The Underwriting Agreement granted the underwriters an overallotment option to purchase an additional $50,000,000 of the Preferred C Shares, which option was exercised in full on May 5, 2008, bringing the total offering to $400,000,000. Plaintiff Leon H. Loewenstine ("Loewenstine") (the "Preferred C Plaintiff") purchased the Preferred C Shares in the Preferred C Offering. The defendants in this sub-class are Defendants, the Director

Defendants (defined below under the heading "Parties"), and the Preferred C Underwriter Defendants (defined below under the heading "Parties").

**A.** **DEFENDANTS FALSELY STATED THAT FIFTH THIRD DID NOT PARTICIPATE IN SUBPRIME LENDING AND USED CONSERVATIVE UNDERWRITING AND DOCUMENTATION STANDARDS**

7.     Fifth Third is a diversified financial services company.  Throughout the Class Period, from October 19, 2007 through June 17, 2008, Fifth Third's commercial and consumer loan portfolios were suffering losses, which Defendants blamed on macroeconomic trends, including declining real estate markets in Florida and Michigan.  During this time, when red flags were appearing publicly about the riskiness of subprime lending, Defendants consistently distanced themselves from subprime lenders by representing that Fifth Third was not involved in subprime lending, stating: "**No Subprime**" (Risk Management Presentation, August 29, 2007 Form 8-K) and **"[W]e're a prime underwriter**" (Defendants' presentation at Annual Shareholder Meeting, April 15, 2008).  Defendants also assured the investing public that the Company was managing its credit risk through "**conservative underwriting and documentation standards**," and that, with respect to its origination of non-conforming residential mortgages known as "**Alt-A" loans, borrower qualification were "comparable to other residential mortgage products..."** (2007 Form 10-K).  These statements were untrue.

8.     Contrary to Defendants' representations, since mid-2006 and continuing throughout the Class Period, **Fifth Third progressively lowered its loan underwriting standards and began originating risky consumer loans that amounted to subprime lending and commercial lending on ever increasing amounts of illiquid assets such as land**. Specifically, Fifth Third aggressively marketed Alt-A mortgages, home equity loans and lines of credit, adjustable rate mortgages ("ARMs") (*i.e.*, a mortgage where the interest rate is

periodically adjusted based on a specified market index), and option-ARMs (*i.e.*, ARMs with an interest-only payment option). Also, contrary to Defendants' representations, **the qualifications of their Alt-A borrowers were comparable to subprime borrowers due to lack of documentation and verification of income and assets and the existence of numerous risk factors for many borrowers, the cumulative effect of which was to increase their risk of default to a level which placed them in the category of subprime borrowers.**

9. As early as June 2006, the subprime mortgage market was beginning to show signs of stress and by the fourth quarter of 2006, there were many indicators pointing to significant problems in subprime mortgage loan performance. For example: (i) the ABX Index (an index tracking the subprime backed securities) saw notable price declines for subprime-backed securities; (ii) early payment defaults on mortgage loans (defined as a loan that becomes 90 days past due any time during the first 12 months, or 60 days past due in the first four months) began to rise; (iii) buyers in the secondary market began requesting originators to repurchase bad loans at sizable discounts; (iv) there was a rise in subprime delinquencies and there was also a troubling increase in the 30 to 89 day past due category, which is historically a precursor to more serious delinquencies which ultimately may lead to loan losses; and (v) home prices began to fall or stagnate.

10. In the context of these red flag warnings about subprime lending, Defendants repeatedly denied Fifth Third's involvement in subprime lending and instead assured investors that Fifth Third's Alt-A loan portfolio was the product of conservative underwriting and documentation standards. These false assurances were material to investors who wanted to invest in a conservative financial institution whose lending practices would not subject it to the high risk of defaults and losses to which acknowledged subprime lenders were subject.

11.    The investing public was kept in the dark about Fifth Third's deficient underwriting standards – and thus unable to assess the true risks of investing in Fifth Third's publicly traded securities – because Defendants failed to disclose material facts about the commercial and consumer loans the Company was originating, such as how many of its riskiest loans were originated with borrowers who possessed layered or cumulative risk factors, including: (i) low credit scores (FICO scores below 660 – a key threshold set by bank regulators); (ii) undocumented employment, income and/or assets; (iii) unverified employment, income and/or assets; (iv) unreasonably high total debt-to-income ratios; and (v) loan-to-value ratios ("LTV") as high as 100%.  Defendants also failed to disclose material facts concerning the commercial loans that Fifth Third was originating, such as the extent to which the Company was making high LTV land and construction loans to builders and developers, particularly in economically stressed regions like Michigan and Florida, which posed a severe risk of loss to Fifth Third because there was no equity cushion or liquidity in the event the development project failed and a subsequent foreclosure took place in these declining real estate markets.

**B.     DEFENDANTS' DENIAL OF SUBPRIME LENDING WAS HIGHLY MATERIAL TO INVESTORS CONCERNED ABOUT THE DETERIORATION OF THE SUBPRIME MARKETS**

12.    Defendants' repeated denials of participation in subprime lending were material to investors because it meant that Fifth Third was avoiding the riskiest segment of the consumer credit market and that its loan portfolio was insulated from the high risk of default inherent in subprime lending, which was beginning to surface by late 2006.

13.    Borrowers in the mortgage market are classified into three basic groups: (i) prime borrowers, (ii) Alt-A borrowers, and (iii) subprime borrowers.  Subprime lending was explicitly defined by the Federal Deposit Insurance Corporation ("FDIC") and was understood by investors

and the banking industry to mean borrowers who do not qualify under conventional credit criteria because of low or deficient credit scores, or borderline credit scores combined with other risk factors such as high LTV ratios, and high total debt-to-income ratios.

14.    Most lenders use a credit system called "FICO" named for its creator, Fair Isaac Corporation.  FICO refers to a method for calculating a borrower's credit worthiness.  Although FICO's inner-workings are largely proprietary, it is understood that FICO scores are based on the information in a credit bureau's files, such as credit card usage and payment history, other revolving loan history, installment loan history, previous bankruptcy, judgments, and liens. Based on this data, FICO returns a score between 300 and 800 – the higher the score, the more creditworthy the borrower and the less likely the borrower is to default.

15.    The FDIC and other banking regulators regard a FICO score of 660 as the prime-subprime dividing line.  A subprime borrower will pay a higher interest rate commensurate with higher credit risk.  Further, the median U.S. score is 720 and the dispersion of scores is such that 27% of the population has a score below 650 and 15% of the population scores below 600.

16.    The FDIC has defined subprime lending through the Office of the Comptroller of the Currency's ("OCC") *2001 Expanded Guidance for Subprime Lending Programs,* stating:

> The term "subprime" refers to the credit characteristics of individual borrowers. Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments, and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories. Subprime loans are loans to borrowers displaying one or more of these characteristics at the time of origination or purchase. Such loans have a higher risk of default than loans to prime borrowers. Generally, subprime borrowers will display a range of credit risk characteristics that may include one or more of the following:
>
> • Two or more 30-day delinquencies in the last 12 months, or one or more 60-day delinquencies in the last 24 months;

- Judgment, foreclosure, repossession, or charge-off in the prior 24 months;

- Bankruptcy in the last 5 years;

- Relatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood; and/or

- Debt service-to-income ratio of 50% or greater, or otherwise limited ability to cover family living expenses after deducting total monthly debt-service requirements from monthly income.

This list is illustrative rather than exhaustive and is not meant to define specific parameters for all subprime borrowers. Additionally, this definition may not match all market or institution specific subprime definitions, but should be viewed as a starting point from which the Agencies will expand examination efforts.

17. In 2007, the OCC's *Statement on Subprime Mortgage Lending* reaffirmed the above definition of subprime. Importantly, the FDIC's guidelines on subprime lending recognize that the layering of the risk factors associated with subprime loans adds to overall credit risk and the potential for default.

18. The *Expanded Guidelines for Subprime Lending Programs* recognized the greater risk of subprime lending and advised subprime lenders that typical regulatory guidelines for capitalization were not considered adequate for lenders with significant subprime exposure. These guidelines counseled such lenders to quantify the amount of additional capital needed to compensate for the risks engendered by their subprime lending activities, stating:

The Agencies' minimum capital requirements generally apply to portfolios that exhibit substantially lower risk profiles than exist in subprime loan programs. Therefore, these requirements may not be sufficient to reflect the risks associated with subprime portfolios. Each subprime lender is responsible for quantifying the amount of capital needed to offset the additional risk in subprime lending activities, and for fully documenting the methodology and analysis supporting the amount specified.

9

19. In contrast to subprime loans, Alt-A loans were understood by the market to be a more conservative lending strategy. Alt-A lending emerged in the 1990s to meet the needs of borrowers who could not fully document and verify their income and assets. Typically, these borrowers were self-employed and had good cash flow, but could not document their income via tax returns, W-2s or pay stubs. The demand for such lending increased as more people in the U.S. became self-employed. The typical Alt-A borrower had a good credit history and a high FICO score.

20. Throughout the Class Period, defendants repeatedly emphasized Fifth Third's focus on Alt-A loans in an effort to reassure investors that the credit quality of Fifth Third's consumer loan portfolio was superior to that of a subprime portfolio. However, such representations were highly misleading because Fifth Third's Alt-A loans were comparable to subprime loans as a result of the borrower's cumulative risk factors and the lack of documentation of their income and assets. Thus, investors in Fifth Third during the Class Period were misled into believing that Fifth Third's Alt-A loans were immune from the then-known high risk of defaults and losses surrounding subprime lending.

### C. DEFENDANTS FALSELY ASSURED INVESTORS THAT FIFTH THIRD'S LOAN LOSS RESERVES WERE SUFFICIENT

21. Throughout the Class Period, Defendants repeatedly assured investors that Fifth Third's reserves for loan losses were sufficient to cover probable losses in its loan portfolio. These representations were untrue and highly misleading to investors and analysts.

22. As Fifth Third originated progressively riskier loans without disclosing this fact to investors, its ability to sell these loans in the secondary market diminished and, consequently, the Company's held-for-investment loan portfolio contained ever increasing proportions of risky

loans. Despite the progressively increasing risks in the Company's loan portfolio during the Class Period, Fifth Third was actually substantially decreasing the crucial ratio of its loan loss reserves to nonperforming assets (*i.e.*, loans that had become 90 days delinquent). This metric was important to investors because it measured the level of reserves in relation to loans which were likely to default.

23.     Although Defendants regularly reported increases in nonperforming assets and increases in the total dollar amount of loan loss reserves, in real terms, these metrics were highly misleading because they did not accurately portray the most material consideration, which was whether the reserves were sufficient to cover probable losses from loans which were likely to default. Instead, Defendants concealed this crucial ratio during the Class Period and the fact that Fifth Third's amount of reserves was declining to levels far below those maintained by the Company before it began originating risky subprime and illiquid loans and before the real estate and credit markets began to deteriorate. Thus, Fifth Third's ratio of loan loss reserves to nonperforming assets was going in the wrong direction in view of the deteriorating real estate market and the known risks of subprime lending in such a market.

24.     Specifically, from 2003 to 2005, loan loss reserves were set at levels in excess of 200% of nonperforming assets, but by 2007, Defendants were reserving less than 100% of nonperforming assets. In view of the fact that the level of risk that inured to Fifth Third's loan portfolio (including loans sold with recourse) had materially increased due to the subprime quality of its portfolio and the real estate market's deterioration, a higher percentage of reserves than those historically maintained by the Company in the appreciating real estate market and a much higher percentage than the Company was reserving during the Class Period in a

11

deteriorating real estate market was necessary.  However, Defendants concealed these facts and, instead, repeatedly assured analysts and investors that the Company's reserves were sufficient.

### D.    THE POOR CREDIT QUALITY OF FIFTH THIRD'S LOAN PORTFOLIO IMPERILED THE BANK'S CAPITALIZATION

25.    The inevitable result of the deterioration in the credit quality of a loan portfolio and failure to timely and adequately reserve for loan losses is a material decline in the quality of a bank's tier 1 capital – a crucial regulatory measure of a lender's capitalization – that is considered a measure of a bank's financial strength and its ability to sustain future losses and remain solvent.  Tier 1 capital – the most expensive capital for a bank – is not only a measure of the ability of a bank to absorb losses, but is also a measure of how much capital is available for critical activities such as retiring and/or restructuring debt, stock repurchases to increase earnings per share, acquisition financing, paying dividends, and core growth.  When tier 1 capital declines below acceptable levels, it becomes necessary for a bank to raise additional capital through measures such as dilutive securities offerings, selling assets and/or cutting the dividend.  This is precisely what happened to Fifth Third.  However, Defendants repeatedly assured investors during the Class Period that Fifth Third's tier 1 capital ratios were within acceptable ranges to protect the capital structure and financial stability of the Company.

26.    The insufficiency of Fifth Third's loan loss reserves in view of the poor credit quality of its de facto subprime loan portfolio required material additions to such reserves and became a drain on Fifth Third's tier 1 capital.  Thus, Fifth Third's increasing loan losses had a direct impact on the deterioration of its tier 1 capital.  By failing to disclose truthfully the risky credit quality of Fifth Third's loan portfolio, and failing to take sufficient reserves, Defendants

also concealed from investors the fact that Fifth Third's crucial tier 1 capital was in jeopardy and was deteriorating.

27. Allowing the asset quality of Fifth Third's loan portfolio to deteriorate through its poor credit quality loans and disregard of conservative underwriting and documentation practices resulted in loan losses and the need for additional loan loss reserves. This caused Fifth Third to raise capital by cutting its dividend, making a dilutive preferred stock offering and planning a sale of assets, the announcement of which caused the price of Fifth Third stock to plummet, proximately causing loss to investors. Even these drastic measures were not sufficient to protect Fifth Third's tier 1 capital and ultimately, Fifth Third had to take bailout funds from the federal government to raise additional capital.

E.     **THE TRUTH BEGINS TO EMERGE**

28. On June 18, 2008, the risks created by the Defendants' abandonment of conservative underwriting standards and inadequate loan loss reserves materialized when the Company announced that it needed to raise $3 billion in capital by selling dilutive convertible preferred stock, slashing the Company's historically high dividend by 66%, and selling off non-core assets. Fifth Third also increased its capital targets to 8.0% - 9.0% (from 7.5% - 8%) for its tier 1 capital ratio and projected a second quarter tier 1 capital ratio of 8.5% (from 7.71% for the first quarter), which includes the impact of its First Charter acquisition and related accounting adjustments.

29. This news caused the price of Fifth Third common stock to plummet more than 27% from its previous close of $12.73 per share, to close on June 18, 2008, at $9.26 per share – a decline of $3.47 per share – on unusually heavy trading volume. Also on June 18, 2008, the price of the Preferred B Shares dropped 7.58%, from $18.00 per share to close at $16.64 per

share on June 18, 2008 – $8.36 per share below the Preferred B Share's initial offering price of $25, and the price of the Preferred C Shares dropped 6.53%, from $22.68 per share to close at $21.20 per share on June 18, 2008 – $3.80 per share below the Preferred C Share's initial offering price of $25.

## IV.  <u>JURISDICTION AND VENUE FOR ALL CLAIMS</u>

30.    The Securities Act claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, and rules promulgated thereunder by the SEC.

31.    The Exchange Act claims asserted herein arise under §§10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. §§240.10b-5 and 240.14a-9.

32.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §22 of the Securities Act, 15 U.S.C. §77v or §27 of the Exchange Act, 15 U.S.C. §78aa.

33.    Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c), and §22 of the Securities Act, 15 U.S.C. §77v, or §27 of the Exchange Act, 15 U.S.C. §78aa.  Fifth Third maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

34.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

V.    **THE PARTIES FOR ALL CLAIMS**

A.    **THE PLAINTIFFS**

35.    Co-Lead Plaintiff **The Pension Trust Funds** purchased Fifth Third common stock during the Class Period, as demonstrated by its certification annexed hereto and has suffered damages as a result of the wrongful acts of the Defendants as alleged herein.

36.    Co-Lead Plaintiff **Shelton** acquired Fifth Third common stock pursuant or traceable to Fifth Third's Registration/Proxy Statement filed in connection with the First Charter acquisition, as demonstrated by his certification annexed hereto and has suffered damages as a result of the wrongful acts of the Defendants as alleged herein.

37.    Plaintiff **Dinwoodie** acquired Fifth Third Preferred B Shares pursuant or traceable to Fifth Third's Registration Statement and Prospectus filed with the SEC in connection with the Preferred B Offering, as demonstrated by her certification annexed hereto and has suffered damages as a result of the wrongful acts of the Defendants as alleged herein.

38.    Plaintiff **Wacksman** acquired Fifth Third Preferred B Shares, pursuant or traceable to, Fifth Third's Registration Statement and Prospectus filed with the SEC in connection with the Preferred B Offering, as demonstrated by his certification annexed hereto and has suffered damages as a result of the wrongful acts of the Defendants as alleged herein.

39.    Plaintiff **Loewenstine** acquired Fifth Third Preferred C Shares, pursuant or traceable to, Fifth Third's Registration Statement and Prospectus filed with the SEC in connection with the Preferred C Offering, as demonstrated by his certification annexed hereto and has suffered damages as a result of the wrongful acts of the Defendants as alleged herein.

B.    **THE CORPORATE DEFENDANTS**

40.    Defendant **Fifth Third**, incorporated under Ohio law and headquartered in

Cincinnati, Ohio, is a diversified financial services company. Fifth Third's principal executive office is located at 38 Fountain Square Plaza, Cincinnati, Ohio 45263. Fifth Third operates through its commercial banking, branch banking, consumer lending, and investment advisor businesses. On September 30, 2007, Fifth Third had approximately $104.3 billion in consolidated total assets, consolidated total deposits of $69.4 billion, and operated 18 affiliates with 1,181 full-services banking centers, predominately in the Midwest.

41. Defendant **Fifth Third Capital Trust VI** is a statutory trust formed under Delaware law pursuant to a Declaration of Trust signed by Fifth Third, as sponsor of the Trust. According to the Preferred B Prospectus, Fifth Third owns all of the Fifth Third Capital Trust VI's "common securities." Thus, Fifth Third Capital Trust VI is wholly owned by Fifth Third. Fifth Third Capital Trust VI is a "finance subsidiary" of Fifth Third within the meaning of Rule 3-10 of Regulation S-X under the Securities Act of 1933. Fifth Third Capital Trust VI's principal executive office is Fifth Third Center, 38 Fountain Square Plaza, Cincinnati, Ohio 45263. Fifth Third Capital Trust VI is an issuer of the Fifth Third Preferred B Shares.

42. Defendant **Fifth Third Capital Trust VII** is a statutory trust formed under Delaware law pursuant to a Declaration of Trust signed by Fifth Third, as sponsor of the Trust. According to the Preferred C Prospectus, Fifth Third owns all of the Fifth Third Capital Trust VII's "common securities." Thus, Fifth Third Capital Trust VII is wholly owned by Fifth Third. Fifth Third Capital Trust VII is a "finance subsidiary" of Fifth Third within the meaning of Rule 3-10 of Regulation S-X under the Securities Act of 1933. Fifth Third Capital Trust VII's principal executive office is Fifth Third Center, 38 Fountain Square Plaza, Cincinnati, Ohio 45263. Fifth Third Capital Trust VII is an issuer of the Fifth Third Preferred C Shares.

### C.    **THE INDIVIDUAL DEFENDANTS**

43.    Defendant **Kabat** is and was at all times relevant to this action, the Company's Chief Executive Officer and President.  Among other conduct alleged herein, Defendant Kabat reviewed, approved, and signed the Company's materially false and misleading Registration/Proxy Statement, the Third Quarter 2007 Form 10-Q, the annual report on Form 10-K for the year ended December 31, 2007, the first Quarter 2008 Form 10-Q, and the June 6, 2008 registration statement on Form S-4MEF.

44.    Defendant **Marshall** was the Company's Executive Vice President and Chief Financial Officer until he resigned on May 1, 2008, effective as of April 30, 2008.  Among other conduct alleged herein, Defendant Marshall reviewed, approved, and signed the Company's materially false and misleading March 26, 2007 automatic shelf registration statement on Form S-3, Registration/Proxy Statement, the Third Quarter 2007 Form 10-Q, the December 18, 2007 Form 8-K, the January 22, 2008 Form 8-K, the January 30, 2008 Form 8-K, the annual report on Form 10-K for the year ended December 31, 2007, and the April 22, 2008 Form 8-K.

45.    Defendant **Poston** was, at all relevant times, the Company's Executive Vice President and Controller.  After Defendant Marshall's resignation, Defendant Poston served as the Company's Chief Financial Officer.  Among other conduct alleged herein, Defendant Poston reviewed approved and signed the Company's materially false and misleading Registration/Proxy Statement, the annual report on Form 10-K for the year ended December 31, 2007, the first Quarter 2008 Form 10-Q, the May 12, 2008 Form 8-K, and the June 6, 2008 registration statement on Form S-4MEF.

D.    **THE DIRECTOR DEFENDANTS ON THE PREFERRED B AND PREFERRED C OFFERINGS**

46.    Defendant **Darryl F. Allen** ("Allen"), a member of the Board since 1997 and retired Chairman, President & CEO of Aeroquip-Vickers, Inc., signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

47.    Defendant **John F. Barrett** ("Barrett"), a member of the Board since 1988 and President & CEO of The Western & Southern Life Insurance Company, signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

48.    Defendant **James P. Hackett** ("Hackett"), a member of the Board since 2001 and President, CEO & Director of Steelcase, Inc., signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

49.    Defendant **Gary R. Heminger** ("Heminger"), a member of the Board since 2006 and Executive Vice President of Marathon Oil Corporation, signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

50.    Defendant **Joan R. Herschede** ("Herschede"), a member of the Board during the Class Period, signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

51.    Defendant **Allen M. Hill** ("Hill"), a member of the Board during the Class Period and retired President & CEO of DPL, Inc., signed the Company's March 26, 2007 "shelf"

18

Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

52.     Defendant **Robert L. Koch II** ("Koch"), a member of the Board during the Class Period and President & CEO of Koch Enterprises, Inc., signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

53.     Defendant **Mitchel D. Livingston, Ph.D.** ("Livingston"), a member of the Board since 1997 and Vice President for Student Affairs University of Cincinnati, signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

54.     Defendant **Hendrik G. Meijer** ("Meijer"), a member of the Board since 2001 and Co-Chairman of Meijer, Inc., signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

55.     Defendant **George A. Schaefer, Jr.** ("Schaefer") was, until his retirement on June 17, 2008, Chairman of the Board.  Among other conduct alleged herein, Defendant Schaefer was formerly President and Chief Executive Officer of the Company.  Defendant Schaefer reviewed, approved, and signed the Company's materially false and misleading March 26, 2007 automatic shelf registration statement on Form S-3, Registration/Proxy Statement, the annual report on Form 10-K for the year ended December 31, 2007, and the June 6, 2008 registration statement on Form S-4MEF.

56.     Defendant **John J. Schiff, Jr.** ("Schiff"), a member of the Board since 1983 and Chairman, President & CEO of Cincinnati Financial Corporation, signed the Company's March

26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

57. Defendant **Dudley S. Taft** ("Taft"), a member of the Board since 1981 and President of Taft Broadcasting Company, signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

58. Defendant **Thomas W. Traylor** ("Traylor"), a member of the Board since 1999 and Chairman & CEO of Traylor Bros., Inc., signed the Company's March 26, 2007 "shelf" Registration Statement on Form S-3ASR pursuant to which the Company offered its Preferred B and Preferred C shares for sale to the investing public.

59. Defendants Allen, Barrett, Hackett, Heminger, Herschede, Hill, Koch, Livingston, Meijer, Schaefer, Schiff, Taft and Traylor are referred to collectively as the "Director Defendants."

### E. ADDITIONAL DIRECTOR DEFENDANTS ON THE FIRST CHARTER REGISTRATION/PROXY STATEMENT

60. Defendant **Ulysses L. Bridgeman, Jr.** ("Bridgeman"), a member of the Board since 2007, signed the Company's Registration/Proxy Statement for the First Charter acquisition.

61. Defendant **James E. Rogers** ("Rogers"), a member of the Board since 1995, signed the Company's Registration/Proxy Statement for the First Charter acquisition.

### F. THE UNDERWRITER DEFENDANTS

#### 1. The Preferred B Underwriters

62. Defendant **UBS Securities LLC** ("UBS Securities") is a subsidiary of UBS AG, a Swiss corporation headquartered at Bahnhofstrasse 45, Zurich, Switzerland, and Aeschenvorstadt

1, Basel, Switzerland. UBS is headquartered in Stamford, Connecticut. UBS was an underwriter of the Preferred B Offering.

63.    Defendant **Citigroup Global Markets Inc.** ("Citigroup") is a subsidiary of Citigroup Inc., a Delaware corporation that is headquartered at 399 Park Avenue, New York, New York 10043.  Citigroup was an underwriter of the Preferred B Offering.

64.    Defendant **Merrill Lynch, Pierce, Fenner & Smith Incorporated** ("Merrill Lynch") is a subsidiary of Merrill Lynch & Co., a Delaware corporation that is headquartered at 4 World Financial Center, New York, New York 10080.  Merrill Lynch was an underwriter of the Preferred B Offering.

65.    Defendant **Morgan Stanley & Co. Incorporated** ("Morgan Stanley") is a subsidiary of Morgan Stanley, a Delaware corporation that is headquartered at 1585 Broadway, New York, New York 10036.  Morgan Stanley was an underwriter of the Preferred B Offering.

66.    Defendant **Wachovia Capital Markets, LLC** ("Wachovia") is a subsidiary of Wachovia Corp., a North Carolina corporation that is headquartered at 301 South College Street, Suite 4000, One Wachovia Center, Charlotte, North Carolina.  Wachovia was an underwriter of the Preferred B Offering.  On October 3, 2008, Wachovia Corp. and Wells Fargo & Company ("WFC"), a Delaware corporation, entered into a definitive Agreement and Plan of Merger ("Merger Agreement").  The Merger Agreement provides that WFC will acquire all outstanding stock of Wachovia Corp., which will "merger with and into" WFC.  The deal is structured as a stock-for-stock transaction, whereby each outstanding share of Wachovia Corp. common stock will be converted into 0.1991 of a share of WFC common stock.  WFC will be the surviving corporation after the merger and Wachovia Corp. will cease to exist.

67.    Defendant **Banc of America Securities LLC** ("Banc America") is a subsidiary of

Banc of America Corp, a Delaware Corporation that is headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255.  Banc America was an underwriter of the Preferred B Offering.

68.     Defendant **Credit Suisse Securities (USA) LLC** ("Credit Suisse") is a wholly-owned indirect subsidiary of Credit Suisse AG. Credit Suisse is headquartered at 11 Madison Avenue, New York, New York 10010.  Credit Suisse was an underwriter of the Preferred B Offering.

69.     Defendants UBS Securities, Citigroup, Merrill Lynch, Morgan Stanley, Wachovia, Banc America, and Credit Suisse, are collectively, the "Preferred B Underwriter Defendants."

## 2.     The Preferred C Underwriters

70.     Defendant **Morgan Stanley** was an underwriter of the Preferred C Offering.

71.     Defendant **Citigroup** was an underwriter of the Preferred C Offering.

72.     Defendant **Merrill Lynch** was an underwriter of the Preferred C Offering.

73.     Defendant **UBS Securities** was an underwriter of the Preferred C Offering.

74.     Defendant **Wachovia** was an underwriter of the Preferred C Offering.

75.     Defendant **Banc America** was an underwriter of the Preferred C Offering.

76.     Defendant **Barclays Capital, Inc.** ("Barclays Capital"), the United States affiliate of Barclays Capital, the investment banking division of Barclays Bank PLC, is headquartered at 200 Park Avenue, New York, New York 10166 was an underwriter of the Preferred C Offering.

77.     Defendant **Credit Suisse** was an underwriter of the Preferred C Offering.

78.     Defendant **Fifth Third Securities** was an underwriter of the Preferred C Offering.

79.     Defendants UBS Securities, Citigroup, Fifth Third Securities, Merrill Lynch, Morgan Stanley, Wachovia, Banc America, Barclays Capital, and Credit Suisse, are collectively, the "Preferred C Underwriter Defendants."

## VI.     LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR ALL CLAIMS

80.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following Class members.  The Class consists of all those who purchased and/or acquired Fifth Third common stock during the Class Period, including all those who purchased or otherwise acquired Fifth Third common stock, pursuant or traceable to, the Registration/Proxy Statement on Form S-4 filed with the SEC by Fifth Third on November 7, 2007, as amended on November 29, 2007 (Registration No. 333-147192).  For purposes of Lead Plaintiffs' claims under §§14(a) and 20(a) of the Exchange Act, the Class also includes all First Charter shareholders of record as of November 26, 2007.  Excluded from the Class are the Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

81.     The Class also consists of all those who purchased or otherwise acquired Fifth Third Preferred B Shares pursuant to the Preferred B Offering.  Excluded from the Class are the Defendants, the Director Defendants, the Preferred B Underwriter Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

82.     The Class also consists of all those who purchased or otherwise acquired Fifth Third Preferred C Shares pursuant to the Preferred C Offering.  Excluded from the Class are the

Defendants, the Director Defendants, the Preferred C Underwriter Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

83. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Fifth Third or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

85. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

86. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) With respect to Lead Plaintiffs' claims under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, whether: (i) the documents, reports,

24

filings, releases, and statements disseminated by Defendants during the Class Period misrepresented material facts about the business, performance, and financial condition of Fifth Third in violation of the Exchange Act; (ii) Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein in violation of the Exchange Act; (iii) Defendants acted knowingly or with deliberate recklessness in misrepresenting material facts in violation of the Exchange Act;

(c)     Whether statements in the Registration/Proxy Statement and SEC filings relating to, or incorporated by reference in the Registration/Proxy Statement, contained material misstatements and omissions;

(d)     Whether statements in the Preferred B Offering and SEC filings relating to or incorporated by reference in the Preferred B Offering contained material misstatements and omissions;

(e)     Whether statements in the Preferred C Offering and SEC filings relating to or incorporated by reference in the Preferred C Offering contained material misstatements and omissions; and

(f)     To what extent the members of the Class have sustained damages and the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.   BASIS OF ALLEGATIONS

88.    Lead Plaintiffs' allegations are based upon information and belief, except as to those allegations concerning themselves and Plaintiffs Dinwoodie, Wacksman, and Loewenstine, which are based upon personal knowledge.  Lead Plaintiffs' information and belief allegations are based upon, among other things: (a) the investigation conducted by and through their attorneys; (b) review and analysis of filings made by Fifth Third with the SEC; (c) review and analysis of press releases, public statements, news articles, securities analysts' reports, and other publications disseminated by or concerning Fifth Third; and (d) other publicly available information about Fifth Third.  With respect to Lead Plaintiffs' fraud allegations under §§10(b) and 20(a) of the Exchange Act, Lead Plaintiffs' allegations are also based upon interviews with former Fifth Third employees and other persons with knowledge of the Company.  Most of the facts supporting the allegations contained herein are known only to the Defendants or are within their control.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

## VIII.  SECURITIES ACT CLAIMS

89.    These claims are in effect a separate complaint. For these claims, there is no allegation of fraud, scienter or recklessness.  The only claim is that there were misrepresentations and/or omissions of material fact.

### A.    SUBSTANTIVE ALLEGATIONS OF THE SECURITIES ACT CLAIMS

#### 1.    The First Charter Acquisition

90.    On August 15, 2007, Fifth Third's Board met and approved a $31.00 per share bid

to acquire First Charter, a regional financial services company headquartered in Charlotte, North Carolina, which, at the time, operated 57 branches in North Carolina and 2 in suburban Atlanta, and was the holding company of First Charter Bank.

91. On August 16, 2007, First Charter and Fifth Third publicly announced they had signed a definitive agreement to merge. On this news, the price of First Charter rocketed up 37.8%, or $7.65, to $27.90 in early-afternoon trading.

92. Under the Amended and Restated Agreement and Plan of Merger, dated as of September 14, 2007, by and among First Charter, Fifth Third, and Fifth Third Financial, First Charter agreed to be acquired by Fifth Third for $31.00 per share, or $1.1 billion, which would be paid in the form of 70% Fifth Third common stock and 30% cash. The $31.00 per share offering price represented a 53.1% premium from the closing price of First Charter common stock on August 15, 2007 – the day before the deal was announced.

93. On November 7, 2007 (as amended on November 29, 2007), Fifth Third filed with the SEC its Registration/Proxy Statement and Prospectus for 35,000,000 shares of common stock to be issued upon the completion of the merger of First Charter with and into Fifth Third. The Registration/Proxy Statement was signed by each of the Individual Defendants, the Director Defendants and Defendants Rogers and Bridgeman. The Registration/Proxy Statement became effective on November 30, 2007. The Registration/Proxy Statement incorporated by reference Fifth Third's report on Form 10-Q for the quarter ended September 30, 2007, the Company's Forms 8-K filed with the SEC on October 29, 2007, October 31, 2007 and November 9, 2007 and "any documents filed with the SEC in the future under Sections 13 (a), 13 (c), 14 or 15 (d) of the Securities Exchange Act of 1934, as amended … until we exchange all the securities offered in this Prospectus." These documents contain untrue statements of material fact, omit to state

material facts required to be stated therein, and omit to state material facts necessary to make the statements therein not misleading, for the reasons alleged herein in paragraphs discussing those documents (and subject to the exclusion of all allegations relating to fraud and scienter).

94.     Pursuant to a formula set forth in the Amended and Restated Agreement and Plan of Merger, the Registration/Proxy Statement provided for First Charter shareholders to tender their First Charter common stock in exchange for a combination of Fifth Third common stock and cash.  Specifically, the Registration/Proxy Statement stated that First Charter shareholders would have "the right to receive either $31.00 worth of Fifth Third common stock or $31.00 in cash based on the election of First Charter shareholders," for "[e]ach share of First Charter common stock … that is issued and outstanding immediately prior to the effective time of the merger…." First Charter Shareholders could also "elect to receive a mix of Fifth Third common stock and cash worth $31.00 in return for each First Charter common share."

### a)     Defendants' False and Misleading Statements in the Registration/Proxy Statement

95.     Under the heading "Background of the Merger," the Registration/Proxy Statement stated that the First Charter Board "regularly considered various strategic options directed at increasing shareholder value and maximizing First Charter's return on equity," including, "the possible acquisition of smaller institutions by First Charter … strategic combinations with similarly sized financial institutions and the merger of First Charter with a larger financial institution."  According to the Registration/Proxy Statement, serious discussions concerning a possible merger with Fifth Third began in late 2006 and ramped up during the first six months of 2007, *inter alia*, stating:

> Those potentially interested banks included Fifth Third, whose Chief Financial Officer, Christopher G. Marshall, contacted Mr. James by telephone several times

in the fourth quarter of 2006 and the first half of 2007. Mr. Marshall and Kevin T. Kabat, Fifth Third's Chief Executive Officer, met with Mr. James on March 7, 2007 and June 7, 2007.

96.     Negotiations with Fifth Third and other financial institutions continued until

August 15, 2007.  The Registration/Proxy Statement states that the First Charter Board accepted

Fifth Third's bid of $31.00 per share to acquire First Charter, based primarily on the amount and

composition of consideration Fifth Third offered, as well as Fifth Third's history of paying

dividends:

- **the fact that the consideration payable in the transaction will be valued at $31.00 per share at the time of closing**;
- **Fifth Third's history of paying dividends on its common stock**;
- the fact that Fifth Third's common stock has greater liquidity than First Charter's common stock;

\*     \*     \*

The First Charter Board of Directors did not quantify or attempt to assign relative weights to the specific factors considered in reaching its determination; **however, the First Charter Board of Directors placed special emphasis on the consideration**, including the form, fixed value and tax treatment of such consideration, payable in the proposed merger and the receipt of a favorable fairness opinion from its financial advisor.

(Emphasis added.)

97.     Under the heading "Reasons for the Merger," the Registration/Proxy Statement,

*inter alia*, stated:

The First Charter Board of Directors believes that the terms of the merger agreement are fair to, and that the merger is in the best interests of, First Charter and its shareholders.

98.     Under the heading "Risks Relating to the Merger," the Registration/Proxy

Statement, *inter alia*, stated:

*The conversion ratio is variable and will fluctuate due to changes in the market price of Fifth Third common stock.*

> If you receive Fifth Third common shares as merger consideration you will receive a certain amount of shares of Fifth Third common stock for each share of First Charter common stock if the merger is completed. The conversion ratio is equal to $31.00 divided by the average market price of Fifth Third common stock for the five trading days ending on the trading day immediately before the closing of the merger. Changes in the price of Fifth Third common stock from the date of the merger agreement, from the date of this proxy statement/prospectus and from the date of the special meeting will affect the conversion ratio and, thus, the number of Fifth Third common shares that you receive as merger consideration. Fifth Third's stock price may increase or decrease before and after the effective time of the merger due to a variety of factors, including, without limitation, general market and economic conditions, changes in Fifth Third's businesses, operations and prospects and regulatory considerations. Many of these factors are beyond Fifth Third's control.

99.     The Registration/Proxy Statement states that the First Charter Board engaged the firm of KBW as its financial advisor on the Fifth Third bid and that KBW issued a fairness opinion indicating that Fifth Third was well capitalized, stating:

> KBW's analysis indicated that Fifth Third's Leverage Ratio, Tier 1 Risk-Based Capital Ratio and Total Risk Based Capital Ratio would all remain "well capitalized" by regulatory standards.

100.    The Registration/Proxy Statement also included a Proxy Statement for the Special Meeting of First Charter shareholders on January 18, 2008, seeking their approval of the Plan of Merger with Fifth Third.  The Registration/Proxy Statement stated that the First Charter Articles of Incorporation require that in order to merge with another corporation, "First Charter's shareholders must approve such merger by the affirmative vote of not less than 75% of the aggregate voting power of the outstanding stock entitled to vote."  In seeking this 75% approval vote, the Board of First Charter solicited Proxies for the Special Meeting, by use of the Registration/Proxy Statement, stating that the First Charter Board recommended that First Charter shareholders vote to approve the Plan of Merger, *inter alia*, as follows:

**Recommendation to First Charter Shareholders**

The First Charter Board of Directors recommends that you vote **FOR** approval of
the merger agreement. The First Charter Board of Directors recommends that you
vote **FOR** approval of any proposal to adjourn or postpone the special meeting, if
necessary or appropriate, to solicit additional proxies in the event that there are
not sufficient votes in favor of approval of the merger agreement at the time of the
special meeting.

(Emphasis in original.)

101.    Additionally, the Registration/Proxy Statement stated that the First Charter Board

believes that First Charter shareholders would benefit from receiving Fifth Third stock:

The First Charter Board of Directors believes that you will benefit by either
becoming a shareholder of Fifth Third, or receiving cash in return for your First
Charter common stock.

102.    Finally, the Registration/Proxy Statement represented that the First Charter Board

believed that the merger is in First Charter's and its shareholders' best interests and urged First

Charter shareholders to vote their proxies:

First Charter has scheduled a special meeting for its shareholders to vote on the
merger agreement. The date, time and place of the special meeting are as follows:
**10:00 a.m., Eastern time, January 18, 2008, the First Charter Center, 10200
David Taylor Drive, Charlotte, North Carolina 28262-2373.**

**The Board of Directors of First Charter believes that the merger is in First
Charter's and your best interests.**

Your failure to vote will have the same effect as voting against the merger, so
whether or not you plan to attend the special meeting, please promptly return the
enclosed proxy card to us so that your shares are voted at the special meeting. The
merger cannot be completed unless the shareholders of First Charter approve the
merger agreement by the affirmative vote of 75% of the aggregate voting power
of the outstanding stock of First Charter entitled to vote at the close of business on
November 26, 2007. **Your vote is very important.**

(Emphasis in original.)

103.    Attached as an exhibit to the Registration/Proxy Statement was a proxy card seeking First Charter shareholder approval of the merger of First Charter and Fifth Third, *inter alia*, stating:

### THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE FOLLOWING PROPOSALS

1.  Proposal to approve the merger of First Charter with and into Fifth Third Financial Corporation, substantially on the terms set forth in the Amended and Restated Plan of Merger dated as of September 14, 2007 by and among First Charter, Fifth Third Bancorp and Fifth Third Financial Corporation.

(Emphasis in original.)

104.    The Registration/Proxy Statement included a chart purporting to depict Fifth Third's financial condition, including its loan loss reserves and percentage of non-performing assets, as compared to its competitors and First Charter, stating:

|  | Fifth Third Peer Group Fifth Third | Median | First Charter Peer Group First Charter | Median |
|---|---|---|---|---|
| **Financial Condition Measures:** | | | | |
| Tangible Equity/Tangible Assets | 6.53 % | 5.55 % | 7.48 % | 6.66 % |
| Loans/Deposits | 112 % | 117 % | 110 % | 95 % |
| Latest Twelve Months Net Charge-offs /Average Loans | 0.46 % | 0.25 % | 0.07 % | 0.14 % |
| Loan Loss Reserves/Loans | 1.02 % | 1.08 % | 1.26 % | 1.16 % |
| Nonperforming Assets/Assets | 0.55 % | 0.42 % | 0.41 % | 0.35 % |

105.    The Registration/Proxy Statement also reported Fifth Third's purported capital ratios for the quarter ended September 30, 2007, as follows:

*Capital Ratios:*
| | |
|---|---|
| Average shareholders' equity to average assets | 9.56 % |
| Tier 1 risk-adjusted capital | 8.46 % |
| Total risk-adjusted capital | 10.87 % |
| Tier 1 leverage | 9.23 % |

106.    The Registration/Proxy Statement contained the following material misstatements and omissions: (a) the consideration payable in the transaction to First Charter shareholders was not worth $31.00 per share at the time of closing; (b) the Company used a system of rigid sales

quotas and lavish bonuses as incentive for its employees to originate risky and illiquid commercial and consumer loans; (c) these risky loans included Alt-A loans that carried risks that were comparable to subprime loans; (d) Fifth Third was originating Alt-A loans that had layered risk factors, including high LTVs, FICO scores below 660 (a key credit threshold established by bank regulators), unverified employment, unverified income, unverified assets, and high total debt-to-income ratio borrowers; (e) Defendants aggressively marketed risky high LTV commercial loans and high LTV land loans; (f) Defendants aggressively marketed Fifth Third-financed Florida real estate (particularly unimproved land and condominiums) to Europeans for whom the Company was unable to obtain credit scores or verify any other borrower data germane to loan origination and sound underwriting practices; (g) as a direct and proximate result of the Defendants' deficient underwriting and risk management practices, Fifth Third was increasingly unable to sell loans it originated in the secondary market and thus, was forced to retain these poor quality loans in its held-for-investment loan portfolio; (h) as Fifth Third rapidly increased its holdings of unsalable, risky loans from mid-2006 through 2008, the credit quality of the Company's loan portfolio rapidly deteriorated; (i) Fifth Third had failed to timely identify and report nonperforming loans; (j) Fifth Third had failed to timely and adequately reserve for deteriorating asset quality and loan losses; (k) as a result of the Company's failure to take timely reserves for loan losses, Fifth Third's net income throughout the Class Period was overstated; (l) the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and vulnerable to future losses; and (m) as a direct and proximate result of the foregoing, the Company was required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, selling assets, and seeking federal bailout funds.

107.    On January 14, 2008, Fifth Third filed with the SEC a current report on Form 8-K updating the market on the status of regulatory approvals necessary for the First Charter acquisition, *inter alia*, stating:

> Fifth Third previously reported that the Merger was expected to close in the first quarter of 2008, subject to regulatory approval and approval by the holders of 75% of the outstanding shares of First Charter Common Stock. The Merger is subject to the approval of the Federal Reserve Board and the prior approval of the North Carolina Commissioner of Banks.  On September 18, 2007, Fifth Third submitted applications for both approvals and received the approval of the North Carolina Commissioner of Banks on October 22, 2007. As of the date of this report Fifth Third has not yet received the approval of the Federal Reserve Board. Fifth Third has responded to information requests from the Federal Reserve Board regarding its application and comment letters received from the public and is currently responding to further inquiries from the Federal Reserve Board regarding related topics. Consequently, although a first quarter closing still could be possible if approval would be obtained soon, Fifth Third no longer expects or believes that the transaction will close in the first quarter of 2008. As the passage of time makes a first quarter closing increasingly unlikely, Fifth Third now is planning for closing in the second quarter of 2008 although no assurance can be given in this regard. As previously reported, the First Charter shareholder meeting to consider and vote upon the Merger will be held at 10:00 a.m. on January 18, 2008.

108.    After filing the Registration/Proxy Statement with the SEC and prior to the closing of the First Charter acquisition on June 6, 2008, the Defendants failed to correct any of the misstatements and omissions contained in the Registration/Proxy Statement and continued to issue materially false and misleading statements regarding the Company's business and financial condition.

109.    On June 6, 2008, Fifth Third filed with the SEC a registration statement on Form S-4MEF, signed by Defendants Kabat, Poston, and Schaefer, for the purpose of registering an additional 13,000,000 shares of Fifth Third common stock for issuance in connection with the merger of First Charter, pursuant to the Registration/Proxy Statement, which provided for the registration of 35,000,000 shares of its common stock.

110.    On June 6, 2008, Fifth Third issued a press release announcing the completion of the acquisition of First Charter.

### b)    The Truth Begins to Emerge

111.    On June 18, 2008, the Company shocked investors when it issued a press release revealing, among other things, that the Company was in desperate need of capital and was planning a $1 billion convertible preferred stock offering and a fire sale of "non-core businesses" to raise an additional $1 billion in capital.  The Company also announced that it was slashing its quarterly dividend 66% from $0.44 per share to $0.15 per share, *inter alia*, stating:

> Fifth Third Bancorp today announced actions to strengthen its capital position in light of continued deterioration in credit trends during the second quarter of 2008 and its view that conditions are unlikely to improve in the near-term. The Company's Board of Directors has approved the following actions:
>
> •    The planned issuance of $1 billion in Tier 1 capital in the form of convertible preferred shares.
>
> •    A reduction in the quarterly dividend level. The Company declared its second quarter cash dividend on its common stock and set the level at $0.15 per share, a reduction from the previous $0.44 per share quarterly level. The new dividend is payable on July 22, 2008, to holders of record on June 30, 2008.
>
> •    The anticipated sales of certain non-core businesses that, if successfully completed, would supplement common equity capital by an estimated additional $1 billion or more. Fifth Third owns several non-strategic businesses that are not significantly synergistic with its core financial services businesses. We expect these transactions to be completed over the course of the next several quarters.
>
> In conjunction with these actions and a more difficult operating environment, Fifth Third is revising its capital targets and is now targeting an 8 to 9 percent range for its Tier 1 capital ratio. The convertible preferred share issuance and dividend reduction will allow us to readily meet our higher Tier 1 capital ratio target throughout the remainder of 2008. We believe, given the uncertainty with respect to trends in the economy and credit environment, that proceeding with the sale of certain non-core businesses will ensure we remain within our capital ratio target as we move through 2009.

112.    News of this shocked the market, causing the price of Fifth Third common stock to decline 27% from its previous close of $12.73 per share, to close on June 18, 2008 at $9.26 per share – a drop of $3.47 per share – on unusually heavy volume.

c)    **COUNT I – Against Defendant Fifth Third, the Individual Defendants, Director Defendants and Defendants Rogers and Bridgeman for Violations of §11 of the Securities Act in Connection with the First Charter Registration/Proxy Statement**

113.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Lead Plaintiff Shelton purchased or acquired Fifth Third common stock pursuant to the Registration/Proxy Statement.

114.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons or entities who acquired Fifth Third common stock, pursuant to or traceable to, the Registration/Proxy Statement.

115.    For purposes of this claim, Lead Plaintiff Shelton expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

116.    This claim is based solely upon the Registration/Proxy Statement and SEC filings relating to or incorporated by reference in the Registration/Proxy Statement.

117.    The Registration/Proxy Statement, as set forth above, was inaccurate and misleading, contained untrue statements of material facts, and omitted to state other facts necessary to make the statements contained therein not misleading.  Specifically, as set forth above, the Registration/Proxy Statement was untrue and misleading because (a) the consideration received by First Charter shareholders was not worth $31.00 per share; and (b) because

36

Defendants failed to: (i) accurately report Fifth Third's materially deficient underwriting standards; (ii) the rapidly declining credit quality of its held for investment commercial and consumer loan portfolios; and (iii) the Company's failure to timely and adequately reserve for loan losses. Defendants omitted material facts that: (i) as a result of the Company's failure to take timely reserves for loan losses, Fifth Third's net income throughout the Class Period was overstated; (ii) the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and vulnerable to future losses; and (iii) as a direct and proximate result of the foregoing, the Company was required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, and selling assets. Thus, the Registration/Proxy Statement contained misstatements and material omissions.

118. Fifth Third, as the issuer of the Registration/Proxy Statement, is strictly liable for the material misstatements and omissions therein.

119. The Individual Defendants, the Director Defendants, and Defendants Rogers and Bridgeman signed the Registration/Proxy Statement. Therefore, the Individual Defendants, the Director Defendants, and Defendants Rogers and Bridgeman are liable to Lead Plaintiff Shelton and the other members of the First Charter Class who purchased or otherwise acquired Fifth Third common stock, pursuant to or traceable to, the Registration/Proxy Statement for the various material misstatements and omissions contained therein under §11 of the Securities Act.

120. Lead Plaintiff Shelton and the other members of the First Charter Class acquired Fifth Third common stock, pursuant to or traceable to, the Registration/Proxy Statement. At the time they acquired Fifth Third common stock, Lead Plaintiff Shelton and other members of the

First Charter Class were without knowledge of the facts concerning the material misstatements and omissions alleged herein.

121.    Less than one year has elapsed from discovery of the violations and facts upon which this Complaint is based to the time of filing of this action. Less than three years has elapsed from the time that Fifth Third's common stock was offered bona fide to the public to the time of filing of the action.

122.    By reason of the conduct alleged herein, each Defendant named in this Count violated §11 of the Securities Act. As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiff Shelton and the other members of the First Charter Class have sustained substantial damage in connection with their acquisition of Fifth Third common stock, pursuant to or traceable to, the Registration/Proxy Statement.

> **d)      COUNT II – Against Defendant Fifth Third for Violations of §12(a)(2) of the Securities Act in Connection with the First Charter Registration/Proxy Statement**

123.    Lead Plaintiff Shelton repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    For purposes of this Claim, Lead Plaintiff Shelton expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct. Rather, the conduct alleged herein was negligent or grossly negligent.

125.    This Claim is based solely upon the Registration/Proxy Statement and SEC filings relating to or incorporated by reference in the Registration/Proxy Statement.

126.    This claim is brought pursuant to §12(a)(2) of the Securities Act, against Fifth Third on behalf of all acquirers of Fifth Third securities in the First Charter acquisition.

127.    Fifth Third was a seller, offeror, and/or solicitor of sales of the securities offered pursuant to the Registration/Proxy Statement, which contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading as set forth above.

128.    At all times prior to the close of the First Charter acquisition, Fifth Third had a duty to update all material facts and representations contained in the Registration/Proxy Statement and the documents incorporated therein, so that there would not be any material misstatements and omissions due to intervening changes in the Company's business and/or financial condition, but Fifth Third negligently breached its duty to do so.

129.    Lead Plaintiff Shelton and other members of the First Charter Class who acquired Fifth Third common stock in the exchange for First Charter common stock have sustained damages as a result of the material misstatements and omissions in the Registration/Proxy Statement for which they hereby elect to rescind and tender their Fifth Third stock to Fifth Third, in return for the consideration paid for the Fifth Third common stock with interest or request damages if they no longer own the Fifth Third stock.

130.    Less than one year has elapsed from discovery of the violations and facts upon which this Complaint is based to the time of filing of this action.  Less than three years has elapsed from the time that Fifth Third's common stock was offered bona fide to the public to the time of filing of the action.

131.    By virtue of the foregoing, Fifth Third violated §12(a)(2) of the Securities Act.

> **e)** **COUNT III – Against the Individual Defendants for Violations of §15 of the Securities Act in Connection with the First Charter Registration/Proxy Statement**

132.    Lead Plaintiff Shelton repeats and realleges each and every allegation contained above as if fully set forth herein.

133.    This Count is brought pursuant to §15 of the Securities Act, on behalf of all persons or entities who purchased or otherwise acquired Fifth Third common stock pursuant to or traceable to the Registration/Proxy Statement.

134.    For purposes of this claim, Lead Plaintiff Shelton expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

135.    This claim is based solely upon the Registration/Proxy Statement and SEC filings relating to or incorporated by reference in the Registration/Proxy Statement.

136.    The Individual Defendants were control persons of Fifth Third by virtue of their executive and/or directorial positions at the Company.  The Individual Defendants had the power, and exercised the same, to cause Fifth Third to engage in the violations of law complained of herein and were able to and did control the contents of the Registration/Proxy Statement.

137.    By reason of their positions as senior officers and directors of Fifth Third and their actual control over the Company's day-to-day operations, financial statements, public filings and their intimate involvement and control over the Registration/Proxy Statement, the Individual Defendants are jointly and severally liable to Lead Plaintiff Shelton and the other members of the First Charter Class as a result of the wrongful conduct alleged herein.

    **f)**  **COUNT IV – Brought on Behalf of All First Charter Shareholders of Record as of November 26, 2007, Against Defendant Fifth Third and the Individual Defendants for Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder by the SEC**

  138.  Lead Plaintiff Shelton repeats and realleges each and every allegation contained above as if fully set forth herein.

  139.  For purposes of this claim, Lead Plaintiff Shelton expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

  140.  This claim is based solely upon the Registration/Proxy Statement and SEC filings relating to or incorporated by reference in the Registration/Proxy Statement.

  141.  The Registration/Proxy Statement, including the Proxy Statement for the First Charter Special Meeting, contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

  142.  All Defendants named in this count, jointly and severally, solicited and/or permitted the use of their names in solicitations contained in the Registration/Proxy Statement.

  143.  The Individual Defendants signed the Registration/Proxy Statement or permitted the use of their names in the Proxy Statement for First Charter Special Meeting.

  144.  Defendant Fifth Third is the issuer of the Registration/Proxy Statement.

  145.  In a Form 8-K filed with the SEC on Nov 2, 2007 and a press release issued that day, First Charter stated: "Fifth Third and First Charter and their respective directors and executive officers may be deemed participants in the solicitation of proxies from First Charter's Shareholders in connection with the Merger."

146.    The Registration/Proxy Statement was inaccurate and misleading, contained untrue statements of material facts, and omitted to state other facts necessary to make the statements contained therein not misleading.    Specifically, as set forth above, the Registration/Proxy Statement was untrue and misleading because: (a) the consideration received by First Charter shareholders was not worth $31.00 per share; and (b) the Registration/Proxy Statement failed to accurately report: (i) Fifth Third's materially deficient underwriting standards; (ii) the rapidly declining credit quality of its held for investment commercial and consumer loan portfolios; (iii) the Company's failure to timely and adequately reserve for loan losses; (iv) as a result of the Company's failure to take timely reserves for loan losses, Fifth Third's net income throughout the Class Period was overstated; (v) the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and vulnerable to future losses; (vi) as a direct and proximate result of the foregoing, the Company was required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, and selling assets, as described at length above.

147.    By means of the Registration/Proxy Statement, the Individual Defendants sought to secure Lead Plaintiff Shelton's and the First Charter Class' approval of the First Charter merger by and into Fifth Third and solicited proxies from Lead Plaintiff Shelton and other members of the First Charter Class.

148.    The misstatements and omissions identified above were material to Lead Plaintiff Shelton and the First Charter Class in determining whether to vote, and if so, how to vote with respect to the proposed Plan of Merger, dated as of September 14, 2007, by and among First Charter, Fifth Third, and Fifth Third Financial.  But for the material misstatements and omissions

in the proxy solicitation, Lead Plaintiff Shelton and the First Charter Class would not have voted to approve the Plan of Merger and would not have tendered their First Charter shares for shares of Fifth Third or would have insisted upon a substantially greater number of Fifth Third shares in exchange for their First Charter shares and/or a substantially greater cash component of the $31.00 per share offered by Fifth Third to reflect the true value of the Fifth Third shares at the time.

149.    Each Defendant named in this claim acted negligently in making untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

150.    The Registration/Proxy Statement was an essential link in the accomplishment of the merger. As a direct and proximate result of the Registration/Proxy Statement, the shareholders of First Charter approved the merger. Without the Registration/Proxy statement and two subsequent solicitations, the Individual Defendants would not have been able to secure the necessary affirmative vote of not less than 75% of the aggregate voting power of the outstanding First Charter stock entitled to vote.

151.    Lead Plaintiff Shelton and First Charter Class members eligible to vote on the merger were damaged as a direct and proximate result of the material misstatements and omissions in the Registration/Proxy Statement.

152.    By reason of the foregoing, Defendants have violated §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

> **g)** **COUNT V – Brought on Behalf of All First Charter Shareholders of Record As of November 26, 2007 Against the Individual Defendants for Violations of §20(a) of the Exchange Act**

153.   Lead Plaintiff Shelton repeats and realleges each and every allegation contained above as if fully set forth herein.

154.   The Individual Defendants acted as controlling persons of Fifth Third within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their participation in and/or awareness of Fifth Third's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Fifth Third, including the content and dissemination of the various statements which Lead Plaintiff Shelton contends contain material misstatements and omissions.  The Individual Defendants were provided with or had unlimited access to copies of Fifth Third's, press releases, public filings and other statements alleged by Lead Plaintiff Shelton to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

155.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the violations of §14(a) of the Exchange Act and the Rules promulgated thereunder, as alleged herein, and exercised the same.

156.   As set forth above, the Individual Defendants each violated §14(a) and Rule 14a-9 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff Shelton and other members of the First Charter Class suffered damages in connection with their acquisition of the Company's common stock pursuant to the Registration/Proxy Statement.

WHEREFORE, Lead Plaintiff Shelton prays for relief and judgment, as follows:

   (a)   Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the First Charter Class, and certifying Co-Lead Counsel as First Charter Class Counsel;

   (b)   Awarding compensatory and/or recissory damages in favor of Lead Plaintiff Shelton and the other First Charter Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   (c)   Awarding Lead Plaintiff Shelton and the First Charter Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

   (d)   Such other and further relief as the Court may deem just and proper.

## 2.  The Preferred B Offering – Securities Act Claims

157.   On or about October 22, 2007, the Company filed with the SEC its Preliminary Prospectus Supplement, pursuant to SEC Rule 424(b)(3), in connection with the Company's March 26, 2007 automatic shelf registration statement on Form S-3 (Nos. 333-141560 and 333-141560-03) for the public offering of 34,500,000 of 7.25% Fifth Third Preferred B Shares at $25 per share (the "October 22 Prospectus Supplement").  The October 22 Prospectus Supplement became effective as of October 25, 2007, when Fifth Third filed with the SEC its Final

Prospectus Supplement for the Preferred B Shares (the "Preferred B Prospectus").  The Preferred B Prospectus incorporated by reference "any documents which we file with the SEC in the future under Sections 13 (a), 13 (c), 14, or 15 (d) of the Securities Exchange Act of 1934 … until we sell all of the securities offered by this prospectus."

158.    The Preferred B Prospectus incorporated by reference the Company's March 26, 2007 automatic shelf registration statement on Form S-3, which was signed by Defendants Allen, Barrett, Hackett, Heminger, Herschede, Hill, Koch, Livingston, Marshall, Meijer, Schaffer, Schiff, Taft and Traylor.   The Preferred B  offering  was  underwritten  by  the  Preferred  B Underwriter Defendants.

159.    The Preferred B Prospectus included selected financial data for Fifth Third and reported the Company's provision for loan and lease losses of $205 million and $149 million of the six months ended June 30, 2007 and June 30, 2006, respectively, as follows:

| *(In millions, except per share data)* | Six-Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | **2007** | **2006** | **2006** | **2005** | **2004** |
| **CONSOLIDATED CONDENSED SUMMARIES OF INCOME** | | | | | |
| Total interest income | $2,949 | $2,876 | $5,955 | $4,995 | $4,114 |
| Total interest expense | 1,474 | 1,455 | 3,082 | 2,030 | 1,102 |
| Net interest income | 1,475 | 1,421 | 2,873 | 2,965 | 3,012 |
| ***Provision for loan and lease losses*** | ***205*** | ***149*** | ***343*** | ***330*** | ***268*** |
| Net interest income after provision for loan and lease losses | 1,270 | 1,272 | 2,530 | 2,635 | 2,744 |
| Total noninterest income | 1,355 | 1,272 | 2,153 | 2,500 | 2,465 |
| Total noninterest expense | 1,595 | 1,490 | 3,056 | 2,927 | 2,972 |
| Applicable income taxes | 295 | 312 | 443 | 659 | 712 |
| Cumulative effect of change in accounting principle, net of tax | - | 4 | 4 | - | - |
| Net income | $735 | $746 | $1,188 | $1,549 | $1,525 |

(Emphasis added.)

160.    Under the heading "Recent Developments," the Preferred B Prospectus reported the Company's non-performing assets of $706 million as of September 30, 2007, and the provision for loan losses was $139 million for the third quarter of 2007, as follows:

> **Nonperforming assets were $706 million, or 0.92% of total loans and leases and other real estate owned, as of September 30, 2007**, compared to $528 million (0.70%) as of June 30, 2007 and $411 million (0.56%) as of September 30, 2006. Net charge-offs as a percentage of average loans and leases were 0.60% in the third quarter of 2007, compared to 0.55% in the second quarter of 2007 and 0.43% in the third quarter of 2006. **The provision for loan and lease losses was $139 million in the third quarter of 2007** compared to $121 million in the second quarter of 2007 and $87 million in the third quarter of 2006.

(Emphasis added.)

161.    The Preferred B Prospectus contained material misstatements and omissions because it negligently failed to disclose that Fifth Third's nonperforming assets were rapidly increasing as a result of the undisclosed poor credit quality and illiquidity of the Company's loan portfolio due to the Company's underwriting deficiencies prior to and during the Class Period, that the Company had failed to sufficiently raise loan loss provisions to an adequate level to absorb these losses and that its reported income was inflated.

162.    The Preferred B Prospectus also contained material misstatements and omissions because it failed to disclose: (a) the Company used a system of rigid sales quotas and lavish bonuses as incentive for its employees to originate risky and illiquid commercial and consumer loans; (b) these risky loans included Alt-A loans that carried risks that were comparable to subprime loans; (c) Fifth Third was originating Alt-A loans that had layered risk factors, including high LTVs, FICO scores below 660 (a key credit threshold established by bank regulators), unverified employment, unverified income, unverified assets, and high total debt-to-income ratio borrowers; (d) Defendants aggressively marketed risky high LTV commercial loans and high LTV land loans; (e) Defendants aggressively marketed Fifth Third-financed Florida real

estate (particularly unimproved land and condominiums) to Europeans for whom the Company was unable to obtain credit scores or verify any other borrower data germane to loan origination and sound underwriting practices; (f) as a direct and proximate result of the Defendants' deficient underwriting and risk management practices, Fifth Third was increasingly unable to sell loans it originated in the secondary market and, thus, was forced to retain these poor quality loans in its held-for-investment loan portfolio; (g) as Fifth Third rapidly increased its holdings of unsalable, risky loans from mid-2006 through 2008, the credit quality of the Company's loan portfolio rapidly deteriorated; (h) Fifth Third had failed to timely identify and report nonperforming loans; (i) Fifth Third had failed to timely and adequately reserve for deteriorating asset quality and loan losses; (j) as a result of the Company's failure to take timely reserves for loan losses, Fifth Third's net income throughout the Class Period was overstated; (k) the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and vulnerable to future losses; and (l) as a direct and proximate result of the foregoing, the Company was required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, selling assets, and seeking federal bailout funds.

163.    Following the Company's June 18, 2008 announcement that it was in desperate need of capital and was planning a $1 billion convertible preferred stock offering, the sale "non-core businesses," and was slashing its quarterly dividend 66% from $0.44 per share to $0.15 per share, the price of the Preferred B Shares dropped 7.58%, from $18.00 per share to close at $16.64 per share on June 18, 2008 – $8.36 per share below the Preferred B Share's initial offering price of $25.

a) **COUNT VI – Against Defendants Fifth Third Capital Trust VI, Fifth Third, Individual Defendants, and Director Defendants for Violations of §11 of the Securities Act in Connection with the Preferred B Offering**

164.    Preferred B Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons or entities who acquired Fifth Third Preferred B Shares pursuant or traceable to the Preferred B Prospectus.  Preferred B Plaintiffs purchased Preferred B Shares pursuant or traceable to the Preferred B Prospectus.

166.    For purposes of this claim, Preferred B Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

167.    This claim is based solely upon the Preferred B Offering and SEC filings relating to or incorporated by reference in the Preferred B Offering.

168.    The Preferred B Prospectus, as set forth above, was inaccurate and misleading, contained untrue statements of material facts, and omitted to state other facts necessary to make the statements contained therein not misleading.  Specifically, as set forth above, the Preferred B Prospectus was untrue and misleading in that it failed to: (i) accurately report Fifth Third's materially deficient underwriting standards; (ii) the rapidly declining credit quality of its held for investment commercial and consumer loan portfolios; (iii) the Company's failure to timely and adequately reserve for loan losses; (iv) as a result of the Company's failure to take timely reserves for loan losses, Fifth Third's net income throughout the Class Period was overstated; (v) the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and vulnerable to future losses; and (vi) as a direct and proximate result of the

foregoing, the Company was required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, and selling assets.  Thus, the Preferred B Prospectus contained material misstatements and omissions.

169.    Defendants Fifth Third Capital Trust VI and Fifth Third, as the issuers of the Preferred B Prospectus, are strictly liable for the material misstatements and material omissions therein.

170.    The Individual Defendants and Director Defendants signed the Preferred B Prospectus.  Therefore, the Individual Defendants and Director Defendants are liable to Preferred B Plaintiffs and the other members of the Preferred B Class who purchased or otherwise acquired Fifth Third Preferred B Shares pursuant to or traceable to the Preferred B Prospectus for the various material misstatements and omissions contained therein under §11 of the Securities Act.

171.    Preferred B Plaintiffs and the other members of the Preferred B Class acquired Fifth Third Preferred B Shares, pursuant to or traceable to, the Preferred B Prospectus.  At the time they acquired Fifth Third Preferred B Shares, Preferred B Plaintiffs and other members of the Preferred B Class were without knowledge of the facts concerning the material misstatements and omissions alleged herein.

172.    Less than one year has elapsed from discovery of the violations and facts upon which this Complaint is based to the time of filing of this action.  Less than three years has elapsed from the time that Fifth Third's Preferred B Shares were offered bona fide to the public to the time of filing of the action.

173.    By reason of the conduct alleged herein, each Defendant named in this Count violated §11of the Securities Act.  As a direct and proximate result of the conduct by the

Defendants named in this Count, Preferred B Plaintiffs and the other members of the Preferred B Class have sustained substantial damage in connection with their acquisition of the Preferred B Shares pursuant to or traceable to the Preferred B Prospectus.

        b)      **COUNT VII – Against Defendants Fifth Third, Fifth Third Capital Trust VI, and the Preferred B Underwriter Defendants for Violations of §12(a)(2) of the Securities Act in Connection with the Preferred B Offering**

174.    Preferred B Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

175.    For purposes of this claim, Preferred B Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct. Rather, the conduct alleged herein was negligent or grossly negligent.

176.    This claim is based solely upon the Preferred B Offering and SEC filings relating to or incorporated by reference in the Preferred B Offering.

177.    This claim is brought pursuant to §12(a)(2) of the Securities Act, against Defendants Fifth Third, Fifth Third Capital Trust VI, and the Preferred B Underwriter Defendants on behalf of all acquirers of Preferred B Shares pursuant to the Preferred B Prospectus.

178.    Defendants Fifth Third, Fifth Third Capital Trust VI, and the Preferred B Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the Preferred B Prospectus, which contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading as set forth above.

179.     Preferred B Plaintiffs and other members of the Preferred B Class who acquired Preferred B Shares pursuant to the Preferred B Prospectus have sustained damages as a result of the untrue statements of material facts and omissions in the Preferred B Prospectus for which they hereby elect to rescind and tender their Fifth Third Preferred B Shares to Fifth Third, in return for the consideration paid for the Fifth Third Preferred B Shares with interest or request damages if they no longer own the Preferred B Shares.

180.     Less than one year has elapsed from discovery of the violations and facts upon which this Complaint is based to the time of filing of this action.  Less than three years has elapsed from the time that Fifth Third's Preferred B Shares were offered bona fide to the public to the time of filing of the action.

181.     By virtue of the foregoing, Defendants Fifth Third, Fifth Third Capital Trust VI, and the Preferred B Underwriter Defendants violated §12(a)(2) of the Securities Act.

**c)      COUNT VIII – Against Defendant Fifth Third and the Individual Defendants for Violations of §15 of the Securities Act in Connection with the Preferred B Offering**

182.     Preferred B Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

183.     This Count is brought pursuant to §15 of the Securities Act, on behalf of all persons or entities who purchased or otherwise acquired Fifth Third Preferred B Shares pursuant to or traceable to the Preferred B Prospectus.

184.     For purposes of this claim, Preferred B Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

185.    This claim is based solely upon the Preferred B Offering and SEC filings relating to or incorporated by reference in the Preferred B Offering.

186.    Defendants Fifth Third and the Individual Defendants were control persons of Fifth Third Capital Trust VI and/or Fifth Third by virtue of their sponsorship and/or positions as trustees of Fifth Third Capital Trust VI, and their executive and/or directorial positions at Fifth Third.  Defendant Fifth Third and the Individual Defendants had the power, and exercised the same, to cause Fifth Third Capital Trust VI and/or Fifth Third to engage in the violations of law complained of herein and were able to and did control the contents of the Preferred B Prospectus.

187.    By reason of their positions as sponsors and/or trustees of Fifth Third Capital Trust IV, and their executive and/or directorial positions at Fifth Third and their actual control over Fifth Third Capital Trust VI's and the Company's day-to-day operations, financial statements, public filings, and their intimate involvement and control over the Preferred B Prospectus, the Defendant Fifth Third and Individual Defendants are jointly and severally liable to Preferred B Plaintiffs and the other members of the Preferred B Class as a result of the wrongful conduct alleged herein.

WHEREFORE, Preferred B Plaintiffs pray for relief and judgment, as follows:

(a)    Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Preferred B Class, and certifying Co-Lead Counsel as Preferred B Class Counsel;

(b)    Awarding compensatory and/or recissory damages in favor of Preferred B Plaintiffs and the other Preferred B Class members against all Defendants named in Counts VI, VII, and VIII, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding the Preferred B Plaintiffs and the Preferred B Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

### 3.     <u>The Preferred C Offering – Securities Act Claims</u>

188.    On or about April 28, 2008, Fifth Third filed with the SEC its Prospectus Supplement for the Preferred C Offering.  This Prospectus Supplement became effective on or about April 29, 2008, when Fifth Third filed with the SEC its Free Writing Prospectus for the Preferred C Offering.

189.    Each Preferred C Share represented an undivided beneficial interest in an underlying trust and the only assets of the trust are the $400,000,000 in aggregate principal amount of the 8.875% Junior Subordinated Notes due 2068 (inclusive of underwriters overallotments, which were fully exercised as of May 5, 2008).  The Company owns all of the common securities of the trust.

190.    The Preferred C Prospectus incorporated by reference Fifth Third's Form 10-K for the year ended December 31, 2007, the Company's Forms 8-K filed on January 14, 2008, February 25, 2008, February 28, 2008, and April 23, 2008 and "any documents we file with the SEC in the future under Sections 13 (a), 13 (c), 14 or 15 (d) of the Securities Exchange Act of 1934 … until we sell all the securities offered by this prospectus."  These documents contain untrue statements of material fact, omit to state material facts required to be stated therein, and omit to state material facts necessary to make the statements therein not misleading, for the

reasons alleged herein in paragraphs discussing those documents (and subject to the exclusion of all allegations relating to fraud and scienter).

191. The Preferred C Prospectus incorporated by reference the Company's March 26, 2007 automatic shelf registration statement on Form S-3, which was signed by Defendants Allen, Barrett, Hackett, Heminger, Herschede, Hill, Koch, Livingston, Marshall, Meijer, Schaffer, Schiff, Taft and Traylor. The Preferred C Offering was underwritten by the Preferred C Underwriter Defendants.

192. The Preferred C Prospectus included selected financial data for Fifth Third and reported the Company's provision for loan and lease losses of $628 million and $343 million of the years ended December 31, 2007 and December 31, 2006, respectively, as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| *(In millions, except per share data)* | **2007** | **2006** | **2005** |
| **CONSOLIDATED CONDENSED SUMMARIES OF INCOME** | | | |
| Total interest income | $ 6,027 | $ 5,955 | $ 4,995 |
| Total interest expense | 3,018 | 3,082 | 2,030 |
| Net interest income | 3,009 | 2,873 | 2,965 |
| ***Provision for loan and lease losses*** | ***628*** | ***343*** | ***330*** |
| Net interest income after provision for loan and lease losses | 2,381 | 2,530 | 2,635 |
| Total noninterest income | 2,467 | 2,012 | 2,374 |
| Total noninterest expense | 3,311 | 2,915 | 2,801 |
| Applicable income taxes | 461 | 443 | 659 |
| Cumulative effect of change in accounting principle, net of tax | — | 4 | — |
| Net income | $ 1,076 | $ 1,188 | $ 1,549 |

(Emphasis added.)

193. Under the heading "Recent Developments," the Preferred C Prospectus reported the Company's non-performing assets of $1.6 billion as of March 31, 2008, and the provision for loan losses was $544 million for the first quarter of 2008, as follows:

**Nonperforming assets were $1.6 billion, or 1.96% of total loans and leases and other real estate owned, as of March 31, 2008**, compared to $1.1 billion (1.32%) as of December 31, 2007 and $494 million (0.66%) as of March 31, 2007. Net charge-offs as a percentage of average loans and leases were 1.37% in the first quarter of 2008, compared to 0.89% in the fourth quarter of 2007 and 0.39% in the first quarter of 2007. **The provision for loan and lease losses was**

**$544 million in the first quarter of 2008** compared to $284 million in the fourth quarter of 2007 and $84 million in the first quarter of 2007.

(Emphasis added.)

194.    The Preferred C Prospectus, as set forth above, contained untrue statements of material fact, omitted to state material facts required to be stated therein, and omitted to state material facts necessary to make the statements therein not misleading because it failed to disclose that Fifth Third's nonperforming assets were rapidly increasing as a result of the undisclosed poor credit quality and illiquidity of the Company's loan portfolio due to the Company's underwriting deficiencies prior to and during the Class Period, and that the Company had failed to sufficiently increase loan loss provisions to an adequate level to absorb these losses.

195.    The Preferred C Prospectus also contained material misstatements and material omissions because it failed to disclose: (a) the Company used a system of rigid sales quotas and lavish bonuses as incentive for its employees to originate risky and illiquid commercial and consumer loans; (b) these risky loans included Alt-A loans that carried risks that were comparable to subprime loans; (c) Fifth Third was originating Alt-A loans that had layered risk factors, including high LTVs, FICO scores below 660 (a key credit threshold established by bank regulators), unverified employment, unverified income, unverified assets, and high total debt-to-income ratio borrowers; (d) Defendants aggressively marketed risky high LTV commercial loans and high LTV land loans; (e) Defendants aggressively marketed Fifth Third-financed Florida real estate (particularly unimproved land and condominiums) to Europeans for whom the Company was unable to obtain credit scores or verify any other borrower data germane to loan origination and sound underwriting practices; (f) as a direct and proximate result of the Defendants' deficient underwriting and risk management practices, Fifth Third was increasingly unable to sell loans it originated in the secondary market, and thus, was forced to retain these poor quality

56

loans in its held-for-investment loan portfolio; (g) as Fifth Third rapidly increased its holdings of unsalable, risky loans from mid-2006 through 2008, the credit quality of the Company's loan portfolio rapidly deteriorated; (h) Fifth Third had failed to timely identify and report nonperforming loans; (i) Fifth Third had failed to timely and adequately reserve for deteriorating asset quality and loan losses; (j) as a result of the Company's failure to take timely reserves for loan losses, Fifth Third's net income throughout the Class Period was overstated; (k) the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and vulnerable to future losses; and (l) as a direct and proximate result of the foregoing, the Company was required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, selling assets, and seeking federal bailout funds.

196.    Following the Company's June 18, 2008 announcement that it was in desperate need of capital and was planning a $1 billion convertible preferred stock offering, the sale of "non-core businesses," and was slashing its quarterly dividend 66% from $0.44 per share to $0.15 per share, the price of the Preferred C Shares dropped 6.53%, from $22.68 per share to close at $21.20 per share on June 18, 2008 – $3.80 per share below the Preferred C Share's initial offering price of $25.

        **a)**      **<u>COUNT IX – Against Defendants Fifth Third Capital Trust VII, Fifth Third, Defendant Marshall and the Director Defendants for Violations of §11 of the Securities Act in Connection with the Preferred C Offering</u>**

197.    Plaintiff Loewenstine repeats and realleges each and every allegation contained above as if fully set forth herein.

198.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons or entities who acquired Fifth Third Preferred C Shares, pursuant to or traceable to, the Preferred C Prospectus.  Plaintiff Loewenstine purchased Fifth Third Preferred C Shares, pursuant to or traceable to, the Preferred C Prospectus.

199.    For purposes of this claim, Plaintiff Loewenstine expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

200.    This claim is based solely upon the Preferred C Offering and SEC filings relating to or incorporated by reference in the Preferred C Offering.

201.    The Preferred C Prospectus, as set forth above, contained untrue statements of material facts, and omitted to state other material facts necessary to make the statements contained therein not misleading.  Specifically, as set forth above, the Preferred C Prospectus contained material misstatements and omissions in that it failed to: (i) accurately report Fifth Third's materially deficient underwriting standards; (ii) the rapidly declining credit quality and illiquidity of its held for investment commercial and consumer loan portfolios; (iii) the Company's failure to timely and adequately reserve for loan losses; (iv) as a result of the Company's failure to take timely reserves for loan losses, Fifth Third's net income throughout the Class Period was overstated; (v) the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and vulnerable to future losses; and (vi) as a direct and proximate result of the foregoing, the Company was required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of

dilutive preferred stock, and selling assets.  Thus, the Preferred C Prospectus contained material misstatements and omissions.

202.    Defendants Fifth Third Capital Trust VII and Fifth Third, as the issuers of the Preferred C Prospectus, are strictly liable for the material misstatements and material omissions therein.

203.    Defendant Marshall and the Director Defendants signed the Preferred C Prospectus.  Therefore, Defendant Marshall and the Director Defendants are liable to Plaintiff Loewenstine and the other members of the Preferred C Class who purchased or otherwise acquired Fifth Third Preferred C Shares, pursuant to or traceable to, the Preferred C Prospectus for the various material misstatements and omissions contained therein under §11 of the Securities Act.

204.    Plaintiff Loewenstine and the other members of the Preferred C Class acquired Fifth Third Preferred C Shares pursuant to or traceable to the Preferred C Prospectus.  At the time they acquired Fifth Third Preferred C Shares, Plaintiff Loewenstine and other members of the Preferred C Class were without knowledge of the facts concerning the material misstatements and omissions alleged herein.

205.    Less than one year has elapsed from discovery of the violations and facts upon which this Complaint is based to the time of filing of this action.  Less than three years has elapsed from the time that Fifth Third's Preferred C Shares were offered bona fide to the public to the time of filing of the action.

206.    By reason of the conduct alleged herein, each Defendant named in this Count violated §11 of the Securities Act.  As a direct and proximate result of the conduct by the Defendants named in this Count, Plaintiff Loewenstine and the other members of the Preferred C

Class have sustained substantial damage in connection with their acquisition of the Preferred C

Shares, pursuant to or traceable to, the Preferred C Prospectus.

> **b)**      **COUNT X – Against Defendants Fifth Third, Fifth Third Capital Trust VII, and the Preferred C Underwriter Defendants for Violations of §12(a)(2) of the Securities Act in Connection with the Preferred C Offering**

207. Plaintiff Loewenstine repeats and realleges each and every allegation contained above as if fully set forth herein.

208. For purposes of this claim, Plaintiff Loewenstine expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct. Rather, the conduct alleged herein was negligent or grossly negligent.

209. This claim is based solely upon the Preferred C Offering and SEC filings relating to or incorporated by reference in the Preferred C Offering.

210. This claim is brought pursuant to §12(a)(2) of the Securities Act, against Defendants Fifth Third, Fifth Third Capital Trust VII, and the Preferred C Underwriter Defendants on behalf of all acquirers of Preferred C Shares, pursuant to the Preferred C Prospectus.

211. Defendants Fifth Third, Fifth Third Capital Trust VII, and the Preferred C Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the Preferred C Prospectus, which contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading as set forth above.

212. Plaintiff Loewenstine and other members of the Preferred C Class who acquired Preferred C Shares, pursuant to the Preferred C Prospectus, have sustained damages as a result of the material misstatements and omissions in the Preferred C Prospectus for which they hereby elect to rescind and tender their Preferred C Shares to Fifth Third, in return for the consideration paid for the Preferred C Shares with interest or request damages if they no longer own the Preferred C Shares.

213. Less than one year has elapsed from discovery of the violations and facts upon which this Complaint is based to the time of filing of this action. Less than three years has elapsed from the time that Fifth Third's Preferred C Shares were offered bona fide to the public to the time of filing of the action.

214. By virtue of the foregoing, Defendants Fifth Third, Fifth Third Capital Trust VII, and the Preferred C Underwriter Defendants violated §12(a)(2) of the Securities Act.

### c) COUNT XI – Against Defendant Fifth Third and the Individual Defendants for Violations of §15 of the Securities Act in Connection with the Preferred C Offering

215. Plaintiff Loewenstine repeats and realleges each and every allegation contained above as if fully set forth herein.

216. This Count is brought pursuant to §15 of the Securities Act, on behalf of all persons or entities who purchased or otherwise acquired Preferred C Shares pursuant to or traceable to the Preferred C Prospectus.

217. For purposes of this claim, Plaintiff Loewenstine expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct. Rather, the conduct alleged herein was negligent or grossly negligent.

218. This claim is based solely upon the Preferred C Offering and SEC filings relating to or incorporated by reference in the Preferred C Offering.

219. Defendants Fifth Third and the Individual Defendants were control persons of Fifth Third Capital Trust VII and/or Fifth Third by virtue of their sponsorship and/or positions as trustees of Fifth Third Capital Trust VII, and their executive and/or directorial positions at Fifth Third. Defendant Fifth Third and the Individual Defendants had the power, and exercised the same, to cause Fifth Third Capital Trust VII and/or Fifth Third to engage in the violations of law complained of herein and were able to and did control the contents of the Preferred C Prospectus.

220. By reason of their positions as sponsors and/or trustees of Fifth Third Capital Trust VII, and their executive and/or directorial positions at Fifth Third and their actual control over Fifth Third Capital Trust VII's and the Company's day-to-day operations, financial statements, public filings and their intimate involvement and control over the Preferred C Prospectus, the Defendant Fifth Third and Individual Defendants are jointly and severally liable to Plaintiff Loewenstine and the other members of the Preferred C Class as a result of the wrongful conduct alleged herein.

WHEREFORE, Plaintiff Loewenstine prays for relief and judgment, as follows:

(a)     Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Preferred C Class, and certifying Co-Lead Counsel and Counsel for Plaintiff Loewenstine as Preferred C Class Counsel;

(b)     Awarding compensatory and/or recissory damages in favor of Plaintiff Loewenstine and the other Preferred C Class members against all Defendants named in Counts IX, X, and XI, jointly and severally, for all

damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff Loewenstine and the Preferred C Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## IX.    EXCHANGE ACT CLAIMS

221.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

222.    Set forth below are Lead Plaintiffs' securities fraud allegations on behalf of the Class consisting of all purchasers of Fifth Third common stock during the Class Period under §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  In addition, set forth below are Lead Plaintiffs' securities fraud allegations on behalf the First Charter Class, the Preferred B Class, and the Preferred C Class under §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based upon all of the Defendants' public statements including the false and misleading statements in the Registration/Proxy Statement, the Preferred B Offering, and the Preferred C Offering, identified above.

### A.    SUBSTANTIVE ALLEGATIONS

#### 1.    Defendants Falsely Stated that Fifth Third was not a Subprime Lender and that it Used Conservative Underwriting and Documentation Standards

223.    During the Class Period, Defendants made numerous false and misleading statements that depicted the deterioration of the Company's commercial and consumer loan portfolios as the result of macroeconomic trends, including declining real estate markets in

Florida and Michigan, and the subprime credit crisis.  In truth, Fifth Third's decline was the inevitable consequence of its own sales-driven corporate culture that was fixated on generating ever-increasing revenue from originating new loans, and its abandonment of prudent and conservative lending, underwriting, risk management, and reserving practices.  As a result of Fifth Third's practices, a substantial portion of the mortgages it originated were subprime, despite Defendants' denial of being a subprime lender.  As a mortgage lender, underwriting and risk management practices were among the most important information looked at by investors.

224.   Fifth Third's focus on originating and underwriting as many loans as possible without regard to quality posed few problems for Fifth Third when housing prices were increasing and interest rates remained low.  There were several reasons for this.  First, if a buyer was not able to afford his payments, the bank received title through foreclosure to a home worth more than the amount owed.  Second, property owners could refinance or sell properties prior to default so long as property values continued to increase and interest rates remained low.  Third, borrowers – particularly those who purchased a second home or investment property – were more likely to default on a depreciating asset than an appreciating asset.  As one analyst has succinctly explained in regard to Alt-A loans:

> Because little or no determination is made of the borrower's ability to service the loan, the home itself becomes the source of repayment.… The lender is literally banking on the borrower's ability to refinance the loan at some point or, once again, in a worst case scenario, sell the home at a price that satisfies the outstanding loan obligation and allows the borrower to recover most, if not all, of his/her equity.

225.   As the real estate market slowed in 2006 and 2007 and housing prices stagnated and then fell, the importance of loan quality came to the forefront.  With home prices declining and refinancing increasingly unavailable, borrowers' ability to pay their mortgages became

critical to minimize Fifth Third's loss exposure. Thus, sound underwriting practices were the foundation for minimizing Fifth Third's loss exposure.

226. Unbeknownst to the investing public, beginning in mid-2006, Fifth Third departed from its historically conservative lending practices and embarked on a Company-wide crusade to grow its commercial real estate and consumer lending businesses by offering what amounted to subprime loans. Fifth Third aggressively marketed Alt-A mortgages, 80/20 mortgages, option-ARMs, and high LTV land and construction loans under the guise of brand names such as SimpleFlex, FLEX 53, Quick & Simple™, Alt-97, and Loan Prospector. These products all had one thing in common: they disregarded borrower qualifications, particularly the borrower's income – the primary indicia of ability to repay – and instead looked to the property securing the loan for repayment in the event of a default. Moreover, by making high LTV loans to marginally qualified borrowers and developers, Defendants were betting the bank on an appreciating real estate market at a time when that market was deteriorating. This was a business strategy that entailed a high degree of risk and should have been disclosed to Fifth Third investors – but was not. Ultimately, Defendants' strategy proved toxic when the real estate markets continued to deteriorate at a rapid pace.

227. During the Class Period, Defendants portrayed Fifth Third as a "**prime mortgage originator**" that employed stringent risk management practices based on its "core principles" of "**conservatism, diversification and monitoring**." Moreover, in making statements concerning "prime" versus "subprime" lending, Defendants concealed from investors the Company's internal working definition of "prime," which was utterly and completely inconsistent with commonly accepted definitions of the term within the banking industry. Examples of

Defendants' public misrepresentations of the Company's lending standards include the following:

- **"No subprime"** (Risk Management Presentation, August 29, 2007 Form 8-K)

- **"The management team, we've been very focused on addressing our issues, particularly as it relates to our credit quality.** For example, we've consolidated consumer and home equity underwriting and approval into two regional credit centers. **We have reduced exceptions to guidelines and eliminated channels that were producing home equity loans with poor credit performance.** We're now delivering all alt-A production under an agency flow arrangement and **we're proactively addressing problem loans in the making."** (Defendant Kabat speaking at the October 19, 2007 analyst conference call)

- **"The Bancorp's strategy for credit risk management includes a combination of conservative exposure limits significantly below legal lending limits and conservative underwriting, documentation and collections standards."** (2007 Form 10-K, filed with the SEC on February 22, 2008)

- **"The Bancorp's credit risk management strategy is based on three core principles: conservatism, diversification and monitoring.** The Bancorp believes that effective credit risk management begins with **conservative lending practices**. These practices include conservative exposure and counterparty limits and **conservative underwriting, documentation** and collection standards."** (2007 Form 10-K)

- **"The Bancorp manages credit risk in the mortgage portfolio through conservative underwriting and documentation standards and geographic and product diversification."** (2007 Form 10-K)

- **"The Bancorp originates certain non-conforming residential mortgage loans known as "Alt-A" loans. Borrower qualifications are comparable to other conforming residential mortgage products** and the Bancorp has sold, without recourse, the majority of these loans into the secondary market." (2007 Form 10-K)

- **"Fifth Third has consistently maintained conservative underwriting standards throughout all credit cycles."** (Defendants' presentation during the 2008 Annual Meeting of Fifth Third Shareholders on April 15, 2008)

- "In this environment, we continue to be proactive with steps to mitigate the losses we're facing. **You know that we're a prime underwriter** and you know that we've shut down new lending in the two areas that we've experienced the most significant difficulties, those being home builders and brokered home equity." (Defendant Kabat speaking at the April 22, 2008 analyst conference call)

- **"The Bancorp maintains a conservative approach to both lending and investing activities as it does not originate or hold subprime loans,** nor does it hold collateralized debt obligations ("CDO's") or asset-backed securities backed by subprime loans in its securities portfolio." (Fifth Third's Form 10-Q for the quarter ended March 31, 2008, filed with the SEC on May 9, 2008)

228.    In reality, Defendants had engineered the growth of the Company's mortgage lending business through aggressive marketing of Alt-A mortgage products that were characterized by precisely the same risks as subprime lending.  Indeed, **Confidential Witness-1 ("CW-1), Confidential Witness-8 ("CW-8"), and Confidential Witness-9 ("CW-9") all characterized Fifth Third's lending practices as "subprime."**  According to CW-1, **Fifth Third was in the "business of subprimes."**

229.    According to one former Fifth Third Employee, Confidential Witness-2 ("CW-2"), the Company's entire Florida mortgage operation was focused on originating Alt-A loans.  According to Confidential Wintess-5 ("CW-5"), Fifth Third's Florida affiliate went so far as to hold a contest to see who could sell the largest number of Alt-A loans.  In fact, CW-9 was responsible for creating this Alt-A sales contest.

230.    Fifth Third's Alt-A loans were routinely issued to borrowers with credit scores below the FDIC's 660 FICO score-threshold for subprime loans.  According to CW-2, for Alt-A loans, Fifth Third was "willing to accept borrowers with FICO scores of 620, and in some cases would accept loans where the score was below 620."  Confidential Witness-3 ("CW-3") and CW-9 both state that Fifth Third approved mortgages for borrowers with credit scores as low as 580.  Confidential Witness-10 ("CW-10") states that it was not unusual for borrowers with FICO scores of 570 to 580 to be approved.  Confidential Witness-6 ("CW-6") observed that **at Fifth Third there was no "bottom FICO score."**