231.     In addition, these borrowers carried the added risk of undocumented incomes and/or assets; unverified employment, income and/or assets; and total debt-to-income ratios of 50% or greater.  CW-1 confirms that Fifth Third's risky loan products included interest only, "NINA" (no income/no assets) and "SISA" (state income/stated assets).  Moreover, CW-2 states that **if the unverified information from the borrower "seemed reasonable," then Fifth Third would approve the loan.**

232.     Adding further risks, Fifth Third's Alt-A loans also were often extended with LTV ratios as high as 100% of the value of the collateral.  This greatly increased the risk to Fifth Third because it left no equity cushion to recover in the event of a foreclosure or incentive for the borrower to keep paying in a declining real estate market.  CW-2, CW-3, CW-6, Confidential Witness-7 ("CW-7"), and CW-10 all state that Alt-A loans were routinely made with LTV's of 100%, with the most popular product being the so-called "80/20" loan where the first mortgage was for 80% of the value of the property and the other 20% was an equity loan.  According to CW-9, **Fifth Third management encouraged salespeople to push 100% LTV loans, even when borrowers were capable of putting money down on a property**.

233.     Moreover, Fifth Third was originating loans that violated its own lending guidelines because the borrowers possessed multiple risk factors.  This layering of risk factors created an unreasonably high probability of default – a probability that became a near certainty when the booming real estate market began to decline in late 2006 to early 2007.  During this period, Fifth Third progressively lowered its underwriting metrics to encourage origination of progressively riskier loans and to reduce the number of loans for which exceptions to underwriting rules would be required for approval.  CW-3 and Confidential Witness-11 ("CW-11") state that these **guidelines changed on a daily basis.**  Despite the progressive lowering of

underwriting standards and venturing into new unconventional loan products, Fifth Third managers were, according to CW-2, CW-3 and CW-11, constantly overriding the underwriters' rejections of loans.

234.  Defendants ensured Fifth Third's growth in lending operations by instituting a system of oppressive loan origination quotas for the Company's salespeople.  Specifically, CW-2, CW-3, Confidential Witness-4 ("CW-4"), CW-5, CW-6, CW-9, and CW-11 report that the Company's senior management set sales "expectations" for the number of loans and aggregate dollar value of loans each salesperson needed to close each month.  If salespeople failed to meet their quota for two months, they would be fired.  The confidential sources describe an atmosphere where there was "intense pressure" to meet these quotas and that it would have been impossible for them to do so if the Company had adhered to its purported conservative underwriting and documentation standards.

235.  Fifth Third also set extremely demanding quotas for loan underwriters.  One confidential source, CW-3, reports that underwriters were given a quota to review 120 loans a month – an unreasonable amount of work.  CW-3 states that under Fifth Third's stated underwriting guidelines, a large number of loans were rejected by the underwriters, but that 80% of these denials would be overturned by senior management.  CW-3 states that "there was such immense pressure to make the numbers each month to meet the quota imposed by [senior management in] Cincinnati, that it became so crazy at the end of the month that **every mortgage was being approved just to meet the numbers.**"  CW-5 estimates that of the loans being reviewed, "**one-third of them didn't meet the guidelines, and there was tremendous pressure to approve them anyway.**"

236. The loosening of lending standards for Alt-A loan products led to a rise in delinquencies for the Alt-A loans during the Class Period – delinquencies that occurred for the same reasons as subprime loans: too many loans were made on overvalued properties with little or no down payments combined with little or no proof of income or assets. That is a combination sure to backfire as soon as home prices began to decline.

237. The credit quality of Fifth Third's commercial loans was no better. According to CW-3 and CW-9, Fifth Third routinely issued construction loans to builders at 90% LTV. Additionally, these loans were primarily adjustable rate loans that were structured so that the builder/developer would receive their first draw of 10% of the loan at the time the loan closed. This led to many instances where builders would take their 10% draw, but never even start the projects, leaving Fifth Third with an uncollectable loan.

238. Thus, prior to and during the Class Period, Defendants were aware that the Company's loan underwriting practices, particularly the Company's subprime lending under the guise of Alt-A, and high LTV commercial and consumer real estate loans, were deficient and exposed the Company to the risk of catastrophic losses when real estate markets declined in the regions in which Fifth Third concentrated its business – Michigan and Florida.

## 2. The Poor Credit Quality of Fifth Third's Loans Prevented Their Sale in the Secondary Market and Required Many Such Sales to be with Recourse

239. Defendants misrepresented the credit quality of the loans the Company was originating, including concealing how many of its riskiest loans were originated on a no-documentation basis and that such loans could not be sold on the secondary market.

240. For capital markets-funded lenders like Fifth Third, there were two exit strategies for a loan: sale or securitization. The capital which bank/thrift regulators required financial

institutions holding non-prime loans to maintain, discouraged them from holding these assets in whole loan form because of the impact on their balance sheets. When defaults and foreclosures started to surge in 2007, the market for mortgage-backed securities collateralized by non-conforming loans (such as those originated by Fifth Third) froze up and investor guidelines for the purchase of mortgage loans in the secondary market contracted. Fifth Third found it increasingly difficult to sell or securitize its mortgages in order to raise capital. As a result, billions of dollars in loans held for sale had to be converted into loans held for investment, and capital reserves had to be increased. For example, during 2007, approximately $152 million of Alt-A mortgage loans were moved from "held for sale" to "held for investment." Additionally, loans held for sale during the Class Period were among the $1.692 billion of loans Fifth Third moved to held for investment in 2008, as disclosed in the Company's 2008 Form 10-K.

241.    While Fifth Third may have initially intended to sell its Alt-A originations in the secondary market without recourse, due to the poor credit quality of its Alt-A loans, Fifth Third was unable to sell its riskiest loans or forced to sell them with recourse, meaning that if the loan became delinquent within the first 3 to 6 months, or if misrepresentations were found in the loan documentation, Fifth Third would be obligated to repurchase the defaulted loan. For 2008 and 2007, Fifth Third sold with "credit recourse" $1.3 billion and $1.5 billion, respectively, of residential mortgages to secondary market buyers, and Fifth Third retained the credit risk of the underlying borrowers defaulting on these loans. As a result, prior to and during the Class Period, Fifth Third's loan portfolio rapidly grew and was holding ever increasing proportions of risky loans. Likewise, the number of Alt-A loans sold with recourse rapidly grew and prevented the Company from shifting the early payment default risks to secondary market buyers of their Alt-A loans.

### 3. The Individual Defendants Had Actual Knowledge of Fifth Third's Subprime Lending and Underwriting Deficiencies

242.     The Individual Defendants' actual knowledge of Fifth Third's subprime lending and abandonment of conservative underwriting and documentation standards is supported by: (i) the unreasonably demanding system of sales and underwriting quotas set by senior management in Cincinnati that encouraged risky lending practices; (ii) the mid-2007 formation of the Company's six-member Corporate Credit Committee, Co-Chaired by Defendant Marshall, that was designed "to make sure that the senior[-]most people in the company are focused on credit;" (iii) the Company's "ACAPS" system, which provided them with access to up-to-date, highly detailed information on all mortgages; (iv) the review of every loan in Michigan during the third quarter of 2007; (v) the risk management reports which were distributed to Fifth Third senior management; and (vi) Defendants admitted on June 18, 2008 that during the Class Period, they had conducted an extensive review of the loan portfolio, including a top-down and bottom-up analysis of Fifth Third's real estate and real estate-related portfolios.

243.     Fifth Third's abandonment of conservative underwriting standards was not an isolated problem confined to a small number of regional offices; it was a Company-wide, top-down, aggressive marketing strategy designed to enlarge the Company's share of the growing Alt-A, home equity, and construction lending markets.  As described by the Confidential Witnesses in greater detail below, the Company's senior executives created a system of rigorous sales and underwriting quotas and lavish bonuses and commissions to ensure that the Company's unrealistic sales goals would be met, irrespective of the poor credit quality of the loans the Company was originating.  Even if the Defendants were previously unaware of the results of the sales and underwriting policies that they instituted – *i.e.*, asset-based lending that disregarded borrower qualifications – by the fall of 2007, they could no longer feign ignorance.  \

244.    In a July 23, 2007 *Watch List* article entitled, "Demand, Appetite for CRE Lending Softening," Defendant Marshall described "an extremely thorough review of our Michigan business and specifically went through loan by loan in certain areas like Detroit…" Marshall added, "We had an ongoing effort there, but the review that we just went through didn't result in any need to change any of our treatment of any of those portfolios."

245.    This review of Fifth Third's Michigan loan portfolio was also discussed during the Company's July 19, 2007 analyst conference call during which Defendant Marshall again stated that the Company had just completed a thorough review of its Michigan business and concluded that its existing reserves were adequate and that no adjustments were needed, stating:

**Mike Mayo** *- Deutsche Bank - Analyst*

On that last topic, the commercial real estate growth. I guess there's been some banks who said they initiated new appraisals for Michigan and that led them to more significantly increase their reserves for potential problem loans. Have you done any recent appraisals in that market or what's that process? Thanks.

**Chris Marshall** *- Fifth Third Bancorp - CFO*

Yes and that's a good question, very timely for us. **We just completed a[n] extremely thorough review of our Michigan businesses, specifically went through loan by loan in certain areas like Detroit.** We also had our -- just went through a regulatory review of those same portfolios and **there were no adjustments. So we feel good about [that]. I think we're being very, very careful about those areas,** that we're very focussed [sic] on them. And that review, I felt good that – we've had an ongoing effort there, **but the review that we just went through didn't result in any need to change any of our treatment of any of those portfolios**.

(Emphasis added.)

246.    Also during the July 19, 2007 analyst conference call, Defendant Marshall emphasized that Fifth Third was a prime mortgage originator focused on fixed rate loans:

Offsetting those strong results to some extent was residential lending, particularly in the home equity area. **As you know, these loans are largely prime-based** and **with higher rates, borrowers are tending to opt for traditional fixed rate**

**mortgages. Our mortgage business, obviously, benefits from that but that shows up as mortgage banking fee income instead of loan balances.**

247.    On August 29, 2007, Fifth Third announced in a Form 8-K filing with the SEC that it had formed a six-member Corporate Credit Committee to review the Company's lending practices.  The Corporate Credit Committee, headed by Chief Risk Officer Mary Tuuk ("Tuuk"), included some of the Company's top executives and, according to an October 1, 2007 *U.S. Banker* article entitled, "The 25 Women to Watch," provided the Company's senior executives "a more transparent handle on how risks are interrelated across all of the Cincinnati institution's business lines and operations."

248.    To head the Corporate Credit Committee, Defendants selected as Co-Chairs Tuuk and Defendant Marshall.  Effective June 13, 2007, Defendant Kabat promoted Tuuk to the Chief Risk Officer responsible for the Company's credit, market and operational risk management, and named her to the Fifth Third Enterprise Committee (the senior leadership committee of the bank).  Tuuk replaced Malcolm Griggs, who purportedly left Fifth Third "to return to North Carolina to be closer to his family," according to a June 4, 2007 Fifth Third press release.  On June 19, 2007, the Fifth Third Board appointed Tuuk to the position of Executive Vice President.

249.    An August 31, 2007 *American Banker* article entitled, "In Credit Crisis, Some Focus on Prevention," stated that "[t]he committee was set up in the first quarter [of 2007] and was the brainchild of Kevin T. Kabat…," although the existence of the Corporate Credit Committee was not disclosed to the public until the filing of the Company's report on Form 8-K on August 29, 2007.  Defendant Kabat explained the rationale behind the formation of the Corporate Credit Committee, stating: **"This is an institutional process we are putting in place to make sure that the senior[-]most people in the company are focused on credit with the same discipline that we have in our financials or any part of the businesses…"**  The August

31, 2007 article quotes Tuuk, who described the no-stone-unturned approach of the committee, stating: "We're proactively addressing the market, ensuring execution on the practices we put in place, and monitoring everything along the way…."

250.     In a presentation given by Tuuk to the Fifth Third Board in August 2007 (attached as an exhibit to the August 29, 2007 Form 8-K), the purpose/mission of the Corporate Credit Committee was stated as follows:

> Establishes priorities, develops initiatives and makes policy recommendations to the Enterprise Committee that improves the ability to understand, measure and report credit trends, forecast loss and their associated drivers.

251.     The August 31, 2007 *American Banker* article also reported that the Corporate Credit Committee was then "reviewing consumer lending, where many of the industry's biggest problems have occurred," and, according to Defendant Marshall, it would also "begin reviewing lending practices on the commercial side." Marshall added that the Corporate Credit Committee began by reviewing consumer lending practices "just because we think there were more opportunities to make improvements in procedures than on the commercial side." As confirmed by the Confidential Witnesses, there were indeed "more opportunities to make improvements" in consumer lending practices because of the rampant abuses of Alt-A lending, and other consumer loan products, described herein.

252.     The October 1, 2007 *U.S. Banker* article concludes that: "As a result of the committee's actions, Fifth Third rolled back or abandoned areas of consumer and commercial lending, upgraded underwriting standards and created pricing grids to minimize default probabilities." Proclamations about the Corporate Credit Committee's good deeds, however, were just a façade. In reality, as demonstrated by the Confidential Witnesses, Fifth Third did little to improve its deficient lending and underwriting practices. While the Corporate Credit

Committee did bring or should have brought to the Individual Defendants' attention the Company's widespread underwriting deficiencies, and the poor credit quality of its consumer and commercial loan portfolios, they were largely disregarded as bad loans mounted on Fifth Third's books.

253.    The Individual Defendants were also able to keep abreast of mortgage sales data through the Company's ACAPS system.  Through this system, which provided them with access to up-to-date information on all mortgages, the Individual Defendants knew or were reckless in not knowing the credit worthiness of every mortgage in Fifth Third's portfolio.  Specifically, ACAPS provided senior management, including the Individual Defendants, real-time data on every mortgage, including the unique numerical code for each type of mortgage product, the dollar amount of the loan, the name of the salesperson, the regional affiliate that originated the loan, and cross-selling of credit cards, checking accounts, and savings accounts.  ACAPS also provided the Individual Defendants real-time data as to whether salespeople, sales managers, and regional affiliates were meeting their sales quotas set by senior management in Cincinnati.  CW-9 confirms that this data was actively monitored by senior management in Cincinnati.  Most importantly, ACAPS allowed the Individual Defendants to see, in real-time, when documentation was missing from mortgage applications, because this deficiency was red-flagged by the system.  Thus, throughout the Class Period, the Individual Defendants knew or were reckless in failing to ascertain precisely how many Alt-A, 80/20, option-ARM, and other non-conforming mortgage products were sold, which regional affiliate originated these loans, the dollar value of such loans, and even where the documentation for these loans was deficient.  As a result, the Individual Defendants knew or were reckless in not knowing that Fifth Third's Alt-A loans were

comparable to subprime loans in terms of borrowers' qualifications and that conservative underwriting practices were being disregarded.

254.    In addition, Defendants admitted on June 18, 2008 that during the Class Period, they had conducted an extensive review of the loan portfolio, including a top-down and bottom-up analysis of Fifth Third's real estate and real estate-related portfolios and the "development of stress scenarios to forecast potential losses."

255.    Throughout the Class Period, Defendants represented that Fifth Third was suffering from the same general economic conditions and, in particular, credit issues as its purported prime loan originator peers, when in fact the Company had been making riskier, high LTV land loans and Alt-A loans than prime originators were making.  Fifth Third's real competitors were subprime lenders.  As a result, it was revealed at the end of the Class Period that the Company had sustained higher loan losses than its purported peers and, in fact, was forced to sell more than $1.6 billion of its nonperforming assets and poorly performing assets for a mere $0.33 on the dollar, when these loans had only been discounted down to $0.60 to $0.70 cents on the dollar by Fifth Third.

256.    Despite the Corporate Credit Committee's review of every Michigan loan and Defendant Marshalls' knowledge of the results, the real-time data available to the Individual Defendants on the ACAPS system, and the extensive review of the loan portfolio that Defendant Kabat admitted to on June 18, 2008, throughout the Class Period, Defendants repeatedly and falsely represented that Fifth Third did not originate or hold subprime loans and that the Company's underwriting and risk management was prudent and "conservative."

### 4. Defendants Falsely Represented that Fifth Third's Loan Loss Reserves were Sufficient to Cover Probable Losses

257. While the Individual Defendants engineered the dismantling of Fifth Third's previously conservative lending standards and pressured Fifth Third's sales force to originate progressively higher risk, nontraditional, nonconforming loans, Fifth Third – under the Individual Defendants' direction – was actually decreasing its loan loss reserves. Although the total dollar amount of loan loss reserves steadily increased during the Class Period, in real terms, the amount of reserves was plunging to levels far below those maintained by the Company before it began originating subprime, Alt-A, and riskier high LTV development loans.

258. Loan loss allowances are the amounts that appear on a company's financial statements to reflect expected future defaults. An increase in loss allowances directly reduces the asset values of loans on the books, and therefore, also directly reduces reported earnings per share. According to the FDIC's *Commercial Bank Examination Manual*, *Loan Portfolio Management* (May 1996), loans and lease-financing receivables are to be placed on nonperforming or nonaccrual status if: "(1) principal or interest has been in default for 90 days or more, unless the loan is both well secured and in the process of collection; (2) payment in full of principal or interest is not expected; or (3) they are maintained on a cash basis because the financial condition of the borrower has deteriorated." According to the *Commercial Bank Examination Manual*, a loan is considered well secured "if it is secured (1) by collateral in the form of liens on or pledges of real or personal property, including securities, that have a realizable value sufficient to discharge the debt (including accrued interest) in full or (2) by the guarantee of a financially responsible party." The FDIC instructs that "if a bank has a significant consumer or residential mortgage loan portfolio in relation to its total loans and tier 1 capital, a

thorough review of the delinquency status should be performed to ensure that the bank has not materially misstated its financial condition and earnings."

259. As a financial services company whose core business was lending, Fifth Third's provision for loan losses was a significant element of its financial reporting and Defendants were well aware of the methodology used to set reserves and amount the Company was reserving.

260. In order to preserve the illusion that Fifth Third had sufficient earnings to support dividend payments while remaining well-capitalized, Defendants fraudulently delayed increasing Fifth Third's loan loss reserves during the Class Period.

261. Moreover, general economic conditions in U.S. real estate markets, and particularly in Florida, were deteriorating. This necessitated an increase, not a reduction in loan loss reserves as a percentage of nonperforming assets in 2007 and 2008. Defendants Kabat and Marshall could not have plausibly believed that loan losses would decrease, in view of declining home prices (which necessarily resulted in increased delinquencies and foreclosures).

262. Furthermore, Fifth Third accumulated and held, before and during the Class Period, a significant loan portfolio comprised of various types of non-conforming loans, many of which carried inherent risks all their own. Those included loans such as option-ARMs, Alt-A loans, and loans with high LTV ratios – most of which had been extended to customers with little or no documentation supporting their ability to pay, on a "stated" income basis. Many loans were heavily concentrated in certain geographic areas, and were originated under ineffective, and potentially fraudulent, underwriting practices. The foregoing loan types possessed special risks, requiring particular consideration when determining an allowance for probable losses.

263. The credit quality of Fifth Third's loan portfolio, as indicated by the increasing amount of nonperforming assets that were held for investment, began to deteriorate in 2007.

Nonperforming assets were comprised of loans that were delinquent and, therefore, placed on nonaccrual status, as well as loans for foreclosed properties.  Despite both the inherent risks associated with the types of loans into which the Company was entering, and the downturn in both the real estate market and the economy overall, the Company failed to sufficiently record provisions to increase its allowance for losses.

264.    The Company's false assertion that its loan portfolio, and related allowance for loan losses, was reported in conformity with GAAP rested on willfully ignoring the prevailing economic conditions and the risks inherent in its loan portfolio.  The Company deliberately ignored such conditions and risks in its determination of the collectibility of the loan portfolio, including the allowance for loan losses.  Even as the Company's participation in riskier loans increased, and even as its underwriting standards became less stringent, and even as the real estate market and economy deteriorated, the Company's allowance for loan losses as a percentage of nonperforming assets decreased.

265.    Specifically, from 2003 to 2005, when the real estate markets appeared healthy and were accelerating, loan loss reserves were set at levels in excess of 200% of nonperforming assets, but by 2007, when real estate markets were deteriorating, Defendants lowered the percentage of loan loss reserves to nonperforming assets to less than half of what it was when the real estate markets were strong.  At the time Defendants dramatically lowered the ratio of loan loss reserves to nonperforming assets, Defendants knew (but failed to disclose) that the level of risk that inured to Fifth Third's loan portfolio (including loans sold with recourse) had materially increased, thus necessitating a higher percentage of reserves than those historically maintained by the Company, instead of a lower percentage, which Defendants falsely represented was adequate to cover expected losses.  Defendants intentionally reduced loan loss reserves in order

to inflate reported earnings, satisfy Wall Street's earnings expectations (according to Confidential Witness-12 ("CW-12")), continue to raise capital through equity offerings and make acquisitions. The combination of inflated earnings and Defendants' misrepresentations about the credit quality of Fifth Third's loan portfolio deceived investors about the basic financial condition of Fifth Third.

> **5.** **Defendants Falsely Represented that Fifth Third's Methodology for Setting Loan Loss Reserves, which Relied Predominantly on Historic Loss Rates, was Adequate**

266. As an entity whose core business was commercial and consumer lending, Fifth Third's allowance for loan losses was a significant element of its financial statements – a fact with which Defendants were well aware and intimately familiar. Given the importance of Fifth Third's loan loss allowance to its financial statements, Fifth Third reported in each of its annual Form10-K filings with the SEC a detailed statement of its methodology for setting loan loss allowances.

267. For instance, in its 2006 annual report on Form 10-K filed with the SEC on February 20, 2007, Fifth Third stated that it established the amount of its allowance for loan losses by using a methodology compliant with SEC Staff Accounting Bulletin No. 102, *i.e.*, that its reserves were derived from "conservative" estimates "based on historical loss rates, current credit grades," and that it reviewed loss rates on a quarterly basis and made adjustments in its reserves accordingly, stating in part:

> Provisions for loan and lease losses are based on the Bancorp's review of the historical credit loss experience and such factors that, in management's judgment, deserve consideration under existing economic conditions in estimating probable credit losses. **In determining the appropriate level of the allowance, the Bancorp estimates losses using a range derived from "base" and "conservative" estimates.** The Bancorp's strategy for credit risk management includes **a combination of conservative exposure limits significantly below**

**legal lending limits and conservative underwriting, documentation and collections standards.** The strategy also emphasizes diversification on a geographic, industry and customer level, regular credit examinations and quarterly management reviews of large credit exposures and loans experiencing deterioration of credit quality.

\* \* \*

**Historical loss rates for commercial and consumer loans may be adjusted for significant factors that, in management's judgment, reflect the impact of any current conditions on loss recognition.** Factors that management considers in the analysis include the effects of the national and local economies, trends in the nature and volume of loans (delinquencies, charge-offs and nonaccrual loans), changes in mix, credit score migration comparisons, asset quality trends, risk management and loan administration, changes in the internal lending policies and credit standards, collection practices and examination results from bank regulatory agencies and the Bancorp's internal credit examiners.

**The Bancorp's current methodology for determining the allowance for loan and lease losses is based on historical loss rates, current credit grades, specific allocation on impaired commercial credits and other qualitative adjustments**. **Allowances on individual loans and historical loss rates are reviewed quarterly and adjusted as necessary based on changing borrower and/or collateral conditions and actual collection and charge-off experience.** An unallocated allowance is maintained to recognize the imprecision in estimating and measuring loss when evaluating allowances for individual loans or pools of loans.

(Emphasis added.)

268.    When Defendants secretly abandoned the Company's prudent and conservative underwriting guidelines, the Company was required by GAAP to make a commensurate increase in its allowance for loan losses to reflect the diminished credit quality of its loan portfolio and increased probability of defaults.  But Fifth Third did not – in fact, as shown below, the Company lowered its reserves as a percentage of nonperforming assets based upon a heavy reliance on historical loss rates, which Defendants knew were not an accurate reflection of expected losses, based on the aggressive and imprudent underwriting and poor credit quality of the loan portfolio.  Fifth Third had a real incentive to keep its reserves low.  If it set aside more

reserves for loan losses, its earnings would drop proportionally, according to the applicable accounting rules.

269.    Instead of increasing its allowance for loan losses, beginning in 2006, Fifth Third's allowance for loan losses decreased as a percentage of the Company's nonperforming assets. In fact, while Fifth Third was significantly increasing its total allowance for loan losses from $770 million as of December 31, 2003 to $1.032 billion as of December 31, 2007, as shown in table "A" below, the Company lowered its percentage of allowance for loan losses to nonperforming assets from over 200% during the period from 2003 to 2005, to 170% as of December 31, 2006, and only 88% as of December 31, 2007, as shown in table "B" below:

**TABLE A: CHANGES IN ALLOWANCE FOR CREDIT LOSSES**

| For the years ended December 31 ($ in millions) | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Balance, beginning of year | $847 | 814 | 785 | 770 | 683 |
| Net losses charged off | (462) | (316) | (299) | (252) | (312) |
| Provision for loan and lease losses | 628 | 343 | 330 | 268 | 399 |
| Net change in reserve for unfunded commitments | 19 | 6 | (2) | (1) | - |
| Balance, end of year | $1,032 | 847 | 814 | 785 | 770 |
| Components of allowance for credit losses: | | | | | |
| Allowance for loan and lease losses | $937 | 771 | 744 | 713 | 697 |
| Reserve for unfunded commitments | 95 | 76 | 70 | 72 | 73 |
| Total allowance for credit losses | $1,032 | 847 | 814 | 785 | 770 |

*Source: Fifth Third's 2008 Form 10-K*

**TABLE B**: SUMMARY OF NONPERFORMING ASSETS

| As of December 31 ($ in millions) | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Commercial loans | $175 | 127 | 140 | 105 | 110 |
| Commercial mortgage loans | 243 | 84 | 51 | 51 | 42 |
| Commercial construction loans | 249 | 54 | 31 | 13 | 19 |
| Commercial leases | 5 | 6 | 5 | 5 | 19 |
| Residential mortgages loans *(a)* | 121 | 38 | 30 | 24 | 25 |
| Home equity *(b)(d)* | 91 | 40 | | | |
| Automobile loans(d) | 3 | 3 | | | |
| Credit card *(c)* | 5 | | - | - | - |
| Other consumer loans and leases *(d)* | 1 | - | 37 | 30 | 27 |
| Total nonaccrual loans and leases | 893 | 352 | 294 | 228 | 242 |
| Commercial renegotiated loans and leases | - | - | - | - | 8 |
| Repossessed personal property and other real estate owned | 171 | 103 | 67 | 74 | 69 |
| Total nonperforming assets | $1,064 | 455 | 361 | 303 | 319 |
| Commercial loans | $44 | 38 | 20 | 21 | 14 |
| Commercial mortgage loans | 73 | 17 | 7 | 8 | 8 |
| Commercial construction loans | 67 | 6 | 7 | 5 | 4 |
| Commercial leases | 4 | 2 | 1 | 1 | 1 |
| Residential mortgages loans(e) | 186 | 68 | 53 | 43 | 51 |
| Home equity(d) | 72 | 51 | | | |
| Automobile loans(d) | 13 | 11 | | | |
| Credit card | 31 | 16 | 10 | 13 | 13 |
| Other consumer loans and leases *(d)* | 1 | 1 | 57 | 51 | 54 |
| Total 90 days past due loans and leases | $491 | 210 | 155 | 142 | 145 |
| Nonperforming assets as a percent of total asset s, leases and other assets, including other real estate owned | 1.32 % | .61 | .52 | .51 | .61 |
| Allowance for loan and lease losses as a percent of nonperforming assets | 88 | 170 | 206 | 235 | 219 |

*Source: Fifth Third's 2008 Form 10-K*

270.    This decreasing percentage of reserves compared to nonperforming assets falsely suggested to investors that the overall credit quality of Fifth Third's loan portfolio was improving, rather than deteriorating, as in fact it was.

271.    The Financial Institutions Examination Counsel, *Policy Statement on Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions* (July 2, 2001) requires that a financial institution's allowance for loan and lease losses reflect all *current* conditions affecting loan collectability, stating:

> The determination of the amounts of the ALLL and provisions for loan and lease losses should be based on management's current judgments about the credit quality of the loan portfolio, and should consider all known relevant internal and external factors that affect loan collectability as of the reporting date.

272.    The leading bellwether of loan collectability is when a loan in an institution's loan portfolio becomes 30 to 89 days delinquent and interest is still accruing.  While the lender may

eventually bring these loans current, past due loan trends are a leading indicator of potential future nonperforming loans and charge-offs and must be reserved for.

273. Banking regulators and analysts consider the 30 to 89 day past due pipeline to be among the most important indicators of credit risk trends. For instance, an A.M. Best Special Report, *Are Loss Reserves Adequate in Light of Rising Delinquencies?* (March 26, 2007) stated:

> As yet another indicator of the potential for the U.S. banking industry's 2006 year-end reserve levels to prove inadequate for deteriorating credit risk profiles, the fourth-quarter rise in delinquencies included a troubling increase in the emerging 30- to 89-day past-due category, **Historically, these delinquencies are a precursor to more serious delinquencies, which ultimately may lead to loan losses. Another way of stating it: regard to 30- to 89-day past dues as the pipeline that ultimately feeds into the 90+ past dues and the non-accruals (albeit perhaps not dollar for dollar).** With a groundswell of the 30- to 89-day past dues underpinning the 90+ day past dues and non-accruals, the industry reasonably can be expected to face ever-rising delinquencies in the latter category in the coming months and quarters.

(Emphasis added.)

274. Similarly, the FDIC's rules concerning its risk-based assessment system, which is "based on an institution's probability of causing a loss to the deposit insurance fund due to the composition and concentration of the institution's assets and liabilities," includes "[l]oans past due 30-89 days/gross assets," as one of the five key metrics in its "Risk Category 1" assessment.

275. Unbeknownst to Fifth Third investors, during the Class Period, the Company did not consider the current credit quality of its loan portfolio, including the rapidly growing category of loans that had become 30 to 89 days delinquent, in making its allowance of loan and lease losses. For example, in Michigan, the amount of loans past due 30 to 89 days was much greater than the amount of loans past due 90 days or more:

## MICHIGAN

**Comparison of Construction, Land Development and
Other Land Loans in Domestic Offices
Past Due 30 Through 89 days and Still Accruing with 90+ Days Past Due\***
(Dollar amounts in thousands)

|  | 30-89 Days Past Due | 90+ Days Past Due |
|---|---|---|
| 4Q '07 | 155,573 | 80,310 |
| 1Q '08 | 253,929 | 75,083 |
| 2Q '08 | 163,385 | 119,434 |

**Comparison of Loans Secured By 1-4 Family Residential Properties in Domestic Offices:
Past Due 30 Through 89 Days and Still Accruing with 90+Day Past Due\***
(Dollar amounts in thousands)

|  | 30-89 Days Past Due | 90+ Days Past Due |
|---|---|---|
| 4Q '07 | 142,914 | 86,862 |
| 1Q '08 | 140,925 | 101,959 |
| 2Q '08 | 109,398 | 126,734 |

*\*Source: Consolidated Reports of Condition and Income for a Bank with Domestic and Foreign Offices FFIEC 031,
Federal Financial Institutions Examination Council*

276.     Instead, the Company relied predominantly (**90%**) on historic loss rates, claiming
falsely that its overwhelming reliance on historical loss rates was adequate to account for current
credit risk trends.  Defendants further falsely represented that the historical methodology used by
the Company for the reserving process would result in reserves only "slightly" lagging the actual
deterioration in its loan portfolio.  Specifically, the Company's annual report on Form 10-K for
the year ended December 31, 2007 ("2007 10-K") stated:

> **The Bancorp's current methodology for determining this measure is based
> on historical loss rates**, current credit grades, specific allocation on impaired
> commercial credits and other qualitative adjustments. **Approximately 90% of the
> required reserves come from the baseline historical loss rates, specific
> reserve estimates and current credit grades**; while 10% comes from qualitative
> adjustments. As a result, **the required reserves tend to slightly lag the
> deterioration in the portfolio due to the heavy reliance on realized historical
> losses and the credit grade rating process**.

(Emphasis added.)   The Defendants' statement in the 2007 10-K regarding Fifth Third's methodology for setting loan loss reserves was materially false and misleading because the Company's loan loss reserves were grossly inadequate, given the rapid decline in the real estate market beginning in the first quarter of 2007, the Company's grossly deficient loan underwriting practices, and the large increase in reserves that proved necessary in 2008.   Moreover, by concealing the fact that the rapidly increasing number of loans 30 to 89 days delinquent were not being considered by Fifth Third in setting loan loss reserves, the reserves did not "slightly lag" the deterioration in the loan portfolio, but rather were grossly inadequate when made.

277.    To the extent that Fifth Third relied on "current credit grades" in setting loan loss reserves, Defendants knew that this strategy was equally flawed and the level of reserves would not "slightly lag" the deterioration of the loan portfolio.  A "credit risk grade" is an internal bank rating (typically a numerical value) applied to a borrower at the time a loan is originated.  Credit risk grades are, in essence, the same as S&P or Moody's ratings on bonds, but based on a bank's internal lending policies and practices.  Although credit risk grades may be updated based on post-origination account experience, such adjustments are typically made only on a quarterly or annual basis, if at all, and do not reflect month-to-month changes in credit risk trends like 30 to 89 day past due figures.  Fifth Third's reliance on credit risk grades did not provide information on current credit trends necessary for setting loan loss reserves in a timely manner.

278.    By March of 2009, Fifth Third essentially admitted that its practice of reserving based on 90% of historical loss rates was inadequate.  Specifically, in Fifth Third's annual report on Form 10-K, filed with the SEC on March 2, 2009 ("2008 10-K"), the Company disclosed that sometime during 2008, unbeknownst to the investing public, it was reducing its 90% reliance on

historical loss rates in setting loan loss allowances, to **81%** of its historical loss rates and was placing more emphasis on qualitative adjustments, stating:

> **In 2008, the Bancorp has not substantively changed any material aspect of its overall approach in the determination of the allowance for loan and lease losses** and there have been no material changes in assumptions or estimation techniques as compared to prior periods that impacted the determination of the current period allowance … **The Bancorp's current methodology for determining this measure is based on historical loss rates**, current credit grades, specific allocation on impaired commercial credits above specified thresholds and other qualitative adjustments. **Approximately 81% of the required reserves come from the baseline historical loss rates, specific reserve estimates and current credit grades**; while 19% comes from qualitative adjustments.

279.    Thus, while Defendants had represented to investors that 90% of reserves based on historical loss rates was adequate to cover expected losses in the loan portfolio, Defendants knew that such a high reliance on historical loss rates did not accurately reflect the portfolio's expected losses in view of the Company's disregard of prudent and conservative underwriting.

280.    Defendants violated GAAP and SEC rules by manipulating and artificially increasing the Company's reported earnings by not recording sufficient or reasonable allowance for loan losses in light of the fact the Company had deviated from its purported "conservative" underwriting guidelines beginning in mid-2006 and continuing through 2008 and accumulated new and increased exposures to significant credit risk, primarily for its failure to maintain stringent and adequate underwriting processes and policies.  Additionally, the Company's relevant financial statements materially overstated the value of its loan portfolio.  Thus, the Company's relevant financial statements misrepresented its financial condition and its results of operations in violation of GAAP and SEC rules.

281.    Thus, by the end of the Class Period, Defendants' understatement of allowance for loan losses totaled hundreds of millions of dollars and that understatement caused Fifth Third's reported earnings to be overstated by a commensurate amount.

### 6.    Defendants Falsely Represented that Fifth Third was Well Capitalized and its Tier 1 Capital was Not at Risk

282.    Because Fifth Third was engaged in high-risk lending practices, the typical regulatory guidelines for capitalization, including tier 1 capital, were inadequate to absorb future losses and compensate for its significantly lower credit quality and subprime exposure.  Financial institutions like Fifth Third are required to hold capital to provide protection against unexpected losses (as opposed to expected losses, which are covered by loss reserves and allowances). Pursuant to the FDIC's *Expanded Guidelines for Subprime Lending Programs*, the Company needed to quantify the amount of additional capital needed to offset the additional risks in its high risk and subprime lending activities.  Defendants, however, steadfastly claimed that Fifth Third was well-capitalized because its reported capital ratios were within the ranges provided under the regulatory guidelines for capitalization for prime lenders – which Fifth Third falsely claimed to be.  Thus, Defendants' statements regarding Fifth Third's capitalization were untrue.

283.    As Defendants knew, Fifth Third was engaging in high risk lending activities, described by the Confidential Witnesses below, that amounted to subprime lending and that required the Company to maintain substantial additional capital to compensate for the risks engendered by its loose lending standards.  When Defendants disclosed some information about the deterioration of Fifth Third's loan portfolio during the Class Period, they blamed the deterioration on economic conditions affecting all banks, rather than disclosing the full truth that Fifth Third's abandonment of conservative underwriting and documentation standards had

caused Fifth Third to carry a loan portfolio filled with loans made to less than creditworthy subprime borrowers.

284.    Fifth Third's inadequate capitalization due to its deficient lending practices came to light less than two months after Defendants boldly proclaimed the Company to be adequately capitalized and immune from having to undertake the sort of emergency capital raises done by "other more stressed peers…"  Specifically, during the April 22, 2008 analyst conference call, Defendant Marshall stated:

> **Matthew O'Connor - *UBS - Analyst***
>
> Okay, so on the capital side at this, you'll just grow into the targeted levels or the higher end of the targeted levels as opposed to
>
> **Chris Marshall - *Fifth Third Bancorp - CFO***
>
> We have normal issuances planned, which I can't really comment on more than that, ***but I wouldn't expect to see us do anything out of the ordinary and certainly nothing resembling any of the extreme capital raises you've seen from some of our more stressed peers***. We don't think that's -- ***we think of ourselves as being in an entirely different category and don't need to do any of those things.***

(Emphasis added.)

285.    On June 18, 2008, however, Defendants announced that Fifth Third would be undertaking precisely the type of "extreme capital raises" that Defendants assured the investing public would be unnecessary.  Specifically, Defendants disclosed that for the second quarter of 2008, nonperforming assets were expected to increase 40%-45% from the first quarter of 2008 and that, as a result, Fifth Third was in desperate need of additional capital.  Defendants unveiled a plan to raise $3 billion through a dilutive $1 billion convertible preferred stock offering, the sale of "non-core businesses," which was expected to generate another $1 billion and slashing its dividend by 66%, from $0.44 per share to $0.15 per share.  This announcement revealed to the

market the deterioration of the Company's tier 1 capital, the fact that Fifth Third had been engaged in much riskier lending practices than Defendants had previously disclosed, and that the Company's loan portfolio was filled with toxic paper that was at a far greater risk of going south.

286.     These revelations caused the price of Fifth Third common stock to plunge 27% from $12.73 per share, to close on June 18, 2007 at $9.26 per share (a drop of $3.47) on unusually heavy trading volume.

287.     In the aftermath, on July 22, 2008, Fifth Third announced its second quarter 2008 earnings, including a 44% increase in commercial nonperforming assets and a 26% increase in consumer nonperforming assets, from the first quarter of 2008.  Moreover, because of the Company's bad bets on risky loans, it remained strapped for cash.  Indeed, on October 21, 2008, Fifth Third issued a press release announcing that the Company was considering applying for federal bailout funds – an application the Company eventually filed on October 24, 2008.  On December 31, 2008, the Company disclosed that it had entered into a letter agreement with the U.S Department of the Treasury ("Treasury") pursuant to which the Treasury was to purchase $3.4 billion in Fifth Third preferred stock and warrants.  This bailout deal was completed on January 22, 2009.

> **7.     Confidential Sources Describe How Defendants Abandoned Conservative Lending Standards in Order to Boost Revenue from Originations and Subjected Fifth Third to the Prospect of Catastrophic Loan Losses**

288.     In the face of key indicators of problems in the subprime markets, Defendants attempted to distance Fifth Third from these problems by repeatedly representing throughout the Class Period that Fifth Third's lending practices were "conservative" and that they were not involved in subprime lending.  They also represented that their reserves for loan losses were

adequate. As shown by the Confidential Witnesses described below, who are former Fifth Third employees with firsthand knowledge of the Company's lending, underwriting, appraisal and risk management practices, these representations were materially false and misleading. On the contrary, Defendants caused Fifth Third employees to disregard the Company's underwriting standards in an effort to boost the volume of loans originated, regardless of credit quality, thereby exposing Fifth Third to devastating losses. Indeed, Defendants instituted a system of demanding and punitive sales quotas that essentially mandated such loose lending practices.

a)     **Confidential Witness-1**

289.    CW-1 was employed as Vice President for Mortgage Compliance at Fifth Third's Cincinnati headquarters from 2004 until November 2007. CW-1 reported to Rob Curry, the Manager of Compliance, Stewart M. Greenlee, Senior Vice President of Mortgage Lending, and Lee Lyon, Vice President of Risk Management. In this position, CW-1 was responsible for ensuring that Fifth Third complied with applicable state and federal guidelines for mortgage lending. According to CW-1, **Fifth Third was "in the business of subprimes."** Throughout CW-1's tenure at Fifth Third, CW-1 attended monthly "risk management" meetings attended by senior officers from the compliance, quality control, and underwriting departments. These risk management meetings lasted about 2 hours, and were convened for the purpose of compiling monthly data from all mortgage-related departments to create a summary report that included graphs and charts and **"distribute it upward" to Fifth Third's most senior leadership in its Cincinnati headquarters, including Defendant Kabat.**

290.    CW-1 states that this risk management report detailed the specific kinds of loans granted each month, the amount of money "in reserves", types of loans, and delinquencies. CW-1 said that management from other departments confirmed in the meetings that the types of loans

granted included: interest only, "NINA" (no income, no assets), "SISA" (stated income, stated assets), ARMs and Alt-A. CW-1 said that Fifth Third's lending standards were "**subprime**".

291.  CW-1 states that Fifth Third's quality control group only reviewed loans after they were granted, but there was never any "pre-funding QC" (quality control), so Fifth Third had no system or procedure to verify that loan recipients were appropriately qualified. Because of the low FICO scores and lack of credit checks, CW-1 described Fifth Third's loans as "**garbage**" because the bank had no assurances that the customers would be able to pay them off. CW-1 stressed that with approximately 2,000 loan officers company-wide and no "pre-funding QC," "there was nothing to stop people from garbage in and garbage out." CW-1 frequently spoke with colleagues about the risky subprime mortgages Fifth Third was originating and CW-1 states that everyone in the mortgage compliance department was quite concerned. Finally, CW-1 reports that when the economy started to turn in early 2007, Fifth Third executives began to increase the pressure on the loan officers to close deals.

### b) <u>Confidential Witness-2</u>

292.  CW-2 was an Underwriting Supervisor employed by Fifth Third from 2003 to March, 2007 and supervised 10 underwriters. From 2003 to January 2007, CW-2 reported to Tom Conte. After Conte resigned in January 2007, CW-2 reported to John McGinty ("McGinty"), the head of mortgage operations in Florida. CW-2's position required CW-2 to analyze borrowers' credit, income, assets and appraisals for creditworthiness. CW-2 was responsible for all mortgage underwriting in Florida. According to CW-2, at the end of 2006, a meeting was held in Florida for Fifth Third's underwriters, chaired by Defendants Kabat and Marshall, where the mortgage lending guidelines were discussed. After Defendants Kabat and Marshall left the room, McGinty told the underwriting staff that the "**guidelines were not that**

strict and that he had been given authority to over-ride those guidelines." **Although the guidelines that the Fifth Third underwriters had been given were written, McGinty had been given authority to use his own interpretation and override the underwriting guidelines.**

293. CW-2 states that in the first quarter of 2006, Fifth Third began originating Alt-A mortgages, although the Company had proprietary names for them. The entire Florida mortgage operation was focused on originating Alt-A loans. For Alt-A loans, Fifth Third was "willing to accept borrowers with FICO scores of 620, and in some cases would accept loans where the score was below 620." The Alt-A loans were being made to borrowers with LTVs of up to 100% with the most popular product being the 80/20 loan where the first mortgage was 80% of value of the property and the other 20% was an equity loan. There were a number of components to the Alt-A loan program, but the one most often used was the stated income/stated asset loans. If the information given by the borrower was "reasonable," the loan was approved. But even when the loans were initially rejected by the underwriters, a large number of these rejections were overturned by management, who directed the underwriters to approve them. Within the Ft. Meyers, Florida underwriting operations, "management could over-ride the underwriter's denial of the loan."

294. CW-2 states that Fifth Third loans were being sold into the secondary market, but only the fixed-rate loans. These loans were sold to Bear Stearns. Prior to 2007, Bear Stearns was easy to work with but Tom Quinn ("Quinn"), President of Fifth Third's Florida operations, created an Alt-A loan help desk, and a single individual was then tasked with the Bear Stearns relationship, and underwriters could no longer deal with them.

295.    CW-2 states that McGinty was constantly over-riding the underwriters' rejections of loans.  He fired many salespeople and brought in five hand-picked, highly-compensated salespeople from other mortgage companies and promised them large bonuses and commissions if they got the dollar value of loans higher.  Along with these salespeople, McGinty hired his own hand-picked underwriter.  CW-2 states that the loans originated by McGinty's salespeople did not conform to Fifth Third's guidelines, and that when the loans were rejected by the underwriters, they were approved by McGinty, in accordance with the authority he was given by senior management.

296.    Quinn and McGinty told the salespeople and the underwriters that there was a sales quota for the number of loans and dollar value of loans that the Company needed to close by the end of every month.  CW-2 states that if the quota was not met, people would be fired.  There was immense pressure to approve as many loans as possible, even if the loans did not meet underwriting guidelines.

c)    **Confidential Witness-3**

297.    CW-3 was a Retail Mortgage Underwriter employed by Fifth Third in Ft. Meyers, Florida from 2004 to September 2008.  CW-3 was responsible for rendering underwriting decisions and clearing conditions to allow mortgages to be funded.  According to CW-3, "prior to 2006, the Fifth Third mortgage operations in Florida were a conservative, cautious lending operation."  The underwriters were told that they "did not have to approve any loans that made them uncomfortable."  However, CW-3 states that "prior to 2006, the Fifth Third mortgage operations in Florida were not doing that well."  In order to improve the productivity of Florida operations, Fifth Third executive management in Cincinnati changed the way that the Florida mortgage operations were being run.  They removed the entire group of senior management of

the Florida mortgage operations.  In early 2006, Quinn was named President and Chief Executive Officer for South Florida.  Quinn was based in Naples, Florida, and participated in weekly conference calls with executives in the Cincinnati headquarters.  In September 2006, McGinty, who was based in Ft. Meyers, was appointed Senior Vice President, Mortgage Division for Fifth Third's South Florida affiliate.  Coinciding with these management changes, Fifth Third "**changed from its conservative mortgage lending to more risky mortgage products including adjustable rate mortgages and Alt-A mortgages.**"

298.    CW-3 reports, "In September, 2006, there was a six-member team sent from Fifth Third's headquarters in Cincinnati" to meet with the Florida mortgage underwriters.  This group was referred to by the underwriters as the "SWAT Team."  During meetings, the SWAT Team told the Florida underwriters that they were not properly underwriting to Fifth Third's standards, and their mortgage approval rate was too low.  The SWAT Team told the Florida underwriters that "Fifth Third was going to 'push' the Alt-A mortgages," which were, in turn, going to be sold in the secondary market to Bear Stearns.

299.    CW-3 also states that after McGinty was hired he "fired all of the Florida Fifth Third sales force and hired the top salespeople from other mortgage lenders including National City, Wells Fargo, and Countrywide."  He enticed them to come to Fifth Third with "enormously high salaries and bonus arrangements."  CW-3 states that these salespeople were only interested in selling as many loans as possible to earn the largest commissions and bonuses.  The loans they were bringing to be underwritten were "fraught with problems" and as a result, there was "enormous tension and conflict between the salespeople and the underwriters at Fifth Third in Florida."

300.    CW-3 also states that "McGinty imposed quotas, which he said were established by executive management in Cincinnati."  The quota was that a certain number of millions of dollars in mortgages had to be written every month.  There were quotas for the sales force and for the underwriters.  "If the quotas were surpassed, there were incentives," but "if the quotas were not met in two consecutive months, the sales person or the underwriter was fired."  CW-3 was aware of at least 12 to 24 salespeople in Southwest Florida who were fired for not meeting their quotas.  **The quotas were set so high that if strict underwriting guidelines were followed, "there was no way that the Florida Fifth Third mortgage operations would be able to achieve those goals."**  The entire loan operation became "all about the numbers of mortgages that were funded each month."  With respect to incentives, salespeople were on a sliding scale so, if for instance, they had monthly sales of $3 million they would get a particular percentage commission as a bonus, but if they had sales of $5 million, they would receive a higher percentage commission resulting a disproportionately larger bonus.  Everyone in the mortgage operations, including top management, received a bonus based on production, but if your particular division was not pulling its weight, the entire division might not get bonuses.

301.    CW-3 states, "The underwriters were given a quota of 120 loans each month," which CW-3 described as "a quota that could not possibly be met."  Realistically, an underwriter could complete the work on 4 to 6 mortgages a day.  The standard fixed-rate mortgage information could be put into a computerized program, and the approval process was quickly accomplished.  However, the Alt-A loans had to be handled manually, since the computer program required information that was not provided by the Alt-A loan applicants.  Within the Alt-A program, there were various products that Fifth Third marketed, including stated income/stated asset, no document, and investor loans.

302.    According to CW-3, in the Alt-A loan program, Fifth Third was making loans to borrowers with FICO scores between 620 and 650, but if there was a more favorable LTV-to-income ratio, mortgages would be written with credit scores as low as 580.  One popular loan arrangement in the Alt-A program was the 80/20 loan, where the first mortgage was 80% of the LTV, and a second equity loan represented 20% of the value of the property, which resulted in Fifth Third having mortgaged 100% of the value of the home.

303.    CW-3 states that underwriting decisions were made following a grid or scale that was set forth in a 40-60 page document, with the primary factors being the borrower's credit score and the LTV.  However, **the underwriting guidelines at Fifth Third were constantly changing – sometimes on a weekly or even daily basis**.  Defendants progressively lowered the Company's underwriting metrics for the purpose of encouraging increased risk and lowering the number of loans for which exceptions would be need to be sought by sales and underwriting staff in order to gain approval.

304.    CW-3 states that the approval process was tiered – the riskier the loan, the higher the interest rate.  The underwriter would examine the circumstances of a particular loan but if he denied the loan, the loan officer would complain to the underwriting manager and, in most cases, the loan was approved.  The major problems CW-3 encountered with loan applications were high LTV ratios, high total debt-to-income ratios, and low credit scores.   CW-3 says that the underwriters evaluated these loans in the same conservative manner they had done prior to McGinty's tenure and, as a result, they denied a large number of Alt-A loans.  These denials were reviewed by McGinty's staff and, in each case, McGinty or one of his lieutenants would go over the loan application with the underwriter and explain how the underwriter had not properly evaluated some aspect of the application.  In the end, the loan application that the underwriter

had denied would be approved and funded by Fifth Third. CW-3 estimates that approximately "**80% of the loans rejected by the underwriters, upon review by McGinty and staff, were then approved and funded**." Based on their experience, the underwriters knew that these were bad loans, and in all probability, would default. However, it was clear to CW-3 that to fight with McGinty and his staff over approval decisions would result in the underwriter being fired. **In the most egregious cases, when it was clear that the loan in question could not be sold in the secondary market to Bear Stearns, McGinty would tell the underwriter that Fifth Third would approve the loans and hold it in Fifth Third's loan portfolio**. CW-3 states that "there was such immense pressure to make the numbers each month to meet the quota imposed by [senior management in] Cincinnati, that it became so crazy at the end of the month that **every mortgage was being approved just to meet the numbers**."

305.    Another abuse observed by CW-3 was Fifth Third's marketing efforts in Europe between 2004 and late 2006. Specifically, Fifth Third purchased newspaper advertisements in European countries, urging Europeans to take advantage of the weak U.S. dollar by purchasing Fifth Third-financed property in Florida. Teams of 3 or 4 salespeople travelled to England and Germany to market these deals and by early 2007, there was a flood of Europeans coming to Florida to purchase undeveloped land priced from $100,000 to $150,000. Other European buyers purchased or refinanced condominiums in Orlando – approximately 250-300 units were sold. These sales accounted for millions of dollars in mortgages being written every month. The purchases only required the buyer to make a 20% down payment, place 6 months of payments in escrow, and provide the name of a U.S. contact agent to represent the purchaser's interest. If those criteria were met, the sale went through. In dealing with these European borrowers, the underwriters were faced with the dilemma that there was no credit bureau information on the

purchaser, no credit score, no way to verify employment, income or assets, and no documents for the underwriters to review. Thus, it was impossible for the underwriters to evaluate the borrowers. CW-3 reports that this program was so successful that salespeople writing up the loan applications could barely keep up with the flood of potential borrowers. This allowed the Florida mortgage operations to keep up with their quotas and assured everyone of receiving their sales-based and mortgage-funded bonuses. CW-3 states: "The problem for Fifth Third was that as real estate values in Florida declined, most of the European purchasers of land, who believed they could buy at one price and 'flip' or sell the property for a quick profit, simply walked away from their commitment, stopped making payments, and left the property to be dealt with by Fifth Third Bank."

306.    CW-3 states that construction loans in Florida were another source of problems for underwriters. Fifth Third was routinely extending construction loans in Florida at 90% LTV. Moreover, most of these construction loans were adjustable rate mortgages that were structured so that the builder would receive its first 'draw,' amounting to 10% of the loan, at the time the loan closed. According to CW-3, there were instances where the builder received the 10% draw and the projects were never even started. As a result, executives and the salespeople were being paid commissions and bonuses, while Fifth Third was being left with a portfolio of bad construction loans.

307.    CW-3 also reports that there were abuses with appraisals in Florida. Specifically, CW-3 states that the underwriters found that approximately 25% of the appraisals were "bad" because of inappropriate comparables, the age of property, the distance of the comparable from the subject property, or a combination of these factors. However, when underwriters would discuss the bad appraisal with their supervisor, about 90% of the time the supervisor would say

the appraisal was adequate, which allowed the loan to be approved and funded. Also, if the appraiser did not provide a high enough value for a property, the salesperson would "work on the appraiser" to get the value they wanted – a "practice that happened all the time."

### d)        Confidential Witness-4

308.    CW-4 was a Sales Executive who worked out of the Company's Sarasota, Florida office from November 2006 to July 2008. CW-4 handled jumbo construction loans that averaged $2.2 million per loan. CW-4 reported to Fifth Third Sales Manager Jody Garris, who reported to McGinty. According to CW-4, Fifth Third's "underwriting was a disaster, and that department had a big turnover," and that it sometimes took as long as six months for a loan to close. CW-4 states that when he had "a big fish" that wanted a multimillion dollar loan, the guidelines got loosened and the loan approval would go up the chain of command and finally be made in Cincinnati. Tom Conte was the main person in charge of underwriting in Ft. Meyers, Florida and he was basically a "layman who was in over his head."

309.    CW-4 also states that appraisals were problematic. CW-4 states that Fifth Third relied on outside appraisers who were on an approved list, but the Company had minimal standards for its approved list: "**If you had a license, you got on the list**." CW-4 believes that there "**were crooked appraisers that were pointedly falsifying the information on documents that they included in their reports**." For instance, CW-4 says that at a development called "Shell Point," in Tallahassee, Florida, people purchased property, that they subsequently could not sell. When they tried to refinance, they found the new appraisals were significantly below what they owed on the property.

310.    CW-4 confirms that there were sales quotas for commercial and construction loans and that "**if salespeople did not meet their quota, they were fired.**" CW-4 is aware of at

least one salesperson that was fired for not meeting his quota.  CW-4 also attended monthly sales meetings and states that quotas were always part of the discussions.

311.    With respect to commercial loans, CW-4 states that there were "a lot of shady things going on" with loans to builders and developers.  Many of the builders and developers would "borrow the maximum amount they could, and when the properties didn't sell, they couldn't pay the loans and Fifth Third was left holding the bag."  In Vero Beach, Florida, for example, there were a lot of problems with land sales.  In some cases, Fifth Third originated loans for "flip" transactions where a developer and realtor had worked out a deal where the realtor bought land and sold it to a developer, who then turned around and sold it to a client at a higher price.  For builder and developer loans, there was a lot of competition among banks, and the decisions approving those loans were made at a very high level of the Company.  CW-4 corroborates CW-3, stating that **Fifth Third routinely made loans to builders and developers with LTV ratios as high as 90%**.

> e)    <u>**Confidential Witness-5**</u>

312.    CW-5 was the Vice President of Operations in Fifth Third's Ft. Meyers, Florida office from early 2005 to mid-2007.  In that position, CW-5 directed the Residential Lending Division in Florida.  CW-5 reported to Fifth Third's mortgage lending head, Darryl Bates, until he left the Company, and then reported to Kevin Klimek, and finally to Tom Conte.  According to CW-5, beginning in 2006, a directive from Fifth Third executives in Cincinnati set sales quotas for the number of mortgage applications that should be received in Florida, as well as the dollar amount of the mortgages to be funded each month.  CW-5 states, "There were individual expectations of loan officers that varied based on their client base.  If the quotas were not met,

the Florida executives would not receive their commissions.  If the loan officers did not meet their quota for two consecutive months, they were fired."

313.    CW-5 states, "There was enormous pressure on everyone to meet the quotas, emanating from various sources.  There was constant verbal harassment of everyone by McGinty over the quotas.  Loan officers went "outside the guidelines' in order to find loans that would enable them to meet their quotas.  When these loans were reviewed by the underwriters, and were found not to meet the guidelines, the underwriters and officers would receive calls from upper management instructing them to go ahead and approve the loan."  CW-5 reports that every day CW-5 would receive at least one call – often more calls – from senior management requesting that CW-5 approve loans that did not meet the underwriting guidelines.  CW-5 estimated that of the loans being reviewed, "**one-third of them didn't meet the guidelines, and there was tremendous pressure to approve them anyway**."

314.    According to CW-5:

> **At either the end of 2006, or the beginning of 2007, there was a tremendous push to kick off promotion of Alt-A loans in Florida**.  Within the Florida Fifth Third operations, **there was a contest to see who could secure the largest number of applications for Alt-A loans**.  During this period, the Alt-A loans represented a little less than one-half of the mortgages being written by Fifth Third in Florida."  CW-5 states that Fifth Third originated 100% LTV loans through its Alt-A program: "The Alt-A loan program had a loan-to-value ratio of up to 100% in a combination of an 80% first mortgage and a 20% equity mortgage.

315.    CW-5 states, "There was tremendous pressure to increase the volume of mortgages coming into Fifth Third.  The pressure came from Florida management, primarily McGinty.  As a result, everyone was overloaded with work every day, and there was always pressure to get the loans approved as quickly as possible.  Management believed that every loan in the pipeline should close by the end of the month. If a loan did not meet the guidelines, it was

kicked up to management, and in most cases it was approved regardless of its compliance with the lending guidelines." CW-5 "**had been in banking for 25 years and had never been associated with a bank like Fifth Third that was making decisions to make mortgages in such a reckless manner.**"

### f) <u>Confidential Witness-6</u>

316. CW-6 is a former Fifth Third Wholesale Account Executive who worked in North Carolina from mid-2006 to February 2007. CW-6's job involved developing relationships with mortgage brokers who would bring loans to Fifth Third. CW-6 reported to the Regional Manager for the Carolinas Region. CW-6 corroborates other confidential sources regarding Fifth Third's use of demanding sales quotas. Specifically, CW-6 states that there was enormous pressure to make sales and bring in loans at Fifth Third. Each wholesale account executive was permitted to establish up to 50 accounts with mortgage brokers, and was expected to generate $2.5 million from 30 loans each month. At any given time, these account executives were expected to have between 10 and 15 loans in the pipeline. If an account executive did not meet the quota for one month, they were subjected to a great deal of pressure to perform. If they had two bad months in a row, they were fired.

317. CW-6 reports that Fifth Third's underwriting guidelines were never "set in stone." For example, an account executive could submit a mortgage application for approval at the first of the month, and have it denied. But the same mortgage application submitted near the end of the month, when things "got crazy" to make the monthly numbers, would be approved. If the underwriter found 5 or 6 conditions that needed to be satisfied, by the end of the month, they would approve it if 3 or 4 of those conditions were met.

318.     During CW-6's tenure, mortgages were being written with an average LTV ratio of 95%, but many loans were written with LTV ratios of 100%. These 100% LTV loans were called "Fifth Third 110s." The 100% LTV loans were generally 80/20 combinations with an 80% first mortgage, and a 20% equity loan. Borrowers with FICO scores of 580 were routinely approved, but a "Level 3 loan" would often be approved with a FICO score of 520. **CW-6 states that at Fifth Third there was no "bottom FICO score."** Loans were evaluated based on a combination of LTV, FICO score, assets, down payment, and total debt-to-income ratio. Finally, CW-6 states that popular Alt-A loans included "stated income/stated asset" loans, and "no ratio loans" which had no income verification and no asset verification.

### g)     Confidential Witness-7

319.     According to CW-7, a former Senior Compliance Specialist who worked in Fifth Third's Cleveland, Ohio "hub" from October 2007 to October 2008, Fifth Third continued to make no-doc or stated income loans until at least late 2007. Also, the Company had been approving loans where the LTV ratios were as high as 100% – providing no equity cushion whatsoever in the event of a default – until early 2008.

### h)     Confidential Witness-8

320.     **CW-8 also confirms that Fifth Third originated subprime loans.** CW-8 was a Fifth Third mortgage loan officer in Ohio, from 2006 to December 2007, a job that involved finding new customers that CW-8 classified as "low-to-moderate income borrowers." CW-8 states Fifth Third approved mortgages with no down payment from the customer and offered option-ARMs, Alt-A, jumbo and interest only loans. CW-8 states that Fifth Third loan officers were willing to accept "stated" figures from their customers without backup documentation,

called "**liar loans**."  CW-8 states that because of the combination of high LTV ratios, FICO scores below 680, and "stated incomes," many borrowers were considered high risks, so the loan officer had to find "loopholes" to get the loan approved.  CW-8 states the pressure to sell mortgages was extremely intense.

### i)      Confidential Witness-9

321.    CW-9 was a Vice President and Outside Origination Manager for Fifth Third from 1996 to mid-2007.  From January 2006 until CW-9's departure from the Company, CW-9 was a Vice President in Naples, Florida and reported to Quinn and McGinty.  Quinn directed CW-9 to have brokers aggressively sell 100% LTV loans.  By pushing 100% LTV loans, brokers would receive a 1% commission on the front end and another 1% commission when the loans closed.   In addition, CW-9 would receive a commission of 0.5% on the first $20 million originated, and larger commissions if loan origination was between $25 million and $45 million.

322.    **CW-9 states that Fifth Third offered subprime mortgages for borrowers with FICO scores as low as 580 as long as they provided a "reasonable" explanation why their score was so low.**  If a borrower did not fit into a conventional loan program, Fifth Third would sell them an option-ARM that would reset in 2, 3 or 5 years.  This allowed young, first-time buyers to purchase a home with no money down.

323.    CW-9 states that there was "big pressure" to originate new mortgages at Fifth Third.  If you could not meet your quota, you would be fired.  By the end of the month, virtually every mortgage was being approved.  The most pressure was on the salespeople who had not met their monthly goals.  Quinn would hold retail meetings where he warned salespeople that if the Florida affiliate was behind on its quarterly sales goals, there was a possibility it would remain

behind the next quarter.  Quinn would tell the salespeople, "**This is coming from corporate and we are not going to be in a position to fail.  I don't care how you do it, just get it done.**"

324.    In order to keep track of mortgages, Fifth Third utilized a computer program called "ACAPS."  Each day, all new mortgage sales were entered on ACAPS, with a unique code number for each type of mortgage product, the dollar amount of the loan, the name of the salesperson, and the regional affiliate.  ACAPS also tracked cross-selling of credit cards, checking accounts, and savings accounts.  Every salesperson had access to ACAPS to track their sales goals that had been set by Fifth Third senior management in Cincinnati.  Sales Managers were able to view information on all their salespeople, so they could track their team's performance as compared to the sales goals set in Cincinnati, and identify which salespeople were lagging behind.  It was not unusual for CW-9 to receive an email from the head of mortgage operations in Cincinnati, saying that CW-9 was falling behind in a particular category and to increase efforts to achieve the goal by the end of the month.

325.    Regional affiliate managers used the ACAPS to view the regional affiliate's performance to sales goals set by senior management in Cincinnati.  Senior Management, including Defendants Kabat, Marshall, and Poston could access the ACAPS system and see, on a real-time basis, the performance of individual salespeople, regional affiliates, and the entire company and compare this data to their sales goals.  ACAPS also identified documentation missing from mortgage applications and red-flagged it to remind the sales or underwriting people to obtain the missing documentation.

326.    In Florida, Fifth Third had a list of "approved" appraisers.  However, if the customer had an appraisal that was less than one year old, that was acceptable to be used instead of obtaining a new one.  If the appraisal was less than six months old, someone from Fifth Third

would do a "drive by" of the property and then use that appraisal. Sometimes, in lieu of an appraisal, Fifth Third would use the Florida State Equalized Value ("SEV") (normally used as assessed value for tax purposes) and then multiply that number by 2.2 to generate an appraised value for the home. The 2.2 multiplier was a figure in the Fifth Third underwriting guidelines that originated at Fifth Third headquarters in Cincinnati.

327. CW-9 was responsible for creating the Alt-A sales contest referred to by CW-5. According to CW-9, there was also a monthly Easy Equity mortgage contest, in which the winner would receive a free weekend stay at the Ritz-Carlton hotel, and a contest to sell the most credit cards in which the winner would get an iPod.

### j) Confidential Witness-10

328. CW-10 worked in mortgage sales in Western Michigan from March 2003 to January 2008. Specifically, CW-10 sold the entire line of first mortgages offered by Fifth Third. **CW-10 confirms that Fifth Third originated subprime mortgages**. The biggest seller was an Alt-A loan known as the "Good Neighbor" loan that was offered at 6.25% interest, 100% LTV, did not require personal mortgage insurance, and was targeted at first-time home buyers. The foreclosure rate on these loans in 2007 was 12% of loans written. CW-10 also sold an Alt-A mortgage product called "Alt-97" which was a mortgage with a 97% LTV ratio and that Fifth Third retained in its loan portfolio. CW-10 confirms that Fifth Third continued to originate 80/20 Alt-A loans long after most other lenders stopped offering them.

329. CW-10 found the underwriting guidelines at Fifth Third to be some of the most liberal on the market. CW-10 noted that applicants who had been turned down by National City Bank and Wells Fargo would come to Fifth Third and their mortgage applications would be

approved.  CW-10 reports that if he/she gave the underwriter a "good story" as to why the mortgage should be approved, the loan would be approved.

330.    CW-10 states that Fifth Third offered builder loans.  One of their customers in Portage, Michigan and Grand Rapids, Michigan was a builder named Allan Edwin.  Fifth Third offered "End Loans" to Mr. Edwin after other lenders had refused to fund his construction projects.  According to CW-10, when Fifth Third rejected loan applications from purchasers of his homes because of their poor credit, Mr. Edwin was able to appeal to the Fifth Third loan officers that had turned down applications or approach someone higher up in the Company, and he would get the loans approved.

331.    Fifth Third also did construction lending.  At first, Fifth Third and other lenders were offering construction loans with a 95% LTV.  While other lenders became more conservative and lowered their maximum LTV to 75%, Fifth Third continued to fund loans at the 95% LTV, even though there was a high default rate on those loans.

332.    According to CW-10, Fifth Third's underwriters would approve almost any loan. CW-10 specifically recalls seeing an application with a FICO score of 500 that was approved, and it was not unusual for borrowers with FICO scores of 570 to 580 to be approved.  According to CW-10, Fifth Third underwriters approved loans that would not be approved by other lenders. Even when a loan was rejected, CW-10 was almost always able to find another underwriter who was willing to approve it.

333.    According to CW-10, Fifth Third's property appraisal system consisted of an approved list of appraisers, who were selected by the loan processor on a rotating basis.  When brokers brought in loans, those applications included appraisals that had been done by appraisers selected by the broker.  If the appraisal value given by the appraiser would cause the loan to be

rejected, CW-10 found that the appraisers would be "willing to work with you" and provide a value that would allow the mortgage to be approved.

**k)** **Confidential Witness-11**

334. CW-11 was a Vice President and Regional Manager for Fifth Third's Retail Division from May 2006 to February 2008. CW-11 was hired by Quinn to oversee for 14 branch offices in Western Florida, and 2 branches in Eastern Florida. CW-11 has firsthand knowledge of the lending practices at Fifth Third during CW-11's tenure because the products being sold through the branches were subject to the same credit review and approval processes as mortgages. As the head of Florida retail operations, CW-11 reviewed residential mortgage applications, including credit reports from TRW and Equifax, to determine if additional financial products could be sold to the customer such as credit cards, checking accounts, and home equity loans.

335. According to CW-11, one product being pushed in 2006 was the "Easy Equity Mortgage," which CW-11 described as a "hybrid" of a first mortgage, a second mortgage and a line of credit. Fifth Third used aggressive telemarketing to sell Easy Equity Mortgages – indeed, the entire transaction was handled over the telephone. CW-11 viewed this product as being high risk and states that Fifth Third deceptively portrayed this product as a line of credit rather than a mortgage, with borrowers unwittingly mortgaging 100% of the value of their homes.

336. CW-11 reports that **Fifth Third changed its lending guidelines on a daily basis**, as reflected by a "flood of memos" being sent from corporate headquarters in Cincinnati. At the same time, senior management in Cincinnati for Fifth Third employees increased sales quotas for checking accounts, credit cards, and home equity loans to levels that could not be met. For example, quotas for each branch's new credit cards were gradually increased from 15 per month

to 50 per month – a level that could not be met. CW-11 states that there was tremendous pressure from the senior officers on the employees to meet these quotas. In order to meet sales quotas, managers routinely over-rode decisions made by Fifth Third's automated system that had denied approval for a loan or a credit card. **As the quotas increased, the over-riding of denials became commonplace**.

337. Mortgages were routinely approved as long as the borrower's FICO score was over 600. Credit cards were regularly approved for customers with FICO scores in the 500s. Fifth Third even went as far as having the then regional head of retail banking train Fifth Third managers how to interpret low FICO scores and other negative credit report information. During this training, managers were instructed that defaults on medical payment obligations did not matter, nor did delinquent payments on utilities or telephone service.

338. CW-11 recalls that in 2006, a marketing team from corporate headquarters in Cincinnati came to Tampa, Florida to promote selling Alt-A mortgages, and **portrayed Alt-A as** "**the best thing that ever happened to home mortgages**." Fifth Third sold many types of Alt-A mortgages, but all entailed high risk. **Fifth Third aggressively marketed Alt-A mortgages to foreign buyers, primarily from Germany and England**. Those buyers did not have credit reports or documentation of employment or assets, but Fifth Third approved their mortgage applications as long as they put some money down. According to CW-11, these Europeans were sold on the idea that they could quickly "flip" properties for a significant profit and bought Florida real estate as a speculative investment.

339. CW-11 states that by the middle of 2007, Fifth Third was experiencing ever increasing defaults on mortgages and credit cards. By February 2008, conditions had deteriorated and senior management was looking for ways to handle the losses without revealing

that the mortgage department was responsible. **CW-11 states senior management decided to book defaults on the branch balance sheets rather than the mortgage department to conceal the full extent of the problem**.

### l)    Confidential Witness-12

340.    Defendants' intentional and improper manipulation of loan loss reserves to meet earnings projections is corroborated by CW-12, a Performance Reporting Manager in Fifth Third's Mortgage Division, in Cincinnati from 2000 to 2006. CW-12's job duties included creating financial and production metrics, bench marking for mortgage channels, and designing monthly financial reporting packages for senior-level management. CW-12 reported directly to the CFO of Fifth Third's Mortgage Division.

341.    Among other responsibilities, CW-12 prepared a monthly report called the "Executive Review" or "ER" which provided top corporate executives a "snapshot" of the monthly profit and loss ("P&L"). The ER report was distributed to all Fifth Third executive vice presidents as well as the CEO and CFO of the Company. The ER would show the combined corporate P&L and compared it to the Plan Target (the Company's quarterly or annual projections of revenue generation and dollar value of mortgages originated). When the P&L was below the Plan Target, the CEO and CFO would discuss it among themselves, and then the CFO would tell CW-12 to reduce the provision for loan losses to enable the actual P&L to reflect a corporate financial performance that would meet or exceed the Plan Target. Fifth Third's provision for loan losses was set at 1.5% of the mortgages that were originated, but every month and every year, the CEO and CFO "chopped" the reserves to reflect a profit level that was in line with the Plan Target. CW-12 reports witnessing the provisional credit reserves cut from 1.5% to 1.3% of mortgage originations.

### 8. Defendants Violated Accounting Rules and SEC Regulations

342.    As described above, prior to and during the Class Period, subprime loans under the guise of Alt-A loans, home equity, ARMs, and high LTV commercial real estate loans were mounting on Fifth Third's books, but the Company's reserves for loan losses did not keep pace. GAAP requires that financial institutions like Fifth Third establish reserves for potential credit losses on loans held for investment when the underlying borrowers default on their obligations to make periodic payments. This reserve is referred to as an "allowance for loan losses."

343.    The Financial Institutions Examination Counsel, *Policy Statement on Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions* (July 2, 2001), states:

> For financial reporting purposes, including regulatory reporting, **the provision for loan and lease losses and the ALLL ["Allowance for Loan and Lease Losses"] must be determined in accordance with GAAP**. GAAP requires that allowances be well documented, with clear explanations of the supporting analyses and rationale.

(Emphasis added.)

344.    Throughout the Class Period, the Company issued financial statements that were materially misstated and not presented in accordance with GAAP because the Company did not establish an adequate reserve for loan losses in violation of GAAP and thus, overstated net income. Defendants Kabat and Marshall also repeatedly signed sworn certifications regarding Fifth Third's financial statements and the adequacy of the Company's internal controls, which were materially misleading as these sworn certifications failed to reveal Defendants' knowledge of the Company's violations of GAAP.

**a)**     <u>**Defendants Violated Generally Accepted Accounting**</u>
<u>**Principles**</u>

345.     GAAP are those principles recognized by the accounting profession, promulgated, in part, by the American Institute of Certified Public Accountants ("AICPA"), as conventions, rules and procedures necessary to define accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board. SEC Regulation S-X (17 C.F.R. §210.4-01 (a) (1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures. The responsibility for preparing the financial statements in conformity with GAAP rests with the Company's management. *See* AICPA's Auditing Standards ("AU") §110.03.

346.     Among the GAAP principles violated by Defendants are:

(a)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶95, 97);

(b)     FAS 5 which requires both the recognition of losses that are probable and estimable in the period when so determined and that disclosure be made of losses, including those incurred after the date of the financial statements, but prior to the issuance of such financial statements, that are reasonably possible in order to prevent the financial statements from being misleading (FAS 5 ¶¶10-11);

(c)     FAS 107, as amended by FAS 133, which requires disclosure of all significant concentrations of credit risk arising from all financial instruments (FAS 107, as amended by FAS 133, ¶15A); and

(d)      SOP 94-6, which requires disclosure of certain risks and uncertainties, including an entity's vulnerability due to certain concentrations (SOP 94-6 ¶¶8, 20-22).

### b)      Defendants Violated Other Relevant Accounting Principles

347.   The Company's portfolio of loans held for investment was presented within the Company's balance sheet separately from other asset balances such as cash, securities, or loans held for sale.  Aligned with the loan portfolio was an allowance for loan losses.  The Company's allowance for loan losses was, purportedly, meant to reflect, as reported in the relevant financial statements, the Company's estimate of all probable credit losses resident within the loan portfolio.  This estimate of probable losses was required by GAAP.

348.   FAS 5 provides guidance on accounting and reporting of loss contingencies, including credit losses.  FAS 5 states that an estimated loss from a loss contingency, such as the collectibility of receivables, should be accrued (*i.e.*, increase the allowance for loan losses) by a charge to income.  Such accrual should be made when, based on information available prior to the issuance of the financial statements, it is probable (defined as likely to occur) that the loss has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated (FAS 5 ¶¶3, 4, 8).

349.   FAS 114 discusses three ways in which the impairment of individual loans may be measured.  Impairment may be measured based on: (a) the present value of future cash flows discounted at the loan's effective interest rate; (b) the loan's observable market price; or (c) the fair value of collateral when the loan is collateral dependent. (FAS 114, ¶ 13; FAS 5, ¶ 8).

350.   The AICPA *Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies* (the "AAG") provides that the quality of the related underwriting and review procedures should

be considered in determining when credit losses should be recognized under the FAS 5 criteria. The AAG states, in relevant part, "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive … the loss generally should be recognized at the date of loan origination." (AAG ¶ 9.37).

351. Regarding management's methodology for estimating the amount of credit losses, the AAG enumerates certain common elements of any effective method. Those common elements include:

a. A detailed and regular analysis of the loan portfolio and off-balance-sheet instruments with credit risk.

b. Consideration of all known relevant internal and external factors that may affect collectability.

c. Consideration of all loans (whether on an individual or pool-of-loans basis) and other relevant credit exposure.

d. Consideration of the particular risks inherent in the different kinds of lending.

e. Performance by competent and well-trained personnel.

f. Good documentation with clear explanations of the supporting analyses and rationale. (AAG ¶9.05)

352. Regarding the evaluation of loans, the AAG also provides that "loan evaluations by management" (and tests of such by independent accountants to the extent they are performed as part of the engagement) should avoid the following:

• *Collateral myopia.* This is the failure to see beyond collateral values to a financial weakness in the borrower.

• *Inadequate collateral appraisals.* This is the failure to critically review appraisals to understand the methods employed, assumptions made, and limitations inherent in the appraisal process, including undue reliance on management appraisals. Appraisal

methods and assumptions may be inappropriate in the current circumstances. Going concern values generally are dramatically different from liquidation values. For example, real estate appraisals made on the income approach are not usually appropriate for incomplete projects or in circumstances in which operating conditions have changed.

• *Outdated or unreliable financial information*. This is the reliance on old, incomplete, or inconsistent data to assess operating performance or financial capacity. Financial information should be current and complete, particularly for borrowers sensitive to cyclical fluctuations or who demonstrate significant growth or changes in operating philosophy and markets.

• *Dependence on management representations*. This is undue reliance on management representations even though there is no supporting evidence. For example, such representations as "the guarantee is not signed but it is still good" or "the future prospects for this troubled borrower are promising" necessitate a critical review. (AAG ¶9.17)

353. In addition to those requirements provided in GAAP, SEC Staff Accounting Bulletin: No. 102 – *Selected Loan Loss Allowance Methodology and Documentation Issues*, provides guidance on the proper accounting procedures that Fifth Third should have followed in setting loan loss reserves, but did not, including the requirement that loan loss allowance methodologies must be based on management's "current judgments about the credit quality of the loan," stating:

> The staff normally would expect a registrant that engages in lending activities to develop and document a systematic methodology to determine its provision for loan losses and allowance for loan losses as of each financial reporting date. **It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process.** A registrant's loan loss allowance methodology is influenced by entity-specific factors, such as an entity's size, organizational structure, business environment and strategy, management style, loan portfolio characteristics, loan administration procedures, and management information systems. However, as indicated in the AICPA Audit and Accounting Guide, Banks and Savings Institutions (Audit Guide), "[w]hile different institutions may use different methods, there are certain common elements that should be included in any [loan loss allowance] methodology for it to be effective." A registrant's loan loss allowance methodology generally should:

> • Include a detailed analysis of the loan portfolio, performed on a regular basis;

• Consider all loans (whether on an individual or group basis);

• Identify loans to be evaluated for impairment on an individual basis under SFAS No. 114 and segment the remainder of the portfolio into groups of loans with similar risk characteristics for evaluation and analysis under SFAS No. 5;

• Consider all known relevant internal and external factors that may affect loan collectibility;

• Be applied consistently but, when appropriate, be modified for new factors affecting collectibility;

• Consider the particular risks inherent in different kinds of lending;

• Consider current collateral values (less costs to sell), where applicable;

• Require that analyses, estimates, reviews and other loan loss allowance methodology functions be performed by competent and well-trained personnel;

• Be based on current and reliable data;

• Be well documented, in writing, with clear explanations of the supporting analyses and rationale...; and

• Include a systematic and logical method to consolidate the loss estimates and ensure the loan loss allowance balance is recorded in accordance with GAAP.

**For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements.** Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses.

(Emphasis added.)

354.    Regulatory guidance that specifically related to the allowance for loan losses on subprime lending was issued as early as 2001, collectively, by the OCC, the Federal Reserve Board, the FCIC and the Office of Thrift Supervision (collectively, the "Agencies"). The Agencies' *Expanded Guidance for Subprime Lending Programs* indicated that estimated credit losses should meet the criteria of GAAP and substantively reiterated the importance of many of the above considerations to a company when estimating credit losses. Specifically, it provided

118

that, when using historical loss experience to estimate expected credit losses, the historical loss experience "should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter such experience." Further, the guidance stated that "[t]he allowance should represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision."

355. Fifth Third failed to prudently consider or adhere to the aforementioned guidance, ultimately rendering its financial statements materially false and misleading.

## B. **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

356. In addition to the Defendants' false and misleading statements made in connection with the First Charter acquisition, the Preferred B Offering and the Preferred C Offering, the Defendants made the following false and misleading statements and omissions of material facts during the Class Period.

357. As discussed above, Defendants misrepresented and concealed the material facts that they engaged in subprime lending, systematically disregarded conservative underwriting practices, systematically overrode the Company's own underwriting standards and risk control procedures, routinely approved loans based on undocumented and unverified income, employment and/or assets, and fostered a widespread corporate culture that encouraged employees to push through mortgages without regard to conservative underwriting standards.

### 1. **The Third Quarter 2007 Earnings Release and Form 8-K**

358. The Class Period begins on October 19, 2007, when Fifth Third issued a press release and quarterly financial supplement announcing its earnings for the third quarter of 2007

(the "Third Quarter 2007 Earnings Release").  The Company reported third quarter 2007 earnings of $376 million, or $0.71 per diluted share.  Commenting on these results, Defendant Kabat stated:

> Third quarter results were solid in a quarter that saw significant market disruption. While we weren't completely immune from that disruption, we were spared most of its effects … Revenue growth of two percent sequentially and seven percent from a year ago was impressive, given the market, with strength in both net interest income and fee income. Expenses were also well controlled during the quarter. Credit continues to be a challenge and we are actively managing our risks as the cycle progresses. We continue to expect further deterioration in credit trends for the near future but the deterioration to remain manageable. Overall, we were pleased with our results given the macro environment in this kind of quarter and continue to execute our strategic plans.

359.    With respect to the Company's provision for loan and lease losses, the Third Quarter 2007 Earnings Release reported the following:

> Provision for loan and lease losses totaled $139 million in the third quarter, exceeding net charge-offs of $115 million, compared with $121 million last quarter and $87 million in the same quarter last year. The allowance for loan and lease losses represented 1.08 percent of total loans and leases outstanding as of quarter end, compared with 1.06 percent last quarter and 1.04 percent in the same quarter last year.

360.    The Defendants reported in the Third Quarter 2007 Earnings Release an increase in nonperforming assets, including growth in nonperforming commercial construction and commercial mortgage assets in Michigan, Ohio and Florida, as follows:

> Nonperforming assets (NPAs) at quarter end were $706 million, or 92 bps of total loans and leases and other real estate owned, up from 70 bps last quarter and 56 bps in the third quarter a year ago. Sequential growth in NPAs was $178 million, or 34 percent. Commercial NPAs of $446 million, or 104 bps, grew $116 million. Commercial construction and commercial mortgage continued to drive commercial NPA growth, particularly in Eastern Michigan, Northeastern Ohio, and Southern Florida which together accounted for two-thirds of the increase in commercial NPAs. Consumer NPAs of $260 million, or 78 bps, grew $62 million, driven primarily by higher first and second mortgage non-accrual loans, including $22 million related to debt restructurings with borrowers as well as higher foreclosed real estate, reflecting the impact of a weaker economy in parts of our footprint and generally lower home prices. Florida and Michigan accounted for

almost two-thirds of the consumer NPA increase. Delinquent loans were $360 million, up $58 million from the second quarter, with the growth split evenly between commercial and consumer. Commercial delinquency growth was concentrated in construction lending, particularly in Southern Florida and Eastern Michigan. Consumer growth was driven by residential delinquencies in Florida and Michigan.

361.    Additionally, Defendants represented in the October 19, 2007 press release that Fifth Third was adequately capitalized, as follows:

| | For the Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | September 2007 (a) | June 2007 | March 2007 | December 2006 | September 2006 |
| **Capital Position** | | | | | |
| Average shareholders' equity to average assets | 9.13% | 9.53% | 10.05% | 9.70% | 9.33% |
| Tangible equity | 6.88% | 6.92% | 7.65% | 7.79% | 7.40% |
| Regulatory capital ratios: | | | | | |
| Tier I capital | 8.50% | 8.13% | 8.71% | 8.39% | 8.64% |
| Total risk-based capital | 10.91% | 10.54% | 11.19% | 11.07% | 10.61% |
| Tier I leverage | 9.27% | 8.76% | 9.36% | 8.44% | 8.52% |

362.    Although the Third Quarter 2007 Earnings Release reported increased reserves for loan losses and an increase in nonperforming assets, the Defendants' statements in the Third Quarter 2007 Earnings Release were materially false and misleading because they concealed the fact that Defendants had fraudulently delayed increasing allowances for loan and lease losses to an amount sufficient to cover Fifth Third's risky loan portfolio, which was likely to suffer increasing defaults.  Defendants knew that the third quarter 2007 allowances for loan and lease losses of $139 million was only 20% of NPAs of $706 million, which represented a dramatic decline from 170% as of December 31, 2006.  They also knew, but failed to disclose that using historical loss rates as a criterion for determining the provision for loan losses would result in an insufficient provision in light of the then-current real estate and financial markets.  Indeed, Defendants admitted that they relied on historical loss rates too heavily during the Class Period. The Company's annual report on Form 10-K for the 2008 financial year stated:

> **The** Bancorp's **current methodology for determining this measure is based on historical loss rates**, current credit grades, specific allocation on impaired commercial credits above specified thresholds and other qualitative adjustments. **Approximately 81% of the required reserves come from the baseline**

**historical loss rates, specific reserve estimates and current credit grades**; while 19% comes from qualitative adjustments. **As a result, the required reserves tend to slightly lag the deterioration in the portfolio due to the heavy reliance on realized historical losses** and the credit grade rating process.

(Emphasis added.)

363.    In order to preserve the illusion that Fifth Third was profitable and had sufficient earnings to support dividend payments while remaining well-capitalized, Defendants fraudulently delayed sufficiently increasing Fifth Third's loan loss reserves in the third quarter of 2007 and continuing throughout the Class Period, as reported in the Company's financial statements filed with the SEC during the Class Period.  If Fifth Third had taken sufficient reserves from the end of the third quarter of 2007 onward, its earnings during the Class Period would have been materially lower.  Moreover, Defendants concealed the adverse material facts that the Company had made riskier loans, particularly Alt-A mortgage loans, home equity loans, and high LTV land and construction loans in the 2006 - 2007 period than in earlier years and that these vintages of loans necessarily comprised a larger proportion of the Company's held-for-investment portfolio of loans than in previous years.  Additionally, Defendants concealed from the investing public the fact that the Company's underwriting deficiencies had exposed Fifth Third to the known risk of further defaults on commercial and consumer loans that would have an adverse material impact on the Company's financial condition, including its earnings and the deterioration of its tier 1 capital.

### 2.    The Third Quarter 2007 Analyst Conference Call

364.    On October 19, 2007, Fifth Third hosted a conference call for securities analysts and investors to discuss its third quarter 2007 financial results.  The Company was represented on the call by, among others, Defendants Kabat and Marshall.  In his prepared comments,

Defendant Kabat represented that the Company's fee growth and net interest income growth were sufficient to generate quarterly growth in earnings per share, despite the Company's increased provision for loan losses, stating:

> I would like to start off by saying that this was a solid quarter for us and we're pleased with the results, particularly given the macro environment that we're operating in. We showed strong revenue growth and expenses were well controlled. Fee growth was outstanding, and NII growth was also quite good, and we hope will continue to benefit from wider, more rational spreads. We do expect some further deterioration of credit as we manage our way through the cycle. However, **we've been able to generate core performance that has allowed us to earn through a higher provision and still grow EPS.**

(Emphasis added.)

365.    Additionally, Defendant Kabat represented that the Company had tightened its lending standards and had improved its credit quality, stating:

> We told you we would fix our balance sheet issue last year, and we did. We made commitments to deliver on our growth initiatives like our card initiative and healthcare industry vertical, and we're doing that. **We've also been completely transparent about our opportunities and our problems. For example, we've been very clear for a year that we expected home equity to be the most likely source of higher losses, not only for us but for the industry.**
>
> The management team, **we've been very focused on addressing our issues, particularly as it relates to our credit quality**. For example, we've consolidated consumer and home equity underwriting and approval into two regional credit centers. We have reduced exceptions to guidelines and eliminated channels that were producing home equity loans with poor credit performance. **We're now delivering all alt-A production under an agency flow arrangement and we're proactively addressing problem loans in the making**. We can't eliminate the effects of the market and the cycle, and though they have increased, charge-offs are in line with our forecast at the beginning of the year, though higher than we would like. The steps we're taking will take time to cycle through, but will produce better results in the future. You can expect that as a team we'll remain focused on executing our strategic plan, meeting our commitments, and building a stronger institution going forward even as we work through a fairly challenging time.

(Emphasis added.)

366.    Defendant Kabat's statement that "we've been able to generate core performance that has allowed us to earn through a higher provision and still grow EPS," was materially false and misleading because it concealed the fact that the provision for loan losses was still insufficient in view of Fifth Third's risky, inferior credit quality loan portfolio, which was likely to suffer increasing defaults.  Defendants' failure to disclose the true credit quality of Fifth Third's loan portfolio permitted them to inflate Fifth Third's earnings by failing to take sufficient provisions for loan losses.  Defendant Kabat's statements that "[w]e've also been completely transparent about our … our problems," and that "we expected home equity to be the most likely source of higher losses," were materially false and misleading because they concealed from the investing public the Company's deficient underwriting standards, the fact that home equity was not the biggest problem.  The fact that the Company had originated riskier loans, particularly subprime loans under the guise of Alt-A, and high LTV land and construction loans in 2006 - 2007 than it had represented to the public, and the fact that these loans necessarily comprised a larger proportion of the Company's held-for-investment portfolio of loans than in previous years.  Defendant Kabat's statements that "we've been very focused on … our credit quality" and "[w]e're now delivering all alt-A production under an agency flow arrangement and we're proactively addressing problem loans in the making," were materially false and misleading because Fifth Third had abandoned its prior conservative underwriting standards and was then making loans, under the guise of Alt-A, which in reality had all of the characteristics of subprime loans.

367.    Also during the October 19, 2007 conference call, Defendant Marshall delivered prepared comments regarding nonperforming assets and the Company's purported improvements in credit quality, stating:

124

Let me move onto the details, starting with credit. It was obviously a difficult quarter from a credit standpoint. There is no getting around that... Though NPA growth at 34% was higher than we were projecting, and **we had some upward pressure in the quarter in that market conditions were very poor for NPA and charged-off loan sales. That obviously raises our NPAs** and lowers our recoveries. We continue to evaluate opportunities to sell NPAs at the right pricing and we'd expect to do so moving forward. Additionally, as Kevin noted, we did restructure consumer borrowings this quarter and that increased NPAs by $22 million.

*   *   *

Moving onto provision, **provision expense was $139 million** and exceeded net charge-offs by $24 million, which as I said earlier increased the allowance ratio to 1.08. We would expect to see provision continue to exceed charge-offs for the near future given our expected loan growth and the expectation for continued growth in NPAs and criticized assets in the near term.

Let me mention just a few more points on NPAs to make sure I cover everything. Let's see. **NPAs totaled $706 million or 92 basis points of loans, up 22 basis points from last quarter. That totals $178 million increase or 34%, as I just said. Commercial NPAs were $446 million.** We had $106 million (sic -- see Press Release) increase in NPAs in commercial. Most of the increase came from commercial mortgage and construction, particularly in eastern Michigan, northeastern Ohio, and southern Florida. Home builders and developers accounted for about $50 million of the total which is up about $5 million from the second quarter.

Consumer NPAs of $276 million (sic -- see Press Release) were up $61 million (sic -- see Press Release), and they were driven by an increase in residential mortgage and home equity loans primarily in Florida and Michigan. As Kevin mentioned, of that increase $22 million related to proactively restructuring borrowers' debt to better enable them to service their loans, and we'd expect to do more of that in the next few quarters.

Now, again, credit is problematic, but we've made a lot of changes, as Kevin said, **since the new team has been in place over the past 12 months in terms of identifying areas of potential and developing stress in the portfolio, tightening terms and guidelines to ensure that credit problems are mitigated….**

(Emphasis added.)

368.   During the call, Defendants were questioned regarding the increase in

nonperforming assets during the quarter, stating:

**Chris Marshall  - *Fifth Third Bancorp - EVP, CFO***

Mike, this is Chris. Let's see. First of all, in terms of the NPA growth, I can't give you an exact number, but I think 34% is what we saw this quarter. I think that was, if you look at it in two pieces, **the biggest piece obviously credit deterioration was probably about 25%,** and **9 or 10% was due to the troubled debt restructuring and the lack of a NPA sale**. I can't tell you what we're going to do in the fourth quarter, but **I would expect that not having an NPA sale is going to be unusual for us.** We would look to do those each quarter. That would offset some of the NPA growth.

**Then the troubled debt restructuring, while it is a little too early to tell how those credits are going to perform once they're restructured, I put those in a slightly different category, so I might look at the underlying NPA growth as a little bit lower than the 34%, more in the 25% range….**

*    *    *

**John McDonald  - *Banc of America Securities - Analyst***

Chris, I was wondering if you can give us a little bit of color on what the drivers are of the level of reserve builds I guess with NPAs and charge-off ratio going up, why don't we see a growth in the ratio of reserve to loans?

**Chris Marshall  - *Fifth Third Bancorp - EVP, CFO***

Well, I will give you a general answer there, John. **There is not a linear relationship as you know between NPAs and reserves. It really has to do with the expected loss from those loans that are moving into NPA status**, and in our case the vast majority of them are commercial loans, and our loss expectation on those loans are all factored into the calculation. I mean, we looked at what our -- in fact, we not only look at what our loss experience has been over the last couple of quarters, **we really tightened that up to make sure we're looking at what our loss experience has been in the immediately preceding quarter as opposed to looking over the average of a year or two. So I think we're looking very accurately at credit by credit or pool by pool what's flowing into NPA, what the cure rates have been, and what the expected losses are, and that's how the allowance is built.**

(Emphasis added.)

369.    Defendant Marshall's statements that "market conditions were very poor for NPA and charged-off loan sales" and that "troubled debt restructuring and the lack of a NPA sale" were to blame for Fifth Third's quarterly increase in nonperforming assets were materially false

and misleading because they concealed the fact that nonperforming assets had increased because of the Company's grossly deficient underwriting standards and risk management practices, the fact that the Company had originated riskier loans in 2007 than it had represented to the public, and the fact that these loans necessarily comprised a larger proportion of the Company's held-for-investment portfolio of loans than in previous years because these loans could not be sold in the secondary market. Defendant Marshall's statement that "there is not a linear relationship … between NPAs and reserves," was materially false and misleading because it obfuscated the fact that the ratio of loan loss reserves to nonperforming assets was declining dramatically, which was known by Defendants but concealed from investors. Defendant Marshall's claims that Fifth Third's loan loss reserves were based on "expected loss from those loans that are moving into NPA status," and that "we really tightened that up to make sure we're looking at what our loss experience has been in the immediately preceding quarter as opposed to looking over the average of a year or two," were materially false and misleading because they concealed the poor credit quality of the Company's held-for-investment loan portfolio due to the Company's deficient underwriting standards and sales-driven corporate culture, and the fact that the Company's reported nonperforming assets did not reflect the rapidly growing number of loans that had become 30 to 89 days delinquent and for which Fifth Third not take additional reserves. Given the downturn in the real estate market, these loans should have been considered impaired and the Company should have taken reserves against such loans, but failed to do so in order to continue to artificially inflate the Company's reported financial results.

370. With respect to Alt-A loans, Defendant Marshall represented that the Company had taken steps to get these riskier loans off the Company's books and claimed that the loans in

the Company's Alt-A loan portfolio had a "weighted average FICO of 700 and a loan to value

ratio of 72%, stating:

> In Alt-A, as we've told you, we've moved very aggressively to try to stay ahead
> of changing market conditions. We wanted to develop this product without risk of
> holding it. Now, we're one of a handful of banks that in the last quarter has been
> able to arrange for future Alt-A production to be delivered within flow sale
> agreements, and so we feel good about that, and we don't think you should expect
> any future warehouse risk from this product. The $110 million of loans we moved
> to the portfolio had a weighted average FICO of 700 and LTV of 72%.

371.    The Defendants' statements during the Third Quarter 2007 Conference Call

regarding Fifth Third's Alt-A loan origination were materially false and misleading because they

concealed from the investing public the fact that, since at least the third quarter of 2006, Fifth

Third had grossly deficient underwriting standards and had originated extremely risky loans,

including Alt-A loans with multiple layered risk factors described above, that were precisely the

same risk factors identified by the OCC as being characteristic of subprime loans.  Defendants'

statements also failed to disclose whether Fifth Third had verified Alt-A borrowers' income,

employment, assets or other salient borrower information.  Indeed, the borrower's FICO score

was meaningless if the borrower had insufficient income to repay the loan.  Moreover, the above

statement that Alt-A loans were to be delivered through "flow sale agreements" concealed the

fact that Fifth Third was unable to sell the riskiest of its loans and, even when it was able to sell

Alt-A loans, the Company was no longer able to sell such loans without recourse.  Thus, Fifth

Third was retaining the risk of early payment defaults (*i.e.*, loans that become 90 days delinquent

during the first 12 months or 60 days delinquent in the first four months), and would be required

to repurchase and/or charge-off delinquent loans that it purported to get off its own  books.  As a

result, the Company was under-reserving for probable loan losses, and the Company required

higher levels of capital than amounts that typically meet regulatory well-capitalized levels.

### 3. The Third Quarter 2007 Form 10-Q

372.     On or about November 9, 2007, Fifth Third filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2007 ("Third Quarter 2007 10-Q").  The Third Quarter 2007 10-Q was signed by Defendant Marshall and certified by Defendants Kabat and Marshall pursuant to the requirements of the Sarbanes-Oxley Act of 2002 ("SOX") that the Third Quarter 2007 10-Q did not contain any false or misleading statements of material fact or fail to disclose any material facts and fairly presented the Company's financial results and condition, as follows:

1.  I have reviewed this annual report on Form 10-Q of Fifth Third Bancorp (the "Registrant");

**2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

**3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;**

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

   a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and

the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

   a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

   b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

373.  Defendants Kabat's and Marshall's statements in their respective SOX certifications were materially false and misleading because, contrary to their representations that the Third Quarter 2007 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made … not misleading" and "the financial statements … included in this report, fairly present … the financial condition" of the Company, the Third Quarter 2007 10-Q did not fairly present the financial condition and results of Fifth Third because it failed to disclose the Company's grossly deficient lending and underwriting standards which caused the credit quality of the Company's loan portfolio to rapidly deteriorate,

the fact that Fifth Third failed to set aside sufficient loan loss reserves in light of its undisclosed, increased credit risks, and the fact that, as a result, the Company's earnings were overstated.

374.    The Third Quarter 2007 10-Q reiterated the financial results reported in the Third Quarter 2007 Earnings Release.  In addition, the Defendants made the following disclosures regarding nonperforming assets:

> Commercial nonaccrual credits as a percent of commercial loans increased since the third quarter of 2006, from .61% to 1.00%. **The majority of the increase continues to be driven by the real estate and construction industries in the Southern Florida, Northeastern Ohio and Eastern Michigan affiliates** … As of September 30, 2007, the Bancorp has outstanding loans to homebuilders of $1.4 billion, exposure of $2.4 billion and $49 million of nonaccrual credits.
>
> Consumer nonaccrual credits as a percent of consumer loans increased since the third quarter of 2006, from .22% to .41%. **The increase in consumer nonaccrual credits is primarily attributable to the housing markets in the Michigan and Florida affiliates**, the changes in policy for the repossession of automobiles and the restructuring of certain high risk loans.
>
> \*    \*    \*
>
> **Total nonperforming assets were $706 million at September 30, 2007**, compared to $455 million at December 31, 2006 and $411 million at September 30, 2006. Nonperforming assets as percentage of total loans, leases and other assets, including other real estate owned increased to .92% as of September 30, 2007 compared to .61% as of December 31, 2006 and .56% as of September 30, 2006.

375.    Defendants' statements in the Third Quarter 2007 10-Q were materially false and misleading because they blamed "the real estate and construction industries in the Southern Florida, Northeastern Ohio and Eastern Michigan affiliates" for increased commercial NPAs and blamed increased consumer NPAs "primarily" on "the housing markets in the Michigan and Florida," which concealed the fact that these increased loan defaults were the inevitable consequence of the Company's abandonment of conservative lending and underwriting standards, and risk management practices.

376.    With respect to the Company's provision for loan and lease losses, the Third

Quarter 2007 10-Q stated:

> **The provision for loan and lease losses increased to $139 million in the third quarter of 2007 compared to $87 million in the same period last year. The $52 million increase is related to loan growth during the past year, increases in delinquencies and increases in severity of loss from the decline in the real estate market.** The allowance for loan and lease losses as a percentage of loans and leases increased to 1.08% at September 30, 2007 from 1.06% at June 30, 2007 and 1.04% at September 30, 2006. The increase in allowance percentage from third quarter of 2006 is primarily due to an increase in nonperforming assets and net charge-off trends from $411 million at September 30, 2006 to $706 million at September 30, 2007.

(Emphasis added.)

377.    The Defendants' statements in the Third Quarter 2007 10-Q that "[t]he provision

for loan and lease losses increased to $139 million in the third quarter of 2007" and that "$52

million increase is related to loan growth during the past year, increases in delinquencies and

increases in severity of loss from the decline in the real estate market," were materially false and

misleading because they concealed the fact that Defendants had fraudulently delayed increasing

allowances for loan and lease losses to an amount sufficient to cover Fifth Third's risky loan

portfolio.  Defendants knew that the third quarter 2007 allowance for loan and lease losses of

$139 million were insufficient because they were only 20% of NPAs of $706 million, which

represented a dramatic decline from 170% as of December 31, 2006.  These allowances were

inadequate because the credit quality of the loan portfolio was deteriorating as a result of Fifth

Third's abandonment of conservative underwriting practices.  They also concealed from the

investing public the fact that Fifth Third had grossly deficient underwriting and risk management

standards and, since at least the third quarter of 2006, originated extremely risky loans, including

land loans with LTVs as high as 90% and Alt-A loans with multiple layered risk factors

described above, that were precisely the same risk factors identified by the OCC as being characteristic of subprime loans.

378.    The Third Quarter 2007 10-Q disclosed that Fifth Third was originating residential mortgages with high LTV ratios and that the Company was retaining a substantial portion of these loans in its residential mortgage portfolio, stating:

> **Certain mortgage products have contractual features that may increase credit exposure to the Bancorp in the event of a decline in housing prices.** These types of mortgage products offered by the Bancorp include high loan-to-value ("LTV") ratios, multiple loans on the same collateral that when combined result in a high LTV ("80/20") and interest-only loans.
>
> *    *    *
>
> **The Bancorp also sells certain of these mortgage products in the secondary market with recourse.** The outstanding balances and delinquency rates for these loans sold with recourse as of September 30, 2007 and 2006 were $1.6 billion and 2.36% and $1.1 billion and 1.66%, respectively.

379.    Defendants' statement in the Third Quarter 2007 10-Q that "[c]ertain mortgage products have contractual features that may increase credit exposure to the Bancorp in the event of a decline in housing prices," was materially false and misleading because it failed to disclose that Fifth Third was using demanding sales quotas and lavish bonuses to aggressively market Alt-A loans, and it was originating Alt-A loans with risks that were comparable to subprime loans because they had layered risk factors including high LTVs, FICO scores below 660, and undocumented and/or unverified employment, income and/or assets.   Defendants' statements in the Third Quarter 2007 10-Q that "[t]he Bancorp also sells certain of these mortgage products in the secondary market with recourse" concealed the fact that as a direct and proximate result of the Company's grossly deficient underwriting practices, Fifth Third was increasingly unable to sell loans it originated in the secondary market and, thus, was forced to retain the riskiest of its loan originations in its held-for-sale loan portfolio.

380.    The First Quarter 2007 10-Q included two tables purporting to disclose the extent of the high LTV residential mortgages originated by Fifth Third and those retained in its portfolio, stating:

| As of September 30 ($ in millions) | 2007 | | | 2006 | | |
|---|---|---|---|---|---|---|
| | Amount | Percent of total | Delinquency Ratio | Amount | Percent of total | Delinquency Ratio |
| Greater than 80% LTV with no mortgage insurance | $ 1,855 | 21% | 6.89% | $ 1,949 | 22% | 3.56% |
| Interest-only | 1,567 | 18 | 1.44 | 1,216 | 14 | .08 |
| Greater than 80% LTV and interest-only | 514 | 6 | 3.68 | 561 | 6 | .38 |
| 80/20 loans | — | — | — | 37 | — | — |

*    *    *

| ($ in millions) | 2007 | | 2006 | |
|---|---|---|---|---|
| | Amount | Percent of total | Amount | Percent of total |
| For the three months ended September 30: | | | | |
| Greater than 80% LTV with no mortgage insurance | $ 45 | 2% | $ 153 | 7% |
| Interest-only | 438 | 16 | 310 | 14 |
| Greater than 80% LTV and interest-only | — | — | 19 | 1 |
| 80/20 loans | 66 | 2 | 133 | 6 |
| For the nine months ended September 30: | | | | |
| Greater than 80% LTV with no mortgage insurance | 243 | 3 | 545 | 8 |
| Interest-only | 1,496 | 17 | 924 | 13 |
| Greater than 80% LTV and interest-only | 19 | — | 172 | 2 |
| 80/20 loans | 177 | 2 | 349 | 5 |
| 80/20 loans and interest-only | 44 | 1 | — | — |

Defendants' statements in the Third Quarter 2007 10-Q concerning Fifth Third's origination of high LTV mortgages was materially false and misleading because they failed to disclose the fact that these high LTV loans were frequently made to borrowers with many other risk factors, such as FICO scores below 660, and failed to disclose how many of these loans were made to borrowers with undocumented and unverified employment, income, and/or assets, and that these high LTV loans were of subprime credit quality, when viewed in conjunction with the borrowers' other risk factors.

381.    The Third Quarter 2007 10-Q acknowledged that Fifth Third originated Alt-A mortgages, but claimed that borrower qualifications for Alt-A loans were comparable to

conforming mortgages, and that such loans were primarily originated for sale rather than being held for investment purposes, stating:

> The Bancorp originates certain non-conforming residential mortgage loans known as Alt-A. **Borrower qualifications are comparable to other conforming residential mortgage products and the Bancorp has sold the majority of these loans into the secondary market without recourse.** For the three and nine months ended September 30, 2007, the Bancorp originated $71 million and $644 million of Alt-A loans. During 2007, approximately $150 million of Alt-A loans were moved from held for sale to held for investment, and an impairment charge of approximately $3 million was recognized in mortgage banking net revenue. As of September 30, 2007, the Bancorp held $163 million of Alt-A loans for investment with approximately $2 million on nonaccrual status. As market conditions for these loans changed throughout 2007, management responded by making adjustments to underwriting standards and, as of September 30, 2007, all Alt-A loans are being underwritten and sold under an agency flow sale agreement.

(Emphasis added.)  The Defendants' statements regarding the qualifications for Alt-A borrowers were materially false and misleading because, since mid-2006, the Company had been originating Alt-A loans where the borrowers patently failed to meet the qualifications of conforming residential mortgages.  On the contrary, as related by the Confidential Witnesses, the Alt-A borrowers typically presented multiple risk factors, including FICO scores below 660, unverified employment, unverified income, and unverified assets.  On top of that, Fifth Third was approving loans to these poorly qualified borrowers at LTV ratios as high as 100% through its use of 80/20 products.  Moreover, Fifth Third senior management was driving salespeople and underwriters to approve these risk-laden loans by creating a system of oppressive sales quotas.  Also, many of these risky loans could not be sold in the secondary market or were sold with recourse.

382.    With respect to risk management, the Third Quarter 2007 10-Q represented that Fifth Third's risk management strategy is based on "conservatism, diversification and monitoring," stating:

The objective of the Bancorp's credit risk management strategy is to quantify and manage credit risk on an aggregate portfolio basis, as well as to limit the risk of loss resulting from an individual customer default. **The Bancorp's credit risk management strategy is based on three core principles: conservatism, diversification and monitoring.** The Bancorp believes that effective credit risk management begins with **conservative lending practices.** These practices include conservative exposure, counterparty limits and conservative underwriting, documentation and collection standards. The Bancorp's credit risk management strategy also emphasizes diversification on a geographic, industry and customer level, regular credit examinations and monthly management reviews of large credit exposures and credits experiencing deterioration of credit quality. Lending officers with the authority to extend credit are delegated specific authority amounts, the utilization of which is closely monitored. Lending activities are largely centralized, while ERM manages the policy and authority delegation process directly. The Credit Risk Review function, within ERM, provides objective assessments of the quality of underwriting and documentation, the accuracy of risk grades and the charge-off and reserve analysis process.

(Emphasis added.)

383. The Defendants' statements regarding its "conservative lending practices" and "core principles" of "conservatism, diversification and monitoring" were materially false and misleading because, they concealed from the investing public the fact that Fifth Third had inadequate controls over its loan origination and underwriting and its loan portfolio was riddled with under-collateralized loans issued to borrowers that lacked sufficient incomes or assets to repay their loans. Also, contrary to Defendants' representations, the Company had under-reserved for probable loan losses and that a substantially greater proportion of its loan portfolio was impaired or at risk for becoming impaired due to the Company's grossly deficient underwriting and risk management policies.

384. With respect to Fifth Third's capitalization, the Third Quarter 2007 10-Q represented that Fifth Third maintained relatively high levels of capital in order to protect shareholders and that it was well-capitalized, stating:

The Bancorp maintains a relatively high level of capital as a margin of safety for its depositors and shareholders. At September 30, 2007, shareholders' equity was

$9.3 billion, compared to $10.0 billion at December 31, 2006 and September 30, 2006. Average shareholders' equity as a percentage of average assets for the third quarter of 2007 was 9.13% compared to 9.33% in the same quarter last year. Tangible equity as a percent of tangible assets was 6.83% and 7.40% at September 30, 2007 and 2006, respectively. The decline in shareholders' equity and the tangible equity ratio are a result of the $1.1 billion in share repurchases during 2007.

\* \* \*

| ($ in millions) | September 30, 2007 | December 31, 2006 | September 30, 2006 |
|---|---|---|---|
| Tier I capital | $ 9,201 | 8,625 | 8,810 |
| Total risk-based capital | 11,824 | 11,385 | 10,817 |
| Risk-weighted assets | 108,754 | 102,823 | 101,940 |
| Regulatory capital ratios: | | | |
|    Tier I capital | 8.46% | 8.39 | 8.64 |
|    Total risked-based capital | 10.87 | 11.07 | 10.61 |
|    Tier I leverage | 9.23 | 8.44 | 8.52 |

385.    The Defendants' statements in the Third Quarter 2007 10-Q regarding the Company's capital ratios were materially false and misleading because they failed to disclose that the credit quality of Fifth Third's tier 1 capital had severely deteriorated due to the poor credit quality of its loan portfolio and failure to set aside adequate reserve for loan losses, thus leaving the Company undercapitalized and that, as a direct and proximate result of the foregoing, the Company would be required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, selling assets, and seeking federal bailout funds.

## 4.    The November 14, 2007 Form 8-K

386.    On November 14, 2007, Fifth Third filed with the SEC a current report on Form 8-K in which the Company disclosed its presentation to the Merrill Lynch 2007 Banking & Financial Services Conference held on November 14, 2007.  A copy of this presentation was attached as an Exhibit to the Form 8-K.  Among other things, the presentation touted the Company's "Strong capital position," including its 8.46 tier 1 capital ratio.  With respect to the

Company's $35 billion consumer loan portfolio, this presentation represented that the portfolio contained "No subprime" loans.  The presentation also represented that the consumer loan portfolio had a "Weighted average FICO 733."  Additionally, with respect to the Company's portfolio of consumer "Mortgage: $9.1B[illion] outstanding," the November 14, 2007 presentation touted average LTV ratios of 80% and "weighted average" FICO scores over 700, stating:

> – 1st liens: 100%
> – Weighted average LTV: 80%; weighted average origination FICO: 720
> – Origination FICO bands:
> <659 13%; 660-689 11%; 690-719 17%; 720-749 18%; 750+ 39%
> (note: loans <659 includes CRA loans and FHA/VA loans)

With respect to the Company's portfolio of consumer "Home equity: $11.7B[illion] outstanding," the November 14, 2007 presentation also touted "weighted average" LTV ratios of 78% and "weighted average" FICO scores of 741, stating:

> – 1st liens: 38%; 2nd liens: 62% (25% of 2nd liens behind FITB 1st s)
> – Weighted average CLTV: 78% (1st liens 64%; 2nd liens 82%)
> – Weighted average origination FICO: 741 (1st liens 749; 2nd liens 739)
> – Origination FICO bands:
> <659 5%; 660-689 10%; 690-719 16%; 720-749 20%; 750+ 48%

387.   The Defendants' statements in the November 14, 2007 presentation were materially false and misleading because the information concerning borrowers' FICO scores and LTV ratios on consumer loans gave the impression that Fifth Third was using prudent lending standards, when, in fact, it was not.  Defendants' statements failed to disclose the true magnitude of the risk in Fifth Third's consumer loan portfolio because it failed to disclose: (i) the layering of risk factors such as marginal FICO scores and high LTV ratios; (ii) whether the Company required that borrowers obtain private mortgage insurance for high LTV loans; (iii) whether the Company had verified key borrower information such as employment, income, and assets,

particularly on risky Alt-A loans, ARMs, high LTV loans, and marginal FICO score borrowers; (iv) the Company relied on a subjective "reasonableness" standard for assessing the veracity of borrowers' reported incomes and assets for no-documentation loans; (v) Fifth Third had progressively lowered its lending/underwriting standards prior to and during the Class Period; (vi) Fifth Third was routinely making exceptions to its weakened and materially deficient underwriting standards; and (vii) the Company's internal definition of "prime" versus "subprime," which was inconsistent with accepted industry definitions.

### 5.    The November 29, 2007 Form 8-K

388.    On November 29, 2007, Fifth Third filed with the SEC a current report on Form 8-K in which the Company disclosed its presentation to the Fox-Pitt, Kelton Cochran Caronia Waller Financial Services Conference held on November 14, 2007.  A copy of this presentation was attached as an Exhibit to the Form 8-K.  Among other things, the presentation touted the Company's "Strong capital position," including its 8.46 tier 1 capital ratio.  With respect to the Company's $35 billion consumer loan portfolio, the November 29, 2007 presentation represented that the portfolio contained "No subprime" loans.  The presentation also represented that the consumer loan portfolio had a "Weighted average FICO 733."  Additionally, with respect to the Company's portfolio of consumer "Mortgage: $9.1B[illion] outstanding," the November 29, 2007 presentation touted average LTV ratios of 80% and "weighted average" FICO scores over 700, stating:

> – 1st liens: 100%; weighted average LTV: 80%; weighted average origination FICO: 720
> – Origination FICO bands:
> <659 12%; 660-689 10%; 690-719 15%; 720-749 16%; 750+ 47%
> (note: loans <659 includes CRA loans and FHA/VA loans)
> – Origination LTV distribution:
> <70 26%; >70-80 41%; >80-90 11%; >90 22%

With respect to the Company's portfolio of consumer "Home equity: $11.7B[illion] outstanding," the November 29, 2007 presentation also touted "weighted average" LTV ratios of 78% and "weighted average" FICO scores of 741, stating:

> 1st liens: 25%; 2nd liens: 75% (20% of 2nd liens behind FITB 1st s)
> Weighted average CLTV: 78% (1st liens 64%; 2nd liens 82%)
> Origination CLTV distribution: <70 27%; >70-80 22%; >80-90 21%; >90.1 30%
> Weighted average origination FICO: 741 (1st liens 749; 2nd liens 739)
> Origination FICO distribution: <659 5%; 660-689 10%; 690-719 16%; 720-749 20%; 750+ 48%

389. The Defendants' statements in the November 29, 2007 presentation were materially false and misleading because the information concerning borrowers' FICO scores and LTV ratios on consumer loans gave the impression that Fifth Third was using prudent lending standards, when, in fact, it was not. Defendants' statements failed to disclose the true magnitude of the risk of Fifth Third's consumer loan portfolio because it failed to disclose: (i) the layering of risk factors such as marginal FICO scores and high LTV ratios; (ii) whether the Company required that borrowers obtain private mortgage insurance for high LTV loans; (iii) whether the Company had verified key borrower information such as employment, income, and assets, particularly on risky Alt-A loans, ARMs, high LTV loans, and marginal FICO score borrowers; (iv) the Company relied on a subjective "reasonableness" standard for assessing the veracity of borrowers' reported incomes and assets for no-documentation loans; (v) Fifth Third had progressively lowered its lending/underwriting standards prior to and during the Class Period; (vi) Fifth Third was routinely making exceptions to its weakened and materially deficient underwriting standards; and (vii) the Company's internal definition of "prime" versus "subprime," which was inconsistent with accepted industry definitions.