6.    **The December 18, 2007 Form 8-K**

390.    On December 18, 2007, Fifth Third filed with the SEC a current report on Form
8-K, signed by Defendant Marshall, in which Defendants disclosed that the Company expected
to increase its loan loss provision for the fourth quarter of 2007 to approximately $275 million
due to higher current charge-offs and an expected 49 percent total nonperforming asset growth,
stating:

> Provision expense for loan and lease losses in fourth quarter 2007 is currently
> expected to be approximately $275 million. The provision is expected to exceed
> charge-offs by approximately $105 million and raise the reserve to loan ratio to
> 1.15 percent. The increase in provision expense for loan and lease losses is
> primarily driven by higher current charge-offs as well as higher loss expectations
> resulting from trends in nonperforming and other criticized assets. The increase in
> allowance for loan losses is being driven primarily by higher allocations related to
> home equity loans as well as commercial construction and commercial mortgage
> loans.

*    *    *

> Nonperforming assets (NPAs) at the end of the quarter are expected to increase
> approximately 49 percent from the third quarter of 2007, to approximately 1.30
> percent of loans, leases and other real estate owned... Commercial NPAs are
> expected to increase approximately 51 percent from the third quarter of 2007,
> driven primarily by deterioration in the commercial construction and commercial
> mortgage portfolios and in Eastern Michigan and Florida, including NPAs added
> from R-G Crown. Consumer NPAs are expected to increase approximately 46
> percent from the third quarter of 2007, driven by growth in the residential
> mortgage and home equity portfolios and in Michigan and Florida, including
> NPAs added from R-G Crown. Troubled debt restructurings for consumer
> borrowers are expected to total approximately $48 million during the quarter, or
> 18 percent of the expected 46 percent consumer NPA growth rate and seven
> percent of the expected 49 percent total NPA growth rate. Other assets including
> other real estate owned (OREO) is expected to increase approximately 28 percent,
> primarily in OREO. Loans 90 days past due are expected to increase
> approximately 17 percent from the third quarter of 2007, primarily in the
> residential mortgage and home equity loan portfolios.

391.    The Defendants' statements in the December 18, 2007 Form 8-K regarding
expected increases in the Company's provision for loan losses and nonperforming assets in

fourth quarter 2007 partially disclosed the fact that Fifth Third's loan portfolio had more exposure to risky loans than the Company had previously disclosed, and caused the price of Fifth Third common stock to decline from $26.56 per share, to close at $25.53 per share (or -3.87%), on December 19, 2007, on unusually heavy volume of more than 6.8 million shares traded.

392.    However, Defendants' statements in the December 18, 2007 Form 8-K were materially false and misleading because Defendants continued to blame general market conditions for the Company's increases in nonperforming assets and loan loss reserves, and concealed from the investing public the fact that Fifth Third had grossly deficient underwriting standards and, since at least mid-2006, originated extremely risky loans, including land loans with LTVs as high as 90% and Alt-A loans with multiple layered risk factors, the combination of which constituted the same level of risk of default as subprime lending.   Additionally, Defendants' statements regarding nonperforming assets were materially false and misleading because they did not reflect the rapidly growing number of loans that had become 30 to 89 days delinquent and for which Fifth Third not take additional reserves.  Given the downturn in the real estate market, these loans should have been considered impaired and the Company should have taken reserves against such loans, but failed to do so in order to continue to inflate artificially the Company's reported financial results.

### 7.    The January 22, 2008 Earnings Release and Form 8-K

393.    On January 22, 2008, Fifth Third issued a press release announcing the Company's financial results for the fourth quarter and full year 2007, and concurrently filed with the SEC a current report on Form 8-K, signed by Defendant Marshall, that included as an exhibit the complete text of the press release (the "January 22, 2008 Earnings Release").  The January

22, 2008 Earnings Release reported "2007 earnings of $1.1 billion, or $2.03 per diluted share …

[and] fourth quarter 2007 earnings were $38 million, or $0.07 per diluted share…."

394.    With respect to nonperforming assets, the January 22, 2008 Earnings Release stated:

> **Provision expense for loan and lease losses in fourth quarter 2007 is currently expected to be approximately $275 million. The provision is expected to exceed charge-offs by approximately $105 million and raise the reserve to loan ratio to 1.15 percent.** The increase in provision expense for loan and lease losses is primarily driven by higher current charge-offs as well as higher loss expectations resulting from trends in nonperforming and other criticized assets. **The increase in allowance for loan losses is being driven primarily by higher allocations related to home equity loans as well as commercial construction and commercial mortgage loans.**
>
> *    *    *
>
> **Nonperforming assets (NPAs) at the end of the quarter are expected to increase approximately 49 percent from the third quarter of 2007, to approximately 1.30 percent of loans, leases and other real estate owned…** Commercial NPAs are expected to increase approximately 51 percent from the third quarter of 2007, driven primarily by deterioration in the commercial construction and commercial mortgage portfolios and in Eastern Michigan and Florida, including NPAs added from R-G Crown. Consumer NPAs are expected to increase approximately 46 percent from the third quarter of 2007, driven by growth in the residential mortgage and home equity portfolios and in Michigan and Florida, including NPAs added from R-G Crown. Troubled debt restructurings for consumer borrowers are expected to total approximately $48 million during the quarter, or 18 percent of the expected 46 percent consumer NPA growth rate and seven percent of the expected 49 percent total NPA growth rate. Other assets including other real estate owned (OREO) is expected to increase approximately 28 percent, primarily in OREO. Loans 90 days past due are expected to increase approximately 17 percent from the third quarter of 2007, primarily in the residential mortgage and home equity loan portfolios.

(Emphasis added.)

395.    The statements in Fifth Third's January 22, 2008 Earnings Release were materially false and misleading because they failed to attribute the Company's increases in nonperforming assets and the need to increase loan loss reserves to the fact that, since at least

mid-2006, Fifth Third had grossly deficient underwriting standards and originated extremely risky loans, including land loans with LTVs as high as 90% and Alt-A loans with multiple layered risk factors that constituted the same level of risk associated with subprime loans. Additionally, Defendants' statements regarding nonperforming assets were materially false and misleading because they did not reflect the rapidly growing number of loans that had become 30 to 89 days delinquent and for which Fifth Third not take additional reserves.  In a declining real estate market, the 30 to 89 day past due loans are considered a lead indicator of and precursor to potential nonperforming loans and charge-offs.  As such, these loans should have been considered impaired and the Company should have taken reserves against such loans, but failed to do so in order to continue to artificially inflate the Company's reported financial results.

### 8. The January 22, 2008 Analyst Conference Call

396.    On January 22, 2008, Fifth Third held a conference call for securities analysts and investors to discuss the Company's fourth quarter 2007 and full year 2007 financial results.  Fifth Third was represented on this call by Defendants Kabat and Marshall.  With respect to the weakening credit environment, Defendant Kabat attempted to assure investors that Fifth Third had taken sufficient measures to minimize the impact of the deteriorating real estate markets in Florida and Michigan and that the Company was adequately capitalized, stating:

> This has obviously been a difficult quarter for Fifth Third and for the industry. On most of our key operating metrics we had good results [] this quarter, but I would be the first to acknowledge that was overshadowed by what happened on the credit front. **Credit deteriorated fairly sharply this quarter, and we saw that reflected in growth in MPAs [sic] and losses, as well as provision. As you know, we don't hold the kind of assets that have produced the huge losses some of our peers have seen.**

*    *    *

144

The credit environment remains challenging, and we expect credit conditions in the performance of our portfolio to continue to deteriorate in the near term. As we have discussed with you since the middle of '06, **we have been concerned about home equity lending and real estate loans in general, particularly in the upper Midwest and Florida more recently.** We have been actively working to mitigate the impact of these problems. **So though it is a tough environment, and we expect the near term to present further deterioration in credit metrics, Fifth Third is well positioned. Our tangible capital levels are relatively strong compared to most of our peers. Most of the problematic credit areas have been with us for a while, and we have taken action to fix them.** We have a number of strategic initiatives that are positioning us well for the future. **This environment should present opportunities on which to capitalize for a strong institution like Fifth Third.**

(Emphasis added.)

397.    Defendant Kabat's statement that "we don't hold the kind of assets that have produced the huge losses some of our peers have seen," was materially false and misleading because, contrary to Defendants' representations, Fifth Third had been originating subprime loans under the guise of Alt-A lending since mid-2006, and Fifth Third retained in its held-for-investment portfolio many of the riskiest loans it originated because it was unable to sell them in the secondary market.  Defendant Kabat's statement that Fifth Third was "concerned about home equity lending and real estate loans in general, particularly in the upper Midwest and Florida," was materially false and misleading because, again, Defendants failed to attribute the deterioration of the Company's loan portfolio to the Company's grossly deficient underwriting standards.  Defendant Kabat's statements that "Fifth Third is well positioned," and that "[t]his environment should present opportunities on which to capitalize," were false and misleading because, as Kabat knew, the Company was poorly positioned for a downturn in the real estate and credit markets because it had been engaging in high risk lending practices such as originating high LTV loans and ARMs to borrowers with unverified and undocumented employment, income and assets, which posed an unreasonable risk of default because such

145

borrowers would have negative equity in their properties.  Defendant Kabat's statement that "[o]ur tangible capital levels are relatively strong compared to most of our peers," was false and misleading because Fifth Third's core tier 1 capital was insufficient to mitigate the poor credit quality of the Company's loan portfolio and failure to maintain adequate loan loss reserves, and the Company would require massive infusions of capital to compensate for these risks.

398.    During the January 22, 2008 conference call, Defendants were questioned regarding the Company's exposure to the Florida real estate market.  In response, Defendants would not provide LTV data, but admitted that $8.3 billion of Fifth Third's portfolio was in Florida and that most of these loans were added to the portfolio in corporate acquisitions, stating:

**Casey Embrick  - *Millenium - Analyst***

Sure. So I was looking for a little more detailed exposure, particularly on the Florida and Michigan. Would you cite that as like a 50% of your problems? Like for example, could you go through your ELOC [equity line of credit] book and what are the LTDs [sic]? What is the size of the book, what are the appraisals? When were they last appraised?

**Chris Marshall  - *Fifth Third Bancorp - CFO***

I am not sure I can reel through all of that on the call. We have got that data here. We can go through that. I am not going to be able to pull all of those numbers together instantaneously.

**Casey Embrick  - *Millenium - Analyst***

Okay. I think that would be a good - okay, how big is your Florida book, just in general? How many of the loans are in Florida?

**Chris Marshall  - *Fifth Third Bancorp - CFO***

$8.3 billion.

**Casey Embrick  - *Millenium - Analyst***

$8.3 billion. And of the amount, how much of the loans were acquired through deals in the last four deal years?

**Chris Marshall  - *Fifth Third Bancorp - CFO***

I mean, most of it.

**Casey Embrick  - *Millenium - Analyst***

Most of it right, in the thrifts you bought?

**Chris Marshall  - *Fifth Third Bancorp - CFO***

No, for the Florida National - sorry, FMB deal and the Crown deal, Crown being about a little over [$]2 [billion] and FMB about $4 billion, maybe.

**Casey Embrick  - *Millenium - Analyst***

Do you have a general LTD [sic] on Florida?

**Chris Marshall  - *Fifth Third Bancorp - CFO***

Because the portfolio, it includes everything, I don't know that an LTD [sic] would mean anything.

**Casey Embrick  - *Millenium - Analyst***

Okay. I mean additional exposure like that, it might be gad [sic] to get out there. Because just saying that Florida is melting down is tough for us to see.

**Chris Marshall  - *Fifth Third Bancorp - CFO***

No, we've got it all in there, but in the Qs, Casey, we disclose our portfolio by state, and then in the release we talk about the effect that Florida and Michigan are having on [obviously] all portfolios.

399.    The Defendants' statements during the Fourth Quarter 2007 Conference Call about the composition of the Florida portfolio were materially false and misleading and evasive because they represented that most of the loans in the Florida portfolio were acquired through acquisitions, when, in fact, Fifth Third had been making poor credit quality loans in Florida as a result of the Company's abandonment of conservative underwriting standards and risk management practices.  The Company originated extremely risky loans, including land loans with LTVs as high as 90% and Alt-A loans with layered risk factors.

147

400.  Finally, with respect to capital, Defendant Marshall claimed that the Company was on track to meet its capital targets and that Fifth Third was well-capitalized, stating:

> **We continue to target a 6.5% TCE ratio, we'd expect to be about 630 at the end of the first quarter and somewhere in the 625 and 650 range the rest of the year.** Now we are assuming we do an auto loan sale on the first quarter, and for this part of our guidance only, we do assume we'll see a reversal of the VISA litigation charges. **We are targeting a 7.5 to 8% tier one ratio and 11 to 11.5% total capital ratio. We are below that total capital target ratio now, but we expect to solve that very, very quickly.**

(Emphasis added.)

401.  Defendants' statements regarding Fifth Third's capital position were materially false and misleading because they concealed the deterioration in the Company's tier 1 capital, which resulted from the Company's abandonment of conservative underwriting, described above, which would require the Company to raise massive amounts of capital through dilutive preferred stock offerings, cutting the dividend, accepting government bailout funds, and selling assets.

402.  Defendants' misstatements in the January 22, 2008 Earnings Release and the January 22, 2008 conference call caused the price of Fifth Third stock to remain artificially inflated.  Indeed, the price of Fifth Third common stock increased $0.93 per share or 4.115% from its previous close of $22.60 per share, to close at $23.53 on January 22, 2008, on extremely heavy volume of more than 11 million shares traded.  The rally in Fifth Third stock continued the next day, when price increased another $1.63 per share or 6.927%, to close at $25.16 per share on January 23, 2008, on unusually heavy volume of more than 10.7 million shares traded.

403.  Unaware of the undisclosed material facts, Richard X. Bove of Punk Ziegel, wrote in a February 11, 2008 report:

> **The key problem facing the Company is not bad loans, however.  It is finding new business.**

### 9. The January 30, 2008 Report on Form 8-K

404.    On January 30, 2008, Fifth Third filed with the SEC a current report on Form 8-K, signed by Defendant Marshall, disclosing the Company's presentation at the Citi 2008 Financial Services Conference on January 30, 2008.  The January 30, 2008 Form 8-K included as an exhibit the presentation materials from the Citi 2008 Financial Services Conference.  These materials disclosed, among other things, some deterioration in the Company's commercial real estate portfolio, home equity portfolio, and nonperforming assets.  In the presentation, Defendants touted the Company's purported ability to "[m]aintain strong tangible capital ratios, absolute and relative to peers," including a tier 1 capital ratio of 7.71% and Tangible Common Equity of 6.07% as percentage of tangible assets.  Contrary to the Defendants' statements in the January 30, 2008 presentation, the materials did not disclose the full extent of the deterioration of its loan portfolio and because they did not reflect the rapidly growing number of loans that had become 30 to 89 days delinquent and for which Fifth Third not take additional reserves.  In a declining real estate market, the 30 to 89 day past due loans are considered a lead indicator of and precursor to potential nonperforming loans and charge-offs.  As such, these loans should have been considered impaired and the Company should have taken reserves against such loans, but failed to do so in order to continue to artificially inflate the Company's reported financial results.  As a result of the deterioration of the credit quality of the Company's loan portfolio, a substantial portion of Fifth Third's tier 1 Capital was impaired, requiring a massive infusion of capital.

### 10. The 2007 Annual Report on Form 10-K

405.    On February 22, 2008, Fifth Third filed with the SEC its annual report on Form 10-K (the "2007 10-K"), which was signed by Defendants Kabat, Marshall, and Poston and the

Director Defendants, and certified by Defendants Kabat and Marshall pursuant to SOX that: "[T]he financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant." The 2007 10-K reiterated the financial results reported in the January 22, 2008 Earnings Release. The Defendants' statements in the 2007 10-K were materially false and misleading because the Company's net income was materially overstated due to Fifth Third's failure to take timely and adequate reserves for loan losses. Throughout the Class Period, Defendants fraudulently delayed increasing allowances for loan and lease losses in order to preserve the illusion the Fifth Third was profitable, and had sufficient earnings to support dividend payments, while remaining well-capitalized.

406. Additionally, the 2007 10-K claimed that Fifth Third did not have any exposure to subprime mortgages or subprime backed securities, stating:

> **The Bancorp maintains a conservative approach to both lending and investing activities as it does not originate or hold subprime loans, nor does it hold collateralized debt obligations ("CDOs") or asset-backed securities backed by subprime loans in its securities portfolio**. However, the Bancorp has exposure to the housing markets, which weakened considerably during 2007, particularly in the upper Midwest and Florida. Consequently, net charge-offs as a percent of average loans and leases were 61 basis points ("bp") in 2007 compared to 44 bp in 2006. At December 31, 2007, nonperforming assets as a percent of loans and leases increased to 1.32% from .61% at December 31, 2006.

(Emphasis added.)

407. Defendants' statement that "maintains a conservative approach to both lending and investing activities as it does not originate or hold subprime loans," was materially false and misleading because, as the Confidential Witnesses described above, Fifth Third had been originating subprime loans under the guise of Alt-A lending since mid-2006, and Fifth Third was

forced to retain in its held-for-investment portfolio many of the riskiest loans it originated because it was unable to sell them in the secondary market.

408.    The 2007 10-K also claimed that Fifth Third was "well-capitalized," stating:

> **The Bancorp's capital ratios exceed the "well-capitalized" guidelines as defined by the Board of Governors of the Federal Reserve System ("FRB")**. As of December 31, 2007, the Tier I capital ratio was 7.72% and the total risk-based capital ratio was 10.16%. The Bancorp had senior debt ratings of "Aa3" with Moody's, "A+" with Standard & Poor's, "AA-" with Fitch and "AAL" with DBRS at December 31, 2007, which indicate the Bancorp's strong capacity to meet its financial commitments. The "well-capitalized" capital ratios, along with strong credit ratings, provide the Bancorp with access to the capital markets.

(Emphasis added.)

409.    Defendants' statement that Fifth Third was "well-capitalized," was materially false and misleading because the Company's core tier 1 capital was severely compromised by the poor credit quality of the Company's loan portfolio, which was deteriorating at a more rapid rate than Defendants publicly disclosed.  The statement was also false and misleading because of Defendants' failure timely and adequately to set aside loan loss reserves sufficient to compensate for losses that Defendants could reasonably expect based on, among other things, the percentage of loans in the Company's portfolio that were then 30 to 89 days delinquent, which, in turn, necessitated a massive infusion of capital to compensate for the losses not covered by reserves.

410.    Under the heading "Credit Risk Management," the 2007 10-K reiterated that the Company did not have any subprime exposure, stating:

> If trends in charge-offs, delinquent loans and economic conditions continue to deteriorate in 2008, the Bancorp would expect to record a larger allowance for credit losses in accordance with its allowance methodology. **Overall, the Bancorp's long history of low exposure limits, lack of exposure to subprime lending businesses, centralized risk management and its diversified portfolio reduces the likelihood of significant unexpected credit losses**.

(Emphasis added.)

411.  With respect to the Company's methodology for setting reserves for loan losses, the 2007 10-K represented that such reserves were based on "conservative" estimates "based on historical loss rates, current credit grades," and that it reviewed loss rates on a quarterly basis and made adjustments in its reserves accordingly, stating in part:

The Bancorp maintains an allowance to absorb probable loan and lease losses inherent in the portfolio. The allowance is maintained at a level the Bancorp considers to be adequate and is based on ongoing quarterly assessments and evaluations of the collectibility and historical loss experience of loans and leases. Credit losses are charged and recoveries are credited to the allowance. Provisions for loan and lease losses are based on the Bancorp's review of the historical credit loss experience and such factors that, in management's judgment, deserve consideration under existing economic conditions in estimating probable credit losses. **In determining the appropriate level of the allowance, the Bancorp estimates losses using a range derived from "base" and "conservative" estimates. The Bancorp's strategy for credit risk management includes a combination of conservative exposure limits significantly below legal lending limits and conservative underwriting, documentation and collections standards.** The strategy also emphasizes diversification on a geographic, industry and customer level, regular credit examinations and quarterly management reviews of large credit exposures and loans experiencing deterioration of credit quality.

\*  \*  \*

Historical loss rates for commercial and consumer loans may be adjusted for significant factors that, in management's judgment, are necessary to reflect losses inherent in the portfolio. Factors that management considers in the analysis include the effects of the national and local economies; trends in the nature and volume of delinquencies, charge-offs and nonaccrual loans; changes in mix; credit score migration comparisons; asset quality trends; risk management and loan administration; changes in the internal lending policies and credit standards; collection practices; and examination results from bank regulatory agencies and the Bancorp's internal credit examiners.

**The Bancorp's current methodology for determining the allowance for loan and lease losses is based on historical loss rates, current credit grades, specific allocation on impaired commercial credits and other qualitative adjustments**. Allowances on individual loans and historical loss rates are reviewed quarterly and adjusted as necessary based on changing borrower and/or collateral conditions and actual collection and charge-off experience. An unallocated allowance is maintained to recognize the imprecision in estimating and measuring loss when evaluating allowances for individual loans or pools of loans.

(Emphasis added.)

412.    The 2007 10-K was materially false and misleading because it failed to accurately and completely disclose the extent of the growth in the Company's non-performing assets and that the rapidly deteriorating credit quality of its loan portfolio was quickly eroding the Company's capital structure, and would require the Company to raise billions in new capital.  As the Confidential Witnesses described above, prior to and during the Class Period, Alt-A loans that were comparable to subprime loans and high LTV commercial real estate loans were mounting on Fifth Third's books, but the Company's reserves for loan losses did not keep pace. Among other things, Defendants failed to take additional reserves for the rapidly growing number of loans that had become 30 to 89 days delinquent, which should have been considered impaired given the downturn in the real estate market.  As a result of its failure to use prudent and conservative underwriting and documentation standards, the Company was required by GAAP to make a commensurate increase in its allowance for loan losses to reflect the diminished credit quality of its loan portfolio and increased probability of defaults, but failed to do so, in violation of GAAP.  Instead, the Company lowered its reserves as a percentage of nonperforming assets.  Defendants were highly motivated to keep Fifth Third's loan loss reserves low because, if they set aside appropriate reserves for loan losses, Fifth Third's earnings would drop proportionally, according to the applicable accounting rules.

413.    With respect to Alt-A lending, the 2007 10-K acknowledged that Fifth Third had originated Alt-A loans, but falsely claimed that the borrower qualifications for Alt-A loans were comparable to conventional, conforming mortgages.  Additionally, Defendants represented that Fifth Third sold the majority of its Alt-A loans without recourse, stating:

> The Bancorp originates certain non-conforming residential mortgage loans known as "Alt-A" loans.  **Borrower qualifications are comparable to other**

**conforming residential mortgage products** and **the Bancorp has sold, without recourse, the majority of these loans into the secondary market**. For the years ended December 31, 2007 and 2006, the Bancorp originated $756 million and $341 million of Alt-A mortgage loans. During 2007, approximately $152 million of Alt-A mortgage loans were moved from held for sale to held for investment, and an impairment charge of approximately $3 million was recognized in mortgage banking net revenue. As of December 31, 2007, the Bancorp held $134 million of Alt-A mortgage loans for investment with approximately $2.5 million in nonaccrual. **As market conditions for these loans changed throughout 2007, management responded by making adjustments to underwriting standards and Alt-A loans are being underwritten and sold under an agency flow sale agreement**.

414.    Defendants' statements in the 2007 10-K regarding the Company's origination of Alt-A loans were materially false and misleading because they continued to blame general market trends for the deterioration in the Company's Alt-A loan portfolio, while concealing from investors the fact that the Company had under-reserved for probable Alt-A loan losses, and that a substantial proportion of its Alt-A loan portfolio had been sold with recourse and were impaired or at risk for becoming impaired due to the Company's grossly deficient underwriting and risk management practices.    Contrary to Defendants' representations, Fifth Third lacked adequate controls over its loan origination and underwriting and its Alt-A loan portfolio was riddled with under-collateralized loans issued to borrowers who lacked sufficient incomes or assets to repay their loans.    Contrary to Defendants' representation that the borrower qualifications for Alt-A loans were "comparable to other conforming residential mortgage products," the Alt-A loans were actually comparable to subprime loans.

## 11.    The April 15, 2008 Annual Meeting and Investor Presentation

415.    On April 15, 2008, Defendant made a presentation during the 2008 Annual Meeting of Shareholders of Fifth Third.    A copy of the presentation was filed as an exhibit to

Fifth Third's current report on Form 8-K filed with SEC on April 16, 2008. Under the heading "Credit containment" this presentation highlighted, among other things, that:

- **"Fifth Third has consistently maintained conservative underwriting standards throughout all credit cycles;"**

- "Geographic and economic issues have required aggressive management action;"

- "Eliminated all brokered HELOC production;"

- "Suspended all new developer lending;"

- "Significantly tightened underwriting limits and exception authorities;"

- "Centralized all credit approvals;"

- "Major expansion of commercial and consumer workout teams;"

- **"Aggressive write downs in stressed geographies;"**

- "Significant addition to reserve levels;"

- **"Direct executive management oversight of every major credit decision;"**

- **"Fifth Third has moved aggressively to stay ahead of emerging credit issues;"**

- "Fifth Third has developed and implemented targeted strategies to help our customers who are experiencing financial difficulties. Options include:

  — Refinancing – saleable or on balance sheet

  — Rate reductions, term extensions and loss mitigations;" and

- "Loss mitigation strategies have been enhanced as follows:

  — Payment affordability – expanded payment reduction options including:

    – Rate reductions

    – Interest and fees waivers

    – Principal balance reductions (temporary or permanent)

155

– Suspension of penalty interest assessed after delinquency grace period."

416.    Defendants' statements in the presentation at the 2008 Annual Meeting of Shareholders were materially false and misleading because, among other things, the Company had failed to use "conservative underwriting standards," but instead employed underwriting standards, practices and procedures that ignored risks associated with the non-traditional, non-conforming mortgages originated by Fifth Third, including originating high LTV land loans and Alt-A mortgages that in reality were subprime loans.  Moreover, members of Fifth Third senior management used sales "expectations" (a euphemism for sales quotas) and harsh penalties (including termination) for failing to meet such quotas, to encourage sales staff to originate loans without adherence to prudent origination practices.   Further, Defendants did not move "aggressively to stay ahead of emerging credit issues," nor did they perform "aggressive write downs in stressed geographies" because they did not reserve for loans 30 to 89 days delinquent, which are the lead indication of deteriorating credit quality.  Defendants had actual knowledge of these facts or were reckless in not knowing them because of the "[d]irect executive management oversight of every major credit decision."

## 12.    The First Quarter 2008 Earnings Release and Form 8-K

417.    On April 22, 2008, Fifth Third issued a press release and its quarterly financial supplement announcing its earnings for the first quarter of 2008 (the "First Quarter 2008 Earnings Release").  A copy of this press release was filed with the SEC on April 22, 2008 as an exhibit to the Company's current report on Form 8-K, signed by Defendant Marshall.  The First Quarter 2008 Earnings Release reported "first quarter 2008 earnings of $292 million, or $0.55 per diluted share…."  Commenting on these results, Defendant Kabat claimed that the Company

had taken aggressive steps to counteract increases in nonperforming assets and deteriorating real estate values by increasing allowances for loan losses and maintaining adequate capital, stating:

> This quarter we produced excellent loan and deposit growth that drove impressive performance in net interest income and continued strong fee growth from our businesses … However, strong operating performance continues to be offset by higher credit costs, primarily reflecting further deterioration of residential real estate, homebuilder and residential development loans. Nonperforming asset growth and higher loan losses reflect a weaker economic environment and continue to be disproportionately experienced in Florida and Michigan. **Based on these developments, we significantly increased our allowance for loan and lease losses during the quarter.**
>
> **We remain very active in taking steps to address the issues we and the industry are facing**, and to work with borrowers to address difficulties they are experiencing. We expect credit conditions to continue to deteriorate in the near term, and to experience higher nonperforming assets and credit losses during this period.
>
> Although every credit cycle differs, we expect them to occur. We take seriously our responsibility to provide credit to our customers, to lend prudently, and to maintain the capital necessary to manage through these cycles. This is an unusually difficult cycle, **but we believe Fifth Third is well-positioned relative to many of its peers.** We expect to continue to post strong operating results, to execute on our strategic plans, and to capitalize on the opportunities that are created by an environment such as this."

(Emphasis added.)

418.    The Company's risky lending practices, described above, subjected the Company to far greater credit risks than its peers.  Contrary to Defendants' statements, Fifth Third was not "well-positioned" relative to its competitors.  Moreover, Defendants' statement that, "we significantly increased our allowance for loan and lease losses during the quarter" and that they were "taking steps to address the issues we and the industry are facing" were materially false and misleading because they continued to conceal the material fact that throughout the Class Period, high risk loans that were comparable to subprime loans and high LTV commercial real estate loans were mounting on Fifth Third's books, but the Company's reserves for loan losses did not

keep pace. Among other things, Defendants failed to take additional reserves for the rapidly growing number of loans that had become 30 to 89 days delinquent, which should have been considered impaired given the downturn in the real estate market. As a result of its failure to use prudent and conservative underwriting guidelines, the Company was required by GAAP to make a commensurate increase in its allowance for loan losses to reflect the diminished credit quality of its loan portfolio and increased probability of defaults, but failed to do so, in violation of GAAP. Instead, the Company lowered its reserves as a percentage of nonperforming assets.

419. With respect to the credit quality of the Company's loan portfolio and provision for loan losses, the First Quarter 2008 Earnings Release stated:

> Provision for loan and lease losses totaled $544 million in the first quarter of 2008, exceeding net charge-offs by $268 million. The increase in the provision for loan and lease losses and allowance for loan and lease losses was driven by higher probable losses resulting from deterioration in residential real estate collateral values and negative trends in nonperforming and other criticized assets.
>
> The allowance for loan and lease losses represented 1.49 percent of total loans and leases outstanding as of quarter end, compared with 1.17 percent last quarter and 1.05 percent in the same quarter last year.

420. The foregoing statements regarding provisions for loan losses in the First Quarter 2008 Earnings Release were materially false and misleading because, despite quarterly increases in loss reserves by failing to reserve for loans 30 to 89 days delinquent, Defendants were continuing to fraudulently delay increasing allowances for loan losses. Defendants were motivated to delay reserving for loan loss because and such allowances directly reduce the asset values of loans on the books, and therefore also directly reduce reported earnings per share. In order to preserve the illusion the Fifth Third was still performing better than its peers and was well-capitalized, Defendants fraudulently delayed increasing Fifth Third's loss reserves in the first quarter of 2008. If Fifth Third had held proper reserves from the end of first quarter of 2008

forward, the write-offs of loans at the end of the Class Period would have been materially smaller.

421.    Finally, with respect to nonperforming assets, the First Quarter 2008 Earnings Release stated:

> Nonperforming assets (NPAs) at quarter end were $1.6 billion, or 1.96 percent of total loans and leases and other real estate owned ("OREO"), up from 1.32 percent last quarter and 0.66 percent in the first quarter a year ago. Sequential growth in NPAs was $528 million, or 50 percent, driven by increases related to residential real estate builders and developers as well as residential real estate OREO.

> Commercial NPAs of $1.1 billion, or 2.20 percent, grew $363 million or 52 percent in the first quarter of 2008. Commercial NPA growth was primarily driven by continued deterioration in the commercial construction and commercial mortgage portfolios, particularly in Michigan and Florida. NPAs in the C&I portfolio of $305 million increased $126 million from the previous quarter. Commercial construction NPAs were $418 million, an increase of $162 million from the fourth quarter of 2007. Commercial mortgage NPAs were $325 million, a sequential increase of $70 million. Commercial real estate loans in Michigan and Florida represented 46 percent of our total commercial real estate portfolio. Increases in NPAs in these states represented 69 percent of commercial real estate NPA growth and these regions accounted for 66 percent of total commercial real estate NPAs. Residential real estate builders and developers represented approximately $309 million in commercial NPAs, an increase of $133 million from the fourth quarter of 2007.

> Consumer NPAs of $534 million, or 1.62 percent, rose $165 million, or 45 percent in the first quarter of 2008. Of the growth, $156 million was experienced in residential real estate portfolios. Residential mortgage NPAs increased $117 million to $333 million, of which $122 million was in OREO. Of residential mortgage NPAs, $12 million were in residential construction loans (of which $5 million was OREO). Home equity NPAs increased $38 million to $162 million, of which $34 million was OREO. Residential real estate loans in Michigan and Florida represented 71 percent of the growth in residential real estate NPAs, 58 percent of total residential real estate NPAs, and 26 percent of total residential real estate loans. Included within consumer NPAs, primarily in residential real estate loans, were $172 million in troubled debt restructurings, including $92 million restructured in the first quarter of 2008. These debt restructurings assist qualifying borrowers in creating workable payment plans to enable them to remain in their homes.

Loans still accruing over 90 days past due were $539 million, up $48 million from the fourth quarter of 2007. Consumer 90 days past due balances increased 5 percent from the previous quarter and commercial 90 days past due balances increased 18 percent. Growth in commercial and consumer 90 days past dues was generally concentrated in commercial real estate and residential mortgages in the regions noted earlier.

422.    Defendants' statements regarding nonperforming assets were materially false and misleading because they did not reflect the rapidly growing number of loans that had become 30 to 89 days delinquent and for which Fifth Third not take additional reserves.  Given the downturn in the real estate market, these loans should have been considered impaired and the Company should have taken reserves against such loans, but failed to do so in order to continue to artificially inflate the Company's reported financial results.

### 13.    The April 22, 2008 Analyst Conference Call

423.    On April 22, 2008, Fifth Third conducted a conference call with securities analysts, in which defendants Kabat and Marshall participated.  During the Conference call, Defendant Kabat claimed that Fifth Third had substantially increased its provision for loan losses in the first quarter of 2008, stating:

> During the quarter, Fifth Third continued to produce very strong core operating results. Growth was broad based across all businesses, from payments processing to our core retail banking franchise to corporate banking. We're taking share and we're able to get better pricing on that business. Now, that performance is being overshadowed by the current environment and the elevated credit costs we're experiencing. We continue to see deterioration in our residential real estate book and the related exposures in commercial real estate, notably home builders and developers. **Those stresses, particularly in Michigan and Florida, as we've mentioned before, have elevated our loss in nonperforming asset levels and they led us to substantially increase our provision and loan loss allowance this quarter.** These conditions have also contributed to wider credit spreads in the market, which resulted in a further market value loss on one of our BOLI insurance policies, which Chris will talk about in a few moments. We've not yet seen any indication the credit cycle has peaked.

(Emphasis added.)

424. The Defendants' statements were materially false and misleading because they overstated the Company's net income due to Defendants' failure to take timely and adequate reserves for loan losses. In fact, the Company had allowed the percentage of allowance for loan losses to nonperforming assets to drop from over 200% during the period from 2003 to 2005, to less than 100% during 2006 to 2007. Had Defendants taken appropriate reserves for loan losses, the Company's net income would have been materially lower than what was reported in the Company's SEC filings, earnings releases, and conference calls.

425. Additionally, Defendant Kabat claimed that Fifth Third is a "prime underwriter" and that it was taking a "proactive" approach to mitigating losses on its loan portfolio such as shutting down new lending to home builders and brokered home equity loans and lines of credit, stating:

> The situation will ultimately improve, but for the near term, we expect credit conditions to continue to be difficult … In this environment, **we continue to be proactive with steps to mitigate the losses we're facing. You know that we're a prime underwriter and you know that we've shut down new lending in the two areas that we've experienced the most significant difficulties, those being home builders and brokered home equity.**

(Emphasis added.)

426. Defendant Kabat's statement that "we're a prime underwriter" was materially false and misleading because Defendants continued to conceal the Company's deficient underwriting practices that ignored risks associated with the non-traditional, non-conforming mortgages originated by Fifth Third, including originating high LTV land loans and Alt-A mortgages that in reality were subprime loans. Moreover, members of Fifth Third senior management used sales "expectations" (a euphemism for sales quotas) and harsh penalties (including termination) for failing to meet such quotas, to encourage sales staff to originate loans without adherence to prudent origination practices. Defendant Kabat's statement that "we've

shut down new lending in the two areas that we've experienced the most significant difficulties," was materially false and misleading because it lead investors to believe that Fifth Third had its substantial credit risk under control by shutting down home builder and brokered home equity loans when, in fact, the Company's risks were not under control due to widespread abandonment of conservative underwriting practices and the Company's failure to take timely and adequate loan loss reserves to compensate for these risks.

427.    During this call, Defendant Marshall was questioned regarding the Company's capital ratios and whether the Company would need to raise additional capital in the near term. In response, CFO Marshall stated that the Company was "comfortable" with its current capital levels and that it would not need to undertake "any of the extreme capital raises" done by other "more stressed peers," stating:

**Matthew O'Connor -** *UBS - Analyst*

Fifth Third's always been a bit more conservative when it comes to capital than most banks, meaning carrying more. And I'm just wondering your thoughts, you know, the environment is very uncertain here. **Your capital ratios will be at the lower end of your targeted levels and I'm just wondering what you might be able to do to get them up there, whether there's some additional asset sales or securitization**, or would you consider non-dilutive capital raise and of course while we're on the topic, if you could comment on your dividends, which does screen high on a couple of different metrics?

**Chris Marshall -** *Fifth Third Bancorp - CFO*

Matt, our -- **actually we expect our capital to be comfortably within our targets … while we're very, very mindful of managing our capital carefully, we actually think we feel pretty comfortable with where we are.**

                          *    *    *

**Matthew O'Connor -** *UBS - Analyst*

Okay, so on the capital side at this, you'll just grow into the targeted levels or the higher end of the targeted levels as opposed to…

**Chris Marshall - *Fifth Third Bancorp - CFO***

We have normal issuances planned, **which I can't really comment on more than that, but I wouldn't expect to see us do anything out of the ordinary and certainly nothing resembling any of the extreme capital raises you've seen from some of our more stressed peers**. We don't think that's -- **we think of ourselves as being in an entirely different category and don't need to do any of those things.**

(Emphasis added.)

428.    Also during the April 22, 2008 conference call, Defendant Marshall was questioned regarding reported increases in non-performing assets in the Commercial and Industrial loan portfolio, in the first quarter of 2008.  In response to these questions, Defendant Marshall disclosed that approximately half of the Company's commercial loan portfolio was related to real estate, stating:

**Mike Mayo - *Deutsche Bank - Analyst***

Just a follow-up to the problem loans. It looks like most of the increase was in the commercial category broadly, but also over 100 million increase in commercial loans separate from real estate. So can you discuss what's going on there?

**Chris Marshall - *Fifth Third Bancorp - CFO***

There is -- beyond the, beyond the concentration and real estate-related companies, Mike, there wasn't a single concentration anywhere.

**Mike Mayo - *Deutsche Bank - Analyst***

I'm looking at -- in December, it was $175 million. Now this quarter it's $300 million in the category commercial loans, which is separate from commercial mortgage or commercial construction or commercial leases, so if it's not just one area, can you just give us a little more color as far as the several parts that might be in there?

**Chris Marshall - *Fifth Third Bancorp - CFO***

Well, again, the $125 million in CNI, about a quarter of that were two companies that are generally related to the real estate industry. So, that's one concentration. Beyond that, while losses were higher in Florida and Michigan just due to stressed economies there, there's no other industry concentration I could point to.

429. Finally, Defendants were questioned regarding the Company's ratio of loan loss allowances to nonperforming assets and why the Company had dramatically decreased its loan loss reserves in the first quarter of 2008, despite the fact that nonperforming assets were increasing, as follows:

**David Campbell** - *Owl Creek - Analyst*

Hello. Just wanted to compare the ratio of allowances to non-performing assets and loans 90 days past due. **A year ago, you were reserved at 117% of NPA's and (inaudible) 90-day delinquencies and now the ratio is about 61% unadjusted for -- unadjusted for those write-downs to the NPA's. Is 60 -- is that an appropriate level of reserves**?

**Chris Marshall** - *Fifth Third Bancorp - CFO*

**Yes, we think based on all the comments we just went through that our reserves are appropriate.** That is kind of a hard question to answer any other way than that, but when you say unadjusted, I would ask you to go back through the text and go through the details we shared with you and then if you've got some questions based on those adjustments that -- follow up with Jeff offline, we would be happy to answer any other questions.

**David Campbell** - *Owl Creek - Analyst*

The adjustments would have the effect of -- I mean putting those (inaudible) analysis, **they would have the effect of showing a more aggressive, or a lower level of reserves** to (inaudible).

**Chris Marshall** - *Fifth Third Bancorp - CFO*

David, I'm not following your question, but we did go through quite a bit of detail on our NPA's and I'm not sure exactly what you're trying to get at, but I would be happy to take your question offline and go through the detail again.

(Emphasis added.)

430. The statements in the First Quarter 2008 Earnings Release, Form 8-K and analysts' conference call were materially false and misleading because they failed to accurately and completely disclose the extent of the deterioration in the credit quality of the Company's

loan portfolio due to the Company's abandonment of conservative underwriting standards and undisclosed subprime lending, which was causing rapid growth in nonperforming assets. Moreover, Defendants failed to take additional reserves for the rapidly growing number of loans that had become 30 to 89 days delinquent, which should have been considered impaired given the downturn in the real estate market.  As a result of its failure to use prudent and conservative underwriting guidelines, the Company was required by GAAP to make a commensurate increase in its allowance for loan losses to reflect the diminished credit quality of its loan portfolio and increased probability of defaults, but failed to do so, in violation of GAAP.  Instead, the Company lowered its reserves in real terms, *i.e.*, reserves as a percentage of nonperforming assets and Defendant Marshall evaded answering the analyst's question on this crucial metric. This, in turn, caused a material weakening in the Company's capital structure and would require the Company to raise billions in new capital and reduce the dividend.

431.    The Defendants' April 22, 2008 statements caused the price of Fifth Third common stock to remain artificially inflated as the price increased $1.55 per share or 7.99% to close at $20.93 per share on April 22, 2008, on unusually heavy volume of more than 13.9 shares traded.

### 14.    The May 2, 2008 Press Release and Form 8-K

432.    On May 2, 2008, Fifth Third issued a press release announcing that Defendant Marshall had "resigned" as Executive Vice President and Chief Financial Officer of Fifth Third on May 1, 2008 effective as of April 30, 2008 and that Daniel T. Poston, Executive Vice President and Controller of Fifth Third Bancorp, would serve as the Chief Financial Officer of Fifth Third until a permanent successor for Mr. Marshall was named.

### 15. The First Quarter 2008 Form 10-Q

433.     On or about May 9, 2008, Fifth Third filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2008 ("First Quarter 2008 10-Q").  The First Quarter 2008 10-Q was signed by Defendant Poston and certified by Defendants Kabat and Poston pursuant to SOX that the First Quarter 2008 10-Q did not contain any false or misleading statements of material fact or fail to disclose any material facts and fairly presented the Company's financial results and condition.  The First Quarter 2008 10-Q reiterated the financial results reported in the April 22, 2008 press release.   In addition, the Defendants falsely represented that Fifth Third had employed conservative lending practices, and that it did not originate or hold subprime loans, stating:

> **The Bancorp maintains a conservative approach to both lending and investing activities as it does not originate or hold subprime loans, nor does it hold collateralized debt obligations ("CDO's") or asset-backed securities backed by subprime loans in its securities portfolio**.

(Emphasis added.)

434.     In discussing the Company's consumer lending for the first quarter of 2008, Defendants stressed that Fifth Third had increased mortgage originations by 39% over the same quarter in 2007, while remaining "committed to being a prime mortgage originator," stating:

> **Consumer Lending had mortgage originations of $3.9 billion, an increase of 39% over the same quarter last year.** The Bancorp has benefited from the recent downturn in the credit cycle as many competitors have exited or scaled back their mortgage businesses. **The Bancorp remains committed to being a prime mortgage originator.**

(Emphasis added.)

435.     Defendants' statements in the first Quarter 2008 10-Q were materially false and misleading because, among other things, the Company had abandoned conservative underwriting standards, practices and procedures and ignored risks associated with the non-traditional, non-

conforming mortgages originated by Fifth Third, including Alt-A mortgages, that in reality were as risky as subprime loans. Moreover, mortgage originations had increased because members of Fifth Third senior management used sales "expectations" (a euphemism for the Company's quota system) and harsh penalties for failing to meet such expectations (including termination), to encourage sales staff to originate loans without adherence to conservative origination practices.

436. The First Quarter 2008 10-Q represented that the Company had increased its provision for loan losses to $544 million for the first quarter of 2008, as compared to $84 million for the first quarter of 2007, based on increasing delinquencies and "deterioration in real estate values, stating:

> **The provision for loan and lease losses increased to $544 million in the first quarter of 2008 compared to $84 million in the same period last year. The primary factors in the increase was the increase in delinquencies, the deterioration in residential real estate collateral values in certain of the Bancorp's key lending markets and declines in general economic conditions**. As of March 31, 2008, the allowance for loan and lease losses as a percent of loans and leases increased to 1.49% from 1.05% at March 31, 2007.

(Emphasis added.)

437. The provision for loan losses was materially understated because the Company's reported nonperforming assets did not include the rapidly growing number of loans that had become 30 to 89 days delinquent and for which Fifth Third not take additional reserves. Given the aggressive underwriting by Fifth Third combined with the downturn in the real estate market, these loans should have been considered impaired and the Company should have taken reserves against such loans, but failed to do so in order to continue to artificially inflate the Company's reported financial results and capital levels. Defendants' statements regarding provisions for loan losses were also materially false and misleading because they failed to truthfully attribute the deterioration in the credit quality of the Company's loan portfolio to the Company's

abandonment of conservative lending practices, while concealing from investors the fact that the Company had under-reserved for probable loan losses and that a substantially greater proportion of its loan portfolio was impaired or at risk for becoming impaired due to the Company's abandonment of conservative underwriting and risk management policies and practices. Contrary to Defendants' representations, Fifth Third had inadequate controls over its loan origination and underwriting and its loan portfolio was riddled with under-collateralized loans issued to borrowers that lacked sufficient income, cash flow or assets to repay their loans.

438.    With respect to risk management, the First Quarter 2008 10-Q reiterated substantially the same risk management policy and procedures reported in the 2007 10-K, and again claimed that Fifth Third's credit risk management strategy was based on "conservatism, diversification and monitoring," and that the Company's quarterly assessments of its loan portfolio were used to promptly identify problem loans in its portfolio, to make timely and adequate reserves for such loans and stating:

> The objective of the Bancorp's credit risk management strategy is to quantify and manage credit risk on an aggregate portfolio basis, as well as to limit the risk of loss resulting from an individual customer default. **The Bancorp's credit risk management strategy is based on three core principles: conservatism, diversification and monitoring. The Bancorp believes that effective credit risk management begins with conservative lending practices. These practices include conservative exposure and counterparty limits and conservative underwriting, documentation and collection standards.**
>
> *    *    *
>
> **The Bancorp manages credit risk in the mortgage portfolio through conservative underwriting and documentation standards and geographic and product diversification.**

(Emphasis added.)

439.    Defendants' statements in the First Quarter 2008 10-Q regarding the Company's "conservative    lending    practices,"    "conservatism,"    "conservative    underwriting    and

documentation," and "conservative exposure" were materially false and misleading because they concealed from the investing public the Company's abandonment of conservative underwriting standards, the fact that the Company had originated riskier loans, particularly Alt-A mortgage loans which in reality had all of the characteristics of subprime loans, home equity loans, and high LTV land and construction loans in 2006 – 2007, than it had represented to the public and the fact that these loans necessarily comprised a larger proportion of the Company's held-for-investment portfolio of loans than in previous years.

440.    The First Quarter 2008 10-Q disclosed that Fifth Third was originating residential mortgages with high LTV ratios and that the Company was retaining a substantial portion of these loans in its residential mortgage portfolio, stating:

> Certain mortgage products have contractual features that may increase credit exposure to the Bancorp in the event of a decline in housing prices. These types of mortgage products offered by the Bancorp include loans with high LTV ratios, multiple loans on the same collateral that when combined result in a high loan-to-value ("LTV") ("80/20") and interest-only loans... The Bancorp does not originate mortgage loans that permit customers to defer principal payments or make payments that are less than the accruing interest.

441.    The First Quarter 2008 10-Q included two tables purporting to disclose the extent of the high LTV residential mortgages originated by Fifth Third and those retained in its portfolio, stating:

| | 2008 | | 2007 | |
|---|---|---|---|---|
| For the three months ended March 31 ($ in millions) | Amount | Percent of total | Amount | Percent of total |
| Greater than 80% LTV with no mortgage insurance | $ 7 | — % | $ 108 | 4% |
| Interest-only | 432 | 11 | 495 | 18 |
| Greater than 80% LTV and interest-only | — | — | 15 | 1 |
| 80/20 loans | 31 | 1 | 46 | 2 |

*    *    *

| | 2008 | | | 2007 | | |
|---|---|---|---|---|---|---|
| As of March 31 ($ in millions) | Amount | Percent of total | Delinquency Ratio | Amount | Percent of total | Delinquency Ratio |
| Greater than 80% LTV with no mortgage insurance | $ 2,020 | 21% | 9.91 % | $ 1,755 | 21 % | 3.82 % |
| Interest-only | 1,689 | 18 | 1.65 | 1,253 | 15 | .23 |
| Greater than 80% LTV and interest-only | 471 | 5 | 7.95 | 543 | 7 | 1.54 |
| 80/20 loans | — | — | — | 31 | — | .65 |

169

Defendants' statements in the First Quarter 2008 10-Q concerning Fifth Third's origination of high LTV mortgages was materially false and misleading because they failed to disclose the fact that these high LTV loans were frequently made to borrowers with many other risk factors, such as FICO scores below 660, and failed to disclose how many of these loans were made to borrowers with undocumented and unverified employment, income, and/or assets, and that these high LTV loans were of subprime credit quality.

442.    The First Quarter 2008 10-Q acknowledged that the Company originated Alt-A mortgage loans, but claimed that borrowers' qualifications for these loans were comparable to conforming mortgage loans.   Additionally, Defendants represented that Fifth Third sold the majority of its Alt-A loans without recourse and that charge-offs for Alt-A loans sold with recourse were not material to the Company's financial results, stating:

> **The Bancorp originates certain non-conforming residential mortgage loans known as "Alt-A" loans. Borrower qualifications are comparable to other conforming residential mortgage products** and the Bancorp underwrites and sells, without recourse, the majority of these loans into the secondary market under an agency flow sale agreement. As of March 31, 2008, the Bancorp held $128 million of Alt-A mortgage loans in its portfolio with approximately $5.2 million in nonaccrual.
>
> The Bancorp previously sold certain mortgage products in the secondary market with recourse. The outstanding balances and delinquency rates for those loans sold with recourse as of March 31, 2008 and 2007 were $1.5 billion and 4.66%, and $1.2 billion and 1.50%, respectively. **Charge-offs on recourse loans were not material for the three months ended March 31, 2008 and 2007.**

(Emphasis added.)

443.    The Defendants' statements in the First Quarter 2008 10-Q regarding LTV ratios of its loan portfolio and Alt-A lending practices were materially false and misleading because the borrowers' qualifications for Alt-A loans originated by Fifth Third were not comparable to borrowers that qualified for conforming loans.   On the contrary, a substantial portion of Alt-A

loans carried undisclosed, layered risks that were comparable to subprime loans. Moreover, Defendants' statements concealed from the investing public the fact that a substantial proportion of its loan portfolio was impaired, or at risk for becoming impaired, due to the Company's abandonment of conservative underwriting and risk management policies, and that the Company had significantly under-reserved for probable loan losses as its loan portfolio was riddled with under-collateralized loans issued to borrowers who lacked sufficient incomes or assets to repay their loans.

444. Additionally, Defendants represented that the Company was well-capitalized, stating:

> The Bancorp's capital ratios exceed the "well-capitalized" guidelines as defined by the Board of Governors of the Federal Reserve System ("FRB"). As of March 31, 2008, the Tier I capital ratio was 7.72%, the Tier I leverage ratio was 8.28% and the total risk-based capital ratio was 11.34%. The Bancorp had senior debt ratings of "Aa3" with Moody's, "A+" with Standard & Poor's, "AA-" with Fitch Ratings and "AAL" with DBRS Ltd. at March 31, 2008, which indicate the Bancorp's strong capacity to meet financial commitments. The "well-capitalized" capital ratios along with strong credit ratings provide the Bancorp with access to the capital markets.

445. The Defendants' statements in the First Quarter 2008 10-Q regarding the Company's capital ratios were materially false and misleading because they failed to disclose that the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and that as a direct and proximate result of the foregoing, the Company would be required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, selling assets, and seeking federal bailout funds.

### 16.    The May 12, 2008 Presentation and Form 8-K

446.    On May 12, 2008, Fifth Third filed with the SEC a current report on Form 8-K.
signed by Defendant Poston, regarding the Company's presentation at the UBS Global Financial
Services Conferences (the "May 12, 2008 8-K").   A copy of the presentation materials was
attached as an exhibit to the Mary 12, 2008 8-K.  Under the heading "Strong capital positioning,"
Defendants reported the Company's tangible common equity as a percentage of Tangible assets
of 6.22% with a target of 6-6.5%.  Likewise, the Company reported its tier 1 ratio of 7.72% with
a target of 7.5-8%.   The May 12, 2008 8-K highlighted the Company's purported "Credit
containment" measures designed to tighten the Company's undisclosed lax lending and
underwriting standards, stating:

- Eliminated all brokered home equity production
- Suspended all new developer lending
- Significantly tightened underwriting limits and exception authorities
- Major expansion of commercial and consumer workout teams
- **Aggressive write downs in stressed geographies**
- **Significant addition to reserve levels**
- **Direct executive management oversight of every major credit decision**

**Fifth Third has moved aggressively to stay ahead of emerging credit issues**

(Emphasis added.)

447.    The May 12, 2008 Presentation and Form 8-K was materially false and
misleading because it failed to disclose that Defendants had failed timely to set aside additional
reserves to compensate for the rapidly growing number of loans that had become 30 to 89 days
delinquent, which should have been considered impaired given the downturn in the real estate
market.  As a result of its failure to use prudent and conservative underwriting guidelines, the
Company was required by GAAP to make a commensurate increase in its allowance for loan
losses to reflect the diminished credit quality of its loan portfolio and increased probability of

defaults, but failed to do so, in violation of GAAP. Instead, the Company lowered its reserves in real terms, *i.e.*, reserves as a percentage of nonperforming assets. Moreover, Defendants' statement that the Company had taken "aggressive write downs," was materially false and misleading because the Company still had approximately $1.6 billion in impaired assets in its held-for-investment loan portfolio that were being carried at inflated values and should have been written down to reflect current market valuations.

448.    The Defendants' statements during the Class Period alleged above were also false and misleading because they failed to disclose (a) the Company used a system of oppressive sales quotas and lavish bonuses in its effort to aggressively market risky commercial and consumer loans; (b) these risky loans included Alt-A loans that, contrary to Defendants' assurances as to credit worthiness, carried risks that were comparable to subprime loans; (c) that Fifth Third was originating Alt-A loans that had layered risk factors, including high LTVs, FICO scores below 660, unverified employment, unverified income, unverified assets, and high total debt-to-income ratio borrowers; (d) Defendants aggressively marketed risky high LTV commercial loans and high LTV land loans; (e) Defendants aggressively marketed Fifth Third-financed Florida real estate (particularly unimproved land and condominiums) to Europeans for whom the Company was unable to obtain credit scores or verify any other borrower data germane to loan origination and sound underwriting practices; (f) as a direct and proximate result of the Defendants deficient underwriting and risk management practices, Fifth Third was increasingly unable to sell loans it originated in the secondary market and, thus, was forced to retain these loans in its held-for-investment loan portfolio; (g) as Fifth Third rapidly increased its holdings of unsalable loans from 2006 through mid-2008, the credit quality of the Company's loan portfolio rapidly deteriorated; (h) Fifth Third had failed to timely identify and report

nonperforming loans; (i) Fifth Third had failed to timely and adequately reserve for loan losses; (j) As a result of the Company's failure to take timely reserves for loan losses, Fifth Third's net income throughout the Class Period was overstated; (k) the credit quality of Fifth Third's tier 1 capital had severely deteriorated, leaving the Company undercapitalized and vulnerable to future losses; and (l) as a direct and proximate result of the foregoing, the Company was required to raise massive amounts of capital through, among other things, slashing its annual dividend, selling billions of dollars of dilutive preferred stock, selling assets, and seeking federal bailout funds.

## C.     THE TRUTH BEGINS TO EMERGE

### 1.     The June 18, 2008 Press Release and Form 8-K

449.    On June 18, 2008, the Company shocked investors when it issued a press release, and concurrently filed with the SEC a current report on Form 8-K, signed by Defendant Poston, that included as an exhibit the full text of the press release, revealing to the market, among other things, that the credit quality of the Company's tier 1 Capital had deteriorated to an extent that could not be explained by the weakening real estate market or other general economic trends, but rather was a Company-specific event that resulted when the risks engendered by the Company's abandonment of conservative underwriting practices materialized.    As a result of the deterioration of Fifth Third's tier 1 Capital, the Company was in desperate need of new capital and was planning a $1 billion convertible preferred stock offering and a fire sale of "non-core businesses" to raise an additional $1 billion in capital.    The Company also announced that it was slashing its quarterly dividend 66% from $0.44 per share to $0.15 per share, stating:

> Fifth Third Bancorp today announced actions to strengthen its capital position in light of continued deterioration in credit trends during the second quarter of 2008 and its view that conditions are unlikely to improve in the near-term. The Company's Board of Directors has approved the following actions:

• The planned issuance of $1 billion in Tier 1 capital in the form of convertible preferred shares.

• A reduction in the quarterly dividend level. The Company declared its second quarter cash dividend on its common stock and set the level at $0.15 per share, a reduction from the previous $0.44 per share quarterly level. The new dividend is payable on July 22, 2008, to holders of record on June 30, 2008.

• The anticipated sales of certain non-core businesses that, if successfully completed, would supplement common equity capital by an estimated additional $1 billion or more. Fifth Third owns several non-strategic businesses that are not significantly synergistic with its core financial services businesses. We expect these transactions to be completed over the course of the next several quarters.

450. The June 18, 2008 press release also disclosed that Fifth Third expected to increase its provision for loan and lease losses, and an increase in nonperforming assets by an astonishing 45%, stating:

Provision expense for loan and lease losses for the second quarter of 2008 is currently expected to be approximately $700-725 million. **The increase in provision expense for loan and lease losses is primarily driven by higher inherent loss expectations resulting from trends in severities of loss on collateral as well as in nonperforming and other criticized assets.** Management expects that elevated recent losses are likely to be more indicative of inherent rates of loss in the portfolio than previous loss experience recognized six or twelve months ago. **As a result, we are further adjusting qualitative factors in our loss models to place greater emphasis on the current environment for defaults and losses given default.** We currently expect the second quarter loan loss provision to exceed charge-offs by approximately $350-375 million, which is expected to increase the ratio of reserves for loan losses to loans and leases to approximately 1.8 percent at end of the current quarter. We also expect to record provision expense for unfunded commitments in other noninterest expense of approximately $20 million in the second quarter of 2008.

\*   \*   \*

Nonperforming assets (NPAs) at the end of the quarter are expected to increase approximately 40-45 percent from the first quarter of 2008, to approximately 2.6 percent of total loans, leases and other real estate owned. The inclusion of First Charter is expected to contribute approximately $35-40 million in second quarter growth in total NPAs. **Commercial NPAs are expected to increase approximately 45 percent from the first quarter of 2008, including 3 percent**

**related to First Charter, driven primarily by continued deterioration in the commercial construction and commercial mortgage portfolios in Eastern Michigan and Florida.** Consumer NPAs are expected to increase approximately 35 percent from the first quarter of 2008, driven by growth in the residential mortgage and home equity portfolios and in Michigan and Florida. Troubled debt restructurings for consumer borrowers implemented during the second quarter are expected to total approximately $165 million, representing 90 percent of consumer NPA growth and a 25 percent of total NPA growth.

(Emphasis added.)

451. In a letter to shareholders dated June 18, 2008, Defendant Kabat admitted that the decision to reduce the dividend was made "only after long and careful consideration." He also admitted that, during the Class period, Fifth Third had undertaken a "**thorough review of our credit portfolio.**" (Emphasis added.)

452. In a June 18, 2008 investor presentation, Defendants acknowledged the lax underwriting standards and poor credit quality of its borrowers by announcing the following actions:

- Significantly tightened underwriting limits and exception authorities

  *   *   *

- Expanded consumer credit outreach program

- Major expansion of commercial and consumer workout teams

453. This disclosure of Fifth Third's true financial condition shocked the market, causing the price of Fifth Third common stock to decline 27% from its previous close of $12.73 per share, to close on June 18, 2008 at $9.26 per share – a drop of $3.47 per share – on unusually heavy volume of more than 104.2 million shares traded.

### D.    **THE AFTERMATH**

454.    On July 22, 2008, Fifth Third issued a press release and its quarterly financial supplement for the second quarter of 2008, confirming that the Company had sustained a net loss of $202 million or ($0.37 per share) for the quarter and massive increases in reported nonperforming assets, which had grown to a staggering $2.2 billion or 2.56% of total loans, stating:

> **Nonperforming assets (NPAs) at quarter end were $2.2 billion, or 2.56 percent of total loans and leases and OREO, up from 1.96 percent last quarter and 0.70 percent in the second quarter a year ago**. Sequential growth in NPAs was $606 million, or 38 percent, down from 50 percent growth in the first quarter. Second quarter growth was driven by increases related to residential real estate builders and developers in the commercial portfolio and restructurings of mortgage and home equity loans in the consumer portfolio.
>
> **Commercial NPAs of $1.5 billion, or 2.93 percent, grew $465 million, or 44 percent, in the second quarter of 2008**. Commercial NPA growth was primarily driven by continued deterioration in the commercial construction and commercial mortgage portfolios, particularly in Michigan and Florida. NPAs in the C&I portfolio of $414 million, increased $109 million, from the previous quarter, driven by a $20 million increase in residential homebuilder and developer NPAs and weakness among customers associated with residential construction activities. Commercial construction NPAs were $552 million, an increase of $133 million from the first quarter of 2008. Commercial mortgage NPAs were $540 million, a sequential increase of $216 million. Commercial real estate loans in Michigan and Florida represented 42 percent of our total commercial real estate portfolio. Increases in NPAs in these states represented 74 percent of commercial real estate NPA growth and these regions accounted for 68 percent of total commercial real estate NPAs. Residential real estate builders and developers represented approximately $547 million in commercial NPAs and increased $239 million from the first quarter of 2008, accounting for approximately half of the increase in total commercial NPAs.
>
> **Consumer NPAs of $674 million, or 2.00 percent, increased $141 million, or 26 percent, in the second quarter of 2008**. Of the growth, $136 million was experienced in residential real estate portfolios. Residential mortgage NPAs increased $115 million to $448 million. Of residential mortgage NPAs, $12 million were in residential construction loans (of which $7 million was OREO). Home equity NPAs increased $21 million to $183 million. OREO represented $119 million of total residential mortgage NPAs and $32 million in total home equity NPAs. Residential real estate loans in Michigan and Florida represented 64

percent of the growth in residential real estate NPAs, 59 percent of total residential real estate NPAs, and 36 percent of total residential real estate loans. Included within consumer NPAs, primarily in residential real estate loans, were $318 million in troubled debt restructurings, including $146 million restructured in the second quarter of 2008. These debt restructurings assist qualifying borrowers in creating workable payment plans to enable them to remain in their homes.

(Emphasis added.)

455.    In an exhibit to the July 22, 2008 press release, Defendants admitted that 13% of Fifth Third's residential mortgage borrowers had FICO scores of less than 659 and 16% of loans had an LTV greater than 95%.

### 1.    The Third Quarter 2008 Earnings Release and Form 8-K

456.    On October 21, 2008, Fifth Third issued a press release announcing its earnings for the third quarter of 2008, revealing that despite the huge capital raise announced by the Company on June 18, 2008, Fifth Third was now considering applying for federal government bailout funds, stating: "Last week … the U.S. Treasury outlined a plan that would involve the purchase of Tier 1 securities from eligible financial institutions… We are in the process of evaluating this opportunity and considering an application."

457.    Defendants' disclosure that the Company was considering applying for federal bailout funds only months after the Company had undertaken a massive capital raise further demonstrated that the Company had failed to adequately reserve for loan losses during the Class Period and lacked sufficient capital to absorb probable loan losses.

### 2.    The October 27, 2008 Press Release and Form 8-K

458.    On October 27, 2008, Fifth Third issued a press release announcing that the Company would participate in the federal government's bailout program, stating "Fifth Third has

had the requisite discussions with its primary regulator and submitted an application for participation, which was filed Thursday. Our application was for an amount equal to 3 percent of risk-weighted assets, or approximately $3.4 billion."

### 3. The Third Quarter 2008 Form 10-Q

459.    On or about November 7, 2008, Fifth Third filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2008, disclosing that the Company then held $118 million of Alt-A loans in its portfolio, of which approximately $13 million were nonperforming.  However, the Company reported that an additional $1.4 billion of Alt-A loans had been sold **with recourse** and as of September 30, 2008, **4.98% of these loans were delinquent**, *i.e.*, Fifth Third faced the prospect of being required to repurchase and/or charge-off these loans, stating:

> The Bancorp previously sold certain mortgage products in the secondary market with recourse. The outstanding balances and delinquency rates for those loans sold with recourse as of September 30, 2008 and 2007 were $1.4 billion and 4.98%, and $1.6 billion and 2.36%, respectively. The Bancorp maintained an estimated credit loss reserve of approximately $13 million and $18 million relating to these residential mortgage loans sold at September 30, 2008 and 2007, respectively.

### 4. The November 28, 2008 Report on Form 8-K

460.    On November 28, 2008, Fifth Third filed with the SEC a current report on Form 8-K disclosing that the Company had filed an application with the Capital Purchase Program of the U.S. Department of the Treasury under the Emergency Economic Stabilization Act of 2008, for federal bailout funds and had received approval for the Treasury to buy $3.46 billion of the Company's preferred stock.  Finally, Fifth Third disclosed that it was preparing agreements required by the Treasury to participate in its Capital Purchase Program.

### 5.      The December 31, 2008 Form 8-K

461.    Fifth Third reported in a report on Form 8-K, filed with the SEC on December 31, 2008, that the federal bailout deal was completed on December 31, 2008, when Fifth Third entered into a "Letter Agreement" with the Treasury pursuant to which the Company issued and sold to Treasury for an aggregate purchase price of approximately $3.4 billion in cash: (i) 136,320 shares of the Company's Fixed Rate Cumulative Perpetual Preferred Stock, Series F, having a liquidation preference of $25,000 per share, and (ii) a ten-year warrant to purchase up to 43,617,747 shares of the Company's common stock at an initial exercise price of $11.72 per share.

### 6.      The January 22, 2009 Earnings Release, Form 8-K and Conference Call

462.    On January 22, 2009, Fifth Third issued a press release and its quarterly financial supplement announcing its earnings release for the fourth quarter of 2008 and concurrently filed with the SEC a report on Form 8-K, announcing "a full year 2008 net loss of $2.2 billion, or $3.94 per diluted share, compared with net income of $1.1 billion, or $1.99 per diluted share in 2007.  The Fourth Quarter 2008 Earnings Release also revealed that: (i) the Company had sold or transferred to "held-for-sale" approximately $1.6 billion of troubled loans that were previously held for investment in its loan portfolio; (ii) approximately 90% of these loans were for commercial real estate in Florida and Michigan; and (iii) the Company had sold these loans for a mere $0.33 on the dollar, stating:

> During the fourth quarter, **the Bank sold or transferred to held-for-sale loans with contractual balances of $1.6 billion and a carrying value of approximately $1.3 billion at the end of the third quarter. Approximately 90 percent of these loans were commercial real estate secured loans in Florida and Michigan.** Loans sold had contractual balances of $240 million, carrying values (net of prior charge-offs) at the end of the third quarter of $177 million, on

which we recorded fourth quarter net charge-offs of $120 million. Loans transferred to held-for-sale had contractual balances of $1.4 billion and carrying values of $1.2 billion at the end of the third quarter. Net charge-offs of $680 million were recorded in the fourth quarter on these loans as they were written down to bids received or collateral liquidation values. **Overall, net charge-offs on loans either sold or transferred to held-for-sale during the fourth quarter totaled $800 million, which reflected a reduction in the value of loans sold or transferred to approximately 33 cents of their contractual balances.** Fifth Third also significantly increased its reserve for loan and lease losses to $2.8 billion, resulting in an allowance to loan and lease ratio of 3.31 percent, up from 2.41 percent in the third quarter, and an allowance to nonperforming loans ratio of 123 percent, up from 79 percent in the third quarter.

(Emphasis added.)

463. Defendant Kabat stated that the Company had suspended originating homebuilder and developer loans and commercial non-owner occupied loans, and implemented "more stringent underwriting standards." Additionally, Defendant Kabat explained the losses incurred in the fourth quarter of 2008 as a result of the Company finally taking steps to get more than $1.3 billion in problem loans off its portfolio:

> Our underlying business results continue to be solid. We produced growth in both consumer and commercial deposit accounts of 4%, excluding acquisitions. Our Everyday Great Rates strategy helped us expand our customer base despite the extremely aggressive deposit competition we saw in 2008. Additionally, corporate banking fees were $444 million for the full year, up 21% in 2008, and electronic payments processing revenue and service charges on deposits were both up 11%.

> Since the beginning of the current credit cycle in the second half of 2007, we have been aggressively addressing our loan portfolio exposure to the geographies and industries most affected by this credit downturn. Actions we've taken include suspending originations of residential homebuilder and developer loans and commercial non-owner occupied real estate loans, discontinuing all brokered home equity products, and implementing more stringent underwriting standards. We have significantly increased our reserves by over $1.9 billion over the course of 2008, including over $700 million in the fourth quarter.

> During the fourth quarter, we took actions that resulted in the recording of significant losses. We sold or transferred to held-for-sale of $1.3 billion of commercial loans, based on the combined carrying value of these loans at the end of the third quarter. These steps were intended to further reduce the risk of our most problematic loan portfolios, primarily residential homebuilder and

commercial non-owner occupied real estate loans in Michigan and Florida. During the quarter, $800 million in losses were recorded on these loans sold or transferred to held-for-sale. We also continued to be very aggressive in dealing with problematic loans in our consumer portfolio, modifying a total of $218 million loans during the quarter. Modifying these loans is beneficial not only to our shareholders but is also consistent with the needs of our customers, and result in a greater likelihood of payment and more value ultimately received by Fifth Third. As of year-end, we had $574 million in restructured customer loans on our books. We understand that these actions significantly impacted our bottom line results, but we believe the actions taken in 2008 to mitigates risks and fortify the balance sheet will benefit our shareholders and customers in 2009 as this credit cycle progresses. During 2008, we raised a combined $4.5 billion in preferred equity, including $3.4 billion under the U.S. Treasury's Capital Purchase Program, and increased our reserve for loan and lease losses by $1.9 billion from the prior year's level, bolstering the strength of our balance sheet. The investment by the Treasury was made on December 31, 2008. This additional capital increases our capacity to provide credit to businesses and consumers in our markets in coming periods and to further assist struggling borrowers as we work together to manage through this difficult environment."

In addition, during the January 22, 2009 conference call, Defendant Kabat revealed that approximately $1.3 billion carrying value of commercial loans in Florida and Michigan were sold or moved to held-for-sale, and that the value of these loans was discounted to approximately thirty-three cents on the dollar: stating:

These loans had a carrying value at September 30, 2008 net of prior charge-offs of $1.3 billion. That $1.3 billion was made up of $732 million of nonperforming loans and **$609 million of performing loans at September 30th, although the latter were loans with significant potential issues. These loans in aggregate represent the deepest discount loans on our books.** We sold $240 million of principal balance loans during the fourth quarter and have contracts to close an additional $180 million this quarter, most of those in January. The remaining loans identified for sale were transferred to held for sale with losses recorded down to either the level of bids we received or otherwise to their liquidation value based primarily on recent appraisals. Overall, **loans sold or transferred to held for sale were reduced to a value of approximately $0.33 of their contractual balances**. We continue to aggressively work on selling down the held for sale position, which we expect to accomplish without further losses.

(Emphasis added.)  The Defendants' January 22, 2009 statements were an admission that Fifth Third had been carrying $1.6 billion of loans held for investment at substantially inflated values,

given the deteriorating credit quality of these assets due to the Company's abandonment of conservative lending and underwriting standards. Indeed, Defendants admitted that immediately prior to this announcement, these loans were being carried at approximately $1.3 billion (*i.e.*, 80% of their full value), when they were actually worth only 33% of their original value. Even more shocking was Defendants' admission that nearly half of these loans -- $609 million – were "performing loans with significant potential issues" and that, according to Defendants, "represent the deepest discount loans on our books." In other words, loans that the Company had been carrying as "performing loans," such as loans 30 to 89 days past due, were in fact loans with significant problems and were likely to move into the nonperforming asset category, and therefore they were worth only 33 cents on the dollar of their original contractual values.

### 7.    The March 30, 2009 Press Release

464.    On March 30, 2009, Fifth Third announced that it had agreed to sell its 51% interest in its payment-processing unit to private-equity firm Advent International Corp. for $561 million in cash. The sale is expected to raise $1.2 billion of tier 1 capital for Fifth Third. The payment-processing unit, a profitable area of the bank that processes credit- and debit-card payments, will be spun off into a separate company called Fifth Third Processing Solutions LLC. In a client note on March 30, 2009, analyst Robert Patten of Regions Financial Corp.'s Morgan Keegan & Co. Inc. stated that Fifth Third is likely to need more capital. Though selling the processing unit "buys time," he noted, the "transaction is also a negative in that the processing unit represents the bank's fastest-growing revenue stream." This transaction again demonstrates that Fifth Third's capital position remains dangerously weak, even after its $1 billion convertible preferred offering, slashing its dividend and receiving a $3.45 billion injection of capital from the federal government.

E.     **FACTS WHICH GIVE RISE TO A COGENT INFERENCE OF SCIENTER**

465.    The following facts provide support for the strong inference of Defendants' scienter:

(a)      During the Class Period, Fifth Third sold more than **$3 billion** of Fifth Third securities at inflated prices, including: (i) the Preferred B Offering of 34,500,000 shares at $25 per share that raised gross proceeds of $862,510,000 for the Company; (ii) the Preferred C Offering of approximately 16,000,000 shares at $25 per share that raised gross proceeds of $400,000,000 for the Company; (iii) the February 26, 2008 offering of $1,000,000,000 of Fifth Third 8.25% Subordinated Notes due 2038; and (iv) the April 30, 2008 offering of $750,000,000 of Fifth Third 6.250% Senior Notes due 2013. Defendants were motivated to commit fraud in order to artificially inflate the price of Fifth Third securities and/or reduce the costs of borrowing by reducing the interest rates the Company would pay on its two Class Period notes offerings. If Defendants had publicly disclosed that Fifth Third was a subprime lender, it would have had to pay higher interest rates to compensate notes purchasers for the increased risks of the Company's business model and assets.

(b)      Defendants were motivated to commit fraud in order to artificially inflate the price of Fifth Third common stock so that the inflated stock could be used as currency to fund corporate acquisitions, including First Charter (paying approximately $770 million of the $1.1 billion purchase price with artificially inflated Fifth Third common stock on June 6, 2008);

184

(c)  The Individual Defendants had actual knowledge of Fifth Third's underwriting deficiencies and abandonment of conservative underwriting from the Corporate Credit Committee, which was co-chaired by Defendant Marshall  It was formed in mid-2007 "to make sure that the senior[-]most people in the company are focused on credit…."  As described above, among other things, the Corporate Credit Committee reviewed every commercial loan in Michigan in late 2007, and it provided and/or made available to the Individual Defendants with up-to-date information about the real reasons for the deteriorating credit quality of the Company's loan portfolio;

(d)  Defendant Kabat's actual knowledge or reckless disregard of the findings of the Corporate Credit Committee is supported by the fact that the committee itself was Kabat's "brainchild," and his statement that the committee was formed "to make sure that the senior[-]most people in the company are focused on credit…."  Therefore, he had a vested interest in making sure that the committee achieved its goals and informing himself as to any significant findings made by the committee regarding the credit quality of the Company's loan portfolio;

(e)  CW-1's information about risk management reports demonstrates that the Individual Defendants had actual knowledge or recklessly disregarded that Fifth Third originated subprime loans.  Risk management reports were generated in monthly risk management meetings that were attended by senior officers from the compliance, quality control, and underwriting departments.  These risk management reports included compilations of monthly data from all mortgage-

related departments and were distributed to Fifth Third's most senior leadership in its Cincinnati headquarters, including Defendant Kabat;

(f) The Individual Defendants actual knowledge or reckless disregard of the fact that Fifth Third originated subprime loans is further supported by the information provided by CW-1, who states that the risk management reports referred to above detailed the specific kinds of loans granted each month, the amount of money "in reserves," types of loans, and delinquencies. CW-1 said that management from other departments confirmed in the meetings that the types of loans granted included interest only, "NINA" (no income, no assets), "SISA" (stated income, stated assets), ARMs and Alt-A. CW-1 said that the standards were "subprime." Therefore, a review of those reports would have revealed to the Individual Defendants the "subprime" loans that Fifth Third was originating;

(g) The ACAPS system provided the Individual Defendants actual knowledge or they recklessly disregarded information which showed the fact that Fifth Third was a subprime lender. The ACAPS system was intended to provide senior management, including the Individual Defendants, real-time data on every mortgage sold by Fifth Third, including the unique code number for each type of mortgage product, the dollar amount of the loan, the name of the salesperson, the regional affiliate, cross-selling of credit cards, checking accounts, and savings accounts;

(h) The Individual Defendants also had actual knowledge or recklessly disregarded that Fifth Third was encouraging its employees to generate subprime loans through demanding sales quotas because ACAPS provided real time data to

186

them as to whether salespeople, sales managers, and regional affiliates were meeting the sales quotas set by senior management in Cincinnati. CW-9 confirms that compliance with sales quotas was actively monitored by senior management in Cincinnati;

(i)     The Individual Defendants also had actual knowledge or recklessly disregarded that Fifth Third was making subprime loans because ACAPS allowed the Individual Defendants to see, in real-time, when documentation was missing from mortgage applications, which was red-flagged by the system. Therefore, the Individual Defendants had information readily available to them which would show the large number of loans that were made without income, asset or employment verification and/or faulty appraisals;

(j)     As a result of the unreasonable and unrealistic Company-wide sales quotas for mortgages and other loan products which the Individual Defendants knew or recklessly disregarded as a result of their access to ACAPS, the Individual Defendants knew or were reckless in not knowing about the poor credit quality loans that were being generated in order to meet those quotas;

(k)     Since Defendants Kabat and Marshall had all of the relevant information regarding underwriting and credit quality at their fingertips through ACAPS, they either knew or were reckless in not knowing that the poor credit quality of the loans the Company had been originating and the poor credit quality of the loan portfolio were the sources of the increases in nonperforming assets and not general economic conditions;

(l)     The Individual Defendants knew or recklessly disregarded the subprime/poor credit quality of Fifth Third's loan portfolio because they admitted during their presentation at the 2008 Annual Meeting of Shareholders on April 15, 2008, and again in their May 12, 2008 presentation for the UBS Global Financial Services Conference that they had "**Direct executive management oversight of every major credit decision**."

(m)     Defendant Kabat's actual knowledge of the poor credit quality of the Company's loan portfolio is supported by his admission in the April 22, 2008 press release that **"[w]e remain very active in taking steps to address the issues we and the industry are facing**" and his admission during the Company's April 22, 2008 conference call that, "**we continue to be proactive with steps to mitigate the losses we're facing**;"

(n)     Each of Fifth Third's Class Period interim reports filed with the SEC on Form 10-Q, certified pursuant to SOX by either or both Defendants Kabat, Marshall and/or Poston, represented that Defendants undertook the affirmative obligation to obtain sufficient knowledge to ensure that the Company's disclosures to the market were truthful, as alleged herein. In addition, Fifth Third's 2007 annual report, filed with the SEC on Form 10-K, was certified pursuant to SOX by Defendants Kabat and Marshall, as alleged herein;

(o)     Defendants Kabat and Marshall knew or recklessly disregarded the lack of adherence to prudent, conservative underwriting guidelines because, according to CW-2, at the end of 2006, Defendants Kabat and Marshall met with Fifth Third's underwriters in Florida to discuss mortgage lending guidelines, but

immediately after Kabat and Marshall had left the room, McGinty told the underwriting staff that the "guidelines were not that strict and that he had been given authority [by senior management] to over-ride those guidelines;"

(p)     The Individual Defendants knew or recklessly disregarded that Fifth Third made subprime loans, disregarded prudent, conservative underwriting and had unreasonable sales and underwriting quotas, all of which resulted in the poor credit quality of Fifth Third's loan portfolio because the residential mortgage and commercial lending business, which is the subject of the fraud alleged herein, was the core business of Fifth Third during the Class Period, and the financial success of the Company depended on the revenue generated by its lending operations. As Defendants admitted in the 2007 10-K, "managing risk is an essential component of successfully operating a financial services company." Thus, the Individual Defendants could not plausibly be ignorant regarding the Company's abandonment of conservative underwriting and the poor credit quality of its loan portfolio, particularly in view of their access to all of the information evidencing these deficiencies through ACAPS, the Corporate Credit Committee, and risk management reports;

(q)     In a letter to shareholders, Defendant Kabat admitted that the decision to reduce the dividend was made "only after long and careful consideration." Therefore, Defendants Kabat, Marshall and Poston had actual knowledge of or were reckless in not knowing of the poor credit quality of the loans Fifth Third had originated that were then causing huge losses which resulted in the

deteriorating capital position of Fifth Third and necessitated a reduction in the dividend;

(r)     In a presentation to investors on June 18, 2008, Defendants admitted that Fifth Third had "[r]ecently conducted intensive review of loan portfolio to develop credit forecast of 2H 2008 and 2009," including a "[t]op-down and bottom-up analysis with particular focus on RE/RE-related portfolios," and "[d]evelopment of stress scenarios to forecast potential losses and adequacy of capital actions."  As a result of this "intensive review" during the Class Period, the Individual Defendants had actual knowledge or were reckless in not knowing of the poor credit quality of Fifth Third's loan portfolio as a result of its subprime lending and disregard of conservative underwriting and documentation standards; and

(s)     The Individual Defendants knew or recklessly disregarded that Fifth Third was carrying $1.6 billion of loans in its held for investment portfolio at substantially inflated values, given the deteriorating credit quality of these assets due to the Company's abandonment of conservative lending and underwriting standards.  Defendants admitted on January 22, 2009, these loans were being carried at approximately $1.3 billion (*i.e.*, 80% of their full value), when they were actually worth only 33% of their original value.  Moreover, nearly half of these loans -- $609 million – were "performing loans with significant potential issues," which, according to Defendants, "represent the deepest discount loans on our books."   In other words, loans that the Company had been carrying as "performing loans," such as loans 30 to 89 days past due, were in fact loans with

190

significant problems and were likely to move into the nonperforming asset category, and therefore, as Defendants belatedly admitted, they were worth only 33% of their original contractual values.

1. **The Cogent Inference of Scienter is Further Supported by the Individual Defendants' Motive to Secure Highly Lucrative Bonuses, Stock, and Stock Option Awards**

466. The Individual Defendants were also strongly motivated to misrepresent Fifth Third's financial results because of the potential to receive enormous incentive-based cash bonuses and stock and option awards. As detailed in Fifth Third's 2008 Proxy Statement filed on March 6, 2008, the Individual Defendants' wealth and compensation is directly tied to the performance of the Company. According to the 2008 Proxy Statement, under the heading "Base Salary," "[s]alary increases are based on the Company's overall performance and the executives attainment of individual objectives…." The "Pay for Performance" section of the Proxy Statement provides that the Individual Defendants' "compensation is based on individual, division and Company performance," including "Growth in core deposits, loans, fees, total revenue, net income and earnings per share" and "stock price growth and price/earnings ratio."

467. Further, under the heading "2007 Long-term Equity-based Compensation Awards," the Proxy Statement provides that executive compensation is based in part on the "Company's revenue and expense results."

468. The Individual Defendants' compensation was directly tied to the performance of the Company and the price of Fifth Third's stock. Accordingly, the Individual Defendants were motivated to inflate the perceived success of the Company and boost its apparent performance, because the better the Company's performance and, consequently, the higher the price of the Company's stock, the larger the Individual Defendants' salaries and incentive compensation.

Indeed, the Individual Defendants did reap enormous compensation awards in 2007 based on the perceived success of the Company and its artificially inflated stock price.

469. For the fiscal year of 2007, Defendant Kabat received a total compensation package of $6,225,890. That amount includes, among other things, a base salary of $866,534, Stock Awards in the amount of $704,985, Option Awards in the amount of $1,486,770, and Non Equity Incentive Based Plan Compensation in the amount of $3,013,200. Therefore, a full $5,204,955 of Kabat's total compensation for 2007 represents incentive or bonus awards directly tied to the price of Fifth Third stock.

470. For the Fiscal year of 2007, Defendant Marshall received a total compensation package of $2,059,773. That amount includes, among other things, a base salary of $513,257, Stock Awards in the amount of $325, 010, Option Awards in the amount of $101,707, and Non Equity Incentive Plan Compensation in the amount of $916,677. Therefore, a full $1,343,394 of Marshall's total compensation for 2007 represents incentive or bonus awards directly tied to the price of Fifth Third stock.

471. For the Fiscal year 2007 Defendant Schaefer received a total compensation package in the amount of $6,862,096, including, among other things, a base salary of $990,018, Stock Awards in the amount of $1,244,457, Option Awards in the amount of $2,580,462, and Non Equity Incentive Plan Compensation in the amount of $1,104,840. Therefore, a full $4,929.759 of Schaefer's total compensation for 2007 represents incentives or bonus awards directly tied to the price of Fifth Third stock.

**2. The Cogent Inference of Scienter is Further Supported by the Company's Detailed Credit Risk Management System**

472. The Individual Defendants had actual knowledge or recklessly disregarded that Fifth Third was originating subprime, poor credit quality loans by reason of the Company's elaborate credit risk review system. The 2007 10-K describes the Company's risk management, including credit risk, through the following system:

Managing risk is an essential component of successfully operating a financial services company. The Bancorp's risk management function is responsible for the identification, measurement, monitoring, control and reporting of risk and mitigation of those risks that are inconsistent with the Bancorp's risk profile. **The Enterprise Risk Management division ("ERM"), led by the Bancorp's Chief Risk Officer, ensures consistency in the Bancorp's approach to managing and monitoring risk** within the structure of the Bancorp's affiliate operating model. In addition, **the Internal Audit division provides an independent assessment of the Bancorp's internal control structure and related systems and processes**. The risks faced by the Bancorp include, but are not limited to, credit, market, liquidity, operational and regulatory compliance. ERM includes the following key functions:

• Risk Policy - ensures consistency in the approach to risk management as the Bancorp's clearinghouse for credit, market and operational risk policies, procedures and guidelines;

• **Credit Risk Review - responsible for evaluating the sufficiency of underwriting, documentation and approval processes for consumer and commercial credits, counter-party credit risk, the accuracy of risk grades assigned to commercial credit exposure, and appropriate recognition accounting for charge-offs, non-accrual status and specific reserves and reports directly to the Risk and Compliance Committee of the Board of Directors;**

• Consumer Credit Risk Management - responsible for credit risk management in consumer lending, including oversight of underwriting and credit administration processes as well as analytics and reporting functions;

\*   \*   \*

• Compliance Risk Management - responsible for oversight of compliance with all banking regulations;

• **Operational Risk Management - responsible for enterprise operational risk programs, such as risk self assessments, key risk indicators**

**and new products review as well as root cause analysis and corrective action plans relating to identified operational losses;**

\* \* \*

• Risk Strategies and Reporting - responsible for quantitative analytics and Board of Directors and senior management reporting on credit, market and operational risk metrics.

**Designated risk managers have been assigned to all business lines. Affiliate risk management is handled by regional risk managers who are responsible for multiple affiliates and report directly to ERM.**

**Risk management oversight and governance is provided by the Risk and Compliance Committee of the Board of Directors and through multiple management committees whose membership includes a broad cross-section of line of business, affiliate and support representatives.** The Risk and Compliance Committee of the Board of Directors consists of five outside directors and has the responsibility for the oversight of credit, market, operational, regulatory compliance and strategic risk management activities for the Bancorp, as well as for the Bancorp's overall aggregate risk profile. The Risk and Compliance Committee of the Board of Directors has approved the formation of key management governance committees that are responsible for evaluating risks and controls. These committees include the Market Risk Committee, the Corporate Credit Committee, the Credit Policy Committee, the Operational Risk Committee and the Executive Asset Liability Committee. There are also new products and initiatives processes applicable to every line of business to ensure an appropriate standard readiness assessment is performed before launching a new product or initiative. Significant risk policies approved by the management governance committees are also reviewed and approved by the Risk and Compliance Committee of the Board of Directors.

## CREDIT RISK MANAGEMENT
**The objective of the Bancorp's credit risk management strategy is to quantify and manage credit risk on an aggregate portfolio basis, as well as to limit the risk of loss resulting from an individual customer default. The Bancorp's credit risk management strategy is based on three core principles: conservatism, diversification and monitoring. The Bancorp believes that effective credit risk management begins with conservative lending practices. These practices include conservative exposure and counterparty limits and conservative underwriting, documentation and collection standards.** The Bancorp's credit risk management strategy also emphasizes diversification on a geographic, industry and customer level as well as regular credit examinations and monthly management reviews of large credit exposures and credits experiencing deterioration of credit quality. **Lending officers with the authority to extend credit are delegated specific authority amounts, the utilization of**

194

**which is closely monitored**. Lending activities are largely centralized, while ERM manages the policy and authority delegation process directly. **The Credit Risk Review function, within ERM, provides objective assessments of the quality of underwriting and documentation, the accuracy of risk grades and the charge-off and reserve analysis process.**

(Emphasis added.)  As the chief executive and financial officers of Fifth Third, the Individual Defendants could not plausibly be ignorant regarding the Company's underwriting deficiencies and the poor credit quality of its loan portfolio, particularly in view of the Company's elaborate credit risk management system described above.

### 3. <u>Group Pleading</u>

473.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Fifth Third were privy to confidential and proprietary information concerning Fifth Third, its operations, finances, financial condition and present, and future business prospects.   The Individual Defendants also had access to material adverse non-public information concerning Fifth Third, as discussed in detail below.  Because of their positions with Fifth Third, the Individual Defendants had access to non-public information about Fifth Third's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.   Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.  As a result, the Individual Defendants are responsible for the accuracy of Fifth Third's corporate releases detailed herein, and therefore, are responsible and liable for the representations contained therein.

474.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Fifth Third's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Fifth Third's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

475.    Each of the Individual Defendants is liable as a primary violator in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Fifth Third's securities during the Class Period.  Defendants had motives to pursue a fraudulent scheme in furtherance of their common goal (*i.e.*, artificially inflating the trading price of Fifth Third's securities, which was based in large part on Fifth Third's revenues and profit margins) by making false and misleading statements and concealing material adverse information.  The fraudulent scheme and course of business was designed to and did: (i) deceive the investing public, including Lead Plaintiffs and other Class members; (ii) artificially inflate the price of Fifth Third's securities during the Class Period; (iii) cause Lead Plaintiffs and other members of the Class to purchase Fifth Third's securities at inflated prices; (iv) allow Fifth Third to conceal and cover up the true financial condition of Fifth Third to the detriment of its investors, but to the financial benefit of Fifth

Third, which sold more than $3 billion of its securities in public offerings during the Class Period; and (v) substantially cause the significant decline in Fifth Third's stock price as the artificial inflation was released, resulting in economic damages to Lead Plaintiffs and the Class.

**X.      PLAINTIFFS' LOSS WAS PROXIMATELY CAUSED BY THE DISCLOSURE OF PREVIOUSLY MISREPRESENTED AND OMITTED MATERIAL FACTS AND THE MATERIALIZATION OF THE RISK CREATED BY DEFENDANTS' CONDUCT**

476.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Fifth Third's securities and operated as a fraud or deceit on Class Period purchasers of Fifth Third securities by misrepresenting among other things, the credit quality of the Company's loan portfolio, the sufficiency of its reserves for loan losses, the Company's underwriting practices, and the quality of its tier 1 capital, as alleged herein.  Defendants created Fifth Third's façade of success, growth and strong future business prospects through a variety of material misstatements, omissions and accounting manipulations, as described herein.

477.    On October 19, 2007, the first day of the Class Period, Fifth Third announced its financial results for the third quarter of 2007, including earnings of $376 million, or $0.71 per diluted share.  The Company reported a $139 provision for loan losses, which represented a modest increase from the $121 million it had set aside in the previous quarter.  Further, Defendants represented that the Company was well-capitalized.  Following this news, the price of Fifth Third shares closed relatively flat at $29.97 per share.

478.    During the Class Period, Defendants maintained the artificial inflation in Fifth Third's stock prices by continuing to make false and misleading statements regarding the purported good credit quality of the Company's loan portfolio, and its repeated claims that it was a "prime lender" that did not engage in subprime lending and it maintained conservative lending,

underwriting and risk control standards, and that the deterioration of its loan portfolio, which resulted in significant increases in nonperforming assets and write-downs, and necessitated substantial increases in loan loss provisions, was caused by general macroeconomic conditions and, in particular, negative trends in the Florida and Michigan real estate markets, when in fact, the Company's mounting loan losses were a known, direct and foreseeable consequence of the Company's outright abandonment of conservative lending standards in order to grow the Company's commercial and consumer lending business.  But for Defendants' material misstatements and omissions, as alleged herein, Fifth Third's securities would not have traded at the elevated levels they did during the Class Period.

479.    The artificial inflation in Fifth Third's securities prices began to be eliminated when, on June 18, 2008, the market learned that, contrary to Defendants' Class Period statements, Fifth Third needed to raise $3 billion in additional capital as a result of the substantial deterioration of the Company's tier 1 Capital, and, in particular, its loan portfolio, as reflect by the Company's disclosure that nonperforming assets were expected to increase 40%-45% for the second quarter of 2008.  In order to raise the needed capital, the Company unveiled a plan for a $1 billion convertible preferred stock offering, the sale of "non-core businesses," and cutting its dividend by 66%, from $0.44 per share to $0.15 per share.  The deterioration of the Company's tier 1 Capital – marked by an expected 40%-45% quarterly increase in nonperforming assets – represented a materialization of the risks created by the Company's undisclosed abandonment of conservative lending standards, which the market now understood to be at a far greater risk of further deterioration.  Defendants also announced that Fifth Third was taking actions to "specifically tighten [] underwriting limits and exception authorities and was undertaking a "major expansion of commercial and consumer workout teams."

480.     As a direct and proximate result of these revelations, the price of **Fifth Third common stock fell 27.25%,** from $12.73 per share on June 17, 2008, to close at $9.26 per share on June 18, 2007 (a drop of $3.47), on unusually heavy trading volume of 104,273,655 shares traded.  The **Preferred B Shares dropped 7.58%**, from $18.00 per share to close at $16.64 per share on June 18, 2008, on unusually heavy volume of 146,494 shares traded.  The **Preferred C Shares dropped 6.53%**, from $22.68 per share to close at $21.20 per share on June 18, 2008, on unusually heavy volume of 89,800 shares traded.  By comparison, the stock market, as reflected by the **S&P Bank Index declined by only 2.9%** and the **S&P Preferred Stock Index fell by only 0.77%**.

481.     The foregoing allegations describe Lead Plaintiff's theory of damages, demonstrate that Lead Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any inference that Lead Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to the false and misleading information complained of herein.

## XI.     INAPPLICABILITY OF THE SAFE HARBOR

482.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint, because the specific statements pleaded herein were neither identified as "forward-looking statements" when made, nor accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.  To the extent that the statutory safe harbor applies to any of the statements pleaded herein, Defendants are liable for those statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement

was false, and/or the forward-looking statement was made by or with the approval of an executive officer of the Company who knew that the statement was false or misleading when made.

## XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

483.    At all relevant times, the market for Fifth Third common stock, Preferred B Shares and Preferred C Shares was an efficient market for the following reasons, among others:

a.  Fifth Third common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and technologically advanced equities market;

b.  Fifth Third Preferred B Shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and technologically advanced equities market;

c.  Fifth Third Preferred C Shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and technologically advanced equities market;

d.  As a regulated issuer, Fifth Third filed periodic public reports with the SEC and the NASDAQ;

e.  According to the Third Quarter 2007 10-Q, as of October 31, 2007, there were 532,651,493 shares of Fifth Third common stock outstanding.  According to the First Quarter 2008 10-Q, as of March 31, 2008, there were 532,106,075 shares of Fifth Third common stock outstanding;

f.   According to Bloomberg, during the period from September 30, 2007 to June 30, 2008 (roughly approximating the dates spanning the Class Period), the average number of Fifth Third common shares held by the public was approximately 541,114,000;

g.   According to Bloomberg, during the Class Period, 34,500,000 shares of Fifth Third Preferred B Shares were outstanding;

h.   According to Bloomberg, during the Class Period, 16,000,000 shares of Fifth Third Preferred C Shares were outstanding;

i.   As of December 31, 2007, the Bancorp had approximately 55,961 shareholders of record;

j.   Fifth Third regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

k.   During the Class Period, Fifth Third common stock had a high average weekly trading volume of approximately 37 million shares;

l.   During the Class Period, Fifth Third Preferred B Shares had a high average weekly trading volume of approximately 519,827 shares;

m. During the Class Period, Fifth Third Preferred C Shares had a high average weekly trading volume of approximately 787,958 shares;

n.   During the Class Period, Fifth Third was followed by numerous securities analysts employed by major brokerage and securities research firms, including, but not limited to, Morgan Keegan & Co., Inc., RBC Capital Markets, Deutsche Bank Securities Inc., Punk,

Ziegel & Company, JPMorgan Securities Inc., Fox-Pitt Cochran Caronia Waller, HSBC Securities (USA) Inc., and Ladenburg Thalmann & Co. Inc., who regularly wrote reports that were distributed to certain customers of their respective brokerage and research firms. Each of these reports was publicly available and entered the public marketplace;

o. According to Bloomberg, Fifth Third stock had approximately 62 market makers during the Class Period; and

p. As demonstrated herein, there are "empirical facts" showing causation between corporate events or releases and an immediate response in the price of Fifth Third common stock, Preferred B Shares and Preferred C Shares.

484. As a result of the foregoing, the market for Fifth Third securities promptly digested current information regarding Fifth Third from all publicly available sources and reflected such information in Fifth Third's securities prices.

485. Lead Plaintiffs, Plaintiffs Dinwoodie, Wacksman and Loewenstine, and all other members of the Class purchased shares of Fifth Third common stock, Preferred B Shares, and Preferred C Shares at prices set by the market and did so in reliance on the integrity of those prices. Under these circumstances, all purchasers of Fifth Third common stock, Preferred B Shares and Preferred C Shares during the Class Period suffered similar injury through their purchase of Fifth Third common stock, Preferred B Shares and Preferred C Shares at artificially inflated prices, and a presumption of reliance applies.

## XIII. PLAINTIFFS' EXCHANGE ACT CLAIMS

### A. COUNT XII – For Violations of §10(b) of the Exchange Act and Rule 10b-5 against Defendant Fifth Third and the Individual Defendants

486. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

487.    Fifth Third and the Individual Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct, to make materially false and misleading statements about the Company's financial condition and operations, and to conceal adverse material information about the Company.  They employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and courses of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about the Company not misleading, as set forth more particularly in the paragraphs herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

488.    Fifth Third and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such misrepresentations and/or omissions were done knowingly or recklessly with for the purpose and effect of concealing the true information about the Company's financial condition and operations from the investing public and artificially inflating the price of its securities.

489.    Fifth Third and the Individual Defendants each acted with scienter in that each knew that the Company's public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated in the issuance or dissemination of such statements or documents as primary violators of the Exchange Act.

490. Fifth Third and the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company and its business practices, their control over and/or receipt of Fifth Third's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

491. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Fifth Third's securities were artificially inflated during the Class Period.

492. In ignorance of the materially false and misleading nature of the reports and statements described above, Lead Plaintiffs and the other members of the Class relied, to their detriment, on the integrity of the market for the Company's securities and the completeness and accuracy of the information disseminated to the Company's investors in connection with their purchase of the Company's securities.

493. By virtue of the foregoing, Fifth Third and the Individual Defendants each have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and Lead Plaintiffs and the Class have been damaged thereby, in an amount to be proven at trial.

**B.**     **COUNT XIII – Against the Individual Defendants for Violations of §20(a) of the Exchange Act**

494.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

495.     The Individual Defendants acted as controlling persons of Fifth Third within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company and/or their ownership of Fifth Third securities, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements alleged by Lead Plaintiffs.  The Individual Defendants formulated and carried out, or were provided with or had unlimited access to information about, among other things, the undisclosed high risk lending practices and materially deficient lending and underwriting policies prior to and during the Class Period as well as copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

496.     In particular, each of the Individual Defendants had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

497.     As set forth above, Fifth Third and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead

Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## XIV.  <u>JURY TRIAL DEMANDED</u>

Lead Plaintiffs hereby demand a trial by jury.

Dated: April 3, 2009

By: _____/s/ Phyllis E. Brown_____
Phyllis E. Brown, Esq.
**LAW OFFICES OF PHYLLIS E. BROWN**
119 East Court Street
Cincinnati, Ohio  45202
Phone:  (513) 241-0061
Fax:  (513) 621-7086

*Liaison Counsel for Plaintiffs and the Class*

Sherrie R. Savett, Esq.
Michael T. Fantini, Esq.
Barbara A. Podell, Esq.
Eric Lechtzin, Esq.
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania  19103
Phone: (215) 875-3000
Fax:  (215) 875-4604
E-mail:  ssavett@bm.net
E-mail: mfantini@bm.net
E-mail:  bpodell@bm.net
E-mail:  elechtzin@bm.net

Paul J. Geller, Esq.
Douglas Wilens, Esq.
Jack Reise, Esq.
Stephen R. Astley, Esq.
**COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP**
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida  33432-4809
Phone:  (561) 750-3000
Fax:  (561) 750-3364 (fax)
E-mail:  pgeller@csgrr.com
E-mail:  dwilens@csgrr.com
E-mail:  jreise@csgrr.com
E-mail: sastley@csgrr.com

*Co-Lead Counsel for Plaintiffs and the Class*

Daniel W. Krasner
Robert B. Weintraub
**WOLF HALDENSTEIN ADLER FREEMAN
  & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Phone:  (212) 545-4600
Fax:  (212) 545-4653
E-mail:  krasner@whafh.com
E-mail:  weintraub@whafh.com

Michael R. Schmidt, Ohio Atty. No. (0022999)
Donald J. Rafferty, Ohio Atty. No. (0042614)
**COHEN, TODD, KITE & STANFORD, LLC**
250 East Fifth Street, Suite 1200
Cincinnati, OH 45202
Phone:  (513) 421-4020
Fax:  (513) 241-4495
E-mail:  mschmidt@ctks.com
E-mail:  drafferty@ctks.com

*Co-counsel for Plaintiff Leon H. Loewenstine as*
*Proposed Class Representative for the Preferred C Class*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on April 3, 2009, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record who are registered on the CM/ECF system.

/s/ Phyllis E. Brown          

Phyllis E. Brown, Esq.

**FIFTH THIRD BANCORP**
**CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAW**

Edwin B. Shelton ("Plaintiff") duly swears and says, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint filed against Fifth Third Bancorp ("Fifth Third") and certain of its officers.

2. I did not purchase the security that is the subject of this action at the direction of my counsel or in order to participate in this private action.

3. I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. I was a holder of 72,990 shares of First Charter Corp. common stock as of November 26, 2007. I acquired Fifth Third common stock pursuant or traceable to the Registration Statement on Form S-4 filed with the SEC by Fifth Third on November 7, 2007, as amended on November 29, 2007 (Registration No. 333-147192). My transactions in the securities of Fifth Third between and including October 19, 2007 through June 17, 2008 are as follows:

| SECURITIES PURCHASED OR ACQUIRED | DATE OF PURCHASE PURCHASE | PRICE PER SHARE |
|---|---|---|
| | (See attached) | |
| SECURITIES SOLD | DATE OF SALE | PRICE PER SHARE |
| | (See attached) | |

5. I have not sought to serve as a class representative in any other action filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed.

6. I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _18_ day of _August_, 2008.

By: _Edwin B. Shelton_
Edwin B. Shelton

### EDWIN B SHELTON

### Transactions in Shares of Fifth Third Bancorp Acquired in Exchange for Shares of First Charter Corp. or During Period from October 19, 2007 through June 17, 2008

| Trade & Settlement Date | Transaction Type | No. Shares Bought | Purchase Price / Share | No. Shares Sold | Price / Share Sold |
|---|---|---|---|---|---|
| **First Charter Corp Shares Held November 26, 2007** | | | | | |
| 11/26/07 | Held | 70,750.00 | | | |
| 11/26/07 | Held | 2,240.00 | | | |
| **Total Held** | | **72,990.00** | | | |
| | | | | | |
| **Fifth Third Bancorp Shares Acquired in Exchange for First Charter Corp. Shares** | | | | | |
| 6/6/08 & Rec'd 6/18/08 | Merger-Acquisition | 123,137.00 | $17.804 | | |
| 6/6/08 & Rec'd 6/18/08 | Merger-Acquisition | 3,900.00 | $17.804 | | |
| 6/6/08 & Rec'd 6/18/08 | Merger-Acquisition | 0.39 | $17.804 | | |
| 6/6/08 & Rec'd 6/18/08 | Payment for Fractional Shr. | | | 0.39 | $17.804 |
| 6/6/08 & Rec'd 6/18/08 | Merger-Acquisition | 0.17 | $17.804 | | |
| 6/6/08 & Rec'd 6/18/08 | Payment for Fractional Shr. | | | 0.17 | $17.804 |
| 6/6/08 & Rec'd 6/19/08 | Transfer-in of shares acquired in merger | 696.00 | $17.804 | | |
| **Total for Acquisition** | | **127,733.56** | | **0.56** | |
| | | | | | |
| **Sale of Shares Acquired in Exchange for First Charter Shares (Settlement Date Only)** | | | | | |
| 06/26/08 | Sell | | | 60,000.00 | $10.050 |
| 06/26/08 | Sell | | | 35,368.00 | $10.400 |
| 06/26/08 | Sell | | | 4,400.00 | $10.410 |
| 06/26/08 | Sell | | | 200.00 | $10.405 |
| 06/26/08 | Sell | | | 23,865.00 | $9.900 |
| 07/11/08 | Sell | | | 3,900.00 | $10.820 |
| **Subtotal of Sales of Acquisition Shares** | | | | **127,733.00** | |

**EDWIN B SHELTON**

**Transactions in Shares of Fifth Third Bancorp Acquired in Exchange for Shares of First
Charter Corp. or During Period from October 19, 2007 through June 17, 2008**

| Trade & Settlement Date | Transaction Type | No. Shares Bought | Purchase Price / Share | No. Shares Sold | Price / Share Sold |
|---|---|---|---|---|---|
| | | | | | |
| **Additional Open Market Transactions (Settlement Date Only)** | | | | | |
| 04/24/08 | Buy | 10,000.00 | $19.400 | | |
| 04/24/08 | Buy | 10,000.00 | $19.500 | | |
| 04/24/08 | Buy | 10,000.00 | $19.700 | | |
| 04/25/08 | Sell | | | 30,000.00 | $20.700 |
| 04/28/08 | Buy | 10,000.00 | $19.650 | | |
| 04/28/08 | Buy | 10,000.00 | $20.000 | | |
| 04/28/08 | Buy | 10,000.00 | $21.000 | | |
| 04/28/08 | Sell | | | 4,500.00 | $20.830 |
| 04/28/08 | Sell | | | 2,700.00 | $20.800 |
| 04/28/08 | Sell | | | 2,300.00 | $20.830 |
| 04/28/08 | Sell | | | 500.00 | $20.810 |
| 04/28/08 | Sell | | | 20,000.00 | $21.500 |
| 05/01/08 | Buy | 10,000.00 | $22.000 | | |
| 05/06/08 | Sell | | | 10,000.00 | $22.600 |
| 05/21/08 | Buy | 10,000.00 | $20.360 | | |
| 05/21/08 | Buy | 5,000.00 | $19.350 | | |
| 06/05/05 | Buy | 5,000.00 | $18.000 | | |
| 06/23/08 | Sell | | | 20,000.00 | $10.800 |
| **TOTAL** | | **90,000.00** | | **90,000.00** | |

Page 2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

LOCAL 295/LOCAL 851 IBT EMPLOYER GROUP PENSION TRUST AND
WELFARE FUNDS ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
| --- | --- | --- | --- |

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

FIFTH THIRD

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of August , 2008.

> LOCAL 295/LOCAL 851 IBT EMPLOYER GROUP PENSION TRUST AND WELFARE FUNDS

By: _Neil J Savasta_

Its: _Administrator_

- 2 -

FIFTH THIRD

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 10/19/2007 | 1,900 | $29.98 |
| 10/23/2007 | 10,400 | $29.99 |
| 10/24/2007 | 5,900 | $29.27 |
| 10/29/2007 | 5,200 | $29.57 |
| 10/29/2007 | 11,900 | $29.52 |
| 11/02/2007 | 2,000 | $29.45 |
| 03/07/2008 | 560 | $21.71 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 12/06/2007 | 1,100 | $29.45 |
| 12/12/2007 | 8,600 | $28.17 |
| 02/12/2008 | 3,000 | $26.26 |
| 02/12/2008 | 5,100 | $26.19 |
| 02/13/2008 | 1,800 | $25.64 |
| 02/14/2008 | 1,100 | $25.64 |
| 04/22/2008 | 560 | $20.49 |
| 06/26/2008 | 13,800 | $10.33 |
| 07/07/2008 | 2,800 | $10.17 |

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

DISTRICT NO. 9, I.A. OF M. & A.W. PENSION TRUST ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint filed in this matter.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

See attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*In re RenaissanceRe Holdings, Ltd. Sec. Litig.*, No. 1:05-cv-06764-WHP (S.D.N.Y.)
*Apple v. LJ International Inc., et al.* No. 2:07-cv-06076-GAF-JWJ (C.D. Cal.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*In re Security Capital Assurance Ltd. Sec. Litig.*, No. 07-CV-11086(DAB)(S.D.N.Y.)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Mavilia v. J. Roger Moyer, Jr., et al.*, No. 1:07-cv-04108-JGK (S.D.N.Y.)
*In re Luminent Mortgage Capital, Inc. Sec. Litig.*, No. 3:07-cv-04073-PJH (N.D. Cal.)
*Ploss v. BankAtlantic Bancorp, Inc., et al.*, No. 1:07-cv-10937-SWK (S.D.N.Y.)

FIFTH THIRD

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _18_ day of _August_, 2008.

DISTRICT NO. 9, I.A. OF M. & A.W.
PENSION TRUST

By: _Roger E. Poole_,

Its: _Managing Trustee_

-2-

FIFTH THIRD

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 10/24/2007 | 8,700 | $29.17 |
| 10/30/2007 | 11,700 | $30.07 |
| 02/13/2008 | 400 | $25.78 |
| 04/22/2008 | 8,200 | $19.56 |

**Sales**

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| 06/23/2008 | 400 | $9.90 |
| 07/15/2008 | 10,700 | $10.60 |
| 07/16/2008 | 17,900 | $11.36 |

**FIFTH THIRD BANCORP**
**CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAW**

Jacqueline Dinwoodie ("Plaintiff") duly swears and says, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint filed against Fifth Third Bancorp ("Fifth Third") and certain of its officers and authorize its filing.

2. I did not purchase the security that is the subject of this action at the direction of my counsel or in order to participate in this private action.

3. I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in Fifth Third Capital Trust VI, Preferred B (symbol "FTB.PRB") between and including October 19, 2007 through June 17, 2008 are as follows:

| SECURITIES PURCHASED OR ACQUIRED | DATE OF PURCHASE PURCHASE | PRICE PER SHARE |
|---|---|---|
| **500** | **04/16/2008** | **$22.114** |

| SECURITIES SOLD | DATE OF SALE | PRICE PER SHARE |
|---|---|---|
| **NONE** | | |

5. I have not sought to serve as a class representative in any other action filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed.

6. I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _9_ day of _JAN._, 2009.

By: _Jacqueline Dinwoodie_
JACQUELINE DINWOODIE
919 Grand Court
Cincinnati, OH 45246

Apellidos: Carrera
Nombres: Linda

**FIFTH THIRD BANCORP**
**CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAW**

Jeffrey J. Wacksman ("Plaintiff") duly swears and says, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint filed against Fifth Third Bancorp ("Fifth Third") and certain of its officers and authorize its filing.

2. I did not purchase the security that is the subject of this action at the direction of my counsel or in order to participate in this private action.

3. I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in Fifth Third Capital Trust VI, Preferred B (symbol "FTB.PRB") between and including October 19, 2007 through June 17, 2008 are as follows:

| SECURITIES PURCHASED OR ACQUIRED | DATE OF PURCHASE PURCHASE | PRICE PER SHARE |
|---|---|---|
| 1,000 | 04/02/2008 | $21.8799 |

| SECURITIES SOLD | DATE OF SALE | PRICE PER SHARE |
|---|---|---|
| NONE | | |

5. I have not sought to serve as a class representative in any other action filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed.

6. I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___15___ day of ___Jun___, 2009.

By: _____
JEFFREY J. WACKSMAN
3521 Heron Glen Court
Bonita Springs, FL 34134

## PLAINTIFF'S CERTIFICATION

I, LEON H LOEWENSTINE, declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the Complaint.

2.    I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in Fifth Third Bancorp, Fifth Third Capital Trust VI, Preferred B, securities during the Class Period specified in the Complaint are as follows:

| Security | Date | Number of Shares Purchased | Number of Shares Sold | Price |
|---|---|---|---|---|
| 5/3 BonA 5.450 | 3/3/08 | # 100,000 | | 94868 |
| 5/3 Pre 8.78 | 4/30/08 | 4000 | | 100,000 25 |
| CUSIP 3167802044 FTB PR C | | | | |
| | | | | |

5.    During the three years prior to the date of this Certificate, I have not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.    I will not accept any payment for serving as a representative party on behalf of the class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of July, 2008.

1628750_1.DOC