# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| **LOCAL 295/LOCAL 851 IBT EMPLOYER GROUP PENSION TRUST AND WELFARE FUNDS AND DISTRICT NO. 9**, *et al.*, | ) ) ) | **Case No. 1:08-cv-421** |
| **Plaintiffs,** | ) ) ) | **(Judge Sandra S. Beckwith)** **(Magistrate Judge Timothy S. Black)** |
| -v- | ) ) | |
| **FIFTH THIRD BANCORP**, *et al.*, | ) ) | |
| **Defendants**. | ) ) | |

## <u>DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT WITH MEMORANDUM IN SUPPORT</u>

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, all Defendants in this action move the Court for an Order dismissing Plaintiffs' Consolidated Class Action Complaint for failure to state a claim upon which relief can be granted and failure to adequately plead securities fraud and scienter.  This Motion is supported by the attached Memorandum in Support and the exhibits filed as attachments to the Affidavit of Joseph M. Callow, Jr., filed separately.

Dated:  July 15, 2009

Respectfully submitted,

s/ James E. Burke
James E. Burke (0032731)
Joseph M. Callow, Jr. (0061814)
Jennifer J. Morales (0076835)
Danielle M. D'Addesa (0076513)
Anthony M. Verticchio (0084645)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Telephone: (513) 579-6400
E-mail: jburke@kmklaw.com
        jcallow@kmklaw.com
        jmorales@kmklaw.com
        ddaddesa@kmklaw.com
        averticchio@kmklaw.com

*Attorneys for Fifth Third Bancorp, Fifth Third
Securities, Fifth Third Capital Trust VI, Fifth
Third Capital Trust VII, Kevin T. Kabat,
Christopher G. Marshall, and Daniel T.
Poston*

-and-

s/ Glenn Virgil Whitaker
Glenn Virgil Whitaker (0018169)
Mary C. Henkel (0039563)
Dorothea K. Langsam (0082973)
VORYS, SATER, SEYMOUR AND PEASE LLP
221 East Fourth Street, Suite 2000
Atrium Two
Cincinnati, Ohio 45202
Telephone: (513) 723-4000
E-mail: gvwhitaker@vorys.com
        mchenkel@vorys.com
        dklangsam@vorys.com

*Attorneys for Darryl F. Allen, John F. Barrett,
Ulysses L. Bridgeman, Jr., James P. Hackett,
Gary R. Heminger, Joan R. Herschede, Allen
M. Hill, Robert L. Kock, II, Mitchel D.
Livingston, Ph.D., Hendrik G. Meijer, James
E. Rogers, George A. Schaeffer, Jr., John J.
Schiff, Jr., and Dudley S. Taft*

-and-

s/ Robert A. Pitcairn, Jr.
Robert A. Pitcairn, Jr. (0010293)
KATZ, TELLER, BRANT & HILD
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202
Telephone:  (513) 977-3477
E-mail:  rpitcairn@katzteller.com

*Attorney for Defendants UBS Securities LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated, Wachovia Capital Markets, LLC, Banc of America Securities LLC, Credit Suisse Securities (USA) LLC and Barclays Capital Inc.*

OF COUNSEL:

Herbert S. Washer
Adam S. Hakki
Daniel Lewis
SHEARMAN & STERLING LLP
559 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
E-mail: herbert.washer@shearman.com
        ahakki@shearman.com
        daniel.lewis@shearman.com

Laura A. Hinegardner
KATZ, TELLER, BRANT & HILD
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202
Telephone: (513) 977-3484
E-mail: lhinegardner@katzteller.com

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................1

II.   SUMMARY OF PRINCIPAL ARGUMENTS AND PRIMARY
      AUTHORITIES RELIED UPON.........................................................................2

      A.    Securities Exchange Act Claims (Counts XII – XIII Under Sections 10(b)
            and 20(a) and Rule 10b-5; Asserted Against Fifth Third and the Individual
            Defendants)...............................................................................................2

            1.    Section 10(b) and Rule 10b-5 Claims Must Satisfy Exacting
                  Pleading Requirementss...................................................................2

            2.    The CAC Fails to Plead an Actionable Misstatement or Omission............2

            3.    The CAC Fails to Raise a Strong Inference of Scienter ............................3

            4.    Plaintiffs Fail to Adequately Allege Loss Causation...................................4

            5.    The CAC Does Not State a Claim Under Section 20(a) Against the
                  Individual Defendants ..................................................................4

      B.    Securities Act Claims (Counts I – III and VI – XI Under Sections 11,
            12(a)(2), and 15; Asserted Against Fifth Third, the Individual Defendants,
            the Director Defendants, the Trust Defendants, and the Underwriter
            Defendants) ...............................................................................................5

            1.    Plaintiffs Fail to Allege an Actionable Misstatement or an
                  Omission Under Section 11 .........................................................5

            2.    Plaintiffs' Section 11 Claims Sound in Fraud and Therefore Must
                  Be Pled with Particularity ...........................................................5

            3.    Negative Loss Causation Is Apparent from Plaintiffs' CAC,
                  Warranting Dismissal of the Section 11 Claims........................................6

            4.    Plaintiffs' Section 12(a)(2) Claims Should Be Dismissed..........................6

            5.    Plaintiffs' Claims Under Section 15 of the Securities Act Also Fail..........6

      C.    Claims in Connection with First Charter Proxy/Registration Statement
            (Counts IV – V Under Sections 14(a) and 20(a) of the Exchange Act and
            Rule 14a-9; Asserted Against Fifth Third and the Individual Defendants)............7

      D.    Allowing Plaintiffs to Amend the CAC Would Be Futile ......................................7

III.   THE PARTIES .................................................................................................... 7

IV.   FACTUAL ALLEGATIONS .............................................................................. 9

    A.    The Global Financial Meltdown of 2008 ............................................... 11

    B.    Fifth Third's Public Disclosures ............................................................ 14

        1.    Disclosures Made Prior to October 19, 2007 ............................ 14

            a.    Disclosures Regarding the Real Estate Market/Loan Performance ................................................................. 14

            b.    Disclosures Regarding Concerns over the Economy in General ........................................................................ 17

        2.    Disclosures Made During the Proposed Class Period ................ 18

            a.    Disclosures Pertaining to Fifth Third's Exposure .......... 18

            b.    Disclosures Concerning Credit Deterioration ............... 20

            c.    Disclosures Describing an Increase in Reserves for Loan Losses .............................................................. 21

            d.    Disclosures Relating to Loan Composition ................... 22

            e.    Disclosures on Financial Ratios .................................... 24

        3.    Fifth Third's June 18, 2008 Form 8-K and Related Press Release ............ 25

    C.    Fifth Third's Share Prices ..................................................................... 25

    D.    Plaintiffs' Consolidated Class Action Complaint and the Onslaught of Securities Filings Relating to the Worldwide Financial Meltdown of 2008 ......... 27

        1.    Plaintiffs' Consolidated Class Action Complaint ...................... 27

            a.    Statements that Allegedly Concealed Fifth Third's Loan Underwriting Standards ................................. 27

            b.    Statements that Allegedly Concealed the Supposed Insufficiency of Fifth Third's Provision for Loan Losses ............ 28

            c.    Statements that Allegedly Concealed the Supposed Deterioration of Fifth Third's Capital Structure ............ 29

        2.    The Onslaught of Securities Filings ............................................ 29

V.    ARGUMENT ...................................................................................................33

      A.    The Securities Exchange Act Claims Must Be Dismissed (Counts XII –
            XIII Under Sections 10(b) and 20(a) and Rule 10b-5; Asserted Against
            Fifth Third and the Individual Defendants). ...........................................34

            1.    Section 10(b) and Rule 10b-5 Claims Must Satisfy Exacting
                  Pleading Requirements ...............................................................34

            2.    The CAC Fails to Plead an Actionable Misstatement or Omission ..........35

                  a.    Plaintiffs Fail to Allege an Actionable Misstatement or an
                        Omission Under Section 11 or Section 12(a)(2) in Light of
                        Fifth Third's Disclosures ................................................36

                  b.    Allegations of Mismanagement Are Not Actionable Under
                        Section 10(b). ..............................................................38

                  c.    Optimistic and Vague Statements Are Not Actionable ................41

                        i.    Loan Underwriting Standards ...........................................42

                        ii.   Capitalization ................................................................44

                  d.    Fifth Third's Statements Regarding Reserve Projections
                        and Capital Targets Are Not Actionable Under the
                        PSLRA's Safe Harbor Provision. ...................................44

                        i.    Loan Loss Reserves .........................................................45

                        ii.   Capitalization ................................................................47

                  e.    GAAP-Based Allegations Are Insufficient to Establish
                        Falsity When No Facts Are Presented Showing that the
                        Statements Were Known to Be False at the Time They
                        Were Made. ..................................................................47

                  f.    Fifth Third's Disclosures Were Accurate .....................................49

                  g.    The Alleged Omissions Have No Relation to the
                        Statements that Plaintiffs Allege to Be False ................................52

            3.    The CAC Fails to Raise a Strong Inference of Scienter ...........................54

                  a.    The More Compelling Inference Is that Fifth Third, Along
                        with Many Other Financial Institutions, Suffered from an
                        Unexpected Economic Meltdown and Updated Its Financial
                        Disclosures Accordingly ...............................................55

b. Plaintiffs Cannot Use Group Pleading to Establish Scienter .........57

c. Plaintiffs Inadequately Allege Motive and Opportunity for Any Defendant to Commit Securities Fraud ...................................58

d. Plaintiffs Fail to Show Conscious Misbehavior or Recklessness by Any Defendant. ....................................................60

    i. None of the Confidential Witness Statements Alleges that Any Defendant Had Knowledge of Alleged Misbehavior ......................................................60

    ii. The CAC Does Not State What the Reports that Defendants Allegedly Received Would Have Told Them About Corporate Misbehavior. ...............................62

        (A) Summary Reports .....................................................63

        (B) ACAPS System ........................................................64

    iii. Generalized Imputations of Knowledge Based on a Position within Fifth Third Are Insufficient to Establish Scienter. ...............................................................65

    iv. Allegations that a Particular Individual Served on a Committee Are Insufficient to Establish Scienter. ............67

e. Scienter Cannot Be Established through the Signing of a Public Disclosure. ............................................................................68

f. Plaintiffs' Remaining Attempts to Establish a Strong Inference of Scienter Also Fail. ......................................................68

4. Plaintiffs Fail to Adequately Allege Loss Causation. ................................70

a. No Falsity Was Ever Revealed to the Market. ...............................70

b. Plaintiffs Fail to Distinguish the Drop in Stock Price from the Broad Market Downturn. ...........................................................71

5. The CAC Does Not State a Claim Under Section 20(a) Against the Individual Defendants ................................................................................73

a. Plaintiffs Have Failed to Plead a Predicate Violation of the Securities Laws .............................................................................73

b. Plaintiffs Have Failed to Allege Culpable Participation by Any of the Individual Defendants. ...................................................74

B.    The Securities Act Claims Must Be Dismissed (Counts I – III and VI – XI Under Sections 11, 12(a)(2), and 15; Asserted Against Fifth Third, the Individual Defendants, the Director Defendants, the Trust Defendants, and the Underwriter Defendants) .................................................................................74

       1.    Plaintiffs Fail to Allege an Actionable Misstatement or Omission Under Section 11 .....................................................................................76

            a.    Loan Loss Reserves ...........................................................76

            b.    Capital Ratio .......................................................................78

            c.    Loan Underwriting Standards ............................................80

            d.    Consideration in First Charter Acquisition .......................80

       2.    Plaintiffs' Section 11 Claims Sound in Fraud and Therefore Must Be Pled with Particularity. ..........................................................................81

       3.    Negative Loss Causation Is Apparent from Plaintiffs' CAC, Warranting Dismissal of the Section 11 Claims. .....................................84

       4.    Plaintiffs' Section 12(a)(2) Claims Should Be Dismissed. .......................85

       5.    Plaintiffs' Claims Under Section 15 of the Securities Act Also Fail. ........89

C.    The Claims in Connection with First Charter Proxy/Registration Statement Must Be Dismissed (Counts IV – V Under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9; Asserted Against Fifth Third and the Individual Defendants) ...............................................................................................89

       1.    Plaintiffs' Section 14 Claim Sounds in Fraud and Therefore Must Be Pled with Particularity ...............................................................................90

       2.    Plaintiffs Do Not Allege that Defendants Negligently Made Any False Statements ........................................................................................90

       3.    Plaintiffs' Section 20 Claims Likewise Fail ..............................................90

D.    Allowing Plaintiffs to Amend the CAC Would Be Futile .....................................91

VI.    CONCLUSION ....................................................................................................................92

## <u>TABLE OF AUTHORITIES</u>

### CASES

*In re 2007 Novastar Financial, Inc. Securities Litigation*, No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) ................................................. *passim*

*Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002) ...................................................... 66

*In re Acceptance Insurance Co.*, 423 F.3d 899 (8th Cir. 2005) .................................................... 78

*In re Advanta Corp. Securities Litigation*, 180 F.3d 525 (3d Cir. 1999) ..................................... 66

*Alaska Electrical Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815 (S.D. Cal. 2006) .............. 48

*Albert Fadem Trust v. American Electric Power Co.*, 334 F. Supp. 2d 985 (S.D. Ohio 2004) ............................................................................................................. *passim*

*In re American Business Financial Services, Inc. Securities Litigation*, 413 F. Supp. 2d 378 (E.D. Pa. 2005) ............................................................................................................ 41

*In re America Service Group, Inc.*, No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) .................................................................................................... 5, 45, 77

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ....................................................... 33, 84, 88

*Auslender v. Energy Management Corp.*, 832 F.2d 354 (6th Cir. 1987) .................................. 3, 38

*Backhouse v. Streamedia Communications, Inc.*, No. 01 CIV 4889, 2002 WL 1870272 (S.D.N.Y. Aug. 14, 2002) .......................................................................................... 86

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ........................................................................ *passim*

*Bastian v. Petren Resource Corp.*, 892 F.2d 680 (7th Cir. 1990) ................................................ 10

*Beaver County Retirement Board v. LCA-Vision, Inc.*, No. 1:07-CV-750, 2009 WL 806714 (S.D. Ohio Mar. 25, 2009) .................................................................................. 45, 62

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... *passim*

*Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356 (6th Cir. 2001) ........................................... 11

*Brody v. Transitional Hospitals Corp.*, 280 F.3d 997 (9th Cir. 2002) ......................................... 37

*In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997) .................... 60

*Butler v. Aetna U.S. Healthcare, Inc.*, 109 F. Supp. 2d 856 (S.D. Ohio 1999) ............................33

*In re CIT Group, Inc. Securities Litigation*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004)....................78

*California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126
    (3d Cir. 2004)................................................................................ *passim*

*City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651
    (6th Cir. 2005)................................................................................ *passim*

*In re Comshare, Inc. Securities Litigation*, 183 F.3d 542 (6th Cir. 1999).........................34, 35, 58

*Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957 (2d Cir. 1987)....................................84

*In re Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132
    (C.D. Cal. 2008)................................................................................84

*In re Daou System*, 411 F.3d 1006 (9th Cir. 2005)........................................................60

*D.E.&J. LP v. Conaway*, 133 F. App'x 994 (6th Cir. June 10, 2005) .......................................4, 71

*DeMaria v. Andersen*, 153 F. Supp. 2d 300 (S.D.N.Y. 2001) ..............................................88

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) ............................................................31

*Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000) ...............................................90

*In re Deutsche Telekom AG Securities Litigation*, No. 00 CIV 9475 SHS, 2002 WL
    244597 (S.D.N.Y. Feb. 20, 2002) ........................................................88

*In re Diebold Securities Litigation*, No. 5:05CV2873, 2008 WL 3927467 (N.D. Ohio
    Aug. 22, 2008) ...........................................................................60, 62

*In re Donald J. Trump Casino Securities Litigation-Taj Mahal Litigation*, 7 F.3d 357
    (3d Cir. 1993)................................................................................51

*In re Downey Securities Litigation*, No. CV 08-3261-JFW, 2009 WL 736802
    (C.D. Cal. Mar. 18, 2009) ..........................................................31, 41, 44, 56

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ......................................... *passim*

*In re Elan Corp. Securities Litigation*, No. 02 Civ. 865, 2004 WL 1305845 (S.D.N.Y.
    May 18, 2004)................................................................................83

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).......................................................35

*In re Ferro Corp.*, Nos. 1:04CV1440, 1:04CV1589, 2007 WL 1691358 (June 11, 2007 N.D. Ohio) ................................................................................................60

*In re FirstEnergy Corp. Securities Litigation*, 316 F. Supp. 2d 581 (N.D. Ohio 2004)...............87

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)...........................10, 71

*In re Fleming Companies Inc. Securities & Derivative Litigation*, No. CIVA503MD1530TJW, 2004 WL 5278716 (E.D. Tex. June 16, 2004).........................87

*In re Ford Motor Co. Securities Litigation*, 381 F.3d 563 (6th Cir. 2004).........................3, 41, 44

*Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008)....................................................................35

*Fryling v. Merrill Lynch, Pierce, Fenner & Smith*, 593 F.2d 736 (6th Cir. 1979) .......................71

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) .....................................59

*Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006).................................................68

*In re Global Crossing, Ltd. Securities Litigation*, 471 F. Supp. 2d 338 (S.D.N.Y. 2006) ...........84

*Grillo v. Tempur-Pedic International, Inc.*, 553 F. Supp. 2d 809 (E.D. Ky. 2008).............4, 63, 64

*Gruhn v. Tween Brands, Inc.*, Nos. 2:07-cv-852, 2:07-cv-894, 2:07-cv-925, 2009 WL 1542795 (S.D. Ohio June 2, 2009) ..........................................................63

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999)..............................................................11, 45

*Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 261 (S.D.N.Y. 2008) .....................72

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) ....................................................3, 45, 54, 55

*Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999) .........................................6, 87

*Higginbotham v. Baxter International, Inc.*, 495 F.3d 753 (7th Cir. 2007)...................................61

*Hinerfeld v. United Auto Group*, 97 Civ. 3533, 1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998) ..............................................................78

*In re Huffy Corp. Securities Litigation*, 577 F. Supp. 2d 968 (S.D. Ohio 2008)......................3, 57

*In re Huntington Bancshares Inc. ERISA Litigation*, No. 2:08-cv-0165, 2009 WL 330308 (S.D. Ohio Feb. 9, 2009)..............................................................32

*In re ICN Pharmaceuticals, Inc. Securities Litigation*, 299 F. Supp. 2d 1055 (C.D. Cal. 2004) ............................................................................................................51

*In re Impac Mortgage Holdings, Inc. Securities Litigation*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008) ........................................................................................ *passim*

*In re JP Morgan Chase Securities Litigation*, No. 02 Civ. 1282, 2007 WL 950132 (S.D.N.Y. Mar. 29, 2007) ..........................................................................41, 42, 49

*J & R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384 (6th Cir. 2008) ...............6, 36, 89

*J & R Marketing, SEP v. General Motors Corp.*, No. 06-10201, 2007 WL 655291 (E.D. Mich. Feb. 27, 2007) .....................................................................................52

*In re K-Tel International, Inc. Securities Litigation*, 300 F.3d 881 (8th Cir. 2002) ....................60

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ................................................................58

*In re Kindred Healthcare, Inc. Securities Litigation*, 299 F. Supp. 2d 724 (W.D. Ky. 2004) ...............................................................................................45, 46, 77

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ...............................................11

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ...............................71, 85

*League of United Latin American Citizens v. Bredesen*, 500 F.3d 523 (6th Cir. 2007) ...............33

*Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008) ............................................. *passim*

*Lindner Dividend Fund, Inc. v. Ernst and Young*, 880 F. Supp. 49 (D. Mass. 1995)...................51

*In re Lockheed Martin Corp. Securities Litigation*, 272 F. Supp. 2d 944 (C.D. Cal. 2003) ........67

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015 (5th Cir. 1996).......................................11, 39

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998).......................................6, 87

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006)................................57

*Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir. 1998) ................................................66

*Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir. 1979) .......................................35

*Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994)..........................................................82

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................................................................85

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 289 F. Supp. 2d 416 (S.D.N.Y. 2003) ........................................................................................54

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 273 F. Supp. 2d 351 (S.D.N.Y. 2003) ........................................................................................11

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 568 F. Supp. 2d 349 (S.D.N.Y. 2008) ...................................................................................71, 73

*Merzin v. Provident Financial Group, Inc.*, 311 F. Supp. 2d 674 (S.D. Ohio 2004) ...................11

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) ............62

*Miller v. Champion Enterprises, Inc.*, 346 F.3d 660 (6th Cir. 2002) ................................... *passim*

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007) .......................................................11

*In re Morgan Stanley and Van Lampen Mutual Fund Securities Litigation*, No. 03 Civ. 8208, 2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. Apr. 14, 2006) ...............................................83

*Morse v. McWherter*, 200 F. Supp. 2d 853 (M.D. Tenn. 1998) ....................................................59

*New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003) ....................................................................................11

*In re New York Community Bancorp, Inc. Securities Litigation*, 448 F. Supp. 2d 466 (E.D.N.Y. 2006) ........................................................................................51

*New York State Teachers' Retirement Systems v. Fremont General Corp.*, No. 2:07-cv-05756-FMC-FFMx, 2008 U.S. Dist. LEXIS 91365 (C.D. Cal. Oct. 28, 2008) ......................32

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ............................................37

*O'Sullivan v. Trident Microsystems, Inc.*, No. C 93-20621, 1994 WL 124453 (N.D. Cal. Jan. 31, 1994) ........................................................................................76

*Panther Partners, Inc. v. Ikanos Communications*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) ..........76

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101 (W.D. Mich. 1996) ...................................................................................74, 76

*Pinter v. Dahl*, 486 U.S. 622 (1988) ........................................................................................6, 86

*Pittleman v. Impac Mortgage Holdings, Inc.,* No. SACV 07-0970 AG, 2009 U.S. Dist. LEXIS 18213 (C.D. Cal. Mar. 9, 2009)............................................................................31, 56

*In re PMI Group, Inc. Securities Litigation*, Nos. C 08-1405 SI, C 08-1406 SI, 2009 WL 1916934 (N.D. Cal. July 1, 2009) .........................................................................................31

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004) ............................................ *passim*

*Pullins v. Klimley*, No. 3:05-CV-082, 2008 WL 85871 (S.D. Ohio Jan. 7, 2008) .......................89

*In re Radian Securities Litigation*, No. 07-3375, 2009 U.S. Dist. LEXIS 30224 (E.D. Pa. Apr. 9, 2009) ........................................................................................... *passim*

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...............................................................5, 81, 83

*San Leandro Emergency Medical Plan v. Philip Morris, Inc.*, 75 F.3d 801 (2d Cir. 1996)..........60

*Sears v. Likens*, 912 F.2d 889 (7th Cir. 1990) ...............................................................................82

*Seattle-First National Bank v. Carlstedt*, 800 F.2d 1008 (10th Cir. 1986)...................................82

*Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3d Cir. 1992) ................................................39, 78

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996) ...........................................62, 81

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ...................................................30

*Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037 (6th Cir. 1991)............................................30, 36

*In re Sirrom Capital Corp. Securities Litigation*, 84 F. Supp. 2d 933 (M.D. Tenn. 1999) ...........39

*In re SmarTalk Teleservices, Inc. Securities Litigation*, 124 F. Supp. 2d 527 (S.D. Ohio 2000) .......................................................................................................................74, 91

*Smith v. American National Bank & Trust Co.*, 982 F.2d 936 (6th Cir. 1992).............................87

*In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997) ..................................3, 51, 53, 80

*Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) ......................................................................................................................57

*In re Splash Technology Holdings, Inc. Securities Litigation*, No. C-99-00109-SBA, 2000 U.S. Dist. LEXIS 15369 (N.D. Cal. Sept. 29, 2000) .....................................74

*In re Stac Electronics Securities Litigation*, 89 F.3d 1399 (9th Cir. 1996) ...................................83

*Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997)........................................................42

*Superintendent of Insurance of New York v. Bankers Life & Casualty Co.*,
    404 U.S. 6 (1971)........................................................................................................38

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ........................................41

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d
    190 (2d Cir. 2008)..............................................................................................62, 65

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...................... *passim*

*In re Tellium, Inc. Securities Litigation*, No. 02CV5878FLW, 2005 WL 2090254
    (D.N.J. Aug. 26, 2005)..........................................................................6, 71, 85

*Thor Power Tool Co. v. Commissioner of Internal Revenue*, 439 U.S. 522 (1979) ....................47

*Tripp v. IndyMac Financial Inc.,* No. CV07-1635-GW, 2007 WL 4591930
    (C.D. Cal. Nov. 29, 2007) ................................................................................ *passim*

*In re United American Healthcare Corp. Securities Litigation*, No. 2:05-CV-72112, 2007
    WL 313491 (E.D. Mich. Jan. 30, 2007)..........................................................39

*United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996) ................................................39

*Venture Associates Corp. v. Zenith Data System Corp.*, 987 F.2d 429 (7th Cir. 1993) ...............33

*In re Verifone Securities Litigation*, 784 F. Supp. 1471 (N.D. Cal. 1992) .............................79, 80

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) .........................................5, 81, 82

*Wagner v. First Horizon Pharm.*, 464 F.3d 1273 (11th Cir. 2006) .........................................5, 81

*Weiner v. Klais & Co.*, 108 F.3d 86 (6th Cir. 1997)................................................................11, 33

*Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007)................................................3, 57, 58

*WorldCom, Inc. Securities Litigation*, No. 02 Civ. 3288, 2005 WL 375314
    (S.D.N.Y. Feb. 17, 2005)..........................................................................85

*In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407 (9th Cir. 1994)..............................60

*Wright v. National Warranty Co.*, 953 F.2d 256 (6th Cir. 1992) ..................................................85

*Zaluski v. United American Healthcare Corp.*, 527 F.3d 564 (6th Cir. 2008) ........................3, 48

## STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 77k ..................................................................................................5, 76

15 U.S.C. § 77z ................................................................................................78, 86

15 U.S.C. § 78j ............................................................................................... *passim*

15 U.S.C. § 78n .....................................................................................................89

15 U.S.C. § 78t ......................................................................................................73

15 U.S.C. § 78u ............................................................................................. *passim*

17 C.F.R. § 230.405 ..............................................................................................74

17 C.F.R. § 240.10b-5 ...........................................................................................34

17 C.F.R. § 240.14a-9 ...........................................................................................89

Fed. R. Civ. P. 12(b)(6) ...................................................................................33, 85

Fed. R. Civ. P. 9(b) ........................................................................................ *passim*

Fed. R. Evid. 201 ..................................................................................................54

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

This case is a purported class action alleging violations of various provisions of the federal securities laws. Plaintiffs' Consolidated Class Action Complaint (the "CAC") does not allege, however, that any of the specific statements or the financial disclosures made in Fifth Third's periodic SEC filings and offering documents were inaccurate. Rather, Plaintiffs claim that when Fifth Third made disclosures about its loan portfolio, credit quality, and financial ratios in late 2007 and the first half of 2008, it knew or should have known that the greatest financial catastrophe since the Great Depression was coming, and should have predicted its ultimate impact. Plaintiffs apparently believe that Fifth Third — which, like every other United States financial institution, saw its economic condition and stock price gutted by the credit crisis — somehow knew what was coming and failed to disclose it. Simply to state Plaintiffs' theory makes clear how preposterous it is. Lack of clairvoyance is not actionable under the federal securities laws. Similarly, to suggest that the drop in Fifth Third's stock price during a selected eight-month period (October 19, 2007 to June 17, 2008) — a period during which the KBW Bank Index[1] dropped 37 percent — is not related to the overall stock market collapse is spurious. Certainly, the CAC contains no specific allegations to support such a leap of logic.

The prolixity of the CAC does not make up for its utter failure to state a claim against any of the Defendants. As explained herein, the CAC is legally deficient and fails to state a claim under settled case law of the Sixth Circuit and the United States Supreme Court. The CAC should be dismissed in its entirety, and with prejudice, for all the following reasons:

---

[1] The KBW (Keefe, Bruyette & Woods) Bank Index consists of 24 U.S. banks, including Fifth Third.

(1)  all the actual facts that Plaintiffs allege were not disclosed (as opposed to unwarranted conclusions and inferences) in fact were disclosed repeatedly and accurately;

(2)  the CAC fails to sufficiently plead facts demonstrating a "strong inference of scienter" under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007);

(3)  the CAC fails to properly allege "loss causation" under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005);

(4)  the CAC fails to plead fraud with particularity; and

(5)  as a result of the foregoing legal deficiencies, the claims against the Individual Defendants, the Director Defendants, the Underwriter Defendants, and the Trust Defendants (defined below) necessarily fail as well and should be dismissed.

## II.  SUMMARY OF PRINCIPAL ARGUMENTS AND PRIMARY AUTHORITIES RELIED UPON

### A.  Securities Exchange Act Claims (Counts XII – XIII Under Sections 10(b) and 20(a) and Rule 10b-5; Asserted Against Fifth Third and the Individual Defendants) (p. 34)

#### 1.  Section 10(b) and Rule 10b-5 Claims Must Satisfy Exacting Pleading Requirements. (p. 34)

Under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA, to survive a motion to dismiss, plaintiffs must specify each statement alleged to have been misleading, and state the reasons why the statement is misleading.  15 U.S.C. § 78u-4(b)(1).  Additionally, the inference of scienter raised by the complaint must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

#### 2.  The CAC Fails to Plead an Actionable Misstatement or Omission. (p. 35)

In examining whether an allegedly false statement is actionable, courts must consider whether the information, had it been presented as the plaintiff claims it should have been, would have altered the "total mix" of information available. *City of Monroe Employees Ret. Sys. v.*

- 2 -

*Bridgestone Corp.*, 399 F.3d 651, 691 (6th Cir. 2005).  "Mere mismanagement or inaccurate predictions" are insufficient to establish a securities fraud claim.  *Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 357 (6th Cir. 1987).  Statements of puffery and "corporate optimism" are not actionable.  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004).

The PSLRA safe harbor provision "excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance."  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547-48 (6th Cir. 2001).  The alleged GAAP violations are not actionable without specific allegations that the defendants made the violation with knowledge, or in an extreme departure from the standards of ordinary care.  *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008).  Corporations do not have a duty to disclose all information even colorably material, as "[s]uch a rule would deluge investors with marginally useful information."  *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 403 (6th Cir. 1997).

### 3. <u>The CAC Fails to Raise a Strong Inference of Scienter.</u> (p. 54)

Plaintiffs' theory of scienter — i.e., that Defendants purposefully ignored faulty underwriting standards and vastly understated Fifth Third's reserves in order to secure "enormous incentive-based cash bonuses and stock and option awards" (CAC ¶ 191) — is far less compelling than the competing inference that Fifth Third, like many other financial institutions, government officials, and economists, failed to predict the scope and severity of the economic meltdown that began to manifest toward the end of 2007.

Plaintiffs cannot show scienter through the use of the group pleading doctrine, which is not viable under the PSLRA.  *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 984-86 (S.D. Ohio 2008); *Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007).  Plaintiffs' motive allegations invoke the types of motives that corporations and executives hold generally, making them insufficient to constitute a motive for fraud as a matter of law.  *PR Diamonds, Inc. v.*

*Chandler*, 364 F.3d 671, 690 (6th Cir. 2004).  The purported confidential witness statements presented in the CAC fail to allege "what, when, where, and how" the Defendants knew what they are alleged to have known, and therefore fail to show scienter.  *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008).

Plaintiffs further neglect to cite with specificity anything in internal reports that would have put Defendants on notice of a divergence between the reports and external statements on Fifth Third's underwriting standards.  *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 819 (E.D. Ky. 2008).  "[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."  *PR Diamonds*, 364 F.3d at 688.  Nor can scienter be inferred from the "customary endeavor" of creating a corporate committee to improve internal processes.  *In re 2007 Novastar Fin., Inc. Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166, at *14 (W.D. Mo. June 4, 2008).

### 4. <u>Plaintiffs Fail to Adequately Allege Loss Causation.</u> (p. 70)

Plaintiffs can satisfy the element of loss causation only by pleading facts showing that the "share price fell significantly after the truth became known."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Because Plaintiffs fail to identify a disclosure by Fifth Third that revealed any type of misstatement or fraud, the loss causation element is not satisfied.  *D.E.&J. LP v. Conaway*, 133 F. App'x 994, 1000-01 (6th Cir. June 10, 2005).

### 5. <u>The CAC Does Not State a Claim Under Section 20(a) Against the Individual Defendants.</u> (p. 73)

Because Plaintiffs have failed in their attempts to state underlying securities law violations, the Court should dismiss Plaintiffs' Section 20(a) claims.  *Ley*, 543 F.3d at 818.

- 4 -

**B.** **Securities Act Claims (Counts I – III and VI – XI Under Sections 11, 12(a)(2), and 15; Asserted Against Fifth Third, the Individual Defendants, the Director Defendants, the Trust Defendants, and the Underwriter Defendants) (p. 74)**

**1.** **Plaintiffs Fail to Allege an Actionable Misstatement or an Omission Under Section 11. (p. 76)**

Section 11 liability is limited to statements within the four corners of the registration statement and prospectus. 15 U.S.C. § 77k(a). Statements in Fifth Third's filings regarding its loan loss reserves are, by definition, inactionable forward-looking statements; the CAC affirmatively states that it makes "no allegation of fraud, scienter or recklessness" as to the Securities Act claims. *In re Am. Serv. Group, Inc.*, No. 3:06-0323, 2009 WL 1348163, at *37 (M.D. Tenn. Mar. 31, 2009). The alleged failure to disclose information about Fifth Third's underwriting standards did not render any affirmative statement in the offering documents misleading, as required for Section 11 liability. *Albert Fadem Trust v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1022-23 (S.D. Ohio 2004).

**2.** **Plaintiffs' Section 11 Claims Sound in Fraud and Therefore Must Be Pled with Particularity. (p. 81)**

"Rule 9(b) applies when the misrepresentation justifying relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10b-5." *Wagner v. First Horizon Pharm.*, 464 F.3d 1273, 1277 (11th Cir. 2006). Although Plaintiffs attempt to package their Securities Act claims as non-fraud claims, they obviously are based on the same "unified course of conduct" as Plaintiffs' Exchange Act claims. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003). Rule 9(b) applies to Plaintiffs' Securities Act claims for the additional reason that, in pleading those claims, Plaintiffs use language commonly associated with claims of "fraud or mistake." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). The CAC fails under Rule 9(b), however, to identify any actionable misstatement or

omission.

### 3. Negative Loss Causation Is Apparent from Plaintiffs' CAC, Warranting Dismissal of the Section 11 Claims. (p. 84)

Because Plaintiffs fail to plead facts showing that the revelation of a secret fraud caused a decline in Fifth Third's stock price, negative causation is apparent on the face of the CAC, and it must therefore be dismissed. *Dura*, 544 U.S. at 347. Plaintiffs allege only that Fifth Third disclosed "bad news," which is insufficient to establish loss causation. *In re Tellium, Inc. Sec. Litig.*, No. 02CV5878FLW, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005). The Director Defendants are sued only on non-viable Section 11 claims and should be dismissed.

### 4. Plaintiffs' Section 12(a)(2) Claims Should Be Dismissed. (p. 85)

The Section 12(a)(2) claims fail for the same reasons that Plaintiffs' Section 11 claims fail. The claims also fail because a plaintiff may assert them only against a defendant who either directly sold the security to the plaintiff, or directly solicited the plaintiff's purchase of the security. *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). The Certifications of the Preferred B Plaintiffs make clear that they could not have purchased their shares in the initial offering, and therefore they have no standing to assert claims under Section 12(a)(2). *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999). The Section 12 claims should be dismissed for the additional reason that Plaintiffs fail to allege the particular defendants from whom they purchased their shares. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998). The Underwriter Defendants are sued only on non-viable Section 12 claims and should be dismissed from the action.

### 5. Plaintiffs' Claims Under Section 15 of the Securities Act Also Fail. (p. 89)

Because Plaintiffs have failed to state a claim for violations of Sections 11 or 12(a)(2) of the Securities Act, Plaintiffs' Section 15 claims must also be dismissed. *J & R Mktg., SEP v.*

*Gen. Motors Corp.*, 549 F.3d 384, 398 (6th Cir. 2008).

      **C.**      **Claims in Connection with First Charter Proxy/Registration Statement (Counts IV – V Under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9; Asserted Against Fifth Third and the Individual Defendants) (p. 89)**

Plaintiffs' Section 14 claims related to the First Charter Offering allege falsity on the same bases as Plaintiffs' Section 11 claims, and they therefore fail for the same reasons that the Section 11 claims fail.

      **D.**      **Allowing Plaintiffs to Amend the CAC Would Be Futile. (p. 91)**

This Court should dismiss Plaintiffs' CAC with prejudice because amendment would be futile and would thwart the PSLRA's purpose of frustrating "harassing strike suits filed the moment a company's stock price falls." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 689-90 (6th Cir. 2002).

**III.**     **THE PARTIES**

Defendant Fifth Third Bancorp ("Fifth Third" or the "Company") is a diversified financial services company headquartered in Cincinnati, Ohio, and it is the holding company for one of the largest regional banks in the country.

Fifth Third Capital Trust VI and Fifth Third Capital Trust VII are statutory trusts that are alleged to be wholly owned by Fifth Third (the Trusts are referred to collectively herein as the "Trust Defendants").

Individual Defendant Kevin Kabat is the President and CEO of Fifth Third; Individual Defendant Daniel Poston has been the Executive Vice-President, Controller, and Chief Financial Officer since May 1, 2008; and Individual Defendant Christopher Marshall was Chief Financial Officer in 2007 and through April 30, 2008 (collectively, the "Individual Defendants").

Fifth Third has an independent Board of Directors. Each director has been named as an individual defendant in this litigation: John F. Barrett, James P. Hackett, Gary R. Heminger, Joan R. Herschede, Allen M. Hall, Robert L. Koch, II, Mitchel D. Livingston, Hendrik G. Meijer, George A. Schaefer, Jr., John J. Schiff, Jr., Dudley S. Taft, Thomas W. Traylor, Darryl F. Allen, Ulysses L. Bridgeman, Jr., and James E. Rogers (collectively, the "Director Defendants").[2]

Defendants UBS Securities LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated, Wachovia Capital Markets, LLC, Banc of America Securities LLC, and Credit Suisse Securities (USA) LLC (collectively, the "Preferred B Underwriter Defendants") were underwriters of the Preferred B Share Offering in 2007. These seven financial institutions, along with Defendants Barclays Capital Inc. and Fifth Third Securities (collectively, the "Preferred C Underwriter Defendants"), were the underwriting banks on the Preferred C Share Offering in 2008 (collectively, the "Underwriter Defendants").

Plaintiffs are entities or individuals who purportedly purchased Fifth Third common stock or acquired Fifth Third Preferred B or Preferred C shares[3] between October 19, 2007 and June 17, 2008 (the proposed "Class Period").

Plaintiffs have alleged 13 counts in the CAC, but not all counts are against all Defendants:

---

[2] Counsel for the Outside Director Defendants filed a Suggestion of Death for Ms. Hershcede on May 15, 2009 (Doc. no. 60), and they understand that Plaintiffs have agreed to dismiss the Hershcede estate from the litigation, without prejudice, although the dismissal has not yet occurred.

[3] The Preferred B shares consisted of 34,500,000 7.25% shares initially sold at $25 per share. Fifth Third's Final Prospectus Supplement for these shares was filed with the SEC on October 25, 2007. The Preferred C shares consisted of 8.875% Junior Subordinated Notes with an aggregate principal amount of $400,000,000. Fifth Third's Free Writing Prospectus for this offering was filed on April 29, 2008.

- The Underwriter Defendants are named as defendants in Counts VII and X (Section 12(a)(2) claims in connection with the Preferred B and Preferred C Offerings, respectively).

- The Director Defendants are named as defendants in Counts I, VI, and IX (Section 11 claims), and Director Defendants Rogers and Bridgeman are named as defendants in Count I only.

- The Trust Defendants are named as defendants in Counts VI and VII (Section 11 and Section 12(a)(2) claims in connection with the Preferred B Offering), and Counts IX and X (Section 11 and Section 12(a)(2) claims in connection with the Preferred C Offering).

- The Individual Defendants are named as defendants in Counts I, VI, and IX (Section 11 claims); Counts III, VIII, and XI (Section 15 claims); Count IV (Section 14(a) and Rule 14a-9 claims); Count XII (Section 10(b) and Rule 10b-5 claims); and Count XIII (Section 20(a) claim).

- Fifth Third is named as a defendant in Counts I, VI, and IX (Section 11 claims); Counts II, VII, and X (Section 12(a)(2) claims); Count IV (Section 14(a) and Rule 14a-9 claims); and Count XII (Section 10(b) and Rule 10b-5 claims).

For the reasons explained below, all claims should be dismissed against all Defendants.

## IV.  **FACTUAL ALLEGATIONS**

Plaintiffs seek to hold Defendants liable for failing to predict an unprecedented financial market collapse — described by the Federal Reserve and the International Monetary Fund as the worst financial crisis since the Great Depression[4] — that blindsided and crippled businesses and financial institutions worldwide in 2008.  Despite multiple and repeated warnings in several of Fifth Third's SEC filings throughout 2007 and during the proposed Class Period (October 19, 2007 – June 17, 2008) regarding deteriorating market conditions, increases in nonperforming assets, threatened loan reserves, and specific concerns regarding real estate markets in Florida

---

[4] Tom Barkley et al., *IMF Sees U.S. Maladies Infecting World Economy*, Wall St. J., Apr. 10, 2009, at A9 (Exhibit 1 to Affidavit of Joseph M. Callow, Jr. ("Aff.")); Damian Paletta et al., *At Moment of Truth, U.S. Forced Big Bankers to Blink*, Wall St. J., Oct. 15, 2008, at A1 (Aff. Ex. 2).

and the Midwest, Plaintiffs simply allege that more disclosures were required. Plaintiffs submitted a 209-page, 483-paragraph Complaint in hopes that the sheer weight of the filing hides the legal and factual deficiencies which require dismissal under the strict pleading standards that govern motions to dismiss in federal securities litigation. This case — similar to approximately 200 other credit crisis-related securities and tag-along ERISA suits filed in the United States alone in the past two years[5] — is a classic "fraud by hindsight" case, which courts have consistently rejected:

> No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a finetooth comb in the hope of uncovering a misrepresentation. . . . If the defendants' . . . ventures failed . . . because of industry-wide phenomena that destroyed all or most such ventures, then the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages.

*Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990); *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("When the plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases."); *infra* Section IV(D)(2) (discussing "subprime/financial meltdown" cases dismissed in the past year).

To better understand the factual background, it is important for the Court to consider the following: (a) the scope of the worldwide financial meltdown of 2008 and the market-wide deterioration phenomenon; (b) Fifth Third's numerous SEC filings both immediately before and during the proposed Class Period, and the warnings and disclosures Fifth Third made in those filings; (c) the performance of Fifth Third common shares and Preferred B and C shares during the Class Period, including the rebound and return of share prices to pre-June 17, 2008 closing

---

[5] According to http://www.oakbridgeins.com/clients/blog/subprimelawsuitslist.doc, as of July 15, 2009, 195 "subprime and credit crisis-related securities lawsuits" had been filed in various United States district courts.

prices; and (d) the CAC as part of an onslaught of securities and tag-along litigation clogging the federal courts. The Court may take judicial notice and rely upon all the facts referenced in the Factual Background section and throughout the Motion.[6]

## A.    The Global Financial Meltdown of 2008

Much has now been written regarding the worldwide financial meltdown of 2008. The breadth and depth of the carnage is staggering:

> The losses in 2008 were so broad and deep that every sector in the Standard & Poor's 500 stock index took a double-digit hit, and **the financial sector lost more than half of its value.** The Dow Jones industrial average, an index of 30 blue-chip stocks, and the S&P, a broader index watched by market professionals, were

---

[6] For the Court's convenience, documents referenced in the Factual Background section and throughout the Motion are attached to the Affidavit of Joseph M. Callow, Jr. (hereinafter referred to as "Aff."), filed separately, and may be considered by the Court in deciding this Motion to Dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) (court may consider documents incorporated in a complaint by reference, and take judicial notice of certain matters); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP,* 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice."); *Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir. 1997) ("[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the Plaintiffs' complaint and are central to her claim"). Specifically, with respect to certain documents identified herein:

SEC Filings — *See Bovee v. Coopers & Lybrand C.P.A.,* 272 F.3d 356, 360-61 (6th Cir. 2001) ("[T]his Court may consider the full text of the SEC filings, prospectus, analysts' reports and statements integral to the complaint, even if not attached, without converting the motion into one for summary judgment under Fed. R. Civ. P. 56."); *Albert Fadem Trust v. Am. Elec. Power Co.,* 334 F. Supp. 2d 985, 995 (S.D. Ohio 2004) ("In addition to considering the allegations in the complaint, a court can consider the full texts of SEC filings, prospectuses, analysts' reports and other documents referred to in the complaint, regardless of whether they are attached in part or whole."); *see also Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir. 1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC."); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991) ("Were courts to refrain from considering such documents [required by law to be filed with the SEC], complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. . . . This of course includes related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements.").

Press Releases and News Reports — *See Harris v. Ivax Corp.,* 182 F.3d 799, 802 n.2 (11th Cir. 1999) (court can consider press releases even if not attached to the complaint if the contents are not in dispute); *Merzin v. Provident Fin. Group, Inc.,* 311 F. Supp. 2d 674, 677 n.1 (S.D. Ohio 2004) (holding that press releases discussed in complaint are incorporated by reference into the complaint and may be considered by the Court, on a motion to dismiss, in their entirety); *In re Merrill Lynch & Co. Research Sec. Litig.,* 273 F. Supp. 2d 351, 383 n.3, 383-88 (S.D.N.Y. 2003) (taking judicial notice of speeches by SEC chairman and newspaper articles).

Stock Quotations — *See Miller v. Lazard, Ltd.,* 473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007) (court can take judicial notice of well-publicized stock prices as well as "documents that are attached to, referenced in, or integral to the preparation of the pleadings"); *Merzin,* 311 F. Supp. 2d at 686 (taking judicial notice of stock prices on motion to dismiss).

- 11 -

down 34 percent and 38 percent, respectively, their deepest losses since the 1930s.  The tech heavy Nasdaq composite index was down 41 percent, its worst year since the exchange was created in 1971.

Overseas, the year was just as dismal.  In Germany, stocks were down 40 percent, in Japan, 42 percent, in Brazil, 41 percent.  **Taken together, all of the world's stock lost 48 percent last year.**[7]

\* \* \*

**All told, about $7 trillion of shareholders' wealth — the gains of the last six years — was wiped out in a year of violent market swings.**

But what is striking is not just the magnitude of the declines, staggering as they are, but also their breadth.  **All but two of the 30 Dow industrials, Wal-Mart and McDonald's, fell by more than 10 percent.  Almost no industry was spared as the crisis that first emerged in the subprime mortgage market mestastasized and the economy sank into what could be a long recession.**[8]

\* \* \*

**The U.S. Housing market lost $3.3 trillion in value last year** and almost one in six owners with mortgages owed more than their homes were worth as the economy went into recession, Zillow.com said. . . .  More than 2.3 million properties got a default or auction notice or were seized by lenders last year, according to RealtyTrac, Inc., a seller of data on defaults.  **About $6.1 trillion of value has been lost since the housing market peaked in the second quarter of 2006 and last year's decline was almost triple the $1.3 trillion lost in 2007, Zillow said.**[9]

In the third quarter of 2008 alone — the timeframe immediately following Fifth Third's

June 18, 2008 Form 8-K filing and press release that is the main subject of this litigation —

investors lost $5.8 trillion in approximately ninety days.[10]

Statistics tell only part of the story:

---

[7] Renae Merle, *Wall Street's Final '08 Toll: $6.9 Trillion Wiped Out*, Wash. Post, Jan. 1, 2009, at A1 (emphasis added) (Aff. Ex. 3).
[8] Vikas Bajaj, *Markets Limp Into 2009 After a Bruising Year*, N.Y. Times, Dec. 31, 2009, at A1 (emphasis added) (Aff. Ex. 4).
[9] Dan Levy, *U.S. Property Owners Lost $3.3 Trillion in Home Value*, Bloomberg, Feb. 3, 2009, available at http://www.bloomberg.com/apps/news?pid=20601087&sid=aE29HSrxA4rI (emphasis added) (Aff. Ex. 5).
[10] *Investors World Over Lose $10 Trillion So Far*, Express India, Oct. 3, 2008, available at http://www.expressindia.com/latest-news/Investors-world-over-lose-10-trillion-so-far/369004/ (*quoting* Standard & Poor's) (Aff. Ex. 6).

- In March 2008, Bear Stearns, America's fifth largest bank, was sold for $2 per share, having traded previously at over $140 per share.[11]

- Two of the three largest bank failures in U.S. history (Washington Mutual and IndyMac) occurred in the third quarter of 2008.[12]

- During the first week of September 2008, two of the country's largest mortgage companies (Fannie Mae and Freddie Mac) were placed in government conservatorship.[13]

- In September and early October of 2008, Merrill Lynch and Wachovia were sold for a fraction of their book value, and one of the largest and oldest investment banking firms (Lehman Brothers) declared bankruptcy.[14]

- The world's largest insurer, AIG, was provided a $180 billion rescue package, and it is now 80 percent owned by the United States government.[15]

- The United States government provided over $700 billion in Troubled Asset Relief Program ("TARP") funds to over 150 entities (including Fifth Third).[16]

- The United Kingdom purchased controlling interests in Royal Bank of Scotland, Lloyds TSB, and HBOS for approximately $64 billion, and Germany and France announced combined bank bailouts of over $1 trillion.[17]

In short, the events of 2008 have been aptly described by the International Monetary Fund and Federal Reserve Chairman Ben Bernanke as the worst financial crisis since the Great Depression.[18]

It is against this backdrop of an unprecedented, once-in-a-lifetime, worldwide financial

---

[11] Andrew Clark, *Sold for Just $2 a Share — The Bank Once Worth $25 Billion*, The Guardian, Mar. 17, 2008, available at http://www.guardian.co.uk/business/2008/mar/17/jpmorgan.useconomy1 (Aff. Ex. 7).

[12] Ari Levy & David Milenberg, *IndyMac Seized by U.S. Regulators Amid Cash Crunch*, Bloomberg, July 11, 2008, available at http://www.bloomberg.com/apps/news?pid= 20601087&sid=atyF3ydPUlk8&refer=home (Aff. Ex. 8); Robin Sidel et al., *WaMu is Seized, Sold Off to J.P. Morgan, in Largest Failure in U.S. Banking History*, Wall St. J., Sept. 26, 2008, at A1 (Aff. Ex. 9).

[13] James R. Hagerty et al., *U.S. Seizes Mortgage Giants — Government Outs CEOs of Fannie, Freddie; Promises Up to $200 Billion in Capital*, Wall St. J., Sept. 8, 2008, at A1 (Aff. Ex. 10).

[14] Matthew Karnitschnig et al., *Bank of America to Buy Merrill*, Wall St. J., Sept. 15, 2008, at A1 (Aff. Ex. 11); David Enrich & Dan Fitzpatrick, *Wachovia Chooses Wells Fargo, Spurns Citi — Deal Avoids Need for Taxpayer Cash*, Wall St. J., Oct. 4, 2008, at A1 (Aff. Ex. 12).

[15] AP Newswire, *AIG Gets $1.2 Billion for a Building in Tokyo*, N.Y. Times, May 11, 2009, at B7 (Aff. Ex. 13).

[16] Matthew Ericson et al., *Tracking the $700 Billion Bailout*, N.Y. Times, June 17, 2009, available at http://projects.nytimes.com/creditcrisis/recipients/table (Aff. Ex. 14).

[17] Nelson D. Schwartz, *A Host of Measures Across Europe*, N.Y. Times, Oct. 14, 2008, at B7 (Aff. Ex. 15).

[18] Barkley, *supra* note 4, at A9; Paletta, *supra* note 4, at A1.

- 13 -

meltdown that Plaintiffs bring the instant action challenging the nature and quality of information provided by Fifth Third in its public filings between October 19, 2007 and June 17, 2008.

**B.      Fifth Third's Public Disclosures**

Although no one could have predicted the full scope of the worldwide financial meltdown of 2008, there is no question that market conditions showed signs of concern in late 2006 and early 2007.  That is one of the reasons why Fifth Third issued multiple warnings and made extensive disclosures in its public filings **before October 19, 2007 and throughout the Class Period** regarding downward trends in the real estate market and the economy, which were playing out, to an unprecedented degree, in real time.[19]

**1.      Disclosures Made Prior to October 19, 2007**

**a.      Disclosures Regarding the Real Estate Market/Loan Performance**

Plaintiffs allege that "[a]s early as June 2006, the subprime mortgage market was beginning to show signs of stress and by the fourth quarter of 2006, there were many indicators pointing to significant problems in subprime mortgage loan performance."  (CAC ¶ 9.)  In fact, there were growing problems in the real estate market and loan performance generally, and in Fifth Third's portfolio specifically, which Fifth Third disclosed to the investing public multiple times throughout 2007 in, among other places:

---

[19] Obviously, such disclosures, as well as all other publicly available data, were part of the total mix of information available to Plaintiffs.  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (to be material, statement must alter the "total mix" of information).

- Fifth Third, Fifth Third Bancorp Reports 2006 Earnings of $2.13 per Diluted Share (Form 8-K), at 5 (Jan. 18, 2007) (Aff. Ex. 19):

  Nonperforming assets (NPAs)[20] at quarter end were $455 million, or 61 bps of total loans and leases and other real estate owned, up from 56 bps last quarter and 52 bps in the fourth quarter a year ago. The sequential increase of $44 million was balanced between consumer and commercial NPAs. Consumer NPA growth was evenly split between indirect consumer and mortgage loans. The increase in commercial NPAs largely occurred in the real estate and construction portfolios. There were no significant geographic concentrations, but NPA growth was highest in eastern Michigan and northeastern Ohio due to the location of the largest NPAs inflows. About half of the commercial NPA increase was experienced in the small business and business banking portfolio. The allowance for loan and lease losses represented 1.04 percent of total loans and leases outstanding as of quarter end, consistent with 1.04 percent last quarter and 1.06 percent in the same quarter last year.

- Fifth Third, Fifth Third Bancorp Reports First Quarter 2007 Earnings of $0.65 per Diluted Share (Form 8-K), at 7 (Apr. 19, 2007) (Aff. Ex. 21):

  Nonperforming assets at quarter end were $494 million . . . . The sequential increase in NPAs . . . occurred primarily in the commercial mortgage portfolios. Commercial NPA growth was concentrated in Florida . . . and in Michigan.

- Fifth Third, Quarterly Report (Form 10-Q), at 10, 26 (May 10, 2007) (Aff. Ex. 22):

  The provision for loan and lease losses increased to $84 million in the first quarter of 2007 compared to $78 million in the same period last year.

  As of March 31, 2007 nonaccrual loans in Florida comprised 14% of the Bancorp's total nonaccrual loans, up from four percent of total nonaccrual loans at March 31, 2006.

- Fifth Third, Fifth Third Bancorp Reports Second Quarter 2007 Earnings of $0.69 per Diluted Share (Form 8-K), at 2, 7-8 (July 19, 2007) (Aff. Ex. 23):

  [C]redit is a challenge at this point in the cycle . . . . We do expect continued deterioration in credit trends for the near future.

---

[20] NPAs (nonperforming assets) are defined by Fifth Third to include: "(i) nonaccrual loans and leases for which ultimate collectibility of the full amount of the principal and/or interest is uncertain; (ii) restructured consumer loans which have not yet met the requirements to be classified as a performing asset; (iii) commercial loans and leases that have been renegotiated to provide for a reduction or deferral of interest or principal because of deterioration in the financial position of the borrower and (iv) other assets, including other real estate owned and repossessed equipment." Fifth Third, Annual Report (Form 10-K), at 41 (Feb. 22, 2008) (Aff. Ex. 20).

Commercial NPA growth of $12 million was driven by growth in commercial mortgage and construction NPAs, particularly in Eastern Michigan.

Commercial delinquency growth was concentrated in real estate lending, particularly in Michigan and South Florida.  Consumer growth was driven by residential delinquencies in South Florida, Northeastern Ohio, and Eastern Michigan.

- Fifth Third, Quarterly Report (Form 10-Q), at 11, 27-28 (Aug. 9, 2007) (Aff. Ex. 24):

The provision for loan and lease losses increased to $121 million in the second quarter of 2007 compared to $71 million in the same period last year.  The $50 million increase is primarily related to loan growth during the past year, increases in nonperforming assets and modest deterioration in economic condition.

Total loans and leases 90 days past due have increased from $191 million as of June 30, 2006 to $302 million as of June 30, 2007, with the majority of the increase in the real estate and construction industries in the Michigan and Florida affiliates.

The Bancorp's higher rate of charge-offs in the second quarter of 2007 compared to 2006 was mostly concentrated in the real estate markets of the Florida and Michigan affiliates.

Fifth Third was not alone in raising concerns regarding the real estate and lending market, but nonetheless not foreseeing the scope of the worldwide financial meltdown of 2008. In March 2007, Federal Reserve Chairman Ben Bernanke testified before Congress that "the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."[21]  As late as July 2007, Treasury Secretary Henry Paulson expressed his confidence in the economy, stating, "I think we're at or near the bottom there.  I don't deny there's a problem with subprime mortgages but I really do believe its [sic] containable, it's quite containable."[22]

Concerns with mortgage loans and the real estate market were generally known, disclosed, discussed, and understood in the market.

---

[21] *Hearing before the J. Economic Comm.*, 110th Cong. 1-2 (Mar. 28, 2007) (Aff. Ex 16).
[22] *US's Paulson:  Subprime "At, Near Bottom"; Need Vigilance*, Market News Service, July 24, 2007, at 1 (Aff. Ex. 17).

**b.** ***Disclosures Regarding Concerns over the Economy in General***

Fifth Third made disclosures not only with respect to concerns in the real estate and

lending markets specifically, but also with respect to the economy generally, in, among other

places:

- Fifth Third, Annual Report (Form 10-K), at 3 (Feb. 20, 2007) (Aff. Ex. 25):

  As we look into 2007 we would expect to see upward pressure on credit. . . .
  [W]e have been experiencing slower economic growth and higher levels of credit
  losses than banks in other regions for some time.

- Fifth Third, Fifth Third Bancorp Reports First Quarter 2007 Earnings of $0.65 per
  Diluted Share (Form 8-K), at 1 (Apr. 19, 2007) (Aff. Ex. 21):

  The prolonged inverted yield curve coupled with some softness in certain areas of
  the economy makes for a challenging operating environment.

- Fifth Third, Fourth Quarter 2007 Earnings Call Transcript, at 5 (July 20, 2007) (Aff.
  Ex. 26):

  I know when you look at national economic statistics the U.S. economy is still
  strong but significant parts of the Midwest have been in recession-like conditions
  for several years. This particularly applies to eastern Michigan and northern parts
  of Ohio and Indiana where the domestic auto belt is centered.

- Fifth Third, Investor Update Presentation (Form 8-K), at 37 (Aug. 29, 2007) (Aff Ex.
  27):

  Midwest economy is lagging other parts of the country

  [Economy is] softening in Michigan and Northern Ohio.

Throughout 2007, Fifth Third warned of and made multiple disclosures regarding

downward-trending economic forces.  Fifth Third noted and disclosed upward pressure on credit,

increases in nonperforming assets, increases in net charge-offs in nearly every consumer and

commercial category, increases in ninety-day past-due loans, increases in commercial and

residential delinquencies, and increases in home equity and residential mortgage losses.  These

issues were outlined and disclosed to the public and potential investors **prior** to October 19,

2007 (the start date of Plaintiffs' proposed Class Period).

## 2. <u>Disclosures Made During the Proposed Class Period</u>

According to former Federal Reserve Chairman Alan Greenspan, "[o]n August 9, 2007 and the days immediately following, financial markets in much of the world seized up. Virtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged."[23] In subsequent months, investors began to withdraw from mortgage debt and securities backed by home loans as the commercial paper market collapsed and the inter-bank lending rates steeply increased. As outlined above, the third quarter of 2007 saw an unprecedented loss of investor value and the collapse of some of the largest financial institutions in the United States.

Continuing with the warnings and disclosures made in early 2007, Fifth Third consistently warned investors throughout the eight-month proposed Class Period about its potential exposure to risk of loss; the continued deterioration in its credit portfolio; the need for increases in its reserves for loan losses; and concerns with certain non-traditional loans.

### a. *Disclosures Pertaining to Fifth Third's Exposure*

In its quarterly and annual reports, Fifth Third made repeated and specific disclosures regarding potential exposure in the event of a decline in housing prices, including the following:

- Fifth Third, Quarterly Report (Form 10-Q), at 28 (Nov. 9, 2007) (emphasis added) (Aff. Ex. 28):

  > **Certain mortgage products have contractual features that may increase credit exposure to the Bancorp in the event of a decline in housing prices. These types of mortgage products offered by the Bancorp include high loan-to-value ("LTV") ratios, multiple loans on the same collateral that when combined result in a high LTV ("80/20") and interest-only loans.**[24]

---

[23] Alan Greenspan, *The Roots of the Mortgage Crisis*, Wall St. J., Dec. 12, 2007, at A19 (Aff. Ex. 18).
[24] *See also* Fifth Third, Annual Report (Form 10-K), at 40 (Feb. 22, 2008) (same statement) (Aff. Ex. 20); Fifth Third, Quarterly Report (Form 10-Q), at 28 (May 9, 2008) (same statement) (Aff. Ex. 29).

- Fifth Third, Quarterly Report (Form 10-Q), at 4 (Nov. 9, 2007) (Aff. Ex. 28):

  The Bancorp is also exposed to the risk of losses on its loan and lease portfolio as a result of changing expected cash flows caused by loan defaults and inadequate collateral, among other factors.

- Fifth Third, Annual Report (Form 10-K), at 22 (Feb. 22, 2008) (emphasis added) (Aff. Ex. 20):

  **If the strength of the U.S. economy in general and the strength of the local economies in which Fifth Third conducts operations declines, or continues to decline, this could result in, among other things, a deterioration in credit quality or a reduced demand for credit, including a resultant effect on Fifth Third's loan portfolio and allowance for loan and lease losses.**  (Under heading: "Weakness in the economy and in the real estate market, including specific weakness within Fifth Third's geographic footprint.")

  Fifth Third expects credit conditions and the performance of its loan portfolio to continue to deteriorate in the near term. . . .  Additional increases in the allowance for loan and lease losses **may be necessary in the future**.  Accordingly, a decrease in the quality of Fifth Third's credit portfolio could have a material adverse effect on earnings and results of operations.  (Under heading: "Deteriorating credit quality, particularly in real estate loans.").

- Fifth Third, Annual Report (Form 10-K), at 20-21, 23 (Feb. 22, 2008) (emphasis added) (Aff. Ex. 20):

  Credit losses are charged and recoveries are credited to the allowance [for loan and lease losses].  Provisions for loan and lease losses are based on the Bancorp's review of the historical credit loss experience and such factors that, in management's judgment, deserve consideration under existing economic conditions in estimating probable credit losses.

  Two of Fifth Third's most critical estimates are the level of the allowance for loan and lease losses and the valuation of mortgage servicing rights.  Due to the inherent nature of these estimates, **Fifth Third cannot provide absolute assurance that it will not significantly increase the allowance for loan and lease losses and/or sustain credit losses that are significantly higher than the provided allowance**, not that it will not recognize a significant provision for impairment of its mortgage servicing rights.  If Fifth Third's allowance for loan and lease losses is not adequate, **Fifth Third's business, financial condition, including its liquidity and capital, and results of operations could be materially adversely affected.  Additionally, in the future, Fifth Third may increase its allowance for loan and lease losses, which could have a material adverse effect on its capital and results of operations.**

- Fifth Third, Annual Report (Form 10-K), at 20, 44 (Feb. 22, 2008) (emphasis added)

(Aff. Ex. 20):

> [T]he Bancorp has exposure to the housing markets, which weakened considerably **during 2007**, particularly in the upper Midwest and Florida.[25]

> Real estate price deterioration, as determined by the Home Price Index, was most prevalent in Michigan, due in part to cutbacks by automobile manufacturers, and Florida, due to past real estate price appreciation and related overdevelopment. The Bancorp has sizable exposure in both of these markets. The deterioration in real estate values increased the expected loss once a loan becomes delinquent, particularly for home equity loans with high loan-to-value ratios.

- Fifth Third, Quarterly Report (Form 10-Q), at 4, 33 (May 9, 2008) (Aff. Ex. 29):

> The Bancorp is also exposed to the risk of losses on its loan and lease portfolio as a result of changing expected cash flows caused by loan defaults and inadequate collateral due to a weakening economy within the Bancorp's footprint.

> Real estate price deterioration, as determined by the Home Price Index, was most prevalent in Michigan, due in part to cutbacks by automobile manufacturers, and Florida, due to past real estate price appreciation and related over-development. The Bancorp has sizable exposure in both of these markets.

### b.    *Disclosures Concerning Credit Deterioration*

In addition to the statements noted above, Fifth Third made a number of warnings to investors regarding continued deterioration in Fifth Third's credit portfolio, including the following:

- Fifth Third, Fifth Third Bancorp Reports 2007 Earnings of $2.03 per Diluted Share (Form 8-K), at 2 (Jan. 22, 2008) (Aff. Ex. 30):

> [T]he credit environment remains challenging, and we expect credit conditions and the performance of our loan portfolio to continue to deteriorate in the near term.

- Fifth Third, Fourth Quarter 2007 Earnings Call Transcript, at 2-3 (Jan. 22, 2008) (Aff. Ex. 31):

> Credit deteriorated fairly sharply this quarter and we saw that reflected in growth in NPAs and losses as well as provisions.

---

[25] *See also* Fifth Third, Quarterly Report (Form 10-Q), at 5 (May 9, 2008) ("[T]he Bancorp has exposure to the housing markets, which continued to weaken considerably during the first quarter of 2008, particularly in the upper Midwest and Florida.") (Aff. Ex. 29).

The credit environment remains challenging and we expect credit conditions and the performance of our portfolio to continue to deteriorate in the near term.

- Fifth Third, Annual Report (Form 10-K), at 32, 42 (Feb. 22, 2008) (Aff. Ex. 20):

  The provision for loan and lease losses increased $54 million over 2006 due to the deteriorating credit environment involving home equity loans, particularly in Michigan and Florida.

  During 2007, Florida, Michigan and Ohio were ranked among the top states in total mortgage foreclosures. These foreclosures not only added to the volume of charge-offs, but also hampered the Bancorp's ability to recover the value of the homes collateralizing the mortgages as they contributed to declining home prices.

- Fifth Third, Fifth Third Bancorp Reports First Quarter 2008 Earnings of $0.55 per Diluted Share (Form 8-K), at 2 (Apr. 22, 2008) (Aff. Ex. 32):

  [S]trong operating performance continues to be offset by higher credit costs, primarily reflecting further deterioration of residential real estate, homebuilder and residential development loans.

- Fifth Third, First Quarter 2008 Earnings Call Transcript, at 2-3 (Apr. 22, 2008) (Aff. Ex. 33):

  We continue to see deterioration in our residential real estate book and related exposures in commercial real estate, notably homebuilders and developers.

  [W]e expect credit conditions to continue to be difficult.

### c. *Disclosures Describing an Increase in Reserves for Loan Losses*

Fifth Third addressed the significant increases to its provision for loan losses in nearly all of the disclosures that Plaintiffs cite in the CAC.

- Fifth Third, Quarterly Report (Form 10-Q), at 11 (Nov. 9, 2007) (emphasis added) (Aff. Ex. 28):

  **The provision for loan and lease losses increased to $139 million in the third quarter of 2007 compared to $87 million in the same period last year. The $52 million increase is related to loan growth during the past year, increases in delinquencies and increases in severity of loss from the decline in the real estate market.**

- Fifth Third, Fifth Third Bancorp Announces Charges, Expectations for Fourth Quarter 2007 Results (Form 8-K), at 1 (Dec. 18, 2007) (Aff. Ex. 34):

Provision expense for loan and lease losses in fourth quarter 2007 is currently expected to be approximately $275 million.  The provision is expected to exceed charge-offs by approximately $105 million and raise the reserve to loan ratio to 1.15 percent.

- Fifth Third, Quarterly Report (Form 10-Q), at 12 (May 9, 2008) (Aff. Ex. 29):

  The provision for loan and lease losses increased to $544 million in the first quarter of 2008 compared to $84 million in the same period last year. The primary factors in the increase was the increase in delinquencies, the deterioration in residential real estate collateral values in certain of the Bancorp's key lending markets and declines in general economic conditions.

The increases were also reflected in Fifth Third's earnings releases and discussed in their accompanying analyst calls.  (*See* Fifth Third, Fifth Third Bancorp Reports Third Quarter 2007 Earnings of $0.71 per Diluted Share (Form 8-K), at 7 (Oct. 19, 2007) (Aff. Ex. 35); Fifth Third, Third Quarter 2007 Earnings Call Transcript, at 12 (Oct. 19, 2007) (Aff. Ex. 36); Fifth Third, Fifth Third Bancorp Reports 2007 Earnings of $2.03 per Diluted Share (Form 8-K), at 9 (Jan. 22, 2008) (Aff. Ex. 30); Fifth Third, Fifth Third Bancorp Reports First Quarter 2008 Earnings of $0.55 per Diluted Share (Form 8-K), at 2, 9 (Apr. 22, 2008) (Aff. Ex. 32); Fifth Third, Fourth Quarter 2007 Earnings Call Transcript, at 7 (Jan. 22, 2008) (Aff. Ex. 26); Fifth Third, First Quarter 2008 Earnings Call Transcript, at 11 (Apr. 22, 2008) (Aff. Ex. 33).)

### d.    *Disclosures Relating to Loan Composition*

Fifth Third made a plethora of disclosures on the composition of its loans, including the following, which have not been previously cited:

- Fifth Third, Quarterly Report (Form 10-Q), at 28 (Nov. 9, 2007) (Aff. Ex. 28):

  Charts showing the percentage of Fifth Third loans that were (a) greater than 80 percent LTV [Loan to Value] with no mortgage insurance, (b) interest-only, (c) greater than 80 percent LTV and interest-only, (d) 80/20 loans, and (e) 80/20 loans and interest-only.

The Bancorp originates certain non-conforming residential mortgage loans known as Alt-A.[26]

- Fifth Third, Merrill Lynch 2007 Banking & Financial Services Conference Presentation (Form 8-K), at 22 (Nov. 14, 2007) (Aff. Ex. 37):

  Origination FICO[27] bands: <659 13%; 660-689 11%; 690-719 17%; 720-749 18%; 750+ 39%.

- Fifth Third, Fox-Pitt Kelton Cochan Caronia Waller Financial Services Conference Presentation (Form 8-K), at 22 (Nov. 29, 2007) (Aff. Ex. 38):

  Origination FICO distribution: <659 12%; 660-689 10%; 690-719 15%; 720-749 16%; 750+ 47%.

  Origination LTV distribution[28]: <70 26%; >70-80 41%; >80-90 11%; >90 22%.

  Alt A originations: 3Q07 $71MM; $43MM warehouse, WA [Weighted Average] FICO 700, WA LTV 72%.

  Alt A originations: 3Q07 $71MM; $43MM warehouse, WA FICO 700, WA LTV 72%.

  $163MM in [Alt-A] loan portfolio (viewed as un-saleable in current market environment), WA origination FICO 700, WA origination LTV 72%.

- Fifth Third, Citigroup 2008 Financial Services Conference Presentation (Form 8-K), at 17 (Jan. 30, 2008) (Aff. Ex. 39):

  Alt A originations: 4Q07 $137MM; $52MM 12/31/07.

  Origination FICO distribution: <659 13%; 660-689 11%; 690-719 17%; 720-749 18%; 750+ 41%.

  Origination LTV distribution: <70 26%; 70.1-80 42%; 80.1-90 12%; >90.1 20%.

---

[26] Alt-A loans are defined by Fifth Third to be "non-conforming" loans in which "[b]orrower qualifications are comparable to other conforming residential mortgage products." (Fifth Third, Annual Report (Form 10-K), at 41 (Feb. 22, 2008) (Aff. Ex. 20).) "Alt-A lending emerged in the 1990s to meet the needs of borrowers who could not fully document and verify their income and assets." (CAC ¶ 19.)

[27] "FICO [Fair Isaac Corporation] refers to a method for calculating a borrower's credit worthiness. Although FICO's inner-workings are largely proprietary, it is understood that FICO scores are based on the information in a credit bureau's files, such as credit card usage and payment history, other revolving loan history, installment loan history, previous bankruptcy, judgments, and liens. Based on this data, FICO returns a score between 300 and 800 — the higher the score, the more creditworthy the borrower and the less likely the borrower is to default." (CAC ¶ 14.)

[28] This statistic discloses the percentage of borrowers broken out by their LTV ratios. For example, 22 percent of Fifth Third loan originations in this disclosure are loans in which the loan value exceeds 90 percent of the actual value of the property.

- Fifth Third, Annual Report (Form 10-K), at 41 (Feb. 22, 2008) (Aff. Ex. 20):

    The Bancorp originates certain non-conforming residential mortgage loans known as "Alt-A" loans.

- Fifth Third, Quarterly Report (Form 10-Q), at 28-29 (May 9, 2008) (Aff. Ex. 29):

    Charts showing the percentage of Fifth Third loans that were (a) greater than 80 percent LTV with no mortgage insurance, (b) interest-only, (c) greater than 80 percent LTV and interest-only, and (d) 80/20 loans.

    The Bancorp originates certain non-conforming residential mortgage loans known as "Alt-A" loans.

- Fifth Third, UBS Global Financial Services Conferences Presentation (Form 8-K), at 21 (May 12, 2008) (Aff. Ex. 40):

    Alt A originations for delivery only.

    Origination FICO distribution: <659 13%; 660-689 11%; 690-719 17%; 720-749 18%; 750+ 40%.

    Origination LTV distribution: <70 26%; 70.1-80 42%; 80.1-90 12%; >90.1 20%.

    e.    ***Disclosures on Financial Ratios***

Fifth Third plainly and repeatedly disclosed loan loss reserves as a percentage of nonperforming assets in its SEC filings and disclosed this percentage in **every** earnings release during the Class Period. (*See* Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Oct. 19, 2007) (Aff. Ex. 35); Fifth Third, Quarterly Report (Form 10-Q), at 29 (Nov. 9, 2007) (Aff. Ex. 28); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Jan. 22, 2008) (Aff. Ex. 30); Fifth Third, Annual Report (Form 10-K), at 42 (Feb. 22, 2008) (Aff. Ex. 20); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Apr. 22, 2008) (Aff. Ex. 32); Fifth Third, Quarterly Report (Form 10-Q), at 30 (May 9, 2008) (Aff. Ex. 29).)

In those same documents, Fifth Third disclosed overall numbers and ratios for Tier I capital, total risk-based capital, and risk-weighted assets. (Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Oct. 19, 2007) (Aff. Ex. 35); Fifth Third, Quarterly Report (Form

10-Q), at 29 (Nov. 9, 2007) (Aff. Ex. 28); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Jan. 22, 2008) (Aff. Ex. 30); Fifth Third, Annual Report (Form 10-K), at 42 (Feb. 22, 2008) (Aff. Ex. 20); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Apr. 22, 2008) (Aff. Ex. 32); Fifth Third, Quarterly Report (Form 10-Q), at 30 (May 9, 2008) (Aff. Ex. 29).) These disclosures consistently showed a risk-based capital ratio of just above 10 percent.

### 3. Fifth Third's June 18, 2008 Form 8-K and Related Press Release

Plaintiffs' reference to June 18, 2008 as the date that "[t]he Truth Begins to Emerge" (CAC ¶ 449) has a melodramatic, Hollywood-like tone and, more important, is utterly inaccurate. On June 18, 2008, Fifth Third filed a Form 8-K with the SEC and it announced that the Company was raising its Tier I capital targets to 8-9%; cutting its dividend; and raising additional capital, possibly through the sale of non-core assets. That same day, Fifth Third announced management decisions made in response to the deteriorating market conditions and trends, and uncertainty about the future. As succinctly summarized in Kabat's June 18, 2008 Letter to Shareholders:

> **In today's unprecedented economic environment and with continuing uncertainty regarding the future, it was the prudent thing to do.**

(Fifth Third, Letter from Kevin T. Kabat to Shareholders (Form 8-K), at 2 (June 18, 2008) (emphasis added) (Aff. Ex. 41).)

Notwithstanding these announcements, on June 18, 2008, Fifth Third did not restate earnings from a prior period; it did not disclose any accounting irregularities; it did not state that any of its prior disclosures were inaccurate; nor did it issue any corrective statements.

### C. Fifth Third's Share Prices

Plaintiffs allege that despite the numerous and various disclosures made by Fifth Third before and during the proposed Class Period, the "truth emerged" on June 18, 2008, and

- 25 -

impacted the share prices of Fifth Third common stock and B and C class Preferred Shares.

> This news caused the price of Fifth Third common stock to plummet more than 27% from its previous close of $12.73 per share, to close on June 18, 2008, at $9.26 per share — a decline of $3.47 per share — on unusually heavy trading volume. Also on June 18, 2008, the price of the Preferred B Shares dropped 7.58%, from $18.00 per share to close at $16.64 per share on June 18, 2008 — $8.36 per share below the Preferred B Share's initial offering price of $25, and the price of the Preferred C Shares dropped 6.53%, from $22.68 per share to close at $21.20 per share on June 18, 2008 — $3.80 per share below the Preferred C Share's initial offering price of $25.

(CAC ¶ 29; *see also id.* ¶ 480.)  It is undisputed that the various share prices dropped on June 18, 2008, just as it is equally undisputed that the various share prices rose thereafter and quickly reached at least the same level as at the opening on June 18, 2008.

Shares of Fifth Third common stock closed at a share price of $9.75 on June 19, 2008 — up 5.3 percent from the prior day's closing price.[29]  Less than one month later, on July 17, 2008, and after a $0.15-per-share dividend was paid on June 26, 2008, shares of Fifth Third common stock closed at a share price of $13.76.  This rebound that carried Fifth Third stock higher than its June 17, 2008 close ($12.73) continued — the stock closed above $12.73 every single day for the next seventy-three days, despite the overall market deterioration taking place.  The share price also closed above $12.73 at various times in October 2008, and another $0.15-per-share dividend was paid on September 26, 2008.

Shares of Fifth Third Preferred B Shares — contrary to Plaintiffs' allegations — actually dropped from a share price of $18 on June 17, 2008 to $16.635 on June 18, 2008.[30]  The price of these shares rebounded to close at $17.06 on June 20, 2008, and at $18.27 on August 8, 2008, less than two months later.  In fact, Fifth Third Preferred B shares are currently trading in the $17 – $18 per share range.

---

[29] Westlaw Business, Fifth Third Common Stock Price Spreadsheet (Oct. 19, 2007–July 13, 2009) (Aff. Ex. 45).
[30] Westlaw Business, Fifth Third Preferred B Stock Price Spreadsheet (Oct. 30, 2007–July 13, 2009) (Aff. Ex. 46).

Shares of Fifth Third Preferred C Shares closed at $21.45 on June 20, 2008, and traded above $22 a share on July 3 and July 7, 2008 — less than three weeks later.[31]  Share prices of Fifth Third Preferred C Shares again traded at above $22 per share in August 2008, and currently are trading at above $20 per share.

The worldwide financial meltdown of 2008 has been severe.  Many financial institutions did not survive.  Fifth Third did.  Like thousands of other companies worldwide, Fifth Third has seen a loss in shareholder value since 2006, but that loss has no relation to a "truth emerging" on June 18, 2008, or to any violation of federal securities laws.

**D.** **Plaintiffs' Consolidated Class Action Complaint and the Onslaught of Securities Filings Relating to the Worldwide Financial Meltdown of 2008**

**1.** **Plaintiffs' Consolidated Class Action Complaint**

After June 2008, multiple lawsuits were filed against Fifth Third and its officers, outside directors and Underwriter Banks.  Eventually, Lead Plaintiffs filed their CAC on April 3, 2009 (Doc. nos. 54 (Part I of CAC), 55 (Part II of CAC), 56 (Part III of CAC).)  The claims center on three areas:  Fifth Third's underwriting standards, Fifth Third's provision for loan losses, and Fifth Third's capital structure.

**a.** ***Statements that Allegedly Concealed Fifth Third's Loan Underwriting Standards***

Over the course of the proposed Class Period, Fifth Third made a number of statements pertaining to its loan underwriting standards and its loan portfolio quality.  In general, the allegedly false statements that Plaintiffs attempt to link to Fifth Third's loan underwriting can be grouped into a handful of areas.  First, Plaintiffs point to a number of broad statements pertaining to Fifth Third's conservative underwriting ideals (CAC ¶¶ 382-83, 406-07, 415-16, 433, 438-39),

---

[31] Westlaw Business, Fifth Third Preferred C Stock Price Spreadsheet (Mar. 28, 2008–July 13, 2009) (Aff. Ex. 47).

its origination of Alt-A loans — which were explicitly acknowledged to be "non-conforming" (*id.* ¶¶ 381, 413, 442) — and its abstention from dealing in subprime loans (*id.* ¶¶ 386, 388, 406, 433).  Second, Plaintiffs cite Fifth Third's disclosures pertaining to the type of loans that the bank acknowledged "may increase credit exposure to the Bancorp in the event of a decline in housing prices."  (*Id.* ¶¶ 378, 380, 386-89, 441.)  Third, the CAC alleges that a number of Fifth Third's statements are false because they discussed overall market difficulties rather than attributing problems to Fifth Third's allegedly faulty loan underwriting practices.  (*Id.* ¶¶ 374-75, 390-92, 396-97, 436-37.)  And fourth, many of the allegedly false statements — despite Plaintiffs' assertions to the contrary — at best pertain only tenuously to loan underwriting standards.  (*Id.* ¶¶ 358-63, 365-69, 398-99, 417-18.)  Plaintiffs contend that these statements were all false when made because they somehow concealed allegedly widespread loan underwriting deficiencies at Fifth Third.

### b. *Statements that Allegedly Concealed the Supposed Insufficiency of Fifth Third's Provision for Loan Losses*

Plaintiffs repeatedly argue in the CAC that Fifth Third mismanaged its loan loss provision.  They come to this conclusion based on two central arguments.  First, Plaintiffs assert throughout the CAC that Fifth Third's disclosures did not reflect the number of loans that had become 30-to-89 days overdue.  (*Id.* ¶¶ 368-69, 390, 392, 394-95, 404, 408-09, 411-12, 415-22, 436-37, 446-47.)  Almost without fail, Plaintiffs accompany these irrelevant observations with claims that these loans "should have been considered impaired."  (*Id.* ¶¶ 369, 392, 395, 404, 409, 412, 418, 422, 447.)  Second, Plaintiffs assert that Fifth Third mismanaged its loan loss reserves by loosely tying statements on increasing the level of loan loss reserves (*id.* ¶¶ 417-18, 423-24, 446-47), and setting the level of reserves (*id.* ¶¶ 411-12, 429-30) to the ratio of reserves to nonperforming assets (*id.* ¶¶ 412, 418, 424, 430, 447).  Plaintiffs concede that the level of

reserves (which consistently were disclosed) steadily and significantly increased during the Class Period. (*Id.* ¶¶ 362, 364, 376, 390, 394, 417, 419, 436.)

Plaintiffs further allege falsity based on Defendant Marshall's statement that the Company believed the level of reserves going forward was appropriate. (*Id.* ¶ 429.) Beyond this, Plaintiffs attempt to allege falsity by tying a number of broad and general statements to Fifth Third's allegedly insufficient loan loss reserves. (*Id.* ¶¶ 365, 405, 417.) Plaintiffs claim that these statements are all false by virtue of Fifth Third allegedly under-reserving for the increasing loan losses it experienced as the worldwide financial meltdown deepened. (*Id.* ¶¶ 366, 405, 418.)

### c. *Statements that Allegedly Concealed the Supposed Deterioration of Fifth Third's Capital Structure*

Plaintiffs argue in the CAC that a number of statements made by Fifth Third were false because they failed to disclose that the credit quality of Fifth Third's Tier I capital had supposedly deteriorated. (*Id.* ¶¶ 384-85, 396-97, 400-01, 408-09, 411-12, 427, 444-45.) Two of the allegedly false statements pertained to the Company's expectations. (*Id.* ¶¶ 400, 427.) Others were general and optimistic statements pertaining to capital. (*Id.* ¶¶ 396, 427). Plaintiffs also argue that statements containing statistics showing that the bank was "well-capitalized" under Federal Reserve System guidelines were misleading (*id.* ¶¶ 408, 444), and that statistics on Fifth Third's capital and capital ratios, including risk-based capital, were somehow false (*id.* ¶¶ 361, 384-85).

### 2. The Onslaught of Securities Filings

Plaintiffs' CAC is one of approximately 200 securities and tag-along lawsuits related to

the worldwide financial meltdown of 2008.[32]   The plaintiffs in these cases seek to capitalize on

the 20/20 vision that hindsight provides.

The basic theory that each of these suits alleges is that the respective defendant

repeatedly lied about its exposure to non-conventional loans, and under-reserved for the

inevitable losses in order to inflate its stock price.  In the aggregate, these lawsuits allege nothing

less than a worldwide conspiracy by the defendant financial institutions to defraud their

shareholders on a massive scale.  Of course, plaintiffs cannot explicitly acknowledge this

preposterous notion.  Instead, each plaintiff alleges that its respective defendant should have seen

this economic meltdown, despite the fact that almost no one else did.  Put simply, the

plaintiffs' bar claims to have discovered hundreds of individual frauds, occurring

simultaneously, concerning the same series of events — all without the apparent knowledge of

the marketplace or government regulators.  This implausible theory not only falls far short of

establishing a compelling inference of fraud, but also fails to even suggest a reasonable inference

of negligence.  *See* Floyd Norris, *It's a Crisis, and Ideas Are Scarce*, N.Y. Times, Apr. 11, 2008,

at C1 ("Most of the critics — myself included — did not anticipate the severity of the credit

collapse, and we should not act as if the executives and regulators who failed to prevent it were

blind or stupid.").

Courts have long been skeptical of "fraud by hindsight" claims brought by plaintiffs in

the wake of market downturns.  *E.g., Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037 (6th Cir.

1991) (plaintiffs' claims that defendants should have known of construction market's decline

were "fraud by hindsight" claims, and therefore not actionable); *Shields v. Citytrust Bancorp,*

*Inc.*, 25 F.3d 1124 (2d Cir. 1994) (rejecting "fraud by hindsight" claim where plaintiffs alleged

---

[32] *See supra* note 5.

- 30 -

that bank executives should have known that reserves were understated in the face of collapsing real estate market); *Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) (rejecting "fraud by hindsight" claim where plaintiffs alleged that bank should have known that reserves were understated in the face of its risky lending during real estate downtown).

Courts have continued to reject "fraud by hindsight" claims brought in the wake of the current credit crisis, finding that the economic meltdown, rather than fraud on the part of the respective defendants, is the more compelling inference as the cause of any drop in the company's stock price:

- *In re PMI Group, Inc. Securities Litigation*, Nos. C 08-1405 SI, C 08-1406 SI, 2009 WL 1916934 (N.D. Cal. July 1, 2009) – Plaintiffs alleged securities fraud based on the defendants' statements of conservative underwriting and alleged improper accounting for loan loss reserves. *Id.* at *3, *5. The court dismissed the complaint, finding that the plaintiffs' scienter allegations based on the receipt of reports, the individual defendants' positions within the company, and the executive bonus plans failed to show that the individuals actually had information showing the problems that the plaintiffs alleged. *Id.* at *8-10.

- *In re Radian Securities Litigation*, No. 07-3375, 2009 U.S. Dist. LEXIS 30224 (E.D. Pa. Apr. 9, 2009) – Plaintiffs alleged that the defendants issued false statements concerning investments associated with subprime lending. *Id.* at *29. The court found that the complaint's scienter allegations on motive, insider trading, and alleged GAAP violations were not as compelling as the defendant's non-culpable explanations, and that the complaint itself showed the numerous disclosures that the defendant had made regarding the riskiness of its subprime portfolio. *Id.* at *81.

- *In re Downey Securities Litigation*, No. CV 08-3261-JFW, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) – Plaintiffs attempted to establish scienter by arguing inferences based on the defendants' positions within the company, signatures on public filings, resignations and terminations of corporate officers, allegations of GAAP violations, and allegations by confidential witnesses. *Id.* at *8-12. The court dismissed the complaint and held that any inference of scienter it pled was less compelling than opposing inferences. *Id.* at *6.

- *Pittleman v. Impac Mortgage Holdings, Inc.*, No. SACV 07-0970 AG, 2009 U.S. Dist. LEXIS 18213 (C.D. Cal. Mar. 9, 2009) – The court dismissed plaintiffs' complaint with prejudice. *Id.* at *10. It found that the case was not about a race-to-the-bottom in loan quality and underwriting standards, as plaintiffs had alleged, but

rather a case "about a company involved in a volatile industry at the onset of a long, destructive economic downturn." *Id.*

- *New York State Teachers' Retirement Systems v. Fremont General Corp.*, No. 2:07-cv-05756-FMC-FFMx, 2008 U.S. Dist. LEXIS 91365 (C.D. Cal. Oct. 28, 2008) – The court dismissed plaintiffs' complaint, finding that the complaint's allegations of falsity were conclusory and failed to illuminate how or why the falsity was material. *Id.* at *14. Further, the allegations failed to adequately plead a strong inference of scienter. *Id.* at *15.

- *In re 2007 Novastar Financial, Inc. Securities Litigation*, No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) – The court dismissed plaintiffs' complaint with prejudice in which plaintiffs alleged that the defendants inappropriately loosened their underwriting guidelines and failed to adequately account for loss reserves. *Id.* at *9-10. The court held that "Plaintiff's allegations are more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than they are with a company and executives recklessly deceiving the investing community." *Id.* at *15.

- *In re Impac Mortgage Holdings, Inc. Securities Litigation*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008) – The court dismissed plaintiffs' complaint alleging that the defendant failed to properly monitor the quality of its loans. *Id.* at 1087-88. The complaint failed to raise the requisite inference of scienter as instructed by *Tellabs*, as none of the allegations showed that any defendant was "notified of information that would have led them to believe that any of the challenged statements were false when made." *Id.* at 1101.

- *Tripp v. IndyMac Financial Inc.*, No. CV07-1635-GW, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) – The plaintiffs alleged that the defendants inappropriately loosened their underwriting guidelines, leading to the lending institution's ultimate collapse. *Id.* at *3. The court dismissed the plaintiffs' complaint, finding that "an even stronger inference is that Defendants were simply unable to shield themselves as effectively as they anticipated from the drastic change in the housing and mortgage markets and, once that inability became evident, IndyMac's financials were changed accordingly." *Id.* at *4.

- *See also In re Huntington Bancshares Inc. ERISA Litigation*, No. 2:08-cv-0165, 2009 WL 330308 (S.D. Ohio Feb. 9, 2009) – The court dismissed ERISA claims against the defendant financial holding company. *Id.* at *1. The court noted that the defendant's stock price basically moved in tandem with other regional banks in the defendant's geographic footprint. *Id.* at *8. Further, the defendant's SEC filings extensively disclosed the risks that the company faced because of the deterioration of the housing market. *Id.* at *10-11.[33]

---

[33] The Fifth Third and Director Defendants are separately filing a motion to dismiss the consolidated ERISA claims.

The context of these cases is identical to that of the present case. Financial institutions worldwide are mired in a drastic and unexpected change in the economy, and they have done their best to "catch a falling knife" while experiencing the dire consequences of a market-wide collapse. The courts in the cases listed above found that this collapse is the more likely cause of drops in stock price, rejecting attempts by plaintiffs to draw an inference that financial institutions all independently conspired to commit fraud in order to artificially inflate their stock prices. The same result should be reached here.

## V.    **ARGUMENT**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's complaint must provide "more than labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must contain either direct or inferential allegations regarding all material elements of the asserted causes of action. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Although well-pleaded factual allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff, courts need not accept as true conclusions of law, conclusions unsupported by the facts alleged, bald assertions, or unwarranted factual inferences. *Twombly*, 550 U.S. at 555. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

When analyzing a motion to dismiss filed under Rule 12(b)(6), the court may consider "[d]ocuments that a defendant attaches" to the motion, which "are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (adopting rule set forth in *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)); *see also Butler v. Aetna U.S. Healthcare, Inc.*, 109 F. Supp. 2d 856, 859-60 (S.D. Ohio 1999) (considering plan documents

provided by defendants when reviewing motion to dismiss without converting it to a motion for summary judgment due to numerous references to the plan in the plaintiffs' complaint and the plan's crucial role in the litigation).

      **A.**    **The Securities Exchange Act Claims Must Be Dismissed (Counts XII – XIII Under Sections 10(b) and 20(a) and Rule 10b-5; Asserted Against Fifth Third and the Individual Defendants).**

              **1.**    **Section 10(b) and Rule 10b-5 Claims Must Satisfy Exacting Pleading Requirements.**

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, a plaintiff must allege (i) a misstatement or omission (ii) of material fact by a defendant (iii) with scienter, (iv) in connection with the purchase or sale of a security, (v) reasonable reliance by the plaintiff on the representation or omission, and (vi) that the misstatement or omission proximately caused economic loss. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999). Failure to properly plead any one element necessitates dismissal of the claim. *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 691 (6th Cir. 2005).

Heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") apply to claims brought under Section 10(b). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the PSLRA requires that

plaintiffs "state with particularity facts giving rise to a *strong* inference that the defendant acted

with the required state of mind." *Id.* § 78u-4(b)(2) (emphasis added).

To survive a motion to dismiss, the inference of scienter in a securities fraud complaint

must be "at least as compelling as any opposing inference one could draw from the facts

alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "The PSLRA

does not permit a plaintiff merely 'to allege facts from which an inference of scienter rationally

could be drawn.' Rather, the inference of scienter 'must be cogent and compelling, thus strong

in light of other explanations.'" *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)

(*quoting Tellabs*, 551 U.S. at 313-14).

The Supreme Court has defined "scienter" as "a mental state embracing intent to deceive,

manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976). The Sixth

Circuit has explained that with respect to "securities fraud claims based on statements of present

or historical fact, . . . scienter consists of knowledge or recklessness." *PR Diamonds, Inc. v.

Chandler*, 364 F.3d 671, 681 (6th Cir. 2004). Recklessness has been defined by the Sixth Circuit

as "highly unreasonable conduct which is an extreme departure from the standards of ordinary

care. While the danger need not be known, it must at least be so obvious that any reasonable

man would have known of it." *Id.* (*quoting Mansbach v. Prescott, Ball & Turben*, 598 F.2d

1017, 1025 (6th Cir. 1979)); *see also In re Comshare*, 183 F.3d at 150 (describing recklessness

as a "mental state apart from negligence and akin to conscious disregard").

### 2. The CAC Fails to Plead an Actionable Misstatement or Omission.

In examining whether an allegedly false statement is actionable, courts must consider

whether the information, had it been presented as the plaintiff claims it should have been, would

have altered the "total mix" of information available. *City of Monroe*, 399 F.3d at 669.

Additionally, "the court must scrutinize the nature of the statement to determine whether the

statement was false when made."  *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir. 1991).  Certain types of corporate statements — including the failure to disclose mismanagement, corporate puffery, and forward-looking statements protected by the PSLRA's safe harbor provision — generally are not actionable.  *Albert Fadem Trust v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1016-17, 1021-22, 1026-27 (S.D. Ohio 2004).

None of the statements that Plaintiffs allege to be false are actionable in a securities lawsuit.  As explained in detail below, all of the purportedly false statements are either allegations of mismanagement, statements of puffery and corporate optimism, forward-looking statements protected by the PSLRA's safe harbor provision, allegations of GAAP violations without any knowledge on the part of any defendant, and omissions that are unrelated to the allegedly false statements.[34]  Even if this Court were to find that certain statements could be a misrepresentation as pled, Plaintiffs fail to allege that any Defendant knew that the statement was false when made, as discussed below.  This failure is fatal to all of Plaintiffs' claims.

> **a.** **Plaintiffs Fail to Allege an Actionable Misstatement or an Omission Under Section 11 or Section 12(a)(2) in Light of Fifth Third's Disclosures.**

Courts must consider allegedly false statements in the context of other statements made by the defendant.  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (to be material, statement must alter the "total mix" of information); *J & R Mktg., SEP v. Gen. Motors, Inc.*, 549 F.3d 384, 395 (6th Cir. 2008) (affirming dismissal based on the fact that the allegedly false statements were "immaterial as a matter of law when read in context of the entire 2003 10-K"); *Albert Fadem Trust*, 334 F. Supp. 2d at 1019 ("The test for whether a statement is materially

---

[34] Curiously, Plaintiffs cite a Form 8-K filed on May 2, 2008 under the CAC's "Defendants' False and Misleading Statements" section.  (CAC ¶ 432.)  This 8-K announced that Defendant Marshall had resigned as Chief Financial Officer of Fifth Third.  (*Id.*)  Plaintiffs make no attempt to detail why this allegation is false, or even suspicious.  (*Id.*)  In the absence of allegations to suggest the resignation was related to fraudulent conduct, the 8-K is irrelevant to Plaintiffs' claims.  *In re Radian*, 2009 U.S. Dist. LEXIS 30224, at *76-77.

misleading under Section 10(b) and Section 11 is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." (internal quotation marks and citations omitted)). Dismissal of securities claims is warranted where the risks allegedly concealed by the defendant are in fact disclosed. *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5, 9 (2d Cir. 1996). The Ninth Circuit has held that statements "will not mislead even when [they are] incomplete or fail to include all relevant facts," and that, to be misleading, an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). In light of Fifth Third's extensive disclosures relating to its loan portfolio, detailed in Section IV(B), investors were well-informed as to the "state of affairs" at Fifth Third with respect to its loan underwriting, loan loss reserves, or capital strength.

Fifth Third made a number of explicit disclosures about its exposure to the adverse economic climate. (*E.g.*, Fifth Third, Quarterly Report (Form 10-Q), at 28 (Nov. 9, 2007) ("Certain mortgage products have contractual features that may increase credit exposure to the Bancorp in the event of a decline in housing prices.") (Aff. Ex. 28).) The Company continually disclosed pressure that the economy was putting on its credit, and how continued credit deterioration could be expected. (*E.g.*, Fifth Third, Fifth Third Bancorp Reports Second Quarter 2007 Earnings of $0.69 per Diluted Share (Form 8-K), at 2 (July 19, 2007) ("[C]redit is a challenge at this point in the cycle . . . We do expect continued deterioration in credit trends for the near future.") (Aff. Ex. 23).) The rise in delinquency rates was described by region and by portfolio. (*E.g.*, *id.* at 8 ("Commercial delinquency growth was concentrated in real estate lending, particularly in Michigan and South Florida. Consumer growth was driven by residential delinquencies in South Florida, Northeastern Ohio, and Eastern Michigan.").) Furthermore, Fifth

Third repeatedly disclosed the increases in their loan loss provisions and what was causing those increases. (*E.g.*, Fifth Third, Quarterly Report (Form 10-Q), at 11 (Nov. 9, 2007) ("The provision for loan and lease losses increased to $139 million in the third quarter of 2007 compared to $87 million in the same period last year. The $52 million increase is related to loan growth during the past year, increases in delinquencies and increases in severity of loss from the decline in the real estate market.") (Aff. Ex. 28).) Similarly, increases in nonperforming assets were repeatedly disclosed by region and by portfolio. (*E.g.,* Fifth Third Bancorp Reports First Quarter 2007 Earnings of $0.65 per Diluted Share (Form 8-K), at 7 (Apr. 19, 2007) ("Nonperforming assets at quarter end were $494 million . . . The sequential increase in NPAs . . . occurred primarily in the commercial mortgage portfolios. Commercial NPA growth was concentrated in Florida . . . and in Michigan.") (Aff. Ex. 21).) And Fifth Third made clear that it originated and dealt in non-traditional and non-conforming loans. (*E.g.*, Fifth Third, Citigroup 2008 Financial Services Conference Presentation (Form 8-K), at 17 (Jan. 30, 2008) (disclosing amount of Alt-A originations, percentage of borrowers with FICO scores of less than 660, and percentage of loans with at least a 90 percent LTV ratio) (Aff. Ex. 39).)

In light of these disclosures, reasonable investors could not have been misled regarding Fifth Third's loan underwriting, loan loss reserves, or capital strength.

> **b.** ***Allegations of Mismanagement Are Not Actionable Under Section 10(b).***

To survive a motion to dismiss in a securities fraud action, the complaint must allege that the defendants made the supposed misstatements with an intent to deceive. *Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 357 (6th Cir. 1987). "Mere mismanagement or inaccurate predictions are not enough [to establish a securities fraud claim]." *Id.*; *see also Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971) ("Congress by § 10(b) did not seek

to regulate transactions which constitute no more than internal corporate mismanagement."); *In re United Am. Healthcare Corp. Sec. Litig.*, No. 2:05-CV-72112, 2007 WL 313491, at *20 (E.D. Mich. Jan. 30, 2007) ("Without an intent to deceive, violations of accounting principles are closer to corporate mismanagement, which the federal securities laws do not govern.").

Courts have applied this rule in the specific context of reserves for future losses. Absent allegations that the defendants knew, or were reckless in not knowing, the inadequacy of their reserves, allegations regarding the "mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992); *accord United States v. Morris*, 80 F.3d 1151, 1164-65 (7th Cir. 1996); *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 942 (M.D. Tenn. 1999).

Plaintiffs' claims regarding the alleged inadequacy of Fifth Third's loan loss reserves are precisely the type of mismanagement claims that courts routinely find to be not actionable under Section 10(b). Plaintiffs repeatedly assert that Defendants should have considered loans that were 30-to-89 days delinquent to be impaired. (*See* CAC ¶¶ 368-69, 390, 392, 394-95, 404, 408-09, 411-12, 415-16, 417-22, 436-37, 446-47.) Plaintiffs' only bases for their opinion are (i) that the FDIC considers this statistic, among others, in assessing a financial institution's strength, and (ii) that a report cited this statistic "[a]s yet another indicator" for assessing reserve levels. (*Id.* ¶¶ 273-74.) Plaintiffs never allege any facts showing that this statistic is "[t]he leading bellwether of loan collectability" (*id.* ¶ 272), or "the lead indication of deteriorating credit quality" (*id.* ¶ 416), as Plaintiffs maintain. Plaintiffs certainly do not cite any sources that describe the 30-to-89 day statistic in such grandiose terms, much less point to other financial institutions' use of this statistic. *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020

(5th Cir. 1996) ("[B]are allegation[s] about industry custom [are] precisely the type of conclusory allegation that motivated the heightened pleading standards.").  Plaintiffs' repetitive assertion that the 30-to-89 day delinquency statistic should have caused Defendants to raise their reserve levels is, moreover, a classic instance of "fraud by hindsight" pleading, and does nothing more than second-guess the business judgments of Defendants.

Further, despite emphasizing the 30-to-89 day delinquency statistic so heavily in the CAC, Plaintiffs point to only one disclosure that even touches on this statistic.  (CAC ¶ 275.) That disclosure was made in a report that was limited to assessing loans in Michigan only, and included statistics for only three consecutive quarters, beginning with the fourth quarter of 2007. (*Id*.)  The report does not in any way corroborate Plaintiffs' accusations that there was also "a troubling increase in the 30 to 89 day past due category" (*id.* ¶ 9), or that there existed a "rapidly increasing number of loans 30 to 89 days delinquent" (*id.* ¶¶ 276, 369, 392, 395, 404, 412, 418, 422, 430, 437, 447).  The report's breadth is extremely narrow and it simply does not reflect any increase in loans that fall into the 30-to-89 day category.  Conclusory allegations that amount to nothing more than speculation fail to state a claim, even under notice-pleading standards.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Plaintiffs also maintain that Fifth Third should have increased reserves more than it did based on the increase of nonperforming assets.  (CAC ¶¶ 412, 418, 424, 430, 447.)  Although Plaintiffs repeatedly state that the reserves-to-nonperforming-assets ratio was dropping, they acknowledge that the amount of reserves steadily and substantially increased throughout the Class Period.  (*Id.* ¶¶ 362, 364, 376, 390, 394, 417, 419, 436.)  Plaintiffs never allege, however, that the pre-meltdown ratio used by Fifth Third was in some way the minimum acceptable level,

or what the proper level is.  And, again, they point to no industry standard.  Thus, Plaintiffs'
assertion that the drop in the reserves-to-nonperforming-assets ratio should have caused Fifth
Third to raise its reserve levels is another instance of "fraud by hindsight" pleading, and is
nothing more than inappropriate second-guessing.

### c.     *Optimistic and Vague Statements Are Not Actionable.*

Courts may dismiss claims based on statements of puffery and "corporate optimism" at
the motion to dismiss stage.  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir.
2004).  This principle is based on the premise that in order for a statement to be material, "there
must be a substantial likelihood that the disclosure of the omitted fact would have been viewed
by the reasonable investor as having significantly altered the 'total mix' of information made
available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Courts have
demonstrated a willingness to dismiss claims based upon corporate statements that "lack[] a
standard against which a reasonable investor could expect them to be pegged," and that are "too
untethered to anything measurable."  *City of Monroe*, 399 F.3d at 671.

Courts have made use of this rule in dismissing securities lawsuits based on statements
pertaining to oversight of internal controls.  *E.g., In re JP Morgan Chase Sec. Litig.*, No. 02 Civ.
1282, 2007 WL 950132, at *12 (S.D.N.Y. Mar. 29, 2007), *aff'd sub nom. ECA, Local 134 IBEW
Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)
("generalizations regarding integrity, fiscal discipline and risk management constitute precisely
the type of puffery that this and other circuits have consistently held to be inactionable" (internal
quotation marks omitted)); *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 400
(E.D. Pa. 2005) (statements on the company's "focus on credit quality" and "application of
uniform underwriting standards" are puffery and are not actionable).  Courts also have applied
this principle in dismissing cases arising from the current credit crisis.  *E.g., In re Downey Sec.*

- 41 -

*Litig.*, No. CV 08-3261-JFW, 2009 WL 736802, at *6 (C.D. Cal. Mar. 18, 2009) (finding that financial company's statement regarding its "strong" capital position was not actionable); *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (finding that mortgage company's statement regarding "continued solid loan production" was not actionable).

### i.      Loan Underwriting Standards

Plaintiffs allege that Fifth Third made false statements when it represented that its "credit risk management strategy is based on three core principles: conservatism, diversification and monitoring," and that "[the bank] believes that effective credit risk management begins with conservative lending practices."  (CAC ¶¶ 382-83, 438-39; *see also id.* ¶¶ 415-16.)  But these are the types of "generalizations regarding integrity, fiscal discipline and risk management" that courts routinely reject as puffery.  *See In re JP Morgan*, 2007 WL 950132, at *12.  Because these types of statements are too vague for anyone to compare them to an objective standard in order to prove them false, they are not actionable.  *City of Monroe*, 399 F.3d at 671.

Likewise, Fifth Third's disclosures regarding its Alt-A loan origination are too vague to be actionable under Section 10(b) and Rule 10b-5.  Fifth Third described these "non-conforming" loans as being "comparable to other conforming residential mortgage products."  (CAC ¶¶ 381, 413, 442.)  Plaintiffs cannot prove these statements to be false because the term "comparable" is too vague to serve as a basis for liability.  *Suna v. Bailey Corp.*, 107 F.3d 64, 70 (1st Cir. 1997) (statement that new supply arrangements would provide "opportunities comparable to those that have been provided by the [previous] models" not actionable).  Plaintiffs fail to allege, moreover, that Alt-A loans are not actually comparable to conforming loans.  They also fail to allege any uniform standard for "conforming" loans, compounding the vagueness of the allegations.

Plaintiffs also take issue with statements by Fifth Third regarding its abstention from dealing in subprime loans. (CAC ¶¶ 386, 388, 406-07, 410, 425, 433-35.) These statements are inactionably vague, however, and lack a standard against which they can be evaluated. *See City of Monroe*, 399 F.3d at 671 (dismissing claims based on statements that "lacked a standard against which a reasonable investor could expect them to be pegged"). Plaintiffs attempt to compensate for the lack of an objective standard by alleging that "[t]he FDIC and other banking regulators regard a FICO score of 660 as the prime-subprime dividing line." (CAC ¶ 15.) But Plaintiffs outright ignore language in the FDIC's document stating that "[t]his [list of factors] is . . . not meant to define specific parameters for all subprime borrowers. Additionally this definition may not match all market or institution specific subprime definitions, but should be viewed as a starting point from which the Agencies will expand examination efforts." (*Id.* ¶ 16.)

Nothing in the CAC supports the contention that the FICO score of 660 is "a key threshold" in determining prime versus subprime status. (*Id.* ¶ 11.) Plaintiffs do not cite any sort of regulation on classification of subprime loans, much less one that mandates the use of FICO scores as a key indicator. Nor do Plaintiffs allege any facts about the practices of other mortgage lenders — a fatal omission in their attempt to demonstrate an industry standard.

Additionally, Plaintiffs ignore the fact that no reasonable investor could have thought that Fifth Third intended to define subprime as FICO scores of less than 660. As shown in Plaintiffs' CAC, Fifth Third repeatedly disclosed the percentage of its borrowers with FICO credit scores below 660. (*Id.* ¶¶ 386 (13% of mortgage borrowers have FICO scores of less than 660), 388 (12% of borrowers have sub-660 scores); *see also* Fifth Third, Citigroup 2008 Financial Services Conference Presentation (Form 8-K), at 17 (Jan. 30, 2008) (13% of borrowers have sub-660 scores) (Aff. Ex. 39); Fifth Third, UBS Global Financial Services Conferences Presentation

(Form 8-K), at 21 (May 12, 2008) (same) (Aff. Ex. 40).)  Thus, Plaintiffs' argument that Fifth

Third somehow was attempting to "conceal" subprime borrowers is without merit.

### ii. Capitalization

The legal principle that statements constituting puffery are not actionable under

Section 10(b) and Rule 10b-5 also applies to five of Fifth Third's statements pertaining to

capitalization that are identified in the CAC.  Defendant Kabat's statement on a January 22, 2008

analyst call — "[o]ur tangible capital levels are relatively strong compared to most of our peers"

(CAC ¶ 396) — is analogous to a statement that the court in *In re Downey* recently deemed to be

puffery.  2009 WL 736802, at *6 (finding that financial company's statement regarding its

"strong" capital position was not actionable).  Similarly, Defendant Marshall's statement during

an April 22, 2008 call that Fifth Third "actually think[s] we feel pretty comfortable with where

we are" (CAC ¶ 427), and Defendant Kabat's statement from an undisclosed source that "we

believe Fifth Third is well-positioned relative to many of its peers" (*id.* ¶ 417), are merely

statements of corporate optimism and, therefore, are not actionable.  *Cf. In re Ford Motor*, 381

F.3d at 570-71 (dismissing claims based on statements in which company "praise[d] their

products and their objectives").  This principle likewise applies to Defendant Kabat's statement

that "though it is a tough environment, and we expect the near term to present further

deterioration in credit metrics, Fifth Third is well positioned" (CAC ¶ 396), and Fifth Third's

statement that it "has moved aggressively to stay ahead of emerging credit issues" (*id.* ¶¶ 415,

446).

> **d.** ***Fifth Third's Statements Regarding Reserve Projections and Capital Targets Are Not Actionable Under the PSLRA's Safe Harbor Provision.***

The PSLRA provides protection to certain forward-looking statements through its safe

harbor provision.  15 U.S.C. § 78u-5.  The safe harbor provision "excuses liability for

defendants' projections, statements of plans and objectives, and estimates of future economic performance." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547-48 (6th Cir. 2001). "A plaintiff may overcome this protection only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." *Id.* at 548.

### i.  Loan Loss Reserves

Statements that pertain to the adequacy of reserves are inherently forward-looking and are protected by the safe harbor provision. *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004). This is due to the fact that such statements can be verified only at some future time. *Id.* (*citing Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) ("a statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance . . . [and is] thus forward-looking and in the safe harbor")); *In re Am. Serv. Group, Inc.*, No. 3:06-0323, 2009 WL 1348163, at *37 (M.D. Tenn. Mar. 31, 2009) (stating in safe harbor discussion that "the failure to establish adequate reserves is generally not sufficient to establish securities fraud" (internal quotation marks and citation omitted)); *Beaver County Ret. Bd. v. LCA-Vision, Inc.*, No. 1:07-CV-750, 2009 WL 806714, at *14 (S.D. Ohio Mar. 25, 2009) (plaintiffs' claims based on alleged failure to establish sufficient reserves for doubtful accounts deemed not actionable under PSLRA's safe harbor provision). In *In re Kindred Healthcare*, the court held that all the following statements of the defendants constituted forward-looking statements protected under the PSLRA: (a) "the expectation of Kindred's management is that current reserves are adequate"; (b) "management believed that Kindred adequately recorded reserves for professional liability [and] confirmed that that they were comfortable with Kindred's numbers for professional liability"; (c) "[Kindred is]

comfortable with its reserves"; and (d) "Kindred believes that it is appropriately reserved for professional liability."  299 F. Supp. 2d at 734-38.

For similar reasons, Defendant Marshall's statement during an April 22, 2008 conference call that "we think . . . our reserves are appropriate" is not actionable.  (CAC ¶ 429.)  Defendant Marshall couched the statement in cautionary terms, and it is inherently forward-looking. Accordingly, the statement falls within the purview of the PSLRA's safe harbor provision.[35]

The following purportedly false, forward-looking statement of expectations found in Fifth Third's December 18, 2007 Form 8-K likewise is protected by the safe harbor provision:

> Provision expense for loan and lease losses in fourth quarter 2007 is currently expected to be approximately $275 million.  The provision is expected to exceed charge-offs by approximately $105 million and raise the reserve to loan ratio to 1.15 percent.

(*Id.* ¶ 390)  The Form 8-K contained a paragraph with extensive cautionary language, including that "[t]here are a number of important factors that could cause future results to differ materially from historical performance and these forward-looking statements," such as "prepayment speeds, loan origination and sale volumes, charge-offs and loan loss provisions," and that "general economic conditions . . . are less favorable than expected."  (Fifth Third, Fifth Third Bancorp Announces Charges, Expectations for Fourth Quarter 2007 Results (Form 8-K), at 3 (Dec. 18, 2007) (Aff. Ex. 34).)  As discussed below in Section V(A)(3), these statements also qualify for safe harbor protection because Plaintiffs fail to properly allege that any Defendant knew the statement to be false when made.

---

[35] Furthermore, a Fifth Third representative made the following statement at the beginning of the call: "[T]his call contains certain forward-looking statements about Fifth Third Bancorp pertaining our financial condition, results of operations, plans, and objectives.  These statements involve certain risks and uncertainties.  There are a number of factors that could cause results to differ materially from historical performance in these statements."  Fifth Third, First Quarter 2008 Earnings Call Transcript, at 1-2 (Apr. 22, 2008) (Aff. Ex. 33).

**ii.     Capitalization**

The PSLRA's safe harbor provision protects the following four statements pertaining to

capital target ratios that Plaintiffs allege to be false:

- In a January 22, 2008 conference call, Defendant Marshall stated that although Fifth Third was below its capital target ratio, "we expect to solve that very, very quickly." (CAC ¶ 400.)

- In a call on April 22, 2008, Marshall stated with regard to capital ratios that "we expect our capital to be comfortably within our targets."  (*Id.* ¶ 427.)

- Addressing credit deterioration due to the lack of an NPA sale, Marshall stated that he "would expect that not having an NPA sale is going to be unusual for us."  (*Id.* ¶ 368.)

- Responding to a question on Fifth Third's capital expectations, Marshall stated, "I wouldn't expect to see us do anything out of the ordinary and certainly nothing resembling any of the extreme capital raises you've seen from some of our more stressed peers."  (*Id.* ¶ 427.)

All these statements plainly are forward-looking, and are couched in the cautionary language of

expectation.  Further, all of these statements were from analyst calls that began with a statement

on the risks and uncertainties that could cause actual performance to differ from the calls'

forward-looking statements.  (Fifth Third, Third Quarter 2007 Earnings Call Transcript, at 1-2

(Oct. 19, 2008) (Aff. Ex. 36); Fifth Third, Fourth Quarter 2007 Earnings Call Transcript, at 1-2

(Jan. 22, 2008) (Aff. Ex. 31); Fifth Third, First Quarter 2008 Earnings Call Transcript, at 1-2

(Apr. 22, 2008) (Aff. Ex. 33).)

**e.     *GAAP-Based Allegations Are Insufficient to Establish Falsity When No Facts Are Presented Showing that the Statements Were Known to Be False at the Time They Were Made.***

The Supreme Court has recognized that the Generally Accepted Accounting Principles

("GAAP") are "far from being a canonical set of rules that will ensure identical accounting

treatment of identical transactions."  *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439

U.S. 522, 544 (1979).  The principles "tolerate a range of 'reasonable' treatments, leaving the

choice among alternatives to management." *Id.* To be actionable under Section 10(b) and

Rule 10b-5, GAAP violations must be accompanied by specific allegations that the defendants

made the violation with knowledge or in an extreme departure from the standards of ordinary

care. *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008).

Here, Plaintiffs fail to allege that any supposed GAAP violation was knowingly made.

(*See* CAC ¶¶ 342-55.)  Nor do Plaintiffs state with particularity why Fifth Third's reserve

estimations were outside the range of reasonable treatments, or what exactly the range of

reasonable treatments should have been.  (*Id.*)  Rather, Plaintiffs simply allege that "the

Company issued financial statements that were materially misstated and not presented in

accordance with GAAP because the Company did not establish an adequate reserve for loan

losses in violation of GAAP and thus, overstated net income."  (*Id.* ¶ 344.)  Courts have held,

however, that "a bare allegation that bad debt reserves were inadequate is insufficient because

even reasonable predictions turn out to be wrong."  *Alaska Elec. Pension Fund v. Adecco S.A.*,

434 F. Supp. 2d 815, 823 (S.D. Cal. 2006).  "Instead, plaintiffs must allege with particularity

facts that show the initial prediction was a falsehood."  *Id.*  Plaintiffs spend multiple pages in the

CAC listing various accounting principles and guidelines, and then assert in a single sentence

that "Fifth Third failed to prudently consider or adhere to the aforementioned guidance,

ultimately rendering its financial statements materially false and misleading."  (CAC ¶ 355.)

Such allegations do not satisfy the pleading standards for Section 10(b) and Rule 10b-5 claims.

*See, e.g., In re 2007 Novastar Fin., Inc. Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 U.S. Dist.

LEXIS 44166, at *11-13 (W.D. Mo. June 4, 2008) (finding GAAP allegations based on

inadequate reserves not actionable, noting that "Plaintiff fails to identify a single false entry in

the Company's financial statements, nor does he identify the 'truth' that should have been disclosed.").

In analyzing alleged GAAP violations in a securities fraud action, courts often consider whether the company has been required to restate its financials. When no one has suggested that a company should do so, an implication that "reasonable accountants could differ" exists; this is "an inference that defeats plaintiffs' claims of recklessness." *In re JP Morgan*, 2007 WL 950132, at *13*; see also In re Novastar*, 2008 U.S. Dist. LEXIS 44166, at *12 (finding it "noteworthy that nobody — the SEC, Novastar's auditors, or anyone else — has suggested Novastar should or must restate its financial reports"); *Tripp v. IndyMac Financial Inc.*, No. CV07-1635-GW, 2007 WL 4591930, at *5 (C.D. Cal. Nov. 29, 2007) ("as Defendants point out, IndyMac's financials have been audited without restatement"). Plaintiffs have not alleged that ***anyone*** has suggested that Fifth Third should restate its financials dating from the Class Period. This supports an inference that Defendants were not reckless in reserving the amounts that they did. Plaintiffs' attempt to establish false statements based on alleged GAAP violations thus fails.

### f.      *Fifth Third's Disclosures Were Accurate.*

Plaintiffs' allegations regarding the alleged falsity of Fifth Third's financial statistics fail because the CAC does not specify how those disclosures were in any way inaccurate. (*See* CAC ¶¶ 359-61, 367-68, 374, 376, 380, 384, 386, 388, 390, 394, 408, 419, 421, 423, 436, 441, 444.) Fifth Third's disclosures clearly set forth statistics on the increases in Fifth Third's loan loss provision (*id.* ¶¶ 359, 367, 368, 376, 394, 419, 423, 436), Fifth Third's origination of non-traditional loans (*id.* ¶¶ 380, 386, 388, 441), the increase in delinquent loans (*id.* ¶ 360), the increase in Fifth Third's nonperforming assets (*id.* ¶¶ 360, 367, 374, 390, 394, 421, 423), and Fifth Third's capital levels, including risk-based capital (*id.* ¶¶ 361, 384, 408, 444). Instead of detailing why these disclosures are false, Plaintiffs merely state in a conclusory fashion that the

disclosures concealed the "true" state of affairs.  For example, following a citation to Fifth

Third's statements regarding its Tier I capital ratio, Plaintiffs attempt to show falsity based on an

assertion that Fifth Third supposedly "failed to disclose that the credit quality of Fifth Third's

tier 1 capital had severely deteriorated."  (*Id.* ¶ 445; *see also id.* ¶¶ 385, 401, 409, 412, 430.)

Such conclusory pleading, which permeates the entire CAC, is insufficient to survive a motion to

dismiss under the PSLRA.

Many of Plaintiffs' attempts to establish falsity are premised on Plaintiffs' desire for

details beyond the in-depth statistics that Fifth Third already has provided.  Fifth Third disclosed

data on delinquency rates for interest-only loans, greater than 80 percent LTV loans with no

mortgage insurance, greater than 80 percent LTV loans which were interest-only, 80/20 loans,

and 80/20 loans that were interest-only.  (*Id.* ¶¶ 380, 441.)  Fifth Third also disclosed data on the

number of loans made to borrowers with FICO scores under 660.  (*Id.* ¶¶ 386, 388; *see also* Fifth

Third, Citigroup 2008 Financial Services Conference Presentation (Form 8-K), at 17 (Jan. 30,

2008) (13% of borrowers have sub-660 scores) (Aff. Ex. 39); Fifth Third, UBS Global Financial

Services Conferences Presentation (Form 8-K), at 21 (May 12, 2008) (same) (Aff. Ex. 40).)

Plaintiffs assert that Fifth Third should have disclosed more information regarding "other risk

factors," such as borrowers with undocumented employment.  (CAC ¶¶ 379, 380, 397, 441.)

Plaintiffs acknowledge, however, that Fifth Third disclosed its Alt-A originations (*id.* ¶¶ 365,

370, 381, 413, 442), and that Alt-A loans are generally understood to be loans to "borrowers who

could not fully document and verify their income and asset" (*id.* ¶ 19).  Likewise, while Plaintiffs

repeatedly complain that Fifth Third failed to disclose the "layered risk factors" of its Alt-A

loans (*e.g.*, *id.* ¶¶ 106, 162, 195), Fifth Third in fact also disclosed the FICO scores and LTV

ratios for that sub-set of loans, and Fifth Third informed investors that it considered $163 million

of its Alt-A loans to be "un-saleable" in the current market.  (Fifth Third, Fox-Pitt Kelton

Cochan Caronia Waller Financial Services Conference Presentation (Form 8-K), at 22 (Nov. 29,

2007) (Aff. Ex. 38).)  Similarly, Plaintiffs appear to contend that Fifth Third "concealed" the

"crucial ratio of its loan loss reserves to nonperforming assets" (CAC ¶¶ 22-23), yet Fifth Third

disclosed this ratio throughout the Class Period.  (*See supra* Section IV(B)(2)(e).)

Plaintiffs' wish for even more information is unjustified.  Additional statistical

disclosures by Fifth Third would have "deluge[d] investors with marginally useful information."

*In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 403 (6th Cir. 1997).  Further, companies are

"not required to use the negative characterizations that Plaintiffs suggest" and "do not need to

use 'pejorative nouns or adjectives'" to describe their operations or outlook.  *Ley v. Visteon

Corp.*, 543 F.3d 801, 808 (6th Cir. 2008) (*citing In re Donald J. Trump Casino Sec. Litig.-Taj

Mahal Litig.*, 7 F.3d 357, 375 (3d Cir. 1993); *In re Sofamor Danek*, 123 F.3d at 402); *see also In

re New York Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) (bank

not required to describe mortgage-backed securities "in pejorative terms").

Plaintiffs' remaining allegations concerning Fifth Third's loan loss reserves and

nonperforming assets all revolve around the accusation that Fifth Third "should" have increased

its reserves earlier than it did.  (*See* CAC ¶¶ 369, 392, 395, 404, 412, 418, 422, 430, 437, 447.)

This is blatant second-guessing through the hindsight that the passage of time provides; as such,

it is insufficient to state a securities fraud claim.  *See In re ICN Pharm., Inc. Sec. Litig.*, 299 F.

Supp. 2d 1055, 1065 (C.D. Cal. 2004) ("[E]ven a delinquent write-down of the impaired assets,

without anything more, does not state a claim of securities fraud, stating at best a bad business

decision."); *Lindner Dividend Fund, Inc. v. Ernst and Young*, 880 F. Supp. 49, 58 (D. Mass.

1995) (substantial increase in loan loss reserves due to market conditions is not evidence that

- 51 -

reserves in earlier statements were inadequate).

> **g.**     ***The Alleged Omissions Have No Relation to the Statements that Plaintiffs Allege to Be False.***

Throughout the CAC, Plaintiffs pull statements from various Fifth Third disclosures and argue that they are false due to material omissions, when, in fact, the statements have no relation to the supposedly concealed information.  (*See* CAC ¶¶ 358-63, 365-67, 369, 398-99, 405, 411-12, 417-18.)  Plaintiffs seem to be arguing that any time Fifth Third makes a public statement about any aspect of its financial standing, a duty arises that compels Fifth Third to speak on every facet of the business that could possibly be related.  No such duty exists.  *See J & R Mktg., SEP v. Gen. Motors, Inc.*, No. 06-10201, 2007 WL 655291, at \*9 (E.D. Mich. Feb. 27, 2007) ("*City of Monroe* . . . demonstrate[s that] in order to maintain a claim for omission of a fact that would make other statements not misleading, any undisclosed information must relate to a particular disclosure that the defendant made."); *Albert Fadem Trust*, 334 F. Supp. 2d at 1022 ("The principle implied by the plain language of the [securities] statutes is that, to be actionable, omissions must be related to the statements made by Defendants.").  A duty to affirmatively disclose arises only when there is a statute requiring disclosure, an inaccurate, incomplete, or misleading prior disclosure, or instances of insider trading.  *City of Monroe*, 399 F.3d at 669.

Plaintiffs allege that all the following statements are false because they failed to disclose the allegedly deficient underwriting at Fifth Third:

- "We continue to expect further deterioration in credit trends for the near future but the deterioration to remain manageable. Overall, we were pleased with our results given the macro environment in this kind of quarter and continue to execute our strategic plans."  (CAC ¶ 358.)

- "[W]e've been able to generate core performance that has allowed us to earn through a higher provision and still grow EPS."  (*Id.* ¶ 364.)

- "We've also been completely transparent about our opportunities and our problems. For example, we've been very clear for a year that we expected home equity to be the most likely source of higher losses, not only for us but for the industry." (*Id.* ¶ 365.)

- In response to a question about the proportion of loans based in Florida that were acquired through acquisitions of banks, Defendant Marshall stated, "I mean, most of it." (*Id.* ¶ 398.)

- "We remain very active in taking steps to address the issues we and the industry are facing." (*Id.* ¶ 417.)

To claim, as Plaintiffs do, that these statements are false because they neglected to disclose allegedly deficient loan underwriting does not make sense. These statements do not pertain to Fifth Third's underwriting, so no duty arises to address underwriting issues in connection with such statements (even if they existed). A finding that these disclosures are incomplete because they don't address Fifth Third's underwriting would "place corporations [like Fifth Third] . . . under a duty to disclose all information even colorably material, or face potential second-guessing in a subsequent disclosure suit. Such a rule would deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public." *In re Sofamor Danek*, 123 F.3d at 403.

Plaintiffs exaggerate when they assert that Fifth Third's disclosure of its methodology for setting loan loss reserves was "false" because it concealed Fifth Third's allegedly weak capital structure. (CAC ¶¶ 411-12.) The relationship is tenuous at best, and, in any event, Fifth Third is under no duty to deluge investors with such attenuated information. *In re Sofamor Danek*, 123 F.3d at 403. The same can be said of Plaintiffs' attempt to demonstrate a falsity in Fifth Third's statements regarding increasing the loan loss reserves given general economic conditions. (CAC

¶¶ 375-75, 390-92, 396-97, 436-37.)  Plaintiffs' constant denials that market conditions were at all to blame for Fifth Third's drop in stock price fly in the face of reason.[36]

### 3. The CAC Fails to Raise a Strong Inference of Scienter.

To survive a motion to dismiss in this post-PSLRA era, a plaintiff must plead actual facts — not merely speculate or assert conclusions — that give rise to a "strong inference" that the defendant made false or misleading statements with actual knowledge or recklessness.  *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 676 (6th Cir. 2002).  The Sixth Circuit has instructed that conclusory labels in a plaintiff's securities fraud complaint should be ignored, and that a district court's analysis of the complaint should concentrate on the facts alleged therein to determine whether those facts "produce a strong inference of scienter in securities fraud."  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551-52 (6th Cir. 2001).  If sufficiently particular facts are absent from a complaint, it must be dismissed.  *Champion Enters.*, 364 F.3d at 673.

Thus, the CAC must contain specific, well-pleaded facts establishing that Defendants knew about or recklessly disregarded evidence that, as Plaintiffs allege, (1) the Company had "widespread underwriting deficiencies," (2) it was purposely under-reserving for loan losses in order to inflate earnings, and (3) as a result, the Company was undercapitalized.

The Sixth Circuit has stated that the following factors are usually relevant to scienter in securities fraud actions:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

---

[36] The Court may take judicial notice of the housing downturn and subsequent financial crisis.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (taking judicial notice of the "internet bubble and its subsequent crash" as a fact "generally known within the territorial jurisdiction of the trial court" (*quoting* Fed. R. Evid. 201)).  Defendants request judicial notice of these facts.

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig*, 251 F.3d at 552.  Most of these factors are undeniably absent from Plaintiffs' CAC.  The only factors that Plaintiffs attempt to address are the second and sixth factors.  As demonstrated below, however, Plaintiffs' attempts to establish scienter based on these two factors fall short of the mark.  Without any particularized facts demonstrating that Defendants knew of or recklessly ignored the alleged underwriting deficiencies or allegedly inadequate amount of reserves, Plaintiffs are not entitled to relief under Section 10(b) or Rule 10b-5.

     **a.** ***The More Compelling Inference Is that Fifth Third, Along with Many Other Financial Institutions, Suffered from an Unexpected Economic Meltdown and Updated Its Financial Disclosures Accordingly.***

  The Supreme Court has made clear that a securities fraud complaint can survive a motion to dismiss only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Plaintiffs' theory of scienter — that Defendants encouraged or purposefully ignored faulty underwriting standards and vastly understated their reserves in order to secure "enormous incentive-based cash bonuses and stock and option awards" (CAC ¶ 191) — is far less

compelling than the competing inference that Fifth Third, like many other financial institutions, government officials, and economists, failed to predict the scope and severity of the economic meltdown that began to manifest in the latter portion of 2007.

Despite the widely-held outlook that any problems with subprime mortgages would be contained (*see supra* Section IV(B)(1)(a)), in August 2007, an unprecedented credit crisis began to develop across the world economy. In the wake of this turn of events, hundreds of securities lawsuits have been brought by plaintiffs across the country who seek to capitalize on the 20/20 vision that hindsight provides.[37]

Courts have long been skeptical of "fraud by hindsight" claims brought by plaintiffs in the wake of market downturns (*see supra* Section IV(D)(2)), and they have continued to dismiss claims brought in the wake of the current credit crisis, finding that the economic meltdown, rather than fraud, is the most plausible of competing inferences with respect to the cause of any drop in stock price. *See In re Radian Sec. Litig.*, No. 07-3375, 2009 U.S. Dist. LEXIS 30224, *81 (E.D. Pa. Apr. 9, 2009) (complaint's scienter allegations not as compelling as non-culpable inferences based on overall market conditions); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW, 2009 WL 736802, at *6 (C.D. Cal. Mar. 18, 2009) (same); *Pittleman v. Impac Mortgage Holdings, Inc.*, No. SACV 07-0970 AG, 2009 U.S. Dist. LEXIS 18213, at *10 (C.D. Cal. Mar. 9, 2009) (same); *In re 2007 Novastar Financial, Inc. Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166, at *15 (W.D. Mo. June 4, 2008) (same); *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1101 (C.D. Cal. 2008) (same); *Tripp v. IndyMac Financial Inc.*, No. CV07-1635-GW, 2007 WL 4591930, at *4 (C.D. Cal. Nov. 29, 2007) (same). Just as in these cases, the economic downturn is the more likely cause of any drop in

---

[37] *See supra* note 5.

Fifth Third's stock prices, and Plaintiffs' attempts to draw a strong inference of scienter therefore fail.

> **b.** ***Plaintiffs Cannot Use Group Pleading to Establish Scienter.***

"The group pleading doctrine is a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Winer Family Trust v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007). Contrary to Plaintiffs' assertions (CAC ¶¶ 473-75), they may not use this doctrine to establish scienter on the part of Defendants. This Court recently concluded that the doctrine did not survive the adoption of the PSLRA, stating that group pleading "is antithetical to the pleading requirement for scienter set forth in § 21D(b) of the PSLRA." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 984-86 (S.D. Ohio 2008). The circuit courts that have examined the issue post-PSLRA agree with this view. *E.g., Winer Family Trust*, 503 F.3d at 337; *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006), *rev'd on other grounds,* 551 U.S. 308 (2007); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 364-65 (5th Cir. 2004).

Because the group pleading doctrine is no longer viable (if it ever was) in securities fraud actions, Plaintiffs cannot show scienter simply by alleging that "[b]ecause of their positions with Fifth Third, the Individual Defendants had access to non-public information about Fifth Third's business," and therefore they "knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public." (CAC ¶ 473.) Instead, Plaintiffs must allege particular and precise facts as to **each** Defendant's knowledge or reckless disregard of the allegedly adverse facts.

**c.** ***Plaintiffs Inadequately Allege Motive and Opportunity for Any Defendant to Commit Securities Fraud.***

"The bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 689 (6th Cir. 2004) (*quoting In re Comshare*, 183 F.3d at 551). Courts distinguish between "motives common to corporations and executives generally" and "motives to commit fraud." *Id.* at 690. The CAC must allege motives on the part of each Defendant "from which the Court could infer a knowing or reckless state of mind." *Id.* at 690. To satisfy the PSLRA's pleading requirements, moreover, Plaintiffs must allege a concrete and personal benefit to each particular Defendant. *In re Radian*, 2009 U.S. Dist. LEXIS 30224, at *40 (*citing Winer Family Trust*, 503 F.3d at 337). Plaintiffs continue to "group plead" in their motive allegations, however. The CAC attributes all allegations to all Defendants and makes no particularized allegations with respect to each individual. In fact, the CAC never specifically mentions Defendant Poston in any of the motive allegations, and it mentions Defendants Kabat and Marshall — along with another director against whom fraud claims are not asserted — only in the context of examples of compensation that Fifth Third links to bonus awards. (CAC ¶¶ 465-471.)

Plaintiffs' principal motive allegation is that the Individual Defendants were motivated to "secure highly lucrative bonuses, stock, and stock option awards." (CAC ¶¶ 466-71.) But these are the types of motives that corporations and executives hold generally and, therefore, are insufficient to constitute a motive for fraud as a matter of law. *See PR Diamonds*, 364 F.3d at 690 (allegations that executives were motivated by desire to increase their compensation do not constitute motive for fraud); *see also Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers").

In any event, Plaintiffs' theory defies logic. Plaintiffs' CAC displays compensation breakdowns for Defendants Kabat, Marshall, and Schaefer. (CAC ¶¶ 469-71.) They show that a very significant portion of the executive bonuses are awarded in stocks and stock options.[38] (*Id.*) Plaintiffs' theory, then, is that these Defendants committed fraud in order to award themselves what they knew to be overinflated stock that would almost certainly soon fall due to the "widespread underwriting deficiencies" that Defendants purportedly knew were pervasive at Fifth Third. *See Morse v. McWherter*, 200 F. Supp. 2d 853, 898 (M.D. Tenn. 1998), *vacated on other grounds*, 290 F.3d 795 (6th Cir. 2000) (decision to purchase company stock "undermines an inference of scienter because it presumably would make no sense to purchase that stock if defendants knew the prices to be inflated"). The more compelling inference, once again, is that Defendants — like many other financial institutions, government officials, and economists — failed to predict the scope and severity of the economic meltdown that began to manifest towards the end of 2007.

Plaintiffs further allege a motive on Defendants' part to inflate Fifth Third's stock price for the purpose of using this inflated stock to fund corporate acquisitions. In *In re Radian*, the court rejected a similar motive allegation, finding that, like compensation increases, completing corporate mergers and acquisitions are motives held by corporations and executives generally. 2009 U.S. Dist. LEXIS 30224, at *40 (*citing GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237-38 (3d Cir. 2004)).

Plaintiffs assert one other motive — that Fifth Third committed fraud so as to "reduce the costs of borrowing by reducing the interest rates the Company would pay on its two Class Period notes offerings" — but fail to plead it with particularity. (CAC ¶ 465(a).) Plaintiffs do not

---

[38] For Defendant Schaefer, nearly 80 percent of his bonus compensation was awarded in these forms. (CAC ¶ 471.)

allege any facts regarding what interest rates Fifth Third paid, what rates Fifth Third would have paid had they disclosed the circumstances that Plaintiffs allege, or what amount of benefit Fifth Third would have received in real terms. These failings clearly render such motive allegations insufficient under the PSLRA.[39]

> **d.** **Plaintiffs Fail to Show Conscious Misbehavior or Recklessness by Any Defendant.**
>
> > **i.** **None of the Confidential Witness Statements Alleges that Any Defendant Had Knowledge of Alleged Misbehavior.**

Although the statements of confidential witnesses "are not altogether irrelevant to the scienter analysis," for a court to consider them, they must allege "what, when, where, and how" the defendants knew what they are alleged to have known. *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008). Broad characterizations made by confidential witnesses as to a general scheme or "pressure from corporate" do not satisfy this requirement. *In re Diebold Sec. Litig.*, No. 5:05CV2873, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008). Speculation by confidential witnesses as to what the defendants "should have/could have/would have known . . . are routinely rejected by courts as not evidencing scienter." *In re Ferro Corp.*, Nos. 1:04CV1440, 1:04CV1589, 2007 WL 1691358, at *12 (June 11, 2007 N.D. Ohio). Courts should scrutinize statements from confidential witnesses to ensure that the statements comply with the PSLRA's pleading requirements. *In re Daou Sys.*, 411 F.3d 1006, 1015-16 (9th Cir.

---

[39] Several circuit courts of appeal have found that the absence of stock sales by corporate insiders "sufficiently undermines plaintiffs' claims regarding motive." *San Leandro Emergency Med. Plan v. Philip Morris, Inc.*, 75 F.3d 801, 814 (2d Cir. 1996); *see also In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) ("evidence that the individual defendants abstained from trading may undercut allegations of motive"); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3d Cir. 1997) (finding no inference of scienter as to defendants that did not make any sales); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("the Officers' minimal sales of stock also negates an inference of scienter"). Here, Plaintiffs have not alleged that any individual defendant benefitted from selling his Fifth Third stock at the purportedly inflated price. While this factor is not dispositive in this circuit, *see PR Diamonds*, 364 F.3d at 691, it is a factor that other circuits have regarded as negating a strong inference of scienter.

2005); *cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.").

A number of the federal district courts that recently have dismissed securities lawsuits stemming from the credit crises have rejected plaintiffs' efforts to establish scienter through the use of confidential witnesses, finding that the statements failed to allege with the requisite particularity how any named defendant had knowledge of supposed impropriety. *E.g., In re Radian*, 2009 U.S. Dist. LEXIS 30224, at *72; *In re Impac*, 554 F. Supp. 2d at 1099; *Tripp*, 2007 WL 4591930, at *3. Just as in those cases, Plaintiffs' confidential witnesses fail to establish that any Defendant knew of deficient underwriting or accounting improprieties at Fifth Third. Most do not even pretend to establish such knowledge — only three of Plaintiffs' 12 confidential witnesses are quoted in the CAC's section on scienter. (CAC ¶¶ 465-75.) Yet, even those witnesses never spoke with any Defendant, and they have no knowledge that any Defendant was aware of deficient underwriting practices. Plaintiffs' support for their contention that the three confidential witnesses' allegations demonstrate a strong inference of scienter is limited to conversations that the witnesses had with someone who is not a defendant regarding reports that Defendants allegedly received. (*Id.* ¶ 465.)

For example, confidential witness number two ("CW-2") claims that, in late 2006, Defendants Kabat and Marshall attended a meeting in Florida in which lending guidelines were discussed. (*Id.* ¶ 292.) According to CW-2, "[a]fter Defendants Kabat and Marshall left the room, John McGinty[40] told the underwriting staff that the 'guidelines were not that strict and that he had been given authority to over-ride those guidelines.'" (*Id.*) Thus, neither Kabat nor Marshall heard this alleged statement by McGinty, and the guidelines discussed while they were

---

[40] McGinty is not an executive based in Fifth Third headquarters; nor is he a defendant in this action. (CAC ¶ 292.)

present were, based on McGinty's comment, presumably "strict." CW-2's allegations do not

raise a strong inference of scienter; quite the opposite, they imply that Defendants Kabat and

Marshall were presenting a system of strict lending guidelines to the underwriters.

CW-2 states that McGinty claims to have been authorized to override the "strict"

guidelines, but, if this is true, then why did McGinty wait to make the alleged statement until

Kabat and Marshall had left the room? Further, although McGinty's "authority" could mean any

number of things, it is unlikely to mean that Kabat and Marshall authorized him to redefine Fifth

Third's lending guidelines as Plaintiffs claim.

### ii. The CAC Does Not State What the Reports that Defendants Allegedly Received Would Have Told Them About Corporate Misbehavior.

The only other way in which Plaintiffs attempt to tie the confidential witnesses to their

scienter allegations is through accusations regarding reports and data that Defendants

purportedly received. But, "[t]he PSLRA requires that a plaintiff do more than make conclusory

allegations about what an internal reporting system would have shown." *Beaver County Ret. Bd.*

*v. LCA-Vision, Inc.*, No. 1:07-CV-750, 2009 WL 806714, at *21 (S.D. Ohio Mar. 25, 2009). The

plaintiff "must include adequate corroborating details, such as the sources of her information

with respect to the reports, how she learned of the reports, who drafted them, . . . which officers

received them, and an adequate description of their contents." *In re Diebold Sec. Litig.*, No.

5:05CV2873, 2008 WL 3927467, at *6 (N.D. Ohio Aug. 22, 2008); *see also Metzler Inv. GMBH*

*v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) (executive access to

"management information system" insufficient to establish scienter); *Teamsters Local 445*

*Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (allegations

that defendants had access to data showing delinquencies and impairments insufficient to raise

inference of scienter); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996)

(executive access to "highly-efficient reporting system" insufficient to establish scienter); *Gruhn v. Tween Brands, Inc.*, Nos. 2:07-cv-852, 2:07-cv-894, 2:07-cv-925, 2009 WL 1542795, at *8 (S.D. Ohio June 2, 2009) ("[A]llegations that Defendants could regularly track sales data contradicting the [targeted] forecasts[s], accompanied by a general assertion about what [plaintiffs] think the data showed, is insufficient to plead scienter without hard numbers or other specific information." (citations and internal quotation marks omitted)); *In re Impac*, 554 F. Supp. 2d at 1100 (receipt of spreadsheets and reports about company performance insufficient to support inference of scienter).

The district court for the Eastern District of Kentucky recently found that allegations similar to those made by Plaintiffs in the CAC were insufficient to raise a strong inference of scienter. *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 818-19 (E.D. Ky. 2008). The *Grillo* plaintiffs alleged that, according to a former distribution manager, the distribution managers prepared a monthly report on sales that was presented to the defendants. *Id.* at 818. The plaintiffs asserted that, in light of the report, the defendants knew or were reckless in not knowing that the company was far behind its sales forecast when contrary public statements were made. *Id.* at 818-19. The court found, however, that due to the plaintiffs' failure "to cite with specificity anything in any of the monthly financial reports that would have put Defendants on notice that there was a divergance [sic] between Tempur-Pedic's internal reports and external statements, Plaintiffs have failed to satisfy the PSLRA's pleading requirements." *Id.* at 819.

### (A) Summary Reports

Plaintiffs in this action rely on statements from confidential witness number one ("CW-1") in attempting to show Defendants' scienter based on summary reports. (CAC ¶¶ 289-91, 465(e)-(f).) CW-1 alleges that summary reports were prepared and distributed upward, where they allegedly reached Defendant Kabat and others in Fifth Third's senior management. (*Id.*

¶ 289.)  According to CW-1, these reports contained information on the "kinds of loans granted each month, the amount of money 'in reserves,' types of loans, and delinquencies."  Plaintiffs then claim in a conclusory fashion that "CW-1 said that the standards were 'subprime.'  Therefore, a review of those reports would have revealed to the Individual Defendants the 'subprime' loans that Fifth Third was originating."  (*Id.* ¶ 465(f).)

Plaintiffs' conclusory allegations fall far short of imputing a strong inference of scienter to Defendant Kabat, much less any of the other Defendants.  Plaintiffs do not allege with particularity the means by which these reports would have informed Defendant Kabat that Fifth Third suffered from "widespread underwriting deficiencies."  The fact that the reports disclosed that Fifth Third originated "non-vanilla" loans such as interest-only and Alt-A loans is a fact that the public already knew, because Fifth Third repeatedly disclosed it in their public filings, as shown in Plaintiffs' CAC.  (*Id.* ¶¶ 227, 365, 366, 370, 378, 381, 413, 440-42.)  Furthermore, Plaintiffs fail to explain with particularity how statistics on delinquencies and the amount in reserves made Defendant Kabat reckless in not knowing about deficient underwriting standards, as opposed to a general decline in market conditions.

Plaintiffs' allegations mimic the allegations that the Eastern District of Kentucky dismissed in *Grillo*.  Just as in that case, Plaintiffs have neglected to "cite with specificity anything in any of the monthly financial reports that would have put Defendants on notice" of a divergence between internal reports and external statements on Fifth Third's underwriting standards.  *Grillo*, 553 F. Supp. 2d at 819.

### (B)    ACAPS System

Plaintiffs also fail in their attempt to establish a strong inference of scienter through Fifth Third's Automated Credit Application Processing System ("ACAPS").  Plaintiffs do not allege that this system presented information in any type of report form, but rather that Defendants

merely had access to the system. (CAC ¶ 465(g)-(k).) According to Plaintiffs, this system provided "real-time data on every mortgage sold by Fifth Third, including the unique code number for each type of mortgage product, the dollar amount of the loan, the name of the salesperson, the regional affiliate, cross-selling of credit cards, checking accounts, and savings accounts," "whether salespeople, sales managers, and regional affiliates were meeting the sales quotas set by senior management in Cincinnati," and "when documentation was missing from mortgage applications." (*Id.* ¶ 465(g)-(i).) Plaintiffs particularly allege only that Defendants viewed the data on sales quotas. (*Id.* ¶ 465(h).)

The Second Circuit recently rejected an attempt to use a defendant's access to raw data to show scienter in *Teamsters*, 531 F.3d 190. The plaintiffs in that case argued that because the defendants had access to collection data containing information on risky loans and delinquencies, the defendants knew the falsity of their public statements on company performance. *Id.* at 196. The Second Circuit affirmed the dismissal of the plaintiffs' claims, stating that the "broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance." *Id.* Plaintiffs' claims in the CAC based on access to the ACAPS system similarly should be dismissed.

### iii. Generalized Imputations of Knowledge Based on a Position within Fifth Third Are Insufficient to Establish Scienter.

"[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." *PR Diamonds*, 364 F.3d at 688. Without specific facts and circumstances that show knowledge on the part of the defendants, a complaint cannot meet the PSLRA's pleading requirements for establishing scienter. *Id.* "[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known'

a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (*quoting Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998)); *see also Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company").

Plaintiffs maintain that this Court can draw an inference of scienter from the fact that Defendants stated that they had "[d]irect executive management oversight of every major credit decision." (CAC ¶ 465(l).)  This statement in no way shows that Defendants had knowledge of deficient underwriting on mortgages.  Further, Plaintiffs attempt to imply that Defendants' positions of oversight within Fifth Third ascribe knowledge of every action that the Company takes relating to credit.  Allegations of scienter based upon executive oversight are precisely the kind of pleading that the Sixth Circuit has warned against.  *PR Diamonds*, 364 F.3d at 688.

Plaintiffs' allegation that "the Individual Defendants could not plausibly be ignorant regarding the Company's abandonment of conservative underwriting and the poor credit quality of its loan portfolio, particularly in view of their access to all of the information evidencing these deficiencies," even more explicitly attempts to establish scienter through executive capacity. These "must have known"-based allegations are routinely rejected by courts in a scienter analysis.  *E.g., In re Advanta*, 180 F.3d at 539; *Maldonado*, 137 F.3d at 10; *Abrams*, 292 F.3d at 432.  The same reasoning defeats Plaintiffs' attempt to show scienter based on Fifth Third's "detailed credit risk management system."  (CAC ¶ 472 (stating that "the Individual Defendants could not plausibly be ignorant regarding the Company's underwriting deficiencies and the poor credit quality of its loan portfolio, particularly in view of the Company's elaborate credit risk

management system described above").) This allegation once again attempts to impute knowledge to Defendants based upon their executive oversight, and therefore must fail.

### iv. Allegations that a Particular Individual Served on a Committee Are Insufficient to Establish Scienter.

Plaintiffs fail to allege a strong inference of scienter as to Defendants Marshall and Kabat through their affiliations with Fifth Third's Corporate Credit Committee. To properly allege scienter, a plaintiff must describe with particularity the duties of the committee, how each particular defendant participated in it, and what knowledge the defendant gained from this participation. *In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 944, 956 (C.D. Cal. 2003). Courts cannot infer scienter from the mere fact that a defendant sat on a committee that regularly discussed policy, adverse changes in the company's financial position, and ways to improve operations. *In re Novastar*, 2008 U.S. Dist. LEXIS 44166, at *14. "This conduct is normal and expected, and does not indicate fraudulent intent. Management is supposed to review results and search for ways to improve operations, and this customary endeavor does not indicate an intent to deceive when positive information is disseminated." *Id.* at *14-15.

Fifth Third created the Corporate Credit Committee to improve internal processes associated with credit. (CAC ¶ 249.) Just as in *In re Novastar*, no inference of scienter can be inferred from this "customary endeavor." 2008 U.S. Dist. LEXIS 44166, at *14.

Plaintiffs provide no particularized allegations regarding how Defendant Marshall's participation on the Corporate Credit Committee imputes knowledge to him of widespread underwriting deficiencies. Beyond alleging Marshall's title of co-chair of the Committee, Plaintiffs' CAC alleges nothing about the level of involvement that Marshall had with the Committee, what his duties were, the amount of time he spent on Committee work, or the information that he had access to as a result of his position.

Similarly, Plaintiffs fail to allege any particularized facts regarding Defendant Kabat's involvement with the Corporate Credit Committee, his purported "brainchild."  (CAC ¶ 465(d).) Plaintiffs provide no support for their speculative allegations concerning the Committee — e.g., that it "made available to the Individual Defendants . . . up-to-date information about the real reasons for the deteriorating credit quality of the Company's loan portfolio" (*id.* ¶ 465(c)) — and the allegations therefore fail to establish the requisite strong inference of scienter.

### e. *Scienter Cannot Be Established through the Signing of a Public Disclosure.*

Plaintiffs' attempt to show scienter through Sarbanes-Oxley certifications fails because it is contrary to Sixth Circuit law.  Plaintiffs' CAC asserts that scienter is established through the certifications because they represent "that Defendants undertook the affirmative obligation to obtain sufficient knowledge to ensure that the Company's disclosures to the market were truthful."  (*Id.* ¶ 465(n).)  Addressing a similar argument, the Sixth Circuit recently stated that "[w]e agree with the Eleventh Circuit that a 'Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.'"  *Ley*, 543 F.3d at 812 (*quoting Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).  Given that, as detailed above, Defendants had no reason to know of any falsities in their SEC filings, their certifications do not raise a strong inference of scienter.

### f. *Plaintiffs' Remaining Attempts to Establish a Strong Inference of Scienter Also Fail.*

Plaintiffs suggest that a number of benign statements give rise to a strong inference of scienter.  The CAC cites Defendant Kabat's statements that "[w]e remain very active in taking steps to address the issues we and the industry are facing," that "we continue to be proactive with steps to mitigate the losses we're facing" (CAC ¶ 465(m)), and that the decision to reduce the

dividend was made "only after long and careful consideration" (*id.* ¶ 465(q)).  These statements

fall far short, however, of creating a strong inference of scienter.  In fact, they fail to establish

knowledge on the part of Defendants in any respect whatsoever.  The same is true of the

unattributed statement that Fifth Third had "[r]ecently conducted intensive review of loan

portfolio to develop credit forecast of 2H 2008 and 2009," including a "[t]op-down and bottom-

up analysis with particular focus on RE/RE-related portfolios," and "[d]evelopment of stress

scenarios to forecast potential losses and adequacy of capital actions."  (*Id.* ¶ 465(r).)  These

general statements relating to Fifth Third's efforts to operate as efficiently as possible given the

harsh operating environment cannot serve to establish a strong inference of scienter.  *See In re

Novastar*, 2008 U.S. Dist. LEXIS 44166, at *14-15 ("Management is supposed to review results

and search for ways to improve operations, and this customary endeavor does not indicate an

intent to deceive when positive information is disseminated.").

Plaintiffs also misleadingly attempt to establish scienter through Fifth Third's decision to

sell loans that had not previously been classified as impaired with a discount off their contractual

value.  (CAC ¶ 465(s).)  Recognition of this sale took place in 2009, after the Class Period

ended.  (*Id.*)  Plaintiffs fail to mention that the bulk of this large transaction entailed the sale of

assets that Fifth Third had already recognized as impaired and had written off.  The average price

of 33 cents on the dollar that Fifth Third is alleged to have received for those assets reflects only

the average of the entire transaction, and it says nothing about the relative worth of the non-

impaired loans.  Nevertheless, Plaintiffs speculate that the non-impaired loans consisted of loans

that were "30 to 89 days past due," "were likely to move into the nonperforming assets category,

and therefore . . . were worth only 33% of their original contractual values."  (*Id.*)  This manner

of pleading, based entirely on speculation and guesswork, fails to satisfy even notice-pleading

standards, much less the heightened pleading standards of the PSLRA.

### 4.    Plaintiffs Fail to Adequately Allege Loss Causation.

Even if one or more of Plaintiffs' Section 10(b) claims were pleaded properly, they nevertheless should be dismissed for failure to plead loss causation, i.e., a causal connection between the material misrepresentation and the alleged loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 347 (2005). To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege an injury that was proximately caused by the alleged misconduct. *See generally* 15 U.S.C. § 78u-4(b)(4); *Dura*, 544 U.S. at 346-47. Dismissal of a complaint is appropriate when a plaintiff has not alleged a cognizable injury or has failed to plead a direct causal connection between the alleged fraud and the losses claimed. *Dura*, 544 U.S. at 346-47.

Plaintiffs cannot satisfy the element of loss causation simply by asserting that they paid artificially inflated prices for Fifth Third stock; rather, Plaintiffs must plead facts showing that the "share price fell significantly after the truth became known." *Id.* at 347.

### a.    *No Falsity Was Ever Revealed to the Market.*

Plaintiffs fail to identify a disclosure by Fifth Third that revealed any type of misstatement or fraud. In the section of the CAC that attempts to establish loss causation, Plaintiffs point to a single disclosure made in a Form 8-K dated June 18, 2008. (CAC ¶¶ 476-81.) The 8-K detailed the upcoming actions that Fifth Third would take "to strengthen its capital position in light of continued deterioration in credit trends during the second quarter of 2008 and its view that conditions are unlikely to improve in the near-term." (*Id.* ¶ 449.) These actions included issuing convertible preferred shares, cutting cash dividends on common stock, and selling certain non-core businesses. (*Id.*) The 8-K also stated that Fifth Third, like other financial institutions across the country, would substantially increase its allocation for nonperforming assets and its reserves for loan losses. (*Id.* ¶ 450.) Nowhere in the 8-K, however,

- 70 -

did Fifth Third reveal any sort of truth that had previously been concealed. The 8-K instead disclosed steps that Fifth Third would take in response to the economic meltdown.

The Sixth Circuit has stated that a stock drop in the wake of bad news does not fulfill the loss causation element of a securities fraud claim. *D.E.&J. LP v. Conaway*, 133 F. App'x 994, 1000-01 (6th Cir. June 10, 2005); *see also In re Tellium, Inc. Sec. Litig.*, No. 02CV5878FLW, 2005 WL 2090254, at \*4 (D.N.J. Aug. 26, 2005) ("*Dura* itself makes clear that loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose [a] fraud."). Moreover, "the mere fact that [a company's] reserves eventually proved to be inadequate does not mean a false statement was made." *In re Novastar*, 2008 U.S. Dist. LEXIS 44166, at \*11. Because the announcement of increased reserves and other affirmative actions taken by Fifth Third did not reveal the falsity of any prior statements, but instead was merely an announcement of "bad news," the June 18, 2008 Form 8-K cannot serve to establish loss causation.

### b. *Plaintiffs Fail to Distinguish the Drop in Stock Price from the Broad Market Downturn.*

"[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994). In order to adequately allege loss causation, a plaintiff "must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (*quoting Dura*, 544 U.S. at 343). Further, the complaint must plead "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [the company's] misstatements." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007); *see also Fryling v. Merrill Lynch, Pierce, Fenner &*

*Smith*, 593 F.2d 736, 743-44 (6th Cir. 1979) (recognizing in loss causation discussion that plaintiff cannot recover damages caused by a general market decline).

Throughout the CAC, Plaintiffs refuse to acknowledge the impact of the credit crisis affecting Fifth Third and other financial institutions. Instead, their entire theory of loss causation hinges on Fifth Third's release of unfavorable financial information having nothing to do with the revelation of a prior fraud. In discussing the drop in Fifth Third's stock price, Plaintiffs never attempt to distinguish the unquestionable effect of the recent economic meltdown on the price. This omission is fatal to Plaintiffs' securities fraud claims.

Furthermore, Plaintiffs ignore the fact that Fifth Third's stock price steadily dropped throughout the proposed Class Period even before the June 18, 2008 Form 8-K filing. (*E.g.*, November 1, 2007: - 4.3%; November 7, 2007: - 6.6%; November 26, 2007: - 6.5%; December 11, 2007: - 7.2%; December 12, 2007: - 6.0%; February 5, 2008: - 4.9%; February 29, 2008: - 4.8%; March 12, 2008: - 4.4%; March 14, 2008: - 4.3%; April 8, 2008: - 4.4%; April 14, 2008: - 8.8%; April 21, 2008: - 7.5%; April 23, 2008: - 4.9%; May 8, 2008: - 4.3%); June 6, 2008: - 4.7%; June 11, 2008: - 6.6%; June 13, 2008: - 10.3%.) In fact, from the beginning to the end of the Class Period, Fifth Third's stock price fell from $31.30 to $12.73, a drop of 59.3 percent. None of this loss can be attributed to any purported fraud by Fifth Third; Plaintiffs themselves allege that any type of "fraud" was revealed only on June 18, 2008, the day after their proposed Class Period ended. *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 261, 265 (S.D.N.Y. 2008) (plaintiff must plead losses that occur after "materialization of the concealed risk"). Instead, the drop in Fifth Third's stock price during the Class Period must be presumed to have been caused by overall market deterioration, especially in the financial institution sector of the economy.

The fact that Fifth Third's stock price quickly rebounded after its decline on June 18, 2008 further weakens Plaintiffs' theory of loss causation.  By July 11, 2008, the stock price had risen above the pre-disclosure price of $12.73.  The stock maintained its rebound, and, after closing at $13.76 on July 17, 2008, the stock closed above the pre-disclosure price every day until late September 2008.  In the ninety days following the disclosure, the stock averaged a closing price of $13.62 — seven percent above the pre-disclosure price.

Because Plaintiffs have failed to "distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price," *In re Merrill Lynch*, 568 F. Supp. 2d at 363, the Court should dismiss their Section 10(b) and Rule 10b-5 claims.

**5.     The CAC Does Not State a Claim Under Section 20(a) Against the Individual Defendants.**

**a.     *Plaintiffs Have Failed to Plead a Predicate Violation of the Securities Laws.***

Section 20(a) of the Exchange Act creates a cause of action for "control person" liability:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce that act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Section 20(a) thus has two components: (1) the "controlled person" must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder; and (2) the "controlling person" must have controlled the person liable for the securities law violation.  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004).

When a plaintiff fails to state an underlying securities law violation, his Section 20(a) claims must also fail.  *Ley*, 543 F.3d at 818.  Because Plaintiffs in this case have failed in their

attempts to state underlying securities law violations, the Court should dismiss Plaintiffs' Section 20(a) claims.

> **b.**      ***Plaintiffs Have Failed to Allege Culpable Participation by Any of the Individual Defendants.***

In addition to requiring an underlying securities law violation, as noted above, "the 'controlling person' defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation." *PR Diamonds*, 364 F.3d at 696. "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* (*quoting* 17 C.F.R. § 230.405). To establish control person liability, a plaintiff must, at a bare minimum, "allege facts that permit a reasonable inference that the defendant actually participated in the operations of the controlled person in general, and that the defendant possessed the power to control the specific transaction or activity upon which primary violation is predicated." *In re SmarTalk Tele., Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 549 (S.D. Ohio 2000). This Court should dismiss Plaintiffs' Section 20(a) claims on the basis that Plaintiffs have failed to "plead the circumstances of the control relationship with particularity." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C-99-00109-SBA, 2000 U.S. Dist. LEXIS 15369, at *83-84 (N.D. Cal. Sept. 29, 2000).[41]

> **B.**      **The Securities Act Claims Must Be Dismissed (Counts I – III and VI – XI Under Sections 11, 12(a)(2), and 15; Asserted Against Fifth Third, the Individual Defendants, the Director Defendants, the Trust Defendants, and the Underwriter Defendants).**

Plaintiffs style their complaint as two "separate" complaints under a single cover. (CAC

---

[41] Defendant Poston in particular is barely even mentioned in the CAC. Instead, Plaintiffs apparently try to establish his control through the use of the discredited group pleading doctrine (*see supra* Section V(A)(3)(b)), and on the basis that he signed certain public disclosures. This fails to confer liability under Section 20(a). *See Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1134 (W.D. Mich. 1996) (signature on group-published information insufficient to establish control liability).

¶¶ 89, 222.) The first, among other things, alleges negligence and strict liability under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") based on three Fifth Third securities offerings: (1) the common stock issued at the time of the First Charter merger (the "First Charter Offering"); (2) the Preferred B Offering; and (3) the Preferred C Offering. The second alleges securities fraud under Sections 10(b) and 20(a) of the Exchange Act. (*Id.* ¶ 221 *et seq.*).

Plaintiffs expressly disavow any intention to allege fraud with respect to the claims under the Securities Act (*id.* ¶ 90), and expressly limit the fraud allegations to the Exchange Act portion of the complaint (*id.* ¶ 221). The Court's review of Plaintiffs' Securities Act claims therefore is limited to the allegations made in that Securities Act portion of the CAC. *See California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 162 (3d Cir. 2004) (district courts are not required to "sift" through allegations to determine on which ones a plaintiff intends to rely in asserting claims under Securities Act).

The Securities Act claims should be dismissed for multiple independent reasons. *First*, Plaintiffs fail to allege any actionable misstatement in any offering document or any omission that rendered a statement contained therein misleading. This is a prerequisite to a Securities Act claim, and Plaintiffs' failure to do so warrants dismissal. *Second*, to the extent that Plaintiffs base their Securities Act claims on the securities fraud allegations contained in the Exchange Act portion of the Complaint, the CAC fails to satisfy the particularity requirements of Rule 9(b). *Third*, Plaintiffs fail to plead adequately that the alleged misrepresentations in the offering documents were the cause of Plaintiffs' losses. *Fourth*, Plaintiffs' Section 12(a)(2) claims based on the Preferred B and C Offerings should be dismissed for the additional reason that Plaintiffs lack standing to assert Section 12 claims based on the Preferred B Offering and otherwise fail to

allege adequately their standing to bring Section 12 claims based on either of the Preferred B or Preferred C Offerings.

<strong>1. Plaintiffs Fail to Allege an Actionable Misstatement or Omission Under Section 11.</strong>

To state a claim under Section 11, a plaintiff needs to "show that he purchased a security issued pursuant to a registration statement and that the statement made a material misrepresentation or omission." *Picard Chem.*, 940 F. Supp. at 1131.  By its terms, then, liability is limited strictly to statements within the four corners of the registration statement and prospectus.  15 U.S.C. § 77k(a); *see also Albert Fadem Trust v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1019 (S.D. Ohio 2004) ("As explained above, Section 11 allows purchasers of securities to bring a claim against certain enumerated parties in a registered offering if false or misleading information was included in a registration statement."); *O'Sullivan v. Trident Microsys., Inc.*, No. C 93-20621, 1994 WL 124453, at *3 (N.D. Cal. Jan. 31, 1994) ("Section 11 concerns only registration statements.").  The Section 11 claims fail under *Twombly* because they do not raise any "plausible" claim of a misstatement in any of the offering documents.  *Panther Partners, Inc. v. Ikanos Commc'ns*, 538 F. Supp. 2d 662, 667 (S.D.N.Y. 2008) (citing *Twombly*, 550 U.S. at 556, and dismissing §§ 11 and 12(a)(2) claims).

<strong>a. <em>Loan Loss Reserves</em></strong>

The CAC claims that representations regarding the specific dollar amount of and changes to Fifth Third's loan loss reserves contained in the First Charter offering materials were misleading.  (CAC ¶ 104.)  Similar representations are the only allegedly misleading statements specifically identified with respect to the claims based on the Preferred B and Preferred C Offerings.  (*Id.* ¶¶ 159-60, 192-93.)  Plaintiffs do not allege that these dollar amounts were misleading because Fifth Third had undisclosed loan loss reserves or that the amounts indicated

in the offering materials actually were not the amounts of Fifth Third's loan loss reserves for the respective periods.  Nor does the CAC identify — because there are none — any predictions or positive characterizations of Fifth Third's loan loss reserves in any of the offering documents. Instead, Plaintiffs claim that the representation regarding the amounts of the loan loss reserves was misleading because the reserves were not sufficient to cover rapidly increasing losses as a result of Fifth Third's non-performing assets.  (*E.g.*, *id.* ¶¶ 106, 161, 194.)

But this theory of liability serves only to demonstrate why it is "'beyond argument'" that the statements regarding Fifth Third's loan loss reserves were "'forward looking statement[s]'" that could be "verified" only when the liabilities were actually "'filed, litigated to conclusion, or settled.'"  *In re Am. Serv. Group, Inc.*, No. 3:06-0323, 2009 WL 1348163, at *37 (M.D. Tenn Mar. 31, 2009) (*quoting In re Kindred Healthcare Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004)).  The offering documents expressly warned that such forward-looking statements were "subject to risks and uncertainties," including changes to the company's "loan loss provisions."  (*E.g.*, Fifth Third, Form of prospectus disclosing information, facts, events covered in both forms 424B2 424B3 (Form 424B5), at S-iii (Apr. 30, 2008) (Aff. Ex. 42).)  And they incorporated by reference the risk disclosures made by Fifth Third in other SEC filings, *e.g.*, *id.* ("You should refer to our periodic and current reports filed with the Securities and Exchange Commission, or 'SEC,' for further information on other factors which could cause actual results to be significantly different from those express or implied by these forward-looking statements"), including those discussed in Sections IV(B) and V(A)(2)(a), *supra*.

Beyond the cautionary language employed by Fifth Third, the allegedly false statements also fall within the safe harbor provision because Plaintiffs have failed to raise plausible allegations that any Securities Act Defendant had "actual knowledge . . . that the statement[s]

[were] false or misleading."  15 U.S.C. § 77z-2(c)(1)(B); *see also supra* Section V(A)(3)

(discussing Plaintiffs' failure to plead scienter adequately).  In fact, the CAC affirmatively states

that it makes "no allegation of fraud, scienter or recklessness" as to Securities Act claims.  (CAC

¶ 89.)  Thus, the forward-looking statements fall within the safe harbor of 15 U.S.C. § 77z-2 on

the face of the pleadings.

The statements do not become actionable if, in hindsight, it turns out that the reserves

were not sufficient.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992); *see also In re*

*Acceptance Ins. Co.*, 423 F.3d 899, 901-03 (8th Cir. 2005) (court dismissed Securities Act claims

based on alleged inadequacy of reserves, stating "this type of retrospective analysis of awareness

cannot be the basis for a claim"); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689

(S.D.N.Y. 2004) (a failure to "correctly gauge the adequacy of the loan loss reserves" is "not

actionable under the securities laws"); *Hinerfeld v. United Auto Group*, 97 Civ. 3533, 1998 U.S.

Dist. LEXIS 10601, at *21 (S.D.N.Y. July 15, 1998) (failure to "anticipate the extent of

necessary reserves, even if it amounts to mismanagement, is not actionable under federal

securities laws.").  Nor do they become actionable because Fifth Third did not characterize the

loan loss reserves "as inadequate, meaningless, out of control, or ineffective."  *Shapiro*, 964 F.2d

at 281.  There are no facts alleged suggesting that such a characterization would have been true,

and there is no law that requires offering materials to adopt Plaintiffs' self-serving, after-the-fact

characterization of the Company.

### b.     *Capital Ratio*

The CAC claims that Fifth Third's disclosure of its capital ratios in the First Charter

offering materials was misleading because the ratios allegedly concealed the credit quality of

Fifth Third's Tier I capital.[42]  (CAC ¶¶ 106, 117.)  As with their accusations on loan loss reserves, Plaintiffs do not allege that the statistics in the offering materials were in some way inaccurate.  Instead, Plaintiffs suggest that more detailed information on Fifth Third's capital should have been disclosed.

Plaintiffs ignore, however, the abundance of information related to capital that Fifth Third included in its registration statement for the First Charter Offering.  While the CAC mentions only that Fifth Third disclosed its capital ratios for the quarter ending September 30, 2007 (*id.* ¶ 105), the Form S-4/A filing further disclosed, in a side-by-side comparison, the ratios for the quarter ending September 30, 2006, and the year-end ratios for 2002 through 2006 (Fifth Third, Pre-effective amendment to an S-4 filing (Form S-4/A), at 125 (Nov. 29, 2007) (Aff. Ex. 43)).  Fifth Third also disclosed the ratios for the quarters ending June 30, 2007 and June 30, 2006 in the offering materials.  (Fifth Third, Registration of securities issued in business combination transactions (Form S-4), at 126 (Nov. 7, 2007) (Aff. Ex. 44).)  In addition, the materials provide a detailed description of Fifth Third's system for classifying Tier I and risk-based capital.  (*Id.* at 53-54.)  Fifth Third also disclosed that its financial advisor, Keefe, Bruyette & Woods, Inc., found that the Company's capital ratios would all remain "well capitalized" following the merger with First Charter, and Fifth Third stated that "[f]or all the above analysis, the actual results achieved by Fifth Third following the merger may vary from the projected results, and the variations may be material."  (*Id.* at 33.)

There is no merit to Plaintiffs' claim that some additional, unspecified information

---

[42] Although Plaintiffs also claim that the Preferred B and Preferred C Offerings contained false statements pertaining to Fifth Third's capital (CAC ¶¶ 168, 201), Plaintiffs do not identify any statements in these Offerings that relate to capital.  Absent a link between an alleged omission and an affirmative statement in the offering documents, no Section 11 liability exists.  *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993).

regarding Fifth Third's capital ratios should have been disclosed.  The Sixth Circuit recognizes

that the securities laws do not require corporations to inundate investors with "all information

even colorably material."  *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 403 (6th Cir. 1997).

### c.    *Loan Underwriting Standards*

The CAC also includes a "laundry list" of information regarding Fifth Third's mortgage

loan underwriting standards supposedly omitted from the First Charter, Preferred B, and

Preferred C offering documents.  (CAC ¶¶ 106, 109, 162, 195.)  The Securities Act portion of the

CAC — which should be treated as a separate complaint — does not identify a single

representation rendered misleading by these alleged omissions.

Undoubtedly Plaintiffs' failure to identify such a representation is because none of the

offering documents included any representations regarding Fifth Third's loan underwriting

standards.  The securities laws simply do not require issuers "to dump all known information

with every public announcement."  *Albert Fadem Trust*, 334 F. Supp. 2d at 1023.  Accordingly,

the alleged failure to disclose information about Fifth Third's underwriting standards did not —

and could not — render an affirmative statement in the offering documents misleading as

required for Section 11 liability.  *Id.* at 1022-23 (failure to "relate[]" claimed omission to any

statements made in the offering documents warrants dismissal); *see also In re Verifone Sec.

Litig.*, 784 F. Supp. 1471, 1484 (N.D. Cal. 1992) (absent a genuine link between an alleged

omission and an affirmative statement in the prospectus, there can be no Section 11 liability),

*aff'd*, 11 F.3d 865 (9th Cir. 1993).

### d.    *Consideration in First Charter Acquisition*

Finally, Plaintiffs allege that the First Charter Offering materials contained misstatements

because the consideration paid to First Charter shareholders was allegedly not worth $31.00 per

share at the time of closing.  (CAC ¶¶ 106, 117.)  (Similar allegations are not made with respect

to the Preferred B and Preferred C Offerings.)  Plaintiffs fail to point to any statement in the offering materials that purports to guarantee such a value.  Instead, the materials clearly disclose the conversion ratio to be used in calculating merger consideration.  In the "Risk Factors" section of the offering materials, Fifth Third explains that the conversion ratio for First Charter shareholders receiving stock as consideration will be "equal to $31.00 divided by the average market price of Fifth Third common stock for the five trading days ending on the trading day immediately before the closing of the merger."  (Fifth Third, Registration of securities issued in business combination transactions (Form S-4), at 15, 21, 29 (Nov. 7, 2007) (Aff. Ex. 44).)  The materials further explain that "[c]hanges in the price of Fifth Third common stock . . . from the date of the special meeting will affect the conversion ratio and, thus, the number of Fifth Third shares that [the shareholder] receive[s] as merger consideration."  (*Id.* at 15, 22.)  Finally, the materials warn that "Fifth Third's stock price may increase or decrease before and after the effective time of the merger due to a variety of factors, including, without limitation, general market and economic conditions."  (*Id.* at 15.)  Plaintiffs fail to allege any way in which Fifth Third did not comply with its directives, or in which these disclosures were inaccurate.

## 2.    **Plaintiffs' Section 11 Claims Sound in Fraud and Therefore Must Be Pled with Particularity.**

Although the Sixth Circuit has yet to address the applicability of Rule 9(b) to Securities Act claims, nearly every other circuit now agrees that "Rule 9(b) applies when the misrepresentation justifying relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10b-5."  *Wagner v. First Horizon Pharm.*, 464 F.3d 1273, 1277 (11th Cir. 2006); *accord Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir. 2004); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003); *Shaw v. Digital Equip. Corp.*,

82 F.3d 1194, 1233 (1st Cir. 1996); *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994);

*Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990); *Seattle-First Nat'l Bank v. Carlstedt*, 800

F.2d 1008, 1010 (10th Cir. 1986).

Although packaged as non-fraud claims, Rule 9(b) still applies to Plaintiffs' claims under

the Securities Act because they obviously are based on the same alleged "course of fraudulent

conduct" as Plaintiffs' securities fraud claims.  *Vess*, 317 F.3d at 1103-04 (9th Cir. 2003); *In re*

*Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2009 U.S. Dist. LEXIS 8125, at *13

(N.D. Cal. Feb. 4, 2009) ("A typical example of [a unified course of conduct] is where a plaintiff

alleges that the same court of conduct constitutes both securities fraud under Section 10 as well

as a violation of Section 11").  For example, Section III of the CAC, labeled "Nature of the

Action," and described as "contain[ing] allegations common to all claims" (CAC ¶ 2), sets forth

the same theory of liability for both the Securities Act and the Exchange Act sections of the

CAC.  Specifically, it alleges that "[t]he investing public was kept in the dark about Fifth Third's

underwriting standards" (*id.* ¶ 11), that Fifth Third made "untrue and highly misleading"

assurances to investors "that Fifth Third's reserves for loan losses were sufficient to cover

probable losses in its loan portfolio" (*id.* ¶ 21), and that Fifth Third "concealed from investors the

fact that Fifth Third's crucial tier 1 capital was in jeopardy and was deteriorating" (*id.* ¶ 26).

Rule 9(b) applies for the additional reason that Plaintiffs plead their Securities Act claims

by using language commonly associated with claims of "fraud or mistake."  Fed. R. Civ. P. 9(b).

For example, Plaintiffs allege that Defendants made "untrue" statements or "concealed"

information regarding underwriting standards, loan loss reserves and capital levels (CAC ¶¶ 7,

21, 93, 117, 127, 141, 146, 149, 168, 178-79, 190, 194, 201, 211), and that Fifth Third "misled"

investors as to its Alt-A loan portfolio (*id.* ¶ 20).  The substance of these allegations controls

whether Rule 9(b) applies, *Rombach*, 355 F.3d at 171, and they are averments of fraud and mistake. *See Chubb*, 394 F.3d at 161 (affirming dismissal and applying 9(b) standards to allegations of defendants "conceal[ing] key facts from its public disclosures until after the merger closed" and "concealing the continued serious deterioration in [defendant]'s standard commercial insurance business"); *In re Elan Corp. Sec. Litig.*, No. 02 Civ. 865, 2004 WL 1305845, at *14 (S.D.N.Y. May 18, 2004) (dismissing, under Rule 9(b), allegations that the defendant "*concealed* and *failed to disclose* material facts"); *Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 486 (D.N.J. 1999) (dismissing, under Rule 9(b), allegations that the defendant attempted to "conceal the adverse facts concerning [defendant]'s operations, financial condition and business").

It does not matter that the CAC includes a few sentences attempting to disclaim reliance on the securities fraud allegations. Rule 9(b) still applies. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 n.2 (9th Cir. 1996) (plaintiffs' "nominal efforts" to disclaim "are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus"); *see also Chubb*, 394 F.3d at 160 ("The one-sentence disavowment of fraud contained within Plaintiffs' Section 11 Count . . . does not require us to infer that the claims are strict liability or negligence claims, and in this case is insufficient to divorce the claims from their fraudulent underpinnings.").

The Securities Act claims fail under Rule 9(b). When Rule 9(b) applies to Section 11 claims, the "scienter requirements of Rule 9(b)" apply as well. *In re Morgan Stanley and Van Lampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208, 2006 U.S. Dist. LEXIS 20758, at *28 n.12 (S.D.N.Y. Apr. 14, 2006) (*citing Rombach*, 355 F.3d at 171). Although allegations of intent may be averred "generally," *see* Fed. R. Civ. P. 9(b), *Twombly* requires Plaintiffs to raise well-

pleaded, non-conclusory factual allegations that can be reviewed based on the court's "judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009). "[W]ell-pleaded facts [that] do not permit the court to infer more than the mere possibility of misconduct" are insufficient to allege a required state of mind. *Id.*; *see also Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987) (Rule 9(b) requires pleaded facts to give rise to a "strong inference that the defendant had an intent to defraud, knowledge of falsity, or a reckless disregard for the truth"). For all of the reasons explained in Section V(A)(3), *supra*, Plaintiffs failed to plead scienter against any defendant. Plaintiffs do not even attempt to demonstrate scienter with respect to the Director and Underwriter Defendants, much less raise factual allegations that would permit the court to infer more than the mere possibility that the Director and Underwriter Defendants acted with scienter.

Moreover, Section V(A)(2), *supra*, addressing Plaintiffs' separately pleaded claims under the Exchange Act, explain in detail why the CAC fails under Rule 9(b) to identify with sufficient particularity any actionable (1) misstatement, (2) material omission, or (3) duty to disclose the allegedly omitted information. These arguments apply with equal force to Plaintiffs' Section 11 claims and independently compel dismissal.

### 3. Negative Loss Causation Is Apparent from Plaintiffs' CAC, Warranting Dismissal of the Section 11 Claims.

Although loss causation is not an element of a Securities Act claim, a loss causation defense "can be considered on a motion to dismiss to the extent it is claimed that the lack of loss causation is apparent on the face of the complaint." *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 347-48 (S.D.N.Y. 2006); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1171 (C.D. Cal. 2008) ("The face of a complaint can provide a complete causation defense where the vast majority of a security's decline cannot be attributed to an

alleged corrective disclosure."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003) ("Where it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) is proper.").

     As discussed with respect to Plaintiffs' claims under 10(b), Plaintiffs must, but fail to, plead facts showing that the revelation of a secret fraud caused a decline in Fifth Third's stock price, *Dura*, 544 U.S. at 347, or to plead in a manner that "allow[s] a factfinder to ascribe some rough proportion of the whole loss to [the company's] misstatements," *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007); s*ee also WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("[T]he negative causation defense in Section 11 and the loss causation element in Section 10(b) are mirror images.").  Instead, Plaintiffs allege only that Fifth Third disclosed "bad news," which is insufficient to establish loss causation.  *In re Tellium, Inc. Sec. Litig.*, No. 02CV5878FLW, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005).  Because a loss causation defense to the Securities Act claims is apparent from the CAC, Plaintiffs' Securities Act claims should be dismissed.

### 4.     Plaintiffs' Section 12(a)(2) Claims Should Be Dismissed.

     To establish a Section 12(a)(2) violation — the only claims against the Underwriter Defendants —"a plaintiff must show that (1) defendants offered or sold a security, (2) by the use of any means of communication in interstate commerce; (3) through a prospectus or oral communication; (4) by making a false or misleading statement of a material fact or by omitting to state a material fact; (5) plaintiff did not know of the untruth or omission; and (6) defendants knew, or in the exercise of reasonable care could have known of the untruth or omission." *Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 262 n.3 (6th Cir. 1992).

Plaintiffs' Section 12 claims should be dismissed because they are based on the same allegations as Plaintiffs' Section 11 claims. *Backhouse v. Streamedia Commc'ns, Inc.*, No. 01 CIV 4889, 2002 WL 1870272, at *5 (S.D.N.Y. Aug. 14, 2002) ("To state a claim under § 12(a)(2), plaintiffs must satisfy the same requirements as under § 11.").[43] Moreover, like the Section 11 claims, Plaintiffs' Section 12 claims are based on forward-looking statements that are protected by the Securities Act's statutory safe harbor provision. 15 U.S.C. § 77z-2. The Section 12 claims against the Underwriter Defendants, who are excluded from the "separate complaint" alleging scienter, in particular should be dismissed because Plaintiffs fail to allege that any Underwriter Defendant had "actual knowledge . . . that [any] statement was false or misleading." 15 U.S.C. § 77z-2(c)(1)(B); *see also* Sections V(B)(1)(a) and V(B)(2), *supra*.

The Section 12 claims based on the Preferred B and C Offerings should be dismissed for the additional, independent reason that Plaintiffs lack standing to bring claims based on the Preferred B Offering and because Plaintiffs fail to plead adequately their standing to bring claims based on either the Preferred B or Preferred C Offering.

Section 12(a)(2) provides that a person who "offers or sells a security" by means of a prospectus containing materially misleading statements or omissions "shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77l(a)(2). The Supreme Court has stated that the language of Section 12 "contemplates a buyer-seller relationship not unlike traditional contractual privity." *Pinter v. Dahl*, 486 U.S. 622, 642 (1988). Under *Pinter*, a plaintiff may only assert Section 12(a)(2) claims against a defendant who either directly sold the

---

[43] The only claims asserted against the Underwriter Defendants are Section 12(a)(2) claims based on the Preferred B (Count VII) and Preferred C Offerings (Count X). The **sole** allegation against the Underwriter Defendants is that they were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the Preferred B and Preferred C Prospectuses. (CAC ¶¶ 178, 211.) The CAC references one chart regarding loan loss provisions, and one paragraph regarding nonperforming assets, in each prospectus — without specifying the falsity of the information provided. (*Id.* ¶¶ 159-60, 192-93.) These are not actionable misrepresentations. Moreover, to the extent Rule 9(b) applies, these allegations fail for the reasons set forth in Section V(B)(2), *supra*

security to the plaintiff, or directly solicited the plaintiff's purchase of the security. *Id.* at 647; *see also In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004) ("The Supreme Court has held that 12(a)(2) only applies to initial offerings and not to aftermarket trading."). Furthermore, liability extends only to those sellers and solicitors who are motivated at least in part by a desire to serve their own interests. *Pinter,* 486 U.S. at 647. It is not sufficient, however, "that the putative seller stands to benefit if the sale goes through; to be liable under a solicitation theory, he must have engaged in actual solicitation." *Smith v. Am. Nat'l Bank & Trust Co.*, 982 F.2d 936, 941 (6th Cir. 1992).

The "Preferred B Plaintiffs" are Jacqueline Dinwoodie and Jeffrey J. Wackman. (CAC ¶¶ 37-38.) The Certifications attached to and incorporated into the CAC demonstrate that these Plaintiffs purchased their shares on the **open market, below** the offering price of $25 per share, not in the initial distribution. (*See* Certification Pursuant to the Fed'l Securities Law of Jacqueline Dinwoodie (purchased at $22.114 per share); Certification Pursuant to the Fed'l Securities Law of Jeffrey J. Wackman (purchased at $21.8799/per share).) Because neither purchased Preferred B securities at the offering price, they could not have purchased their shares in the initial offering and have no standing to assert claims under Section 12(a)(2). *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999) (purchase of shares in initial offering is "by definition" a purchase made at "the price at which the security was offered to the public").

The Section 12 claims based on the Preferred B and Preferred C Offerings should be dismissed for the additional reason that Plaintiffs fail to allege the particular defendants from whom they purchased their shares. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998); *see also In re Fleming Companies Inc. Sec. & Derivative Litig.*, No. CIV-

A503MD1530TJW, MDL-530, 2004 WL 5278716, at *51 (E.D. Tex. June 16, 2004) (allegation that "[t]he Underwriter Defendants offered for sale and sold the securities purchased by plaintiffs and the members of the Subclass" deemed insufficient to confer Section 12 standing because it did not establish privity, and did not articulate any direct communication between plaintiffs and underwriters); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 307 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170 (2d Cir. 2003) (dismissing plaintiffs' Section 12 claim against underwriter defendants because "the amended complaint d[id] not aver that any defendant was the immediate seller to any named plaintiff," or that any defendant "actively solicited any named plaintiff in connection with the sale" of security at issue); *Sheldon Co. Profit Sharing Plan & Trust v. Smith*, 828 F. Supp. 1262, 1280 (W.D. Mich. 1993) (dismissing Section 12 claim because plaintiffs failed to allege that the particular defendant solicited plaintiffs to buy stocks at issue).

Instead of alleging from which Defendant the shares were purchased, Plaintiffs simply parrot the generic requirements for Section 12 liability, stating, for example, that the Underwriter Defendants, along with Fifth Third and Fifth Third Capital Trust VII, "were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the Preferred C Prospectus." (CAC ¶ 211; *see also id.* ¶ 178 (same with respect to claims based on Preferred B Offering.) This "formulaic recitation of the elements of a cause of action" is not sufficient. *Twombly*, 550 U.S. at 555; *see also Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). This failing independently warrants dismissal of Plaintiffs' Section 12(a)(2) claims based on the Preferred B and Preferred C Offerings. *See In re Deutsche Telekom AG Sec. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597, at *4-5 (S.D.N.Y. Feb. 20, 2002) (holding that plaintiffs' "bald allegations" that

defendants were "sellers, offerors, and/or solicitors of sales . . . by means of the Prospectus" were insufficient to confer Section 12(a)(2) liability on the defendants).

**5.      Plaintiffs' Claims Under Section 15 of the Securities Act Also Fail.**

Because Plaintiffs have failed to state a claim for violations of Sections 11 or 12(a)(2) of the Securities Act, Plaintiffs' Section 15 claims must also be dismissed. *J & R Mktg., SEP v. Gen. Motors, Corp.*, 549 F.3d 384, 398 (6th Cir. 2008). Section 15 claims are analogous to Section 20(a) claims under the Exchange Act, and courts therefore apply the same law to both. *Pullins v. Klimley*, No. 3:05-CV-082, 2008 WL 85871, at *27 (S.D. Ohio Jan. 7, 2008). As explained in Section V(A)(5)(b), *supra*, Plaintiffs fail to allege with specificity how each Defendant participated in the challenged disclosures. Instead, the CAC asserts the Individual Defendants' control "by virtue of their executive and/or directorial positions at the Company" (CAC ¶¶ 136, 186, 219), and "by virtue of their sponsorship and/or positions as trustees of Fifth Third Capital Trust" (*id.* ¶¶ 186, 219). These allegations are insufficient to establish control person liability.

**C.      The Claims in Connection with First Charter Proxy/Registration Statement Must Be Dismissed (Counts IV – V Under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9; Asserted Against Fifth Third and the Individual Defendants).**

Section 14(a) of the Exchange Act and Rule 14a-9 combine to prohibit material misrepresentations and omissions in the solicitation of proxy votes. 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9. At the very least, a plaintiff asserting a Section 14 claim must establish negligence on the part of the defendant. *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 168 (3d Cir. 2004).

**1.      Plaintiffs' Section 14 Claim Sounds in Fraud and Therefore Must Be
Pled with Particularity.**

Just as with Securities Act claims, courts apply Rule 9(b) pleading standards to

Section 14 Exchange Act claims that sound in fraud.  *Id.* at 144-45 ("While claims brought

pursuant to section 14(a) of the 1934 Act do not require that scienter be pleaded, any claims

brought under the 1934 Act must meet the PSLRA particularity requirements quoted above if a

plaintiff elects to ground such claims in fraud."); *Desaigoudar v. Meyercord*, 223 F.3d 1020,

1022-23 (9th Cir. 2000) (applying Rule 9(b) to a Section 14 claim that sounded in fraud, and

requiring plaintiff "to plead her case with a high degree of meticulousness").  As set forth in

Section V(B)(2), *supra*, Plaintiffs allege a unified course of fraudulent conduct, and the CAC

sounds in fraud.  Thus, Rule 9(b)'s pleading requirements apply.  Because Plaintiffs have

obviously pled their Section 14 claim under Rule 8, and given that the Section 14 claim utterly

fails to plead with particularity as to alleged misstatements, Plaintiffs' claim must fail.

**2.      Plaintiffs Do Not Allege that Defendants Negligently Made Any False
Statements.**

Plaintiffs' basis for its Section 14 claim is identical to its Section 11 and Section 12

claims.  Specifically, Plaintiffs allege that the Registration/Proxy Statement failed to disclose

underwriting deficiencies, capital deterioration, inadequate loss reserves and insufficient

consideration in connection with the First Charter transaction.  As described in Section V(B)(1),

*supra*, Plaintiffs fail to properly allege any actionably false statements.

**3.      Plaintiffs' Section 20 Claims Likewise Fail.**

Because Plaintiffs' underlying Section 14 claim fails, its derivative Section 20 claims

also fail.  *Chubb*, 394 F.3d at 159 n.21.  Additionally, Plaintiffs have failed to allege that each

particular Individual Defendant has acted to control the entity liable for the alleged securities law

violations.  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004).  As argued in

Section V(A)(5)(b), *supra*, Plaintiffs seek to impose control-person liability through the use of the group pleading doctrine rather than by alleging the manner in which each individual participated in the operations of the controlled entity. This insufficient pleading fails to properly allege a Section 20 claim. *In re SmarTalk Tele., Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 549 (S.D. Ohio 2000).

> **D.    Allowing Plaintiffs to Amend the CAC Would Be Futile.**

This Court should dismiss Plaintiffs' CAC with prejudice because amendment would be futile and would thwart the PSLRA's purpose of frustrating "harassing strike suits filed the moment a company's stock price falls." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 689-90 (6th Cir. 2002). A natural tension exists between Rule 15(a) of the Federal Rules of Civil Procedure, which states that courts should freely allow amendment when justice so requires, and the PSLRA, which states that "[i]n any private action arising under this title, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements . . . are not met," 15 U.S.C. § 78u-4(b)(3)(A). The Sixth Circuit has settled the "tension in favor of the PSLRA, concluding that in light of that statute's requirements, 'we think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure.'" *PR Diamonds*, 364 F.3d at 700 (*quoting Champion Enters.*, 346 F.3d at 692).

Courts are especially wary of allowing cases to proceed "where Plaintiffs have alleged nothing more than 'fraud by hindsight.'" *Albert Fadem Trust v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1029 (S.D. Ohio 2004). Plaintiffs' claims fall squarely into this rubric because they allege — with the benefit of hindsight — that Fifth Third overinflated its stock price by failing to adequately reserve for loan losses. Plaintiffs' claims therefore should be dismissed with prejudice.

## VI.  **CONCLUSION**

For all the reasons discussed above, Defendants respectfully request that the Court

dismiss, with prejudice, Plaintiffs' Consolidated Class Action Complaint in its entirety.

Dated:  July 15, 2009                                Respectfully submitted,

                                                      s/ James E. Burke
                                                      James E. Burke (0032731)
                                                      Joseph M. Callow, Jr. (0061814)
                                                      Jennifer J. Morales (0076835)
                                                      Danielle M. D'Addesa (0076513)
                                                      Anthony M. Verticchio (0084645)
                                                      KEATING MUETHING & KLEKAMP PLL
                                                      One East Fourth Street, Suite 1400
                                                      Cincinnati, Ohio 45202
                                                      Telephone: (513) 579-6400
                                                      E-mail: jburke@kmklaw.com
                                                              jcallow@kmklaw.com
                                                              jmorales@kmklaw.com
                                                              ddaddesa@kmklaw.com
                                                              averticchio@kmklaw.com
                                                      *Attorneys for Fifth Third Bancorp, Fifth Third
                                                      Securities, Fifth Third Capital Trust VI, Fifth
                                                      Third Capital Trust VII, Kevin T. Kabat,
                                                      Christopher G. Marshall, and Daniel T.
                                                      Poston*


                                                      -and-


                                                      [*continued on next page*]

s/ Glenn Virgil Whitaker
Glenn Virgil Whitaker (0018169)
Mary C. Henkel (0039563)
Dorothea K. Langsam (0082973)
VORYS, SATER, SEYMOUR AND PEASE LLP
221 East Fourth Street, Suite 2000
Atrium Two
Cincinnati, Ohio 45202
Telephone: (513) 723-4000
E-mail: gvwhitaker@vorys.com
         mchenkel@vorys.com
         dklangsam@vorys.com

*Attorneys for Darryl F. Allen, John F. Barrett, Ulysses L. Bridgeman, Jr., James P. Hackett, Gary R. Heminger, Joan R. Herschede, Allen M. Hill, Robert L. Kock, II, Mitchel D. Livingston, Ph.D., Hendrik G. Meijer, James E. Rogers, George A. Schaeffer, Jr., John J. Schiff, Jr., and Dudley S. Taft.*

-and-

s/ Robert A. Pitcairn, Jr.
Robert A. Pitcairn, Jr. (0010293)
KATZ, TELLER, BRANT & HILD
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202
Telephone: (513) 977-3477
E-mail: rpitcairn@katzteller.com

*Attorney for Defendants UBS Securities LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated, Wachovia Capital Markets, LLC, Banc of America Securities LLC, Credit Suisse Securities (USA) LLC and Barclays Capital Inc*

OF COUNSEL:

Herbert S. Washer
Adam S. Hakki
Daniel Lewis
SHEARMAN & STERLING LLP
559 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
E-mail: herbert.washer@shearman.com
       ahakki@shearman.com
       daniel.lewis@shearman.com

Laura A. Hinegardner
KATZ, TELLER, BRANT & HILD
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202
Telephone: (513) 977-3484
E-mail: lhinegardner@katzteller.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served upon all counsel of record via the Court's ECF System this 15th day of July, 2009.

s/ Jennifer J. Morales
Jennifer J. Morales

2950074.16