UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LOCAL 295/LOCAL 851 IBT EMPLOYER
GROUP PENSION TRUST AND WELFARE
FUNDS AND DISTRICT NO. 9, *et al.*,

                      Plaintiffs,

vs.

FIFTH THIRD BANCORP, *et al.*,

                      Defendants.

No. 1:08-cv-00421-SSB-TSB

<u>CLASS ACTION</u>

Chief Judge Sandra S. Beckwith
Magistrate Judge Timothy S. Black

---

**<u>NOTICE OF SUPPLEMENTAL AUTHORITY
IN SUPPORT OF LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS</u>**

    Co-Lead Plaintiffs Local 295/Local 851 IBT Employer Group Pension Trust and Welfare Funds, District No. 9, I.A. of M. & A.W. Pension Trust and Edwin B. Shelton and additional plaintiffs Jeffrey J. Wacksman, Leon H. Loewenstine, and Jacqueline Dinwoodie (collectively, "Plaintiffs") submit this Notice of Supplemental Authority to direct the Court's attention to recent decisions that provide further support for Lead Plaintiffs' Omnibus Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Opposition") (Doc. No. 88):

    **I.**    **<u>In re Dynex Capital, Inc., Sec. Litig.</u>**, 05 Civ. 1897 (HB), 2009 U.S. Dist. LEXIS 96527 (S.D.N.Y. Oct. 19, 2009) (attached at Tab A). This decision further supports Lead Plaintiffs' arguments set forth in sections III.B.1.-7. and III.C.2.a.-h. of the Opposition.

    The court denied defendants' motion to dismiss securities fraud claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder,

where the plaintiffs alleged that the defendants engaged in a fraudulent scheme to artificially inflate the price of bonds collateralized by thousands of mobile home loans that were originated and serviced by Dynex. Plaintiffs alleged that defendants misrepresented that the poor performance of the bond collateral resulted from "market conditions," thereby concealing that the defendants' aggressive and reckless loan underwriting and origination practices generated a pool of loans of poor credit quality and impaired by inherent defects. *Id*. at *7-*8.

### Underwriting Standards

- The court held that the complaint "sufficiently alleges that the Underwriting Statements are misleading to the extent that they claim that some standards pertaining to borrower documentation or creditworthiness were followed when in fact such requirements were regularly or routinely disregarded or were based upon falsified loan documentation." *Id*. at *27. *See* Opposition at 28-34, 36-43.

- Defendants' scienter for these misstatements is supported by the following allegations: (i) that "disregard for underwriting standards was a top-down directive from Dynex management;" (ii) "management policies to promote loan volume at the expense of borrower creditworthiness and loan documentation requirements;" (iii) the defendants "set monthly quotas for loan volume and the [confidential witnesses] reported that both salary and bonuses at the regional offices were based on loan volume, creating incentives to approve loans with no documentation of borrower income;" (iv) internal reports that "corroborate the allegation that the Individual Defendants had personal knowledge of the overall composition of the pool of Collateral Loans;" and (v) confidential witness statements supporting allegations that the defendants monitored the performance of loans. *Id*. at *43-*46. *See* Opposition at 72-80, 84-87.

### Market Conditions

- Defendants made false and misleading statements "that purport to attribute losses and 'loss severities' in the Bond Collateral, as well as the need for increased loss reserves, primarily to 'market conditions' … but that omit to state that the poor performance in fact derived from 'reckless underwriting and origination practices.'" *Id*. at *28. *See* Opposition at 20-24, 32-34, 57-59.

- The court found a strong inference of scienter for these statements based on defendants' receipt of "several forms of report that collectively must have disclosed that origination practices were a material cause of the poor performance of the Bond Collateral," as opposed to market conditions. *Id*. at *50. *See* Opposition at 72-80.

II.   **In re Washington Mutual, Inc. Sec. Litig.**, 2:08-md-1919 (MJP), C08-387 (MJP), 2009 U.S. Dist. LEXIS 99727 (W.D.Wash. Oct. 27, 2009) (attached at Tab B). This decision further supports Lead Plaintiffs' arguments set forth in sections III.B.1.-7. and III.C.2.a.-h. of the Opposition.

The court upheld substantially all of plaintiffs' Section 10(b) and Rule 10b-5 claims where plaintiffs alleged that "[i]n an effort to increase net income, WaMu allegedly commenced a drive to originate more loans" by engaging in "a host of improper activities that it hid from investors." *Id*. at *11. Plaintiffs alleged that defendants: "(1) deliberately and secretly decreased the efficacy of WaMu's risk management policies; (2) corrupted WaMu's appraisal process; (3) abandoned appropriate underwriting standards; and (4) misrepresented both WaMu's financial results and internal controls." *Id*. These allegations were supported by statements from "[c]onfidential witnesses … from various levels and geographic locations within the Company [who] corroborate WaMu's lax underwriting guidelines, its practice of selling loans to borrowers with extremely low Fair Isaac Credit Organization ("FICO") credit scores, [and] its failure to request documentation or verification of a borrower's stated income…." *Id*. at *12.

**Credit Risk Management**

- The court held that plaintiffs sufficiently alleged the falsity and materiality of statements made by WaMu's CEO, CFO and other senior officers of the company concerning credit risk management, including statements that: (i) WaMu maintained "appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance," (ii) WaMu was "very well positioned, regardless of what happens in the housing market," and (iii) "[w]e continue to proactively manage our credit risk, and are taking steps now to reduce potential future exposure." *Id*. at *18-*19, *35. These statements were false because WaMu's risk management operations had been purposefully rolled back by the defendants. *Id*. at *19-*20. *See* Opposition at 30, 36-44, 52-55.

- The complaint raises a strong inference of scienter for these statements based on: (i) monthly risk reports distributed to management, which "specifically quantified the fact that the Company was exceeding certain risk parameters;" (ii) defendants' attendance at "monthly Enterprise Risk Committee meetings where 'all aspects of risk across the bank

were discussed;'" and (iii) the CEO's and CFO's own statements about risk management that showed their detailed knowledge about the processes. *Id*. at *21-*22, *35. *See* Opposition at 68-79.

**Underwriting Standards**

- The court found materially false defendants' statements regarding WaMu's underwriting standards, such as: (i) WaMu was "disciplined and vigilant in [its] underwriting standards;" (ii) WaMu had "excellent processes, policies, underwritings, standards;" (iii) "[w]e have more than 20 years experience underwriting and originating option ARM loans through many market cycles [and] the quality of our option ARM portfolio remains strong;" and (iv) "[c]redit quality continues to surpass our expectations." *Id*. at *25-*26, *38. *See* Opposition at 28-34, 36-43, 58.

- These statements were false because, as plaintiffs alleged, "WaMu lowered its underwriting standards and pressured underwriters to approve loans outside of the guidelines." *Id*. at *26-*27.

- The court held that plaintiffs raised a strong inference of scienter as to misstatements concerning underwriting standards based on: (i) the defendants' "position[s] within the Company;" (ii) the defendants' own statements that showed they were "deeply familiar with WaMu's underwriting guidelines;" (iii) the defendants' "access to regular and special reports on underwriting;" and (iv) the "critical importance [of underwriting] to WaMu's financial health." *Id*. at *28-*29, *39-*40. *See* Opposition at 68-80.

**Allowance For Loan Losses**

- The court held that defendants made materially false statements concerning internal controls and allowance for loan losses because of "WaMu's failure to provision accurately and in acknowledgment of the risks created by emphasizing loan volume over quality." *Id*. at *30. Such statements include: (i) "[w]e continue to look at all of our loss factors and the performance of [the] underlying portfolio and continually make adjustments;" and (ii) assurances that WaMu was being "very disciplined" in provisioning for loan losses. *Id*. at *40-*41. *See* Opposition at 31-32, 45-57, 62-63.

- Plaintiffs raised a strong inference of scienter for misstatements concerning the allowance for loan losses where: (i) WaMu's CFO, by virtue of his position, "was responsible for the Company's financial reporting and … his statements show his detailed knowledge of WaMu's financial condition;" (ii) defendants "attended monthly Risk Management Committee meetings and received financial forecasts or projections from WaMu's different business units;" (iii) "there were ample red flags throughout the Class Period that the Allowance was under-provisioned;" (iv) defendants "received the CRO Report" which gave them "actual knowledge of the deficiencies in WaMu's internal controls;" and (v) defendants had the "motive and opportunity to make false statements given that [their] bonuses were tied to the Company's performance." *Id*. at *33-*34, *41-*42. *See* Opposition at 68-84.

III.     **In re The PMI Group, Inc. Sec. Litig.**, No. C 08-1405 SI, 2009 U.S. Dist. LEXIS 101582 (N.D. Cal. Nov. 2, 2009) (attached at Tab C). This decision further supports Lead Plaintiffs' arguments set forth in sections III.B.1.-3.,6. and III.C.2.a.-h. of the Opposition.

The court denied defendants' motion to dismiss Section 10(b) claims, where plaintiffs alleged that The PMI Group ("PMI"), "had historically been a conservative insurer of full documentation home mortgages," but during the class period, "PMI began to insure high-risk loan products." *Id*. at *3. Even as defendants were aware of PMI's mounting losses, plaintiffs allege that "defendants continued to assure the market that PMI was closely monitoring and evaluating risk." *Id*. at *3-*4.

**Credit Risk Management**

- The court held that the "complaint sufficiently alleged that defendants made material false and misleading statements about PMI's prudent and careful risk management, as well as PMI's reporting of reserves for losses." *Id*. at *4. *See* Opposition at 28-32.

- The court found that the complaint raised a strong inference of scienter based on: (i) "defendants' own admissions about their intimate and day-to-day involvement in PMI's operations;" (ii) "details about PMI's 'risk layering,' which exposed PMI to increased risk of borrower default, and which allegedly was not disclosed to investors;" (iii) allegations of "internal reports to specifically evaluate the company's credit risk and potential losses from mortgage defaults … [which] showed that PMI's delegated underwriters were regularly performing below PMI's established standards and that PMI's portfolio was suffering mounting losses;" (iv) confidential witnesses' statements showing that the individual defendants were aware of the low credit quality of the loans PMI had insured; (v) defendants "repeatedly acknowledged that credit quality was critical to PMI's success and that they were directly involved with determining PMI risk management.'" *Id*. at *5-*6, *8-*9. *See* Opposition at 68-80, 84-78, 91-93.

**Purported Forward-Looking Statements**

- The court rejected the defendants' contention that many of defendants' statements were forward-looking and, thus, protected by the PSLRA safe harbor and/or the bespeaks caution doctrine, stating that "many of the statements alleged to be false or misleading are not forward-looking, but are un-protected statements of then-existing fact regarding the quality of PMI's book of business and PMI's underwriting and risk management practices." *Id*. at *10-*11. *See* Opposition at 46-48.

DATED:  November 16, 2009

LAW OFFICES OF
PHYLLIS BROWN, L.L.C.


/s/ PHYLLIS E. BROWN
PHYLLIS E. BROWN

119 East Court Street
Cincinnati, OH  45202
(513) 241-0061 Phone
(513) 621-7086 Fax

*Liaison Counsel for Lead Plaintiffs*

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS, LLP
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432-4809
(561) 750-3000 Phone
(561) 750-3364 Fax
E-mail:  jreise@csgrr.com
E-mail:  sastley@csgrr.com
E-mail:  eshonson@csgrr.com

BERGER & MONTAGUE, P.C.
SHERRIE R. SAVETT
BARBARA A. PODELL
ERIC LECHTZIN
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000 Phone
(215) 875-4604 Fax
E-mail:  ssavett@bm.net
E-mail:  bpodell@bm.net
E-mail:  elechtzin@bm.net

*Co-Lead Counsel for Lead Plaintiffs*

**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ, LLP**
DANIEL W. KRASNER
ROBERT B. WEINTRAUB
270 Madison Avenue
New York, NY  10016
(212) 545-4600 Phone
(212) 545-4653 Fax
E-mail:  krasner@whafh.com
E-mail:  weintraub@whafh.com

**COHEN TODD KITE**
   **& STANFORD, LLC**
MICHAEL R. SCHMIDT
DONALD J. RAFFERTY
250 East Fifth Street, Suite 1200
Cincinnati, OH 45202
(513) 421-4020 Phone
(513) 241-4495 Fax
E-mail:  mschmidt@ctks.com
E-mail:  drafferty@ctks.com

*Co-counsel for Plaintiff Leon H. Lowenstine as
Proposed Class Representative for the
Preferred C Class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 16, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ PHYLLIS E. BROWN
PHYLLIS E. BROWN

# TAB A



LEXSEE 2009 U.S. DIST. LEXIS 96527

**In re DYNEX CAPITAL, INC., SECURITIES LITIGATION**

**05 Civ. 1897 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2009 U.S. Dist. LEXIS 96527*

**October 19, 2009, Decided
October 19, 2009, Filed**

**COUNSEL:** [*1] For Teamsters Local 445 Freight Division Pension Fund, on its own behalf, Plaintiff: Christopher Lometti, LEAD ATTORNEY, Cohen, Milstein, Sellers & Toll, P.L.L.C., New York, NY; Joel Paul Laitman, LEAD ATTORNEY, Daniel Brett Rehns, Schoengold & Sporn, P.C., New York, NY; Samuel P. Sporn, LEAD ATTORNEY, Schoengold, Sporn, Laitman & Lometti, P.C., New York, NY.

For Teamsters Local 445 Freight Division Pension Fund, on behalf of all others similarly situated, Plaintiff: Christopher Lometti, LEAD ATTORNEY, Cohen, Milstein, Sellers & Toll, P.L.L.C., New York, NY; Joel Paul Laitman, Samuel P. Sporn, LEAD ATTORNEYS, Schoengold & Sporn, P.C., New York, NY.

For Dynex Capital, Inc., Merit Securities Corporation, Stephen J. Benedetti, Thomas H. Potts, Defendants: Edward Joseph Fuhr, Eric Harrison Feiler, Monica Shelton Call, LEAD ATTORNEYS, Hunton & Williams, L.L.P., Richmond, VA; Joseph John Saltarelli, LEAD ATTORNEY, Hunton & Williams, LLP(NYC), New York, NY; Terence James Rasmussen, LEAD ATTORNEY, Hunton & Williams, LLP (Richmond VA), Richmond, VA.

For Lehman Brothers, Inc., Greenwich Capital Markets, Inc., Defendants: James Ellis Brandt, LEAD ATTORNEY, Latham & Watkins LLP, New York, NY; Jeff [*2] G. Hammel, Latham and Watkins (NY), New York, NY.

**JUDGES:** Hon. HAROLD BAER, JR., United States District Judge.

**OPINION BY:** HAROLD BAER, JR.

**OPINION**

**OPINION & ORDER**

    **Hon. HAROLD BAER, JR., United States District Judge**:

    This putative securities class action, filed by lead plaintiffs Teamsters Local 445 Freight Divisions Pension Fund ("Teamsters" or "Plaintiffs") more than four years ago, concerns asset-backed securities. Specifically, bonds collateralized by several thousand mobile home loans originated and initially serviced by Defendant Dynex Capital, Inc. ("Dynex") and its affiliates. Plaintiffs allege that Dynex, its subsidiary Merit Securities Corporation ("Merit"), and two senior executives of the companies, Thomas H. Potts ("Potts") and Stephen J. Benedetti ("Benedetti") made false and misleading statements about the bonds in violation of *Section 10(b)* of the Securities and Exchange Act of 1934, *15 U.S.C. § 78j(b)* (the "Act"). Plaintiffs also assert claims for "control person" liability against Potts and Benedetti (collectively, "Individual Defendants") under *Section 20(a)* of the Act, *15 U.S.C. § 78t(a)*, which are derivative of their Section 10(b) claims. In 2006, I granted Defendants' motion to dismiss the then-operative [*3] First Amended Complaint ("FAC") against the Individual Defendants for a failure to adequately allege scienter, but I denied the motion with respect to Dynex and Merit (collectively, "Corporate Defendants"). *In re Dynex Capital Secs. Litig., No. 05 Civ. 1897, 2006 U.S. Dist. LEXIS 4988, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006)* ("*Dynex I*"). Because at the time there was a difference of opinion in this Circuit as to whether scienter could be adequately alleged against a corporation without concomitant allegations that an employee or officer acted with the requisite

Case 1:08-cv-00421-SSB-TSB   Document 98   Filed 11/16/09   Page 11 of 47

Page 2
2009 U.S. Dist. LEXIS 96527, *

state of mind, I certified the matter for interlocutory appeal. *In re Dynex Capital Inc. Secs. Litig., No. 05 Civ. 1897, 2006 U.S. Dist. LEXIS 35386, 2006 WL 1517580 (S.D.N.Y. Jun. 12, 2006)*. In 2008, the Court of Appeals held that in appropriate circumstances allegations of corporate scienter may be sustained "in the absence of successfully pleading scienter as to an expressly named officer," but concluded that Plaintiffs had not done so in this case. *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc., 531 F.3d 190 (2d Cir. 2008)* ("*Teamsters*"). The Court of Appeals thus vacated my decision in *Dynex I* and remanded with instructions to dismiss the FAC against [*4] the Corporate Defendants and to grant Plaintiffs leave to replead. Plaintiffs have since filed a Second Amended Complaint ("SAC") and Defendants have again moved to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*. As set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

### A. Factual Background and General Allegations of Securities Fraud

Dynex is a financial services company in the business of packaging mortgage loans into securities (i.e. "securitizing" loans), including the two series of bonds at issue here: the $ 336 million offering of Series 12 bonds issued on April 2, 1999 and the $ 303 million offering of Series 13 bonds issued on September 2, 1999 (collectively, "Bonds"). Together with its affiliates, Dynex was responsible for all aspects of the loan securitization process. Through its subsidiary Dynex Financial, Inc. ("DFI"), between 1996 and 1999 Dynex originated or purchased the 13,000 manufactured housing (*i.e.* mobile home) loans that collateralized the Bonds ("Collateral Loans" or "Bond Collateral"). Dynex subsidiary Merit served as issuer of the bonds, purchasing the Collateral Loans from another Dynex subsidiary, Issuer Holding Corp. ("IHC"), [*5] and packaging them into securities. Merit retained the most junior, or subordinated "tranche" or class of securities within each series of Bonds--*i.e.* the class of Bonds that bore losses first and received payments last--and also committed to provide "overcollateralization" in the form of, *inter alia*, lines of credit, reserve funds, insurance policies, or additional loans to be drawn upon in the event of losses in the Bond Collateral, thereby providing "credit enhancement" to the Bonds themselves. SAC PP 36-39; Decl. of Terrence Rasmussen ("Rasmussen Decl."), Ex. 3 ("Series 13 Prospectus Supplement"), at 32. Finally, until 1999, Dynex's loan servicing affiliate serviced the Collateral Loans, collecting and remitting payments that ultimately found their way to bondholders. [1] Dynex sold its loan servicing operation in 1999, but retained its role as "Master Servicer" with respect to the Bonds. In fulfilling that role, Dynex

published a monthly report that summarized the performance of the Bond Collateral, listing number and dollar value of delinquent loans ("Monthly Collateral Reports"). SAC P 21. During the relevant time periods, Potts was president and principal executive officer of [*6] Merit and was an officer and director of Dynex. The Teamsters bring this putative class action on behalf of persons who purchased the Bonds between February 7, 2000 and May 13, 2004 ("Class Period").

> 1   Payments of interest and principal on the Collateral Loans flowed as follows: payments were collected by the servicer (originally a Dynex affiliate and subsequently Origin Financial, Inc) and remitted to the "Master Servicer" (Dynex); after retaining its fee, the Master Servicer remitted the payments to the trustee of the Bonds, who then made payment to the bondholders. SAC PP 21-22.

It was not long after the Bonds were issued that the Collateral Loans began to perform poorly. For example, whereas Merit represented in the Series 13 Prospectus Supplement that, as of August 1999, 1.36% of the Collateral Loans were delinquent, by December 2000 the delinquency percentage had jumped to 4.92%. SAC P 8; Rasmussen Decl. Ex. 4 ("Series 13 Prospectus Supplement"), at S-5. In October 2003, Dynex's Monthly Collateral Report disclosed that cumulative repossessions in the Series 13 Collateral Loans had been understated by approximately 34% or $ 15.92 [*7] million. SAC P 134. Between November 2003 and May 2004, the Bonds were reviewed by rating agencies Moody's Investor Service and Fitch Ratings ("Rating Agencies") and ultimately downgraded. SAC PP 10-12. In announcing the downgrade of the Series 12 Bonds, Fitch noted that "relaxed credit standards, overbuilding by manufacturers, and the difficulties relating to servicing this unique asset have all contributed to poor performance of [manufactured housing] securities." SAC P 94. In April 2004, Merit disclosed an "internal control deficiency" with regard to recording losses on the Collateral Loans and restated its earnings for the second and third quarters of 2003. SAC P 149. Following the downgrades by the Rating Agencies, the value of the Bonds dropped by as much as 85%. SAC P 11.

The gravamen of Plaintiffs' claims--the central theme of both the earlier and instant complaints--are allegations that Defendants engaged in a fraudulent scheme to artificially inflate the price of the Bonds by misrepresenting that the poor performance of the Bond Collateral resulted from "market conditions," thereby concealing what Plaintiffs contend was the *true* cause of the poor performance: namely, that [*8] Defendants'

2009 U.S. Dist. LEXIS 96527, *

aggressive and reckless loan underwriting and origination practices generated a pool of Collateral Loans of poor credit quality and impaired by inherent defects. FAC PP 2, 10; SAC PP 2-8. More specifically, Plaintiffs' theory is that Dynex was a late entrant to the market for originating and securitizing mobile home loans and as a consequence overtly expressed to mobile home dealers a willingness to "buy bad paper," *i.e.* to originate or purchase uncreditworthy loans in order to gain market share and generate a sufficient volume of new loans to permit the issuance of mortgage-backed securities ("MBS"). FAC P 5; SAC P 58. Thus, in both their earlier and instant pleadings, Plaintiffs allege that Defendants "systematically disregarded" their own underwriting guidelines relative to borrower creditworthiness and minimum documentation requirements, originated a large volume of so-called "buy-for" loans (*i.e.* loans where the signatory to loan documents was not the mobile home's owner or occupant, which frustrated repossession), [2] "repeatedly purchas[ed] loans from mobile home dealers known to regularly submit falsified loan applications," and failed to obtain releases from landowners [*9] ("no-release loans"), which also frustrated repossession of the mobile home collateral located thereon. FAC P 10; SAC PP 89, 91.

> 2    Plaintiffs allege that the "Dynex collectors were forbidden by the Fair Debt Collection Practices Act [*15 U.S.C. § 1692 et seq.* ("FDCPA")], to even contact the occupant without the permission of the person who signed the loan application." SAC P 76. The Court takes judicial notice of the fact that the FDCPA generally prohibits a "debt collector" from communicating with any party other than the "consumer" (*i.e.* the party liable for the debt), his attorney, or immediate family, except to confirm basic information about the debtor's place of residence and employment. *15 U.S.C.A. §§ 1692b, 1692c(b).*

As a consequence of Defendants' questionable underwriting and origination practices, Plaintiffs contend that certain of Defendants' statements in the Bonds' prospectuses (collectively, "Offering Documents") were materially false and misleading, as were public statements that purported to attribute losses on the Bond Collateral primarily to market forces instead of Defendants' own practices in originating and underwriting the Bond Collateral. *See, e.g.*, FAC P 13, SAC [*10] P 93.

**B. First Motion to Dismiss: *Dynex I***

In *Dynex I*, I found Plaintiffs' allegations of scienter lacking with respect to the Individual Defendants. Although I concluded the FAC "aptly described a pattern of reckless corporate behavior," I found that Plaintiffs "failed to link that behavior to any culpable individuals"

and did not allege that "Potts or Benedetti saw or had access to specific reports or statements that indicated malfeasance or that contradicted their public statements." *Dynex I, 2006 U.S. Dist. LEXIS 4988, 2006 WL 314524, *9*. With respect to the Corporate Defendants, however, I noted that a plaintiff may adequately plead scienter "on the part of the corporate defendants without pleading scienter against any particular employees of the corporation." *Id.* (citing *In re Worldcom, 352 F.Supp. 2d 472, 497 (S.D.N.Y. 2005)*). Specifically, I found that the FAC adequately alleged that officers and employees of the Corporate Defendants "had the motive and opportunity to commit fraud" and that Plaintiffs' allegations that the Corporate Defendants "systematically originated defective loans . . . constitute[d] 'strong circumstantial evidence of . . . recklessness.'" *Id.* (quoting *Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)*).

Defendants [*11] moved for reconsideration or, in the alternative, for interlocutory appeal. I concluded that the question of whether scienter could be successfully alleged against a corporation without also alleging that specific corporate officers or employees acted with fraudulent intent was "a controlling question of law as to which there is substantial ground for difference of opinion." *28 U.S.C. § 1292(b)*. I thus certified the matter for interlocutory appeal. *In re Dynex Capital Inc. Secs. Litig., 2006 U.S. Dist. LEXIS 35386, 2006 WL 1517580, *3*.

**C. Second Circuit Opinion: *Teamsters***

On appeal, the Second Circuit confirmed that "there are circumstances in which a plaintiff may plead the requisite scienter against a corporate defendant without successfully pleading scienter against a specifically named individual defendant." *Teamsters, 531 F.3d at 192*. However, the Circuit reviewed my denial of Defendants' motion to dismiss *de novo* and concluded that the allegations of the FAC were insufficient to raise the requisite "strong inference" of scienter against Dynex and Merit, rejecting each of Plaintiffs' three arguments as to why the FAC's allegations of scienter were adequate. *Id. at 196*. In conclusion, the Court of Appeals stated [*12] that Plaintiffs had "fail[ed] to allege the existence of information that would demonstrate that the statements made to investors were misleading, *e.g.*, information showing that the primary cause of the bonds' poor performance was *not* the general weakness in the mobile homes market." *Id. at 197*. As a consequence, the panel could not conclude that Plaintiffs' proffered inference--namely, that someone responsible for the statements made them with at least a reckless disregard for their truth--was "'at least as compelling as the competing inference'; i.e. that the statements either were not misleading" or were the result of careless mistakes based on erroneous information." *Id.* (quoting *Tellabs v. Makor*

*Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007))* (internal citation omitted). The Circuit vacated the *Dynex I* opinion and remanded with instructions to dismiss the FAC against the Corporate Defendants and to grant Plaintiffs leave to replead.

**D. Second Amended Complaint**

The SAC attempts to remedy the pleading deficiencies identified by the Court of Appeals by supplementing the allegations in the FAC in two primary ways. First, the SAC describes nine confidential witnesses whose statements [*13] form the basis of many of the substantive allegations. The confidential witnesses ("CWs") include three district sales managers who were involved in the origination of the Bond Collateral and who generally describe Dynex's loan underwriting practices, a credit underwriter at a Dynex regional office during a portion of the period in which the Bond Collateral was underwritten, four Dynex employees who worked in Dynex's loan servicing and collection departments, and a "senior accountant" at Dynex's Virgina headquarters.

Second, the SAC identifies and describes for the first time the following four categories of reports that Plaintiffs contend put the Defendants on notice that their public statements were materially misleading. [3]

> 3   A fifth form of report, the Monthly Collateral Report, is referenced in the FAC. *See* FAC PP 9, 25.

1. Manufactured Housing Dealer Performance Reports ("MHDP Reports"): The SAC alleges that during the period of loan origination (*i.e.* 1996 - 1999) data from Dynex's regional and district offices were collected and synthesized into monthly MHDP Reports that inventoried the number and dollar amounts of loans from each manufactured housing dealer and assessed the loans' [*14] creditworthiness on a scale of "A" (superior), "B" (good), or "C" (poor), "based on borrower credit scores and other indicia of creditworthiness." SAC PP 4, 66. The MHDP Reports were prepared by Dynex management in Virginia and disseminated to the company's regional offices. SAC P 4.

2. Manufactured Housing Regional Performance Reports ("MHRP Reports"): During the same period, Dynex also prepared and circulated MHRP Reports that listed the number and dollar amount of mobile home loans by region, and also rated the loans' credit quality on the "A" to "C" scale. SAC PP 5, 66. Plaintiffs allege that the MHRP Report for Dynex's Northeast Region for the first quarter of 1997 revealed that 64% of the $ 8.3 million in loans funded in that region in that quarter were assigned a "C" rating. SAC P 66. Plaintiffs allege that both the MHDP and MHRP Reports were reviewed by

the Individual Defendants and used to evaluate and compensate regional management in accordance with a corporate culture "completely focused on achieving high loan volume." SAC PP 6, 66.

3. "Basis Reports": According to the SAC, during the Class Period Benedetti reviewed monthly "Basis Reports" that summarized Dynex's balance [*15] sheet and valued its assets, a substantial portion of which were its own debt securities including the Bonds. SAC P 85. Benedetti allegedly attended monthly accounting meetings "approximately one hour in duration" at which the Basis Reports were discussed. *Id.*

4. "Audit Reports": Finally, Plaintiffs allege that quality-control audits of the Bond Collateral were prepared in Dynex's Fort Worth, Texas servicing headquarters and summarized into "Audit Reports" that "revealed true rates of first payment defaults and dealer fraud" and "uncovered that borrower's creditworthiness was not consistent with underwriting guidelines." SAC P 53(i). Additionally, the SAC contains allegations that employees in Dynex's Fort Worth servicing center prepared "foreclosure reports" for every loan that went into default. Such reports, together with all of the underlying documentation for the defaulted loan were sent to Dynex's Virginia headquarters by means of a computerized imaging system called "Polaris." SAC PP 53(g), 84.

Like the FAC, the SAC depicts Dynex and Merit entering the mobile home loan market in a particularly aggressive fashion by, among other things, consistently agreeing to purchase or fund [*16] poor quality loans, often without sufficient documentation, although the instant pleading adds detail to the allegations of the central role played by Dynex's management in Virginia. For example, the SAC alleges that in 1999 Dynex adopted a computer-based underwriting system named "Portal" that centralized loan underwriting decisions and led to approval of loans that would not have been approved under the prior manual underwriting process. SAC PP 63-65. The SAC alleges that in 1996 Dynex's senior management implemented the "225 Program" which streamlined the process by which Dynex reviewed mobile home dealers in order to expedite growth in the dealer base, SAC P 68, and authorized an underwriting directive to approve loans to senior citizens with repayment terms that exceeded normal life-expectancy statistics. SAC P 74.

**II. LEGAL STANDARD**

According to the Supreme Court's most recent pronouncements, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L.*

Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "A claim [*17] has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556)*. The requirement that the court accept all factual allegations as true does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* The court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific inquiry" that requires application of "judicial experience and common sense." *Id.*

A securities fraud claim such as this one must also satisfy the heightened pleading requirements of the PSLRA and *Rule 9(b)* by stating with particularity the circumstances constituting fraud. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009)* (citations omitted). To comply with *Rule 9(b)*, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)*. [*18] Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(1), (2)*.

In the time since I decided *Dynex I*, but before the Circuit's decision in *Teamsters, 531 F.3d 190*, the Supreme Court has clarified the standard and analytical framework applicable to determination of the central issue in this case: namely, when a plaintiff's allegations of scienter are adequate to establish the required "strong inference" that the defendant acted with fraudulent intent. *Tellabs, 127 S.Ct. 2509*. *First*, as with any *Rule 12(b)(6)* motion to dismiss, the court must accept all factual allegations in the complaint as true. *Id. Second*, the court must "consider the complaint in its entirety," together with the other sources ordinarily examined when ruling on a *Rule 12(b)(6)* motion to dismiss, such as documents incorporated into the complaint and upon which Plaintiffs rely. *Id.* The proper inquiry is whether "*all* of the facts alleged, taken collectively, give rise to [*19] a strong inference of scienter." *Id.* (emphasis in original). *Third*, the court must "take into account plausible opposing inferences" in an inquiry that is "inherently comparative." *Id. at 2509-10*. Although the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre," the complaint

will only survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## III. DISCUSSION

### A. Elements of Securities Fraud Claim

Plaintiffs' principal claims are brought under *Section 10(b)* of the Exchange Act, *15 U.S.C. § 78j(b)* and *Rule 10b-5*, which implements the statute to prohibit "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *17 C.F.R. § 240.10b-5(b) (2008)*. To state a claim for securities fraud under *Section 10(b)* and *Rule 10b-5*, a plaintiff must allege (1) a material misrepresentation or omission; (2) scienter, *i.e.* an intent to deceive or defraud; (3) a connection with the purchase [*20] or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*.

### B. Actionable Misrepresentations

Only materially misleading statements or omissions give rise to liability under *Section 10(b)*. A statement or omission is materially misleading if there is a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *In re NovaGold Res. Inc. Secs. Litig., 629 F. Supp. 2d 272, 2009 WL 1575220, *16 (S.D.N.Y. 2009)* (quoting *Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988))*. Of course, in addition to being material, to form the basis of liability an affirmative statement must be false and an omitted fact must be true.

#### 1. Underwriting Statements

Plaintiffs allege that Defendants' statements that they relied upon their own guidelines to underwrite the Bond Collateral were false and misleading because the underwriting guidelines were in fact "systematically disregarded" ("Underwriting Statements"). SAC P 100. These allegations derive from the statements of the confidential witnesses [*21] who observed, for instance, "Dynex's underwriters and sales managers routinely ignor[ing] the Company's stated [underwriting] guidelines in order to achieve 'volume'" in the origination of mobile home loans and who noted that "regional offices were given wide latitude to waive underwriting standards." SAC P 53(b), (f). Plaintiffs also purport to base their allegations upon the MHDP, MHRP, and Audit Reports.

Plaintiffs cannot convincingly argue that the poor credit quality of the Collateral Loans alone rendered the Underwriting Statements false and misleading because Defendants never publicly articulated minimum credit-worthiness standards below which they would not lend. Rather, the Offering Documents merely state that Collateral Loans would be originated pursuant to *either* (a) the generally accepted underwriting standards of Fannie Mae and Freddie Mac ("GSE's"), *or* (b) Defendants' "various credit, appraisal and underwriting standards and guidelines, themselves "less stringent then those applied by [the GSE's]." [4] Thus, even assuming every MHRP Report revealed a percentage of "C" rated loans as high as the 64% disclosed in the 1997 report cited in the SAC, such information would not [*22] establish the falsity of the Underwriting Statements. [5] *See In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008)* (statements about mere existence of risk management program without "qualitative assurances" about its effectiveness were not actionable). Similarly, the Offering Documents disclosed that the Defendants' underwriting standards would be "varied" or documentation requirements "waived" in "appropriate cases where factors such as low loan-to-value ratios or other favorable compensating factors exist." Series 13 Prospectus at 34. Thus, revelations that "regional offices were given wide latitude to waive underwriting standards" are insufficient to render the Underwriting Statements false or misleading. SAC P 53(b).

4    The Offering Documents warned in bold typeface that as a consequence of the less stringent underwriting standards, the Collateral Loans were "*likely* to experience rates of Delinquency and Foreclosure that are higher and may be substantially higher, than Mortgage Loans originated in accordance with [GSE] underwriting guidelines." Series 13 Prospectus at 7 (emphasis added). The Offering Documents also disclosed that underwriting guidelines were "intended" [*23] to provide for origination of loans to "non-conforming credit[s]," including loans to borrowers who "may have a record of major derogatory credit items, such as default on a prior mortgage loan, credit write-offs, outstanding judgments and prior bankruptcies." Series 13 Prospectus at 7.

5    As lax as Dynex's underwriting appears to have been, this is not a case of a lender who publicly touted the quality of its loans as it originated loans to unqualified borrowers without regard to its publicly proclaimed underwriting standards. *Cf. Atlas v. Accredited Home Lenders Holding Co., 556 F. Supp. 2d 1142 (S.D. Cal. 2008)* (defendants' repeated representations that its under-

writing procedures were more conservative than those of other subprime lenders were false and misleading because they were consistently disregarded); *In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1192-93 (C.D. Cal. 2008)* (CEO's statements that loans to borrowers with FICO scores below 550 could not be priced to cover risk were false and misleading when lender in fact made numerous loans to such borrowers); *In re New Century, 588 F.Supp. 2d 1206 (C.D. Cal. 2008)* (company's statements that the credit quality [*24] of its loans was "excellent" and "very high" and that it employed "strict" and "strong" underwriting guidelines were false and misleading because officers were aware of "pervasive company-wide practice of issuing loans of poor quality without complying with any basic set of underwriting standards").

Rather, Plaintiffs' theory of falsity with respect to the Underwriting Statements turns on allegations that Dynex "systematically" or "routinely" disregarded its own underwriting standards, not in the principled manner described in the Offering Documents--*i.e.* in "appropriate cases" where "favorable compensating factors exist"--but recklessly to achieve loan volume. *See, e.g.*, SAC P 73. According to the SAC, Dynex's "systematic disregard" for its own documentation requirements in the origination process led to a significant number of loans that were "facially defective," such as "buy-for" and "no release" mobile home loans which presented substantial obstacles to successful collection. SAC PP 53(f), 75, 79. Worse yet, according to the SAC, Dynex repeatedly purchased loans from mobile home dealers known to regularly submit falsified loan applications. SAC PP 53(b), 90. Statements in the Offering [*25] Documents that underwriting standards are generally applied to evaluate a prospective borrower's "repayment ability" are misleading if the factual predicates of such a determination are deliberately falsified. SAC P 75; Series 13 Prospectus at 33. Defendants dispute the sufficiency of the confidential witnesses' observations, arguing that "'several instances' witnessed by one low-level employee do not a 'systematic disregard' make." Defs.' Br. at 29. But three of the confidential witnesses were district sales managers and each reported that underwriting guidelines were "routinely" sacrificed in the name of loan volume and loans with falsified documentation were "routinely" approved. SAC P 53(a)-(c). These observations are corroborated by those of two former employees in Dynex's loan servicing center who "routinely" encountered underwriting and documentation deficiencies and falsified loan documentation in the course of performing their loan-servicing duties. [6] SAC P 53(e)-(f).

6   Defendants also seek to discredit Plaintiffs' anonymous sources by noting that many of them were employed by a Dynex affiliate prior to the Class Period and that one of their disclosures actually undermines Plaintiffs' [*26] allegations. These arguments are unavailing. First, because the Collateral Loans were originated by a Dynex affiliate prior to the Class Period confidential witnesses employed by that affiliate during that time period are "described in the [SAC] with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak, 216 F.3d at 314*. Second, although the statement attributed to CW # 4 that the pre-1999 underwriting process at Dynex was "very labor intensive" does not support Plaintiffs' allegation that underwriting guidelines were routinely disregarded, when the balance of the well-pleaded factual allegations of the SAC are taken as true it is clear that Defendants' did not disregard stated underwriting guidelines or purchase loans with falsified documentation on a merely ad hoc basis.

At some point, statements by a defendant that it "generally" adheres to a particular policy become misleading when in fact there is no such policy or the policy is something else altogether. *See Novak, 216 F.3d at 311* (finding statements materially misleading because "disclosed policy no longer reflected actual practice"); [*27] *In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 510 (S.D.N.Y. 2009)* (statement by credit rating agency that it relied on "originator and servicer quality" in its analysis of MBS was an actionable misrepresentation where defendant did not consider such practices at the time the statements were made). When the allegations in the SAC are accepted as true and reasonable inferences drawn in Plaintiff's favor, the SAC sufficiently alleges that the Underwriting Statements are misleading to the extent that they claim that *some* standards pertaining to borrower documentation or creditworthiness were followed when in fact such requirements were regularly or routinely disregarded or were based upon falsified loan documentation.

## 2. Market Conditions Statements

The allegedly actionable statements most central to Plaintiffs' allegations of fraud are Defendants' public statements during the Class Period that purport to attribute losses and "loss severities" in the Bond Collateral, as well as the need for increased loss reserves, primarily to "market conditions" (the "Market Conditions Statements"), but that omit to state that the poor performance in fact derived from "reckless underwriting and [*28] origination practices." *See, e.g.*, SAC PP 111-122.

Representative of the Market Conditions Statements are those found in Merit's Form 10-K for the year 2001, which explained the need to increase provision for losses over the previous year as follows:

> The Company has seen the loss severity on manufactured housing loans increase dramatically since the third quarter of 2000 as a result of the saturation in the market place with both new and used (repossessed) manufactured housing units. In addition, the Company has seen some increase in the overall default rates on its manufactured housing loans. The Company anticipates that market conditions for manufactured housing loans will remain unfavorable through 2002.

SAC P 119 (quoting Merit 2001 Form 10-K); *see also* SAC P 113 (Dynex Form 10-K for 2000); P 115 (Merit Form 10-K for 2000). In Defendants' public statements, market conditions are blamed for not only high "loss severities," *i.e.* the amount by which the outstanding loan balance exceeds the lender's recovery from a foreclosure sale net of expenses, *see Teamsters, 531 F.3d at 192-93*, but also, in at least one instance, a "high level of credit *losses*." SAC P 117 (quoting Merit 2001 Annual [*29] Report) (emphasis added). In an April 2, 2002 letter to Merit shareholders, Potts wrote that the company was "experiencing a high level of credit losses on the manufactured housing loan portfolio" and that these losses were "primarily related to the depressed market for repossessed manufactured homes, compounded by the exit from that market of several large lenders." *Id.*

Defendants argue that Plaintiffs have not pled the falsity of such statements because the SAC does not allege that Merit had *not* seen loss severities increase or *not* observed a rise in default rates. But Defendants' argument misses the mark. Plaintiffs' theory is that Defendants *omitted* material facts about the true causes of the Bond Collateral's poor performance. [7] *See, e.g.*, SAC P116. Once Merit chose to speak about what caused losses in the Bond Collateral it had an obligation to be "both accurate and complete." *Caiola v. Citibank N.A., New York, 295 F.3d 312, 331 (2d Cir. 2000)*. Put differently, a defendant has a duty to disclose material facts, *i.e.* facts that, if disclosed, would significantly alter the "total mix" of available information. *In re Take-Two Interactive Sec. Litig., 551 F.Supp.2d 247, 263 n. 8 (S.D.N.Y. 2008)* [*30] (citing *In re Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)*).

7   Indeed, faulting Plaintiffs for failing to allege the falsity of statements concerning rising default

rates makes no sense when Plaintiffs' allegations are in part *premised* on the rise in default rates over the Class Period. Similarly, the SAC's allegations are consistent with high loss severities in the Bond Collateral. *See, e.g.*, SAC P 83 ("[A] mobile home loan that served as the basis for Bond collateral following a repossession/sale and foreclosure generally would be sold for only pennies on the dollar.").

Of course, omitting the *true* causes of the credit losses is only actionable if the omission is both material and true. *Id.* Assuming, *arguendo*, their truth, the materiality of the alleged omissions is apparent. Disclosure of the true cause of the Bond Collateral's poor performance would be viewed by reasonable investors as having altered the "total mix" of information available, *Levinson, 485 U.S. at 231-32*, because while market conditions fluctuate and are easily observed by myriad objective and publicly available indicia, loan underwriting and origination defects are "built-in" to the Collateral Loans such  [*31] that poor performance is likely to continue notwithstanding improvements in general market conditions.

Determination of whether the allegedly omitted facts are *true*, however, is not as simple, even when all of the SAC's allegations are themselves assumed to be true. Analysis must start with recognition that the "reckless underwriting and origination practices" alleged by the SAC resulted in loans that fall into two general categories: loans of poor credit quality (*i.e.* loans to borrowers with low indicia of creditworthiness), and "facially defective" loans (*i.e.* loans originated pursuant to fraudulent or highly deficient loan applications, "buy for" loans, and "no release" loans). The distinction matters because to argue that poor credit quality is the true cause of losses in the Bond Collateral, Plaintiffs rely on a logical assumption that does not support the weight that Plaintiffs place upon it. Plaintiffs contend that creditworthiness of the Collateral Loans, must have played a material role in causing the losses because market conditions are only relevant after a default and "borrower default is inextricably tied, first and foremost, to the borrower's ability to pay--or the borrower's  [*32] creditworthiness." [8] Pls.' Opp'n. Br. at 29. *Defaults* are generally a factor of borrower creditworthiness (though macro-economic factors such as rising unemployment rates can certainly affect individual borrowers' ability to repay a loan), but *losses* are a function of *both* creditworthiness and the market conditions that dictate the price recovered at a foreclosure sale. It is thus theoretically possible for a pool of loans to exhibit both high rates of default and low overall losses if the lender (or servicer) is successful in recovering outstanding loan balances through foreclosure. [9] Of course, the reverse is also theoretically possible: a pool

of loans may exhibit low rates of default and high losses because the lender cannot recover through foreclosure. In neither hypothetical, are *losses* "inextricably tied" to creditworthiness. This exercise demonstrates that Plaintiffs' logical inference does not establish the truth of one of the alleged omissions from Defendants' public statements, *i.e.* that poor credit quality was a primary cause of losses in the Bond Collateral. In the scenario of high rates of default and high losses alleged by the SAC, one cannot rely on logic alone to single  [*33] out credit quality as the principal culprit.

[8]   Creditworthiness can only plausibly be cited as a material cause of *losses* in the Bond Collateral. It would be illogical to attribute high loss severities to poor credit quality because the likelihood that a loan will become delinquent in the first instance does not affect the *magnitude* of a resulting loss. Moreover, if creditworthiness is defined as the likelihood of borrower default then attributing an increase in default rates to poor credit quality borders on tautological.

[9]   The Series 13 Prospectus discloses that the "[w]eighted average loan-to-value ratio" of the loans securing those bonds is 87.27%, which leaves preciously little room for error with respect to either valuation of the collateral or estimation of foreclosure expenses. When combined with the Prospectuses' disclosures that, in contrast to mortgaged real property, the value of manufactured housing tends to decrease over time, the wisdom of the high loan-to-value ratios suspect. But the Securities Act imposes liability for false statements made with fraudulent intent, not poor exercise of business judgment. *See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 479, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977).*

The  [*34] same cannot be said of loans that, independent of their credit quality, have inherent defects that preclude or materially frustrate collection, whether through foreclosure or otherwise. In such instances, a default necessarily entails a loss irrespective of market fluctuations. When collection through foreclosure is thwarted, either because the servicer cannot legally contact the owner of the collateral (in the case of a "buy for" loan) or enter the property (in the case of a "no release" loan) the "loss severity" will inevitably equal 100% of the outstanding principal balance. Therefore, assuming the truth of the SAC's allegations that Defendants' origination practices resulted in a pool of loans plagued by a substantial number of inherent defects--*i.e.* where 65-70% of delinquencies were "buy for" loans [10]--when defaults rise (as they did here) losses must rise too, irrespective of market conditions. Consequently, the Defendants' failure to state that origination practices, to the

extent they led to "facially defective" loans, were also a contributing cause of high losses was misleading.

> 10    The allegations in the SAC concerning "buy-for" loans are somewhat inconsistent. *Compare* SAC [*35] P 75 ("By 2000, Dynex knew approximately 65% - 70% of the *delinquent* mobile home loans were "Buy For" loans.") (emphasis added) *with* SAC P 90 (Dynex's origination practices "resulted in 65% - 70% of its mobile home loan portfolios [consisting of] undisclosed "Buy For" loans.")

### 3. Other Allegedly Actionable Statements

Plaintiffs also allege that Defendants misrepresented the number of delinquencies and repossessions in the Bond Collateral. *See* SAC P 2. Plaintiffs' allegation that Defendants directed that reported delinquencies and repossessions be falsified is unsupported by any factual allegations, *see* SAC P 78, albeit if credited it would suffice to state a claim of securities fraud. Consequently, the allegation is "not entitled to the assumption of truth," *Iqbal, 129 S.Ct. at 1951*, and Plaintiffs' allegation of securities fraud based upon this alleged false or misleading statement falls short. The Monthly Collateral Report for September 2003 misstated the number of repossessions in the Series 13 Bond Collateral; this figure was restated in the next month's report. Allegations of "accounting irregularities" must be "coupled with evidence of corresponding fraudulent intent" to be actionable, [*36] *Novak, 216 F.3d at 309*, and thus alleged misstatements concerning cumulative repossessions will rise or fall with the SAC's allegations of scienter. The same goes for the next category of allegedly false or misleading statements, those which claimed that Merit's internal controls for evaluating repossessions were sufficient. These allegations will support liability if made with fraudulent intent. Finally, Plaintiffs allege that Merit's statements that it had adequate loss reserves were false and misleading because due to the high number of facially defective and thus largely uncollectable loans Merit should have provided for loss reserves for even current mobile home loans as it ultimately did in 2004. Defendants' statements concerning the adequacy of Merit's loss reserves during the Class Period are misleading to the extent Plaintiffs allege that they were in fact *inadequate* due to the high percentage of "facially defective" Collateral Loans. They are thus actionable to the same extent as the Market Conditions Statements and will support liability if made with scienter.

### C. Scienter

In this Circuit, the requisite "strong inference" of scienter "can be established by alleging facts to [*37]

show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA Local, 553 F.3d at 198* (citing *Ganino v. Citizens Utilities Co., 228 F.3d 154, 168-69 (2d Cir. 2000)*; *Novak, 216 F.3d at 307*. With respect to a corporate defendant, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters, 531 F.3d at 195*. Although not strictly necessary, "[i]n most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Id.* Here, Plaintiffs contend that the allegations of the SAC support a "strong inference" that the Individual Defendants Potts and Benedetti, and thus by imputation the Corporate Defendants, acted with an intent to deceive based upon (i) their motive and opportunity to commit fraud; and (ii) strong circumstantial evidence of conscious recklessness. I address each manner of pleading scienter in turn and then consider the allegations collectively, taking into account "plausible opposing inferences," in order [*38] to determine if Plaintiffs' proffered inference of scienter is "cogent and at least as compelling as any opposing inference one could draw form the facts alleged." *Tellabs, 127 S.Ct. at 2510.*

### 1. Motive and Opportunity

The question of whether the Individual Defendants, and thus by extension the Corporate Defendants, had *opportunity* to commit fraud need not detain us long. As senior executives, the Individual Defendants had the ability to direct the allegedly false and misleading statements to be made. *See In re PXRE Group, Ltd. Sec. Litig., 600 F. Supp. 2d 510, 529 (S.D.N.Y. 2009)*. Rather, the question is whether Plaintiffs have adequately pleaded that the Defendants had a *motive* to commit fraud. The answer is that they have not. "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must alleged that [Defendants] 'benefitted in some concrete and personal way from the purported fraud.'" *ECA Local, 553 F.3d at 198* (quoting *Novak, 216 F.3d at 307*). " It is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain [*39] the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *South Cherry Street, LLC v. Hennessee Group LLC, 573 F.3d 98, 109 (2d Cir. 2009)* (quoting *Novak, 216 F.3d at 308*).

Plaintiffs offer two theories as to why Defendants had motive to conceal the true impaired quality of the Bond Collateral. First, Plaintiffs allege that towards the

end of the period of loan origination through the beginning of the Class period (i.e. 1999-2000), Dynex "was in the midst of a dramatic financial collapse" with its stock price having fallen 99% in less than two years and its access to operating capital rapidly deteriorating. SAC PP 9, 57, 152. As a consequence, Plaintiffs allege that Defendants "could not afford to disclose Dynex's aggressive underwriting and the true impaired quality" of the Bond Collateral. SAC P 9. Second, Plaintiffs allege that the Individual Defendants were motivated to commit fraud to "preserve and protect their bonus compensation." SAC PP 9, 26-27. Each proffered motive has been rejected by the courts of this Circuit.

First, the alleged motivations of a corporation to halt [*40] a drop in its stock price, raise money or preserve access to capital or lines of credit are all "far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit." *PXRE Group, 600 F.Supp. 2d at 532* (citing *Kalnit, 264 F.3d at 142*); *see also In re AstraZeneca Sec. Litig., 559 F.Supp. 2d 453 (S.D.N.Y. 2008)*, aff'd *State Universities Retirement System of Illinois v. Astrazeneca PLC, No. 08-3185, 2009 U.S. App. LEXIS 13674, 2009 WL 1796534, *1 (2d Cir. Jun. 25, 2009).*

Second, "'incentive compensation can hardly be the basis on which an allegation of fraud is predicated,'" because if "scienter could be pleaded solely on [that] basis . . . 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *ECA & Local, 553 F.3d at 201* (quoting *Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir.1995)).* Plaintiffs' allegations that Potts and Benedetti were motivated by a desire to preserve their bonus compensation, then, are unavailing.

## 2. Scienter and Strong Circumstantial Evidence of Recklessness

In the context of scienter, the Second Circuit has said that "[b]y reckless disregard for the [*41] truth, we mean 'conscious recklessness--*i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'" *South Cherry Street, 573 F.3d at 109* (quoting *Novak, 216 F.3d at 312*(emphases in original). Where, as here, the plaintiff does not adequately allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." *PXRE Group, 600 F.Supp.2d at 535* (citing *Kalnit, 264 F.3d at 142*).

Strong circumstantial evidence of recklessness may be alleged in two ways. First, "[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepre-

senting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig. 252 F.3d 63, 76 (2d. Cir. 2001)* (citing *Novak, 216 F.3d at 308*). Second, "a strong inference of the requisite state of mind 'may arise where the complaint sufficiently alleges that the defendants . . . failed to check information they had a duty to monitor.'" *South Cherry Street, 573 F.3d at 110* (quoting [*42] *Novak, 216 F.3d at 311*). That is, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ? recklessness." *Chill, 101 F.3d at 269* (internal quotation marks omitted)

### i. Underwriting Statements

"There is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis of an inference of recklessness." *In re Sadia, S.A. Sec. Litig., No. 08 Civ. 9528 (SAS), 2009 U.S. Dist. LEXIS 66998, 2009 WL 2356181, *11 (S.D.N.Y. Jul. 29, 2009)* (citing *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir.2001)* ("[D]efendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness."); *Novak, 216 F.3d at 311* (defendants "knowingly sanctioned procedures that violated the Company's own markdown policy"). As previously discussed, the SAC adequately alleges that the Defendants' routine disregard for their publicly stated underwriting guidelines not only resulted in a large percentage of "facially defective" and thus uncollectable loans, but also rendered certain of the Defendants' Underwriting Statements false and misleading. When taken as true, the allegations [*43] of the SAC make clear that the disregard for underwriting standards was a top-down directive from Dynex management in Virginia and that Benedetti and other top executives knew that dealer fraud was rampant. *See, e.g.*, SAC PP 4, 53(c). These are the facts that make Defendants' statements that underwriting guidelines were "generally followed" misleading.

The SAC's well-pleaded factual allegations describe management policies to promote loan volume at the expense of borrower creditworthiness and loan documentation requirements that resulted in a substantial portion of Collateral Loans being fraudulently procured or "facially defective" and therefore largely uncollectible. For example, the management-imposed "225 Program" eliminated most of the audit and review procedures used to approve mobile home dealers from whom Defendants purchased loans and, as confirmed by the CWs, Dynex purchased loans from dealers who routinely submitted falsified loan documentation. SAC PP 68, 53. Dynex set monthly quotas for loan volume and the CWs reported that both salary and bonuses at the regional offices were based on loan volume, creating incentives to approve loans with no documentation of borrower income [*44] or with fa-

cially defective documentation, *e.g.* applications for borrowers who were minors, deceased, or not the occupant of the home (*i.e.* a "buy for" loan). SAC PP 53, 72. The SAC further details a specific management directive to approve loans to senior citizens that would far exceed normal life-expectancy statistics--a top down directive that is inconsistent with application of underwriting standards meant to judge "repayment ability." SAC P 74; Series 13 Prospectus at 33. These practices "represent [] an extreme departure from the standards of ordinary care to the extent that the danger [of having uncollectable loans] was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." *South Cherry Street, 573 F.3d at 110*.

Furthermore, while the information disclosed to the Individual Defendants in the MHDP and MHRP Reports does not *directly* contradict the misleading Underwriting Statements, [11] the existence of such reports provides support for an inference of recklessness. These reports corroborate the allegation that the Individual Defendants had personal knowledge of the overall composition of the pool of Collateral Loans; Potts and Benedetti [*45] reviewed these reports to compensate regional managers with an emphasis on loan volume. SAC P 6. An inordinate percentage of low-quality loans in the pool of Collateral Loans following an express emphasis by management on loan volume is arguably a red flag that, in the ordinary course of business, the company's decisions to originate or purchase a particular loan were driven by a desire to maximize loan volume instead of adherence to the company's stated underwriting guidelines.

> 11  Even assuming that a majority of the reports revealed that more than 50% of the Collateral Loans were of "C" quality, the Defendants never claimed the loans would meet minimum creditworthiness standards. But they did claim that underwriting standards would be applied to evaluate a prospective borrower's ability to repay a loan.

Finally, the SAC contains well-pleaded factual allegations that Defendants monitored the performance of the Collateral Loans when servicing the loans in the period between their origination and the issuance of the Bonds in 1999 and that clear warnings about the falsity of the Underwriting Statements were reported to Dynex management, including the Individual Defendants. For example, [*46] CW # 7 worked as a supervisor in Dynex's loan servicing center between 1998 and 2000 and reported to Cynthia Wasser, a Vice President for Collections in the Fort Worth servicing center who prepared the Audit Reports of a percentage of the Collateral Loans. SAC P53(g). CW # 7 prepared foreclosure reports, which, together with all of the underlying documentation for a defaulted loan, were sent to Daryl Ake, a Vice

President for Collections in Defendant's Virginia headquarters, via Dynex's computerized documentation system called Polaris. SAC PP 53(g), 61, 84. Loan application documentation that was facially deficient, fraudulent, or missing altogether was thus revealed to Dynex management at this point. Furthermore, CW # 9 performed quality control audits of sample sets of the Collateral Loans that revealed the rates of dealer fraud and provided reports of such audits to Cynthia Wasser who reported to Senior Vice President Doug Burdette. The Individual Defendants and others responsible for the false and misleading Underwriting Statements necessarily reviewed collections data and the foregoing reports to provide the then-current rates of delinquency in the Offering Documents. Consequently, [*47] when taken as true, the foregoing allegations also establish that Defendants either "'failed to check information that they had a duty to monitor, or ignored obvious signs of fraud,' and hence 'should have known that they were misrepresenting material facts.'" *South Cherry, 573 F.3d at 110* (quoting *Novak, 216 F.3d at 308*).

### ii. Market Conditions Statements

The SAC also sets forth factual allegations from which a strong inference may be drawn that the Market Conditions Statements were made with an intent to deceive, manipulate, or defraud the investing public. In contrast to the FAC, the instant pleading contains factual allegations about several forms of reports that collectively provided to Dynex's senior management, including the Individual Defendants, information that contradicted their misleading statements. First, the Audit Reports and the foreclosure reports generated prior to and throughout the Class Period revealed the existence of numerous facially defective or fraudulently procured loans. CW # 9 avers that he or she "routinely performed" quality control audits on "sample sets of the mobile home loan portfolio" at Dynex's Fort Worth servicing center. SAC P 53(i). The SAC also [*48] alleges that during the Class Period Vice President Cynthia Wasser regularly conducted audits of a percentage of the Collateral Loans to determine their "bona fide value" and that "[t]hese audits, as well as the experience of [Dynex's] collectors, confirmed that a large percentage of the underlying loans were substantially defective," including "buy for" and "no release" loans and loans for which not even the first payment was made. SAC P 7. Dynex management also reviewed the foreclosure reports and loan documentation uploaded to the Polaris system and Benedetti relied upon these various sources of information "while he conducted intense examinations of losses" in the Bond Collateral. SAC PP 26-27. Second, the SAC alleges that Benedetti and others met monthly to discuss the Basis Reports "a summary of Dynex's value as [a] sum of the value of its assets," which included a large number of the Bonds themselves.

Although standing alone the allegations about the Basis Reports are insufficient to put Defendants on notice of the falsity of the Market Conditions Statements--the summary of assets did not itself disclose the *cause* of the decrease in the value of the Bonds that Dynex retained [*49] in its own portfolio--they do reveal that Benedetti was well aware that losses were accumulating faster than expected. Benedetti himself prepared the Monthly Collateral Reports that documented the number and dollar amount of delinquencies in the pool of Bond Collateral as well as "cumulative losses" and reviewed information stored on the Polaris system in order to do so. SAC P 82. Again, although this form of report did not specify the *reasons* for the losses they clearly indicated that the Bond Collateral was performing poorly and in preparing the reports Benedetti must have encountered clear red flags--such as falsified loan documents or buy/for loans that could not be collected--while reviewing information stored on Polaris to prepare the monthly reports.

Consequently, although none of the reports *individually* analyzed the servicing data in a way that would "demonstrate [] that loan origination practices were undermining the collateral's performance" as opposed to market conditions or some other cause, *Teamsters, 531 F.3d at 196*, the SAC alleges Dynex's senior management, including the Individual Defendants, relied upon the several forms of report that collectively *must have* disclosed [*50] that origination practices were a material cause of the poor performance of the Bond Collateral. The Individual Defendants were on notice of (i) the credit quality of Bond Collateral by way of the MHDP and MHRP Reports; (ii) the number of facially or inherently defective loans and loans with fraudulent or deficient documentation by virtue of the Audit Reports, the foreclosure reports, and use of the Polaris system; and (iii) the rapid increases in the overall levels of delinquencies and cumulative losses as a consequence of the Basis Reports and the Monthly Collateral Reports. The Circuit was clear that in order to allege a strong inference of scienter on the basis of known facts the Plaintiffs must "specifically identify the reports or statements containing this information." *Teamsters, 531 F.3d at 196* (citing *Novak, 216 F.3d at 309*), but neither the Circuit's decision in *Teamsters* nor any other binding precedent requires that the contradictory facts must be summarized in a single report that explicitly states the direct opposite of the misleading statement. To the contrary, a strong inference of scienter is alleged by "'specific allegations of various reasonably available facts . [*51] . . that should have put the officers on notice' that their public statements were false." *Police & Fire Ret. Sys. v. SafeNet, Inc., F.Supp.2d , 2009 U.S. Dist. LEXIS 68322, 2009 WL 2391849 (S.D.N.Y. Aug. 5, 2009) (quoting In re Refco, Inc. Sec. Litig., 503 F.Supp. 2d 611, 649 (S.D.N.Y. 2007))*. The SAC adequately alleges specific facts that

were available to and reviewed by the senior management responsible for the public statements at issue that either put them on notice of the falsity of those statements or clearly should have done so. Collectively, these reports establish that the Defendants either "had access to non-public information contradicting their public statements, *Scholastic, 252 F.3d at 76*, or acted with an "egregious refusal to see the obvious." *Chill, 101 F.3d at 269*. Consequently, the SAC supports a strong inference of scienter with respect to the Market Conditions Statements.

### iii. **Other Misstatements**

Based upon the foregoing conclusions that the Individual Defendants both knew about the "inherently defective" Collateral Loans and that such defects were a material cause of the Bonds' poor performance, the allegations of the SAC support a strong inference [*52] of scienter with respect to the balance of Defendants' allegedly misleading statements during the Class Period: namely, that Merit had adequate loan loss reserves and internal controls and that the delinquencies and repossessions in the Bond Collateral were adequately reported. *See* SAC PP 123-24, 127-34, 137-41. In the same way that the Individual Defendants either must have known or consciously refused to recognize that the substantial number of "inherently defective" Collateral Loans would lead to losses, they either must have known or refused to acknowledge that their loss reserves and internal controls were insufficient, as ultimately became manifest when Merit restated its loan loss reserves and cited internal control deficiencies as the cause. Although the fact of a restatement is not enough, alone, to support an inference of scienter, *see, e.g., City of Brockton Retirement System v. Shaw Group Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008)*, when paired with allegations of knowledge or recklessness the fact of the restatement, as well as its size and relation to a defendant's "core operations" are all some evidence of scienter. *See In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 482 (S.D.N.Y. 2008)*; [*53] *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004)*. Here, the SAC supports a strong inference that the Defendants acted recklessly with respect to their public statements concerning the affects of the inherently defective Collateral Loans and, when coupled with the restatements, the same conclusion applies to statements about sufficiency of Merit's loss reserves and internal controls. Similarly, the Defendants failed to accurately check information they had a duty to monitor--namely the number of reported delinquencies and cumulative repossessions--and when combined with the foregoing conclusions about what the Individual Defendants knew or recklessly disregarded the allegations of the SAC support a strong inference the misstatements of these figures were made with scienter.

### 3. Comparison to Plausible Opposing Inferences

In light of the foregoing, let us turn to the considerations spelled out in *Tellabs* and consider the "whether *all* of the allegations, taken collectively, give rise to a strong inference of scienter" and whether, in comparison to "plausible opposing inferences," the inference that Defendants acted with scienter is "at least [*54] as compelling as any opposing inference." *Tellabs, 127 S.Ct. at 2509-10.* In *Teamsters*, the Second Circuit concluded that a "number of competing inferences regarding scienter" could be drawn from the allegations of the Plaintiffs' earlier pleading, namely:

> One might infer that no one at Dynex or Merit found the statements misleading because they identified the cause of the bonds' performance as accurately as possible, or that no one responsible for the statements made to investors had reason to believe that Dynex employees were systematically flouting its underwriting guidelines or giving them false information about the cause of the bonds' poor performance . . . [or that the statements] were the result of merely careless mistakes at the management level based on false information fed it from below.

*Teamsters, 531 F.3d at 197* (internal quotation omitted). The difference between the FAC and the SAC with respect to allegations of scienter, however, is that the SAC does not require one to speculate that "*someone* whose scienter is imputable to the corporate defendants and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements." *Id.* [*55] Rather, the internal reports known to and reviewed by the Individual Defendants disclosed to them that the Underwriting Statements and the Market Conditions statements were misleading. Therefore, while it remains *conceivable* that the misleading statements were the result of "merely careless mistakes"; that explanation is no longer as compelling as the one urged by Plaintiffs. *Id.* Similarly, when the allegations of the SAC are taken as true, they foreclose the possibility that "no one responsible for the statements made to investors had reason to believe that Dynex employees were systematically flouting its underwriting guidelines." The several forms of report quite clearly gave the Individual Defendants and other senior management "reason to believe" the underwriting guidelines and documentation requirements were systematically disregarded. *Id.* As a consequence, when the well-pleaded allegations of the SAC are taken as true and reasonable inferences drawn in Plaintiff's

favor, the inference of scienter is at least as cogent and compelling as the competing inferences that the misleading statements were merely the result of careless mistakes or false information fed from below.

In arguing [*56] against the cogency of Plaintiff's inference of scienter, Defendants offer several substantive arguments about why Plaintiffs' theory of securities fraud does not add up. For example, Defendants point to the fact that Dynex accurately disclosed the total losses in the Bond Collateral each month, and argues that this course of conduct is inconsistent with a fraudulent scheme to conceal from investors the poor performance of the Bonds. To be sure, a record of honest disclosure cuts against an inference of fraudulent intent, but *Tellabs* does not require that the inference of scienter be premised on "smoking gun" evidence or evidence wholly free from doubt: it simply requires that the inference of fraudulent intent be at *least as* cogent and compelling as other inferences. Accurate disclosure of delinquency rates, moreover, is not necessarily inconsistent with the misleading statements made during the Class Period. Dynex produced the Monthly Collateral Reports pursuant to its duties as Master Servicer and in that role had incentive to accurately disclose delinquencies and losses because the Trustee of the Bonds had authority not to renew Dynex's Master Servicer Agreement. *See* Series 13 [*57] Prospectus Supplement at S-20. Moreover, public statements that attributed the Bonds' poor performance to circumstances extrinsic to the loans are plausibly viewed as misleading attempts to minimize investor concern: if the poor performance is due to extrinsic factors, like market conditions, then presumably when the market rebounds so too will the Bonds. Defendants also point to the fact that Dynex and Merit were "investors" in the bonds who hoped to profit from the "spread" between the higher interest rates paid by borrowers and the lower rates paid to bond holders and in fact believed the Collateral Loans would perform well. *See* SAC P 56. As a consequence it is certainly plausible that Defendants had disincentives to disregard underwriting criteria, but once it was clear to them that the Bond Collateral was comprised of numerous facially defective or fraudulently procured loans, they certainly had an incentive to withhold information about the disregard of the underwriting guidelines in the Offering Documents. Similarly, the Defendants' ownership of the securities at issue does not immunize them from liability and the misstatements that attributed the Bonds' poor performance to [*58] market conditions could have easily been motivated by an intent to prop up the flagging value of the Bonds themselves.

In sum, when the allegations of the SAC are assessed "holistically" a cogent story of securities fraud is revealed: the Defendants originated or purchased a large number of mobile home loans of generally low credit

quality, a substantial number of which were "inherently defective," and packaged them into the Bonds failing to disclose that the stated underwriting guidelines were "systematically disregarded"; then, when adverse market conditions coincided with rising defaults and many loans were uncollectible as a consequence of inherent defects, Defendants publicly stated that market conditions were to blame in an attempt to forestall deeper drops in the value of the Bonds, many of which they held for their own account. For the foregoing reasons the SAC adequately alleges facts that give rise to a strong inference that the statements I have found to be false and misleading were made with scienter.

### D. Loss Causation

Defendants contend that the SAC fails to allege loss causation, another required element of securities fraud under *Section 10(b)*. To plead loss causation, Plaintiff [*59] must allege that the price of the Bonds dropped as a result of the "truth" regarding the alleged misrepresentations being revealed to the market. *Dura Pharms., 544 U.S. at 346-47.* Defendants argue that the Rating Agency downgrades that mark the end of the Class Period and that are alleged to be the proximate cause of the drop in the market price of the Bonds did not disclose the falsity of Defendants' misleading statements. That is, according to Defendants, the SAC fails to allege a "corrective disclosure"--*i.e.* a disclosure that demonstrates to the market not only that the securities were overvalued but also that the Defendants' prior statements were false. *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 (2d Cir. 2005).*

In *Dynex I*, I rejected the same argument that the Defendants re-assert here. However, because my decision in *Dynex I* was vacated by the Circuit, it is no longer the law of the case. Nevertheless, Defendants point to no intervening change in the law or other compelling reason for me to reverse my earlier decision on the issue of loss causation. Both the earlier and instant pleadings allege that it was Dynex's dramatic restatement of cumulative losses in Series 13 Bond [*60] Collateral in October 2003 that caused the Rating Agencies to initiate a credit review of that series of Bonds which in turn led to downgrades that cited "relaxed credit standards" as a cause of the Bonds' poor performance. SAC P 94. Subsequently, in early 2004, the Rating Agencies reviewed and downgraded the Series 12 Bonds. *Id.* Immediately after the downgrades, the market price of the Bonds dropped precipitously. *Id.* The Bonds' price dropped further after disclosures in April and May 2004 that Merit had to restate its prior financial results due to internal control deficiencies. SAC P 95. This chain of events is sufficient to allege loss causation at the pleading stage.

### E. Timeliness of Plaintiff's Claims Pertaining to the Underwriting Statements

Defendants also recycle their argument that certain of Plaintiffs' allegations are time-barred--namely, those contained in the Offering Documents in 1999. The Circuit declined to address this argument in *Teamsters. 531 F.3d at 197.* Actions for securities fraud must be brought within five years after the violation, which in this context occurs when the misleading statement or omission was made. *See 28 U.S.C. § 1658(b).* Here, the FAC was filed [*61] on February 7, 2005, nearly six years after the Offering Documents were issued. However, as noted in *Dynex I*, in a case such as this one in which a series of fraudulent misrepresentations is alleged, the "'period of repose begins when the last alleged misrepresentation was made.'" *Dynex I, 2006 U.S. Dist. LEXIS 4988, 2006 WL 314524 at *5* (quoting *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, 2005 WL 2148919, *5 (S.D.N.Y. Sep. 6, 2005)); see also Plymouth County Ret. Ass'n v. Schroeder. 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008).*

In reasserting their timeliness argument here, Defendants rely upon the Supreme Court's decision in *Klehr v. A.O. Smith Corp, 521 U.S. 179, 117 S. Ct. 1984, 138 L. Ed. 2d 373 (1997)*, which held in the context of a civil RICO action that the last predicate act rule is at odds with the basic objective of limitations periods because a series of predicate acts can continue indefinitely. However, Defendants point to no authority applying *Klehr* to the securities fraud context and I find none. Consequently, Defendants have failed to persuade me that reversal of my earlier decision with respect to the timeliness of Plaintiff's claims based on statements that preceded the Class Period is [*62] warranted.

### F. Standing to Assert Claims as to Series 12 Bonds

Next, Defendants again contend that Plaintiffs lack standing to pursue claims based on the Series 12 Bonds because the SAC contains no allegation that Plaintiffs purchased those securities. The Second Circuit similarly declined to consider this argument in *Teamsters. 531 F.3d at 197.* As I held in *Dynex I*, at this stage of the litigation Plaintiffs have adequately alleged their standing to proceed on behalf of purchasers of both the Series 12 and Series 13 Bonds because they allege that Defendants made the exact same misrepresentations with respect to both series of bonds and that the bond collateral suffered from the same defects. *Dynex I, 2006 U.S. Dist. LEXIS 4988, 2006 WL 314524 at *12* (citing *Bombadier, 2005 U.S. Dist. LEXIS 19506, 2005 WL 2148919 at *5).*

### G. Section 20(a) Control Person Claims

Finally, because I have concluded that Plaintiff's SAC has adequately alleged a violation of *Section 10(b)*, premised in large measure on what the Individual Defendants Potts and Benedetti knew at the time the statements at issue were made, the SAC's derivative claims for "control person" liability under *Section 20(a)* may proceed. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).*

## IV.  [*63] CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. The SAC adequately alleges violations of *Section 10(b)* with respect to (i) the Defendants' statements in the Offering Documents that *some* standards pertaining to borrower documentation or creditworthiness were followed; (ii) that market conditions were to blame for *losses* in the Bond Collateral, and (iii) that during the Class Period and prior to the restatements Merit had adequate loss reserves and internal controls; and (iv) that during the Class Period and prior to October 2003 cumulative repossession and delinquency figures for the Bond Collateral were accurately reported. With respect to such claims and the corresponding *Section 20(a)*  [*64] claims, Defendants' motion to dismiss is DENIED. With respect to claims of securities fraud based upon other allegedly false and misleading statements, Defendants' motion to dismiss is GRANTED. The parties are directed to meet and confer with respect to the timeline for the balance of this litigation and to jointly submit a proposed pretrial scheduling order within twenty (20) days of the date hereof. The Clerk of the Court is instructed to close this motion.

**SO ORDERED**

October 19, 2009

**New York, New York**

/s/ Harold Baer

**U.S.D.J.**

# TAB B



LEXSEE 2009 U.S. DIST. LEXIS 99727

**In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation IN RE WASHINGTON MUTUAL, INC. SECURITIES LITIGATION; This Document Relates to: ALL CASES**

**Lead Case No. 2:08-md-1919 MJP,Case No. C08-387 MJP**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

*2009 U.S. Dist. LEXIS 99727*

**October 27, 2009, Decided**
**October 27, 2009, Filed**

**COUNSEL:** [*1] For Burton Rosenfield, Movant: Nancy Kaboolian, LEAD ATTORNEY, ABBEY SPANIER RODD ABRAMS & PARADIS LLP, NEW YORK, NY.

For New York City Police and Fire Pension Funds, Movant: `Peter Dexter St Philip , Jr, LEAD ATTORNEY, LOWEY DANNENBERG BEMPORAD SELINGER & COHEN PC, WHITE PLAINS, NY.

For Massachusetts Pension Reserves Investment Management Board, Movant: Richard A Speirs, LEAD ATTORNEY, ZWERLING SCHACHTER & ZWERLING LLP, NEW YORK, NY.

For WaMu Institutional Investor Group, Helaba Invest Kapitalanlagegesellschaft, City of Philadelphia Board of Pensions and Retirement, Alamada County Employees Retirement Association, Metzler Asset Management GmbH, Movants: Geoffrey Coyle Jarvis, LEAD ATTORNEY, GRANT & EISENHOFER PA, WILMINGTON, DE.

For Ontario Teachers Pension Plan, Movant: Gerald Harlan Silk, LEAD ATTORNEY, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, NEW YORK, NY; C Chad Johnson, BERNSTEIN LITOWITZ BERGER & GROSSMANN (NY), NEW YORK, NY.

For Dennis Koesterer, on behalf of himself and all others similarly situated, Plaintiff: James Abram Harrod , III, Robert Craig Finkel, LEAD ATTORNEYS, WOLF POPPER LLP, NEW YORK, NY.

For Joel Abrams, individual and on behalf of all others similarly situated, [*2] Brian Roffe, individually and on behalf of all others similarly situated, Plaintiffs: Darren J Robbins, David C Walton, LEAD ATTORNEYS, COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP, SAN DIEGO, CA; Jack Gerald Fruchter, LEAD ATTORNEY, PRO HAC VICE, ABRAHAM FRUCHTER & TWERSKY LLP, NEW YORK, NY; Samuel H Rudman, LEAD ATTORNEY, COUGHLIN STOIA GELLER RUDMAN & ROBBINS (NY), MELVILLE, NY.

For Brockton Contributory Retirement System, Plaintiff: Christopher Steven Jones, Joseph Edward White, Maya Susan Saxena, LEAD ATTORNEYS, SAXENA WHITE PA, BOCA RATON, FL; Jeffrey C Grant, LEAD ATTORNEY, AOKI SAKAMOTO GRANT, SEATTLE, WA.

For Lou Solton, Monterey County Treasurer, on behalf of the Monterey County Investment Pool, Plaintiff: Mark Cotton Molumphy, LEAD ATTORNEY, PRO HAC VICE, COTCHETT PTRE & MCCARTHY, BURLINGAME, CA.

For City of San Buenaventura, Plaintiff: Ariel Pierre Calonne, LEAD ATTORNEY, OFFICE OF THE CITY ATTORNEY, VENTURA, CA; Joseph W Cotchett, LEAD ATTORNEY, COTCHETT ILLSTON & PITRE, BURLINGAME, CA; Mark Cotton Molumphy, Nanci E Nishimura, LEAD ATTORNEY, PRO HAC VICE, COTCHETT PTRE & MCCARTHY, BURLINGAME, CA.

2009 U.S. Dist. LEXIS 99727, *

For Washington Mutual Inc, Defendant: Jonathan D Polkes, Lavell Malloy, Penny [*3] P Reid, LEAD ATTORNEYS, WEIL GOTSHAL & MANGES (NY), NEW YORK, NY.

For Kerry K Killinger, Defendant: Daniel W Turbow, LEAD ATTORNEY, PRO HAC VICE, WILSON SONSINI GOODRICH & ROSATI (PALO ALTO), PALO ALTO, CA; Barry M Kaplan, Douglas W Greene, WILSON SONSINI GOODRICH & ROSATI (WA), SEATTLE, WA.

For David C Schneider, Thomas W Casey, Stephen J Rotella, Ronald J. Cathcart, Defendants: Andrew B Brettler, Barry Robert Ostrager, Robert J Pfister, LEAD ATTORNEYS, PRO HAC VICE, SIMPSON THACHER & BARTLETT LLP (LOS ANGELES,CA), LOS ANGELES, CA; Mary Kay Vyskocil, LEAD ATTORNEY, SIMPSON THACHER & BARTLETT, NEW YORK, NY.

For John F. Woods, Melissa J. Ballenger, Defendants: Andrew B Brettler, LEAD ATTORNEY, PRO HAC VICE, SIMPSON THACHER & BARTLETT LLP (LOS ANGELES,CA), LOS ANGELES, CA.

For Anne V. Farrell, Charles M. Lillis, Regina T Montoya, Mary E. Pugh, James H. Stever, Willis B. Wood, Jr., McQuade, Margaret Osmer McQuade, Defendants: Ronald L Berenstein, PERKINS COIE (SEA), SEATTLE, WA.

For Stephen E. Frank, Thomas C. Leppert, Phillip D. Matthews, Michael K. Murphy, William G. Reed, Orin C. Smith, Defendants: John S Rossiter , Jr, LEAD ATTORNEY, PERKINS COIE (SF), SAN FRANCISCO, CA; Ronald L Berenstain, [*4] PERKINS COIE (SEA), SEATTLE, WA.

For Deloitte & Touche LLP, Defendant: Matthew D Harrison, LEAD ATTORNEY, PRO HAC VICE, LATHAM & WATKINS (SF), SAN FRANCISCO, CA; Wendy Harper, LEAD ATTORNEY, PRO HAC VICE, LATHAM & WATKINS (L.A.), LOS ANGELES, CA.

For Goldman Sachs & Co., Morgan Stanley & Co Incorporated, Morgan Stanley & Co Incorporated, Deutsche Bank Securities Inc., Lehman Brothers Inc., UBS Securities LLC, Banc of America Securities LLC, JP Morgan Securities Inc, Barclays Capital Inc, Keefe, Bruyette & Woods, Inc., Cabrera Capital Markets, LLC, The Williams Capital Group, L.P., Citigroup Global Markets, Inc., BNY Capital Markets, Inc., Samuel A. Ramirez & Company, Inc., Samuel A. Ramirez & Company, Inc., Samuel A. Ramirez & Company, Inc., Credit Suisse (USA) LLC, Defendants: Lindsay Rae Pennington, LEAD ATTORNEY, GIBSON DUNN & CRUTCHER LLP (LA/CA), LOS ANGELES, CA.

For Mike Amato, Defendant: Christopher Cavallar Mason, LEAD ATTORNEY, SMYTH & MASON PLLC, SEATTLE, WA; Jeffrey Alan Smyth, SMYTH & MASON, SEATTLE, WA.

**JUDGES:** Marsha J. Pechman, United States District Judge.

**OPINION BY:** Marsha J. Pechman

**OPINION**

ORDER ON DEFENDANTS' MOTIONS TO DISMISS

This matter comes before the Court on five motions to dismiss Plaintiffs' [*5] second amended consolidated class action complaint ("Complaint"). (Dkt. No. 293.) [1] The motions to dismiss have been filed by: (1) Defendants Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co. Inc. ("Morgan Stanley"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Deutsche Bank Securities Inc. ("Deutsche Bank"), UBS Securities LLC ("UBS"), Banc of America Securities LLC ("Banc of America"), J.P. Morgan Securities Inc. ("J.P. Morgan"), Barclays Capital Inc. ("Barclays"), Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette"), Cabrera Capital Markets LLC ("Cabrera Capital"), The Williams Capital Group, L.P. ("Williams Capital"), Citigroup Global Markets Inc. ("Citigroup"), Greenwich Markets, Inc. ("Greenwich"), BNY Capital Markets, Inc. ("BNY"), and Samuel A. Ramirez & Company Inc. ("Ramirez & Co.") (collectively, the "Underwriter Defendants") (Dkt. No. 310); (2) Defendant Deloitte and Touche LLP ("Deloitte") (Dkt. No. 313); (3) Defendants Thomas Casey, Stephen Rotella, Ronald Cathcart, David Schneider, John Woods, and Melissa Ballenger (Dkt. No. 316); (4) Defendants Anne Farrell, Stephen Frank, Thomas Leppert, Charles Lillis, Phillip Matthews, Regina Montoya, Michael Murphy, [*6] Margaret Osmer McQuade, Mary Pugh, William Reed, Jr., Orin Smith, James Stever, and Willis Wood, Jr. (collectively, the "Outside Director Defendants") (Dkt. No. 317); and (5) Defendant Kerry Killinger (Dkt. No. 321) (the court refers to Killinger, Casey, Rotella, Cathcart, Schneider, Woods, and Ballenger collectively as the "Officer Defendants").

1    All citations to entries or filings on the docket refer to case number 2:08-md-1919 MJP. The page numbers refer to the docket number's pagination, not the pagination of the original filing.

Having reviewed the motions, Plaintiffs' responses (Dkt. Nos. 332, 333, 334, 335, 336), Defendants' reply briefs in support of their motions (Dkt. Nos. 338, 340, 341, 342, 343), and all papers in support thereof, and having heard oral argument from the parties on Tuesday, October 6, 2009 (*see* Dkt. No. 364), the Court makes the following rulings: (1) the Court DENIES in part and GRANTS in part Defendants' motions to dismiss Counts One, Two, and Three; and (2) the Court GRANTS in part and DENIES in part Defendants' motions to dismiss Counts Four, Five, and Six. The Court's reasoning is set forth below.

**Procedural History**

On May 7, 2008, the Court consolidated [*7] three related securities class actions as part of a Multi-District Litigation proceeding against Defendants. (Dkt. No. 24.) Defendants filed their first round of motions to dismiss on December 8, 2008, and the Court heard argument on these motions on May 1, 2009. The Court dismissed Counts One, Two, and Three, and granted in part and denied in part Counts Four, Five, and Six. (Dkt. No. 277.) On June 15, 2009, Plaintiffs filed their second amended consolidated class action complaint. (Dkt. No. 293.) Defendants filed five separate motions to dismiss on July 17, 2009 and the Court heard oral argument on October 6, 2009.

**Legal Standard and Judicial Notice**

The standards guiding this court's review of Plaintiffs' Complaint under *Rule 12(b)(6)* are set forth in the previous Order. (Dkt. No. 277 at 3.) After the Court issued its Order, the Supreme Court decided *Ashcroft v. Iqbal, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*, which discusses *Federal Rule of Civil Procedure ("Rule") 8(a)(2)*. *Iqbal* reaffirms the Supreme Court's decision in *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* and does not alter the standard the Court previously employed to test those claims in the Complaint subject to *Rule 8*. As before, "to [*8] survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal, 129 S. Ct. at 1949* (quoting *Twombly, 550 U.S. at 570*).

Deloitte requests the Court judicially recognize excerpts of Washington Mutual, Inc.'s ("WaMu" or "the Company") amended 2005 Annual Report (Form 10-K/A) and WaMu's 2006 Annual Report (Form 10-K), to which Plaintiffs pose no objection. (Dkt. No. 313.) The Court will take notice of these documents and draw no inferences in favor of Defendants from judicially noticed facts. *See McGuire v. Dendreon Corp., No. C07-800MJP, 2008 U.S. Dist. LEXIS 65436, 2008 WL 1791381, at *4 (W.D. Wash. Apr. 18, 2008)*. To the ex-

tent that Deloitte requests the Court judicially notice the Public Company Accounting Oversight Board's ("PCAOB") Release No. 2007-005, the request is denied. This document is not necessary to decide the issues presented in Deloitte's motion.

The Officer Defendants request the Court take judicial notice of a number of documents, which largely include SEC filings and conference call transcripts. (Dkt. No. 316.) Plaintiffs object to only one document, a "quasi-editorial *Wall Street Journal* article [*9] criticizing certain accounting rules." (Dkt. No. 333 at 9.) The Court will take no notice of this article (Dkt. No. 319-4 at 43-46), as it is not necessary to decide the issues presented. (*See* Dkt. No. 277 at 4.) The Court will take notice of the other items submitted by the Officer Defendants to which Plaintiffs do not object, and draw no inferences in Defendants' favor. (Dkt. Nos. 319-2, 319-3, 319-4 at 1-42.)

The Outside Directors ask the Court to take notice of the audit charters of three companies, DTS, Inc., VirnetX Holding Corp., and Morgan Stanley. (Dkt. No. 317 at 13.) Plaintiffs object and argue that these documents are not relevant to deciding the Outside Directors' motion. (Dkt. No. 335 at 7.) These documents are not necessary to decide the issues presented in the motion and the Court declines to afford them judicial notice.

Killinger requests the Court take judicial notice of 44 documents, including earnings call transcripts, conference call transcripts, and SEC filings, to which Plaintiffs object. (Dkt. No. 323; Dkt. No. 334 at 3.) [2] The Court takes notice of these documents, except Exhibits DD (*The New Yorker* article), GG (OTS release), HH (FFIEC press release), KK (FDIC [*10] quarterly), and MM (abstract related to FASB) of the Davis Declaration, which are not necessary to decide the issues presented in the motion.

> 2   Killinger also provides the Court with documents that summarize and categorize allegations in the Complaint. (*See* Dkt. Nos. 321-2, 321-2.) The Court has conducted an independent review of the Complaint in its consideration of these motions and does not rely on these summaries and appendices.

**Discussion**

Plaintiffs bring this action on behalf of a putative class of individuals who purchased securities issued by WaMu or its subsidiaries from October 19, 2005 to July 23, 2008 (the "Class Period"). Plaintiffs have substantially edited their initial Complaint, which lacked "proper structural organization and coherent pleading." (Dkt. No. 277 at 19.) Plaintiffs' amended Complaint is now 267

pages and 877 paragraphs, in which Plaintiffs present cogent and concise allegations against Defendants. As before, the Complaint asserts claims under *§§ 10(b) and 20(a)* of the 1934 Securities and Exchange Act (the "Exchange Act") and *Rule 10b-5* promulgated under *§ 10(b)* of the Exchange Act (Counts One, Two, and Three), and Claims under *§§ 11, 12(a)(2)* and *15* of the [*11] 1933 Securities Act (the "Securities Act") (Counts Four, Five, and Six).

Plaintiffs' allegations focus on WaMu's residential lending practice, which was WaMu's major "business driver and the source of 70% of WaMu's net interest income." (P 19.) [3] In an effort to increase net income, WaMu allegedly commenced a drive to originate more loans, which were either sold to third parties or kept in WaMu's held-for-investment portfolios. (PP 17, 44.) To meet the demand for more loans, WaMu allegedly engaged in a host of improper activities that it hid from investors, and which caused WaMu's stock and securities to be artificially inflated. (*Id.*) Specifically, Plaintiffs allege that WaMu and Defendants: (1) deliberately and secretly decreased the efficacy of WaMu's risk management policies; (2) corrupted WaMu's appraisal process; (3) abandoned appropriate underwriting standards; and (4) misrepresented both WaMu's financial results and internal controls. (P 1.) The following paragraphs provide a brief summary of Plaintiffs' allegations.

3    All paragraph citations refer to the Complaint (Dkt. No. 293).

Plaintiffs allege that WaMu relegated its risk management group to a "customer service" role to encourage [*12] loan volume at the expense of sound credit risk management. (P 3.) The Officer Defendants are alleged to have led this drive. (*Id.*) WaMu also allegedly pressured and hand-picked appraisers willing to abide by WaMu's dictates to inflate appraisal values for homes on which WaMu sold loans. (P 4.) This artificially lowered the loan-to-value ("LTV") ratio and created "the illusion of lower credit risk." (*Id.*) Confidential witnesses ("CWs") from various levels and geographic locations within the Company corroborate WaMu's lax underwriting guidelines, its practice of selling loans to borrowers with extremely low Fair Isaac Credit Organization ("FICO") credit scores, its failure to request documentation or verification of a borrower's stated income, and its habitual underwriting of Option Adjustable Rate Mortgages ("ARMs") to the introductory or "teaser" rate instead of the fully-indexed rate. (P 5.) WaMu also allegedly increased sales of Option ARM loans, which, though classified as "prime," led to high rates of default and negative amortization because they were improperly underwritten. (*Id.*) WaMu is also alleged to have increased its credit risk by causing the subprime under-writing guidelines [*13] to become "nearly nonexistent as underwriters were encouraged to allow exceptions to increasingly permissive standards." (*Id.*) These actions collectively increased WaMu's credit risk, which was not disclosed to the investing public.

Plaintiffs allege that WaMu misstated its financial condition and misled investors as to the condition of its internal controls. (P 6.) Generally accepted accounting principles ("GAAP") and SEC regulations required WaMu to "increase the Company's provision for its Allowance in a manner commensurate with the decreasing quality of its home mortgage products." (*Id.*) Plaintiffs allege that WaMu under-reserved for the increased credit risk it created as described above. (*Id.*) Plaintiffs allege further that WaMu's Loan Performance Risk Model ("LPRM"), used to determine the Allowance, did not take into account important credit risks, such as the potential for negative amortization from Option ARM loans and the increased credit risk from WaMu's permissive underwriting standards and distorted LTV ratios. (*Id.*) By under-provisioning its Allowance, WaMu misstated and artificially inflated its net income and earnings per share in each quarter of the Class Period. (*Id.*)   [*14] Additionally, WaMu allegedly misrepresented the state of its internal controls, which were weakened in order to facilitate WaMu's reckless lending practice. (PP 331-36.)

# I. PLAINTIFFS' EXCHANGE ACT CLAIMS

## A. *Count One: Section 10(b) of the Exchange Act*

*Section 10(b)* provides, in part, that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe. . . ." *15 U.S.C. § 78j(b)*. *Rule 10b-5* makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2009). Plaintiffs bring their § 10(b) claims for securities fraud against Defendants Killinger, Casey, Rotella, [*15] Cathcart, and Schneider. To state a claim, Plaintiffs must plead six elements as to each defendant: (1) a strong inference of scienter, (2) a material misrepresentation or omission, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42, 345, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*.

Defendants argue that the *§ 10(b)* claims should be dismissed because the Complaint fails to allege the falsity of certain statements and particularized facts giving rise to a strong inference of scienter. (Dkt. Nos. 316, 321.) Because a *§ 10(b)* claim alleges fraud, Plaintiffs must plead with particularity "the circumstances constituting the fraud. . . ." *Fed. R. Civ. P. 9(b)*. Additionally, under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff alleging securities fraud must "plead with particularity both falsity and scienter." *In re Vantive Corp. Secs. Litig., 283 F.3d 1079, 1084 (9th Cir. 2002)* (citing *Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001))*. The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" [*16] and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)*. The required state of mind is scienter, defined as "deliberate[] reckless[ness] or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999)*.

The facts alleged in a complaint will give rise to a strong inference of scienter when the inference is "more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues and Rights, Ltd., 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*. In evaluating scienter, the Court must consider the Complaint's allegations holistically, and take note that "[v]ague or ambiguous allegations are now properly considered as a part of a holistic review. . . ." *South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008)*. It is not sufficient to allege that corporate management was generally aware of the day-to-day operations without adding "some additional allegation of specific information conveyed to management and related to the fraud." *Metzler Inv. GmbH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1068 (9th Cir. 2008)*. [*17] However, scienter may be inferred where Plaintiffs "offer details that would bridge the gap between the existence of . . . reports [containing information contrary to public statements made by defendants] and actual knowledge on the part of the defendants." *South Ferry, 542 F.3d at 783*.

The Court's scienter analysis necessarily accompanies a review of the alleged false or misleading statements, because Plaintiffs must "adequately plead scienter in connection with those statements." *N.Y. State Teachers' Retirement Sys. v. Fremont Gen. Corp., No. 2:07-cv-05756-FMC-FFMx, 2008 U.S. Dist. LEXIS 91365, 2008 WL 4812021, at *5 (C.D. Cal. Oct. 28, 2008)*. The Ninth Circuit has observed that because falsity and scienter "are generally strongly inferred from the same set of facts, . . . the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys., Inc., 411 F.3d 1006, 1016 (9th Cir. 2005)* (internal quotation marks omitted).

Below, the Court addresses the statements of each Officer Defendant individually and examines whether Plaintiffs have sufficiently alleged falsity and scienter. Plaintiffs group the allegedly false statements in four categories: (1) risk management, (2) appraisals, (3) underwriting, [*18] and (4) financial statements and internal controls. The Court's analysis tracks this division.

## 1. *Kerry Killinger*

Kerry Killinger was the CEO and Chairman of the Board of WaMu during the Class Period. (P 21.) Killinger joined WaMu in 1982 and in 2005 he hired and promoted Defendants Rotella, Cathcart, and Schneider to assist him in his effort to move WaMu into a "leading national position." (*Id.*) WaMu fired Killinger on September 8, 2008. (*Id.*)

### a. *Risk management*

Plaintiffs accuse Killinger of making thirteen false and misleading statements throughout the Class Period that are allegedly actionable under *§ 10(b)*. (PP 47-48, 50-60.) In late 2005, Killinger stated that the Company maintained "appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance," and provided "objective oversight of risk elements inherent in the Company's business activities and practices. . . ." (P 47.) [4] In January 18, 2006, Killinger stated that "our risk management efforts are on track." (P 49.) On May 18, 2006, Killinger stated that "credit for us is [in] excellent shape, and I feel very comfortable with where we are from management of that credit as well [*19] as the reserving." (P 51.) Killinger then stated on September 6 or 7, 2006 that WaMu "began planning for [a slowdown in housing] quite some time ago [and] took a number of defensive actions." (P 53.) This, Killinger claimed, made WaMu "very well positioned, regardless of what happens in the housing market." (*Id.*) Killinger made nearly identical comments on October 18, 2006 and December 13, 2006. (PP 54-55.)

On January 17, 2007, Killinger stressed that WaMu had taken "decisive actions [that] . . . positioned [it] well to deliver stronger operating performance in 2007." (P 56.)

> 4    Unless otherwise indicated, the Court has removed all emphasis added by Plaintiffs in their Complaint.

Plaintiffs allege these statements are false and misleading because WaMu "had in fact weakened its risk management practices in order to increase loan volume." (P 62.) Plaintiffs support these allegations with internal memoranda and testimony from CWs spanning the Class Period. Plaintiffs allege that starting in "late 2005, WaMu's risk management operations were purposefully rolled back to such a degree that WaMu's risk management systems and personnel could no longer effectively protect the Company's investors  [*20] from the increased risks that WaMu and the Officer Defendants" had created. (P 64.) This allegation is corroborated by CW 17, a Senior Vice President in WaMu's Enterprise Risk Management ("ERM") from August 2001 to September 2006, who states that Cathcart, with Senior Management's blessing, undertook to reduce ERM to an "advisory" only role. (P 65.) CW 18, Vice President in WaMu's Commercial Risk Department from April 2003 to June 2006, also testifies that in the Fourth Quarter 2005, WaMu's chief Enterprise Risk Officer, James Vanasek, "informed the Company's credit risk managers that WaMu's senior management . . . had concluded that the Company planned to be more 'aggressive' in its lending and provisioning practices." (P 66.) An internal memo dated October 31, 2005 corroborates these CWs' statements, and details how "WaMu's risk management functions were being guided through a 'cultural change' and a 'behavioral change internally.'" (P 68.) WaMu's risk management was relegated to a "customer service" position that would not impose a "regulatory burden" on the Company. (*Id.*) Taken together, these allegations sufficiently show that Killinger's statements made throughout the Class Period  [*21] were false. (*See* PP 47-59.)

Defendants urge the Court to examine the "context" of each of the statements Killinger made to find that they were not misleading or false. (Dkt. No. 321 at 9-24; Dkt. No. 316 at 18-24.) Having reviewed the context, the Court does not find that it undermines Plaintiffs' allegations of falsity. The Court does agree with Defendants that Killinger's statement on September 10, 2007, that WaMu took "proactive steps" to prepare for the housing decline, is not sufficiently definitive to constitute an actionable, material misstatement. (P 60.) Defendants' motion is granted as to this statement.

Plaintiffs successfully raise a strong inference of scienter against Killinger. Plaintiffs allege that WaMu's Senior Vice Chairman of ERM complained to WaMu's Board, Killinger included, that the Company was taking on too much risk. (P 76.) Plaintiffs allege that monthly risk reports were distributed quarterly to WaMu's Board, including Killinger, which "specifically quantified the fact that the Company was exceeding certain risk parameters. . . ." (P 78.) Killinger is also alleged to have received monthly risk reports from the Risk Analytics Group, detailing the Company's risk  [*22] management processes. (P 88; *see* PP 90-94.) According to CW 79, who worked closely with Killinger as of July 2006, Killinger was highly involved with analyzing WaMu's risk management processes. (P 80.) CW 79 alleges that Killinger attended monthly Enterprise Risk Committee meetings where "all aspects of risk across the bank were discussed, including credit, market and operational risk." (P 82.) Plaintiffs also allege that the risk parameters for the Company's lending practice could not have been changed without Killinger's consent. (P 87 (CW 79 testimony).) In addition, Killinger's own statements about risk management show his detailed knowledge about the processes. These allegations show his actual knowledge of the risk management problems of which Plaintiffs complain. Defendants' efforts to show alternative inferences of innocence do not weigh against the strong inference scienter. *See Tellabs, 551 U.S. at 323* ("the court must take into account plausible opposing inferences" of innocence); (Dkt. No. 321 at 24-28.)

b. *Appraisals*

Plaintiffs allege that Killinger knowingly made eight false statements regarding WaMu's appraisal process that deceived investors. (PP 96-103.) Plaintiffs focus  [*23] on comments that WaMu's LTV ratio was a "key determinant of future performance" and that the LTV ratio had been kept low to "offset[] the credit risk associated with negative amortization. . . ." (P 96.) Killinger is also alleged to have misled investors by downplaying the concerns about negative amortization and stating that "there's a very strong governance process over those external appraisers." (PP 97-98.)

These statements are alleged to be false because the LTV ratios of which Killinger spoke resulted from a "corrupt appraisal process." (P 105.) As a result, the LTV overstated the value of the homes for which WaMu sold loans and permitted WaMu to claim a lower credit risk than was accurate. Plaintiffs detail an "undisclosed appraisal inflation practice" within WaMu in which the Company (1) exerted undue pressure on appraisers to hit target home values, (2) refused to use appraisers who would not capitulate to WaMu's demands to increase appraisal values, and (3) misused the reconsideration on value ("ROVs") method when appraisals did not hit the values WaMu desired. (P 105; PP 106-61.) Plaintiffs provide substantial detail as to this secret effort, relying

on CW testimony from [*24] various branch level loan officers and underwriters up to regional managers in WaMu's Appraisal Department. (*Id.*) The breadth and depth of these allegations emphasize the pervasive nature of this purported corruption. *See In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008)* (finding a strong inference of scienter based on CW testimony from Countrywide's workforce that detailed "a rampant disregard for underwriting standards"). Plaintiffs have also provided expert data analysis reinforcing their claim that WaMu's appraisal process was corrupt. (P 161.) Based on these allegations, the Court finds that the Plaintiffs have sufficiently pleaded the falsity of Killinger's statements.

Plaintiffs' appraisal allegations raise a strong inference of scienter. Plaintiffs allege that Killinger, as part of senior management, was aware of demands from eAppraiseIT, an external appraiser that frequently performed work for WaMu, to stop receiving pressure from WaMu to increase appraisal values. (P 164.) Plaintiffs rely on the allegations of the New York Attorney General's ("NYAG") complaint and internal WaMu and eAppraiseIT documents to show that Killinger "knew [*25] or recklessly disregarded WaMu's widespread and blatant appraisal manipulation." (P 164.) Plaintiffs also highlight the importance of accurate LTV ratios and appraisals to WaMu's credibility as a source of scienter. Lastly, they point to Killinger's role in overseeing the appraisal process and his statements that show his knowledge of the appraisal process. (PP 167-68.) These allegations raise a strong inference of scienter, bridging the gap between information available to Killinger to his actual knowledge. *See South Ferry, 542 F.3d at 783.* Defendants have not raised a more compelling inference of innocence. (Dkt. No. 321 at 24-28.)

c. *Underwriting*

Plaintiffs allege that Killinger made twenty false and misleading statements about WaMu's underwriting standards that misled investors throughout the Class Period. (PP 169-89.) Plaintiffs highlight Killinger's statements that WaMu was "disciplined and vigilant in [its] underwriting standards," (P 170), had "excellent processes, policies, underwritings, standards," (P 171), and that WaMu "seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting [*26] all purchased subprime loans" (P 174). Plaintiffs allege as false Killinger's statement in October 2006 that "[w]e have more than 20 years experience underwriting and originating option ARM loans through many market cycles [and] the quality of our option ARM portfolio remains strong." (P 178; *see* P 180 (same).) Plaintiffs also allege as false Killinger's statement that "[t]he Company actively manages the credit

risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards. . . ." (P 184; *see* P 185.) Similarly, Plaintiffs allege that Killinger falsely stated that "[i]n our underwriting on option ARMs we underwrite to the fully indexed rate, we never underwrite to the teaser rate." (P 179.) Killinger is also alleged to have made a false statement that WaMu had anticipated a downturn in the housing market and "tightened underwriting." (P 181; *see* PP 186-88.) Lastly, Plaintiffs allege that Killinger falsely stated that WaMu had maintained a "rigorous[] adher[ence] to [its] minimum FICO threshold" in its subprime portfolio. (P 183 (alterations in original).)

Plaintiffs establish with particularity that WaMu lowered its underwriting standards and [*27] pressured underwriters to approve loans outside of the guidelines. (PP 192-223.) CWs from nearly every level of the Company throughout the country verify that WaMu lowered its underwriting standards and systematically granted exceptions to the guidelines that became virtually nonexistent. (*See* PP 195, 197, 200, 202-06, 210, 213-14, 216, 225-26, 228-29); *In re Countrywide, 554 F. Supp. 2d at 1059* (finding a similar practice rendered underwriting standards superfluous). Plaintiffs also rely on expert analysis to allege that WaMu had a much higher loan-to-income ratio than its peers, which "confirms that the deterioration in the underwriting standards at WaMu was nationwide in scope and material in its effects." (P 238.) Additionally, Plaintiffs allege, with support from CWs, that until late 2007, WaMu underwrote Option ARMs to the teaser-rate, rather than the fully indexed rate. (PP 225-26.) These allegations, taken together, show with particularity, that Killinger's statements and omissions alleged above are false and misleading.

However, Plaintiffs may not proceed as Killinger's statement in paragraph 182. Plaintiffs allege as false Killinger's statement that WaMu acted in "prudent [*28] manner" with regard to higher-margin mortgage products. (P 182.) This allegation is simply too vague to be considered a material misstatement. Defendants' motion is granted as to this statement.

Plaintiffs' allegations raise a strong inference of scienter. Killinger's own statements show the extent to which he was deeply familiar with WaMu's underwriting guidelines and had actual knowledge of the falsity of his statements. Additionally, Plaintiffs allege that Killinger had access to regular and special reports on underwriting. (P 241.) Citing to CW 65, Plaintiffs also allege that Killinger issued internal email and pre-recorded statements once a quarter detailing the structure of the guidelines and explaining that the company was changing the guidelines in an attempt to increase volume. (P 242.) This allegation is substantial, especially when considered in light of CW statements that WaMu senior manage-

ment, including Killinger, reviewed and approved all changes to the underwriting guidelines and reviewed reports tracking exceptions to the underwriting guidelines. (PP 244-49.) Plaintiffs' allegations show Killinger's knowledge of and access to information contradicting his statements.  [*29] *See South Ferry, 542 F.3d at 783.* Plaintiffs also point to the allegations of scienter regarding WaMu's risk management as additional support. (PP 76-94, 241.) Defendants have not raised a competing inference of innocence that outweighs the strong inference of scienter. (Dkt. No. 321 at 24-28.)

Killinger argues that the Complaint is inconsistent as a matter of logic because WaMu could not have had lax underwriting standards and also allowed major exceptions to them. (Dkt. No. 321 at 16.) This argument is unavailing. The court in *In re Countrywide* addressed this same point and found that Plaintiffs "paint[ed] a compelling portrait of a dramatic loosening of underwriting standards" where "significant deviations in underwriting were permitted. . . ." *554 F. Supp. 2d at 1058.* Here, Plaintiffs have alleged that WaMu both loosened the guidelines and allowed exceptions to them. The two are not logically dissonant; they operate in tandem.

d. *Financial statements and internal controls*

Plaintiffs allege that Killinger made false statements and omissions about WaMu's financial statements and internal controls, and certified SEC filings containing similar false statements throughout the Class Period. [*30] (PP 267-90.)

Plaintiffs allege that on October 19, 2009, the start of the Class Period, WaMu issued a press release containing purportedly false statements as to the Company's net income, Allowance, and earnings per share that Killinger failed to correct. (P 267.) Killinger is alleged to have made related omissions in similar press releases throughout the Class Period. (*See* PP 271, 274, 177, 280, 283, 286, 288.) Plaintiffs also allege that Killinger did not correct false statements about WaMu's financial statements and internal controls when he certified Quarterly and Annual Reports. (PP 268-69, 272-73, 275, 278, 281, 284-85, 287, 289.) Additionally, Plaintiffs point to affirmative statements Killinger made to investors at various conferences representing that WaMu had sound reserving methodologies. (PP 270, 276, 279, 282.)

The falsity of these statements and omission is alleged in forty-eight paragraphs that detail the applicable accounting guidelines and WaMu's failure to provision the Allowance accurately and in acknowledgement of the risks it created by emphasizing loan volume over quality. (PP 292-324.) Plaintiffs allege that as of September 2005, the LPRM, which helped calculate [*31] the Allowance, was untested on negative amortizing loans and that it lacked of calibration during most of the Class Pe-

riod. (PP 309-22.) By not accounting for negative amortizing loans, which constituted over 50% of WaMu's residential loan portfolio throughout the Class Period, the LPRM could not have calculated the Allowance properly. (PP 192, 310-19.) These allegations add to falsity of Killinger's statements. Plaintiffs also provide expert analysis quantifying, where possible, the amount by which WaMu failed to provision its Allowance. (PP 325-30.) These allegations support Plaintiffs' claim of falsity.

Plaintiffs allege that the remarks regarding WaMu's internal controls were also false because the Company did not have proper management oversight of and reporting for the Allowance and credit reserves. (PP 332-35.) Plaintiffs rely primarily on the Corporate Risk Oversight ("CRO") Report, an internal WaMu document from September 2005, that highlighted gaps in WaMu's internal controls related to its drive to increase loan volume. (PP 331-33.) According to Plaintiffs, the problems identified were slowly addressed, never fully remediated, and never disclosed to the public. (PP 323, 325.)  [*32] As a result, Killinger's statements in SEC filings that internal controls were effective were not, as alleged, true. The Court finds these allegations sufficiently establish the falsity of Killinger's statements.

Plaintiffs' allegations of motive and opportunity are only marginally probative of scienter. In considering (1) the amount and percentage of shares sold, (2) the timing of the sales, and (3) the consistency with prior trading, the Court is not convinced a strong inference can be drawn from Killinger's sales. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004).* Plaintiffs point out that Killinger's sales during the control period (January 13, 2003 to October 17, 2005) compared to the Class Period show a 226% increase in stock sales (from $ 4 million up to $ 13.1 million). (*Id.*) However, Killinger points out that this is merely 5% of his overall WaMu stock holdings. (Dkt. No. 321 at 25.) While Killinger's sales are not particularly consistent, the percentage of shares sold is not disproportionately high--just over 2 times higher than in the control period. This falls below what the Ninth Circuit has considered "unusual." *See Provenz v. Miller, 102 F.3d 1478, 1491 (9th Cir. 1996)*  [*33] (holding that the sale of shares during the class period of almost six times more stock than in the 12 months prior to the class period was probative of scienter). Similarly, the $ 13.1 million cannot said to be so high as create an inference of scienter given that Killinger's sales were only 5% of his total holdings. *See Nursing Home, 380 F.3d at 1232* (where defendant sold $ 900 million worth of stock that amounted to just 2.1% of his total holdings, a finding of motive existed despite the low percentage). As to timing, Plaintiffs have not pointed to any particularly critical

periods that raise an inference of scienter. However, that Plaintiffs' motive allegations do not raise a strong inference of scienter is not fatal to their claim. *See Tellabs, 551 U.S. at 325*; *Fouad v. Isilon Sys., Inc., No. C07-1764-MJP, 2008 U.S. Dist. LEXIS 105870, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008).*

Plaintiffs' allegations regarding financial statements and internal controls raise a strong inference of scienter. Plaintiffs allege that Killinger attended monthly Risk Management Committee meetings and received financial forecasts or projections from WaMu's different business units. (P 338.) Plaintiffs allege that Killinger [*34] spoke of the importance of the Allowance to WaMu's earnings and that there were ample red flags throughout the Class Period that the Allowance was under-provisioned. (PP 340-43.) Killinger was also required to ensure that the process for calculating the Allowance was proper, and that the allowance would "represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision." (P 341.) Killinger is also alleged to have received the CRO Report, which gave him actual knowledge of the deficiencies in WaMu's internal controls. (P 339); *see South Ferry, 542 F.3d at 783.* The scienter allegations against Killinger as to risk management, appraisals, and underwriting also support Plaintiffs' claim. (PP 75-94, 162-68, 240-65.) Defendants have failed to present any persuasive, competing inferences of innocence. (Dkt. No. 321 at 24-28.)

## 2. *Thomas Casey*

Defendant Thomas Casey was the Executive Vice President and CFO of WaMu from October 2002 through October 11, 2008. (P 22.) He also served on the Executive Committee, overseeing the Company's corporate finance, strategic planning, and investor relations. (*Id.*)

### a. *Risk management*

Plaintiffs allege that Casey made four false [*35] and misleading statements and signed two SEC filings that contained misstatements about WaMu's risk management. (PP 357-64.) Casey stated on October 19, 2005 that "[w]e continue to proactively manage our credit risk, and are taking steps now to reduce potential future exposure." (P 358.) Casey made nearly identical statements on January 18, 2006, April 18, 2006, and April 17, 2007. (PP 360-61, 363.) Casey also signed a Quarterly Report on November 7, 2005, that, as discussed above, is alleged to have contained false statements regarding the efficacy of WaMu's ERM. (*Compare* (P 359 *to* P 47.) Plaintiffs present no new allegations of falsity, relying instead on the allegations addresses above as to Killinger. The Court's decision as to those allegations applies to Casey's statements regarding risk management.

Plaintiffs' allegations raise a strong inference of scienter. First, Casey is alleged to have made public claims as to his knowledge of the risk management function of the Company and his close oversight thereof. (P 372.) Second, Plaintiffs allege that throughout the Class Period Casey received weekly Risk Reports that "specifically quantified the fact that he Company was exceeding [*36] certain risk parameters as dictated by [WaMu's] risk guidelines." (P 367.) Similarly, Plaintiffs allege Casey attended monthly Risk Management Meetings where "all aspects of risk across the bank were discussed, including credit, market, and operational risk." (P 371.) Third, Plaintiffs allege that CW 80, a Senior Vice President for Accounting Policy from June 2006 until November 2007 told Casey directly that WaMu's "risk management and accounting standards had dangerously deteriorated, with material effects on the Company's financial statements." (PP 368-70.) Plaintiffs also point to CW 80's statement that "Casey appeared to exert greater influence over the loan loss process as opposed to it being independently managed." (P 370.) Defendants' have not offered a persuasive basis on which to infer an innocent intent. (Dkt. No. 316 at 9-16.)

### b. *Appraisals*

Plaintiffs allege that Casey made two false statements and certified two Annual Reports filed with the SEC that contained false statements about the Company's appraisal inflation. (PP 375-80.) On October 19, 2005, Casey told investors that only 8% of the Option ARM portfolio had an LTV ratio in excess of 80% and that only 2% had an LTV [*37] above 90% at origination. (P 376.) Casey also stated on July 18, 2007 that despite forecasting higher nonperforming assets in home loans, "we expect losses to be much lower due to the lower LTVs and high FICO profile of our prime portfolio." (P 379.) These statements, Plaintiffs allege, were false because the appraisal process had been secretly corrupted and that the LTV ratios were inaccurate and understated. (PP 105-61.) These allegations plead with particularity the falsity of Casey's statements. Similarly, the financial statements Casey signed are sufficiently alleged to be false, for the reasons set out above in Section I.A.1.b.

Plaintiffs' allegations raise a strong inference of scienter. Casey, as part of senior management, is alleged to have known or "recklessly disregarded WaMu's blatant appraisal interference." (P 384.) Given the importance of the LTV and appraisal valuation and Casey's position within the Company, he is alleged to have known of the secret appraisal manipulation. Casey is also alleged to have been aware of the complaints from eAppraiseIT, giving him actual knowledge of the appraisal manipulation. (P 384.) Similarly, Casey is alleged to have known of the appraisal [*38] inflation given the federal regulations requiring him to ensure a proper ap-

praisal process and access to information to satisfy this duty. *See South Ferry, 542 F.3d at 785* (holding that when combined with allegations that the defendant was exposed to specific factual information, allegations of "management's role in the corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter"). These allegations are sufficient to raise a strong inference of scienter, and Defendants fail to provide a persuasive basis on which to infer an innocent intent. (Dkt. No. 316 at 9-16.)

c. *Underwriting*

Plaintiffs allege that Casey made four false statements and signed one Annual Report containing misstatements about the Company's underwriting. (PP 389-95.) On April 18, 2006, Casey stated that "[c]redit quality continues to surpass our expectations . . . [and that] [g]iven the good credit quality and provision level of this quarter, we are revising our credit provision outlook downward to $ 650 to $ 750 million." (P 390.) On that same day, Casey stated at the annual shareholders meeting that "[o]ur  [*39] credit provision was below our original expectation, reflecting our disciplined credit underwriting and a favorable credit environment." (P 391.) On July 19, 2006 Casey praised the "strong ongoing stability and strength of the [loan] portfolio" and stated that the "[c]redit quality continues to be strong." (P 393.) Casey also stated on April 17, 2007 that WaMu was "being selective with [its] underwriting" with regard to subprime loans and that the Company had "significantly increased [its] pricing and [its] risk profile that [it was] willing to underwrite to. . . ." (P 394.) The falsity of these statements is explained above in Section I.A.1.c, *supra.*

Plaintiffs again raise a strong inference of scienter. Given Casey's position within the Company and the statements Casey made with apparent knowledge of WaMu's underwriting guidelines, he appears to have had knowledge of the true state of WaMu's underwriting process. (P 397.) Plaintiffs add further detail, alleging that Defendant Schneider could not have adjusted the underwriting guidelines without Casey's knowledge. (P 398 (relying on CW 79's statements).) Plaintiffs also allege that Casey was aware of WaMu's underwriting given  [*40] its critical importance to WaMu's financial health and given the regimented process that governed the guidelines. (PP 399-400.) *See In re Countrywide, 554 F. Supp. 2d at 1063-64* (a defendant's oversight duty, combined with the magnitude of the lending practice may add to an inference of scienter). Defendants fail to raise a negative inference of innocence sufficient to overcome these substantial allegations. (Dkt. No. 316 at 9-16.)

d. *Financial statements and internal controls*

Plaintiffs allege that Casey made five false and misleading statements about WaMu's financial condition and signed both certifications and SEC filings containing misstatements regarding WaMu's financial condition and internal controls. (PP 402-15.) For example, Casey stated on October 18, 2006 that "[w]e do reviews of our provision throughout the year and our [Allowance] every single quarter and this quarter was no different from any other quarter." (P 408.) Casey continued, stating that "[w]e continue to look at all of our loss factors and the performance of [the] underlying portfolio and continually make adjustments." (*Id.*) Casey made even more detailed comments about WaMu's methods of provisioning for loan losses  [*41] and assured investors WaMu was being "very disciplined." (PP 411, 413-13.) The falsity of these statements is explained above in Section I.A.1.d, *supra.*

Again, Plaintiffs raise a strong inference of scienter. Plaintiffs allege that as CFO, Casey was responsible for the Company's financial reporting and that his statements show his detailed knowledge of WaMu's financial condition. (P 419.) Plaintiffs cite testimony from CW 79 and CW 80 that Casey was directly informed of problems with risk management and that Casey attended monthly Risk Management Committee meetings where financial forecasts were discussed. (PP 420-21.) Plaintiffs also allege that the CRO Report was circulated to Casey, which gave him actual knowledge of WaMu's internal control deficiencies. (P 422.) These allegations alone sufficiently raise a strong inference of scienter. Plaintiffs also rely on the materiality of the accurate financial reporting to sustain their claim. Plaintiffs' allege that Casey had motive and opportunity to make false statements given that his bonuses were tied to the Company's performance. *See Tellabs, 551 U.S. at 325* (noting that personal financial gain may weigh heavily in favor of an inference  [*42] of scienter). These allegations are probative of scienter. Defendants' arguments as to motive, while persuasive, are not sufficient to outweigh the many other allegations supporting the strong inference. (Dkt. No. 316 at 10-11.) Moreover, the Court is not persuaded by Defendants' attack on Plaintiffs' CWs, whose allegations are broad, detailed, and probative of scienter. (*Id.* at 13-16); *see In re Countrywide, 554 F. Supp. 2d at 1058-59* (finding a similar use of CWs from throughout the Company probative of scienter).

3. *Stephen Rotella*

Stephen Rotella served as WaMu's President and Chief Operating Officer from January of 2005 until he resigned on October 3, 2008. (P 23.)

a. *Risk management*

Plaintiffs allege that Rotella made five misleading and false statements about WaMu's risk management. On January 31, 2006, Rotella stated that the Company felt "pretty good" as to "credit" generally and that he felt "pretty good about the credit risk" in the balance sheet of Option ARM products. (P 429.) Rotella then stated on May 9, 2006 that although the Company had seen a slowing in the housing market there was "little evidence of any real deterioration in the consumer," and that WaMu's ERM was monitoring [*43] this closely. (P 430.) At the Investor Day conference in September 2006, Rotella stated that he and the Officer Defendants felt "good about the fact that we've been aggressive in controlling what we can control. Frankly we've been ahead of the market in my perspective." (P 431.) On the investor call of April 17, 2007, Rotella stated that ". . . since the beginning of last year [we have] been tightening credit in that part of the business," referring to subprime lending. (P 431.) On that same day, at the annual shareholders meeting, Rotella stated that the Company was "tighten[ing] credit" in the subprime sector. (P 433.) The falsity of these statements is laid out in paragraphs 62-74 of the Complaint, which shows that Rotella's statements were false and misleading. *See* Section I.A.1.a, *supra.*

Plaintiffs' allegations raise a strong inference of scienter. Rotella is alleged to be the person who spearheaded the restructuring of credit risk reporting and that "Rotella was charged with managing both loan production and risk management in his role as WaMu' President and COO." (P 70.) As reported by the Seattle Times, Rotella was responsible for halting efforts to tighten lending standards [*44] within the credit risk department. (P 440.) These allegations raise a strong inference of scienter. *See Daou, 411 F.3d at 1023* (allegations of direct involvement in the allegedly improper activities may create a strong inference of scienter). Plaintiffs allege further that Rotella received weekly "Risk Reports" that quantified the ways in which the Company was exceeding risk parameters that WaMu itself dictated. (P 441.) These allegations support the claim that Rotella knew he was making false and misleading statements to the investing public. Defendants have not articulated sufficient reasons that an inference of innocence outweighs these allegations. (Dkt. No. 316 at 9-16.)

### b. *Appraisals*

Rotella is alleged to have made only one false statement regarding appraisals. On May 9, 2006, Rotella stated that the Company's low LTV ratios were a "protection against losses going forward." (P 445.) Plaintiffs also allege that Rotella failed to correct false statements made in his presence. (P 446.) The falsity of Rotella's statement is explained above, in that WaMu's LTV ratios were inaccurately understated and therefore not a source of protection against losses. The strong inference of

scienter [*45] comes from Rotella's position as COO (P 23), the importance of LTV and appraisals to the Company (P 449), his duty to enforce an independent appraisal system (P 385), his alleged awareness of the complaints about a corrupt appraisal process from eAppraiseIT (P 384), and the statements he made detailing particulars of the LTV and appraisal process (*see, e.g.,* Dkt. No. 316 at 20). Taken together, these allegations raise a strong inference of scienter. *See Tellabs, 551 U.S. at 323.* Competing inferences of an innocent intent are not convincingly made and do not weigh against the strong inference of scienter. (Dkt. No. 316 at 9-16.)

### c. *Underwriting*

Plaintiffs charge Rotella with making four false statements regarding WaMu's underwriting standards. On January 18, 2006, Rotella stated that as to Option ARMs, "an important fact is that we underwrite every loan at the fully indexed rate. And so that's an important thing to note from a credit perspective." (P 451.) Plaintiffs allege as false Rotella's statement on January 31, 2006 that the Company had mitigated exposure to exotic loans by doing a "good job of trying to fit the right customer to that mortgage" and that "[t]he credit quality on [*46] those products has been quite good." (P 452.) Plaintiffs also allege as false Rotella's statement on May, 2006 that non-performing assets were at a "terrific" level and the Company was "prudent in [its] credit extension. . . ." (P 453.) Again on July 19, 2006, Rotella downplayed the degradation of the subprime portfolio, stating that "we're being quite careful and making any changes we need to make in our credit policies as we move forward, but our sense of things are -- things are in pretty good shape." (P 454.) These statements, Plaintiffs allege, hid from investors the truth of regarding several of WaMu's underwriting practices. Plaintiffs have alleged sufficient facts that show that WaMu did not underwrite Option ARMs to the fully-indexed rate or maintain adequate underwriting guidelines. *See* Section I.A.1.c, *supra.* The falsity of Rotella's statements is adequately alleged.

Plaintiffs' allegations raise a strong inference of scienter. Plaintiffs allege that changes in underwriting could not have been made without Rotella's knowledge. (P 458.) Moreover, Rotella is alleged to have issued internal emails and pre-recorded statements once per quarter detailing the structure and changes [*47] of WaMu's guidelines. (P 460.) Rotella's position and statements also show his knowledge of WaMu's underwriting standards, which add to an inference scienter. (P 458.) Defendants' arguments in favor of an innocent intent are not persuasive when considered against Plaintiffs' allegations. (Dkt. No. 316 at 9-16.)

### d. *Financial results*

Plaintiffs allege that Rotella failed to correct statements of Killinger, Casey, and Schneider as to WaMu's financial state, despite his knowledge to the contrary. (P 463.) The falsity of these allegations is sufficiently pleaded, as discussed above. *See* Sections I.A.1.d. Plaintiffs have raised a strong inference of Rotella's scienter. They point to his attendance at monthly Risk Management Committee meetings, access to the CRO Report which was circulated to him, and the materiality of the Allowance to the Company's overall reputation and stability. (PP 466-69.) Plaintiffs allege further that Rotella had motive and opportunity not to correct these statements because he was given bonuses based on the Company's overall performance. (P 470.) While this alone is insufficient to show scienter, it adds to the totality of the allegations which are sufficient to survive [*48] dismissal, notwithstanding Defendants' arguments to the contrary. *See Tellabs, 551 U.S. at 323*; (Dkt. No. 316 at 9-16.)

### 4. *Ronald Cathcart*

Ronald Cathcart served as Executive Vice President and Chief Enterprise Risk Officer at WaMu from December 2005 to April 2008. (P 24.)

#### a. *Risk management*

Plaintiffs allege that Cathcart made one false statement regarding WaMu's risk management. On September 6 or 7, 2006, he stated that "we have been watching our credit profile diligently for the last two years, and we've been making strategic choices to prepare for the environment we currently find ourselves in." (P 473.) The falsity is explained above and applies with equal force here. *See* Section I.A.1.a, *supra*. Plaintiffs raise a strong inference of scienter based on Cathcart's role as head of Enterprise Risk, where his chief responsibility was overseeing risk management. (P 476.) He is alleged to have attended monthly meetings with the other Officer Defendants where he discussed WaMu's risk exposure in detail. (P 477.) These allegations, considered against the backdrop of inferences of innocence, raise a strong inference of scienter. *See South Ferry, 542 F.3d at 783*; (Dkt. No. 316 at 9-16.)

#### b. *Appraisals*

Plaintiffs [*49] allege only that Cathcart failed to correct Killinger's statement on September 6 or 7, 2006 that there was a "very strong governance process over those external appraisers." (P 98, 488.) The falsity of this allegation is explained above. As to scienter, Plaintiffs point to the same allegations made as to Casey. (PP 383-86, 490.) These raise a strong inference of scienter as to Cathcart. Defendants have not persuaded the Court that an innocent intent outweighs Cathcart's scienter. (Dkt. No. 316 at 9-16.)

#### c. *Underwriting*

Plaintiffs allege that on September 6 or 7, 2006, Cathcart falsely stated that "[a]t origination, WaMu focuses on an effective underwriting process and borrower disclosures," that "WaMu controls the underwriting so we have the opportunity to evaluate the borrower at the time of origination" and that "overall we are comfortable with this portfolio." (P 492.) As discussed above, this statement is false in light of Plaintiffs' allegation that WaMu's underwriting guidelines were secretly lowered and largely disregarded. Scienter is alleged based on Cathcart's position in the Company, his role in auditing the Company's underwriting guidelines as to risk, and the importance [*50] of residential lending to the Company. (PP 495-98.) Plaintiffs also allege that he had motive to perpetrate this fraud given the substantial bonuses he received for WaMu's continued high performance. (P 499.) These allegations raise a strong inference of scienter, despite Defendants' efforts to show a negative inference of innocence. *See Tellabs, 551 U.S. at 323*; (Dkt. No. 316 at 9-16.)

### 5. *David Schneider*

David Schneider served as the Executive Vice President and President of Home Loans from August 2005 until late 2008. (P 25.) He was responsible for overseeing all aspects of the home lending operations. (*Id.*)

#### a. *Risk management*

Plaintiffs allege that Schneider falsely stated on November 15, 2005, that "we've maintained effective risk management processes. This is clearly a top priority for us. We've invested a significant amount in terms of talent and technology in building risk management." (P 502.) The falsity of this statement is supported by the allegations that risk management became superfluous and substantially undermined throughout the Class Period. *See* Section I.A.1.a, *supra*. Plaintiffs allege scienter based on the allegations from CW 19 that Schneider held weekly meetings where [*51] he received reports on all compliance and credit risk deficiencies. (P 507.) CW 78 also states that Schneider received the monthly 'Credit Risk Review" which detailed WaMu's risk exposure. (P 508.) These allegations raise strong inference of scienter, outweighing competing innocent inferences. (Dkt. No. 316 at 9-16.)

#### b. *Underwriting*

Plaintiffs allege that Schneider's statement on November 15, 2005 that "[w]e've done a few things to improve our margins [for Option ARM loans]" and that "[t]hose [changes,] combined with some tightening of underwriting guidelines primarily around the investor property will ensure that we can generate higher margins

and receive the required returns on the product." (P 513.) This is allegedly false because the underwriting guidelines were instead loosened and disregarded, as explained *supra.* These allegations sufficiently show the falsity of Schneider's statements. Plaintiffs allege Schneider was aware of the lax guidelines because he was head of Long Beach Mortgage ("LBM"), the major subprime lending arm of WaMu, where he oversaw the underwriting process in detail. (P 519.) During the Class Period, Schneider is alleged to have known details of LBM and therefore  [*52] WaMu's true underwriting standards. (P 519 (citing CW testimony).) Plaintiffs also point to CW 79, who states that Schneider was responsible for adjusting WaMu's lending practices "as they related to risk," including underwriting. (P 518.) These allegations raise a strong inference of scienter that competing inferences of innocence do not outweigh. (Dkt. No. 316 at 9-16.)

### c. *Financial results and internal controls*

Plaintiffs allege that Schneider made a false statement to investors on November 15, 2005 that "[o]n subprime, we have seen, as other have seen, some early payment default and repurchase activity. We saw most of that occur for us in late '05 Q4 '05 and first quarter of '06. We reserved for it appropriately." (P 524.) This statement is sufficiently alleged to be false given that the WaMu allegedly did not properly reserve for such losses in late 2005, as discussed *supra.* Plaintiffs allege Schneider's scienter based on his access to the CRO Report, the monthly Risk Management Committee meetings where he gained actual knowledge of the Allowance, the materiality of the Allowance, and his motive and opportunity. (PP 527-32.); *see South Ferry, 542 F.3d at 783.* Under the holistic  [*53] analysis of *Tellabs,* the Court finds that Plaintiffs create a strong inference of scienter, notwithstanding Defendants' contrary arguments. (Dkt. No. 316 at 9-16.)

### B. *Counts Two and Three: Section 20(a) of the Exchange Act*

In Count Two, Plaintiffs assert claims against the Officer Defendants and Defendants Woods and Ballenger for violations of *§ 20(a)* of the Exchange Act. In Count Three, Plaintiffs assert similar claims against the Outside Director Defendants.

The Court previously found that Plaintiffs had sufficiently stated claims against Defendants Killinger, Casey, Woods, and Ballenger, and the Outside Officer Defendants for control person liability under of *§ 15* if the Securities Act. (Dkt. No. 277 at 30-32.) Because the control person analysis does not differ between *§ 15* of the Securities Act and *§ 20* of the Exchange Act, the Court's prior Order applies with equal force to the § 20 claims against these defendants. *Hollinger v. Titan Cap-*

*ital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990).* Count Two and Three are adequately pleaded. The Outside Directors' and Defendants Woods and Ballenger's motions are DENIED as to all statements that remain actionable as described *supra.* Killinger,  [*54] Casey, Rotella, Cathcart, and Schnieder do not challenge their status as control persons, and all of Plaintiffs' § 20 claims against them survive dismissal.

## II. PLAINTIFFS' SECURITIES ACT CLAIMS

### A. *Count Four: Section 11 of the Securities Act*

The Court previously found that Plaintiffs had successfully stated a claim against Defendants Killinger and Woods, the Outside Director Defendants, Deloitte, and the Underwriter Defendants for violations of *§ 11* of the Securities Act as to the October 2007 securities offering. (Dkt. No. 277 at 23-29.) The Court also found that Plaintiffs lacked standing to assert claims under *§§ 11* and *12(a)(2)* of the Securities Act for the August 2006, September 2006, and December 2007 securities offerings. Plaintiffs have named three new plaintiffs in order to correct these deficiencies. Plaintiffs are only partly successful, as explained below.

### 1. *Pleading standard*

The previously set forth the proper standard governing Plaintiffs' Securities Act claims. (Dkt. No. 277 at 20-22.)

### 2. *Standing under section 11*

Under *§ 11,* a person acquiring a security pursuant to a registration statement containing a false or misleading statement has standing to sue a variety of participants  [*55] in the security's issuance. *15 U.S.C. § 77k(a)* (emphasis added). Though initial and aftermarket buyers alike have standing, aftermarket buyers face the additional task of tracing their purchase to the registration statement. *Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1080 n.4 (9th Cir. 1999).* If a purchaser acquires the security after the issuer made available an earnings statement covering a twelve-month period after the effective date of the registration statement, he must show reliance. *15 U.S.C. § 77k(a).* This may be done "without proof of the reading of the registration statement. . . ." *Id.*

Defendants contend that the newly named plaintiff, Pompano Beach Firefighters' Retirement System ("Pompano") lacks standing to represent a class of purchasers of 5.50% Notes issued in the August 2006 offering. (Dkt. No. 310 at 10-11.) Pompano did not purchase the 5.50% Notes. Rather, it purchased Floating Rate Notes that were issued in the same offering. (P 279.) Plaintiffs do not have standing to pursue § 11 claims as to the 5.50% Notes. There is no named plaintiff who can be deemed a

"person acquiring such security" (the 5.50% Notes) as required by *§ 11(a)*, and, thus, no named plaintiff [*56] has suffered an "actual injury." *See Casey v. Lewis, 4 F.3d 1516, 1519 (9th Cir. 1993).* Plaintiffs' § 11 and § 12(a)(2) claims as to the 5.50% Notes are DISMISSED. However, Defendants do not move to dismiss Plaintiffs § 11 claims as to the Floating Rate Notes, for which Plaintiffs have standing.

Defendants argue that Harlan Seymour, a newly named plaintiff who purchased Series K stock in the September 2006 offering on July 15, 2008, lacks standing. The parties agree that Seymour must allege reliance, but dispute the sufficiency of the pleadings. Plaintiffs allege that all named plaintiffs, including Seymour, "acquired these securities relying upon the statements . . . shown above to be untrue and/or relying upon the Registration Statements . . . and not knowing the omitted material facts. . . ." (P 841.) Plaintiffs also allege that "Class members did not know, or in the exercise of reasonable diligence could have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts. . . ." (P 846.) These allegations are sufficient under *Rule 9* to allege reliance, particularly given § 11's express statement that reliance may established [*57] "without proof of the reading of the registration statement. . . ." *15 U.S.C. § 77k(a).*

Defendants also move to dismiss Plaintiffs' § 11 claims as to the December 2007 offering of Series R Preferred Stock on the basis that the named plaintiff who purchased this stock, Police & Fire Retirement System of the City of Detroit ("Detroit P & F"), was an "in-and-out" trader. (Dkt. No. 310 at 16-17.) This is a question of loss causation, not one of standing. Plaintiffs have standing to pursue claims as to this offering, given that Detroit P & F's purchased the Series R Preferred Stock the same day it was first offered. (P 677; *id.* at 287.)

Plaintiffs therefore have standing under *§ 11* to pursue claims regarding those securities the named plaintiffs purchased in the August 2006, September 2006, and December 2007 offerings.

### 3. *Substantive section 11 allegations*

Plaintiffs allege that the offering documents for the August 2006, September 2006, and December 2007 securities offerings contain untrue statements and omissions of material fact regarding WaMu's lending practices, financial results, and internal controls. (PP 831; 769-830.) The Court previously found that the allegations as to the October [*58] 2007 offering were sufficiently pleaded with particularity to survive dismissal. (Dkt. No. 277 at 23-29.) Deloitte now challenges the sufficiency of the allegations as to the three new offerings regarding financial statements and internal controls. (Dkt. No. 313 at 11-18, 22-23.) The Underwriter Defendants attack the claims on the basis of negative causation. (Dkt. No. 17-25.) Defendants do not contest the sufficiency of the allegations as to the residential lending practices and the Court does not address them.

#### a. *2006 offerings: financial statements*

Plaintiffs allege that the 2006 offering documents contain "materially misstated financial returns for WaMu for 2005 and the first half of 2006." (P 773.) Plaintiffs focus particularly on the Company's Allowance, which they claim was materially understated, causing WaMu's net income and earnings per share to be materially overstated. (*Id.*) The Court previously found these allegations with regard to the October 2007 offering documents pleaded with sufficient particularity to withstand dismissal. (Dkt. No. 277 at 27-28.) Under GAAP and SEC guidelines, WaMu was required to increase its Allowance commensurate with the Company's credit risk. [*59] (P 749.) Plaintiffs allege that the financial statements incorporated in the 2006 offering documents falsely presented an Allowance that should have been higher because: (1) the LPRM did not account for losses related to Option ARM loans, (2) the Company did not account for its vanishing underwriting standards, and (3) WaMu failed to report the misrepresented LTV ratios on its loans due to appraisal manipulation. (PP 777-78.) Plaintiffs' allegations sufficiently demonstrate with particularity that WaMu's financial statements materially misrepresented the Company's true financial condition, as the Court similarly finds *supra*.

Deloitte argues that Plaintiffs have pleaded themselves out of Court by failing to explain the amount by which the Allowance was understated. (Dkt. No. 313 at 12-13.) Plaintiffs are not required to quantify the amount by which the Allowance was understated. Under *Rule 9(b)*, Plaintiffs are required only to "allege enough information so that 'a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'" *Daou, 411 F.3d at 1017* (quoting *In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)).* [*60] The alleged violations are widespread and material. Additionally, Plaintiffs have explained that it is not possible to state the precise amount by which the Allowance was understated in 2005 given the occurrence of one-time events, such as Hurricane Katrina. (P 327.)

Deloitte argues further that Plaintiffs' allegations regarding the Allowance fail because nothing shows that the LPRM lacked calibration in 2005. (Dkt. No. 313 at 14.) On this point, Deloitte is correct. Plaintiffs allege that "as of the summer of 2007, the LPRM had not been

calibrated to reflect actual loan performance data for over eighteen months." (P 722.) However, this is not the only allegation regarding the deficiency of the LPRM. Plaintiffs allege that separately from the issue of calibration, the LPRM "did not account for deteriorating loan performance during the Class Period" and that the "the LPRM did not appropriately analyze for risk of losses in the Company's Option ARM loans, or other loans with the potential for 'negative amortization.'" (P 751; P 721.) In addition, Plaintiffs allege that Option ARM loans accounted for more than 50% of WaMu's prime single-family residential portfolio throughout the Class [*61] Period. (P 192 Chart 1.) Thus, regardless of calibration, the LPRM's failure to account for Option ARM loans supports Plaintiffs' claim as to the Allowance's deficiencies. (*Id.*) Defendants' motion is DENIED as to this claim.

### c. *2006 offerings: internal controls*

Plaintiffs allege that the 2006 offering documents contain false or misleading statements as to WaMu's internal controls. The Court previously found substantially similar allegations sufficient. (Dkt. No. 277 at 25-26.) As to 2006, Plaintiffs allege that throughout the Class Period "the Company falsely represented that WaMu maintained effective internal controls over financial reporting." (P 785.) Plaintiffs allege that "the Company was operating without adequate controls in place to ensure compliance with the Company's underwriting and appraisal standards" and that it was "without policies and appropriate methodology in place to ensure the soundness of its valuation of the assets and its Allowance. . . ." (P 786.) The CRO Report from late 2005 supports this allegation. As explained in greater detail in Section I.A.1.d, Plaintiffs have sufficiently alleged with particularity why the internal controls statements in the 2006 offering [*62] documents were false and misleading.

### d. *December 2007 offering*

The December 2007 offering documents incorporate nearly identical documents and statements as those incorporated into the October 2007 offering that the Court previously found actionable under *§ 11*. (*Compare* P 790 *to* P 816 *and* Dkt. No. 277 at 24-28.) Defendants provide no basis to conclude that Plaintiffs have inadequately pleaded a § 11 claim, and their motion is DENIED.

### 4. *Subjective Falsity*

Deloitte argues that Plaintiffs must plead that the statements Deloitte made in connection to the 2006 and 2007 offering documents were both objectively and subjectively false. Deloitte relies on *Rubke v. Capitol Bancorp Ltd.*, in which the Ninth Circuit held that fairness opinion from auditors must be plead to be objectively and subjectively false in order to be actionable under §

*11. 551 F.3d 1156, 1162 (9th Cir. 2009).* Plaintiffs' claims against Deloitte, however, turn not on statements of opinion, but statements of fact. Thus, *Rubke's* subjective falsity standard does not apply to the factual statements Plaintiffs allege.

In *Rubke,* the court addressed whether a plaintiff had to prove the subjective falsity of an auditor's fairness opinion [*63] regarding an exchange offer--that a particular offer was "financially fair." *Id.* The court expressly delineated that it was not addressing factual statements, which the parties conceded: "these fairness determinations are alleged to be misleading opinions, not statements of fact. . . ." *Id. Rubke* cites with approval *In re McKesson, 126 F. Supp. 2d 1248,* a case which highlights the limits of the subjective falsity standard. In *McKesson,* the court considered an auditor statement that a merger exchange rate was "fair, from a financial point of view." *126 F. Supp. 2d at 1264.* In applying the subjective falsity standard, the court noted that it did not apply to factual statements: "[o]f course, any purely factual assertions in the fairness opinion, such as Bear Stearns' statements that it reviewed certain materials during its due diligence inquiry, would be held to a negligence standard." *Id. at 1265-66.* As the *McKesson* court put it, "[a] fairness 'opinion' is just that--an opinion." *Id. at 1265.*

The statements examined by courts applying the subjective falsity standard highlight the distinction between opinion and fact statements. For example, the actionable statement in *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991),* [*64] relied on by *Rubke,* was one of opinion: a fairness opinion stating that a merger would "achieve a high value." Similarly, this Court applied the *Rubke* standard to an opinion statement from the defendant that it "hosted a good inspection" by the FDA. *McGuire v. Dendreon Corp.,* No. C07-800MJP, Dkt. No. 117 at 2 (W.D. Wash. May 21, 2009). These opinion statements are unlike the factual ones alleged by Plaintiffs against Deloitte. The court's decision in *In re AOL Time Warner, Inc. Sec. & ERISA Litig.,* is instructive on the division between factual and opinion statements. *381 F. Supp. 2d 192 (S.D.N.Y. 2004).* There, the plaintiffs alleged that the auditor's certification of a financial statement and fairness opinion contained false and misleading statements. *Id. at 241, 243.* The court concluded that the subjective falsity standard applied to the fairness opinion, but not to the certification. *Id.* This holding is persuasive.

Here, Plaintiffs allege that Deloitte made the misleading and false statement that its internal control reports were audited "in accordance with the PCAOB's standards." (PP 788, 830.) Whether or not Deloitte employed the PCAOB standards is a verifiable factual

statement [*65] that is material to those relying on its certification of WaMu's internal controls. Similarly, Plaintiffs' allegations regarding Deloitte's certification of the financial statements are not subject to the *Rubke* standard. Deloitte's affirmation that the financial statements were presented "in conformity with accounting principles generally accepted in the United States of America" is an actionable statement of fact. (*See, e.g.,* PP 779, 781.) And as Plaintiffs have set forth, this was false because the financial statements were not prepared in conformity with GAAP, given the improper understatement of the Allowance. (PP 773, 777.) The Court rejects Deloitte's argument that Plaintiffs must plead the subjective falsity of these statements and DENIES the motion on this issue.

### 5. *Negative causation*

The Underwriter Defendants argue that they have shown that negative causation exists on the face of the Complaint as to Plaintiffs Seymour and Detroit P & F. (Dkt. No. 310 at 19-23.) The Court disagrees.

To sustain a securities fraud claim, Plaintiff must allege that the misrepresentations were the proximate cause of the losses suffered. *Dura Pharms., 544 U.S. at 344*. "[T]he complaint must allege [*66] that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler, 540 F.3d at 1063*. Revelation of the fraud need not be complete for loss causation to be adequately pled. (*See* Dkt. No. 277 at 28); *Freeland v. Iridium World Commc'ns, Ltd., 233 F.R.D. 40, 47 (D.D.C. 2006)* ("[R]eading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures."). In raising the affirmative defense of "negative causation," the defendant must show that on the face of the complaint, the alleged misrepresentation could not have caused a plaintiff's damages. *See 15 U.S.C. § 77k(e)*.

The Underwriter Defendants contend that loss causation is not adequately plead as to Detroit P & F because it was an "in-and-out" trader, who sold its WaMu securities prior to any revelation of fraud. The Court previously found that Plaintiffs alleged "that a series of public disclosures, beginning in October of 2007 and continuing until July 2008, gradually and incrementally revealed previously undisclosed facts about WaMu's true financial condition." (Dkt. No. 277 at 28.) [*67] Plaintiffs allege that after Detroit P & F purchased WaMu Preferred stock, a *Wall Street Journal* article revealed that the SEC had launched an investigation into WaMu's mortgage lending practices. (P 586.) This news is alleged to have caused WaMu's stock to decline. (*Id.*) Plaintiffs therefore properly allege loss causation.

The Complaint adequately pleads loss causation with regard to Plaintiff Seymour and the September 2006 offering. Plaintiff Seymour purchased his shares on July 15, 2008, four days before WaMu allegedly "shocked the market" on July 22, 2008, when it announced a net loss of $ 3.3 billion--more than double the Company's First Quarter 2008 net loss. (P 617.) WaMu's stock fell 20% from July 22 to July 23, 2008. The Complaint alleges further that WaMu's true financial condition continued to be revealed to the public after July 23, 2008, up until WaMu was seized by the federal government. (PP 624-26.) This adequately alleges loss causation as to Plaintiff Seymour and the September 2006 offering. The Court rejects Defendants' negative causation argument.

### B. *Count V: Section 12(a)(2) Claims*

Plaintiffs assert claims pursuant to *§ 12(a)(2)* of the Securities Act against WaMu and [*68] the Underwriter Defendants on behalf of the three newly-named plaintiffs with regard to the August 2006, September 2006, and December 2007 securities offerings. The Underwriter Defendants challenge Plaintiffs' standing as to all three offerings. Plaintiffs lack standing to pursue *§ 12(a)(2)* claims as to both 2006 offerings. [5]

> 5   Plaintiffs also lack *§ 12(a)(2)* standing to pursue claims as to the 5.50% Notes issued in the August 2006 offering, as explained *supra.*

Standing under *§ 12(a)(2)* is more restrictive than under *§ 11. Section 12* "permits suit against a seller of a security by prospectus only by 'the person purchasing such security from him,' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus." *Hertzberg, 191 F.3d at 1081* (quoting *15 U.S.C. § 77l(a)(2)*). As the Ninth Circuit noted in *Hertzberg, § 12(a)(2)* standing will not exist where their purchase is only traceable to the offering. *Id.; see Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 578, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995)* (noting, in dicta, that suit under *§ 12* may only maintained by a person who purchases the stock in the public offering under the prospectus).

There is no clear appellate authority [*69] as to whether aftermarket purchasers may have *§ 12(a)(2)* standing. Some courts have held that it does not exist for those who purchase securities in private and secondary markets outside the initial offering. *See In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216, 244-45 (S.D.N.Y. 2002)* (collecting cases within S.D.N.Y); *Tsirekidze v. Syntax-Brillian Corp., No. CV-07-02204-PHX-FJM, 2009 U.S. Dist. LEXIS 61145, 2009 WL 2151838, at *2 (D. Ariz. July 17, 2009)*. Other courts, such as *Feiner v. SS&C Techs., Inc., 47 F. Supp. 2d 250, 253 (D. Conn. 1999)*, have held that aftermarket

purchases are actionable "so long as that aftermarket trading occurs 'by means of a prospectus or oral communication.'" *Id.* (quoting *15 U.S.C. § 771*); *see In re Levi Strauss & Co. Sec. Litig., 527 F. Supp. 2d 965, 982 (N.D. Cal. 2007).* In *Levi Strauss,* the court clarified that *Feiner* only goes so far as to say that *§ 12(a)(2)* liability is coextensive with the prospectus's effective date. *Levi Strauss, 527 F. Supp. 2d at 983.* "This period is generally forty days, but extended to ninety days if the public offering is the issuer's initial public offering of securities." *Id.* Even under this more expansive reading of *§ 12(a)(2),* [*70] Plaintiffs fail to state a claim as to the 2006 offerings.

Pompano is alleged only to have purchased Floating Rate Notes "on and/or traceable to" the August 2006 offering. (P 11.) The Certification in the Complaint shows that Pompano did not purchase the Floating Rate Notes until January 12, 2007, over four months after the initial offering. This falls outside the effective date for the prospectus. *See Levi Strauss, 527 F. Supp. 2d at 983.* Despite opportunity to clarify how Pompano has standing, Plaintiffs have failed to show how this purchase was made pursuant to an effective prospectus. The Court GRANTS Defendants' motion on this issue and DISMISSES Plaintiffs' § 12(a)(2) claims related to the August 2006 offering.

Similarly, Plaintiffs have failed to allege that Seymour purchased the Series K Preferred Stock pursuant to a misleading prospectus. To the contrary, Plaintiffs have alleged that Seymour's purchase was only "traceable to" the September 2006 offering. (P 12.) This is insufficient to assert *§ 12(a)(2)* standing. *See Hertzberg, 191 F.3d at 1081.* The Court GRANTS Defendants motion on this issue and DISMISSES Plaintiffs' § 12(a)(2) claims related to the September 2006 offering. [*71] However, Plaintiffs have standing to pursue § 12(a)(2) claims as to the December 2007 offering. Detroit P & F purchased shares of Series R Stock directly in the initial offering on December 17, 2007. (*Compare* P 14 *with* Compl. at 287.) Defendants' motion on this issue is DENIED.

### C. *Count Six: Section 15 of the Securities Act*

As explained in the prior Order, the Outside Director Defendants and Defendants Killinger, Casey, Woods, and Ballenger are sufficiently alleged to be control persons for the purpose of *§ 15* liability. Control liability extends to those claims now successfully pleaded under *§§ 11* and *12(a)(2).* (*See* PP 861-64.) Defendants' motion is DENIED as to those claims in Counts Four and Five which survive dismissal and is GRANTED as to those which do not.

**Conclusion**

Plaintiffs have largely succeeded in remedying the deficiencies of their initial Complaint. As to Killinger, nearly all of Plaintiffs' § 10(b) claims in Counts One and Two are adequately pleaded regarding false statements of risk management, appraisals, underwriting, financial statements, and internal controls. Defendants' motions on these claims are DENIED. However, two statements (PP 60, 182) lack sufficient clarity [*72] to state a claim, as described above, and Defendants' motions related thereto are GRANTED. As to Casey, Rotella, Cathcart, and Schneider, all of Plaintiffs' § 10(b) claims in Counts One and Two are adequately pleaded as to all five areas of false statements, and Defendants motions are DENIED. Defendants' motions to dismiss Count Three are DENIED as to those § 10(b) claims which are adequately pleaded and GRANTED as to the two statements made by Killinger that fail to state a claim for relief.

Defendants' motions to dismiss Count Four are DENIED as to the August 2006, September 2006, and December 2007 offerings for those securities actually purchased by the named plaintiffs. Because Plaintiffs do not have standing to pursue claims related to the 5.50% Notes, Defendants' motions to dismiss these claims in Count Four are GRANTED. Defendants' motions to dismiss Count Five are GRANTED as to the August 2006 and September 2006 offerings, including the 5.50% Notes, because Plaintiffs lack standing under *§ 12(a)(2)* to pursue those claims. Plaintiffs' claims in Count Five related to the December 2007 offering, however, are adequately pleaded and Defendants' motions to dismiss these claims are [*73] DENIED. Defendants' motions to dismiss Count Six are DENIED as to those claims in Counts Four and Five that are adequately pleaded and GRANTED as to those claims that are not.

No later than two weeks from the date of this ruling, all parties to the MDL shall file a status report offering a proposed schedule for the resolution of this matter. (*See* Dkt. No. 363.) The schedule should base all proposed motions deadlines on a proposed trial date. The status report should also provide proposed discovery protocols. The Court suggests the parties consult the Federal Judicial Center's *Managing Discovery of Electronic Information: A Pocket Guide for Judges* (2007).

The Clerk is directed to send a copy of this order to all counsel of record.

DATED this 27th day of October, 2009.

/s/ Marsha J. Pechman

Marsha J. Pechman

United States District Judge

# TAB C



1 of 1 DOCUMENT

**In re THE PMI GROUP, INC. SECURITIES LITIGATION; THIS DOC-UMENT RELATES TO ALL ACTIONS**

**No. C 08-1405 SI**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2009 U.S. Dist. LEXIS 101582*

**November 2, 2009, Decided
November 2, 2009, Filed**

**COUNSEL:** [*1] For Lori Weinrib, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Shawn A. Williams, LEAD ATTORNEY, Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA; Alan R. Plutzik, Barroway Topaz Kessler Meltzer & Check LLP, Walnut Creek, CA; Catherine J Kowalewski, Lerach Coughlin et al LLP, San Diego, CA; Darren Jay Robbins, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; David C. Walton, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; Lawrence Timothy Fisher, Barroway Topaz Kessler Meltzer & Check LLP, San Francisco, CA.

For Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust, LEAD PLAINTIFF, Plaintiff: Daniel Jacob Pfefferbaum, Coughlin Stoia Geller Rudman & Robbins, San Francisco, CA; Darren Jay Robbins, LEAD ATTORNEY, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; Jeffrey W. Lawrence, Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA.

For The PMI Group, Inc., L. Stephen Smith, David H. Katkov, Donald P. Lofe, Jr., Defendants: George A. Riley, LEAD ATTORNEY, O'Melveny & Myers LLP, San Francisco, CA; Meredith N. Landy, LEAD ATTORNEY, O'Melveny [*2] & Myers, Menlo Park, CA; Dhaivat H. Shah, O'Melveny & Myers LLP, Menlo Park, CA.

For Bradley M. Shuster, Defendant: George A. Riley, LEAD ATTORNEY, O'Melveny & Myers LLP, San Francisco, CA; Meredith N. Landy, LEAD ATTORNEY, O'Melveny & Myers, Menlo Park, CA.

For Kimberly D. Holt, Movant: Alan Roth Plutzik, Bramson Plutzik Mahler & Birkhaeuser, LLP, Walnut Creek, CA.

For Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees Represented by Local 85 of the Amalgamated Transit Union, 3rd party plaintiff: Samuel M. Ward, Barrack Rodos & Bacine, San Diego, CA.

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINION BY:** SUSAN ILLSTON

**OPINION**

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Defendants' motion to dismiss the first amended complaint is scheduled for a hearing on November

13, 2009. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument. For the reasons set forth below, the Court DENIES defendants' motion. The Court will hold a case management conference on **December 16, 2009** at **2:30 pm**.

## DISCUSSION[1]

> 1   The Court incorporates by reference the detailed background set forth in the July 1, [*3] 2009 order.

Plaintiffs filed this securities fraud class action on behalf of all persons who purchased or otherwise acquired the common stock of The PMI Group, Inc. ("PMI") between November 2, 2006 and March 3, 2008, against PMI and certain of its officers and directors.[2] Plaintiffs allege violations of the Securities Exchange Act of 1934. PMI, through its subsidiaries, "provides credit enhancement products designed to promote homeownership and facilitate mortgage transactions in the capital markets in the United States, Australia, New Zealand, and the European Union." First Amended Compl. ("FAC") P 1. Plaintiffs allege that although PMI had historically been a conservative insurer of full documentation home mortgages, as PMI became marginalized during the housing boom of the early 2000s, PMI began to insure high-risk loan products, and also purchased a controlling share in Financial Guaranty Insurance Company, Inc. ("FGIC"), a company that guaranteed subprime residential mortgage backed securities. The gravamen of the complaint is that "defendants abandoned PMI's core principles and tied the Company's growth plan [to] insuring high risk mortgage loans and exposing its investors to [*4] even higher risk structured finance transactions," and that even as defendants were aware of PMI's mounting losses as the housing market began to crash, defendants continued to assure the market that PMI was closely monitoring and evaluating risk.

> 2   The individual defendants are L. Stephen Smith, Bradley M. Shuster, David H. Katkov, and Donald P. Lofe, Jr.

In an order filed July 1, 2009, the Court granted in part and denied in part defendants' motion to dismiss the consolidated complaint. The Court held that the complaint sufficiently alleged that defendants made material false and misleading statements about PMI's prudent and careful risk management, as well as PMI's reporting of reserves for losses and PMI's losses in its investment in FGIC. The Court also held that the complaint adequately alleged loss causation up to January 18, 2008.[3] However, the Court held that the complaint did not allege a strong inference of scienter because plaintiffs did not allege particular facts showing that defendants were aware that the statements at issue were false or misleading when made. Specifically, the Court found that the complaint did not allege that any individual defendant was aware of the [*5] problems with PMI's loan portfolio, that PMI's delegated underwriters were not adhering to PMI's underwriting standards, and that FGIC was in trouble. The Court also held that because the consolidated complaint did not adequately allege a primary violation of federal securities laws, there was no basis for control person liability.

> 3   Although the consolidated complaint alleged a class period ending March 3, 2008, the consolidated complaint alleged that "As a direct result of defendants' admission and the public revelations regarding the truth about PMI's overstatement of its financial outlook and its actual business prospects going forward, PMI's stock plummeted over 87% . . . on January 18, 2008. This drop removed the inflation from PMI's stock price . . . ." Consol. Compl. P 198. The FAC also alleges a class period ending March 3, 2008, and contains a similar allegation about the "removal of inflation" from PMI's stock price on January 18, 2008. *See* FAC P 235.

On July 27, 2009, plaintiffs filed a first amended complaint. The FAC differs from the original complaint in a number of ways. The FAC clarifies that the scienter allegations are based in large part on defendants' own admissions [*6] about their intimate and day-to-day involvement in PMI's operations. *See* FAC PP 65-69. Plaintiffs have supplemented their allegations regarding previous confidential witnesses and added three new confidential witnesses. Plaintiffs have also included additional allegations about the four individual defendants' positions and responsibilities, including their responsibilities with respect to FGIC. The amended

complaint contains new details about PMI's "risk layering," which exposed PMI to increased risk of borrower default, and which allegedly was not disclosed to investors until after PMI filed its 2007 Form 10-K with the SEC after the class period. Finally, the FAC includes new allegations about a lawsuit between PMI and one of its delegated underwriters, Indymac, which allegedly show that PMI (and defendant Katkov) were aware of Indymac's failure to adhere to proper underwriting guidelines.

Defendants move to dismiss the first amended complaint on four grounds. First, defendants contend that plaintiffs still have not alleged scienter. Second, defendants contend that defendants' statements are forward-looking and protected by the PSLRA's safe harbor and the bespeaks caution doctrine. [*7] Third, defendants contend that, notwithstanding the Court's prior order, the amended complaint does not allege loss causation. Finally, defendants argue that the amended complaint fails to plead control person liability.

## I. Scienter

"[T]o adequately plead scienter, the complaint must [] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco Partners*, 552 F.3d at 991. The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Inc.,* 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007) (emphasis in original). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' - it must be cogent and compelling, thus strong in light of other explanations." *Id. at 2510* (internal quotation marks omitted). "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991. [*8] The Ninth Circuit has instructed that "following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient,

we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* at 992.

The Court finds that plaintiffs have cured the deficiencies identified in the previous complaint and that the FAC sufficiently alleges a strong inference of scienter. The FAC alleges that throughout the class period PMI generated internal reports to specifically evaluate the company's credit risk and potential losses from mortgage defaults, and that these reports showed that PMI's delegated underwriters were regularly performing below PMI's established standards and that PMI's portfolio was suffering mounting losses. The FAC alleges through new confidential witnesses that the individual defendants were aware of these problems. The FAC also contains new allegations about defendants' management and [*9] oversight of FGIC, including their obligations as members of the FGIC audit committee, and that through these positions the individual defendants had both access to and a duty to know about the losses at FGIC. The FAC also alleges that rather than disclosing the problems, "[i]n nearly every conference call from the start of the Class Period until PMI finally admitted the losses, defendants (all of whom were on the conference calls) repeatedly acknowledged that credit quality was critical to PMI's success and that they were directly involved with determining PMI risk management." FAC P 7 These allegations, taken collectively, establish a strong inference of scienter.

## II. Safe harbor/bespeaks caution doctrine

Defendants also contend that all forward-looking statements cited in the amended complaint were accompanied by meaningful cautionary language and are therefore inactionable as a matter of law under the PSLRA's safe harbor and the "bespeaks caution" doctrine. Forward-looking statements, which include "a statement of the plans and objectives of management," a statement "of future economic performance," and a statement "containing a projection of revenues," *15 U.S.C. § 78u-5(i)(1)*, enjoy [*10] special protection under the PSLRA. "A forward-looking statement qualifies for the PSLRA 'safe harbor' and is not actionable if either of the following two conditions is true: (A) the

statement is accompanied by 'meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement'; or (B) plaintiffs fail to establish that the statement was 'made with actual knowledge . . . that the statement was false or misleading.'" *In re iPass, Inc. Sec. Litig.*, 2006 WL 496046 *5 (N.D. Cal. Feb. 28, 2006). Similarly, the "bespeaks caution" doctrine provides a mechanism by which a court as a matter of law may determine that defendant's forward-looking representations contain enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud. *See Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996)*. This doctrine provides that statements must be analyzed "in context," must "be precise," and must "directly address the future defendant's projections." *Id. at 1493*.

Here, many of the statements alleged to be false or misleading are not forward-looking, but are unprotected [*11] statements of then-existing fact regarding the quality of PMI's book of business and PMI's underwriting and risk management practices. Those statements that are forward-looking and accompanied by cautionary language are also not immunized because plaintiffs have alleged facts suggesting that defendants had actual knowledge of the falsity of their statements.

### III. Loss causation

Defendants contend that the FAC does not plead loss causation, i.e., that the "truth" regarding any of the alleged misrepresentations was subsequently revealed to the market and caused PMI's stock price to decline. Defendants' arguments are identical to those raised in the previous motion to dismiss. The Court's July 1, 2009 order found that the complaint sufficiently alleged loss causation up to January 18, 2008, and noted that the Ninth Circuit has recently emphasized that a plaintiff must only allege "facts that, if taken as true, plausibly establish loss causation." *In re Gilead Scis. Litig.,*

*536 F.3d 1049, 1057 (9th Cir. 2008)*. As with the prior complaint, the FAC sufficiently alleges loss causation through January 18, 2008.

### IV. Control person liability

Defendants contend that the control person allegations [*12] are deficient because plaintiffs have failed to allege a primary violation of Section 10(b). For the reasons stated above, the Court finds that the FAC sufficiently alleges a violation of Section 10(b). In addition, the FAC contains detailed allegations about each of the individual defendants' high-ranking positions and responsibilities. *See* FAC PP 14-20. Plaintiffs have adequately alleged that the individual defendants "exercised actual power or control over the primary violator." *Howard v. Everex Sys., 228 F.3d 1057, 1065 (9th Cir. 2000)*. Moreover, "[w]hether the defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions," and thus that these determinations are inappropriate at the pleading stage." *Id*.

### CONCLUSION

For the reasons stated above, the Court DENIES defendants' motion to dismiss the first amended complaint. (Docket No. 51). The Court GRANTS defendants' request for judicial notice. (Docket No. 52). The Court will hold a case management conference on **December 16, 2009** at **2:30 pm**.

**IT IS SO ORDERED**.

Dated: November 2, 2009

/s/ [*13] Susan Illston

SUSAN ILLSTON

United States District Judge