UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| LOCAL 295/LOCAL 851 IBT EMPLOYER GROUP PENSION TRUST AND WELFARE FUNDS AND DISTRICT NO. 9, *et al.*, | No. 1:08-cv-00421-SSB-TSB |
| Plaintiffs, | <u>CLASS ACTION</u> |
| vs. | Chief Judge Sandra S. Beckwith<br>Magistrate Judge Timothy S. Black |
| FIFTH THIRD BANCORP, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN
FURTHER SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS; AND RESPONSE TO DEFENDANTS' NOTICES OF
<u>SUPPLEMENTAL AUTHORITY</u>**

Lead Plaintiffs Local 295/Local 851 IBT Employer Group Pension Trust and Welfare Funds and District No. 9, I.A. of M. & A.W. Pension Trust, and Edwin B. Shelton, and additional plaintiffs Jeffrey J. Wacksman, Leon H. Loewenstine, and Jacqueline Dinwoodie (collectively, "Plaintiffs") respectfully submit this notice of supplemental authority in further support of the Opposition[1] and response to the notices of supplemental authority filed by Defendants in support of their motion to dismiss[2] on December 22, 2010 [Dkt. No.102], January 6, 2010 [Dkt. No. 104], and February 17, 2010 [Dkt. No. 105] (the "Supplemental Authorities").

## I. Plaintiffs' Supplemental Authority Supports the Opposition

Plaintiffs submit the following recent decision that provides further support for Plaintiffs' Opposition:

### A. *In Re Ambac Financial Group, Inc., Sec. Litig.*

*In Re Ambac Financial Group, Inc., Sec. Litig.*, No. 08-411, 2010 U.S. Dist. LEXIS 16701, (S.D.N.Y. Feb. 22, 2010) (attached as **Exhibit A**), further supports Plaintiffs' arguments set forth in Sections III.B and III.C of the Opposition.

The court denied defendants' motion to dismiss securities fraud claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and denied in part the motion to dismiss plaintiffs' claims under the Securities Act of 1933. In *Ambac*, the plaintiffs alleged that defendants engaged in a fraudulent scheme of guaranteeing risky financial products to increase net income and

---

[1] Lead Plaintiffs' Omnibus Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint is referred to herein as the "Opposition" or "Opp. Br." [Dkt. No. 88].

[2] Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint with Memorandum in Support and the Underwriter Defendants' Supplemental Memorandum Supporting Motion to Dismiss [Dkt. Nos.78-82] were filed on July 15, 2009. They are collectively referred to herein as the "Motion to Dismiss."

1

to regain riskier, more lucrative deals that Ambac had previously lost to its competitors. *Id.* at *15. Plaintiffs alleged that defendants made three categories of false and misleading statements concerning: (1) the "cautious" and "conservative" nature of Ambac's underwriting standards (*id.* at *24); (2) Ambac's "active" monitoring of its Residential Mortgage Backed Securities ("RMBS") and Collateralized Debt Obligations ("CDOs") and the strong performance of these portfolios (*id.*); and (3) Ambac's financial statements, which failed to disclose in a timely manner, any material impairment to the RBS-related instruments that Ambac insured (*id.*). Plaintiffs alleged that these false and misleading statements concealed Ambac's financial distress relating to its true RMBS-related exposures. *Id.* at *34. The court made the following determinations:

### False Statements:

- The court noted that plaintiffs identified several changes in Ambac's underwriting practices that loosened the requirements for guaranteeing RMBS. *Id.* at *72-*73. As a result, defendants' touting of the company's "conservative" and "very cautious" underwriting standards that remained "the same … over the years," were actionable misstatements/material omissions under 10b-5. *Id.* Moreover, the court rejected defendants' argument that the alleged misstatements were mere "puffery" or "corporate optimism" that is not actionable. *Id.* at *77-*78.

- The court held that although Ambac had taken many significant write-downs of impaired assets throughout the class period, plaintiffs' allegations that significantly greater write-downs were required, adequately stated GAAP violations. *Id.* at *78-*82. Moreover, although there was no restatement of Ambac's financials, the Court did not find that this negated the falsity of its financial statements. *Id.*

### Scienter:

- The court found that plaintiffs sufficiently alleged a strong inference of defendants' recklessness by alleging that the defendants knew about Ambac's lowered underwriting standards, and approved them, while publicly touting company's "cautious" and "conservative" approach to underwriting. *Id.* at *60. Indeed, the Court held that defendants could have been made aware of the falsity of their statements by: (1) a number of reports taken collectively (plaintiffs were not required to plead contradictory facts summarized in a single report) (*Id.* at *62-*67); (2) the fact that three of the individual defendants served on "Credit Risk Committee," which allegedly approved the lowered underwriting standards for HELOC deals (*Id.* at *65); and (3) the officer defendants' own statements, which detailed the regular reports by which they would have learned of the allegedly drastic deterioration of the

2

      CDO portfolio ("[We have] very current . . . pool information up through the end of March….")(*id*. at *66-*67).

- In addition, the court determined that this was not a "fraud-by-hindsight" case and ***rejected*** the global economic downturn as a more compelling inference than fraud. *Id.* at *69-*70. The court stated that there was "a vast gap between the picture that Ambac presented to investors – of an insurance company that maintained its conservative approach over the years – and the alleged practices within the company, namely the undisclosed lowering of underwriting standards to drive short-term profits." *Id*. at *70.

## II.    Defendants' Supplemental Authorities Do Not Support Dismissal

The Supplemental Authorities submitted by Defendants do not support dismissal of Plaintiffs' Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint").[3] These Authorities do not present novel legal analysis, but, rather, are factually specific holdings that offer nothing to the analysis of Defendants' motion to dismiss the Complaint.

### A.    *Blackmoss Investments, Inc. v. ACA Capital Holdings, Inc.*-

*Blackmoss Investments, Inc. v. ACA Capital Holdings, Inc.*, No. 07-10528, 2010 U.S. Dist. LEXIS 2899 (S.D.N.Y. Jan. 14, 2010) is easily distinguished from the instant case. In *Blackmoss*, the plaintiff alleged that ACA's prospectus did not disclose that the company's collateralized debt obligations contained residential mortgage-backed securities. *Id.* at *20. In reality, this information was specifically disclosed in the prospectus, and thus the court found that the disclosure of this information was not withheld from investors. *Id.* at *21-*22. In stark contrast to *Blackmoss*, the First Charter Acquisition Registration Statement/Proxy Statement, the Preferred B Offering Prospectus, and the Preferred C Offering Prospectus at issue here completely failed to disclose that: (1) the Company's deficient lending practices and underwriting standards resulted in the origination

---

[3]    "¶__" refers to paragraph references in the Complaint.

of loans that were layered with multiple risk factors, which rendered them *de facto* subprime; (2) Defendants failed to adequately reserve for the loan losses associated with these increased risks in the Company's loan portfolio; and (3) the Company was undercapitalized and vulnerable to future losses. ¶¶106, 117, 146, 162, 168, 195, 201.

Moreover, while the *Blackmoss* court dismissed plaintiff's complaint on a negative causation defense, the loss causation allegations in the *Blackmoss* complaint suffered from a defect not at issue in the Complaint. Indeed, in *Blackmoss*, the stock traded above its Initial Public Offering price while the company disclosed information concerning the assets underlying its collateralized debt obligations. *Id.* at *29-*30. Accordingly, the court held that in light of the defendants' disclosures, plaintiff could not establish that subsequent declines in the stock's price were causally related to the defendants' misrepresentations. *Id.* Here, unlike *Blackmoss,* Plaintiffs have adequately alleged loss causation. Indeed, Plaintiffs have alleged that on June 18, 2008, when the Company revealed the truth concerning the Company's need for capital and its plan to raise it through a $1 billion convertible stock offering and fire sale of non-core businesses, as well as the slashing of its quarterly dividend, this news proximately caused the price of Fifth Third common stock to decline 27%, the price of its Preferred B shares to drop 7.58% ($8.36 below the Preferred B Share's offering price), and the price of Preferred C shares to drop 6.53% ($3.80 below the Preferred C Share's offering price) on the very same day. ¶¶111-112, 163, 196. Thus, the stock price declines on June 18, 2008 were directly related to the revelation of the truth on that day, which was not previously disclosed to the market. Here, Defendants have not ***proved*** that a portion of Plaintiff's damages was not caused by false and misleading statements in the registration statements and prospectuses. *See* Opp. Br. at 124-127. Accordingly, Defendants have not properly raised the affirmative defense of negative loss causation. *Id.* Thus, *Blackmoss* has no application to the instant action.

4

**B.** *In re Huntington Bancshares Inc. Sec. Litig.*-

Defendants also overstate the holding of *In re Huntington Bancshares Inc. Sec. Litig.*, No. 07-1267, 2009 U.S. Dist. LEXIS 114081 (S.D. Ohio Dec. 4, 2009) and its application to the instant action. As an initial matter, *Huntington* is currently on appeal so there has not been a final determination in that action. Moreover, in *Huntington*, the court relied on well-settled precedent such as: *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, ___, 127 S. Ct. 2499 (2007), *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001), and *Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008), in rendering its decision. *Id.* at *44-*49. Thus, the *Huntington* opinion was based on the specific facts of that case and not a new proclamation of law.

Here, Plaintiffs have adequately demonstrated the falsity of Defendants' statements concerning Fifth Third's underwriting and documentation standards and the credit quality of Fifth Third loans during the Class Period. Plaintiffs have alleged that although Defendants had abandoned conservative lending and underwriting standards by issuing loans that were layered with multiple risk factors that dramatically increased the likelihood of default and made them akin to subprime loans, they continuously told the market that Fifth Third did not hold subprime loans in its portfolio and was a "prime mortgage originator" with "conservative" lending/underwriting practices. ¶227. Indeed, throughout the Class Period, Defendants repeatedly made false and misleading statements that Fifth Third "maintains a conservative approach to both lending and investing activities" as it "***does not originate or hold subprime loans***" and touting the Company's "***conservative lending practices***," "***conservative underwriting and documentation standards***," and "***conservative approach to lending and investing***." *Id.*

Defendants' adamant proclamations kept the investing public in the dark about Fifth Third's high-risk lending practices and underwriting standards for its residential and commercial loans. In such a way, Defendants' statements during the Class Period effectively distinguished Fifth-Third

5

from the self-proclaimed subprime lending institutions, which were subject to such risks. Defendants' false assurances were material to investors who wanted to invest in a conservative financial institution whose lending practices would not subject it to the high risk of defaults and losses to which acknowledged subprime lenders were subject. ¶¶223-239. Defendants also misled the market about the true credit quality of its loan portfolio, the inadequacy of its loan loss reserves in light of the inherent risks in the Company's loan portfolio, and the deterioration of Fifth Third's tier 1 capital. Without an accurate picture of the current credit quality of Fifth Third's loan portfolio (one of the most important factors to a bank investor), investors were unable to assess the true risks of investing in Fifth Third's publicly traded securities. *See* Opp. Br. at 10-11, 27-64.

Moreover, Plaintiffs have adequately alleged Defendants' scienter. The Complaint details how the Individual Defendants were keenly aware of the Company's high-risk lending and underwriting practices. The Complaint alleges that the Individual Defendants' actual knowledge of Fifth Third's *de facto* subprime lending and its abandonment of its stated conservative underwriting and documentation standards are supported by the following indicia of scienter: (i) Defendants' replacement of the senior management of Fifth Third's Florida operations with individuals focused on selling as many loans as possible even though the loans were "fraught with problems" (¶¶297-299); (ii) the unreasonably demanding system of sales and underwriting quotas set by senior management in Cincinnati that encouraged risky lending practices; (iii) the mid-2007 formation of the Company's six-member Corporate Credit Committee, originated by Defendant Kabat and Co-Chaired by Defendant Marshall, that was designed "to make sure that the senior[ ]most people in the company are focused on credit" (¶465(c)); (iv) the Company's "ACAPS" system, which provided the Individual Defendants with access to up-to-date, highly detailed information on all mortgages, including missing documentation which was red-flagged by the system, as well as numerous sales

6

quotas, which encouraged the making of subprime loans (¶465(g)-(k)); (v) the review of every loan in Michigan during the third quarter of 2007 (¶¶244-245); (vi) the comprehensive Risk Management Reports detailing monthly data from all mortgage related-departments that were distributed to Fifth Third senior management, including Defendant Kabat (¶465(e)-(f)); and (vii) Defendants' admission on June 18, 2008, that during the Class Period they had conducted an extensive review of the Company's loan portfolio, including a top-down and bottom-up analysis of Fifth Third's real estate and real estate-related portfolios. *See* Opp. Br. at 9-10, 64-93; *see also* ¶¶242-256, 465-472.

Accordingly, the facts at issue here satisfy the requisite pleading standards and *Huntington* fails to support dismissal of this action.

   **C.**  **_Konkold v. Diebold, Inc._, 590 F.3d 390 (6th Cir. 2009)-**

Although *Konkold v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009) is binding on the Court, this decision did not contain any novel holdings. Indeed, Defendants do not point to any new pronouncements of law issued by the Sixth Circuit in *Diebold*. Rather, as Defendants acknowledge, the *Diebold* opinion was based on the specific allegations at issue in that case, which are far different than those at issue here. Indeed, Diebold is a corporation that manufactures, distributes and services electronic voting machines and Automated Teller Machines (ATMs). *Id.* at 394. Moreover, the fraudulent scheme alleged in *Diebold* involved the improper recognition of revenue to artificially inflate the company's stock price. *Id.* at 394-395. The *Diebold* Court held that "the alleged revenue recognition scheme is not the type of conduct from which scienter can be strongly inferred by the magnitude of the errors alone. The alleged scheme involved different product lines, and the revenue came from three very different sources . . . . Even if the amount of revenue prematurely recognized was significant, it would have been spread out among those different sources and therefore would not likely have served to put the Defendants on notice of the misstated revenue." *Id.* at 400.

Thus, *Diebold* has little applicability to this action, which involves allegations against a bank for making false and misleading statements concerning the core of its business - - its underwriting and lending practices, as well as the quality of its loan portfolio, the sufficiency of its reserves, and the adequacy of its tier 1 capital. Moreover, as detailed above, unlike the allegations at issue in *Diebold*, Plaintiffs' scienter allegations raise a strong inference of Defendants' scienter. *See also* Opp. Br. at 64-93.

In sum, while Plaintiffs' supplemental authority offers further support for the Opposition, the Supplemental Authorities proffered by Defendants offer nothing new to the analysis and do not support dismissal of the Complaint. As detailed in the Opposition, Plaintiffs' Complaint should be sustained.

DATED:  April 1, 2010

                                        **LAW OFFICES OF**
                                        **PHYLLIS BROWN, L.L.C.**

                                        /s/ PHYLLIS E. BROWN
                                        PHYLLIS E. BROWN

119 East Court Street
Cincinnati, OH  45202
(513) 241-0061 Phone
(513) 621-7086 Fax

*Liaison Counsel for Lead Plaintiffs*

**ROBBINS GELLER RUDMAN &**
   **DOWD LLP**
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432-4809
(561) 750-3000 Phone
(561) 750-3364 Fax
E-mail:  jreise@rgrdlaw.com
E-mail:  sastley@rgrdlaw.com
E-mail:  eshonson@rgrdlaw.com

**BERGER & MONTAGUE, P.C.**
SHERRIE R. SAVETT
BARBARA A. PODELL
ERIC LECHTZIN
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000 Phone
(215) 875-4604 Fax
E-mail:  ssavett@bm.net
E-mail:  bpodell@bm.net
E-mail:  elechtzin@bm.net

*Co-Lead Counsel for Lead Plaintiffs*


**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ, LLP**
DANIEL W. KRASNER
ROBERT B. WEINTRAUB
270 Madison Avenue
New York, NY  10016
(212) 545-4600 Phone
(212) 545-4653 Fax
E-mail:  krasner@whafh.com
E-mail:  weintraub@whafh.com

**COHEN TODD KITE**
   **& STANFORD, LLC**
MICHAEL R. SCHMIDT
DONALD J. RAFFERTY
250 East Fifth Street, Suite 1200
Cincinnati, OH 45202

(513) 421-4020 Phone
(513) 241-4495 Fax
E-mail:  mschmidt@ctks.com
E-mail:  drafferty@ctks.com

***Co-counsel for Plaintiff Leon H. Lowenstine
as Proposed Class Representative for the
Preferred C Class***

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on April 1, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ PHYLLIS E. BROWN  
PHYLLIS E. BROWN
