**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **LOCAL 295/LOCAL 851 IBT EMPLOYER** | ) | |
| **GROUP PENSION TRUST AND WELFARE** | ) | |
| **FUNDS,** *et al.*, | ) | **Case No. 1:08-cv-421** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **(Judge Sandra S. Beckwith)** |
| | ) | **(Magistrate Judge Sharon L. Ovington)** |
| **-v-** | ) | |
| | ) | |
| **FIFTH THIRD BANCORP,** *et al.*, | ) | |
| | ) | |
| **Defendants**. | ) | |

**DEFENDANTS' BRIEF IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

I.     INTRODUCTION ...............................................................................................1

II.    SUMMARY OF PRINCIPAL ARGUMENTS AND PRIMARY AUTHORITIES RELIED UPON ...........................................................................................2

    A.  Legal Standards for Class Certification.........................................................2

    B.  Plaintiffs Fail to Present Any Factual Record for the Court to Conduct the Required "Rigorous Analysis" Required by Rule 23......................................2

    C.  Plaintiffs' Proposed Class Is Overly Broad and Must Be Narrowed ............................2

        1.  The Preferred C Shareholders Have No Named Representative and Cannot Be Included in Any Class or Subclass........................................2

        2.  The Class Definition is Overly Broad and Subclasses Are Necessary ...................3

        3.  Any Class Must Be Limited to Only Those Shareholders Who Sold at a Loss Before Their Shares Returned to Pre-Disclosure Values.........................................3

        4.  The Preferred B Shareholders Have No Named Representative Who Can Prove a Loss, and Thus Cannot Be Included in Any Class or Subclass ..............................3

    D.  Plaintiffs Fail to Satisfy the Prerequisites for Class Certification Set Forth by Rule 23(a)..............................................................................................4

        1.  Plaintiffs' Conclusory Allegations Are Not Sufficient to Satisfy the Numerosity Requirement..............................................................................4

        2.  Plaintiffs' Purportedly Common Issues Are Not in Fact Common to the Proposed Class..............................................................................4

        3.  The Named Plaintiffs' Claims Are Not Typical of the Proposed Class .................4

        4.  The Named Plaintiffs Cannot Fairly and Adequately Represent the Interests of the Proposed Class ..........................................................................5

    E.  Plaintiffs Cannot Satisfy Rule 23(b)(3), and Therefore Class Certification Must Be Denied ................................................................................5

i

III.    RELEVANT BACKGROUND ..........................................................................6

    A.    The June 18, 2008 Announcement ..................................................6

    B.    The Litigation ...................................................................................8

    C.    The Remaining Claims ....................................................................9

    D.    Discovery Conducted to Date...........................................................9

    E.    Plaintiffs' Motion for Class Certification ......................................10

    F.    The Proposed Class Representatives ..............................................11

        1.    The Eshe Fund ....................................................................11

        2.    Jeffrey Wacksman ..............................................................12

        3.    Edwin Shelton .....................................................................15

IV.    ARGUMENT ......................................................................................18

    A.    Legal Standards for Class Certification .........................................18

    B.    Plaintiffs Fail to Present Any Factual Record for the Court to Conduct the Required "Rigorous Analysis" Required by Rule 23.................................................................20

    C.    Plaintiffs' Proposed Class Is Overly Broad and Must Be Narrowed ...........................22

        1.    The Preferred C Shareholders Have No Named Representative and Cannot Be Included in Any Class or Subclass.........................................23

        2.    The Class Definition is Overly Broad and Subclasses Are Necessary .................24

        3.    Any Class Must Be Limited to Only Those Shareholders Who Sold at a Loss Before Their Shares Returned to Pre-Disclosure Values......................................27

        4.    The Preferred B Shareholders Have No Named Representative Who Can Prove a Loss, and Thus Cannot Be Included in Any Class or Subclass .............................30

    D.    Plaintiffs Fail to Satisfy the Prerequisites for Class Certification Set Forth by Rule 23(a)..............................................................................30

        1.    Plaintiffs' Conclusory Allegations Are Not Sufficient to Satisfy the Numerosity Requirement.........................................................31

2.   Plaintiffs' Purportedly Common Issues Are Not in Fact Common to the Proposed Class ................................................................................................................. 31

3.   The Named Plaintiffs' Claims Are Not Typical of the Proposed Class ............... 35

4.   The Named Plaintiffs Cannot Fairly and Adequately Represent the Interests of the Proposed Class ............................................................................................... 36

E.   Plaintiffs Cannot Satisfy Rule 23(b)(3), and Therefore Class Certification Must Be Denied ................................................................................................................... 41

1.   Individual Issues Predominate Over Common Questions ................................... 41

2.   Plaintiffs Have Not Established Superiority .......................................................... 48

V.   CONCLUSION ............................................................................................................... 49

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Alliance Pharmaceutical Corp. Securities Litigation*, 279 F. Supp. 2d 171 (S.D.N.Y. 2003) ............................................................................33

*In re American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir. 1996) ................................... *passim*

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) .......................................36, 41

*Amorosa v. AOL Time Warner, Inc.*, 409 F. App'x 412 (2d Cir. 2011) ........................................27

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) .....................................................................4, 31

*In re Bank of Boston Corp. Securities Litigation*, 762 F. Supp. 1525 (D. Mass. 1991) ...............33

*Beattie v. CenturyTel, Inc.*, 511 F.3d 554 (6th Cir. 2007) .............................................................19

*Beaven v. U.S. Department of Justice*, 622 F.3d 540 (6th Cir. 2010)............................................36

*Beaver County Retirement Board v. LCA-Vision Inc.*, No. 1:07-CV-750, 2009 U.S. Dist. LEXIS 31375 (S.D. Ohio Mar. 25, 2009)...........................................................7

*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001)................................................37

*Blackmoss Investments Inc. v. Aca Capital Holdings, Inc.*, No. 07-10528, 2010 U.S. Dist. LEXIS 2899 (S.D.N.Y. Jan. 12, 2010) ...........................................................27

*Butler v. Sterling, Inc.*, No. 98-3223, 2000 U.S. App. LEXIS 6419 (6th Cir. Mar. 31, 2000) ............................................................................................................3, 24

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011).......................19

*Castano v. America Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) ....................................................21

*In re China North East Petroleum Holdings Ltd. Securities Litigation*, No. 10 Civ. 4577, 2011 U.S. Dist. LEXIS 117711 (S.D.N.Y. Oct. 6, 2011).....................3, 28, 29

*In re Constar International Inc. Securities Litigation*, 585 F.3d 774 (3d Cir. 2009) ...................21

*In re Copper Antitrust Litig.*, 196 F.R.D. 348 (W.D. Wis. 2000)..................................................22

*Courtney v. Smith*, 297 F.3d 455 (6th Cir. 2002)...................................................................2, 23

*Davis v. Hutchins*, 321 F.3d 641 (7th Cir. 2003)...............................................................19, 22

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ...........................................3, 27, 29

*In re Estee Lauder Comp. Secs. Litig.*, No. 06 Civ. 2505, 2007 U.S. Dist. LEXIS 38491
    (S.D.N.Y. May 21, 2007)........................................................................28, 29

*General Telephone Co. v. Falcon*, 457 U.S. 147 (1982) ...........................................................2, 18

*Godec v. Bayer Corp.*, No. 1:10-cv-224, 2011 U.S. Dist. LEXIS 131198 (N.D. Ohio
    Nov. 11, 2011) .................................................................................23

*Gooch v. Life Investors Insurance Co. of America*, Nos. 10-5003, 10-5723, 2012 WL
    410926 (6th Cir. Feb. 10, 2012)....................................................................36

*Groussman v. Motorola, Inc.*, No. 10 C 911, 2011 WL 5554030 (N.D. Ill. Nov. 15, 2011) .......32

*Huntsman v. Akron Tower Housing Partnership*, No. 1:05cv1739, 2007 U.S. Dist.
    LEXIS 36248, (N.D. Ohio May 17, 2007) ....................................................24

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2009)......................................21

*In re Immucor, Inc. Securities Litigation*, No. 1:09-CV-2151, 2011 U.S. Dist. LEXIS
    73279 (N.D. Ga. June 30, 2011) .................................................................28

*Inmates of Northumberland County Prison v. Reish*, No. 08-CV-345, 2008 WL 2412977
    (M.D. Pa. 2008) .............................................................................22

*In re IPO Securities Litigation*, 471 F.3d 24 (2d Cir. 2006)................................................ *passim*

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011)..................................................42

*Malin v. XL Cap. Ltd.*, No. 3:03cv2001, 2005 U.S. Dist. LEXIS 27089 (D. Conn. Sept. 1,
    2005) ......................................................................................28, 29

*Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) .................................................................26

*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2d Cir. 1995)............................5, 37

*McLaughlin v. America Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ...........................................46

*In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6 (1st Cir.
    2008) .......................................................................................21

*In re PHLCORP Secs. Tender Offer Litig.*, No. 88 Civ. 0306(PNL), 1989 U.S. Dist.
    LEXIS 13681, (S.D.N.Y. Nov. 16, 1989)......................................................26

*Pipefitters Local 636 Insurance Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618 (6th Cir. 2011).......................................................................................2, 19

*Public Employees' Retirement Systems of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................................................34

*In re RAIT Financial Trust Securities Litigation*, Case No. 2:07-cv-03148, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) .......................................................4, 25, 33

*Randleman v. Fidelity National Title Insurance Co.*, 646 F.3d 347 (6th Cir. 2011) ................3, 26

*Reeb v. Ohio Department of Rehabilitation and Correction*, 435 F.3d 639 (6th Cir. 2006) .....2, 20

*Retired Chicago Police Association v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993) .............18, 31

*Roe v. Town of Highland*, 909 F.2d 1097 (7th Cir. 1990) ............................................................31

*Romberio v. Unumprovident Corp.*, 385 F. App'x 423 (6th Cir. 2009) ....................................4, 35

*Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435 (S.D. Ohio 2009)............................................37

*Ross v. Walton*, 668 F. Supp. 2d 32 (D.D.C. 2009) ................................................................28, 29

*Senter v. General Motors Corp.*, 532 F.2d 511 (6th Cir. 1976)................................................5, 37

*Smith v. Transworld Systems, Inc.*, 953 F.2d 1025 (6th Cir. 1992) ........................................2, 20

*Szabo v Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001)................................................21

*Thompson v. Board of Education*, 709 F.2d 1200 (6th Cir. 1983) ...........................................2, 24

*United States Parole Commission v. Geraghty*, 445 U.S. 388 (1980)...........................................26

*In re Veeco Instruments, Inc., Secs. Litig.*, No. 05-MC-01695, 2007 U.S. Dist. LEXIS 102363 (S.D.N.Y. June 28, 2007)..................................................................28

*Wal-Mart Stores, Inc. v. Dukes*, —U.S. —, 131 S.Ct. 2541 (2011) ..................................... *passim*

*In re Washington Mutual Mortgage-Backed Securities Litigation*, 276 F.R.D. 658 (W.D. Wash. Oct. 21, 2011) ...............................................................................34

*Zimmerman v. Bell*, 800 F.2d 386 (4th Cir. 1986) ......................................................................46

## FEDERAL STATUTES

15 U.S.C. § 77k (2012) …………...............................................................................4, 25, 33

## FEDERAL REGULATIONS

17 C.F.R. § 240.14a-9 (2012) …………...............................................................4, 25, 33

<u>**MEMORANDUM IN SUPPORT**</u>

**I.    <u>INTRODUCTION</u>**

In this action, Plaintiffs have brought claims under the federal securities laws because certain securities issued by Fifth Third Bancorp ("Fifth Third") suffered temporary declines during the unprecedented economic crisis of 2008–2009.  Fifth Third survived that crisis and is now thriving.  All of the securities at issue rebounded to trade at even higher levels.  Thus, this is an anomalous lawsuit.

The Court recognized the deficiencies in this litigation when it substantially granted Defendants' Motion to Dismiss and severely limited the claims at issue in this case.  The remaining deficiencies are now further exemplified in Plaintiffs' Motion for Class Certification.  This is a situation where Plaintiffs have failed to satisfy virtually all of the prerequisites to class certification.  They have failed to provide this Court with a factual record sufficient for any class to be certified.  Two of the original five purported class representatives have withdrawn and there is no named Plaintiff representing The Preferred C subclass.  Neither of the proposed Preferred B subclass representatives suffered a compensable loss because they still held their shares after the shares had recovered their entire loss in value.  In contrast to Plaintiffs' allegations in the Amended Consolidated Class Action Complaint ("Complaint" or "CAC"), the proposed First Charter class representative knew precisely how the merger consideration was to be calculated.  Each of the class representatives is subject to unique defenses and none is an adequate class representative.  There are few common issues in this case and they clearly do not "predominate."  Certification of a class can never be granted lightly, and under the undisputed facts of this case and the complete failure to satisfy the rigorous requirements of Rule 23, it cannot be granted here.

## II. SUMMARY OF PRINCIPAL ARGUMENTS AND PRIMARY AUTHORITIES RELIED UPON

### A. Legal Standards for Class Certification (p. 18.)

Plaintiffs bear the burden of proving that the proposed class meets the requirements of Rule 23. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982). Both the Supreme Court and the Sixth Circuit require a district court to conduct a 'rigorous analysis' of the Rule 23 requirements before certifying a class. *Wal–Mart Stores, Inc. v. Dukes*, — U.S. —, 131 S.Ct. 2541, 2551 (2011); *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 629 (6th Cir. 2011).

### B. Plaintiffs Fail to Present Any Factual Record for the Court to Conduct the Required "Rigorous Analysis" Required by Rule 23 (p. 20.)

Plaintiffs have filed a perfunctory Motion for Class Certification with almost no evidentiary support. Instead, Plaintiffs merely rehashed the elements of Rule 23 and rely solely upon unsubstantiated allegations in their CAC, which compels denial of their Motion. *Reeb v. Ohio Dept. of Rehab. and Correction*, 435 F.3d 639, 640–43 (6th Cir. 2006); *Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1033 (6th Cir. 1992).

### C. Plaintiffs' Proposed Class Is Overly Broad and Must Be Narrowed (p. 22.)

#### 1. *The Preferred C Shareholders Have No Named Representative and Cannot Be Included in Any Class or Subclass* (p. 23.)

None of the named Plaintiffs has standing to bring claims on behalf of Preferred C shareholders. It is settled law that no class claim can be certified where there is no named representative with standing to assert it. *Courtney v. Smith*, 297 F.3d 455, 467 (6th Cir. 2002). The result is the same if this Court were to divide the class into appropriate subclasses. *Thompson v. Bd. of Educ.*, 709 F.2d 1200, 1205–06 (6th Cir. 1983).

      2.       *The Class Definition is Overly Broad and Subclasses Are Necessary* (p. 24.)

Because the allegations regarding each of the three securities at issue are based upon different disclosures, raise different questions, and require distinct proof, the Court must deny certification of the class or, alternatively, use its discretion under Rule 23 to divide the class into appropriate subclasses before certification. *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 355 (6th Cir. 2011); *Butler v. Sterling, Inc.*, No. 98-3223, 2000 U.S. App. LEXIS 6419, at *22 (6th Cir. Mar. 31, 2000).

      3.       *Any Class Must Be Limited to Only Those Shareholders Who Sold at a Loss Before Their Shares Returned to Pre-Disclosure Values* (p. 27.)

Plaintiffs' class definition includes many members in all three subclasses who will be unable to show loss causation as a matter of law because they did not sell their shares before their prices returned to pre-disclosure values. Failure to sell before the share price recovers is an absolute bar to proving loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005); *In re China N.E. Petroleum Holdings Ltd. Secs. Litig.*, No. 10 Civ. 4577, 2011 U.S. Dist. LEXIS 117711, at *3–4 (S.D.N.Y. Oct. 6, 2011). Only those shareholders who sold their securities before the price recovered can be a part of any certified class.

      4.       *The Preferred B Shareholders Have No Named Representative Who Can Prove a Loss, and Thus Cannot Be Included in Any Class or Subclass* (p. 30.)

Because the two named Plaintiffs who bought Preferred B shares both held their stocks until after the share value had recovered to its pre-disclosure price on August 8, 2008, and therefore are barred from recovery, Plaintiffs are left with no named Plaintiff having standing to assert claims on behalf of Preferred B shareholders.

**D.** **Plaintiffs Fail to Satisfy the Prerequisites for Class Certification Set Forth by Rule 23(a)** (p. 30.)

1. *Plaintiffs' Conclusory Allegations Are Not Sufficient to Satisfy the Numerosity Requirement* (p. 31.)

Plaintiffs have put forth no evidence on numerosity, relying only on speculation and conclusory allegations and, therefore, have failed to satisfy this requirement of Rule 23(a). *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008).

2. *Plaintiffs' Purportedly Common Issues Are Not in Fact Common to the Proposed Class* (p. 31.)

To satisfy the commonality requirement, the purportedly common issue "must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. "This does not mean merely that [Plaintiffs] have all suffered a violation of the same provision of law." *Id.* Because these offerings all occurred at different times, and the falsity of statements made in the offerings must be separately judged from the point in time at which each respective offering was made, lumping all purchasers together as one class is untenable. 15 U.S.C. § 77k(a) (2012); 17 C.F.R. § 240.14a-9 (2012); *In re RAIT Fin. Trust Secs. Litig.*, Case No. 2:07-cv-03148, 2008 WL 5378164, at *5 (E.D. Pa. Dec. 22, 2008). There can be no *common* answer as to the falsity of statements that must be judged from different points in time. *Dukes*, 131 S.Ct. at 2551.

3. *The Named Plaintiffs' Claims Are Not Typical of the Proposed Class* (p. 35.)

"Where a class definition encompasses many individuals who have no claim at all to the relief requested, or where there are defenses unique to the individual claims of the class members the typicality premise is lacking." *Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 431

4

(6th Cir. 2009). Here, the named Plaintiffs are subject to a number of unique defenses, described herein, and therefore their claims are not typical of the class they purport to represent.

4. *The Named Plaintiffs Cannot Fairly and Adequately Represent the Interests of the Proposed Class* (p. 36.)

The Sixth Circuit has articulated two criteria for analyzing whether the named plaintiff meets that standard: (1) "[t]he representative must have common interests with the unnamed members of the class," and (2) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976). "[C]lass certification may properly be denied where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995). Beyond the fact that the named Plaintiffs are inadequate because they lack standing and are subject to unique defenses, each named Plaintiff demonstrated in his deposition that he is an inappropriate representative for the purported class, as detailed herein.

E. **Plaintiffs Cannot Satisfy Rule 23(b)(3), and Therefore Class Certification Must Be Denied** (p. 41.)

Courts routinely acknowledge that the predominance requirement is not met in cases when individual questions of knowledge must be answered before damages may be awarded. *In re IPO Secs. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006). Defendants disclosed much, if not all, of the information the CAC alleged was omitted from the offering materials. Defendants' disclosures of the alleged omissions mean that — at a minimum — each class member could have had knowledge of the "omissions" upon which the remaining claims are built, and that each member of the putative class would therefore have to be separately examined with respect to his or her respective knowledge. Plaintiff Shelton's testimony in particular demonstrates that the issue of

5

each Plaintiff's knowledge about Fifth Third's alleged omissions will predominate over the common issues, if any exist.

## III.    RELEVANT BACKGROUND

### A.    The June 18, 2008 Announcement

On June 18, 2008, Fifth Third announced that it was taking action in response to new forecasts predicting deterioration in credit trends during the latter months of 2008.  Like most financial institutions, Fifth Third was hard hit by the greatest financial catastrophe since the Great Depression, the extent of which surprised investors, business institutions, and governments.  Fifth Third proactively took measures to ensure that it would maintain its historically strong capital position and ensure its continued viability.  First, it announced plans to make a large issuance of convertible preferred shares.  Second, it would reduce its dividend to $0.15 per share, creating flexibility for the company while still paying a dividend to shareholders.  Third, it would sell certain, unidentified non-core businesses in order to supplement its capital.  The announcement noted that even in light of the anticipated future deterioration in credit trends, Fifth Third still expected its Tier 1 capital ratio for the second quarter to be 8.5%.  This was well within Fifth Third's target range, and significantly above the 6.0% ratio required by federal regulators to qualify as "well capitalized."

Although the prices for the Fifth Third securities at issue fell on June 18, it is undisputed that they rose thereafter and quickly reached the same level at which they opened on June 18, 2008.  Shares of Fifth Third common stock fell from an opening of $12.73/share on the morning of the 18th to $9.26/share at day's end.  Preferred B shares declined from $18.00/share to close at $16.64/share, and Preferred C shares declined from $22.68/share to close at $21.30/share. [1]

---

[1]        This Brief is supported by exhibits filed as attachments to the Affidavit of James E. Burke ("Burke Aff."), filed separately.  Exhibit 3 to that Affidavit reflects the closing share prices for each of the securities leading up to

The rebound of the prices of these securities began immediately thereafter.  Shares of Fifth Third common stock closed at a share price of $9.75 on June 19, 2008 — up 5.3 percent from the prior day's closing price.  Less than one month later, on July 17, 2008, and after a $0.15-per-share dividend was paid on June 26, 2008, shares of Fifth Third common stock closed at a share price of $13.76.  The price rebound that carried Fifth Third stock above its pre June 18-close ($12.73) continued.  The stock closed above $12.73 every single day for the next seventy-three days, despite overall market deterioration.  The share price also closed above $12.73 at various times in October 2008, and another $0.15-per-share dividend was paid on September 26, 2008.

Shares of Fifth Third Preferred B stock rebounded to close at $17.06 on June 20, 2008, and at $18.27 on August 8, 2008, above the pre-June 18 price less than two months later.  Shares of Fifth Third Preferred C shares closed at $21.45 on June 20, 2008, and traded above $22 a share on July 3 and July 7, 2008 — less than three weeks later.  The Preferred C shares traded as high as $24.20 on June 26, 2008 — just over a week after the June 18 announcement.  Even more significantly, on June 15, 2011, Fifth Third redeemed all of the outstanding Preferred C shares at the original offering price of $25 per share plus accrued interest.  This may explain why Plaintiffs have no representative Plaintiff who owned Preferred C shares and sustained a loss. (*See* Burke Aff. ¶¶ 4–10 and Exs. 1, 2 attached thereto.)

The proactive conduct of Fifth Third helped it to maintain its long term viability.

- Although the various stock prices indisputably fell in the 24 hours following the announcement, the share prices quickly recovered thereafter, as described above.  Stock price fluctuation after the recovery, such as the market collapse in September 2008, was due to global market factors unrelated to the June 18 announcement.

---

and after the alleged corrective disclosure.  A court may take judicial notice of a stock's historical prices.  *Beaver County Ret. Bd. v. LCA-Vision Inc.*, No. 1:07-CV-750, 2009 U.S. Dist. LEXIS 31375, at *16 (S.D. Ohio Mar. 25, 2009).

- Unlike many financial institutions, Fifth Third survived and remained a successful, profitable bank. Its common stock has traded above pre-announcement levels throughout 2012, its Preferred B securities have traded above pre-announcement levels since July 2009, and its Preferred C securities, which Fifth Third redeemed in June 2011, never traded below pre-announcement levels after September 2009.

## B.    **The Litigation**

Predictably, a number of lawsuits alleging claims under the federal securities laws were filed against Fifth Third shortly after the June 18 announcement. Similar lawsuits were filed against financial institutions across the country on the heels of comparable announcements. The pending actions were consolidated to this Court by virtue of an Order dated December 15, 2008 (Doc. No. 38).[2] The lawsuits essentially allege that, despite multiple and repeated warnings in several of Fifth Third's SEC filings throughout 2007 and 2008 regarding deteriorating real estate market conditions, increases in nonperforming assets, deterioration in Fifth Third's loan portfolio and specific concerns regarding Florida and Michigan real estate, Fifth Third should have disclosed even more. Essentially, Plaintiffs want Fifth Third to have been clairvoyant and to have foreseen in late 2007 the unprecedented economic collapse that occurred in 2008.

The CAC purports to bring causes of action "*on behalf of three sub-classes* consisting of: (i) former First Charter Corp. ("First Charter") shareholders who exchanged their First Charter shares for Fifth Third common stock, in Fifth Third's merger with First Charter which was approved in January 2008; (ii) investors who purchased or acquired Fifth Third Preferred B shares, pursuant or traceable to, the October 2007 Preferred B Offering; and (iii) investors who purchased or acquired Fifth Third Preferred C shares, pursuant or traceable to, the Preferred C

---

[2] Moreover, two ERISA class actions, which were later consolidated, and a derivative action were filed against Fifth Third in the wake of the June 18, 2008 announcement. The consolidated ERISA action was dismissed by this Court on November 24, 2010. (Case No. 1:08-cv-00538, Doc. No. 81.) The derivative action was dismissed by the Hamilton County Ohio Court of Common Pleas on August 15, 2011.

Offering."  (Doc. No. 119, CAC ¶ 2 (emphasis added).)  The CAC then goes on to detail the composition of these three sub-classes, explicitly defining them as separate groups.  (*Id.* ¶¶ 4–6.)

### C.    The Remaining Claims

This Court dismissed many of the claims asserted in the CAC by Order dated August 10, 2010.  The Court dismissed all fraud-related claims and claims asserted on behalf of Fifth Third common shareholders.  The Court allowed the case to proceed on Section 11 (and related Section 12(a)(2) and 14 claims) for:  (i) Purchasers of Fifth Third Capital Trust VI, 7.25% Trust Preferred B Securities in an October 2007 public offering (the "Preferred B Offering"); (ii) Purchasers of Fifth Third Capital Trust VII, 8.875% Trust Preferred C Securities in a public offering in April 2008 (the "Preferred C Offering"); and (iii) Entities and persons who received Fifth Third common stock in Fifth Third's merger with First Charter Bank pursuant to a proxy statement and registration statement dated November 29, 2007 (the "First Charter Merger"). The Court also narrowed the scope of these claims to four alleged misstatements or omissions in the relevant offering documents:

1.    the consideration paid for First Charter shares in the merger;

2.    the alleged deteriorating quality of Fifth Third's loan portfolio;

3.    deterioration in Tier 1 capital; and

4.    the need to raise additional capital.

(Doc. No. 111, Aug. 10, 2010 Order at 68–69.)

### D.    Discovery Conducted to Date

Thus far in discovery, Fifth Third has produced approximately 1,400,000 pages of documents to Plaintiffs.  Plaintiffs have deposed three Fifth Third Rule 30(b)(6) witnesses, and Defendants have taken the depositions of the three persons who Plaintiffs still are proffering as purported class representatives.  The CAC originally proffered Leon Loewenstine and Jacqueline

Dinwoodie as class representatives.  Subsequent to filing the CAC, and before filing the Motion

for Class Certification (the "Motion"), Plaintiffs withdrew Loewenstine as a purported class

representative because he did not sustain a loss.  Although the Motion includes Jacqueline

Dinwoodie as a purported class representative, Plaintiffs have since withdrawn her for the same

reason they withdrew Loewenstine.  (*See* Burke Aff. ¶¶ 4–10 and Exs. 1, 2 attached thereto.)

Thus, *there is no Preferred C class representative*.

       **E.**      **<u>Plaintiffs' Motion for Class Certification</u>**

      Plaintiffs' Motion completely ignores the factual record that the parties have developed.

Instead, Plaintiffs have filed a boilerplate motion that regurgitates the class certification

standards of Rule 23, and then, with no reference to the evidentiary record, concludes that

Plaintiffs have satisfied these standards.  The only exhibits incorporated into Plaintiffs' Motion

are the certifications attached to the CAC, and resumes for the law firms representing Plaintiffs.

The Motion:

- fails to attach a single document that was produced from the approximately 1.4 million pages produced by Fifth Third;

- fails to cite any deposition testimony from the depositions of the three named Plaintiffs;

- fails to refer to any interrogatory responses documents produced by Fifth Third;

- fails to reference any of the offering documents for the Fifth Third securities at issue, or any other public filing made by Fifth Third; and

- fails to cite to any other record support for class certification.

      The Motion also cynically reverses the position Plaintiffs have advanced since the outset

of the case — that there are three sub-classes — and now claims there is a single class which

turns on three entirely different securities.  In stark contrast, the CAC consistently refers to

separate sub-classes "consisting of: (i) former First Charter Corp. shareholders who tendered

their First Charter shares in exchange for shares of Fifth Third common stock, in connection with Fifth Third's acquisition of First Charter; (ii) all investors who purchased or acquired Fifth Third Preferred B shares, pursuant or traceable to, the Preferred B Offering; and (iii) all investors who purchased or acquired Fifth Third Preferred C shares, pursuant or traceable to, the Preferred C Offering." (Doc. No. 119, CAC at ¶ 2; *see also id.* ¶¶ 4–6 (describing the three proposed sub-classes).) This Court's decision on the Motion to Dismiss, moreover, specifically references three sub-classes. (Doc. No. 111, Aug. 10, 2010 Order, at 69.) It is obvious that Plaintiffs' revisionist view of the class they purport to represent is driven by the undeniable fact that *there is no class representative for the Preferred C subclass.* None of the remaining named Plaintiffs purchased, owned, or suffered a loss on any Preferred C shares. (*See* Certifications of named Plaintiffs Edwin Shelton, Jeffrey Wacksman, and Henry Steiner on behalf of The Eshe Fund, attached as Exhibits A, C, and D to Declaration of Barbara A. Podell (Doc. No. 163-3).) Plaintiffs cannot seek damages for Preferred C shareholders.

  **F.** **The Proposed Class Representatives**

   1. *The Eshe Fund*

Named Plaintiff The Eshe Fund bought 1,000 shares of Fifth Third Preferred B stock, all of which was bought at the time that the shares issued. (Doc. No. 163-7, The Eshe Fund Certification ¶ 5.) It did not purchase any shares of Fifth Third Preferred C stock, nor did it acquire any Fifth Third common stock by virtue of the First Charter Merger. (*Id.*) The Eshe Fund continues to own all 1,000 shares of the Preferred B stock it purchased. (Steiner Dep. 28:24–29:2, Jan. 26, 2012.)

In response to comprehensive discovery requests issued by Defendants, The Eshe Fund produced a single, one-page document in response. (*Id.* 59:3–60:23, 87:3–88:19.) The representative for The Eshe Fund at deposition, Henry Steiner, refused to answer a number of

questions despite the absence of any instruction by his counsel not to answer.  (*Id.* 30:10–31:25, 32:17–36:14, 66:21–69:11.)  During his deposition, Steiner also demonstrated a lack of knowledge as to many of the basic facts of the litigation.  (*E.g., id.* 44:22–47:3 (Steiner insists that the June 18, 2008 announcement contained an explicit admission by Fifth Third that the Preferred B prospectus contained misstatements).)

The Eshe Fund Certification represented that the Fund had not, during the three years prior to June 18, 2008, "served as a representative party for a class in an action filed under the federal securities laws."  (Doc. No. 163-7, The Eshe Fund Certification ¶ 6.)  This representation is false, as The Eshe Fund served as a class representative in a securities litigation that did not approve a class settlement until September 19, 2006, a time well within the three-year period to which Steiner attested in the Certification.  (*See Pozniak v. Imperial Chemical*, Case No. 1:03-cv-02457-NRB (S.D.N.Y.) docket, attached as Exhibit 4 to Burke Aff.)

### 2. *Jeffrey Wacksman*

Dr. Jeffrey Wacksman is a physician who specialized in pediatric urology prior to his retirement in 2006.  (Wacksman Dep. 5:11–6:1, Jan. 19, 2012.)  Wacksman has extensive investment experience, having been an active investor for approximately 40 years in connection with his retirement plans, IRAs, and other investments.  (*Id.* 35:12–36:3.)  Wacksman has utilized the services of two investment advisors in recent years, working with Foster & Motley in Cincinnati, Ohio from 1998–2008 and Fred Borowski of Raymond James from 2008–present.  (*Id.* 13:15–17, 37:2–24.)  Over the course of his investment history he has invested in common stocks, preferred stocks, corporate bonds, municipal bonds, mutual funds, private placements, mortgage pools and asset-backed securities.  (*Id.* 36:4–37:10, 46:6–48:24, 56:8–57:14, 70:9–71:4.)

For purposes of this case, it is significant that as of November 2007, Wacksman had invested in mortgage pools for ten years, was aware of what was occurring in the housing market and knew of the "housing bubble."  (*Id.* 58:10–59:20.)  Wacksman purchased a residence in Florida in 2002, witnessed the impact of the speculative Florida real estate bubble in 2002–2007, and saw the value of his own house decline.  (*Id.* 59:21–61:15.)  From his own equity investments, Wacksman knew that the markets were "going to hell" in 2008 and got worse in 2009.  (*Id.* 65:16–66:25.)

The Preferred B initial public offering was made pursuant to a prospectus dated October 25, 2007.  (Doc. No. 119, CAC ¶ 5.)  Wacksman never saw or read the prospectus before the Preferred B shares were purchased for his IRA account.  (Wacksman Dep. 29:24–30:6, 102:16– 104:8.)  Indeed, Wacksman had no involvement in the investment at all because the decision to purchase the Preferred B shares was made by his advisor, Fred Borowski, in April 2008.  (*Id.* 14:21–15:12, 41:7–19, 72:1–9.)  Borowski purchased 1,000 Fifth Third Preferred B shares in April 2008 — more than five months after the public offering.  (*Id.* 15:1–7.)  Wacksman paid $21.80 per share, significantly less than the offering price of $25 per Preferred B Share.  (*Id.*)

The history of Wacksman's decision to become involved in this action demonstrates that his claims are not typical.  Shortly after the June 18, 2008 announcement, Wacksman and Fred Borowski noticed that the Preferred B shares, like Fifth Third common stock, declined in value. (*Id.* 12:15–15:19.)  As of June 30, 2008, Wacksman's Preferred B shares had declined to $16.16 per share.  (*Id.* 78:20–23.)  Unlike other Plaintiffs, he did not contact an attorney or seek to initiate litigation in the wake of the June 18, 2008 announcement.  (*Id.* 15:13–19, 78:20–79:21.) By August 8, 2008, the Preferred B shares had rebounded to $18.27 per share — above the level just before the June 18, 2008 announcement — and on August 29, 2008, the Preferred B shares

were trading at $16.82 per share.  (*Id.* 80:11–17.)  The price for the Preferred B shares declined to $9.15 per share as of September 30, 2008, but then rose more than $5.00 per share to $14.65 per share as of November 28, 2008, and to $15.28 per share as of December 31, 2008.  (*Id.* 80:5–82:22.)  It was not until January 2009 — approximately seven months after the June 18, 2008 announcement and after the Preferred B stock suffered a market-driven "second drop" — that Wacksman decided to pursue litigation, even though his Preferred B stock had increased in value from October–December 2008.  (*Id.* 15:13–16:24, 83:2–85:10.)  Clearly, Wacksman's claim is not temporally or causally related to the June 18, 2008 announcement.

With respect to the Motion for Class Certification, Wacksman never has served as a class representative.  (*Id.* 11:22–24.)  He believes he is representing the Preferred C subclass even though he never purchased and never owned any Preferred C shares (*Id.* 12:3–14, 20:20–21:3; Doc. No. 163-6, Wacksman Certification ¶ 4.)  Wacksman has no knowledge whether Fifth Third ever was involved with any sub-prime loans and does not know what an Alt-A mortgage is.  (Wacksman Dep. 74:25–75:25, 98:21–22.)  Wacksman did not receive the CAC until after it was filed and, even then, did not read it all.  (*Id.* 95:18–24.)  Wacksman could not recall being told by counsel to preserve documents, electronic data, and communications related to his investment in Fifth Third securities.  (*Id.* 24:2–25:6.)  He admitted that relevant information was contained on his computer, but that he purges potentially relevant files from it "every couple of months."  (*Id.* 25:7–19.)  He has continued to discard relevant electronic data since January of 2009.  (*Id.* 25:7–25.)

Wacksman is under the mistaken belief that the June 18, 2008 announcement stated that Fifth Third was "severely undercapitalized," which is indisputably wrong.  (*Id.* 93:8–16.)  Wacksman has no knowledge what Fifth Third or the underwriters knew on October 25, 2007,

the date of the Preferred B prospectus, or if they knew in October 2007 what later was disclosed in June 2008, claiming only that Defendants "had to know."  (*Id.* 18:12–24, 87:12–88:19, 99:10–23.)  Similarly, he has no knowledge that any of the disclosures in the prospectus regarding Fifth Third's loan portfolio are inaccurate in any respect.  (*Id.* 111:3–20.)  Essentially, Wacksman bases his claim on his assumption that the Preferred B securities would not fluctuate much in value even though he bought his Preferred B shares at $3.20 below the original offering price and they declined an additional $3.80 *before* the June 18, 2008 announcement.  (*Id.* 13:4–10, 52:21–53:18.)  Wacksman erroneously concluded that the Preferred B securities would not experience large price fluctuations even though the prospectus that he never read expressly disclosed the risk of "economic, financial and other factors" causing fluctuations in the trading price of the Preferred B shares.  (*Id.* 51:22–52:24, 106:11–108:24.)

    3.  *Edwin Shelton*

    Edwin Shelton is a native of Lincolnton, North Carolina, and owned a hardware store until he retired in 1993.  (Shelton Dep. 5:12–6:3, Jan. 17, 2012.)  He became a First Charter shareholder in approximately 1996–1997, when First Charter merged with a smaller bank, Lincoln Bank, of which Mr. Shelton was then a shareholder.  (*Id.* 13:18–14:2, 22:3–23:5.)  Mr. Shelton acquired his shares of Lincoln Bank in approximately 1982–1983, in an odd series of apparently private transactions orchestrated by his broker, Joe Leonard, unaccompanied by any written disclosures.  (*Id.* 27:6–29:24.)  After Shelton became a First Charter shareholder following the Lincoln Bank merger, *more than 80%* of his entire investment portfolio was concentrated in this single stock.  (*Id.* 53:8–13.)

    Shelton began speculating in the stock market following his 1993 retirement.  During 2007–2008, Shelton built a half-million dollar second home in Cody, Wyoming and "started doing some day trading" to pay it off.  (*Id.* 34:15–35:20.)  Shelton engaged in day trading of

exclusively bank stocks including Regions Financial and BB&T, utilizing a Fidelity Investment online trading tool and Yahoo Finance.  (*Id.* 39:24–40:21.)  Incredibly, during the 2007–2008 time frame, Shelton began doing day trades of Fifth Third stock, based upon a "gut feeling" and hearing CNBC personalities talk about the bank.  (*Id.* 47:16–48:24.)  Shelton's day trades of Fifth Third stock reached as high as $100,000 or more per trade, and he continued day trading in Fifth Third stock after the closing of the First Charter Merger.  (*Id.* 49:24–51:9, 59:22–63:10.)

Shelton read the prospectus dated November 29, 2007 regarding the First Charter Merger, attended the January 18, 2008 shareholders' meeting at which the merger was approved, and voted in favor.  (*Id.* 75:5–16, 77:14–79:4.)  Shelton knew that Fifth Third was offering $31 for each First Charter share, which represented a $10.75 per share premium over First Charter's pre-announcement market price.  (*Id.* 79:22–81:5.)  In stark contrast to the allegations in the CAC, Shelton clearly testified that he knew that the $31 price was to be based upon a conversion ratio calculated according to Fifth Third's trading price on a certain number of trading days prior to the merger:

> Q.     In fact, if you look at the second sentence in that second paragraph, [on page 14 of the prospectus] where it begins, "The conversion ratio," do you see that?
>
> A.     Yes.
>
> Q.     The conversion ratio is equal to $31 divided by the average market price of Fifth Third common stock for the five trading days ending on the trading day immediately before the closing of the merger.
>        You understood that to be a term of the merger?
>
> A.     Yes.
>
> Q.     Changes in the price of Fifth Third common stock from the date of the merger agreement, from the date of this proxy statement prospectus, and from the date of the special meeting will affect the

16

conversion ration and thus the number of Fifth Third common shares that you will receive as a merger consideration.

        You understood that too, right?

A.     Yes.

Q.    The next thing it says is, Fifth Third stock price may increase or decrease before and after the effective time of the merger due to a variety of factors, including, without limitation, general market and economic conditions, changes in Fifth Third's business operations and prospects, and regulatory considerations. Many of these factors are beyond Fifth Third's control.

        Did you read that also, sir?

A.     Yes.

(*Id.* 83:5–84:9.)

On May 6, 2008, Shelton exchanged 70,720 First Charter shares in the merger and subsequently received 127,733 Fifth Third shares.  (*Id.* 64:4–16; Doc. No. 163-4, Shelton Certification ¶ 4.)  After Shelton learned of the June 18, 2008 announcement by Fifth Third, he sold every single Fifth Third share he owned between Friday June 23, 2008 and Monday June 26, 2008.  (Shelton Dep. 67:3–14.)  Shelton explained, "To me, it just felt like the next day and I panicked and that is when I sold."  (*Id.* 102:14–15.)  Shelton never reviewed any of Fifth Third's public disclosures or SEC filings and paid no attention to what happened to Fifth Third's stock price after he sold.  (*Id.* 67:15–22, 98:7–16.)

With respect to the issues relevant to class certification, Shelton has never served as a class representative before and understands a class representative's role as, "I understand they are supposed to represent persons in a misrepresentation of a class action lawsuit [sic]."  (*Id.* 8:5–11.)  Shelton never purchased or owned any Preferred B or Preferred C securities, but believes he is the class representative for these subclasses.  (*Id.* 94:7–15; Doc. No. 163-4, Shelton Certification ¶ 4.)  Shelton is unaware of the class period and believes that there are three class

17

members, himself and two unions.  (Shelton Dep. 73:17–20.)  Shelton has no facts to support the

allegation that Fifth Third knew the facts that were disclosed on June 18, 2008 at the time of the

November 29, 2007 prospectus.  (*Id.* 79:5–21.)  Shelton does not know what the Underwriter

Defendants are alleged to have done wrong.  (*Id.* 93:3–15.)

## IV.  ARGUMENT

### A.  Legal Standards for Class Certification

As this Court is well aware, Plaintiffs bear the burden of proving that the proposed class

meets the requirements of Rule 23.  *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982); *In re Am.*

*Med. Sys., Inc. ("AMS"),* 75 F.3d 1069, 1079 (6th Cir. 1996); *Retired Chicago Police Ass'n v.*

*City of Chicago,* 7 F.3d 584, 596 (7th Cir. 1993).  Rule 23 of the Federal Rules of Civil

Procedure sets forth four prerequisites that a plaintiff must establish when seeking class

certification:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show

that the action is maintainable under Rule 23(b)(1), (2), or (3).  Fed. R. Civ. P. 23.  Failure to

meet any one of these requirements precludes class certification. *Retired Chicago Police Ass'n*, 7

F.3d at 596.

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification

must affirmatively demonstrate his compliance with the Rule." *Wal–Mart Stores, Inc. v. Dukes*,

— U.S. —, 131 S.Ct. 2541, 2551 (2011).  Actual, not presumed, conformance with Rule 23 is an

indispensable part of a district court's analysis. *Falcon*, 457 U.S. at 160. Thus, "both the Supreme Court and this Circuit require that a district court conduct a 'rigorous analysis' of the Rule 23(a) requirements before certifying a class." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 629 (6th Cir. 2011).

"The 'rigorous analysis' requirement is critical because it ensures that each of the prerequisites for certification have actually been satisfied." *Id.* (*citing* 6A Federal Procedure, Lawyers Edition § 12:267 (2011)). The need for rigorous analysis is driven, at least in part, by the fact that "[c]ertification as a class action can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011) (Posner, J.) (*citing* 1998 Advisory Committee Notes to Fed. R. Civ. P. 23(f)). The requirement also "serves the important function of protecting absent class members whose rights may be affected by the class certification." *Davis v. Hutchins,* 321 F.3d 641, 649 (7th Cir. 2003).

"[S]atisfying Rule 23(a) requires something more than mere repetition of the rule's language; there must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." *Id.* (citations and quotation marks omitted). As part of a district court's "rigorous analysis," both the Supreme Court and the Sixth Circuit require that district courts probe beyond the surface of the complaint to ascertain whether the Rule 23 requirements have been met. *AMS*, 75 F.3d 1069, 1078–79 (*citing Falcon*, 457 U.S. at 161).

The district court's decision on class certification is subject to a very limited review, "and will be reversed only upon a strong showing that the district court's decision was a clear abuse of discretion." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 559–60 (6th Cir. 2007), *cert. denied*, 555 U.S. 1032 (2008).

**B.**     **Plaintiffs Fail to Present Any Factual Record for the Court to Conduct the Required "Rigorous Analysis" Required by Rule 23**

In seeking certification of their class, Plaintiffs wholly ignore the body of law discussed above.  Instead, Plaintiffs have filed a perfunctory Motion for Class Certification with almost no evidentiary support.  Plaintiffs are asking this Court to certify a class with no record support — no deposition transcript excerpts, discovery responses, public records, or any other factual support.  Plaintiffs did not even ask for a hearing or an opportunity to present evidence in the future.  Instead, Plaintiffs merely rehash the elements of Rule 23 and rely solely upon unsubstantiated allegations in their CAC.  Plaintiffs' Motion flies in the face of Supreme Court and Sixth Circuit authority requiring that Plaintiffs affirmatively demonstrate compliance with Rule 23, rather than conclusory allegations that generically parrot the Rule's requirements.  Given that Plaintiffs bear the burden of proving that class certification is appropriate under Rule 23(a) and (b), and given that Plaintiffs have presented no factual record to fulfill that burden, Plaintiffs' Motion must be denied on this basis alone.

The Sixth Circuit has repeatedly rejected district court certifications when the plaintiff fails to present a factual record in support of the request for class certification.  *See Reeb v. Ohio Dept. of Rehab. and Correction*, 435 F.3d 639, 640–43 (6th Cir. 2006) (vacating class certification for second time when district court accepted no evidence and made no factual findings); *AMS*, 75 F.3d at 1086–87 (vacating district court's class certification decision based upon allegations in the complaint without allowing or considering presentation of evidence); *Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1033 (6th Cir. 1992) (holding that bare conclusory allegations are insufficient to advance class claims).

This Sixth Circuit position is consistent with the clear weight of authority — a district court cannot conduct a "rigorous analysis" when plaintiffs present no record to analyze in

20

support of the request for class certification.  In *Szabo v Bridgeport Machines, Inc.*, 249 F.3d 672

(7th Cir. 2001)*, the Seventh Circuit instructed:

> The proposition that a district judge must accept all of the
> complaint's allegations when deciding whether to certify a class
> cannot be found in Rule 23 and has nothing to recommend it. . . .
> Before deciding whether to allow a case to proceed as a class
> action, therefore, a judge should make whatever factual and legal
> inquiries are necessary under Rule 23.

*Id.* at 675–76.  *See also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir.

2009) (district court must "consider carefully all relevant evidence and make a definitive

determination that the requirements of Rule 23 have been met before certifying a class"); *In re*

*New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008) (reversing

district court's order certifying a class action because there was not a complete factual record); *In*

*re Public Offerings Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (district court "must receive

enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23

requirement has been met").

Here, Plaintiffs have failed to provide the Court with any factual record upon which to

conduct the "rigorous analysis" required by Rule 23.  Plaintiffs have simply filed a boilerplate

motion for class certification and have asked the Court to accept all of their factual allegations as

true.  Plaintiffs have utterly failed to meet their burden of proving that the requirements of Rule

23(a) and (b) have been met.  They are asking this Court to engage in the same rubber-stamp

approval of class certification that the Sixth Circuit and other federal courts have consistently

rejected.  *See AMS*, 75 F.3d at 1079 (the Rule 23 determination "should be predicated on more

information than the pleadings will provide"); *Szabo*, 49 F.3d at 677 (holding that courts must

"look beneath the surface of a complaint to conduct the inquiries identified in [Rule 23] and

exercise the discretion it confers"); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.

21

1996) ("[g]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of certification issues"); *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 353 (W.D. Wis. 2000) ("[t]he determination whether to certify a class usually should be predicated on more information than the complaint itself affords").

Plaintiffs cannot remedy this deficiency in their reply memorandum. Such "sandbagging" is patently unfair and should not be allowed by the Court. Plaintiffs have the burden of proving that a class should be certified under Federal Rule 23. Plaintiffs are required to fulfill that burden in their Motion, not in a reply memorandum when Fifth Third theoretically has no opportunity to respond. Plaintiffs cannot be allowed to cloak the presentation of evidence as "rebuttal evidence."[3]

Plaintiffs have failed to offer any evidence to establish that they have met the requirements of Federal Rule 23. "Mere repetition of the language of Rule 23" is legally insufficient. *Davis,* 321 F.3d at 649. The Motion for Class Certification must be denied.

### C.    Plaintiffs' Proposed Class Is Overly Broad and Must Be Narrowed

Plaintiffs seek to lump together, in one undifferentiated, monolithic class, three separate classes of purchasers of entirely different securities based upon different offering documents, at different times.   Such a proposed class cannot be certified.

At a minimum, no class or subclass can be certified that includes the Preferred C shareholders, because none of the named Plaintiffs purchased, owned or suffered a loss in connection with the Preferred C shares and, therefore, no plaintiff has standing to pursue a claim

---

[3] The Court should reject any "evidentiary support" Plaintiffs may provide in their reply, and deny their Motion for Class Certification.   At the very least, the Court should allow a sur-reply brief or deny Plaintiffs' Motion without prejudice and require Plaintiffs to develop the necessary factual record upon which the Court can rule on the Motion for Class Certification.  *See, e.g., Inmates of Northumberland County Prison v. Reish*, No. 08-CV-345, 2008 WL 2412977, at *3 (M.D. Pa. 2008).

on their behalf.  Moreover, the proposed class definition is overly broad, involving different factual circumstances and legal issues, and fails to promote the interests of judicial economy and efficiency.  This Court has to engage in three separate analyses of the securities at issue here for each of the distinct classes that Plaintiffs' Complaint described.  Finally, the class definition must be significantly narrowed to exclude any proposed class members who did not sell their shares before the share prices returned to pre-disclosure levels, as those members will never be able to show loss causation as a matter of law.  Because no named Plaintiff sold Preferred B shares prior to recovery of the share price for that security, no class or subclass can be certified that includes Preferred B shareholders.

1.    *The Preferred C Shareholders Have No Named Representative and Cannot Be Included in Any Class or Subclass*

The obvious reason why Plaintiffs have reversed course on the three separate subclasses described in the CAC is that none of the named Plaintiffs has standing to bring claims on behalf of Preferred C shareholders.  Clearly, therefore, no Preferred C subclass can be certified.

Plaintiffs vainly attempt to establish standing for the Preferred C shareholders by lumping them together with the First Charter and Preferred B shareholders and claiming that these purchasers provide standing enough for them all.  (*See* Pls.' Mot. for Class Cert. at 1.)  It is settled law, however, that no class claim can be certified where there is no named representative with standing to assert it.  *Courtney v. Smith*, 297 F.3d 455, 467 (6th Cir. 2002) ("[A]s a prerequisite to certification, it must be established that the proposed class representatives have standing to pursue the claims as to which classwide relief is sought."); *see also Godec v. Bayer Corp.*, No. 1:10-cv-224, 2011 U.S. Dist. LEXIS 131198, at *8 (N.D. Ohio Nov. 11, 2011) (excluding from class those who purchased one type of product from the defendant but not another type because named representative only purchased the first and "a class representative

must himself have standing to assert the claim he seeks to certify"). Because the named Plaintiffs did not also purchase Preferred C shares, they cannot confer standing for a Preferred C claim. The result is the same if this Court were to divide the class into appropriate subclasses. *See Thompson v. Bd. of Educ.*, 709 F.2d 1200, 1205–06 (6th Cir. 1983) (requiring separate subclasses and holding that each must have separate standing); *Huntsman v. Akron Tower Hous. P'ship*, No. 1:05cv1739, 2007 U.S. Dist. LEXIS 36248, at *14 (N.D. Ohio May 17, 2007) (excluding from class certification proposed subclass that lacked independent standing). Accordingly, no class or subclass can be certified that includes Preferred C shareholders.

　　　　2.　　*The Class Definition is Overly Broad and Subclasses Are Necessary*

Plaintiffs propose a single class consisting of purchasers from three separate and unrelated securities: (i) former First Charter shareholders who tendered their First Charter shares in exchange for shares of Fifth Third in the First Charter merger; (ii) investors who purchased Preferred B shares; and (iii) investors who purchased Preferred C shares. Because the allegations regarding each of these securities are based upon different disclosures, raise different questions, and require distinct proof, the Court must deny certification of the class or, alternatively, use its discretion under Rule 23 to divide the class into appropriate subclasses before certification. *Butler v. Sterling, Inc.*, No. 98-3223, 2000 U.S. App. LEXIS 6419, at *22 (6th Cir. Mar. 31, 2000) (affirming denial of class certification where plaintiffs failed to propose appropriate subclasses).

Plaintiffs have previously represented to the Court that the CAC was brought on behalf of separate subclasses representing each of the different securities at issue in this case. (Doc. No. 119, CAC ¶¶ 2, 4–6.) In granting in part and denying in part Defendants' Motion to Dismiss, this Court acknowledged that "the consolidated complaint is comprised of or has under its umbrella *essentially four different lawsuits involving four different sub-classes* of owners or

purchasers of securities."[4]  (Doc. No. 111, Aug. 10, 2010 Order at 2) (emphasis added).  In the Motion, however, Plaintiffs expediently attempt to lump together the purchasers of these three separate securities, which were issued at different times pursuant to three different registration statements.  (*Id.* ¶¶ 4–6.)  Each of these offerings is alleged to contain separate misrepresentations.  (*Id.* ¶¶ 96–107, 158–63, 189–96.)

Plaintiffs now conveniently attempt to blur the clear distinctions between these securities by claiming they were issued pursuant to offering documents that were "substantially the same." (Pls.' Mot. for Class Cert. p. 16.)  Clearly, however, the offering documents were not the same, were not offered at the same time, were not issued for the same types of securities, and were not offered for the same purpose.  For example, the First Charter shareholders acquired Fifth Third common stock in connection with the First Charter Merger that was approved at a January 2008 shareholders meeting, based upon a November 29, 2007 proxy statement.  (Doc. No. 119, CAC ¶ 4.)  The alleged misstatements for this transaction appeared in the registration and proxy statements filed and are material to the circumstances and terms of the merger.  (*Id.* ¶¶ 96–107.) In contrast, the Preferred B shares were issued in October 2007 pursuant to an automatic shelf registration to raise capital for Fifth Third.  (*Id.* ¶ 6.)  The alleged misstatements in this transaction appeared in the Preferred B Prospectus and must be measured against what Fifth Third knew at that time.  15 U.S.C. § 77k(a) ("In case any part of the registration statement, *when such part became effective*, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein . . ." (emphasis added); 17 C.F.R. § 240.14a-9 (prohibiting proxy solicitations "containing any statement which, *at the time and in the light of the circumstances under which it is made*, is false or misleading . . ." (emphasis added)); *In re*

---

[4]  The fourth subclass was comprised of holders of Fifth Third common stock not acquired in the First Charter Merger, but the Court dismissed all claims of that putative subclass.  (Doc. No. 111, Aug. 10, 2010 Order at 69.)

*RAIT Fin. Trust Secs. Litig.*, Case No. 2:07-cv-03148, 2008 WL 5378164, at \*5 (E.D. Pa. Dec. 22, 2008) (to establish falsity in a Section 11 or 12 claim, plaintiff must show "that the statements at issue were untrue or misleading at the time they were made").  Thus, the holders of the three securities will have to provide independent proof of how the alleged misstatements and omissions that appeared in the unrelated offering statements were misleading and material. Plaintiffs' attempt to merge these wholly disparate offerings on the grounds that they reference some of the same SEC filings does not change this fact.  Consequently, this Court must deny certification of Plaintiffs' proposed class.

Under Rule 23(c), district courts have broad discretion to divide a class into subclasses "[w]hen appropriate."  Fed. R. Civ. P. 23(c)(4); *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 355 (6th Cir. 2011).  Subclasses should be created where different groups of putative class members assert different or conflicting claims, or if their claims arise from different factual circumstances.  *See Marisol A. v. Giuliani*, 126 F.3d 372, 378–79 (2d Cir. 1997); *see also In re PHLCORP Secs. Tender Offer Litig.*, No. 88 Civ. 0306(PNL), 1989 U.S. Dist. LEXIS 13681, at \*6 (S.D.N.Y. Nov. 16, 1989) ("[c]onflicts which require the creation of sub-classes in securities actions occur when plaintiffs represent persons owning different classes of securities").  The party seeking class certification bears the burden of constructing subclasses and "is required to submit proposals to the court" for each subclass.  *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980).  The Court cannot conduct a single analysis for the proposed class but must, at a minimum, conduct a separate analysis for each subclass to determine if the requirements of Rule 23 are met for each subclass.

3.    *Any Class Must Be Limited to Only Those Shareholders Who Sold at a Loss Before Their Shares Returned to Pre-Disclosure Values*

Plaintiffs' class definition includes many members in all three subclasses who will be unable to show loss causation as a matter of law because they did not sell their shares before their prices returned to pre-disclosure values.  Although loss causation is an affirmative defense for Section 11, 12 and 15 violations and ordinarily need not be pleaded, where it is clear on the face of the complaint that a plaintiff will never be able to establish loss causation, those claims may be dismissed at the pleading stage.  *See*, *e.g.*, *Amorosa v. AOL Time Warner, Inc.*, 409 F. App'x 412, 417 (2d Cir. 2011) ("The absence of loss causation is an affirmative defense to a section 11 claim, but it is here apparent from the face of the complaint.  It is thus a proper basis on which to dismiss the claim."); *Blackmoss Invs. Inc. v. Aca Capital Holdings, Inc.*, No. 07-10528, 2010 U.S. Dist. LEXIS 2899, at *2, 28–30 (S.D.N.Y. Jan. 12, 2010) (dismissing complaint after taking judicial notice of share prices and holding that the absence of loss causation was clear from the face of the complaint).  Accordingly, the class definition should be narrowed to exclude shareholders of any of the securities for whom it is clear that loss causation can never be proven as a matter of law.

In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court held that an inflated purchase price alone is insufficient to demonstrate loss causation.  544 U.S. at 342–43.  As the Court noted, a plaintiff has not suffered any loss simply by holding shares at an inflated price; rather, the plaintiff must allege that it later suffered some actual loss apart from the inflated purchase price by itself.  *Id*.

All of the courts that have considered the situation where, as here, a share's price has returned to pre-disclosure levels after an alleged corrective disclosure have universally agreed that the failure to sell before the share price recovers is an absolute bar to proving loss causation.

27

"Since *Dura*, courts have held as a matter of law that a purchaser suffers no economic loss if he

holds stock whose post-disclosure price has risen above the purchase price — even if that price

had initially fallen after the corrective disclosure was made." *In re China N.E. Petroleum*

*Holdings Ltd. Secs. Litig.*, No. 10 Civ. 4577, 2011 U.S. Dist. LEXIS 117711, at *3–4 (S.D.N.Y.

Oct. 6, 2011) (granting motion to dismiss where share prices rose above the pre-disclosure price

over next several months); *see also In re Immucor, Inc. Secs. Litig.*, No. 1:09-CV-2151, 2011

U.S. Dist. LEXIS 73279, at *11–12 (N.D. Ga. June 30, 2011) ("Because the Plaintiff could have

sold its shares for a profit in the months following the . . . disclosures, it cannot show actual

economic loss or loss causation.") (granting motion to dismiss); *Ross v. Walton*, 668 F. Supp. 2d

32, 43 (D.D.C. 2009) ("The Court is unaware of any authority in which actual economic loss was

found when the stock value returned to pre-disclosure prices and could have been sold at a profit

just after the class period.") (granting motion to dismiss); *In re Veeco Instruments, Inc., Secs.*

*Litig.*, No. 05-MC-01695, 2007 U.S. Dist. LEXIS 102363, at *21 (S.D.N.Y. June 28, 2007)

(same); *In re Estee Lauder Comp. Secs. Litig.*, No. 06 Civ. 2505, 2007 U.S. Dist. LEXIS 38491,

at *3–4 (S.D.N.Y. May 21, 2007) ("As it is perfectly plain that plaintiff would have profited if he

sold after [the share price recovered] . . . this complaint patently fails to plead loss causation for

this reason alone."); *Malin v. XL Cap. Ltd.*, No. 3:03cv2001, 2005 U.S. Dist. LEXIS 27089, at

*13 (D. Conn. Sept. 1, 2005) (same).

   Here, the share prices for each of the securities at issue closed above their pre-disclosure

values after the alleged corrective disclosure on June 18, 2008. Therefore, the subclasses of

shareholders can only consist of those members who sold before the price recovered for their

respective shares. Shares of Fifth Third common stock closed at $12.73 on June 17, 2008 — the

day before the alleged corrective disclosure — but recovered to $13.76 on July 17, 2008, less

than one month later.  (*See* Historical Stock Prices (Burke Aff. Ex. 3).)  Shares of Fifth Third

Preferred B shares closed at $18.00 on June 17, 2008 but recovered to $18.27 on August 8, 2008,

less than two months later.  (*Id.*)  Shares of Fifth Third Preferred C shares closed at $22.68 on

June 17, 2008 but recovered to $22.32 on August 8, 2008, to $22.80 on July 30, 2009, and were

redeemed at the original issue price of $25.00 per share plus accrued interest on June 15, 2011.

(*Id.*)  Holders of these securities, like the now departed original Preferred C share class

representative, will be unable to establish loss causation as a matter of law and should be

excluded from the class.  *See*, *e.g.*, *Ross*, 668 F. Supp. 2d at 41, 43 (no loss causation where

prices recovered within six months); *In re Estee Lauder*, 2007 U.S. Dist. LEXIS 38491, at *4

(four months); *Malin*, 2005 U.S. Dist. LEXIS 27089, at * 11–12 (three months).

　　　It is of no avail for Plaintiffs to argue that they may be able to prove loss causation

simply by showing that the share prices declined on June 18, 2008 — thereby demonstrating an

artificially inflated share price — as the decisions cited above have expressly rejected that

position when the share price has subsequently recovered.  "[A] price fluctuation without any

realization of an economic loss is functionally equivalent to the Supreme Court's rejection of an

artificially inflated purchase price alone as economic loss.  If the current value is commensurate

to the purchase prices, there is no loss, regardless of whether the purchase price was artificially

inflated."  *Malin*, 2005 U.S. Dist. LEXIS 27089, at *13; *accord In re Estee Lauder*, 2007 U.S.

Dist. LEXIS 38491, at *3–4 (loss causation cannot be proven by showing only that the price of a

stock dropped following disclosure at issue); *In re China*, 2011 U.S. Dist. LEXIS 117711, at *3–

4  (no loss can be demonstrated after the price recovers "even if that price had initially fallen"

after disclosure at issue was made); *see also Dura*, 544 U.S. at 347 ("[An] artificially inflated

purchase price is not itself a relevant economic loss.").

Because the share value for each of the sub-classes of securities recovered to its pre-disclosure price after the alleged corrective disclosure, the class must be restricted to only those who sold their shares at a loss before those dates. Thus, if the Court determines that this litigation can still proceed as a set of subclasses, the only permissible subclass definitions would have to be limited to:

- For acquirers of Fifth Third common stock issued pursuant to the First Charter acquisition, only those acquirers who sold their securities before July 17, 2008;

- For acquirers of Fifth Third Preferred B shares, only those acquirers who sold before August 8, 2008.[5]

As noted above, without a class representative, no Preferred C subclass can be certified at all.

4.     *The Preferred B Shareholders Have No Named Representative Who Can Prove a Loss, and Thus Cannot Be Included in Any Class or Subclass*

As explained immediately above, any class the Court chooses to certify must be limited to only those shareholders who sold at a loss prior to share value returning to the pre-disclosure price. The two named Plaintiffs who bought Preferred B shares, The Eshe Fund and Jeffrey Wacksman, do not fit into such a class. Both held their stocks until after the share value had recovered to its pre-disclosure price on August 8, 2008. (Steiner Dep. 28:24–29:2 (The Eshe Fund still holds all Preferred B shares it had acquired); Wacksman Dep. 84:2–4 (held all Preferred B shares he had acquired until April 2009).) Because Preferred B shareholders are not represented by a Plaintiff who can prove loss, they cannot be included in any class or subclass.

**D.     Plaintiffs Fail to Satisfy the Prerequisites for Class Certification Set Forth by Rule 23(a)**

Turning now to the specific requirements for class certification set forth in Rule 23(a), it is clear that Plaintiffs' proposed class cannot be certified. Failure to meet any one of the four

---

[5] As described immediately below, however, the Preferred B subclass cannot be certified at all because the proffered Preferred B class representatives cannot prove they incurred a loss.

requirements enumerated in Rule 23(a), standing alone, precludes a court from granting class

certification.  *See Retired Chicago Police Ass'n,* 7 F.3d at 596.  Plaintiffs fail to satisfy any of the

Rule 23(a) prerequisites for class certification.

           1.      *Plaintiffs' Conclusory Allegations Are Not Sufficient to Satisfy the Numerosity Requirement*

A plaintiff seeking certification "cannot rely on 'mere speculation' or 'conclusory

allegations' as to the size of the putative class to prove that joinder is impractical for numerosity

purposes."  *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) (*quoting Roe v. Town of

Highland*, 909 F.2d 1097, 1100 n.4 (7th Cir. 1990)).  Yet here, that is exactly what Plaintiffs do.

Although Defendants do not deny that a large number of persons acquired Preferred B, Preferred

C, and Fifth Third common stock issuing as part of the First Charter acquisition, there is no

evidence in the record showing, or even estimating, how many of these persons sold their stock

before it rebounded and therefore potentially suffered losses.  The fact that a number of

shareholders acquired or own the securities at issue does not mean that all these acquirers are

part of any class.  Given the damages analysis in section IV(C)(3), *supra*, the Court cannot

certify a class in which a large number of stockholders had no damages and therefore are not

properly a part of any purported class.  Plaintiffs have put forth no evidence on numerosity,

relying only on speculation and conclusory allegations and, therefore, have failed to satisfy this

requirement of Rule 23(a).

           2.      *Plaintiffs' Purportedly Common Issues Are Not in Fact Common to the Proposed Class*

By seeking to certify one monolithic class, Plaintiffs preclude themselves from satisfying

the commonality requirement as defined by the Supreme Court.  To satisfy this requirement, the

purportedly common issue "must be of such a nature that it is capable of classwide resolution —

which means that determination of its truth or falsity will resolve an issue that is central to the

validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, — U.S. —,
131 S.Ct. 2541, 2551 (2011).  "This does not mean merely that [Plaintiffs] have all suffered a
violation of the same provision of law." *Id.*  Instead, a court must determine that proceeding as a
class action has the ability to generate common answers to issues that drive the resolution of the
litigation.  *Id.*

  Here, Plaintiffs almost entirely ignore *Dukes*, despite its universal recognition as the
preeminent guidance on Rule 23(a)'s commonality requirement.  *Cf. Groussman v. Motorola,
Inc.*, No. 10 C 911, 2011 WL 5554030, at *3–4 (N.D. Ill. Nov. 15, 2011) (*Dukes* decision
"indicated that it would be incorrect to read the language in Section 23(a) to provide a lenient
standard since 'any competently crafted class complaint literally raises common questions,'" and
plaintiffs' failure to acknowledge *Dukes*, combined with Plaintiffs' reliance on pre-*Dukes* cases
and generic assertions regarding commonality, required denial of class certification).  Plaintiffs
instead focus on their contention that "Defendants disseminated *substantially* the same omissions
and misrepresentations to all Class members through *substantially* the same SEC filings."  (Pls.'
Mot. for Class Cert. p. 10 (emphasis added).)  This contention plainly does not satisfy Rule
23(a)'s demanding standards.

  Plaintiffs bring claims based on three separate issuances of securities, each made months
apart from the others.  The Preferred B shares were issued pursuant to a Prospectus effective
October 25, 2007.  (Doc. No. 119, CAC ¶ 158.)  Over a month later, on November 30, 2007, the
Registration/Proxy statement relating to the factually unique First Charter acquisition became
effective.  (*Id.* ¶ 94.)  Then, almost five months after that, on April 29, 2008, the Preferred C
shares were offered.  (*Id.* ¶ 189.)

It is well established that the truth or falsity of the statements underlying Plaintiffs' claims must be judged from the time that the statement was made, and not in hindsight. 15 U.S.C. § 77k(a) ("In case any part of the registration statement, *when such part became effective*, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein . . ." (emphasis added); 17 C.F.R. § 240.14a-9 (prohibiting proxy solicitations "containing any statement which, *at the time and in the light of the circumstances under which it is made*, is false or misleading . . ." (emphasis added)); *In re RAIT*, 2008 WL 5378164, at *5 (to establish falsity in a Section 11 or 12 claim, plaintiff must show "that the statements at issue were untrue or misleading at the time they were made"). Because these offerings all occurred at different times, the falsity of statements made in the offerings must be separately judged from the point in time at which each respective offering was made. Lumping all purchasers together as one class is untenable. There can be no *common* answer as to the falsity of statements that must be judged from different points in time. *See In re RAIT*, 2008 WL 5378164, at *8 n.14 (because Section 11 expressly limits its application to the time that the registration statement became effective, plaintiffs could not claim a duty to update or correct the registration statement); *In re Alliance Pharm. Corp. Secs. Litig.*, 279 F. Supp. 2d 171, 183–85 (S.D.N.Y. 2003) (no liability attaches under Section 11 when events that occur after the effective date of the registration statement render statements therein misleading); *In re Bank of Boston Corp. Secs. Litig.*, 762 F. Supp. 1525, 1537–38 (D. Mass. 1991) (plaintiff must identify statements that were misleading at time registration statement became effective).

The timing of each of the three offerings is of great importance in this case. From 2007 to 2008, financial institutions and the American economy in general underwent drastic and sudden changes. As stated above, proving falsity requires a comparison between the alleged

misstatements and reality at that particular moment in time.  It is undeniable that this reality was rapidly changing as time went on — the credit crisis was deepening, more and more foreclosures were taking place, and the loan portfolios of lending institutions suffered accordingly.  Because the alleged falsity of each respective offering document is driven by a different issue (i.e., What did Fifth Third know in October 2007?  November 2007?  March 2008?), the purportedly common issue is in fact not common at all.  There is not one single issue that drives the determination of whether Defendants have, for three separate offerings, violated the Securities Act and Securities Exchange Act.[6]

To succeed on their claims, Plaintiffs must prove the falsity of three separate offering documents.  In turn, to determine whether each offering document was false, the Court must examine its truth or falsity at the time the offering document became effective.  Because the three offering documents became effective at different times over a span of six months, the issue of "whether the Acquisition and Offering Documents contained material misstatements and/or omissions" does not drive a common answer, as required by *Dukes*.  Instead, because the Court must examine whether the statements at issue were false at three separate time points — three time points spanning a period during which the credit crisis morphed dramatically — the commonality element is not satisfied.

---

[6] None of the post-*Dukes* cases cited by Plaintiffs addresses the foregoing law.  The court in *Public Employees' Retirement Systems of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97 (S.D.N.Y. 2011), while acknowledging that the relevant prospectus supplements were issued at different points in time, focused on the fact that the plaintiffs' claims centered on the process by which the mortgage pass-through certificates were issued, and that this consistent process resulted in the misstatements in all of the prospectus supplements.  *Id.* at 113.  Moreover, that court did not address the law stating that the falsity of each offering document must separately be judged at the time each respective document became effective.  *Id.*  The *In re Washington Mutual Mortgage-Backed Securities Litigation*, 276 F.R.D. 658 (W.D. Wash. Oct. 21, 2011) court did not even consider the varying timing for each offering document at issue.

3.    *The Named Plaintiffs' Claims Are Not Typical of the Proposed Class*

The typicality requirement ensures that the class representative's interests are aligned with those of the absent class members.  *AMS*, 75 F.3d at 1082.  "Where a class definition encompasses many individuals who have no claim at all to the relief requested, or where there are defenses unique to the individual claims of the class members the typicality premise is lacking."  *Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009) (citation omitted).  Here, the named Plaintiffs are not entitled to relief when they have no standing for the various claims Plaintiffs seek to assert, and when they suffered no compensable losses pursuant to well-established law.

For reasons already articulated in section IV(C)(1), *supra*, none of the named Plaintiffs have standing to assert claims or seek damages related to the Preferred C Offering.  The named Plaintiffs' claims derive from offerings wholly separate from the Preferred C Offering.  (*See* Doc. No. 163-4, Shelton Certification; Doc. No. 163-6, Wacksman Certification; Doc. No. 163-7, The Eshe Fund Certification.)  Accordingly, the named Plaintiffs are subject to a unique standing defense with respect to purchasers of Preferred C shares, and their claims are not typical of that set of purchasers.  *Romberio*, 385 F. App'x at 431 (6th Cir. 2009).

The named Plaintiffs are likewise subject to unique defenses relating to the Preferred B security holders.  As discussed in sections IV(C)(3) and IV(C)(4), *supra*, any class the Court chooses to certify must be limited to only those shareholders who sold at a loss prior to share value returning to the pre-disclosure price.  The two named Plaintiffs who bought Preferred B shares, The Eshe Fund and Jeffrey Wacksman, held their securities past the point of recovery and therefore cannot claim any loss caused by Defendants' alleged misstatements.  (Steiner Dep. 28:24–29:2 (still holds Preferred B shares); Wacksman Dep. 84:2–4 (held Preferred B shares until April 2009).)  Because The Eshe Fund and Wacksman are subject to the unique defense that

neither suffered an economic loss, they are not typical of the Preferred B shareholders who potentially hold claims against Defendants.

Plaintiff Wacksman is also subject to a unique spoliation defense, because he has admittedly been purging potentially relevant information off of his computer "every couple months." (Wacksman Dep. 24:2–25:19.) He has engaged in this behavior throughout the litigation and continued to do so up until the time of his deposition in January 2012, at least. (*Id.* 25:7–25.) His knowing destruction of this evidence, which he had control over and which is clearly relevant to the litigation, subjects Wacksman to a wide range of potential sanctions. *E.g., Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553–54 (6th Cir. 2010) (affirming district court's imposition of non-rebuttable adverse inference against party that destroyed folder containing evidence the court found relevant).

Finally, Plaintiff Shelton is subject to a unique defense because of his actual knowledge, at the time he acquired Fifth Third stock, of the information that he now claims was omitted in the offering documents. Because of this knowledge, he is precluded from any recovery, as detailed *infra* in section IV(E)(1).

4.    *The Named Plaintiffs Cannot Fairly and Adequately Represent the Interests of the Proposed Class*

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Although perfect identity of interests between the named class representative and other class members is not required, "something stronger than '[s]hared interests' is necessary in the event that a class representative's interests only minimally overlap with class members' interests." *Gooch v. Life Investors Ins. Co. of Am.*, Nos. 10-5003, 10-5723, 2012 WL 410926, at *18 (6th Cir. Feb. 10, 2012) (*quoting Amchem*, 521 U.S. at 626).

Rule 23(a)(4) requires that the named plaintiffs fairly and adequately protect the interests of the rest of the class. The Sixth Circuit has articulated two criteria for analyzing whether the named plaintiff meets that standard: (1) "[t]he representative must have common interests with the unnamed members of the class," and (2) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976). "[C]lass certification may properly be denied where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995) (internal quotation marks and citation omitted).

The adequacy of representation requirement "is essential to due process because a final judgment in a class action is binding on all class members." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 447 (S.D. Ohio 2009) (*citing AMS*, 75 F.3d at 1083). This concern is heightened in the context of a securities class action. The Private Securities Litigation Reform Act of 1995 (the "PSLRA") provides an "emphatic command that competent plaintiffs, rather than lawyers, direct [the litigation]." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 484 (5th Cir. 2001). Congress perceived that "class counsel too frequently controlled securities class actions leading to various abuses" and the PSLRA was accordingly designed so that courts would "[d]esignate the best representative [who] should retain the class counsel, rather than the attorney selecting the plaintiff." 7A Charles A. Wright and Arthur R. Miller, Federal Practice And Procedure § 1766 (3d ed. 2008).

        a.     *Henry Steiner*

Beyond the fact that the named Plaintiffs are inadequate because they lack standing and are subject to unique defenses, as discussed above in addressing typicality, each named Plaintiff

demonstrated in his deposition that he is an inappropriate representative for the purported class. The representative for The Eshe Fund, Henry Steiner, displayed an obstructionist attitude during his deposition, refusing to answer simple questions and unilaterally declaring what was and was not relevant to the litigation.  In one instance, he refused to answer a simple question pertaining to whether a sale at above par value would result in a capital gain.  (Steiner Dep. 30:10–31:25.) In another, he refused to disclose whether or not he had reviewed the Preferred B prospectus prior to buying shares, declaring the question to be illegitimate.  (*Id.* 32:17–36:14.)  As the deposition wore on, his own counsel even admonished him after he once again refused to answer the questions that Fifth Third's counsel posed to him.  (*Id.* 66:21–69:11 ("Mr. Steiner, he is simply asking you whether you have in your possession any annual reports that Fifth Third issued after you made the purchase.").)  This attitude was also on display when the topic of discovery arose.  On The Eshe Fund's behalf, Steiner produced a single, one-page document in response to Fifth Third's numerous document requests.  He admitted to having a binder of monthly statements detailing his holdings of Fifth Third securities, but refused to produce even redacted copies of these documents because, in his opinion, these statements have no relevance to the case.  (*Id.* 59:3–60:23, 87:3–88:19.)

Steiner is an inappropriate choice as a class representative for other reasons as well.  He fails to grasp many of the basic facts of this litigation, such as the timing of the Preferred B and Preferred C Offerings, the par value of the Preferred C securities, the fact that the Preferred C stock has been redeemed by Fifth Third, or the substance of the June 18, 2008 announcement, which he insists contained an admission of misrepresentation by Fifth Third when it clearly did not.  (*Id.* 44:22–47:3, 130:3–25.)  Moreover, he represented in his Certification, attached to the Complaint and to Plaintiffs' Motion for Class Certification, that the Fund had not, during the

38

three years prior to June 18, 2008, "served as a representative party for a class in an action filed under the federal securities laws." (Doc. No. 163-7, The Eshe Fund Certification ¶ 6.) This claim is not true, as The Eshe Fund served as a class representative in a securities litigation captioned *Pozniak v. Imperial Chemical*, Case No. 1:03-cv-02457-NRB, in the Southern District of New York. (*See Pozniak v. Imperial Chemical* docket (Burke Aff. Ex.4).) The court in that case did not approve a class settlement until September 19, 2006, a time well within the three-year period to which Steiner attested in his Certification. (*Id.*)

b.     *Jeffrey Wacksman*

Named plaintiff Jeffrey Wacksman suffers from many of the same shortcomings as Steiner. Although Wacksman did produce redacted monthly statements for his investments, the redacted material clearly relates to the litigation. For example, a heading that was not redacted shows that Wacksman held a significant amount of "asset-backed securities." (Wacksman Dep. 70:9–71:25.) His investments in such securities could relate to his knowledge of issues that lending institutions were having in 2007 and 2008 with regard to mortgage defaults. In fact, Wacksman invested in mortgage pools for ten years, was well aware of the housing bubble, and witnessed the mortgage bubble first-hand in Florida, where he owned property. (*Id.* 58:10–61:15.) As described later in this brief, possessing such knowledge is important to the predominance inquiry under Rule 23(b)(3). Beyond this, Wacksman lacked knowledge about the litigation, having read only parts of the Complaint, and having no understanding of what Alt-A mortgages are despite the fact that they are mentioned throughout Plaintiffs' allegations. (*Id.* 97:24–98:24.) As noted previously, it also appears that Wacksman may have deleted relevant electronic data that now cannot be produced in discovery. (*Id.* 24:2–25:25.)

Wacksman is also unique in the sense that he did not contact an attorney or seek to initiate litigation in the wake of the June 18, 2008 announcement. (*Id.* 15:13–19, 78:20–79:21.)

39

It was not until January 2009 — approximately seven months after the June 18, 2008 announcement and after the Preferred B stock suffered a market-driven "second drop" — that Wacksman decided to pursue litigation.  (*Id.* 15:13–16:24, 83:2–85:10.)   In the months immediately following the announcement, Wacksman held onto his Preferred B shares as the stock price rose back to pre-announcement price levels.  Oddly, after seeing the Preferred B shares rise in price in August, November, and December 2008, it was only when the stock price dipped again in January 2009 that Wacksman decided to pursue legal options.  (*Id.* 80:5–82:22.)

        c.     *Edwin Shelton*

Plaintiff Edwin Shelton is a self-described day trader, who engaged in day trading of exclusively bank stocks.  (Shelton Dep. 39:24–40:21.)  During the 2007–2008 time frame, Shelton executed day trades of Fifth Third stock based upon a "gut feeling" and hearing CNBC personalities talk about the bank.  (*Id.* 47:16–48:24.)  His day trades of Fifth Third stock reached as high as $100,000 or more per trade, and he continued day trading in Fifth Third stock after the closing of the First Charter Merger.  (*Id.* 49:24–51:9, 59:22–63:10.)

Shelton, while having extensive knowledge about the banking industry, showed little knowledge about events or key allegations of the litigation.  He does not understand the concept of a class action or of the case, as he opined that the class consisted of three members — Shelton himself and two unions.  (*Id.* 73:17–20.)  He described a class action as "the shareholders and the whatever preferred shares or whatever they have to rectify what the — the loss they had and to just get justice."  (*Id.* 72:18–73:5.)  He had no knowledge that multiple complaints had been filed (*id.* 71:6–10), and did not know what Alt-A loans are (*id.* 93:16–20).  He does not know what the Underwriter Defendants are alleged to have done wrong.  (*Id.* 93:3–15.)  Like the other two named Plaintiffs, Shelton's lack of awareness about class action lawsuits, and about the

particulars of this lawsuit, prevents him from serving as an adequate representative for absent members of the proposed class.

**E.** **Plaintiffs Cannot Satisfy Rule 23(b)(3), and Therefore Class Certification Must Be Denied**

If the Court finds that Plaintiffs have satisfied all four of the Rule 23(a) requirements, it still must find that Plaintiffs fail to satisfy Rule 23(b).  This part of the Rule lists three different types of class actions that a plaintiff may pursue, and sets forth standards for each of the three types.  Plaintiffs only assert that they satisfy subsection (3) of the Rule, and do not argue that the purported class may be certified under subsections (1) or (2).  (Pls.' Mot. for Class Cert. pp. 13–19.)  Because Plaintiffs' purported class fails to satisfy Rule 23(b)(3), class certification must be denied.

1.  *Individual Issues Predominate Over Common Questions*

The predominance requirement is a stringent one, and is in fact "far more demanding" than the commonality requirement found in Rule 23(a).  *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–24 (1997).  Plaintiffs attempt to gloss over the predominance requirement by misquoting the Supreme Court, which has stated that "[p]redominance is a test readily met in *certain* cases alleging consumer or securities fraud."  *Id.* at 625.  In Plaintiffs' brief, they replace the word "certain" with a set of ellipses, giving the appearance that the Court set forth a generalized statement regarding the purported ease with which a plaintiff can satisfy the predominance requirement in a securities lawsuit.  (Pls.' Mot. for Class Cert. p. 14 (*quoting Amchem*, 521 U.S. at 625).)  The true quotation indicates no such thing.

In fact, courts routinely acknowledge that the predominance requirement is not met in cases when individual questions of knowledge must be answered before damages may be awarded.  Such is the case here, because any of the purported class members may have had

knowledge of alleged omissions before purchasing the securities at issue, and therefore individual questions will predominate over common issues.  As this Court is aware, "Plaintiffs must show lack of knowledge to recover on their Section 11 claims."  *In re IPO Secs. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006); 15 U.S.C. § 77k(a).  The same is true of Section 12(a)(2).  15 U.S.C. § 77l(a)(2) (the plaintiff must not "know[ ] of such untruth or omission").[7]  Pursuant to this law, individual questions of the Plaintiffs' knowledge will predominate over any common issues that may exist.

As demonstrated in Defendants' Motion to Dismiss (Doc. No. 78, pp. 14–25, 37–38, 50–51) and Reply Memorandum in Support of their Motion to Dismiss (Doc. No. 96, pp. 8–11), Defendants disclosed much, if not all, of the information the CAC alleged was omitted from the offering materials.  For example, Plaintiffs claim that Fifth Third failed to disclose the allegedly deteriorating quality of Fifth Third's loan portfolio.  But the offering documents clearly disclosed financial ratios showing that nonperforming assets were growing in relation to the allowance for loan and lease losses, and that the percentage of nonperforming assets in Fifth Third's loan portfolio was likewise growing.

| | September 30, | | December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 | 2002 |
| *Credit Quality Ratios:* | | | | | | | |
| Allowance for loan and lease losses to nonperforming assets | 117.10% | 185.04% | 169.62% | 206.03% | 235.32% | 242.01% | 250.62% |
| Allowance for credit losses to loans and leases outstanding | 1.19% | 1.14% | 1.14% | 1.16% | 1.31% | 1.47% | 1.49% |
| Net charge-offs to average loans and leases outstanding | 0.51% | 0.41% | 0.44% | 0.45% | 0.45% | 0.63% | 0.43% |
| Nonperforming assets to loans, leases and other real estate owned | 0.92% | 0.56% | 0.61% | 0.52% | 0.51% | 0.61% | 0.59% |

---

[7] Plaintiffs are wrong in their contention that "[a] Section 11 case never demands individualized proof as to an investor's knowledge."  (Pls.' Mot. at 16.)  The plain language of Section 11 belies that contention, because the statute expressly precludes liability for a material misstatement if "at the time of such acquisition [the investor] knew of such untruth or omission."  15 U.S.C. § 77k(a).  The Third Circuit in *In re Constar International Inc. Securities Litigation*, 585 F.3d 774 (3d Cir. 2009) only addressed the knowledge of individual plaintiffs in the context of an argument about reliance, which is a different argument entirely than the one Defendants make here.  The *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) decision was not a class certification ruling, and therefore has no bearing on the issue of individualized Plaintiffs' knowledge.

Fifth Third, Pre-effective amendment to an S-4 filing (Form S-4/A), at 125 (Nov. 29, 2007) (Doc. No. 82-51).  Similar disclosures were made in a number of filings incorporated into the various offering documents.  *See, e.g.,* Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Oct. 19, 2007) (Doc. No. 82-42); Fifth Third, Quarterly Report (Form 10-Q), at 29 (Nov. 9, 2007) (Doc. No. 82-31); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Jan. 22, 2008) (Doc. No. 82-36); Fifth Third, Annual Report (Form 10-K), at 42 (Feb. 22, 2008) (Doc. No. 82-20); Fifth Third,  Quarterly Financial Supplement (Form 8-K), at 2 (Apr. 22, 2008) (Doc. Nos. 82-38, 82-39); Fifth Third, Quarterly Report (Form 10-Q), at 30 (May 9, 2008) (Doc. Nos. 82-32–82-35).

Likewise, the offering documents plainly disclosed current and historical capital ratios, negating Plaintiffs' contention that Fifth Third omitted information about the alleged deterioration in Tier 1 capital.

| | September 30, | | | | December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 | 2002 |
| *Capital Ratios:* | | | | | | | |
| Average shareholders' equity to average assets | 9.56% | 9.19% | 9.32% | 9.06% | 9.34% | 10.01% | 11.08% |
| Tier 1 risk-adjusted capital | 8.46% | 8.64% | 8.39% | 8.35% | 10.31% | 10.97% | 11.70% |
| Total risk-adjusted capital | 10.87% | 10.61% | 11.07% | 10.42% | 12.31% | 13.42% | 13.51% |
| Tier 1 leverage | 9.23% | 8.52% | 8.44% | 8.08% | 8.89% | 9.11% | 9.73% |

Fifth Third, Pre-effective amendment to an S-4 filing (Form S-4/A), at 125 (Nov. 29, 2007) (Doc. No. 82-51).  *See also, e.g.,* Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Oct. 19, 2007) (Doc. No. 82-42); Fifth Third, Quarterly Report (Form 10-Q), at 29 (Nov. 9, 2007) (Doc. No. 82-31); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Jan. 22, 2008) (Doc. No. 82-36); Fifth Third, Annual Report (Form 10-K), at 42 (Feb. 22, 2008) (Doc. No. 82-20); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Apr. 22, 2008) (Doc. Nos. 82-38, 82-39); Fifth Third, Quarterly Report (Form 10-Q), at 30 (May 9, 2008) (Doc. Nos. 82-32–82-35).

The offering documents further disclosed detailed information about nonperforming assets relating to First Charter and/or Fifth Third.

**Table Thirty-Nine**
**Allowance For Loan Losses**

| | Three Month Ended September 30 | | Nine Months Ended September 30 | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | | (In thousands) | | |
| Balance at beginning of period | $  44,790 | $   29,520 | $   34,966 | $   28,725 |
| **Charge-offs** | | | | |
| Commercial real estate | 288 | 151 | 427 | 486 |
| Commercial non real estate | 19 | 341 | 378 | 700 |
| Construction | 121 | — | 121 | — |
| Mortgage | 9 | 83 | 77 | 104 |
| Home equity | 44 | 202 | 238 | 903 |
| Consumer | 5,101 | 530 | 5,674 | 1,478 |
| Total charge-offs | 5,582 | 1,307 | 6,915 | 3,671 |
| Net charge-offs to average portfolio loans (annualized) | 0.57% | 0.13% | 0.22% | 0.12% |
| Allowance for loan losses to portfolio loans | 1.24 | 0.97 | 1.24 | 0.97 |

Fifth Third, Pre-effective amendment to an S-4 filing (Form S-4/A), at 115 (Nov. 29, 2007) (Doc. No. 82-51).  *See also, e.g.,* Fifth Third, Quarterly Financial Supplement (Form 8-K), at 7 (Oct. 19, 2007) (Doc. No. 82-42); Fifth Third, Quarterly Report (Form 10-Q), at 11, 29 (Nov. 9, 2007) (Doc. No. 82-31); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 9 (Jan. 22, 2008) (Doc. No. 82-36); Fifth Third, Annual Report (Form 10-K), at 63 (Feb. 22, 2008) (Doc. No. 82-20); Fifth Third, Quarterly Financial Supplement (Form 8-K), at 9 (Apr. 22, 2008) (Doc. Nos. 82-38, 82-39); Fifth Third, Quarterly Report (Form 10-Q), at 6–7, 30 (May 9, 2008) (Doc. Nos. 82-32–82-35).

Disclosures incorporated into the offering documents further described the state of the loan portfolio, apart from the financial figures cited above.  *E.g*., Fifth Third, Quarterly Report (Form 10-Q), at 11, 27–28 (Aug. 9, 2007) (Doc. Nos. 82-24, 82-25) (incorporated by reference into First Charter, Preferred B and Preferred C offering documents) ("The provision for loan and lease losses increased to $121 million in the second quarter of 2007 compared to $71 million in the same period last year. The $50 million increase is primarily  related to loan growth during the past year, increases in nonperforming assets and modest deterioration in economic condition.");

44

Fifth Third, Quarterly Financial Supplement (Form 8-K), at 2 (Jan. 22, 2008) (Doc. No. 82-36) (incorporated by reference into First Charter and Preferred C offering documents) ("[T]he credit environment remains challenging, and we expect credit conditions and the performance of our loan portfolio to continue to deteriorate in the near term."); Fifth Third, Quarterly Report (Form 10-Q), at 12 (May 9, 2008) (Doc. Nos. 82-32–82-35) (incorporated by reference into First Charter offering documents) ("The provision for loan and lease losses increased to $544 million in the first quarter of 2008 compared to $84 million in the same period last year.  The primary factors in the increase was the increase in delinquencies, the deterioration in residential real estate collateral values in certain of the Bancorp's key lending markets and declines in general economic conditions.").

These are just a few of the many examples showing that the alleged omissions were in fact available to investors such as Plaintiffs in this case, and that many of the plaintiffs in the purported class may have had actual knowledge, at the time of their purchase, of the topics that they are now claiming to have been omitted.  Moreover, many of the purported omissions concern industry conditions that were widespread and well known at the time, as the named Plaintiffs admitted in their depositions.  *E.g.*, Wacksman Dep. 60:5–61:15.

Defendants' disclosures of the alleged omissions mean that — at a minimum — each class member *could* have had knowledge of the "omissions" upon which the remaining claims are built.  Each member of the putative class would therefore have to be separately examined (along with any brokers or agents through whom they made their purchases) in order to determine if they read these offering materials or the materials incorporated therein, analyst reports discussing the materials, or gained knowledge through other sources of the facts disclosed by Defendants.  Whether any class member can assert a claim under the Securities Act

45

cannot be determined without such an individualized inquiry.  *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 224–26, 234 (2d Cir. 2008) (reversing class certification in case against tobacco companies asserting that they misled consumers into thinking that "light" cigarettes were more safe, because individual inquiries about why smokers bought "light" cigarettes and whether they were aware about their health risks would predominate).

The fact that each individual class member may have had claim-dispositive knowledge of the CAC's alleged omissions at the time of purchase of the securities renders the class uncertifiable.  In *In re IPO Securities Litigation*, the Second Circuit dealt with the issue of putative class members potentially knowing of the omitted information forming the basis of their securities claims.  The plaintiffs alleged that the defendant underwriters used fraudulent devices to induce investment in certain securities.  *Id.* at 27.  The Second Circuit reversed the district court's certification of the class, observing that "widespread knowledge" among investors of the alleged scheme "would precipitate individual inquiries as to the knowledge of each member of the class."  *Id.* at 44.  The court accordingly held that common questions did not predominate. *Id.* at 43–44.

The *IPO* rationale applies here with even greater force.  Fifth Third made much of the allegedly omitted information available not only in the SEC filings incorporated into the offering documents, but even included such information in the offering documents themselves.  Any investor who reviewed these SEC filings would have to be excluded from the class. Accordingly, as in *IPO*, there is substantial likelihood that a significant portion of the class members had knowledge of the alleged omissions before they purchased the securities at issue. *See also Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) (affirming denial of class

certification in a Section 14 case alleging that offering documents omitted material information that had been the subject of extensive media coverage).

Even the miniscule sample of named Plaintiffs proffered in this case shows that individual issues in fact exist with respect to knowledge of information Plaintiffs claim was omitted.  For example, Plaintiff Edwin Shelton had substantial knowledge of the banking industry in which he invested.  He served on an advisory board at First Citizens Bank for eight to ten years, and for a time operated as a highly speculative "day trader."  (Shelton Dep. 36:17–22, 34:15–35:20.)   He day traded primarily in banks, sometimes buying or selling as much as $100,000 in Fifth Third stock per trade.   (*Id.* 40:7–13, 50:2–18, 63:16–23.)  He read about bad loans being a problem in the industry during the class period. (*Id.* 43:3–44:16.)  Perhaps most importantly, Shelton admitted that he read everything he got from First Charter, and that he read the entire prospectus for the Fifth Third acquisition.  (*Id.* 14:16–24, 75:5–16, 78:4–8, 82:10–12.) He further specified that he read the section in the prospectus, excerpted above, summarizing the rise in nonperforming assets that First Charter was experiencing, assets that would soon be a part of Fifth Third's portfolio. (*Id.* 89:23–90:4.)

Additionally, Shelton testified that he had a clear understanding that the $31 share price associated with the merger would be based on a conversion ratio calculated according to Fifth Third's trading price during a certain number of days prior to completion of the merger.  (*Id.* 83:5–84:9.)  He read and understood the disclaimer in the offering documents warning that the number of Fifth Third common stock shares he would receive due to the merger would vary depending on fluctuations in the stock's price, and that the price may rise and fall due to a number of different factors, many of which were beyond Fifth Third's control.  (*Id.*)

47

Because Shelton obtained knowledge of the alleged omissions through reading offering documents describing the state of Fifth Third's loan portfolio (the crux of Plaintiffs' claimed misstatements), he is not entitled to recover any damages from Fifth Third.  *E.g., IPO*, 471 F.3d at 43.  And because he understood how the conversion ratio interacted with the $31 per share acquisition price, he had detailed knowledge of the consideration paid for First Charter shares in the merger.  Shelton's testimony demonstrates that the issue of each Plaintiff's knowledge about Fifth Third's alleged omissions will predominate over the common issues, if any exist.  Because of this, class certification must be denied.

2.      *Plaintiffs Have Not Established Superiority*

Proceeding in this action with one monolithic class, purporting to represent acquirers of three separate securities offerings, is not a superior method of adjudication.  Going forward as such would be unmanageable for the Court because the Court would be forced to examine the truth or falsity of statements made in different offering documents that spanned a period of six months.  The only manageable way to determine the truth or falsity of the offering documents is by examining each one individually, judged from the time that the documents were respectively issued, as the law requires.

Furthermore, the Court cannot determine relief for purchasers of Preferred C securities when no named Plaintiff has standing to pursue such claims.  Attempting to proceed with one large class is a classic example of trying to fit a square peg into a round hole, necessitated by the fact that Plaintiffs' counsel did not do proper due diligence prior to filing the Complaint.  Their attempt to certify one class for all purchasers — in direct contravention to what Plaintiffs plead in their Complaint — is nothing more than a desperate attempt to hold onto Preferred C purchasers as part of the class despite the failure to have a single class representative who had purchased such shares.

Similarly, the Court cannot determine relief for purchasers of the Preferred B shares when the only named Plaintiffs who purchased such shares will not be able to show that they sustained a loss.  Both named Plaintiffs who acquired Preferred B shares held onto the shares until long after the share price had recovered.  Accordingly, they cannot be a part of any certified class.

Finally, proceeding as a class action is unmanageable due to the fact that individual inquiries must be made into each plaintiff's knowledge, at the time of purchase, of the information Plaintiffs now claim was omitted.

## V.    <u>CONCLUSION</u>

For all the reasons discussed above, Defendants respectfully request that the Court deny Plaintiffs' Motion for Class Certification.

Respectfully submitted,

 s/ James E. Burke
James E. Burke (0032731)
Joseph M. Callow, Jr. (0061814)
Jennifer J. Morales (0076835)
Danielle M. D'Addesa (0076513)
Anthony M. Verticchio (0084645)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Telephone: (513) 579-6400
E-mail: jburke@kmklaw.com
        jcallow@kmklaw.com
        jmorales@kmklaw.com
        ddaddesa@kmklaw.com
        tverticchio@kmklaw.com

*Attorneys for Fifth Third Bancorp, Fifth Third Securities, Fifth Third Capital Trust VI, Fifth Third Capital Trust VII, Kevin T. Kabat, Christopher G. Marshall, and Daniel T. Poston*

 s/ Glenn Virgil Whitaker
Glenn Virgil Whitaker (0018169)
Mary C. Henkel (0039563)
Dorothea K. Langsam (0082973)
VORYS, SATER, SEYMOUR AND PEASE LLP
221 East Fourth Street, Suite 2000
Atrium Two
Cincinnati, Ohio 45202
Telephone: (513) 723-4000
E-mail: gvwhitaker@vorys.com
        mchenkel@vorys.com
        dklangsam@vorys.com

*Attorneys for Darryl F. Allen, John F. Barrett,
Ulysses L. Bridgeman, Jr., James P. Hackett,
Gary R. Heminger, Joan R. Herschede, Allen
M. Hill, Robert L. Kock, II, Mitchel D.
Livingston, Ph.D., Hendrik G. Meijer, James
E. Rogers, George A. Schaeffer, Jr., John J.
Schiff, Jr., and Dudley S. Taft.*

 s/ Robert A. Pitcairn, Jr.
Robert A. Pitcairn, Jr. (0010293)
KATZ, TELLER, BRANT & HILD
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202
Telephone: (513) 977-3477
E-mail: rpitcairn@katzteller.com

*Attorney for Defendants UBS Securities LLC,
Citigroup Global Markets Inc., Merrill Lynch,
Pierce, Fenner & Smith Incorporated, Morgan
Stanley & Co. Incorporated (n/k/a Morgan
Stanley & Co. LLC), Wachovia Capital
Markets, LLC, Banc of America Securities
LLC (n/k/a Merrill Lynch, Pierce, Fenner &
Smith Incorporated as successor by merger to
Banc of America Securities LLC), Credit
Suisse Securities (USA) LLC and Barclays
Capital Inc.*

OF COUNSEL:

Herbert S. Washer
Adam S. Hakki
Daniel Lewis
SHEARMAN & STERLING LLP
559 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
E-mail: herbert.washer@shearman.com
       ahakki@shearman.com
       daniel.lewis@shearman.com

Laura A. Hinegardner
KATZ, TELLER, BRANT & HILD
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202
Telephone: (513) 977-3484
E-mail: lhinegardner@katzteller.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon all counsel of record via the Court's ECF system this 16th day of April, 2012.

s/ James E. Burke
James E. Burke.

4323056.7

51